UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NENA NWACHUKU, )<br><br>Plaintiff, )<br><br>v. )<br><br>STEPHEN L. JOHNSON, Administrator,<br>U.S. Environmental Protection Agency, )<br><br>Defendant. ) | Civil Case No. 06-0946 (RJL) |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff brings this action against Stephen L. Johnson, Administrator, United States Environmental Protection Agency ("EPA" or "Agency") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f) and 16(c) ("Title VII"), based upon Defendant's alleged race, color, and national origin discrimination and retaliation against Plaintiff. Defendant hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 56, because there is no genuine issue of material fact which would prevent a judgment as a matter of law in Defendant's favor.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Undisputed Facts, and attached exhibits. Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. *See* L. Civ. R. 7(m).

Dated:  May 9, 2008
        Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

        /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

        /s/
_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NENA NWACHUKU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 06-0946 (RJL) |
| | ) | |
| STEPHEN L. JOHNSON, Administrator, | ) | |
| U.S. Environmental Protection Agency, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Stephen L. Johnson ("Defendant"), Administrator, United States
Environmental Protection Agency ("Agency" or "EPA"), by and through his undersigned
counsel, respectfully submits this memorandum of points and authorities in support of his motion
for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(b).

**PRELIMINARY STATEMENT**

Plaintiff, Dr. Nena Nwachuku ("Plaintiff"), has alleged that while she was an EPA
employee, certain supervisors discriminated against her based on her race (African-American),
color (black) and national origin (Nigeria, Africa), and in retaliation for prior protected Equal
Employment Opportunity activity.  Amd. Compl at ¶ 1.  Specifically, Plaintiff asserts that she
was discriminated and retaliated against when she was (1) denied an accretion of duties
promotion; (2) subjected to harassment; and (3) terminated from the Agency.  Amd. Compl. at ¶
8-11; Nwachuku Tr. at 19, Attached Ex. 1.  Plaintiff's claims, however, lack support in the
material facts adduced in discovery in this action.  That is, despite her extensive discovery

efforts, Plaintiff cannot show any genuine issue of material fact that could prevent judgment as a matter of law in Defendant's favor in this action.

*First*, Plaintiff's claims premised upon a failure to promote are unsupportable. Plaintiff has failed to show that any similarly situated employee was promoted in the accretion of duties promotional process upon which Plaintiff's non-selection claims are based. Additionally, Plaintiff has failed to adduce any evidence that would tend to show that Defendant's legitimate rationale for not promoting Plaintiff -- defects in her interpersonal skills -- was somehow pretextual. Further, to the extent Plaintiff asserts a retaliation based non-selection claim, such a claim is meritless as Plaintiff cannot point to any protected EEO activity taken by her that could give rise to an inference of retaliatory intent. Accordingly, the Court should enter judgment in Defendant's favor on Plaintiff's non-selection claims.

*Second*, Plaintiff's termination based claims are also insufficient. Indeed, the overwhelming evidence in this action shows that Plaintiff was terminated due to her own misconduct, and not because of any discriminatory or retaliatory motives. That is, the material facts show that Plaintiff was terminated because she was AWOL, failed to follow instructions from her supervisor, made a false statement, made a false travel claim, made unfounded accusations of physical violence against her supervisor, and/or conducted herself in a highly disrespectful manner vis-à-vis her supervisors. Plaintiff has failed to show that these reasons for her termination were pretextual, and thus, her termination claims should fail.[1]

---

[1]     Furthermore, as to Plaintiff's retaliation based termination claim, Plaintiff's EEO activity prior to her termination alleged discrimination against individuals other than the person who decided to remove her, Mr. Ephraim King. Moreover, Plaintiff has failed to adduce any other evidence upon which an inference of retaliation could be based. Thus, Plaintiff's retaliation-based termination claim is untenable for this additional reason.

*Lastly*, Plaintiff's hostile work environment claim, to the extent she asserts one,[2] is insufficient as a matter of law, particularly in light of the facts adduced during discovery. That is, the undisputed facts in this action fail to show a pervasive pattern of discriminatory intimidation, ridicule, and insult upon which a hostile work environment claim may be based. Indeed, Plaintiff's harassment claim is based upon little more than a series of unsupported deficiencies and annoyances in Plaintiff's alleged work environment. Accordingly, Plaintiff's hostile work environment claim fails as a matter of law.

## STATEMENT OF FACTS

## I.    BACKGROUND

### A.    Plaintiff and Her Position at EPA.

Plaintiff, Dr. Nena Nwachuku ("Plaintiff"), is an African-American female born in Nigeria, Africa. *See* Deposition Transcript of Dr. Nwachuku ("Nwachuku Dep. Tr.") at 4, attached hereto at Exhibit 1 ("Attached Ex. 1"). Plaintiff purports to have a Ph. D. in microbiology from the George Washington University and post doctoral training. *See* Nwachuku Dep. Tr. at 13-14, Attached Ex. 1; Complainant's Opposition to Agency Motion for Summary Judgment and Declaration ("Nwachuku EEO Decl.") at 1, Attached Ex. 2. From January 1998 until December 2006, the Agency employed Plaintiff in Washington, D.C. as a GS-1301-13, Environmental Scientist in what became known as the Human Health Risk Assessment Branch ("HHRA") in the Health and Ecological Criteria Division ("HECD") in the Office of Science and Technology ("OST"), which itself is in the Office of Water ("OW"). *See* Amd. Compl. at ¶ 4; Nwachuku Dep. Tr. at 58, Attached Ex. 1.

---

[2]    It is unclear from the Complaint whether Plaintiff intends to assert a hostile work environment claim. Although Plaintiff uses the terms "harassment" and "hostile work environment" in the body of the Complaint (*see* Compl. at ¶ 10), she fails to include a specific claim of hostile work environment when listing her causes of action. *See* Compl. at ¶¶ 12-17. Even if Plaintiff does allege such a claim, it is without merit for the reasons stated herein.

Plaintiff's duties at the EPA revolved around "doing sound science for the protection of the human environment and [ ] particular[] water[.]"  *See* Transcript of Dr. Nwachuku's Testimony before the Equal Opportunity Employment Commission ("EEOC") ("Nwachuku EEO Tr.") at 13, Attached Ex. 3.  Plaintiff's responsibilities included working on the Contaminant Candidate List ("CCL"), which is a project aimed at identifying contaminants in drinking water. *See* Nwachuku EEO Tr. at 17-19, Attached Ex. 3.  In or about 2006, Plaintiff was the co-chair of a microbiological team or workgroup that worked on matters associated with the CCL list.  *See id.*

**B.    Plaintiff's Supervisors.**

From January 26, 1998, until February 3, 2003, Dr. Rita Schoeny was Plaintiff's first-line supervisor as the Chief of HHRA.  *See* Nwachuku EEO Decl. at 2, Attached Ex. 2.  Next, from February 2003 to May 2003, Tony Maciorowski was Plaintiff's first-line supervisor on a temporary appointment.  *See* Nwachuku Dep. Tr. at 59-60, Attached Ex. 1.  Beginning in June 2003, Dr. Elizabeth Doyle became the Chief of HHRA and Plaintiff's first-line supervisor -- first on a temporary detail and then on a permanent basis -- until Plaintiff was terminated.  *See* Nwachuku EEO Decl. at 44, Attached Ex. 2.

Plaintiff's second-line supervisor -- *i.e.*, the Director of HECD -- during the relevant period was as follows: (i) from January 1998 to March 2002, Jeannette Wiltsie in a permanent role; (ii) from March 2002 to November 2002, Dr. Ed Ohanian in an acting role; (iii) from November 2002 to May 2003, Christopher Zarba in an acting role; and (iv) from May 2003 to December 2006, Dr. Ohanian in a permanent role.  *See* Nwachuku Dep. Tr. at 60-62, Attached Ex. 1; Zarba Dep. Tr. at 6, Attached Ex. 4; Ohanian Dep. Tr. at 5, Attached Ex. 5.

Plaintiff's third-line supervisor -- *i.e.*, the Director of OST -- during the relevant period was as follows: (i) from January 1998 to May 2005, Geoffrey Grubbs; and (ii) from May 2005 to December 2006, Ephraim King.  *See* Nwachuku EEO Decl. at 33-40, Attached Ex. 2; King Dep. Tr. at 5, 48, Attached Ex. 6.

## II.     PLAINTIFF ALLEGES THAT FROM THE INSTANT SHE ARRIVED SHE WAS SUBJECTED TO HARASSMENT.

Plaintiff has alleged that from the instant she arrived in her position with the Agency she was subjected to a campaign of harassment and a hostile work environment.  Specifically, Plaintiff has alleged an ever expanding set of annoyances and deficiencies in her work environment imposed by a number of her supervisors and coworkers that she believes were fueled by discriminatory (race, color, national origin) and retaliatory motives.  However, as noted below, even if the Court accepts Plaintiff's unsupported, self-serving assertions that these annoyances and deficiencies actually occurred, such acts do not give rise to a hostile work environment claim under Title VII.  Indeed, Plaintiff herself was only able to recall three instances in her nearly nine years of employment with the Agency in which an Agency employee used language that she believed was demeaning to African-American individuals or people from Africa.

### A.     Plaintiff's Hostile Work Environment Claims are Based Upon Workplace Annoyances and Deficiencies, Not a Pervasive Pattern of Discriminatory Remark, Insults or other Actions.

Plaintiff came to work at the Agency beginning on January 26, 1998, as a GS-13 environmental scientist.  *See* Nwachuku EEO Tr. at 10, Attached Ex. 3.  Plaintiff has alleged that from the "very beginning of [her] employment," she was subjected to harassment and a hostile work environment.   Nwachuku EEO Decl. at 2, Attached Ex. 2.   Based upon Plaintiff's

Amended Complaint and its reference to her EEO Complaint from Agency No. 2004-0050-HQ

("2004 EEO Compl."), Plaintiff alleges that the harassment she suffered included:

1. Drs. Dolye and Ohanian allegedly suppressing Plaintiff's promotional opportunities;

2. Drs. Doyle and Ohanian allegedly creating "hostile adverse working conditions;"

3. Drs. Doyle and Ohanian allegedly profiling Plaintiff as an angry person; and

4. Drs. Doyle and Ohanian allegedly giving Plaintiff successful, but improper performance evaluations.[3]

*See* 2004 EEO Compl. at 1, Attached Ex. 8; Amd. Compl. at ¶ 10.   Additionally, through

discovery in this action, Plaintiff revealed that certain other actions were part of an alleged

"campaign of harassment," including the following allegations:

A. Dr. Doyle providing Plaintiff projects without appropriate funding, including funding for travel;

B. Dr. Doyle denying Plaintiff the ability to go to leadership training;

C. Dr. Doyle incorrectly reporting Plaintiff's level of compliance with invoicing guidelines;

D. Dr. Doyle going to chemical workgroup meetings, but not to Plaintiff's microbiology workgroup meetings;

E. Dr. Doyle generally not showing interest in Plaintiff's work;

F. Jafrul Hasan, a colleague of Plaintiff's, not inviting Plaintiff to a particular workshop;

G. Dr. Doyle referring to Plaintiff as a member, as opposed to a leader, of a CCL workgroup;

H. Dr. Doyle being rude to Plaintiff, by cutting her off in conversations;

I. Dr. Doyle asking Plaintiff to cease singing in her cubicle; and

---

[3] During the relevant period of time the Agency employed a binary, "successful" / "unsuccessful", performance evaluation system.  *See* Nwachuku 2004 & 2005 Perform. Evals. at 1, Attached Ex 7.  Plaintiff was rated successful in all of her performance evaluations before she was terminated from the Agency.  *See* Nwachuku EEO Decl. at 30, Attached Ex. 2.

J.      Other action of Dr. Doyle on a daily basis.

Nwachuku Dep. Tr. at 32-47, Attached Ex. 1.  Further, at one time or another Plaintiff has also

asserted that the following allegations were part of the campaign of harassment purportedly

carried out against her during her time with the EPA:

i.      Lisa Almodovar and Robin Oshiro, colleagues of Plaintiff's, and other unnamed individuals referring to Plaintiff as a "junior" employee (*see* Nwachuku EEO Decl. at 5, Attached Ex. 2);

ii.     On January 27, 1998, Lisa Almodovar "tore into [Plaintiff]" regarding Plaintiff's review of a Contaminant Candidate List ("CCL") report (*see id.* at 9-10);

iii.    Denis Borum, an Agency employee, sending Plaintiff an allegedly rude email on March 18, 2004, concerning conference room reservations, Dr. Doyle's instruction to Plaintiff on how to reserve conference rooms, and Dr. Ohanian's response to Plaintiff's complaints regarding Dr. Doyle's response to this situation (*see* Adden. to 2004 EEO Compl. at 3, Attached Ex. 9);

iv.     Senior environmental employees ("SEEs")[4] allegedly calling Plaintiff "crap and crazy" and insulting Plaintiff in the performance of her duties, and Dr. Ohanian's responses to Plaintiff's complaints concerning such conduct (*see id.*); and

v.      Dr. Schoeny allegedly refusing to "deal with the issues that were at hand and at the time they occurred," and "promoting and participating in the discriminatory environment" (*see* Nwachuku EEO Decl. at 22, Attached Ex. 2).

Although Plaintiff asserted at her deposition that she believes that this series of

annoyances and deficiencies in her work environment was motivated by a discriminatory and

retaliatory animus (*see* Nwachuku Dep. Tr. at 49, Attached Ex. 1), this belief is not supported by

any other evidence.  Indeed, Plaintiff previously attributed deficiencies in her work environment

to other factors, including, "***I knew from the very beginning of my employment in HECD, that I

was in a dysfunctional group with no defined structure or boundaries and that I will be

dealing with power struggles, cut throat competitions, and unusual personalities.***"  Nwachuku

EEO Decl. at 10, Attached Ex. 2 (emphasis and italics in original).  Further, as noted below, this

series of alleged annoyances or deficiencies in Plaintiff's work environment, even if true, which Defendant does not concede,[5] cannot serve as a basis for a hostile work environment claim under Title VII.

> **B.    Plaintiff Cannot Show Any Pervasive Pattern of Offensive Conduct that Could Serve as a Basis for a Hostile Work Environment Claim.**

Through her own deposition testimony, Plaintiff herself concedes that she was not subjected to a pervasive pattern of offensive conduct based upon her race or national origin. That is, Plaintiff admitted that she does not recall Chris Zarba, Edward Ohanian, Geoffrey Grubbs, Ephraim King, Anthony Maciorowski or Rita Schoeny using any pejoratives or language demeaning to black people or people from Africa as a group.  Nwachuku Dep. Tr. at 200-02, Attached Ex. 1.  Plaintiff further admitted that while Plaintiff was an EPA employee she never heard any of other employee in her branch, HHRA, use any racial pejoratives or say anything insulting to a racial group or perpetuating a stereotype of a certain race.  *Id.* at 93-94. Indeed, when Plaintiff was asked "Did any one of the individuals in your branch ever denigrate you because of your race?" Plaintiff responded, "No. . . .  Not that I can recall."  *Id.* at 94.

As to Dr. Doyle, Plaintiff testified that she believed that Dr. Doyle may have used racial pejoratives on three occasions during Plaintiff's almost nine year tenure with EPA.  *First*, Plaintiff claimed that Dr. Doyle once said "something about Africans, that I just blanked out. . . . I don't recall specifically what she said, but it was very demeaning."  *Id.* at 182.  Upon further

---

[4]    SEEs are retired individuals that are contracted by the Agency to perform certain administrative tasks.  *See* Nwachuku EEO Tr. at 309-10, Attached Ex. 3; Ohanian Dep. Tr. at 42, Attached Ex. 5.

[5]    Further, although not germane for purposes of this motion, the workplace annoyances and deficiencies, which Plaintiff alleges formed a "campaign of harassment," are easily explained by legitimate, non-discriminatory bases.  For example, as Dr. Doyle explained, because her background is in toxicology, she was more likely to attend chemical, as opposed to Plaintiff's biological, team meetings because she could make substantive contributions to the chemical team's efforts.  *See* Doyle EEO Tr. 703, Attached Ex. 10.  Further, the chemical workgroup, unlike the biological one, was fully contained within the division in which Dr. Doyle worked, and the leader of that workgroup was having problems controlling its participants.  *See id.* at 702-04.

examination Plaintiff could not recall any details regarding Dr. Doyle's use of this language, and conceded that no one else heard Dr. Doyle.  *Id.* at 182-85.  *Second*, Plaintiff asserted that Dr. Doyle was insensitive when Plaintiff described the customs that would be honored in burying Plaintiff's mother and in not sending an email to let other HHRA employees know why Plaintiff was absent from work.  *Id.* at 191-95.  Plaintiff, however, could not articulate any specific language used by Dr. Doyle in this incident.  *See id.*  *Lastly*, Plaintiff alleged that on one occasion when Plaintiff asked Dr. Doyle "why she was always nasty and rude to me, and she said, 'well, I used to live in Prince George's County.'"  *Id.* at 195-96.  Plaintiff, however, conceded that Dr. Doyle did not elaborate on this comment and could not recall Dr. Doyle saying anything else in which Dr. Doyle specified that such comment was intended to be demeaning toward African-Americans, people from Africa, or black people.  *Id.* at 196-97.

Dr. Doyle has specifically denied using any "crude language or pejoratives associated with Dr. Nwachuku's race, color, or national origin when communicating with her either face-to-face or via email."  Doyle EEO Decl. at 2, Attached Ex. 11.  Further, Dr. Doyle explained that her remark that "I used to live in Prince George's County" had no racial overtones, and was not meant to be denigrating at all.  Indeed, Dr. Doyle explained that her remark was in response to Plaintiff's question about Dr. Doyle's use of the phrase, "don't let it slide," when reinforcing to Plaintiff the importance of a particular assignment.  *See* Doyle EEO Tr. at 744, Attached Ex. 10.  Dr. Doyle explained that she said "I used to live in Prince George's County" in an attempt to explain that her use of the phrase "don't let it slide" was not intended to be rude, but rather was an idiom that she learned while attending high school in Prince George's County.  *See id.*; Doyle Dep. Tr. at 31, Attached Ex. 12 (Dr. Doyle explaining that she attended high school in Prince George's County).

### III.   PLAINTIFF AND ALL OTHER GS-13s IN HECD WERE PASSED OVER FOR PROMOTION IN THE 2003 ACCRETION OF DUTIES PROMOTIONAL PROCESS.

Plaintiff also claims that she was discriminated and retaliated against when she was passed over for an accretion of duties promotion in 2003.  As noted below, this claim is simply untenable in light of the undisputed facts in this action.

### A.   The Accretion of Duties Promotional Process Was Announced and Plaintiff Described Why She Believed She Deserved an Accretion of Duties Promotion.

On October 16, 2002, Mr. Grubbs (Plaintiff's then third-line supervisor and Director of OST) sent an email to all OST personnel announcing that OST "was at a point where there [was] room" in OST's GS-14/15 administratively imposed ceiling to allow for two or three promotions to the GS-14 level.  *See* Email from Grubbs to OST of 10/16/2002, Attached Ex. 13.[6]  Mr. Grubbs continued and said that he would be meeting with OST's managers "to determine how these additional slots can most fairly be allocated and how best to conduct the selection process." *Id.*

Thereafter, on January 24, 2003, Mr. Grubbs again wrote an email to all OST personnel explaining the process OST would use to fill the two or three available GS-14 positions.  *See* Email from Grubbs to OST of 01/24/2003, Attached Ex. 16.  Specifically, Mr. Grubbs wrote that each division director, in conjunction with the OST immediate office, would review, among other things, "each GS-13 employee eligible for promotion to GS-14 via accretion of duties." *Id.*

---

[6]   As Mr. Grubbs explained before the EEO, in total OST believed it had nine spaces in its GS-14/15 ceiling with which to work with during the 2003 GS-14/15 promotional process.  *See* Grubbs EEO Tr. at 452-55, Attached Ex. 14.  However, Mr. Grubbs and the OST directors determined that seven of those spaces should be allocated for supervisory positions within OST to be selected in a competitive fashion.  *Id.*  Indeed, HECD, Plaintiff's division, was allocated three of these competitive positions: (1) a permanent Director for HECD; (2) a deputy director for HECD; and (3) a branch chief position for a newly created branch within HECD.  *Id.*  Accordingly, OST had two spaces in its GS-14/15 ceiling that it used in evaluating candidates for accretion of duties promotions in the 2003 process.  *Id.*; *see also* Zarba EEO Decl. at ¶ 5-7, Attached Ex. 15.

Mr. Grubbs went on to state that "I am directing all OST supervisors to review every eligible GS-13 and GS-14 employee under their supervision for their potential for promotion through accretion." *Id.* Further, Mr. Grubbs attached "Guidelines for Performance Evaluation Discussion," which he said would be used by each OST director "as a guide in making priority decisions for promotions through accretion." *Id.* Notably, such guidelines specifically included "interaction with peers, staff and managers -- effective and diplomatic," as a criterion. *See id.* Mr. Grubbs concluded his January 24, 2003, email by saying that after supervisors have reviewed all eligible GS-13 and GS-14 employees, "I will then meet with the Deputy Office Director and [the] three Division Directors to discuss potential promotions to the GS-14 and GS-15 levels." *Id.*

Following up on Mr. Grubbs's January 24, 2003, email, Mr. Zarba, the Acting Director of HECD at the time, emailed all HECD personnel, including Plaintiff, on February 6, 2003. *See* Email Zarba to HECD of 02/06/2003, Attached Ex. 17. In that email, Mr. Zarba, among other things, informed all HECD personnel that in response to Mr. Grubbs' email, a list of all eligible HECD candidates had been assembled, and that all eligible HECD employees would soon be receiving an email to confirm their eligibility. *Id.* Thereafter, Plaintiff was notified by email that she was "identified as eligible for GS-13 to GS-14." Email Moss to Plaintiff of 02/06/2003, Attached Ex. 18.

**B.      After Compiling the List of Eligible Candidates, the Supervisors in OST Met, Discussed the Possible Candidates, and Chose Two GS-13s to Promote to GS-14.**

In late-March 2003, the division directors, Mr. Grubbs and the Deputy Director of OST met to discuss the candidates and positions for promotion to GS-14/15. *See* Zarba EEO Decl. at ¶ 3, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 8, Attached Ex. 20. Specifically, present at the meeting were (i) Mr. Zarba as Acting Director of HECD; (ii)

Mary Smith as Director of Engineering and Analysis Division ("EAD"); (iii) Debra Nicoll as

Ms. Smith's deputy in EAD;[7] (iv) Peter Grevatt as Acting Director of the Standards and Health

Protection Division ("SHPD"); (v) Pamela Barr as Deputy Director of OST;[8] and (vi) Mr.

Grubbs as Director of OST.  *See* Grubbs EEO Tr. at 452-57, Attached Ex. 14; Smith EEO Decl.

at ¶ 8, Attached Ex. 20.  As noted above (*supra* at n. 6), after discussing OST's competitive

promotional needs, the panel discussed OST employees who were eligible for a potential

accretion of duties promotion to GS-14.  *See* Grubb EEO Tr. at 454-57, Attached Ex. 14; Smith

EEO Decl. at ¶¶ 8-9, Attached Ex. 20; Grubbs EEO Decl. at 2, Attached Ex. 19; Zarba EEO

Decl. at ¶¶ 5-6, Attached Ex. 15.

Prior to the March 2003 meeting, Mr. Zarba reviewed the write-ups that promotional

candidates had submitted, discussed possible promotion candidates with the branch supervisors

at the time -- including Anthony Maciorowski, who was Plaintiff's first line supervisor at the

time (*see* Zarba Dep. Tr. at 29, Attached Ex. 4; Maciorowski EEO Decl. at ¶ 4, Attached Ex. 22)

-- spoke with customers of HECD, and generally recalled his experiences with eligible HECD

personnel.[9]  Zarba EEO Tr. at 594, 597, 602, Attached Ex. 23.  Based upon Mr. Zarba's review,

he believed that no GS-13s or 14s within HECD, including Plaintiff, met Mr. Grubbs's stated

criteria for accretion of duties promotions.  *See* Zarba Dep. Tr. at 26, 28, Attached Ex. 4; Zarba

EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15.  Accordingly, at

---

[7]     Ms. Nicoll was invited to the March 2003 promotion meeting by Mr. Grubbs because Ms. Smith was "brand new" to her position within OST.  Grubbs EEO Tr. at 452, Attached Ex. 14.

[8]     Ms. Barr was invited to the March 2003 promotion meeting in part to discuss promotional candidates from the immediate or front office of OST, including the Resources Management and Information Staff.  *See* Grubbs EEO Tr. at 456-57, Attached Ex. 14; Barr EEO Decl. at ¶ 2, Attached Ex. 21.

[9]     Mr. Zarba also believes that he discussed potential candidates with Dr. Schoeny in advance of the March 2003 meeting.  *See* Zarba EEO Tr. at 602, Attached Ex. 23.  Dr. Schoeny, however, does not recall such a discussion, but stated that she would believe Mr. Zarba if that is what he recalled.  *See* Schoeny Dep. Tr. at 49-50, Attached Ex. 25; Schoeny EEO Decl. at ¶ 12, Attached Ex. 26; Schoeny EEO Tr. at 574, Attached Ex. 27.

the late-March 2003 meeting, Mr. Zarba did not recommend anyone from HECD for an accretion of duties promotion. *See* Zarba Dep. Tr. at 30, Attached Ex. 4; Zarba EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Smith EEO Decl. at ¶ 10, Attached Ex. 20; Grubbs EEO Tr. at 455, Attached Ex. 14.

Indeed, in Mr. Zarba's mind, after his review, Plaintiff was at the bottom of his mental list of potential HECD promotion candidates given Plaintiff's deficiencies in her interpersonal skills. *See* Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Zarba ROI Decl. at ¶ 6, Attached Ex. 24; Zarba EEO Tr. at 627-28, Attached Ex. 23; Zarba Dep. Tr. at 44, Attached Ex. 4.

At the March 2003 promotion meeting, each division director and Ms. Barr had an opportunity to put forth eligible employees who they believed might be qualified candidates for an accretion of duties promotion. *See* Grubbs EEO Tr. at 454, Attached Ex. 14; Smith EEO Decl. at ¶ 10, Attached Ex. 20. After discussion amongst the participants, the panel concluded that two individuals were most deserving and qualified for accretion of duties promotions from GS-13 to GS-14: Ms. Vera Williams-Bower and Mr. Carey Johnston, who Mr. Grubbs selected for promotion. *See* Zarba EEO Decl. at ¶¶ 7-8, Attached Ex. 15; Grubbs EEO Tr. at 457, Attached Ex. 14; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 10, Attached Ex. 20; Barr EEO Decl. at ¶ 4, Attached Ex. 21.

### C.    The Promotional Process Was Fair And Does Not Give Rise to Any Inference of Discrimination or Retaliation.

Nothing about the promotional process described above, including the selected candidates and the non-selectees similarly situated to Plaintiff, gives rise to an inference of discrimination.

*First*, the process employed by Mr. Grubbs in selecting Ms. Williams-Bower and Mr. Carrey Johnston, was a well established process that had largely been used by Mr. Grubbs in all

GS-14/15 advancement processes he chaired as OST Director.  *See* Grubbs EEO Decl. at 2, 4-7, Attached Ex. 19; Grubbs EEO Tr. at 443-50, Attached Ex. 14.   Further, Plaintiff has adduced no evidence that Mr. Grubbs or the panel made its selections of Ms. Williams-Bower and Mr. Johnston -- from the approximately 55 eligible employees (*see* Grubbs EEO Tr. at 458, Attached Ex. 14) -- based upon any protected status, such as race, national origin, color, or prior EEO activity.  Indeed, the undisputable evidence in this action contradicts any such claim.  *See* Zarba EEO Decl. at ¶ 10, Attached Ex. 15; Grubbs EEO Decl. at 6, Attached Ex. 19; Smith EEO Decl. at ¶ 13, Attached Ex. 20; Grubbs ROI Decl. at ¶ 17, Attached Ex. 28.

*Second*, the selectees themselves do not support any inference of discrimination.  Ms. Williams-Bower is a black, African-American, female who was, prior to her promotion, an Information Technology Specialist in OST.  *See* Williams-Bower EEO Decl. at ¶ 1, Attached Ex. 29; Grubbs EEO Decl. at 2, Attached Ex. 19; Nwachuku Dep. Tr. at 98-99, Attached Ex. 1.  Ms. Williams-Bower was neither in HECD (*i.e.*, Plaintiff's division) nor held a scientific position within OST.  Nwachuku Dep. Tr. at 98-99, Attached Ex. 1; FY03 OST Roster at 1, Attached Ex. 30.  Ms. Williams-Bower's duties as an Information Technology Specialist included managing OST's information systems, and implementing various information security programs, which were vital to OST and in particular EAD due to the office's use of confidential business information and omnipresent security threats.  Grubbs EEO Tr. at 465-67, Attached Ex. 14.  Ms. Williams-Bower was highly recommended by her first-line supervisor, Ellen Haffa, and was unanimously endorsed by the selection panel.  *See* Haffa EEO Decl. at ¶ 3, Attached Ex. 31; Barr EEO Decl. at ¶ 4, Attached Ex. 21; Zarba EEO Decl. at ¶ 7, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19.

Although Mr. Johnston is a white, Caucasian, male, he is also neither in HECD nor held a scientific position within OST. *See* Nwachuku Dep. Tr. at 95-96, Attached Ex. 1. Indeed, Mr. Johnston is an environmental engineer in EAD. *See id.*; Zarba EEO Decl. at ¶ 8, Attached Ex. 15; FY03 OST Roster at 3, Attached Ex. 30. As with Ms. Williams-Bower, Mr. Johnston was unanimously endorsed by the selection panel. *See* Smith EEO Decl. at ¶ 11, Attached Ex. 20; Zarba EEO Decl. at ¶ 8, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19.

*Third*, those similarly situated to Plaintiff -- *i.e.*, GS-13 scientists in HECD, who were also considered in Mr. Zarba's review and not recommended for an accretion of duties promotion -- also undermine any claim of discrimination. At or about the time of the promotional process, there were approximately twelve GS-13s in HECD, nine of which were scientists, including Plaintiff. *See* FY03 OST Roster at 4, Attached Ex. 30; Shaw Decl., Attached Ex. 32 (authenticating FY03 OST Roster dated April 1, 2003, among others). Of the nine GS-13 scientists in HECD, four were Caucasian, two were African-American (including Plaintiff), one was Indian-American, and one was Asian-American. *Compare* FY03 OST Roster at 4, Attached Ex. 30 (people in HECD as of April 1, 2003), *with* FY04 OST Roster at 2-3, Attached Ex. 33 (taken from the Report of Investigation, identifying race). As of April 1, 2003, Plaintiff was the only African born African-American GS-13 scientist in HECD. *See id.* As noted above, Mr. Zarba recommended not a single GS-13, in HECD, scientist or not, for an accretion of duties promotion in March 2003. *See supra* at 12. Thus, quite clearly, regardless of race, color or national origin, if you were a GS-13 in HECD, you were not recommended by Mr. Zarba for an accretion of duties promotion in 2003.

*Lastly*, as to retaliation, prior to March 2003 Plaintiff had not engaged in any EEO activities or filed or sought counseling for any EEO administrative complaints. Nwachuku EEO

Tr. at 4-9, Attached Ex. 3.  Plaintiff's sole administrative complaint that she filed before March 2003, was a Step 1 Union Grievance filed by Plaintiff in November 2001 "under Article VII of the Collective Bargaining Agreement (CBA) between Headquarters, Environmental Protection Agency and the National Treasury Employees Union Chapter 280."  *See* Nov. 2001 Grievance, Attached Ex. 34.  Although this Union Grievance alleged discrimination, Plaintiff has adduced no evidence that such grievance was ever referred to the EEO or was meant as an EEO complaint.  Moreover, Plaintiff's Union Grievance (i) was filed almost a year and a half before Mr. Zarba did not recommend a single GS-13 in HECD to Mr. Grubbs for an accretion of duties promotion, and (ii) alleged wrongdoing on the part of Dr. Schoeny and Ms. Wiltse, not Messrs. Zarba or Grubbs.  *See id.*; Nwachuku EEO Tr. at 4-9, Attached Ex. 3.

> ### D.    Mr. Zarba's Rationale For Not Recommending Plaintiff for an Accretion of Duties Promotion Was Not Pretextual.

There is no genuine issue of material fact that Mr. Zarba's rationale for not recommending Plaintiff to Mr. Grubbs for an accretion of duties promotion was genuine, legitimate and nondiscriminatory.  That is, the evidence in this case clearly shows that all of Plaintiff's supervisors believed that Plaintiff had problems with her interpersonal skills.  *See* Schoeny EEO Decl. at ¶¶ 5-11, Attached Ex. 26; Maciorowski EEO Decl. at ¶¶ 4-8, Attached Ex. 22; Zarba EEO Decl. at ¶¶ 9-10, Attached Ex. 15; Ohanian EEO Decl. at ¶ 8, Attached Ex. 35; Grubbs EEO Decl. at 4-5, Attached Ex. 19; Zarba ROI Decl. at ¶ 6, Attached Ex. 24.  Moreover, given Plaintiff's problematic interpersonal skills, throughout her time at EPA numerous employees complained to Plaintiff's supervisors about her.  *See* Ohanian Dep. Tr. at 66-69, Attached Ex. 5; Doyle Dep. Tr. at 67-69, Attached Ex. 12; Zarba Dep. Tr. at 37-41, Attached Ex. 4.

Further, undersigned counsel posits that perhaps the best evidence of Plaintiff's deficiencies in her interpersonal skills is set forth in Plaintiff's own EEO Declaration, in which she launches numerous ad hominem attacks against her supervisors.  *See* Nwachuku EEO Decl., Attached Ex. 2.  For example, Plaintiff describes Dr. Schoeny as "the unprofessional EPA female manager who comes to work dressed suggestively, exposing her buttocks and breast in the skimpiest, briefest, clinging mini dresses and skirts that you can literarily see underneath.  That is Rita Schoeny's claim to fame.  She exposes her body in the office to divert attention from the work, and her psychological issues, which have kept her in therapy for year" (*id.* at 27); and Plaintiff describes Mr. Zarba's past experience as "essentially a gofer position" (*id.* at 31), and that Mr. Zarba "got where he is today at his GS-15 level, not because of his qualifications or abilities but because he is a Caucasian white male."  *Id.* at 33.

Additionally, evidence of Plaintiff's problematic interpersonal skills existed prior to the selection process.  For example, Plaintiff herself concedes in her EEO Declaration that Plaintiff and Dr. Schoeny previously discussed the competencies for GS-14 and Dr. Schoeny indicated areas in which Plaintiff should work, including "areas of collaboration for 2001 and beyond mostly with microbiologists in ORD in Cincinnati."  *Id.* at 8.

## III.   PLAINTIFF'S TERMINATION WAS PROPER.

### A.   <u>Background of the CCL Workgroup and Charge.</u>

As noted above, in 2006 Plaintiff was a co-chair of an OW microbiology workgroup tasked with working on the CCL ("CCL Workgroup").  *See* Nwachuku Dep. Tr. at 42-43, 149, Attached Ex. 1.  Plaintiff's co-chair on the CCL Workgroup was Tom Carpenter from the Office of Ground Water and Drinking Water ("OGWDW") -- another office in OW, which was the customer for the CCL Workgroup.  *See id.* at 149, 161.  The CCL Workgroup was tasked with

creating a framework for external and EPA experts to employ in determining which water-borne contaminants would be placed on the CCL, thereby supporting OGWDW's regulatory purpose. *See generally* Schoeny Dep. Tr. at 61, Attached Ex. 25; Ohanian Dep. Tr. at 138, Attached Ex. 5.

In May 2006, the CCL Workgroup was preparing to host outside experts in a three-day workshop from June 6 to 8, 2006 ("June Workshop"). *See* Doyle Dep. Tr. at 120, Attached Ex. 12. In preparation for the June Workshop, the CCL Workgroup was tasked with preparing an agenda and a document that raised and explained the questions the expert panel would be asked to discuss, which was called the Charge. *See* Doyle MSPB Tr. at 8-9, Attached Ex. 36; Nwachuku Dep. Tr. at 131-32, Attached Ex. 1. Plaintiff was tasked with drafting the Charge and ensuring that the rest of the CCL Workgroup supported the Charge. *See* Doyle MSPB Tr. at 9, Attached Ex. 36; Nwachuku Dep. Tr. at 128-29, 135-36, Attached Ex. 1.

### B. The Charge Drafting and Editing Process, and Plaintiff's Desire to Attend the ASM Conference.

Plaintiff circulated a first draft of the Charge on May 5, 2006, asking the CCL Workgroup and Drs. Doyle and Ohanian, among others, for comments on the Charge. *See* Email from Ohanian to Nwachuku of 05/14/2006, attaching email from Nwachuku to various of 05/05/2006, Attached Ex. 37. In her email, Plaintiff noted that the expert package (which was to include the Charge), was scheduled to be sent out on May 18, 2006, followed by a note that the American Society for Microbiology ("ASM") conference began on May 20, 2006. *See id.*[10]

Thereafter, certain individuals submitted comments to Plaintiff, including Mr. Carpenter. *See* Email from Burneson to various of 05/16/2006, attached Email from Carpenter to various of

---

[10]     ASM is a scientific organization of individuals interested in microbiological sciences. *See* ASM, About ASM, Attached Ex. 38. Plaintiff had previously attended the annual ASM conference in 2004 and 2005 and wished to go to the 2006 ASM conference. *See* Nwachuku Dep. Tr. at 101, 109, 168-69, Attached Ex. 1. As described below, Plaintiff's unauthorized attendance at the 2006 ASM conference is one of the primary reasons she was terminated from the EPA. *See infra.*

05/11/2006, Attached. Ex. 39.  On Friday, May 12, 2006, Plaintiff emailed the group explaining

that she incorporated certain comments, but not others.  *See* Email from Ohanian to Nwachuku

of 05/14/2006, attaching email from Nwachuku to various of 05/12/2006, Attached Ex. 37.

Specifically, Plaintiff stated that comments from Mr. Carpenter (her co-chair) were not included

as they "were not understandable as written," and "some of the changes were already discussed

by me at our last meeting[.]"  *Id.*  After receiving Plaintiff's email, on Sunday, May 14, 2006,

Dr. Ohanian suggested that Plaintiff and he meet with the "major players" to finalize the Charge

document.  *See* Email from Ohanian to Nwachuku of 05/14/2006, Attached Ex. 37.

The following day, Monday, May 15, 2006, Dr. Doyle responded to Plaintiff's May 12,

2006, email asking Mr. Carpenter and his first-line supervisor, Eric Burneson, whether they were

content with Plaintiff's response to Mr. Carpenter's comments on the Charge.  *See* Email from

Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to various of 05/15/2006,

Attached Ex. 40.  In that same email, Dr. Doyle informed Plaintiff (i) that Dr. Ohanian and

herself would be providing comments to Plaintiff on Tuesday, May 16, 2006, (ii) that after

incorporating such comments Plaintiff should redistribute the Charge to the CCL Workgroup,

and (iii) that Dr. Doyle wanted to see the comments from Mr. Carpenter that were rejected by

Plaintiff.  *Id.*

That same day, Plaintiff replied to Dr. Doyle's email and asked Dr. Doyle, among other

things, "[w]hat about you? Do you have any [comments]? If you ever find time for the work

please send me your own comments."  *Id.*, attaching Email from Nwachuku to various of

05/15/2006.  The next morning, Tuesday, May 16, 2006, Dr. Doyle responded to Plaintiff's

aggressive email, explaining her concerns that Plaintiff had not incorporated the comments from

Mr. Carpenter (who was from the customer, OGWDW).  *Id.*, attaching Email from Doyle to

Nwachuku of 05/16/2006.[11]  Dr. Doyle also explained that she needed to hear from OGWDW to see if they concurred with Plaintiff's handling of their comments, and if not, the Charge would have to be negotiated with them.  *Id.*  Dr. Doyle further emphasized that the CCL Workgroup must be given a further opportunity to review the draft Charge before it was distributed to the outside experts, and recommended that if Plaintiff felt she had insufficient time before Friday, May 19, 2006, to complete the Charge, that she might consider working on the document the following week.  *Id.*  The following week was when the 2006 ASM conference was scheduled, which Plaintiff wanted to attend.  *See* Nwachuku Dep. Tr. at 114-15, 168-69, Attached Ex. 1; Doyle Dep. Tr. at 130, Attached Ex. 12.

After sending Plaintiff this clarification email, Dr. Doyle received an email from Mr. Burneson.  *See* Email Burneson to various of 05/16/2006, Attached Ex. 39.  Mr. Burneson further explained that OGWDW believed that Mr. Carpenter's prior comments were appropriate and would help clarify the Charge.  *See id.*  Plaintiff was included as a recipient on such email. *See id.*  After receiving Mr. Burneson's email, Dr. Doyle responded to the distribution, which included Plaintiff.  *See* Email from Doyle to various of 05/16/2006, Attached Ex. 42.  Dr. Doyle wrote that she agreed with Mr. Burneson's assessment that Mr. Carpenter's changes seemed to clarify the Charge, and directed Plaintiff to make Mr. Carpenter's changes and circulate the revised Charge to the CCL Workgroup.  *See id.*

That same day, Tuesday, May 16, 2006, after not hearing a response from Plaintiff, Dr. Doyle sent Plaintiff an email informing Plaintiff that she could not sign off on Plaintiff's travel to the ASM conference "until you have resolved the issues around the charge to the CCL Panel."

---

[11]     Notably, Plaintiff forwarded this email from Dr. Doyle and the other emails contained in the email string to her friend Brenda Mosley.  *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 40; Nwachuku Dep. Tr. at 152, Attached Ex. 1.

*See* Email from Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to Nwachuku of 05/16/2006, Attached Ex. 43.   Dr. Doyle further instructed Plaintiff to "[p]lease read my emails and attend to the matter promptly." *Id.*  Notably, Plaintiff subsequently forwarded this email to her friend Ms. Mosley. *Id.*

The next morning, Wednesday, May 17, 2006, after not hearing a response to any of her directions to Plaintiff, Dr. Doyle emailed Dr. Ohanian (Dr. Doyle's supervisor), cc'ing Plaintiff and informing Dr. Ohanian that Plaintiff had not as of then incorporated OGWDW's comments into the draft Charge and that a meeting with Pam Barr to finalize the Charge scheduled for Thursday, May 18, 2006, would not be fruitful if OGWDW's comments were not resolved by that point. *See* 1st Email from Doyle to Ohanian, Nwachuku of 05/17/2006, Attached Ex. 44.  In response, Dr. Ohanian agreed with Dr. Doyle that if OGWDW's comments were not resolved, then the Pam Barr meeting would not be productive. *See* 2d Email from Doyle to Ohanian, Nwachuku of 05/17/2006, attaching email from Ohanian to Doyle, Nwachuku of 05/17/2006, Attached Ex. 45.

Still hearing no response from Plaintiff, Dr. Doyle again contacted Plaintiff on Wednesday, May 17, 2006, and told her that a meeting had been scheduled with Plaintiff and OGWDW the following morning at 11:00 a.m. to resolve OGWDW comments. *See* 3d Email from Doyle to Nwachuku of 05/17/2006, Attached Ex. 46.  Dr. Doyle also sent Plaintiff an electronic meeting notice for this meeting. *See id.*  In her email, Dr. Doyle again told Plaintiff that "I can not (sic) approve your travel request for next week if we are unable to come to agreement with OGWDW in the person of Eric Burneson tomorrow at 11:00." *Id.*

On the evening of Wednesday, May 17, 2006, at 8:56 p.m., without replying to Dr. Doyle's prior emails or resolving the issues with the OGWDW comments, Plaintiff sent via

email a revised charge to Drs. Ohanian and Doyle and Mr. Burneson.  *See* Email from Nwachuku to various of 05/17/2006, Attached Ex. 47.

Plaintiff claims that although she was reading certain emails during this time, and was responsible for the CCL Workgroup Charge, she was not necessarily reading emails from her first-line or second-line supervisor relating to the Charge or the CCL Workgroup because she was overwhelmed.  *See* Nwachuku Dep. Tr. at 126-27, 179, Attached Ex. 1.  This self-serving statement is simply not credible given (a) Plaintiff forwarded an email from Dr. Doyle to her friend Ms. Mosley in which Dr. Doyle specifically informed Plaintiff that she would not be authorized to travel to the ASM conference unless OGWDW's concerns with the Charge were addressed (*see* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 43); (b) in certain emails Dr. Doyle was specifically responding to questions posed directly by Plaintiff in previous emails, one of which Plaintiff subsequently forwarded to her friend Ms. Mosley (*see* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 40); (c) the subjects of Dr. Doyle's emails specifically referred to the Charge, the June Workshop, the CCL Workgroup, and/or Plaintiff's travel to the ASM conference (*see* Attached Exs. 40-46); and (d) Plaintiff's own prior statements that "[e]veryone in HECD knows how strict and dedicated I am about my work and that Nena keeps all the records."  *See* Nwachuku EEO Decl. at 47, Attached Ex. 2; *see also* Doyle Dep. Tr. at 113, Attached Ex. 12 ("[Plaintiff] tended to be very e-mail literate[.]"); Excerpt from Pl's Resp. to Def's Reqs. to Admit, No. 14 ("Plaintiff did her best to monitor her e-mails."), Attached Ex. 48.  Plaintiff's self-serving claims of ignorance are further belied by Plaintiff's admissions that the ASM conference was important to her (*see* Nwachuku Dep. Tr. at 169, Attached Ex. 1), and that the Charge was an important document (*see id.* at 132); and Plaintiff's acknowledgements that Dr. Doyle was her supervisor, that Dr. Doyle had authority to supervise

- 22 -

Plaintiff's work, that Plaintiff submitted her work through Dr. Doyle, and that Dr. Doyle was in charge of managing Plaintiff's activities as an EPA employee. *See id.* at 153-54.

> **B.    After Plaintiff Failed to Incorporate OGWDW's Comments, Plaintiff Failed to Attend the Scheduled Meeting and Was Informed that Her Travel to the <u>ASM Conference Was Not Approved.</u>**

Early the following morning, on Thursday, May 18, 2006, Dr. Ohanian and Dr. Doyle exchanged emails, in which Dr. Ohanian asked if the Charge sent by Plaintiff the previous evening resolved the issues with OGWDW, and Dr. Doyle explained that it did not. *See* 1st Email from Doyle to various of 05/18/2006, attaching Email from Ohanian to various of 05/18/2006, Attached Ex. 49. In her email, Dr. Doyle informed Dr. Ohanian that she, Plaintiff and OGWDW were meeting later that morning at 11:00 a.m. in an attempt to resolve their differences concerning the Charge. *Id.*

Plaintiff did not show up for the 11:00 a.m. meeting with OGWDW. *See* 2d Email from Doyle to various of 05/18/2006, Attached Ex. 50. In response to Plaintiff's non-attendance, Dr. Doyle wrote an email to Dr. Ohanian and Ms. Barr, cc'ing Plaintiff and Mr. Burneson and informing them that Plaintiff did not show-up for the 11:00 a.m. meeting with OGWDW and, thus, the meeting with Ms. Barr later that day should be cancelled. *Id.* As noted below, Plaintiff claims that she was sick and was out on sick leave until later in the day on Thursday, May 18, 2006. *See* Nwachuku Dep. Tr. at 147-48, Attached Ex. 1.

Thereafter, Dr. Doyle wrote Plaintiff an email at 1:42 a.m. on that same day, Thursday, May 18, 2006, specifically informing Plaintiff that because the Charge was not completed as per OGWDW's concerns, " I [Dr. Doyle] regret that I can not (sic) authorize your travel for next week." Email 3d Doyle to Nwachuku of 05/18/2006, Attached Ex. 51. Dr. Doyle went on to expressly state that "I want to remind you that you do not have authorization to travel on government [funds]." *Id.*

Additionally, for the avoidance of doubt, Dr. Doyle told Plaintiff in person, after she arrived in the office on Thursday, May 18, 2006, at approximately 4:30 p.m., that Plaintiff was not authorized to go to ASM conference, or expend any government funds on travel to such conference. *See* Doyle MSPB Decl. at ¶¶ 3-5, Attached Ex. 52. After having this face-to-face conversation with Plaintiff, Dr. Doyle left for the weekend as she was on an alternative work schedule and was off on Friday, May 19, 2006. *See* Doyle Dep. Tr. at 44, Attached Ex. 12.

As with Dr. Doyle's other emails regarding the June Workshop, the Charge and Plaintiff's travel to the ASM conference, Plaintiff has claimed that she does not recall seeing Dr. Doyle's email, and specifically denies that Dr. Doyle told her on May 18, 2006, that she was not permitted to go to the ASM conference. For the reasons noted above, the overwhelming facts of this case belie Plaintiff's self-serving contention. *See supra* at 21-22. Further, Plaintiff, concedes that she spoke with Dr. Doyle after she arrived in the office in the afternoon of May 18, 2006 (*see* Nwachuku Dep. Tr. at 211, Attached Ex. 1), and admits that based upon her general practice, if she saw an email regarding her potential travel to the ASM conference, she would have opened it. *See id.* at 176.

## C. Despite Dr. Doyle's Direct Statements, Plaintiff Sent the Charge Without OGWDW Comments to the Experts and Contractors, Attended the ASM Conference, and Used Government Funds to Pay for Her Travel.

### 1. Plaintiff Distributed a Draft Charge Without OGWDW Comments.

On Friday, May 19, 2006, despite Dr. Doyle's express directions, Plaintiff distributed to the experts and logistics contractor the draft Charge without OGWDW's comments ("Draft Charge"). *See* Email from Ohanian to various of 05/20/2006, attaching Email from Nwachuku to various of 05/19/2006, Attached Ex. 53. After Mr. Burneson received Plaintiff's email on Monday, May 22, 2006, and noticed that the distributed Draft Charge did not contain OGWDW's comments, he discussed the matter with Dr. Doyle, and Dr. Doyle subsequently sent

an email to the workgroup, experts and contractor indicating that the Draft Charge was not final and that a revised Charge would be forthcoming.  *See* Burneson MSPB Tr. at 141-42, Attached Ex. 54.

2.    <u>Plaintiff Booked Travel Through Rodgers Travel Without Authorization.</u>

Also on Friday, May 19, 2006, despite Dr. Doyle's clear direction in email and in a face-to-face conversation, Plaintiff arranged travel through Rogers Travel, EPA's contracted travel agent, to attend the 2006 ASM conference in Orlando, Florida.  *See* Nwachuku Dep. Tr. at 125, Attached Ex. 1.  Specifically, on May 19, 2006, Plaintiff concedes that in a series of phone calls with Rodgers Travel she learned that Rodgers Travel was attempting to reach Sherry Howard, the individual in OST responsible for travel billing, and coordinating with EPA's administrative offices in Cincinnati to obtain billing approval for Plaintiff's scheduled travel to the ASM Conference.  *See* Nwachuku Dep. Tr. at 119, 122, Attached Ex. 1.  The evidence shows that Plaintiff never informed Rodgers Travel that her first-line supervisor had directly told her that she was not authorized to book travel using government funds.  *See* Doyle MSPB Decl. at ¶¶ 12-13, Attached Ex. 52; Williams MSPB Decl. at ¶¶ 2-5, Attached Ex. 55.

Sarah J. Williams, a Financial Specialist in the Agency's Office of the Chief Financial Officer ("OCFO") who is responsible for processing travel voucher documents, recalled that on May 19, 2006, she received a telephone call from Rodgers Travel concerning Plaintiff's travel. William MSPB Decl. at ¶¶ 1, 2, Attached Ex. 55.  Specifically, Rodgers Travel called Ms. Williams to verify that Plaintiff's travel could be charged to EPA's account because Plaintiff did not have a CBA form with which to process travel.[12]  *Id.* at ¶¶ 2-3; *see also* Sylvester MSPB

---

[12]    As Ms. Williams explained, a CBA ("Centrally Billed Account") form is the method by which an employee without a government credit card becomes authorized to book travel.  *See* Williams MSPB Decl. at ¶ 3, Attached Ex. 55.  If such an employee wishes to book travel using EPA funds, the CBA form is submitted by an employee

Decl. at ¶ 5, Attached Ex. 57 (declaration of Rogers Travel representative).   In response Ms. Williams attempted to contact Plaintiff's supervisors to ensure that Plaintiff's travel was indeed authorized despite the lack of a CBA form.   William MSPB Decl. at ¶ 4, Attached Ex. 55.   Ms. Williams was unable to contact any of Plaintiff's supervisors, and relying upon the assumption that Plaintiff submitted her travel request in good faith, approved Rodgers Travel to book Plaintiff's travel.   *Id.* at ¶ 5.   Indeed, based upon her experience with Rodgers Travel and the policies of Rodgers Travel, it is obvious in her mind that Plaintiff implicitly or explicitly informed Rodgers Travel that she had authority to travel.   *Id.* at ¶¶ 14-15; *see also* Sylvester MSPB Decl. at ¶ 6, Attached Ex. 57 (Plaintiff never informed Rodgers Travel that she lacked authority to travel, "Rodgers Travel took Dr. Nwachuku at her word that she was authorized to travel to Orlando"); Doyle MSPB Decl. at ¶¶ 13-14, Attached Ex. 52.

       3.     Plaintiff Knew from Past Travel Experiences the Proper Method for <u>Obtaining Authorization to Expend Travel Funds.</u>

Moreover, Plaintiff's past experiences in booking authorized travel without a government credit card clearly show that she knew she had not been authorized to expend government funds to travel to the 2006 ASM conference.

On April 22, 2004, Plaintiff submitted a Travel Request Form, Traveler Authorization Form, and Advance of Funds Application requesting travel funds to attend the 2004 ASM conference from May 23 to 29, 2004, in advance of that conference.   *See* 2004 ASM Travel Request Forms, Attached Ex. 58.   As noted on such forms, Plaintiff's 2004 request was signed and approved by Drs. Ohanian and Doyle in advance of the 2004 ASM conference.   *See id.* at 2-

---

with authorizing signatures from his/her supervisor(s), and the OCFO then approves the expenditures and forwards the form to Rodgers Travel.   *See id*; *see also* Doyle 2d MSPB Decl. at ¶¶ 5, 7, Attached. Ex. 56.

3.  Indeed, Plaintiff acknowledged that the travel forms are prepared "to make sure . . . that it [travel] is approved."  Nwachuku Dep. Tr. at 109, Attached. Ex. 1.

For the 2005 ASM conference, on May 27, 2005, Plaintiff again submitted a Travel Request Form, Traveler Authorization Form, and Advance of Funds Application requesting travel funds in advance of the 2005 conference.  *See* 2005 ASM Travel Request Forms, Attached Ex. 59.  As with Plaintiff's 2004 request, Plaintiff's 2005 request was signed and approved by Dr. Doyle in advance of the conference.  *See id.* at 2-3.

For the 2006 ASM conference, however, Plaintiff did not follow the same procedure. Although a Traveler Authorization Form and Advance of Funds Application were prepared for Plaintiff's travel, they were never signed or authorized by any of Plaintiff's supervisors, let alone before she departed for the 2006 ASM conference.  *See* Draft 2006 ASM Travel Request Forms, Attached Ex. 60.  This evidence overwhelmingly shows that from her past experiences attending prior ASM conferences and obtaining advanced authorization to expend government funds to travel to such conferences, Plaintiff knew that she had not obtained authorization for travel funds to attend the 2006 ASM conference.  *See also* Williams MSPB Decl. at ¶¶ 20-21, Attached Ex. 55 (explaining that no documentation authorizing Plaintiff's travel was ever submitted to OCFO); Doyle 2d MSPB Decl. at ¶¶ 9-11, Attached Ex. 56 (Plaintiff had previously followed process to request funds in prior travel requests).

4.    Plaintiff Used Her Unauthorized Tickets.

After booking her unauthorized travel through Rodgers Travel, Plaintiff used the tickets issued by Rodgers Travel to travel to the 2006 ASM conference, departing on Saturday, May 20, 2006.  *See* Nwachuku Dep. Tr. at 114-15, Attached Ex. 1.  Plaintiff did so despite Dr. Doyle's express directions, which Dr. Ohanian reaffirmed in an email to Plaintiff on the morning of

Saturday, May 20, 2006. *See* Email from Ohanian to various of 05/20/2006, Attached Ex. 53.

Plaintiff never responded to Dr. Ohanian's email. *See* Ohanian MSPB Decl. at ¶ 1, Attached Ex.

61. Instead, Plaintiff used tickets obtained without authorization from Rodgers Travel and paid

for by the EPA to attend the 2006 ASM conference in Orlando, Florida. *See* Nwachuku Dep. Tr.

at 122, Attached Ex. 1 (Plaintiff concedes that EPA eventually paid for the tickets); Williams

MSPB Decl. at ¶¶ 15-16, Attached Ex. 55 (Plaintiff used tickets paid for by EPA); Sylvester

MSPB Decl. at ¶ 7, Attached Ex. 57 (Tickets booked by Rodgers Travel were used).

### D.    After Dr. Doyle Learned that Plaintiff Traveled to the ASM Conference Without Authorization, Dr. Doyle Took Steps to Contact Plaintiff.

On Monday, May 22, 2006, the first business day following Plaintiff's flight to Orlando,

Dr. Doyle discovered that Plaintiff had indeed traveled to the ASM conference without

authorization. *See* Doyle MSPB Decl. at ¶ 6, Attached Ex. 52. Dr. Doyle proceeded to talk with

Dr. Ohanian to be sure that he had not subsequently authorized Plaintiff's travel to Orlando after

Dr. Doyle's email and face-to-face instructions. *See id.* at ¶ 8. Thereafter, Dr. Doyle called Ms.

Williams, who had left a message for Dr. Doyle the previous Friday, to inquire into the situation

and inform Ms. Williams that Plaintiff's travel was unauthorized. *See id.* at ¶¶ 7, 9-15; Williams

MSPB Decl. at ¶¶ 6-7, Attached Ex. 55. Ms. Williams in turn called Mr. Sylvester at Rodgers

Travel to learn more about the situation and whether Plaintiff had indeed traveled on tickets paid

for by the EPA. *See* Williams MSPB Decl. at ¶¶ 8-14, Attached Ex. 55.

After learning that Plaintiff had indeed traveled to Orlando using tickets paid for by the

EPA, Dr. Doyle began to take steps to contact Plaintiff and reinforce to her that she was on

unauthorized travel and leave. These efforts included (i) calling the ASM conference contact

number and asking them to post a message on the conference message board for Plaintiff to

immediately call Dr. Doyle (*see* Proposed Removal (without supporting documentation) at 4,

Attached Ex. 62); (ii) sending Plaintiff an email (*see* Email from Doyle to Nwachuku of 05/23/2006, Attached Ex. 63); and (iii) asking Alice Moss, a colleague of Plaintiff's who knew Plaintiff's cell phone number, to call Plaintiff and instruct her to call Dr. Doyle immediately. Moss MSPB Decl., Attached Ex. 64; *see also generally* Doyle Notes of 05/22/2006, Attached Ex. 65. Plaintiff failed to ever respond to the message left on the ASM message board or to Dr. Doyle's email. *See* Proposed Removal at 4, Attached Ex 62. Further, when Ms. Moss reached Plaintiff on her cell phone and conveyed Dr. Doyle's instruction for Plaintiff to call Dr. Doyle immediately, Plaintiff refused to speak about the matter and instead only offered to speak about the pending seat selection process in HECD. *See* Moss MSPB Decl. at ¶¶ 5, 7, Attached Ex. 64.

Plaintiff was absent without leave and on unauthorized travel from Monday, May 22, 2006, until Friday, May 26, 2006. *See* Proposed Removal at 4, Attached Ex. 62. When Plaintiff returned to work on Tuesday, May 30, 2006 (the Monday was Memorial Day), she refused to speak to any of her supervisors about her previous week's absence. *See id.* at 2.

### E. Upon Plaintiff's Return to the Office She was Insubordinate and Filed a False Violence in the Workplace Claim.

#### 1. Plaintiff was Instructed to Circulate a Revised Charge And Refused.

During Plaintiff's unauthorized leave, after discussing the Draft Charge, Dr. Doyle and Messrs. Burneson and Carpenter incorporated OGWDW's comments into the Draft Charge that Plaintiff improperly distributed on May 19, 2006. *See* Burneson MSPB Tr. at 141-42, Attached Ex. 54; Doyle MSPB Tr. at 24-25, Attached Ex. 36. After Dr. Doyle and Mr. Burneson became comfortable with the revised Charge, they met with Ms. Barr, while Plaintiff was on unauthorized leave, and obtained her approval of the revised Charge. *See* Burneson MSPB Tr. at 143, Attached Ex. 54. Upon Plaintiff's return to the office on May 30, 2006, she was provided the revised charge with OGWDW's comments ("Revised Charged") and instructed to email the

Revised Charge to the workgroup, experts and contractors. *See* Email from Doyle to various of 05/30/2006, Attached Ex. 66; Doyle MSPB Tr. at 25-26, Attached Ex. 36.

Dr. Doyle was out of the office part of the week of May 29, 2006, due to an illness in her family and was off on Friday, June 2, 2006, due to her compressed alternative work schedule. *See* Doyle MSPB Tr. at 25-26, Attached. Ex. 36. On Monday, June 5, 2006, realizing that Plaintiff had not distributed the Revised Charge, Dr. Doyle emailed Dr. Ohanian, cc'ing Plaintiff, and asked for his assistance in directing Plaintiff to distribute the Revised Charge. *See* Email from Ohanian to various of 06/05/2006, attaching Email from Doyle to Ohanian, Nwachuku of 06/05/2006, Attached Ex. 67; Doyle MSPB Tr. at 26-27, Attached Ex. 36. Ohanian then emailed Plaintiff and reiterated the instruction to distribute the Revised Charge. *See id.* Plaintiff refused to respond to her supervisors' direct instructions and did not distribute the Revised Charge. *See* Doyle Dep. Tr. at 187, Attached. Ex. 12; Ohanian MSPB Decl. at ¶¶ 1-2, Attached Ex. 61. Because Plaintiff refused to distribute the Revised Charge, Dr. Doyle came to the June Workshop, which was scheduled to begin on Tuesday, June 6, 2006, with copies of the Revised Charge to hand out at the commencement of the workshop. *See* Doyle Dep. Tr. 186-87, Attached Ex. 12; Doyle MSPB Tr. at 27-29, Attached Ex. 36; Burneson Notes of 06/06/2006 at 2, Attached Ex. 68.

When Plaintiff learned of Dr. Doyle's intent to distribute the Revised Charge to the group at the June Workshop, she became angry. Doyle Dep. Tr. at 186-87, Attached Ex. 12. Immediately, prior to the June Workshop with outside experts, Dr. Ohanian summoned Dr. Doyle and Mr. Burneson to join him in the hallway to discuss with Plaintiff how to proceed with the workshop. *See* Ohanian MSPB Decl. at ¶ 3, Attached Ex. 61; Burneson MSPB Tr. at 145-47, Attached Ex. 54; Doyle MSPB Tr. at 27-29, Attached Ex. 36; Doyle Dep. Tr. at 185-86,

Attached Ex. 12; Burneson Notes of 06/06/2006, Attached Ex. 68; Doyle Notes of 06/06/2006, Attached Ex. 69.  When Plaintiff was informed by Drs. Doyle and Ohanian and Mr. Burneson that the Revised Charge would be circulated, Plaintiff became very agitated at Dr. Doyle.  *See id.* Indeed, Plaintiff began to shout at Dr. Doyle, stepped close to Dr. Doyle, and waved her finger in Dr. Doyle's face.  *Id.*  At one point, Dr. Ohanian told Plaintiff to step back from Dr. Doyle. Despite Plaintiff's hostile tone and behavior, Dr. Doyle kept her composure and responded calmly to Plaintiff's aggression.  *See id.*[13]

2.    Plaintiff Filed a False Violence in the Workplace Claim Against Dr. Doyle.

After Plaintiff returned to work on May 30, 2006, and was directed to circulate the Revised Charge, Plaintiff sent an email to Pam Parker, a Workplace Violence Policy contact at EPA, alleging that Dr. Doyle assaulted Plaintiff during a conversation with Dr. Doyle on May 18, 2006.  *See* Email from Nwachuku to Parker of 05/30/2006, Attached Ex. 70.  Plaintiff claims that Dr. Doyle touched and threatened Plaintiff and waved her finger at Plaintiff wildly.  *See id.* Plaintiff claims that this incident occurred in the only face-to-face meeting she and Dr. Doyle had on May 18, 2006.  *See* Nwachuku Dep. Tr. at 211, Attached Ex. 1.  Dr. Doyle denies that any such incident took place, but agrees that she and Plaintiff had just a single conversation on that day, within which Dr. Doyle informed Plaintiff that she was not authorized to go to the 2006 ASM conference.  *See* Doyle Dep. Tr. at 146-50, Attached Ex. 12.[14]

---

[13]    Despite the overwhelming evidence, including contemporaneous notes written by Dr. Doyle and Mr. Burneson, and three nearly identical accounts from Drs. Doyle and Ohanian, and Mr. Burneson, Plaintiff self-servingly contends that she was not loud, the she did not wave her finger in Dr. Doyle's face, and that she was never asked by Dr. Ohanian to step back from Dr. Doyle.  *See* Nwachuku Dep. Tr. at 233-37, Attached Ex. 1.

[14]    Additionally, Plaintiff and Dr. Doyle agree that the sole in-person interaction they had on May 18, 2006, occurred around 4:30 p.m. and that the interaction occurred near Frank Bell's workspace.  *See* Nwachuku Dep. Tr. at 214, Attached. Ex. 1; Memo Gomez-Taylor to Ohanian rev. 06/12/2006, Attached Ex. 71; Doyle Dep. Tr. at 133-34, Attached Ex. 12.

Dr. Dana Thomas, a colleague of Plaintiff's in HECD, believes that she witnessed the alleged incident.  *See* Thomas MSPB Decl. at ¶ 4, Attached Ex. 72.  Specifically, Dr. Thomas recalls observing a conversation between Plaintiff and Dr. Doyle on or about Thursday, May 18, 2006, in the proximity of the Xerox machine in OST's office space.  *See id.*  Although Dr. Thomas does not recall the topic of the conversation, she recalls that Plaintiff had an abrasive demeanor, and that Dr. Doyle was extremely composed.  *Id.*  Indeed, Dr. Thomas distinctly recalls thinking that "this must be the reason why [Dr. Doyle] recently won a manager of the year award."  *Id.*  Dr. Doyle recalls Dr. Thomas being in the vicinity when Dr. Doyle told Plaintiff on May 18, 2006, that she would not be permitted to attend the 2006 ASM conference.  *See* Doyle Dep. Tr. at 133-34, Attached Ex. 12.[15]  Indeed, the parties have adduced no evidence that could even tend to support Plaintiff's self-serving accusations that Dr. Doyle assaulted her.

**F.    Based Upon Plaintiff's Conduct in May 2006, Dr. Doyle Proposed Plaintiff's Removal.**

On July 11, 2006, after careful consideration, Dr. Doyle proposed Plaintiff's removal from the EPA.  *See* Proposed Removal at 1, Attached Ex. 62.  In the Proposed Removal, Dr. Doyle set forth several grounds upon which she believed Plaintiff should be removed: (i) failing to follow supervisors' instructions (on numerous occasions);[16] (ii) being absent without leave (for five working days); (iii) making a false statement by telling Rodgers Travel that her authorization to travel to Orlando was a work in progress; (iv) making a false claim against the EPA by expending travel funds without authorization; (v) making a knowingly false violence in

---

[15]    After being forwarded Plaintiff's violence in the workplace allegations, Maria Gomez-Taylor, the then Deputy Director of HECD, conducted an inquiry into Plaintiff's allegations and concluded that there was no violence in the workplace by Dr. Doyle.  *See* Memo from Gomez-Taylor to Ohanian rev. 06/12/2006, Attached. Ex. 71.

[16]    The examples Dr. Doyle cited included: (i) Plaintiff's refusal to finalize the Charge during the week of May 22, 2006; and (ii) Plaintiff's refusal to circulate the Revised Charge to the workgroup, experts and contractors on or after May 30, 2006.  *See* Proposed Removal at 3-4, Attached Ex. 62.

the workplace allegation; and (vi) engaging in disrespectful conduct toward Plaintiff's supervisors. *See id.* at 3-6.

>    **G.    After Affording Plaintiff an Opportunity to Submit a Written Response, Allowing Her to Make an Oral Reply, and Requesting Supplemental Evidence from the Agency and a Reply from Plaintiff Thereto, Mr. King Issued a Final Decision Removing Plaintiff from the EPA.**

Upon receiving Dr. Doyle's Proposed Removal, Mr. King, Plaintiff's third-line supervisor, afforded Plaintiff the opportunity to submit a written response and make an oral reply to the Proposed Removal. *See* Pl's Written Response of 09/05/2006, Attached Ex. 73. Plaintiff, through her attorney, both submitted a written response and made a oral reply. *See id.* at n.1. Thereafter, based upon issues raised in Plaintiff's oral and written responses, Mr. King requested additional information from persons of knowledge within the Agency. *See* Letter from King to Shapiro of 11/13/2006, Attached Ex. 74. Mr. King also afforded Plaintiff an opportunity to respond to this supplemental information, which Plaintiff did, through her attorney, on November 30, 2006. *See id.*; Letter from Shapiro to King of 11/30/2006, Attached Ex. 75. After Mr. King's review of all the submissions, on December 4, 2006, Mr. King concluded that the evidence supported Plaintiff's removal for all but one portion of reason (i) described above. *See* Removal Decision at 2, Attached Ex. 76. In making his decision to remove Plaintiff, Mr. King provided Plaintiff a twenty-six page discussion of the evidence he reviewed and why it supported, or did not support, the charges presented in the Proposed Removal. *See id.* As noted below, prior to issuing the Removal Decision, Plaintiff had not alleged that Mr. King discriminated or retaliated against her in any way. *See infra* at 33-34. Furthermore, Plaintiff's last prior EEO administrative complaint was filed on May 11, 2004, and this action was instituted on May 19, 2006. *See* 2004 EEO Compl., Attached Ex. 8; Docket Entry No. 1.

## PROCEDURAL HISTORY

### I.    EEO ADMINISTRATIVE PROCEEDINGS.

#### A.    2003-0065-HQ -- Administrative Complaint Concerning Non-Selection.

On or about June 27, 2003, Plaintiff contacted an EEO counselor concerning her non-selection claim.  *See* Letter from Bucholtz to Higginbotham of 08/29/2003, Attached Ex. 77.  Thereafter, Plaintiff was issued a Notice of Final Interview on August 26, 2002.  *See id.*  Plaintiff filed a formal administrative complaint, through her attorneys, which was stamped received on September 3, 2003.  *See id.*[17]  After a Report of Investigation was issued, such administrative complaint was subsequently consolidated with Plaintiff's 2004 EEO Complaint concerning alleged harassment.

#### B.    2004-0050-HQ -- Administrative Complaint Regarding Alleged Harassment.

On or about April 9, 2004, Plaintiff contacted an EEO counselor concerning her harassment or hostile work environment claim.  *See* Excerpt from Counselor's Report of 05/13/2004, Attached Ex. 78.  Thereafter, Plaintiff was given a Final Interview on May 11, 2002.  *See id.*  Plaintiff filed a formal administrative complaint, dated May 11, 2004.  *See* 2004 EEO Compl. at 1, Attached Ex. 8.  After a Report of Investigation was issued, Plaintiff's 2004 EEO Complaint and her prior non-selection based complaint were subsequently consolidated.

After a four-day hearing before an EEOC administrative judge ("AJ") on the consolidated proceeding, the EEOC AJ found in the Agency's favor on both of Plaintiff's claims -- *i.e.*, non-selection and harassment.  After taking an appeal to the EEOC, Plaintiff instituted this action on May 19, 2006.

---

[17]    This first administrative EEO complaint also raised other allegations that were omitted from the Amended Complaint in this action, and thus, abandoned by Plaintiff.  *Compare* Compl. *with* Letter from Bucholtz to Higginbotham of 08/29/2003, Attached Ex. 77.

## II.    PLAINTIFF'S MSPB PROCEEDING.

After receiving Mr. King's Removal Decision, dated December 4, 2006, Plaintiff appealed that decision to the Merit Systems Protection Board ("MSPB").  By Initial Decision, dated April 25, 2007, the MSPB affirmed Plaintiff's removal.  On June 7, 2007, Plaintiff filed an Amended Complaint, which continued to assert her non-selection and harassment based claims, which were subjected to the EEOC process, and added an allegation concerning her termination. *See* Amd. Compl., Docket Entry No. 6.

### <u>ARGUMENT</u>

Based upon the overwhelming evidence adduced in this action, summary judgment is proper on all of Plaintiff's claims.

## I.    THE RELEVANT LEGAL STANDARDS.

### A.    <u>The Legal Standard for Summary Judgment Under Rule 56.</u>

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 154 (D.D.C. 2007) (Bates, J.), *quoting* Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial responsibility of showing an absence of a genuine issue of material facts.  *Id.*  In deciding whether a genuine issue of material facts exists, the court must "accept all evidence and make all inferences in the non-movant's favor."  *Id.*, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "A non-moving party, however, must establish more than the mere existence of a scintilla of evidence in support of its position."  *Id.* (citations and internal quotation marks omitted).  That is, "'[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.*, *quoting Anderson,* 477 U.S. at 249-50.

Furthermore, "[s]elf-serving testimony does not create genuine issues of material fact[.]" *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) (Robertson, J.) (granting summary judgment on plaintiff's Title VII discrimination and retaliation claims); *see also Bonieskie v. Mukasey*, --- F. Supp. 2d ---, 2008 WL 839051, at *3 (D.D.C. Mar. 31, 2008) (Friedman, J.) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements."); *Lindsey v. Rice*, 524 F. Supp. 2d 55, 60 (D.D.C.2007) (granting summary judgment where plaintiff's "self-serving statements [were] too conclusory to survive [defendant's] summary judgment motion"). Indeed, "'conclusory allegations' and 'unsubstantiated speculation' do not create genuine issues of material fact." *Bonieskie*, 2008 WL 839051, at *3 (citations omitted). Under this standard, Plaintiff's claims should be dismissed in light of the undisputed and overwhelming facts in this case.

**B.    The *McDonnell Douglas* Framework for Disparate Treatment Cases.**

This Court has recently described the burden-shifting framework in analyzing Title VII discrimination and retaliation cases:

> In racial discrimination and retaliation suits under Title VII, "the plaintiff may prove his claim with either direct evidence or by indirectly proving a prima facie case under the burden-shifting framework established in *McDonnell Douglas [Corp. v. Green,* 411 U.S. 792, 802 (1973) ]." *Kalekiristos v. CTF Hotel Mgmt. Corp.,* 958 F. Supp. 641, 665 (D.D.C. 1997). Under this framework, a plaintiff-employee carries the initial burden of production and must establish a prima facie case of discrimination. *Id.* If a plaintiff-employee does so, the burden shifts to the defendant-employer, who "must then articulate a legitimate, nondiscriminatory reason for its actions." *Stella v. Mineta,* 284 F.3d 135, 144 (D.C. Cir.2002) (citing *McDonnell Douglas,* 411 U.S. at 802). If the defendant-employer successfully provides a valid reason, the burden shifts back to the plaintiff-employee, who "must then demonstrate that the employer's stated reason was

> pretextual and that the true reason was discriminatory." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804).
>
> However, under the D.C. Circuit Court's recent decision in *Brady v. Office of Sergeant at Arms,* [520 F.3d 490] (D.C. Cir. Mar. 28, 2008), in a disparate treatment case, once the defendant has articulated a legitimate non-discriminatory reason for its actions, the Court "need not- *and should not*" decide whether a plaintiff who suffered an adverse employment action established a prima facie case. *Id.* at *3 (emphasis in original). Instead, the Court must focus on one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason. . .?" *Id.*

*Laurent v. Bureau of Rehab., Inc.*, --- F. Supp. 2d ---, 2008 WL 1710912, at *3 (D.D.C. April 14, 2008) (Leon, J.) (granting summary judgment on plaintiff's claims including disparate treatment and hostile work environment claims).

Furthermore, as the D.C. Circuit noted in *Brady*, although "a plaintiff need not demonstrate that he or she was treated differently from a similarly situated employee or that the position was filled by a person outside the plaintiff's group[,] . . . such evidence (or the lack of such evidence) may be relevant to the determination at summary judgment or trial whether intentional discrimination occurred." *Brady*, 520 F.3d at 490, n.2. Indeed, "[w]hile a Title VII plaintiff can resort to multiple methods of showing that the employer's stated reason for the employment action was a pretext, the most common method . . . is evidence suggesting that the employer treated other employees of a different race, gender, or national origin more favorably in the same factual circumstances. To prove that she is similarly situated to another employee, a plaintiff must demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the allegedly comparable employee.'" *Laurent*, 2008 WL 1710912, at *3 (internal citations and quotations omitted).

## II.    SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S NON-SELECTION BASED CLAIMS.

Quite simply there is no evidence, aside from Plaintiff's self-serving statements, that suggests that Plaintiff was denied an accretion of duties promotion in 2003 based upon her race and color, national origin, or prior protected EEO activity.

*First*, Plaintiff cannot point to any similarly situated employee that was white, Caucasian, or from the United States that received such a promotion.  Indeed, the overwhelming evidence shows that no scientist within Plaintiff's division, HECD, received a promotion (or for that matter any consideration) by Mr. Grubbs, the selecting official in the accretion of duties promotions.  *See supra* at 13, 14-15.  That is, Mr. Zarba, Plaintiff's then second-line supervisor, and Acting Director of HECD, put forth not a single HECD employee for an accretion of duties promotion in the 2003 process.  *See supra* at 14-15.  Accordingly, no reasonable juror could conclude that Plaintiff was discriminated or retaliated against in not being promoted.

*Second*, even if Plaintiff could somehow overcome this impassible obstacle, Plaintiff cannot show that Mr. Zarba's reason for not recommending Plaintiff was pretextual.  The overwhelming evidence in this action shows that Plaintiff's supervisors believed that she had problems with her interpersonal skills.  *See supra* at 16-17.

Additionally, as to Plaintiff's retaliation-based non-selection claim, the undisputed evidence clearly refutes any causal connection between her non-selection and her prior protected activity.  Prior to 2003, the time of the alleged non-selection, Plaintiff's sole complaint concerning the EPA was Plaintiff's union grievance filed by Plaintiff on November 21, 2001, alleging wrongful conduct by Drs. Schoeny and Wiltse.  *See supra* at 15-16.  Even if this grievance could be considered protected activity under Title VII, which it is not, its utter lack of temporal proximity to the selection process and its lack of allegations against Mr. Grubbs (the

selecting official) and Mr. Zarba (the recommending official), fail to provide the slightest inference of any retaliation. *See Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (three months is the outer limit for a temporal showing of causation) (Walton, J.).

## II.   SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S TERMINATION BASED CLAIMS.

Similarly, Plaintiff's termination based claims are also ripe for summary judgment. The legitimate non-discriminatory reasons offered by Dr. Doyle and accepted by Mr. King quite clearly show that Plaintiff's misconduct, and not her race, color, national origin, or prior protected activity motivated her termination. *See supra* at 17-33. Aside from Plaintiff's self-serving statements, and convenient inability to recall receiving or reading direct communications from her supervisor (despite forwarding certain of such communications to her friend), the record overwhelming establishes that Plaintiff (i) was given direct orders by supervisors that she failed to follow; (ii) spent EPA funds without authorization in booking travel; (iii) was absent from work without authorization or approved leave; (iv) made knowingly baseless and slanderous accusations of battery against her supervisor; and (v) engaged in utterly inappropriate conduct at the June Workshop in the presence of outside experts and contractors. *See supra* at 32-33. Indeed, no reasonable juror could conclude after the considered process and the serious misconduct of Plaintiff, that Mr. King's reasons for terminating Plaintiff were pretextual. Accordingly there is no genuine issue of material fact that Plaintiff's egregious misconduct, and not some impermissible factor prompted Plaintiff's termination. *See e.g., Taylor v. Wash. Metro. Area Transit Auth.,* 922 F. Supp. 665, 673 (D.D.C.1996) (defendant produced legitimate non-discriminatory explanation for adverse personnel action where it found plaintiff to have committed a serious violation of its "rules of conduct"); *Slade v. Billington,* 700 F. Supp. 1134 (D.D.C.1988) (Library of Congress provided a legitimate, non-discriminatory reason for the

issuance of proposed adverse action against employee where he had violated clearly defined personnel policy).

Additionally, as to Plaintiff's retaliation-based termination claim, Plaintiff cannot show any temporal proximity of Mr. King's Removal Decision and any protected activity. Indeed, due to Mr. King's considered process for evaluating Dr. Doyle's Proposed Removal -- which included affording Plaintiff three opportunities to argue her case through counsel -- Mr. King's Removal Decision was issued on December 4, 2006, long after any of Plaintiff's protected activity. *See supra* at 33. Moreover, prior to Mr. King's Removal Decision, Plaintiff had not, in her prior EEO and union complaints, ever alleged that Mr. King discriminated against Plaintiff. Accordingly, for this additional reason, Plaintiff cannot maintain a retaliation-based termination claim.

## II. SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS.

The underlying alleged acts upon which Plaintiff bases her hostile work environment claims are simply insufficient as a matter of law, and thus, summary judgment is appropriate.

### A. <u>Legal Framework of  Hostile Work Environment Claim Under Title VII.</u>

"For plaintiff to establish the existence of a hostile work environment violation under Title VII, she must demonstrate that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race, gender, or national origin; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Laurent*, 2008 WL 1710912 at *4, *citing Gustave-Schmidt v. Chao,* 360 F. Supp. 2d 105, 120 (D.D.C. 2004) (Walton, J.) (granting summary judgment on plaintiff's non-selection, termination, and hostile work environment claims).

Further, "[a] workplace environment becomes hostile 'only when offensive conduct permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Laurent*, 2008 WL 1710912 at *4, *quoting*, *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (affirming dismissal of hostile work environment claim, among others).  Although Title VII gives Plaintiff the right to be free from harassment due to her race or national origin, "it does not protect her from the harsh rudeness that can be a non-discriminatory aspect of a less-than-ideal workplace." *Laurent*, 2008 WL 1710912 at *4, *citing Burton v. Batista,* 339 F. Supp. 2d 97, 111 (D.D.C. 2004) (Bates, J.) (granting summary judgment on plaintiff's hostile work environment claim, among others), *and Amiri v. Stoladi Prop. Group,* 407 F. Supp. 2d 119, 126 (D.D.C. 2005) ("There is no Title VII liability for the 'ordinary tribulations of the workplace,' such as sporadic use of abusive language, occasional teasing, and isolated incidents.") (internal citations omitted); *see also Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C. Cir. 1981) (commenting that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action").

Additionally, "the key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment." *Brady v. Livingood*, 456 F. Supp. 2d 1, 10 (D.D.C. 2006) (Leon, J.), *quoting Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (Bates, J.).  "To determine whether a workplace is sufficiently hostile to be actionable under Title VII, the Court must 'look [ ] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Livingood*, 456 F. Supp. 2d at 10, *quoting*

*Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). "Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status." *Nurriddin*, 382 F. Supp. 2d at 107. Indeed, "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Id.*, *quoting Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). That is, "anti-discrimination laws do not prohibit all workplace harassment, only harassment motivated by a discriminatory criterion." *Elam v. Board of Trustees of Univ. of D.C.*, 530 F. Supp. 2d 4, 23 (D.D.C. 2007) (Bates, J.) (granting summary judgment on plaintiff's hostile work environment claim). Quite simply, Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and "[n]ormal petty slights, minor annoyances, and simple lack of good manners are not actionable under Title VII[.]" *Prince v. Rice*, 453 F. Supp. 2d 14, 29 (D.D.C. 2006) (Bates, J.)

Lastly, a hostile work environment claim cannot be based upon discrete employment actions that might serve as the basis for disparate treatment claims. As Judge Bates has noted:

> [A]lleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim. *See, e.g., Lester v. Natsios,* 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims ... are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); *Gardner v. Tripp County, South Dakota,* 66 F. Supp. 2d 1094, 1101 (D.S.D.1998) (explaining that retaliation claims are distinct from hostile work environment claims because "if the same set of facts could support both claims, state and federal provisions that provide a separate cause of action for retaliatory acts would be rendered superfluous"); *Parker v. State, Dep't of Public Safety,* 11 F.Supp.2d 467, 475 (D.Del.1998) (stating that "the dangers of allowing standard disparate treatment claims to be converted into a

> contemporaneous hostile work environment claim are apparent.
> Such an action would significantly blur the distinctions between
> both the elements that underpin each cause of action and the kinds
> of harm each cause of action was designed to address.").

*Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 164 (D.D.C. 2007) (Bates, J.) (granting summary

judgment on plaintiff's hostile work environment claim).

###    B.    Plaintiff's Claims Fall Well Short of the Hostile Work Environment Standard

As noted above, the alleged incidents that Plaintiff believes constitute a pattern of

harassment and a hostile work environment are simply insufficient as a matter of law. Plaintiff

has failed to adduce any evidence that her workplace was made abusive because of her protected

status. *See supra* at 5-9. That is, the alleged annoyances and deficiencies cannot be considered

to be acts of discriminatory intimidation, ridicule, or insult, let alone a sufficient pervasive

pattern of discrimination upon which a hostile work environment claim may lay. *See Laurent*,

2008 WL 1710912 at *4. Indeed, even if Plaintiff's unsupported, self-serving statements are

taken to be true, and the Court considers that one of her numerous supervisors on three isolated

occasions used language concerning Plaintiff's national origin; and even if such language was

considered abusive or offensive, three isolated remarks in Plaintiff's nearly nine year term at the

EPA are insufficient to show a pervasive hostile work environment. *See Bundy v. Jackson,* 641

F.2d 934, 943 n. 9 (D.C. Cir. 1981) (commenting that "casual or isolated manifestations of a

discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of

action"). Accordingly, summary judgment is proper on Plaintiff's hostile work environment

claims.

*    *    *

## CONCLUSION

For the foregoing reasons, Defendant respectfully asks this Court to enter summary judgment on all of Plaintiff's claims in Defendant's favor.

Dated: May 9, 2008
           Washington, DC

                                        Respectfully submitted,


                                        _____
                                        JEFFREY A. TAYLOR, D.C. BAR #498610
                                        United States Attorney


                                                /s/
                                        _____
                                        RUDOLPH CONTRERAS, D.C. BAR #434122
                                        Assistant United States Attorney


                                                /s/
                                        _____
                                        BRIAN P. HUDAK
                                        Assistant United States Attorney
                                        555 4th Street, NW
                                        Washington, DC 20530
                                        (202) 514-7143

                                        *Attorneys for Defendant*