UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NENA NWACHUKU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 06-0946 (RJL) |
| | ) | |
| STEPHEN L. JOHNSON, Administrator, | ) | |
| U.S. Environmental Protection Agency, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 7(h), Defendant Stephen L. Johnson ("Defendant"), Administrator, United States Environmental Protection Agency ("Agency" or "EPA"), by and through his undersigned counsel, respectfully submits this statement of material facts as to which there exists no genuine issue:

1.    Plaintiff, Dr. Nena Nwachuku ("Plaintiff"), is an African-American female born in Nigeria, Africa.  *See* Deposition Transcript of Dr. Nwachuku ("Nwachuku Dep. Tr.") at 4, submitted herewith at Exhibit 1 ("Attached Ex. 1").

2.    Plaintiff purports to have a Ph. D. in microbiology from the George Washington University and post doctoral training.  *See* Nwachuku Dep. Tr. at 13-14, Attached Ex. 1; Complainant's Opposition to Agency Motion for Summary Judgment and Declaration ("Nwachuku EEO Decl.") at 1, Attached Ex. 2.

3.    From January 1998 until December 2006, the Agency employed Plaintiff in Washington, D.C. as a GS-1301-13, Environmental Scientist in what became known as the Human Health Risk Assessment Branch ("HHRA") in the Health and Ecological Criteria

Division ("HECD") in the Office of Science and Technology ("OST"), which itself is in the Office of Water ("OW"). *See* Amd. Compl. at ¶ 4; Nwachuku Dep. Tr. at 58, Attached Ex. 1.

    4.      Plaintiff's duties at the EPA revolved around "doing sound science for the protection of the human environment and [ ] particular[] water[.]" *See* Transcript of Dr. Nwachuku's Testimony before the Equal Opportunity Employment Commission ("EEOC") ("Nwachuku EEO Tr.") at 13, Attached Ex. 3.

    5.      Plaintiff's responsibilities included working on the Contaminant Candidate List ("CCL"), which is a project aimed at identifying contaminants in drinking water. *See* Nwachuku EEO Tr. at 17-19, Attached Ex. 3.

    6.      In or about 2006, Plaintiff was the co-chair of a microbiological team or workgroup that worked on matters associated with the CCL list. *See id.*

    7.      From January 26, 1998, until February 3, 2003, Dr. Rita Schoeny was Plaintiff's first-line supervisor as the Chief of HHRA. *See* Nwachuku EEO Decl. at 2, Attached Ex. 2.

    8.      Next, from February 2003 to May 2003, Tony Maciorowski was Plaintiff's first-line supervisor on a temporary appointment. *See* Nwachuku Dep. Tr. at 59-60, Attached Ex. 1.

    9.      Beginning in June 2003, Dr. Elizabeth Doyle became the Chief of HHRA and Plaintiff's first-line supervisor -- first on a temporary detail and then on a permanent basis -- until Plaintiff was terminated. *See* Nwachuku EEO Decl. at 44, Attached Ex. 2.

    10.      Plaintiff's second-line supervisor -- *i.e.*, the Director of HECD -- during the relevant period was as follows: (i) from January 1998 to March 2002, Jeannette Wiltse in a permanent role; (ii) from March 2002 to November 2002, Dr. Ed Ohanian in an acting role; (iii) from November 2002 to May 2003, Christopher Zarba in an acting role; and (iv) from May 2003 to December 2006, Dr. Ohanian in a permanent role. *See* Nwachuku Dep. Tr. at 60-62, Attached

Ex. 1; Zarba Dep. Tr. at 6, Attached Ex. 4; Ohanian Dep. Tr. at 5, Attached Ex. 5.

11.     Plaintiff's third-line supervisor -- *i.e.*, the Director of OST -- during the relevant period was as follows: (i) from January 1998 to May 2005, Geoffrey Grubbs; and (ii) from May 2005 to December 2006, Ephraim King.  *See* Nwachuku EEO Decl. at 33-40, Attached Ex. 2; King Dep. Tr. at 5, 48, Attached Ex. 6.

12.     Plaintiff came to work at the Agency beginning on January 26, 1998, as a GS-13 environmental scientist.  *See* Nwachuku EEO Tr. at 10, Attached Ex. 3.

13.     Plaintiff believes that from the "very beginning of [her] employment," she was subjected to harassment and a hostile work environment.  Nwachuku EEO Decl. at 2, Attached Ex. 2.

14.     During the relevant period of time the Agency employed a binary, "successful" / "unsuccessful", performance evaluation system.  *See* Nwachuku 2004 & 2005 Perform. Evals. at 1, Attached Ex 7.

15.     Plaintiff was rated successful in all of her performance evaluations before she was terminated from the Agency.  *See* Nwachuku EEO Decl. at 30, Attached Ex. 2

16.     Based upon Plaintiff's Amended Complaint and its reference to her EEO Complaint from Agency No. 2004-0050-HQ ("2004 EEO Compl."), Plaintiff alleges that the harassment she suffered included:

    a.    Drs. Dolye and Ohanian allegedly suppressing Plaintiff's promotional opportunities;

    b.    Drs. Doyle and Ohanian allegedly creating "hostile adverse working conditions;"

    c.    Drs. Doyle and Ohanian allegedly profiling Plaintiff as an angry person; and

    d.    Drs. Doyle and Ohanian allegedly giving Plaintiff successful, but improper performance evaluations.

*See* 2004 EEO Compl. at 1, Attached Ex. 8; Amd. Compl. at ¶ 10.

17.     Through discovery in this action, Plaintiff revealed that certain other actions were part of an alleged "campaign of harassment," including the following allegations:

a.     Dr. Doyle providing Plaintiff projects without appropriate funding, including funding for travel;

b.     Dr. Doyle denying Plaintiff the ability to go to leadership training;

c.     Dr. Doyle incorrectly reporting Plaintiff's level of compliance with invoicing guidelines;

d.     Dr. Doyle going to chemical workgroup meetings, but not to Plaintiff's microbiology workgroup meetings;

e.     Dr. Doyle generally not showing interest in Plaintiff's work;

f.     Jafrul Hasan, a colleague of Plaintiff's, not inviting Plaintiff to a particular workshop;

g.     Dr. Doyle referring to Plaintiff as a member, as opposed to a leader, of a CCL workgroup;

h.     Dr. Doyle being rude to Plaintiff, by cutting her off in conversations;

i.     Dr. Doyle asking Plaintiff to cease singing in her cubicle; and

j.     Other action of Dr. Doyle on a daily basis.

Nwachuku Dep. Tr. at 32-47, Attached Ex. 1.

18.     At one time or another Plaintiff has also asserted that the following allegations were part of the campaign of harassment purportedly carried out against her during her time with the EPA:

a.     Lisa Almodovar and Robin Oshiro, colleagues of Plaintiff's, and other unnamed individuals referring to Plaintiff as a "junior" employee (*see* Nwachuku EEO Decl. at 5, Attached Ex. 2);

b.     On January 27, 1998, Lisa Almodovar "tore into [Plaintiff]" regarding Plaintiff's review of a Contaminant Candidate List ("CCL") report (*see id.* at 9-10);

c.     Denis Borum, an Agency employee, sending Plaintiff an allegedly rude email on March 18, 2004, concerning conference room reservations, Dr. Doyle's instruction to Plaintiff on how to reserve conference rooms, and Dr. Ohanian's response to Plaintiff's complaints regarding Dr. Doyle's response to this situation

(*see* Adden. to 2004 EEO Compl. at 3, Attached Ex. 9);

d.     Senior environmental employees ("SEEs") allegedly calling Plaintiff "crap and crazy" and insulting Plaintiff in the performance of her duties, and Dr. Ohanian's responses to Plaintiff's complaints concerning such conduct (*see id.*); and

e.     Dr. Schoeny allegedly refusing to "deal with the issues that were at hand and at the time they occurred," and "promoting and participating in the discriminatory environment" (*see* Nwachuku EEO Decl. at 22, Attached Ex. 2).

19.     SEEs are retired individuals that are contracted by the Agency to perform certain administrative tasks.  *See* Nwachuku EEO Tr. at 309-10, Attached Ex. 3; Ohanian Dep. Tr. at 42, Attached Ex. 5.

20.     Plaintiff previously attributed deficiencies in her work environment to other factors, including, "***I knew from the very beginning of my employment in HECD, that I was in a dysfunctional group with no defined structure or boundaries and that I will be dealing with power struggles, cut throat competitions, and unusual personalities.***"  Nwachuku EEO Decl. at 10, Attached Ex. 2 (emphasis and italics in original).

21.     Because Dr. Doyle's background is in toxicology, she was more likely to attend chemical, as opposed to Plaintiff's biological, team meetings because she could make substantive contributions to the chemical team's efforts.  *See* Doyle EEO Tr. 703, Attached Ex. 10.

22.     The chemical workgroup under Dr. Doyle, unlike the biological one, was fully contained within the division in which Dr. Doyle worked, and the leader of that workgroup was having problems controlling its participants.  *See id.* at 702-04.

23.     Plaintiff does not recall Chris Zarba, Edward Ohanian, Geoffrey Grubbs, Ephraim King, Anthony Maciorowski or Rita Schoeny using any pejoratives or language demeaning to black people or people from Africa as a group.  Nwachuku Dep. Tr. at 200-02, Attached Ex. 1.

24.     While Plaintiff was an EPA employee she never heard any of other employee in her branch, HHRA, use any racial pejoratives or say anything insulting to a racial group or

perpetuating a stereotype of a certain race.  *Id.* at 93-94.

25.    Plaintiff's response to the question "Did any one of the individuals in your branch ever denigrate you because of your race?" is, "No. . . .  Not that I can recall." *Id.* at 94.

26.    As to Dr. Doyle, Plaintiff believes that Dr. Doyle may have used racial pejoratives on three occasions during Plaintiff's tenure with EPA.

27.    Plaintiff claimed that Dr. Doyle once said "something about Africans, that I just blanked out. . . . I don't recall specifically what she said, but it was very demeaning." *Id.* at 182.

28.    Plaintiff cannot recall any details regarding Dr. Doyle's use of this language, and conceded that no one else heard Dr. Doyle.  *Id.* at 182-85.

29.    Plaintiff asserted that Dr. Doyle was insensitive when Plaintiff described the customs that would be honored in burying Plaintiff's mother and in not sending an email to let other HHRA employees know why Plaintiff was absent from work.  *Id.* at 191-95.

30.    Plaintiff cannot articulate any specific language used by Dr. Doyle in this incident.  *See id.*

31.    Plaintiff alleged that on one occasion when Plaintiff asked Dr. Doyle "why she was always nasty and rude to me, and she said, 'well, I used to live in Prince George's County.'" *Id.* at 195-96.

32.    Dr. Doyle did not elaborate on this comment and Plaintiff cannot recall Dr. Doyle saying anything else in which Dr. Doyle specified that such comment was intended to be demeaning toward African-Americans, people from Africa, or black people.  *Id.* at 196-97.

33.    Dr. Doyle's remark that "I used to live in Prince George's County" had no racial overtones, and was not meant to be denigrating at all.  *See* Doyle EEO Tr. at 744, Attached Ex. 10.

34.     Dr. Doyle's remark was in response to Plaintiff's question about Dr. Doyle's use of the phrase, "don't let it slide," when reinforcing to Plaintiff the importance of a particular assignment.  *See* Doyle EEO Tr. at 744, Attached Ex. 10.

35.     Dr. Doyle said "I used to live in Prince George's County" in an attempt to explain that her use of the phrase "don't let it slide" was not intended to be rude, but rather was an idiom that she learned while attending high school in Prince George's County.  *See id.*; Doyle Dep. Tr. at 31, Attached Ex. 12 (Dr. Doyle explaining that she attended high school in Prince George's County).

36.     On October 16, 2002, Mr. Grubbs (Plaintiff's then third-line supervisor and Director of OST) sent an email to all OST personnel announcing that OST "was at a point where there [was] room" in OST's GS-14/15 administratively imposed ceiling to allow for two or three promotions to the GS-14 level.  *See* Email from Grubbs to OST of 10/16/2002, Attached Ex. 13. Mr. Grubbs continued and said that he would be meeting with OST's managers "to determine how these additional slots can most fairly be allocated and how best to conduct the selection process."  *Id.*

37.     In total, OST believed it had nine spaces in its GS-14/15 ceiling with which to work with during the 2003 GS-14/15 promotional process.  *See* Grubbs EEO Tr. at 452-55, Attached Ex. 14.  Mr. Grubbs and the OST directors determined that seven of those spaces should be allocated for supervisory positions within OST to be selected in a competitive fashion. *Id.*

38.     HECD, Plaintiff's division, was allocated three of these competitive positions: (1) a permanent Director for HECD; (2) a deputy director for HECD; and (3) a branch chief position for a newly created branch within HECD.  *Id.*  Accordingly, OST had two spaces in its GS-14/15

ceiling that it used in evaluating candidates for accretion of duties promotions in the 2003 process. *Id.*; *see also* Zarba EEO Decl. at ¶ 5-7, Attached Ex. 15.

39.     On January 24, 2003, Mr. Grubbs again wrote an email to all OST personnel explaining the process OST would use to fill the two or three available GS-14 positions. *See* Email from Grubbs to OST of 01/24/2003, Attached Ex. 16.

40.     Specifically, Mr. Grubbs wrote that each division director, in conjunction with the OST immediate office, would review, among other things, "each GS-13 employee eligible for promotion to GS-14 via accretion of duties." *Id.*

41.     Mr. Grubbs went on to state that "I am directing all OST supervisors to review every eligible GS-13 and GS-14 employee under their supervision for their potential for promotion through accretion." *Id.*

42.     Further, Mr. Grubbs attached "Guidelines for Performance Evaluation Discussion," which he said would be used by each OST director "as a guide in making priority decisions for promotions through accretion." *Id.*

*43.*     Such guidelines specifically included "interaction with peers, staff and managers - - effective and diplomatic," as a criterion. *See id.*

44.     Mr. Grubbs concluded his January 24, 2003, email by saying that after supervisors have reviewed all eligible GS-13 and GS-14 employees, "I will then meet with the Deputy Office Director and [the] three Division Directors to discuss potential promotions to the GS-14 and GS-15 levels." *Id.*

45.     Following up on Mr. Grubbs's January 24, 2003, email, Mr. Zarba, the Acting Director of HECD at the time, emailed all HECD personnel, including Plaintiff, on February 6, 2003. *See* Email Zarba to HECD of 02/06/2003, Attached Ex. 17.

46.     In that email, Mr. Zarba, among other things, informed all HECD personnel that in response to Mr. Grubbs' email, a list of all eligible HECD candidates had been assembled, and that all eligible HECD employees would soon be receiving an email to confirm their eligibility. *Id.*

47.     Plaintiff was notified by email that she was "identified as eligible for GS-13 to GS-14." Email Moss to Plaintiff of 02/06/2003, Attached Ex. 18.

48.     In late-March 2003, the division directors, Mr. Grubbs and the Deputy Director of OST met to discuss the candidates and positions for promotion to GS-14/15. *See* Zarba EEO Decl. at ¶ 3, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 8, Attached Ex. 20.

49.     Specifically, present at the meeting were (i) Mr. Zarba as Acting Director of HECD; (ii) Mary Smith as Director of Engineering and Analysis Division ("EAD"); (iii) Debra Nicoll as Ms. Smith's deputy in EAD; (iv) Peter Grevatt as Acting Director of the Standards and Health Protection Division ("SHPD"); (v) Pamela Barr as Deputy Director of OST; and (vi) Mr. Grubbs as Director of OST. *See* Grubbs EEO Tr. at 452-57, Attached Ex. 14; Smith EEO Decl. at ¶ 8, Attached Ex. 20.

50.     Ms. Barr was invited to the March 2003 promotion meeting in part to discuss promotional candidates from the immediate or front office of OST, including the Resources Management and Information Staff. *See* Grubbs EEO Tr. at 456-57, Attached Ex. 14; Barr EEO Decl. at ¶ 2, Attached Ex. 21

51.     Ms. Nicoll was invited to the March 2003 promotion meeting by Mr. Grubbs because Ms. Smith was "brand new" to her position within OST. Grubbs EEO Tr. at 452, Attached Ex. 14.

52.     After discussing OST's competitive promotional needs, the panel discussed OST employees who were eligible for a potential accretion of duties promotion to GS-14.  *See* Grubb EEO Tr. at 454-57, Attached Ex. 14; Smith EEO Decl. at ¶¶ 8-9, Attached Ex. 20; Grubbs EEO Decl. at 2, Attached Ex. 19; Zarba EEO Decl. at ¶¶ 5-6, Attached Ex. 15.

53.     Prior to the March 2003 meeting, Mr. Zarba reviewed the write-ups that promotional candidates had submitted, discussed possible promotion candidates with the branch supervisors at the time -- including Anthony Maciorowski, who was Plaintiff's first line supervisor at the time (*see* Zarba Dep. Tr. at 29, Attached Ex. 4; Maciorowski EEO Decl. at ¶ 4, Attached Ex. 22) -- spoke with customers of HECD, and generally recalled his experiences with eligible HECD personnel.  Zarba EEO Tr. at 594, 597, 602, Attached Ex. 23.

54.     Based upon Mr. Zarba's review, he believed that no GS-13s or 14s within HECD, including Plaintiff, met Mr. Grubbs's stated criteria for accretion of duties promotions.  *See* Zarba Dep. Tr. at 26, 28, Attached Ex. 4; Zarba EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15.

55.     At the late-March 2003 meeting, Mr. Zarba did not recommend anyone from HECD for an accretion of duties promotion.  *See* Zarba Dep. Tr. at 30, Attached Ex. 4; Zarba EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Smith EEO Decl. at ¶ 10, Attached Ex. 20; Grubbs EEO Tr. at 455, Attached Ex. 14.

56.     In Mr. Zarba's mind, after his review, Plaintiff was at the bottom of his mental list of potential HECD promotion candidates given Plaintiff's deficiencies in her interpersonal skills. *See* Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Zarba ROI Decl. at ¶ 6, Attached Ex. 24; Zarba EEO Tr. at 627-28, Attached Ex. 23; Zarba Dep. Tr. at 44, Attached Ex. 4.

57.     At the March 2003 promotion meeting, each division director and Ms. Barr had

an opportunity to put forth eligible employees who they believed might be qualified candidates for an accretion of duties promotion. *See* Grubbs EEO Tr. at 454, Attached Ex. 14; Smith EEO Decl. at ¶ 10, Attached Ex. 20.

58.    After discussion amongst the participants, the panel concluded that two individuals were most deserving and qualified for accretion of duties promotions from GS-13 to GS-14: Ms. Vera Williams-Bower and Mr. Carey Johnston, who Mr. Grubbs selected for promotion. *See* Zarba EEO Decl. at ¶¶ 7-8, Attached Ex. 15; Grubbs EEO Tr. at 457, Attached Ex. 14; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 10, Attached Ex. 20; Barr EEO Decl. at ¶ 4, Attached Ex. 21.

59.    The process employed by Mr. Grubbs in selecting Ms. Williams-Bower and Mr. Carrey Johnston, was a well established process that had largely been used by Mr. Grubbs in all GS-14/15 advancement processes he chaired as OST Director. *See* Grubbs EEO Decl. at 2, 4-7, Attached Ex. 19; Grubbs EEO Tr. at 443-50, Attached Ex. 14.

60.    Ms. Williams-Bower and Mr. Johnston were selected from approximately 55 eligible employees in OST. *See* Grubbs EEO Tr. at 458, Attached Ex. 14

61.    Ms. Williams-Bower is a black, African-American, female who was, prior to her promotion, an Information Technology Specialist in OST. *See* Williams-Bower EEO Decl. at ¶ 1, Attached Ex. 29; Grubbs EEO Decl. at 2, Attached Ex. 19; Nwachuku Dep. Tr. at 98-99, Attached Ex. 1.

62.    Ms. Williams-Bower was neither in HECD (*i.e.*, Plaintiff's division) nor held a scientific position within OST. Nwachuku Dep. Tr. at 98-99, Attached Ex. 1; FY03 OST Roster at 1, Attached Ex. 30.

63.    Ms. Williams-Bower's duties as an Information Technology Specialist included

managing OST's information systems, and implementing various information security programs, which were vital to OST and in particular EAD due to the office's use of confidential business information and omnipresent security threats.  Grubbs EEO Tr. at 465-67, Attached Ex. 14.

64.     Ms. Williams-Bower was highly recommended by her first-line supervisor, Ellen Haffa, and was unanimously endorsed by the selection panel.  *See* Haffa EEO Decl. at ¶ 3, Attached Ex. 31; Barr EEO Decl. at ¶ 4, Attached Ex. 21; Zarba EEO Decl. at ¶ 7, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19.

65.     Mr. Johnston is a white, Caucasian, male, and was neither in HECD nor held a scientific position within OST.  *See* Nwachuku Dep. Tr. at 95-96, Attached Ex. 1.

66.     Mr. Johnston is an environmental engineer in EAD.  *See id.*; Zarba EEO Decl. at ¶ 8, Attached Ex. 15; FY03 OST Roster at 3, Attached Ex. 30.

67.     As with Ms. Williams-Bower, Mr. Johnston was unanimously endorsed by the selection panel.  *See* Smith EEO Decl. at ¶ 11, Attached Ex. 20; Zarba EEO Decl. at ¶ 8, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19.

68.     No GS-13 scientists in HECD were recommended for an accretion of duties promotion in 2003.  *See* Zarba Dep. Tr. at 30, Attached Ex. 4; Zarba EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Smith EEO Decl. at ¶ 10, Attached Ex. 20; Grubbs EEO Tr. at 455, Attached Ex. 14.

69.     At or about the time of the promotional process, there were approximately twelve GS-13s in HECD, nine of which were scientists, including Plaintiff. *See* FY03 OST Roster at 4, Attached Ex. 30; Shaw Decl., Attached Ex. 32 (authenticating FY03 OST Roster dated April 1, 2003, among others).

70.     Of the nine GS-13 scientists in HECD, four were Caucasian, two were African-

American (including Plaintiff), one was Indian-American, and one was Asian-American. *Compare* FY03 OST Roster at 4, Attached Ex. 30 (people in HECD as of April 1, 2003), *with* FY04 OST Roster at 2-3, Attached Ex. 33 (taken from the Report of Investigation, identifying race).

71.    As of April 1, 2003, Plaintiff was the only African born African-American GS-13 scientist in HECD. *See id.*

72.    Prior to March 2003 Plaintiff had not engaged in any EEO activities or filed or sought counseling for any EEO administrative complaints. Nwachuku EEO Tr. at 4-9, Attached Ex. 3.

73.    Plaintiff's sole administrative complaint that she filed before March 2003, was a Step 1 Union Grievance filed by Plaintiff in November 2001 "under Article VII of the Collective Bargaining Agreement (CBA) between Headquarters, Environmental Protection Agency and the National Treasury Employees Union Chapter 280." *See* Nov. 2001 Grievance, Attached Ex. 34.

*74.*    Although this Union Grievance alleged discrimination, such grievance was never referred to the EEO or was meant as an EEO complaint. *See id.*

75.    Plaintiff's Union Grievance (i) was filed almost a year and a half before Mr. Zarba did not recommend a single GS-13 in HECD to Mr. Grubbs for an accretion of duties promotion, and (ii) alleged wrongdoing on the part of Dr. Schoeny and Ms. Wiltse, not Messrs. Zarba or Grubbs. *See id.*; Nwachuku EEO Tr. at 4-9, Attached Ex. 3.

76.    All of Plaintiff's supervisors believed that Plaintiff had problems with her interpersonal skills. *See* Schoeny EEO Decl. at ¶¶ 5-11, Attached Ex. 26; Maciorowski EEO Decl. at ¶¶ 4-8, Attached Ex. 22; Zarba EEO Decl. at ¶¶ 9-10, Attached Ex. 15; Ohanian EEO Decl. at ¶ 8, Attached Ex. 35; Grubbs EEO Decl. at 4-5, Attached Ex. 19; Zarba ROI Decl. at ¶

6, Attached Ex. 24.

77.     Given Plaintiff's problematic interpersonal skills, throughout her time at EPA numerous employees complained to Plaintiff's supervisors about her.  *See* Ohanian Dep. Tr. at 66-69, Attached Ex. 5; Doyle Dep. Tr. at 67-69, Attached Ex. 12; Zarba Dep. Tr. at 37-41, Attached Ex. 4.

78.     Plaintiff has described Dr. Schoeny as "the unprofessional EPA female manager who comes to work dressed suggestively, exposing her buttocks and breast in the skimpiest, briefest, clinging mini dresses and skirts that you can literarily see underneath.  That is Rita Schoeny's claim to fame.  She exposes her body in the office to divert attention from the work, and her psychological issues, which have kept her in therapy for year."  Nwachuku EEO Decl. at 27, Attached Ex. 2.

79.     Plaintiff has described Mr. Zarba's past experience as "essentially a gofer position" (*id.* at 31), and that Mr. Zarba "got where he is today at his GS-15 level, not because of his qualifications or abilities but because he is a Caucasian white male."  *Id.* at 33.

80.     Prior to the 2003 promotion process, Plaintiff and Dr. Schoeny previously discussed the competencies for GS-14 and Dr. Schoeny indicated areas in which Plaintiff should work, including "areas of collaboration for 2001 and beyond mostly with microbiologists in ORD in Cincinnati."  *Id.* at 8.

81.     In 2006 Plaintiff was a co-chair of an OW microbiology workgroup tasked with working on the CCL ("CCL Workgroup").  *See* Nwachuku Dep. Tr. at 42-43, 149, Attached Ex. 1.

82.     Plaintiff's co-chair on the CCL Workgroup was Tom Carpenter from the Office of Ground Water and Drinking Water ("OGWDW") -- another office in OW, which was the

customer for the CCL Workgroup. *See id.* at 149, 161.

83.    The CCL Workgroup was tasked with creating a framework for external and EPA experts to employ in determining which water-borne contaminants would be placed on the CCL, thereby supporting OGWDW's regulatory purpose. *See generally* Schoeny Dep. Tr. at 61, Attached Ex. 25; Ohanian Dep. Tr. at 138, Attached Ex. 5.

84.    In May 2006, the CCL Workgroup was preparing to host outside experts in a three-day workshop from June 6 to 8, 2006 ("June Workshop"). *See* Doyle Dep. Tr. at 120, Attached Ex. 12.

85.    In preparation for the June Workshop, the CCL Workgroup was tasked with preparing an agenda and a document that raised and explained the questions the expert panel would be asked to discuss, which was called the Charge. *See* Doyle MSPB Tr. at 8-9, Attached Ex. 36; Nwachuku Dep. Tr. at 131-32, Attached Ex. 1.

86.    Plaintiff was tasked with drafting the Charge and ensuring that the rest of the CCL Workgroup supported the Charge. *See* Doyle MSPB Tr. at 9, Attached Ex. 36; Nwachuku Dep. Tr. at 128-29, 135-36, Attached Ex. 1.

87.    Plaintiff circulated a first draft of the Charge on May 5, 2006, asking the CCL Workgroup and Drs. Doyle and Ohanian, among others, for comments on the Charge. *See* Email from Ohanian to Nwachuku of 05/14/2006, attaching email from Nwachuku to various of 05/05/2006, Attached Ex. 37.

88.    In her email, Plaintiff noted that the expert package (which was to include the Charge), was scheduled to be sent out on May 18, 2006, followed by a note that the American Society for Microbiology ("ASM") conference began on May 20, 2006. *See id.*

89.    ASM is a scientific organization of individuals interested in microbiological

sciences.  *See* ASM, About ASM, Attached Ex. 38.

90.    Plaintiff had previously attended the annual ASM conference in 2004 and 2005 and wished to go to the 2006 ASM conference.  *See* Nwachuku Dep. Tr. at 101, 109, 168-69, Attached Ex. 1.

91.    After Plaintiff distributed a draft Charge on May 5, 2006, certain individuals submitted comments to Plaintiff, including Mr. Carpenter.  *See* Email from Burneson to various of 05/16/2006, attached Email from Carpenter to various of 05/11/2006, Attached. Ex. 39.

92.    On Friday, May 12, 2006, Plaintiff emailed the group explaining that she incorporated certain comments, but not others.  *See* Email from Ohanian to Nwachuku of 05/14/2006, attaching email from Nwachuku to various of 05/12/2006, Attached Ex. 37.

*93.*    Specifically, Plaintiff stated that comments from Mr. Carpenter (her co-chair) were not included as they "were not understandable as written," and "some of the changes were already discussed by me at our last meeting[.]"  *Id.*

94.    After receiving Plaintiff's email, on Sunday, May 14, 2006, Dr. Ohanian suggested that Plaintiff and he meet with the "major players" to finalize the Charge document.  *See* Email from Ohanian to Nwachuku of 05/14/2006, Attached Ex. 37.

95.    The following day, Monday, May 15, 2006, Dr. Doyle responded to Plaintiff's May 12, 2006, email asking Mr. Carpenter and his first-line supervisor, Eric Burneson, whether they were content with Plaintiff's response to Mr. Carpenter's comments on the Charge.  *See* Email from Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to various of 05/15/2006, Attached Ex. 40.

96.    In that same email, Dr. Doyle informed Plaintiff (i) that Dr. Ohanian and herself would be providing comments to Plaintiff on Tuesday, May 16, 2006, (ii) that after incorporating

such comments Plaintiff should redistribute the Charge to the CCL Workgroup, and (iii) that Dr. Doyle wanted to see the comments from Mr. Carpenter that were rejected by Plaintiff.  *Id.*

97.    That same day, Plaintiff replied to Dr. Doyle's email and asked Dr. Doyle, among other things, "[w]hat about you? Do you have any [comments]? If you ever find time for the work please send me your own comments."  *Id.*, attaching Email from Nwachuku to various of 05/15/2006.

98.    The next morning, Tuesday, May 16, 2006, Dr. Doyle responded to Plaintiff's email, explaining her concerns that Plaintiff had not incorporated the comments from Mr. Carpenter (who was from the customer, OGWDW).  *Id.*, attaching Email from Doyle to Nwachuku of 05/16/2006.

99.    Plaintiff forwarded this email from Dr. Doyle and the other emails contained in the email string to her friend Brenda Mosley.  *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 40; Nwachuku Dep. Tr. at 152, Attached Ex. 1

100.    In Dr. Doyle's email, Dr. Doyle also explained that she needed to hear from OGWDW to see if they concurred with Plaintiff's handling of their comments, and if not, the Charge would have to be negotiated with them.  *Id.*

101.    Dr. Doyle further emphasized that the CCL Workgroup must be given a further opportunity to review the draft Charge before it was distributed to the outside experts, and recommended that if Plaintiff felt she had insufficient time before Friday, May 19, 2006, to complete the Charge, that she might consider working on the document the following week.  *Id.*

102.    The following week was when the 2006 ASM conference was scheduled, which Plaintiff wanted to attend.  *See* Nwachuku Dep. Tr. at 114-15, 168-69, Attached Ex. 1; Doyle Dep. Tr. at 130, Attached Ex. 12.

103.    After sending Plaintiff this clarification email, Dr. Doyle received an email from Mr. Burneson.  *See* Email Burneson to various of 05/16/2006, Attached Ex. 39.

*104.*    Mr. Burneson further explained that OGWDW believed that Mr. Carpenter's prior comments were appropriate and would help clarify the Charge.  *See id.*  Plaintiff was included as a recipient on such email.  *See id.*

105.    After receiving Mr. Burneson's email, Dr. Doyle responded to the distribution, which included Plaintiff.  *See* Email from Doyle to various of 05/16/2006, Attached Ex. 42.

106.    Dr. Doyle wrote that she agreed with Mr. Burneson's assessment that Mr. Carpenter's changes seemed to clarify the Charge, and directed Plaintiff to make Mr. Carpenter's changes and circulate the revised Charge to the CCL Workgroup.  *See id.*

107.    That same day, Tuesday, May 16, 2006, after not hearing a response from Plaintiff, Dr. Doyle sent Plaintiff an email informing Plaintiff that she could not sign off on Plaintiff's travel to the ASM conference "until you have resolved the issues around the charge to the CCL Panel."  *See* Email from Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to Nwachuku of 05/16/2006, Attached Ex. 43.

108.    Dr. Doyle further instructed Plaintiff to "[p]lease read my emails and attend to the matter promptly."  *Id.*

*109.*    Plaintiff subsequently forwarded this email to her friend Ms. Mosley.  *Id.*

110.    The next morning, Wednesday, May 17, 2006, after not hearing a response to any of her directions to Plaintiff, Dr. Doyle emailed Dr. Ohanian (Dr. Doyle's supervisor), cc'ing Plaintiff and informing Dr. Ohanian that Plaintiff had not as of then incorporated OGWDW's comments into the draft Charge and that a meeting with Pam Barr to finalize the Charge scheduled for Thursday, May 18, 2006, would not be fruitful if OGWDW's comments were not

resolved by that point.  *See* 1st Email from Doyle to Ohanian, Nwachuku of 05/17/2006, Attached Ex. 44.

111.    In response, Dr. Ohanian agreed with Dr. Doyle that if OGWDW's comments were not resolved, then the Pam Barr meeting would not be productive.  *See* 2d Email from Doyle to Ohanian, Nwachuku of 05/17/2006, attaching email from Ohanian to Doyle, Nwachuku of 05/17/2006, Attached Ex. 45.

112.    Still hearing no response from Plaintiff, Dr. Doyle again contacted Plaintiff on Wednesday, May 17, 2006, and told her that a meeting had been scheduled with Plaintiff and OGWDW the following morning at 11:00 a.m. to resolve OGWDW comments.  *See* 3d Email from Doyle to Nwachuku of 05/17/2006, Attached Ex. 46.

113.    Dr. Doyle also sent Plaintiff an electronic meeting notice for this meeting.  *See id.* In her email, Dr. Doyle again told Plaintiff that "I can not (sic) approve your travel request for next week if we are unable to come to agreement with OGWDW in the person of Eric Burneson tomorrow at 11:00."  *Id.*

114.    On the evening of Wednesday, May 17, 2006, at 8:56 p.m., without replying to Dr. Doyle's prior emails or resolving the issues with the OGWDW comments, Plaintiff sent via email a revised charge to Drs. Ohanian and Doyle and Mr. Burneson.  *See* Email from Nwachuku to various of 05/17/2006, Attached Ex. 47.

115.    Plaintiff claims that although she was reading certain emails during this time, and was responsible for the CCL Workgroup Charge, she was not necessarily reading emails from her first-line or second-line supervisor relating to the Charge or the CCL Workgroup because she was overwhelmed.  *See* Nwachuku Dep. Tr. at 126-27, 179, Attached Ex. 1.

116.    Plaintiff forwarded an email from Dr. Doyle to her friend Ms. Mosley in which

Dr. Doyle specifically informed Plaintiff that she would not be authorized to travel to the ASM conference unless OGWDW's concerns with the Charge were addressed. *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 43.

117.    In certain emails, Dr. Doyle was specifically responding to questions posed directly by Plaintiff in previous emails, one of which Plaintiff subsequently forwarded to her friend Ms. Mosley. *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 40.

118.    The subjects of Dr. Doyle's emails specifically referred to the Charge, the June Workshop, the CCL Workgroup, and/or Plaintiff's travel to the ASM conference. *See* Attached Exs. 40-46.

119.    "Everyone in HECD knows how strict and dedicated I am about my work and that Nena keeps all the records." *See* Nwachuku EEO Decl. at 47, Attached Ex. 2.

120.    Plaintiff is very email literate. *See* Doyle Dep. Tr. at 113, Attached Ex. 12

121.    Plaintiff did her best to check her emails. *See* Excerpt from Pl's Resp. to Def's Reqs. to Admit, No. 14

122.    The ASM conference was important to Plaintiff. *See* Nwachuku Dep. Tr. at 169, Attached Ex. 1.

123.    The Charge was an important document. *See id.* at 132.

124.    Dr. Doyle was Plaintiff's first-line supervisor. *See id.* at 153-54.

125.    Dr. Doyle had authority to supervise Plaintiff's work. *See id.* at 153-54.

126.    Plaintiff submitted her work through Dr. Doyle. *See id.* at 153-54.

127.    Dr. Doyle was in charge of managing Plaintiff's activities as an EPA employee. *See id.* at 153-54.

128.    Early on the morning of Thursday, May 18, 2006, Dr. Ohanian and Dr. Doyle

exchanged emails, in which Dr. Ohanian asked if the Charge sent by Plaintiff the previous evening resolved the issues with OGWDW, and Dr. Doyle explained that it did not.  *See* 1st Email from Doyle to various of 05/18/2006, attaching Email from Ohanian to various of 05/18/2006, Attached Ex. 49.

129.    In her email, Dr. Doyle informed Dr. Ohanian that she, Plaintiff and OGWDW were meeting later that morning at 11:00 a.m. in an attempt to resolve their differences concerning the Charge.  *Id.*

130.    Plaintiff did not show up for the 11:00 a.m. meeting with OGWDW.  *See* 2d Email from Doyle to various of 05/18/2006, Attached Ex. 50.

131.    In response to Plaintiff's non-attendance, Dr. Doyle wrote an email to Dr. Ohanian and Ms. Barr, cc'ing Plaintiff and Mr. Burneson and informing them that Plaintiff did not show-up for the 11:00 a.m. meeting with OGWDW and, thus, the meeting with Ms. Barr later that day should be cancelled.  *Id.*

132.    Plaintiff claims that she was sick and was out on sick leave until later in the day on Thursday, May 18, 2006.  *See* Nwachuku Dep. Tr. at 147-48, Attached Ex. 1.

133.    Dr. Doyle wrote Plaintiff an email at 1:42 a.m. on Thursday, May 18, 2006, specifically informing Plaintiff that because the Charge was not completed as per OGWDW's concerns, " I [Dr. Doyle] regret that I can not (sic) authorize your travel for next week."  Email 3d Doyle to Nwachuku of 05/18/2006, Attached Ex. 51.

134.    Dr. Doyle went on to expressly state that "I want to remind you that you do not have authorization to travel on government [funds]."  *Id.*

135.    Dr. Doyle told Plaintiff in person, after Plaintiff arrived in the office on Thursday, May 18, 2006, at approximately 4:30 p.m., that Plaintiff was not authorized to go to ASM

conference, or expend any government funds on travel to such conference. *See* Doyle MSPB Decl. at ¶¶ 3-5, Attached Ex. 52.

136.    After having this face-to-face conversation with Plaintiff, Dr. Doyle left for the weekend as she was on an alternative work schedule and was off on Friday, May 19, 2006. *See* Doyle Dep. Tr. at 44, Attached Ex. 12.

137.    Plaintiff spoke with Dr. Doyle after she arrived in the office in the afternoon of May 18, 2006. *See* Nwachuku Dep. Tr. at 211, Attached Ex. 1.

138.    Based upon Plaintiff's general practice, if she saw an email regarding her potential travel to the ASM conference, she would have opened it. *See id.* at 176.

139.    On Friday, May 19, 2006, Plaintiff distributed to the experts and logistics contractor the draft Charge without OGWDW's comments ("Draft Charge"). *See* Email from Ohanian to various of 05/20/2006, attaching Email from Nwachuku to various of 05/19/2006, Attached Ex. 53.

140.    After Mr. Burneson received Plaintiff's email on Monday, May 22, 2006, and noticed that the distributed Draft Charge did not contain OGWDW's comments, he discussed the matter with Dr. Doyle, and Dr. Doyle subsequently sent an email to the workgroup, experts and contractor indicating that the Draft Charge was not final and that a revised Charge would be forthcoming. *See* Burneson MSPB Tr. at 141-42, Attached Ex. 54.

141.    Also on Friday, May 19, 2006, Plaintiff arranged travel through Rogers Travel, EPA's contracted travel agent, to attend the 2006 ASM conference in Orlando, Florida. *See* Nwachuku Dep. Tr. at 125, Attached Ex. 1.

142.    Specifically, on May 19, 2006, Plaintiff concedes that in a series of phone calls with Rodgers Travel she learned that Rodgers Travel was attempting to reach Sherry Howard,

the individual in OST responsible for travel billing, and coordinating with EPA's administrative offices in Cincinnati to obtain billing approval for Plaintiff's scheduled travel to the ASM Conference. *See* Nwachuku Dep. Tr. at 119, 122, Attached Ex. 1.

143. Plaintiff never informed Rodgers Travel that her first-line supervisor had directly told her that she was not authorized to book travel using government funds. *See* Doyle MSPB Decl. at ¶¶ 12-13, Attached Ex. 52; Williams MSPB Decl. at ¶¶ 2-5, Attached Ex. 55.

144. On May 19, 2006, Sarah J. Williams, a Financial Specialist in the Agency's Office of the Chief Financial Officer ("OCFO") who is responsible for processing travel voucher documents, received a telephone call from Rodgers Travel concerning Plaintiff's travel. William MSPB Decl. at ¶¶ 1, 2, Attached Ex. 55.

145. Specifically, Rodgers Travel called Ms. Williams to verify that Plaintiff's travel could be charged to EPA's account because Plaintiff did not have a CBA form with which to process travel. *Id.* at ¶¶ 2-3; *see also* Sylvester MSPB Decl. at ¶ 5, Attached Ex. 57 (declaration of Rogers Travel representative).

146. A CBA ("Centrally Billed Account") form is the method by which an employee without a government credit card becomes authorized to book travel. *See* Williams MSPB Decl. at ¶ 3, Attached Ex. 55.

147. If such an employee wishes to book travel using EPA funds, the CBA form is submitted by an employee with authorizing signatures from his/her supervisor(s), and the OCFO then approves the expenditures and forwards the form to Rodgers Travel. *See id*; *see also* Doyle 2d MSPB Decl. at ¶¶ 5, 7, Attached. Ex. 56.

148. In response to Rodgers Travel's call, Ms. Williams attempted to contact Plaintiff's supervisors to ensure that Plaintiff's travel was indeed authorized despite the lack of a

CBA form.  William MSPB Decl. at ¶ 4, Attached Ex. 55.

149.    Ms. Williams was unable to contact any of Plaintiff's supervisors, and relying upon the assumption that Plaintiff submitted her travel request in good faith, approved Rodgers Travel to book Plaintiff's travel.  *Id.* at ¶ 5.

150.    Plaintiff implicitly or explicitly informed Rodgers Travel that she had authority to travel.  *Id.* at ¶¶ 14-15; *see also* Sylvester MSPB Decl. at ¶ 6, Attached Ex. 57 (Plaintiff never informed Rodgers Travel that she lacked authority to travel, "Rodgers Travel took Dr. Nwachuku at her word that she was authorized to travel to Orlando"); Doyle MSPB Decl. at ¶¶ 13-14, Attached Ex. 52.

151.    On April 22, 2004, Plaintiff submitted a Travel Request Form, Traveler Authorization Form, and Advance of Funds Application requesting travel funds to attend the 2004 ASM conference from May 23 to 29, 2004, in advance of that conference.  *See* 2004 ASM Travel Request Forms, Attached Ex. 58.

152.    As noted on such forms, Plaintiff's 2004 request was signed and approved by Drs. Ohanian and Doyle in advance of the 2004 ASM conference.  *See id.* at 2-3.  Indeed, Plaintiff acknowledged that the travel forms are prepared "to make sure . . . that it [travel] is approved." Nwachuku Dep. Tr. at 109, Attached. Ex. 1.

153.    For the 2005 ASM conference, on May 27, 2005, Plaintiff again submitted a Travel Request Form, Traveler Authorization Form, and Advance of Funds Application requesting travel funds in advance of the 2005 conference.  *See* 2005 ASM Travel Request Forms, Attached Ex. 59.

154.    As with Plaintiff's 2004 request, Plaintiff's 2005 request was signed and approved by Dr. Doyle in advance of the conference.  *See id.* at 2-3.

155.    Although a Traveler Authorization Form and Advance of Funds Application were prepared for Plaintiff's travel to the 2006 ASM conference, they were never signed or authorized by any of Plaintiff's supervisors, let alone before she departed for the 2006 ASM conference. *See* Draft 2006 ASM Travel Request Forms, Attached Ex. 60.

156.    Plaintiff knew that she had not obtained authorization for travel funds to attend the 2006 ASM conference.  *See also* Williams MSPB Decl. at ¶¶ 20-21, Attached Ex. 55 (explaining that no documentation authorizing Plaintiff's travel was ever submitted to OCFO); Doyle 2d MSPB Decl. at ¶¶ 9-11, Attached Ex. 56 (Plaintiff had previously followed process to request funds in prior travel requests).

157.    Plaintiff used the tickets issued by Rodgers Travel to travel to the 2006 ASM conference, departing on Saturday, May 20, 2006.  *See* Nwachuku Dep. Tr. at 114-15, Attached Ex. 1.

158.    Plaintiff used tickets obtained without authorization from Rodgers Travel and paid for by the EPA to attend the 2006 ASM conference in Orlando, Florida.  *See* Nwachuku Dep. Tr. at 122, Attached Ex. 1 (Plaintiff concedes that EPA eventually paid for the tickets); Williams MSPB Decl. at ¶¶ 15-16, Attached Ex. 55 (Plaintiff used tickets paid for by EPA); Sylvester MSPB Decl. at ¶ 7, Attached Ex. 57 (Tickets booked by Rodgers Travel were used).

159.    On Monday, May 22, 2006, the first business day following Plaintiff's flight to Orlando, Dr. Doyle discovered that Plaintiff had indeed traveled to the ASM conference without authorization.  *See* Doyle MSPB Decl. at ¶ 6, Attached Ex. 52.

160.    Dr. Doyle proceeded to talk with Dr. Ohanian to be sure that he had not subsequently authorized Plaintiff's travel to Orlando after Dr. Doyle's email and face-to-face instructions.  *See id.* at ¶ 8.

161.    Thereafter, Dr. Doyle called Ms. Williams, who had left a message for Dr. Doyle the previous Friday, to inquire into the situation and inform Ms. Williams that Plaintiff's travel was unauthorized.  *See id.* at ¶¶ 7, 9-15; Williams MSPB Decl. at ¶¶ 6-7, Attached Ex. 55.

162.    Ms. Williams in turn called Mr. Sylvester at Rodgers Travel to learn more about the situation and whether Plaintiff had indeed traveled on tickets paid for by the EPA.  *See* Williams MSPB Decl. at ¶¶ 8-14, Attached Ex. 55.

163.    On or about May 22, 2006, Dr. Doyle called the ASM conference contact number and asked them to post a message on the conference message board for Plaintiff to immediately call Dr. Doyle.  *See* Proposed Removal (without supporting documentation) at 4, Attached Ex. 62.

164.    On or about May 22, 2006, Dr. Doyle sent Plaintiff an email telling Plaintiff she was on travel without authorization.  *See* Email from Doyle to Nwachuku of 05/23/2006, Attached Ex. 63.

165.    Plaintiff failed to ever respond to the message left on the ASM message board or to Dr. Doyle's email.  *See* Proposed Removal at 4, Attached Ex 62.

166.    On or about May 22, 2006, Dr. Doyle asked Alice Moss, a colleague of Plaintiff's who knew Plaintiff's cell phone number, to call Plaintiff and instruct her to call Dr. Doyle immediately.    Moss MSPB Decl., Attached Ex. 64; *see also generally* Doyle Notes of 05/22/2006, Attached Ex. 65.

167.    When Ms. Moss reached Plaintiff on her cell phone and conveyed Dr. Doyle's instruction for Plaintiff to call Dr. Doyle immediately, Plaintiff refused to speak about the matter and instead only offered to speak about the pending seat selection process in HECD.  *See* Moss MSPB Decl. at ¶¶ 5, 7, Attached Ex. 64.

168.    Plaintiff was absent without leave and on unauthorized travel from Monday, May 22, 2006, until Friday, May 26, 2006. *See* Proposed Removal at 4, Attached Ex. 62.

169.    When Plaintiff returned to work on Tuesday, May 30, 2006 (the Monday was Memorial Day), she refused to speak to any of her supervisors about her previous week's absence. *See id.* at 2.

170.    During Plaintiff's unauthorized leave, after discussing the Draft Charge, Dr. Doyle and Messrs. Burneson and Carpenter incorporated OGWDW's comments into the Draft Charge that Plaintiff improperly distributed on May 19, 2006. *See* Burneson MSPB Tr. at 141-42, Attached Ex. 54; Doyle MSPB Tr. at 24-25, Attached Ex. 36.

171.    After Dr. Doyle and Mr. Burneson became comfortable with the revised Charge, they met with Ms. Barr, while Plaintiff was on unauthorized leave, and obtained her approval of the revised Charge. *See* Burneson MSPB Tr. at 143, Attached Ex. 54.

172.    Upon Plaintiff's return to the office on May 30, 2006, she was provided the revised charge with OGWDW's comments ("Revised Charged") and instructed to email the Revised Charge to the workgroup, experts and contractors. *See* Email from Doyle to various of 05/30/2006, Attached Ex. 66; Doyle MSPB Tr. at 25-26, Attached Ex. 36.

173.    Dr. Doyle was out of the office part of the week of May 29, 2006, due to an illness in her family and was off on Friday, June 2, 2006, due to her compressed alternative work schedule. *See* Doyle MSPB Tr. at 25-26, Attached. Ex. 36.

174.    On Monday, June 5, 2006, realizing that Plaintiff had not distributed the Revised Charge, Dr. Doyle emailed Dr. Ohanian, cc'ing Plaintiff, and asked for his assistance in directing Plaintiff to distribute the Revised Charge. *See* Email from Ohanian to various of 06/05/2006, attaching Email from Doyle to Ohanian, Nwachuku of 06/05/2006, Attached Ex. 67; Doyle

MSPB Tr. at 26-27, Attached Ex. 36.

175.    Ohanian then emailed Plaintiff and reiterated the instruction to distribute the Revised Charge.  *See id.*  Plaintiff refused to respond to her supervisors' direct instructions and did not distribute the Revised Charge.  *See* Doyle Dep. Tr. at 187, Attached. Ex. 12; Ohanian MSPB Decl. at ¶¶ 1-2, Attached Ex. 61.

176.    Because Plaintiff refused to distribute the Revised Charge, Dr. Doyle came to the June Workshop, which was scheduled to begin on Tuesday, June 6, 2006, with copies of the Revised Charge to hand out at the commencement of the workshop.  *See* Doyle Dep. Tr. 186-87, Attached Ex. 12; Doyle MSPB Tr. at 27-29, Attached Ex. 36; Burneson Notes of 06/06/2006 at 2, Attached Ex. 68.

177.    When Plaintiff learned of Dr. Doyle's intent to distribute the Revised Charge to the group at the June Workshop, she became angry.  Doyle Dep. Tr. at 186-87, Attached Ex. 12.

178.    Immediately prior to the June Workshop with outside experts, Dr. Ohanian summoned Dr. Doyle and Mr. Burneson to join him in the hallway to discuss with Plaintiff how to proceed with the workshop.  *See* Ohanian MSPB Decl. at ¶ 3, Attached Ex. 61; Burneson MSPB Tr. at 145-47, Attached Ex. 54; Doyle MSPB Tr. at 27-29, Attached Ex. 36; Doyle Dep. Tr. at 185-86, Attached Ex. 12; Burneson Notes of 06/06/2006, Attached Ex. 68; Doyle Notes of 06/06/2006, Attached Ex. 69.

179.    When Plaintiff was informed by Drs. Doyle and Ohanian and Mr. Burneson that the Revised Charge would be circulated, Plaintiff became very agitated at Dr. Doyle.  *See id.*  Plaintiff began to shout at Dr. Doyle, stepped close to Dr. Doyle, and waved her finger in Dr. Doyle's face.  *Id.*

180.    At one point, Dr. Ohanian told Plaintiff to step back from Dr. Doyle.  Despite

Plaintiff's hostile tone and behavior, Dr. Doyle kept her composure and responded calmly to Plaintiff's aggression.  *See id.*

181.   After Plaintiff returned to work on May 30, 2006, and was directed to circulate the Revised Charge, Plaintiff sent an email to Pam Parker, a Workplace Violence Policy contact at EPA, alleging that Dr. Doyle assaulted Plaintiff during a conversation with Dr. Doyle on May 18, 2006.  *See* Email from Nwachuku to Parker of 05/30/2006, Attached Ex. 70.

*182.*   Plaintiff claimed that Dr. Doyle touched and threatened Plaintiff and waved her finger at Plaintiff wildly.  *See id.*

183.   Plaintiff claimed that this incident occurred in the only face-to-face meeting she and Dr. Doyle had on May 18, 2006.  *See* Nwachuku Dep. Tr. at 211, Attached Ex. 1.

184.   The sole in-person interaction Plaintiff had with Dr. Doyle on May 18, 2006, occurred around 4:30 p.m. near Frank Bell's workspace.  *See* Nwachuku Dep. Tr. at 214, Attached. Ex. 1; Memo Gomez-Taylor to Ohanian rev. 06/12/2006, Attached Ex. 71; Doyle Dep. Tr. at 133-34, Attached Ex. 12.

185.   Dr. Doyle denied that any such incident took place, but agrees that she and Plaintiff had just asingle conversation on that day, within which Dr. Doyle informed Plaintiff that she was not authorized to go to the 2006 ASM conference.  *See* Doyle Dep. Tr. at 146-50, Attached Ex. 12.

186.   Dr. Dana Thomas, a colleague of Plaintiff's in HECD, witnessed the alleged incident.  *See* Thomas MSPB Decl. at ¶ 4, Attached Ex. 72.

187.   Specifically, Dr. Thomas recalls observing a conversation between Plaintiff and Dr. Doyle on or about Thursday, May 18, 2006, in the proximity of the Xerox machine in OST's office space.  *See id.*

188.    Although Dr. Thomas does not recall the topic of the conversation, she recalls that Plaintiff had an abrasive demeanor, and that Dr. Doyle was extremely composed.  *Id.*

189.    Dr. Thomas distinctly recalls thinking that "this must be the reason why [Dr. Doyle] recently won a manager of the year award."  *Id.*

190.    Dr. Doyle recalls Dr. Thomas being in the vicinity when Dr. Doyle told Plaintiff on May 18, 2006, that she would not be permitted to attend the 2006 ASM conference.  *See* Doyle Dep. Tr. at 133-34, Attached Ex. 12.

191.    After being forwarded Plaintiff's violence in the workplace allegations, Maria Gomez-Taylor, the then Deputy Director of HECD, conducted an inquiry into Plaintiff's allegations and concluded that there was no violence in the workplace by Dr. Doyle.  *See* Memo from Gomez-Taylor to Ohanian rev. 06/12/2006, Attached. Ex. 71.

192.    On July 11, 2006, after careful consideration, Dr. Doyle proposed Plaintiff's removal from the EPA.  *See* Proposed Removal at 1, Attached Ex. 62.

193.    In the Proposed Removal, Dr. Doyle set forth several grounds upon which she believed Plaintiff should be removed: (i) failing to follow supervisors' instructions (on numerous occasions); (ii) being absent without leave (for five working days); (iii) making a false statement by telling Rodgers Travel that her authorization to travel to Orlando was a work in progress; (iv) making a false claim against the EPA by expending travel funds without authorization; (v) making a knowingly false violence in the workplace allegation; and (vi) engaging in disrespectful conduct toward Plaintiff's supervisors.  *See id.* at 3-6.

194.    Upon receiving Dr. Doyle's Proposed Removal, Mr. King, Plaintiff's third-line supervisor, afforded Plaintiff the opportunity to submit a written response and make an oral reply to the Proposed Removal.  *See* Pl's Written Response of 09/05/2006, Attached Ex. 73.

195.    Plaintiff, through her attorney, both submitted a written response and made an oral reply.  *See id.* at n.1.

196.    Thereafter, based upon issues raised in Plaintiff's oral and written responses, Mr. King requested additional information from persons of knowledge within the Agency.  *See* Letter from King to Shapiro of 11/13/2006, Attached Ex. 74.

197.    Mr. King also afforded Plaintiff an opportunity to respond to this supplemental information, which Plaintiff did, through her attorney, on November 30, 2006.  *See id.*; Letter from Shapiro to King of 11/30/2006, Attached Ex. 75.

198.    After Mr. King's review of all the submissions, on December 4, 2006, Mr. King concluded that the evidence supported Plaintiff's removal for all but one portion of reason (i) described above.  *See* Removal Decision at 2, Attached Ex. 76.

199.    In making his decision to remove Plaintiff, Mr. King provided Plaintiff a twenty-six page discussion of the evidence he reviewed and why it supported, or did not support, the charges presented in the Proposed Removal.  *See id.*

200.    Prior to issuing the Removal Decision, Plaintiff had not alleged that Mr. King discriminated or retaliated against her in any way.  *See infra* at 33-34.

201.    Plaintiff's last prior EEO administrative complaint was filed on May 11, 2004, and this action was instituted on May 19, 2006.  *See* 2004 EEO Compl., Attached Ex. 8; Docket Entry No. 1.

202.    On or about June 27, 2003, Plaintiff contacted an EEO counselor concerning her non-selection claim.  *See* Letter from Bucholtz to Higginbotham of 08/29/2003, Attached Ex. 77.

*203.*    Thereafter, Plaintiff was issued a Notice of Final Interview on August 26, 2002. *See id.*

204.    Plaintiff filed a formal administrative complaint, through her attorneys, which was stamped received on September 3, 2003.  *See id.*

205.    After a Report of Investigation was issued, such administrative complaint was subsequently consolidated with Plaintiff's 2004 EEO Complaint concerning alleged harassment.

206.    On or about April 9, 2004, Plaintiff contacted an EEO counselor concerning her harassment or hostile work environment claim.  *See* Excerpt from Counselor's Report of 05/13/2004, Attached Ex. 78.

*207.*    Thereafter, Plaintiff was given a Final Interview on May 11, 2002.  *See id.*

208.    Plaintiff filed a formal administrative complaint, dated May 11, 2004.  *See* 2004 EEO Compl. at 1, Attached Ex. 8.

209.    After a Report of Investigation was issued, Plaintiff's 2004 EEO Complaint and her prior non-selection based complaint were subsequently consolidated.

210.    After receiving Mr. King's Removal Decision, dated December 4, 2006, Plaintiff appealed that decision to the Merit Systems Protection Board ("MSPB").  By Initial Decision, dated April 25, 2007, the MSPB affirmed Plaintiff's removal.

211.    On June 7, 2007, Plaintiff filed an Amended Complaint, which continued to assert her non-selection and harassment based claims, which were subjected to the EEOC process, and added an allegation concerning her termination.  *See* Amd. Compl., Docket Entry No. 6.

*    *    *

Dated:  May 9, 2008
          Washington, DC

                                        Respectfully submitted,


                                        _____
                                        JEFFREY A. TAYLOR, D.C. BAR #498610
                                        United States Attorney


                                        _____
                                        RUDOLPH CONTRERAS, D.C. BAR #434122
                                        Assistant United States Attorney


                                                /s/
                                        _____
                                        BRIAN P. HUDAK
                                        Assistant United States Attorney
                                        555 4th Street, NW
                                        Washington, DC 20530
                                        (202) 514-7143

                                        *Attorneys for Defendant*