# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x
                          :
NENA NWACHUKU,            :
                          :
          Plaintiff,      :
                          :
     v.                   :
                          : CIVIL ACTION NO.
                          : 06-0046(RJL)
STEPHEN L. JOHNSON,       :
Administrator             :
U.S. Environmental        :
Protection Agency,        :
                          :
          Defendant.      :
                          :
- - - - - - - - - - - - - x


Washington, D.C.

Thursday, January 17, 2008


Deposition of

NENA NWACHUKU

a witness of lawful age, taken on behalf of the

Defendant  in the above-entitled action, before Paula

J. Homann, Notary Public in and for the District of

Columbia, in the law offices of the United States

Attorney, 501 3rd Street, NW, 4th Floor, Washington,

DC 20001, commencing at 1:07 p.m.



Page 2

APPEARANCES:
On Behalf of the Plaintiff:
    DAVID SHAPIRO, ESQ.
    ALANA HECHT, ESQ.
    Swick & Shapiro, PC
    1225 Eye Street, NW
    Suite 1290
    Washington, DC 20005


On Behalf of the Defendant:
    BRIAN P. HUDAK, ESQ.
    Asst. United States Attorney
    555 4th Street, NW
    Washington, DC 20530
    (202) 514-7143

Also Present:
    PAUL WINICK, ESQ.
    U.S. Enviornmental Protection Agency
    1200 Pennsylvania Avenue, NE
    Washington, D.C. 20004
    //

Page 3

1  - Amended Complaint                    28

2  - Complainant's Opposition to Agency Motion
      For Summary Judgment and Declaration    67

3  - Travel Request Form, 04/22/04         101

4  - Travel Request Form, 05/27/05         109

5  - Email, 05/16/06,                      151

6  - Email, 05/16/06,                      159

7  - Email, 05/16/06,                      165

8  - Email, 05/17/06,                      177

9  - Email, 05/17/06,                      180

Page 4

1                    P R O C E E D I N G S
2    Whereupon,
3                    NENA NWACHUKU
4    a witness, called for examination by counsel for the
5    Defendant, was duly sworn, and was examined and
6    testified as follows:
7         THE REPORTER:  Thank you.
8         EXAMINATION BY COUNSEL FOR DEFENDANT
9         BY MR. HUDAK:
10     Q    Would you please state your name for the
11   record?
12     A    Nena Nwachuku.
13     Q    Dr. Nwachuku, because this is a
14   discrimination case, I just want to get a little bit
15   of your biography on the record.  What is your race?
16     A    I'm African-American.
17     Q    What is your national origin?
18     A    Africa.
19     Q    What country were you born in?
20     A    In Nigeria.
21     Q    What year were you born?
22     A    1949.

Page 5

1      Q    What is your gender?
2      A    Female.
3      Q    And are you represented by counsel here
4    today?
5      A    Yes.
6      Q    And who is your counsel?
7      A    Mr. David Shapiro.
8      Q    Based upon your complaint, I understand that
9    you're seeking attorney's fees among other damages in
10   this case?
11     A    Yes.
12     Q    What is your fee arrangement with counsel?
13        MR. SHAPIRO:  Objection.  Don't answer the
14   question.
15        MR. HUDAK:  Are you directing the --
16        MR. SHAPIRO:  Yes, I'm directing her not to
17   answer.
18        MR. HUDAK:  On what grounds?
19        MR. SHAPIRO:  On the grounds of privilege.
20   You're not entitled to know the arrangement until
21   after the case is over.
22        MR. SHAPIRO:  All right.  Well, I'll just

819e58e5-a886-4c27-899f-40458c11c240

1    Q    Junior college. Okay. And did you have any
2  employment before these, what you describe as menial
3  jobs, before?
4    A    No, because I was going to school full time.
5    Q    Okay. Great. Where did you graduate from
6  high school or the equivalence thereof?
7    A    Archbishop Crowther Memorial Girls School in
8  Port Harcourt.
9    Q    Where? I'm sorry.
10   A    Arch Deacon -- no, it's Archbishop Crowther
11  Memorial Girls School. It's a missionary boarding
12  school in Port Harcourt. Port Harcourt University is
13  in Nigeria.
14   Q    Okay. After graduating from high school,
15  did you go to college?
16   A    Yeah, Immaculata.
17   Q    Okay. Immaculata. That was that at the
18  women's junior college?
19   A    Yes. Uh-huh.
20   Q    After the women's junior college, did you
21  get a degree from that college?
22   A    Yes.

1    Q    And what was your degree in?
2    A    A.A., that's associate of arts.
3    Q    Was there any field in which your degree was
4  in?
5    A    Associate of arts is, you know, a
6  combination of subjects, science, literature. So the
7  degree is just junior college degree, A.A.
8    Q    Okay. After you received your A.A. --
9    A    Uh-huh.
10   Q    -- and in what year did you receive that?
11   A    Okay. That's 1975.
12   Q    All right. And after you received your A.A.
13  in 1975, did you continue your education?
14   A    Yes, at Howard University.
15   Q    And what type of student were you at Howard
16  University? Were you an undergraduate still at that
17  point?
18   A    Yes, because -- yeah.
19   Q    Okay.
20   A    A.A. is freshman and sophomore.
21   Q    Okay.
22   A    So I continued to junior and senior and got

1  a degree.
2    Q    What was your degree in from Howard?
3    A    B.S., microbiology.
4    Q    If I got my dates right, that would have
5  been in 1977?
6    A    Yes.
7    Q    After you graduated from Howard with a B.S.
8  in microbiology, did you obtain any more education?
9    A    Yes, I did.
10   Q    And where did you obtain it?
11   A    Howard University.
12   Q    Okay. What program were you in at Howard?
13   A    A master's program.
14   Q    Did you receive a degree from your master's
15  program?
16   A    Yes, I did.
17   Q    And what field was that degree in?
18   A    Microbiology.
19   Q    What year did you receive your master's
20  degree in microbiology?
21   A    1980.
22   Q    After your master's in microbiology from

1  Howard University, did you receive further education?
2    A    I did.
3    Q    Where?
4    A    George Washington University.
5    Q    What type of program was that at GW?
6    A    Microbiology.
7    Q    That was for your doctorate?
8    A    Yes.
9    Q    What year did you receive your doctorate?
10   A    1986.
11   Q    After receiving your doctorate from GW in
12  microbiology in 1986, did you obtain any further
13  education?
14   A    Yes, I did.
15   Q    And from where did you do that?
16   A    George Washington University.
17   Q    What type of program was that?
18   A    Post doc.
19   Q    I beg your forgiveness. I'm not acquainted
20  with post-doc degrees. My education stops after law
21  school. Is there a degree that you obtain in your
22  post-doctorate work?

819e58e5-a886-4c27-899f-40458c11c240

Page 14

1    A   No. It's post doc. They call it post
2  doctorate. It's not a degree like a bachelor or PhD.
3    Q   How long were you at GW in your post-
4  doctorate studies?
5    A   One year.
6    Q   And that was 1986 to 1987?
7    A   Yes.
8    Q   After your post-doc work, did you have any
9  further education? Formal education?
10   A   Yeah. I was still taking classes to improve
11 myself such as still at GW as alumni, but I was
12 working also.
13   Q   And have you more or less consistently taken
14 various courses since your post-doc work to keep you
15 up on training and development in your field?
16   A   Yes, I have.
17   Q   We'll talk about the training a little bit
18 more in just a little bit.
19        I understand the reason we're here today is
20 because of a discrimination lawsuit that you have
21 filed against the Environmental Protection Agency.
22   A   Yes.

Page 15

1    Q   Other than your time at the EPA and
2  complaints that you filed at the EPA, have you filed
3  any other complaints alleging discriminatory conduct
4  in your employment?
5    MR. SHAPIRO:  Other than the EPA.
6    THE WITNESS:  Okay. Other than the EPA.
7  Not discriminatory conduct.
8    BY MR. HUDAK:
9    Q   Have you filed any complaints regarding your
10 supervision or your conditions of employment at any
11 other position?
12   A   Only for performance evaluation.
13   Q   And where was that?
14   A   D.C. Government.
15   Q   Can you please describe what you alleged in
16 that complaint?
17   A   The performance evaluation was done without
18 showing it to me or discussing it. They did it and
19 just submit it. So I was the one who asked for my
20 evaluation.
21   Q   Did you file any formal complaint with your
22 agency with regards to that matter?

Page 16

1    A   Uh-huh. I think. Yeah. It's not as --
2  it's not like an EEO complaint.
3    Q   It was a administrative grievance?
4    A   Yes.
5    Q   And what was the resolution of that
6  administrative grievance?
7    A   It was resolved and I won.
8    Q   How was it resolved?
9    A   A satisfactory was the one that was
10 submitted on my behalf, and when I won, they changed
11 my evaluation.
12   Q   As part of that proceeding, did you provide
13 any testimony in a formal setting as opposed to, you
14 know, submitting a letter or anything like that?
15   A   It was just the letter and then we went --
16 this was a long time ago -- we went before a lady in -
17 - I've forgotten -- I don't remember specifically but
18 it's not like EEO. We went before a lady.
19   Q   Okay. And I understand it's a long time.
20 But when generally was this event?
21   A   I don't remember.
22   Q   If you could, give an estimate as to a year.

Page 17

1    A   Okay. This was when I was in ERC,
2  Environmental Research Center, when I was doing
3  research and publishing.
4    Q   Okay.
5    A   And I felt the satisfactory was way below my
6  accomplishments, especially since it was submitted
7  without discussion, the standard discussion. It was
8  just submitted without showing any of us.
9    Q   Did you allege in that grievance that it was
10 submitted without your input because of any
11 discriminatory animus directed at you?
12   A   No.
13   Q   Other than that one grievance, have you been
14 involved in any other complaints against your
15 employers or due to the terms and conditions of your
16 employment?
17   MR. SHAPIRO:  Other than the --
18   MR. HUDAK:  Other than then EPA ones.
19   BY MR. HUDAK:
20   Q   I'm asking for everything else.
21   A   No.
22   Q   Okay. Why don't we direct our attention to

819e58e5-a886-4c27-899f-40458c11c240

1  the complaint in this action.  Your complaint alleges
2  that you were discriminated against in certain fashion
3  during your time with the EPA.
4      A   Yes.
5      Q   Specifically which acts do you believe were
6  discriminatorily motivated and reflected adverse
7  actions on you?
8      A   I don't know the acts.  I'm not a lawyer.  I
9  don't know what the acts are.
10     Q   Well, let me take the word "act" out.  What
11 events do you believe --
12     A   Oh, the events.
13     Q   -- that discriminated against you?
14         MR. SHAPIRO:  Can you show her the
15 complaint?
16         MR. HUDAK:  We'll show it to her in a
17 second.  I just want to get her general understanding
18 and then we can show her the complaint.
19         MR. SHAPIRO:  Sure.
20         THE WITNESS:  Okay.  Oh, okay.  That's the
21 EEO complaint?  Is that -- can you ask me again?
22         BY MR. HUDAK:

1      Q   Sure.  The complaint I'm referring to is the
2  complaint filed in the Federal District Court here and
3  the reason that we're having this deposition here
4  today.
5      A   Okay.
6      Q   Which in that complaint, the ones that we're
7  doing here today and the ones that you are asking the
8  court to grant you relief, what acts or events do you
9  believe were discriminatorily motivated and adversely
10 affect you?
11     A   Okay.  One was the promotion.  The second
12 one was the termination of my employment.  And another
13 one was the constant harassment.  I had filed one for
14 promotion, and then the harassment got worse.  It got
15 worse and then I was audited all the time for so many
16 things which I actually put down in my complaint.
17     Q   We'll get to the complaint in a second.  But
18 the promotion you refer to refers to the fact that you
19 were passed over for an accretion of duties promotion
20 in, I believe it was 2003?
21         MR. SHAPIRO:  Objection.  I'm not sure it
22 was -- she didn't say accretion of duties.

1          MR. HUDAK:  Oh, that's --
2          MR. SHAPIRO:  She was passed over for
3  promotion.
4          MR. HUDAK:  That's fine.
5          BY MR. HUDAK:
6      Q   Well, can you more fully describe what you
7  mean by promotion as one of the acts of discrimination
8  that you allege in this case?
9      A   Okay.  To describe?
10     Q   Yes.
11     A   Okay.  I came in at GS-13 full performance
12 level.  And then I was given assignments at a GS-14
13 level, and I was accomplishing at GS-14 level.  And
14 when the accretion of duty promotion came up, we were
15 all asked to submit our qualifications.  And they give
16 us the date for which the -- they sent a letter to all
17 the eligibles, all the eligible GS-13s.  I was one of
18 them.
19         And then they give us the date of April 10
20 as the date to submit our qualifications.  There is
21 only guideline standards sent out by the office
22 director, Mr. Geoffrey Grubbs.  And we were asked to

1  write up and submit.
2          And I wrote up based on the guidelines that
3  they gave us to write up and I submitted.  However, I
4  discovered that the promotions were already made --
5  I've forgotten the date -- in March, whereas, they are
6  telling us to submit our write-ups in April 10th.
7          So -- should I continue?
8      Q   Yes, please.  Please continue.  I want you
9  to fully describe it.
10     A   So when we had been in meeting -- we had on-
11 hands meeting in our division -- and somebody asked
12 did the division director, acting division director,
13 Ed Ohanian, what about what we were asked to submit.
14 What happened about the accretion of duty?
15         And he told us that he had nothing to do
16 with it, that Chris Zarba was the one who said that
17 nobody in our division was qualified to be promoted to
18 a GS-14.  That's based on that guideline given by Mr.
19 Geoffrey Grubbs.  I was surprised.
20         So I went to Mr. Geoffrey Grubbs, and I
21 showed him my write-up and everything.  And I said you
22 gave us this write-up and you told us that we -- that

819e58e5-a886-4c27-899f-40458c11c240

Page 30

1    MR. SHAPIRO: Well, eight also does that,
2  you know?
3    MR. HUDAK: David, I'm asking the questions
4  here. I do not need you to point out things that I'm
5  not asking. I asked if nine summarized it, and she
6  said yes.
7    MR. SHAPIRO: But eight has to do with --
8  you directed her attention to nine only. You didn't
9  direct her attention to eight.
10    Okay. Fine. I'm going to insist that she
11  read the entire complaint. If you're going to play
12  this game, I will insist that she read the entire
13  complaint each time you point a question to her.
14    MR. HUDAK: If you are -- David, you have
15  objections. You can object to preserve the record.
16  If you
17  -- other than that you really shouldn't be speaking
18  here in this deposition, unless you're directing your
19  witness not to answer.
20    BY MR. HUDAK:
21    Q   Paragraph 8, does that also describe events
22  concerning the promotion act that we talked about

Page 31

1  earlier?
2    A   It does.
3    Q   Okay. Paragraph 10, that generally
4  summarizes the constant harassment that you talked
5  about as the second type of discrimination that you
6  faced?
7    A   Yes, 0065, yes.
8    Q   Yes. You see on the one, two, three, four,
9  five lines down, the sentence -- well, actually let's
10  start with this second sentence of the paragraph
11  saying -- actually let's just -- I'm just reading from
12  the beginning.
13    "After learning of her nonpromotion, Dr.
14  Nwachuku lost the discrimination complaint against
15  NST. Following this act" --
16    MR. SHAPIRO: I think you're going to have
17  to read slower.
18    MR. HUDAK: Do I need to read slower? If
19  the court reporter can keep up with me, as long as the
20  witness doesn't have a problem with reading the
21  paragraph, which she just did, I think that it's fine.
22    BY MR. HUDAK:

Page 32

1    Q   "Following this act, HECD management
2  officials, in an effort to continue the race, color,
3  and national origin discrimination against her, and
4  particularly to punish her for having launched a
5  complaint of non-promotion; i.e., EPA Complaint No.
6  2003-0065-HQ, subjected her to a campaign of
7  harassment which included suppressing her promotional
8  opportunities, creating a hostile work environment for
9  her and giving her lower than deserved performance
10  evaluations, all of which is contained in her later
11  administrative EEO complaint; i.e., EPA Complaint No.
12  2004-0050-HQ, as noted this campaign of harassment was
13  continuing in nature."
14    Now I want to direct you specifically to the
15  last three lines on page 4, in paragraph 10, beginning
16  with the line "subject her to a campaign of
17  harassment"; do you see that?
18    A   Yes, I do.
19    Q   All right. What acts or events constituted
20  this campaign of harassment as you allege in paragraph
21  10?
22    A   Okay. This paragraph is referring to the

Page 33

1  constant harassment by my supervisor, Elizabeth Doyle.
2    Q   Okay. And that's --
3    MR. SHAPIRO: I think he wants you to give
4  him examples.
5    BY MR. HUDAK:
6    Q   Of what constituted the campaign of
7  harassment?
8    A   Of harassment? Okay. For example, we all
9  are assigned projects and then there's funding for
10  each person. But she would assign me projects but
11  would give me zero dollar for -- to do the project.
12    For example, CCL, I was leader of my group
13  in CCL. And in our regular year funding, my
14  counterpart, well, usually was given either 25,000 or
15  50,000 to work on her chemistry aspect. But for mine
16  zero dollar was assigned.
17    Q   Okay. So just so I understand, assigning
18  you projects without giving you appropriate funding
19  was part of the campaign for harassment?
20    A   Right.
21    Q   All right.
22    A   To do the job effectively because I can't do

819e58e5-a886-4c27-899f-40458c11c240

Page 34

1  the job with no money.
2      Q   I understand what you're saying.  Are there
3  any other acts or events that comprise the campaign on
4  harassment?
5      A   Several.
6      Q   What are the other ones?
7      A   For example, I would ask to go for -- what
8  is it called -- the training in West Virginia.  Some
9  of the -- when you look at the requirement for GS-14,
10  there are some training that you need to have.  I
11  would ask to get the training, and I will not get it.
12      They will suggest, oh, maybe you can go to
13  do the internet or online.  But when you are writing
14  down your resume and your accomplishments, if you put
15  it down, HR  will --
16      MR. SHAPIRO:  Hold on.
17      (Interruption to the proceedings.)
18      BY MR. HUDAK:
19      Q   We're talking about what constituted the
20  campaign of harassment.  You've mentioned that being
21  assigned projects without appropriate funding, and
22  then you were describing being deprived of training at

Page 35

1  West Virginia, which was a --
2      A   I'm trying to remember what name we called
3  those ABSOC training.
4      Q   Was it leadership training?  Is that what it
5  was?
6      A   Yes.  That's one of them.  Leadership
7  training and I forgot what -- I knew it.
8      Q   Okay.
9      A   And then as a project officer, the way you
10  perform your duty includes being able to approve the
11  invoices as they come in.  Otherwise, your performance
12  can lower down the entire OST.  And one particular
13  time, I saw somebody at the subway, and he told me,
14  "Nena, your name was mentioned at the managers'
15  meeting as the person who is bringing down the OST
16  down.  Your approval is rated at 33 percent."
17      And I said, "No.  my approval, I'm very
18  meticulous, is at hundred percent."  And I said to
19  him, "Why didn't you tell me?"
20      And he said, well, he did tell our main
21  project contacts, and that person was Kathy.  What's
22  Kathy's last name?  Kathy -- I've forgotten Kathy's

Page 36

1  last name.
2      MR. SHAPIRO:  Crawford.
3      THE WITNESS:  Crawford.  She was supposed to
4  be the one to tell me.  So I sent an email.  And
5  before then, the head of projects in Cincinnati was
6  sending emails to all the project officers, and she
7  didn't mention names, but the way she blind-copied me
8  as to those people who were not meeting up in the
9  requirements and so on, I was shocked.
10      So when I called Kathy, and I said, "Listen,
11  this is what's going on.  How come you didn't inform
12  me?"
13      And she said that when it came about, she
14  told Beth, Elizabeth Doyle and Ed Ohanian and they
15  specifically told her not to tell me.
16      And then after that, she went to Geoffrey
17  Grubbs, and Geoffrey Grubbs is the officer director,
18  and they discussed the people who were deficient and
19  those were bringing down the whole, you know.  She
20  even went up to the office director level to discuss
21  me at the staff meeting.
22      But she wouldn't come to me, her

Page 37

1  subordinate, to tell me that something was wrong which
2  was not true.  I approved everything hundred percent.
3   But they -- and she, I believe, that's Elizabeth
4  Doyle and Edward Ohanian were targeting me to look --
5  to make me look real bad in the performance of my
6  duty.
7      And then when I point it out and I brought
8  up an email and forward it and showed them where they
9  were sending the invoices to another office, and I was
10  asking how come you are not sending me my invoices so
11  I can know what's going on with my projects.
12      And so I went -- I sent an email to Mr.
13  Grubbs.  And then he had to apologize, and the lady in
14  Cincinnati apologize and said, "Nena, I'll take you
15  out for cook, you know, and he had to make Elizabeth
16  Doyle apologize.  So this is one of the specific, but
17  there were several things that they did to me,
18  constant harassment and bullying.
19      BY MR. HUDAK:
20      Q   Okay.  What I'm asking for is if you could
21  just list the specific ones.  I think this is the
22  third one that we've now had.  We have being assigned

819e58e5-a886-4c27-899f-40458c11c240

1  projects without appropriate funding, the denial of
2  leadership training, and now this incident regarding
3  deficient invoices.  Is there anything else that
4  comprise the campaign of harassment?
5      A   Several.  And I listed them in my complaint.
6      Q   Okay.  So besides what's written here in the
7  complaint and the three that you listed, is there any
8  other act or event that comprised the campaign of
9  harassment that you allege here?
10     MR. SHAPIRO:  I'm going to object.  She's
11 told you she listed them in her complaint.  Not this
12 complaint.  She listed them in her administrative
13 complaints.
14     MR. HUDAK:  Okay.
15     MR. SHAPIRO:  They're listed directly there.
16     THE WITNESS:  And also in my affidavit.
17     BY MR. HUDAK:
18     Q   Okay.  So if I were to go to your formal
19 complaint, your affidavit, and these three items that
20 you just described to me, that it the totality of
21 items that comprise what you allege is a campaign of
22 harassment?

1      MR. SHAPIRO:  Objection.  That's not what
2  she said.
3      BY MR. HUDAK:
4      Q   Where can I go to find a list of the items
5  that comprise this campaign of harassment?  Please
6  answer.
7      A   Okay.  There are several.  In the -- there
8  was another complaint that I filed, but for 0065 -- no
9  0050 --20040050 -- I did list several.  Some of them
10 as they occur, I will list, and some of them, I'll go
11 to Edward Ohanian to see if I'll get any relief since
12 he is the division director.
13     Q   Okay.  So if I go to your complaint, they're
14 referenced in your District Court complaint.
15     A   Yes.
16     Q   And I read those two complaints, what's
17 described here, and the three things you just
18 mentioned, is there anything else that you believe
19 constituted the campaign of harassment as you used
20 that term in paragraph 10 of your District Court
21 complaint?
22     A   There are several others but because I was

1  overwhelmed, I wasn't going into it.  It was daily
2  bullying.  For example, some meetings I wasn't even
3  invited and it had to do with the projects that I was
4  handling.
5      And then as the leader of CCL, we have the
6  chemistry counterpart and the microbiology
7  counterpart.  She would constantly go to the meetings
8  of my counterpart, but she never came to mine.  So she
9  didn't know some of the problems that I was having
10 firsthand, even though -- she didn't show any interest
11 in my projects.
12     Q   Okay.  So the campaign of harassment, if I
13 understand you correctly, if I go to the two
14 complaints, EPA complaints that are referenced in
15 paragraph 10, and I read paragraph 10, and in addition
16 to the items you testified today about, projects
17 without appropriate funding, the denial of leadership
18 training at West Virginia, the incident regarding
19 deficient invoices, the non-invitation to certain
20 meetings, and I'll just group all that non-invitation
21 together, Elizabeth Doyle going to the chemistry
22 meetings, but not to your meetings, and Elizabeth

1  Doyle generally not showing interest in your work.
2      Is there anything else that you believe
3  constituted the campaign of harassment?
4      A   Yes.
5      Q   What?
6      A   During my performance evaluation, during my
7  performance, usually we have six months evaluation,
8  and final evaluation.  In the final evaluation, I come
9  in and Elizabeth handed me my evaluation.
10     When I read it, I was shocked, those things
11 that she was saying, me excluding Jafrul and something
12 else.  When I asked her to explain and then she
13 mentioned Eric Burneson, that Eric Burneson said that
14 Nena was not reviewing something.  And I said when did
15 this happen, you know?  When did this happen?
16     I've never excluded Jafrul during my
17 workshop.  I invited everybody, everybody, and I give
18 them the thing to review for me.  And when he had his
19 own workshop, he never even invited me.  I only heard
20 through Steve, Steve Schaub, that he was invited, and
21 I never.
22     But here you are writing this in my

Page 42

1  evaluation. This never happened if I even discussed
2  it. And I thought performance evaluation is when you
3  sit down one-on-one with your supervisor, six months,
4  and they tell you what you did wrong before the final,
5  you know.
6        But in the final, she never even discussed
7  it. She never even, it never happened. She just gave
8  me the evaluation to sign. That was the first time I
9  found it was all made up, you know?
10       And another thing, he actually keeps
11 referring to me as a member of CCL. I'm not the lead.
12  I formed -- Dr. Paul Berger and myself formed the CCL
13 -- what's it called -- across the agency workgroup.
14 We called up everybody because this is a new area. It
15 hasn't been before by EPA. And we called those with
16 expertise to come and join us in this workgroup. We
17 formed it.
18       And when he came on board, I oriented her as
19 to what we are doing and give her the book. And I
20 invited her to our meeting in OGW and introduce her.
21 But every time she keeps referring to me as a member
22 of the workgroup.

Page 43

1       I am the leader. I was the crew leader and
2  I formed that workgroup. So this is another
3  discrimination because there's a difference between
4  being a lead of a workgroup and being just a member of
5  the workgroup.
6    Q   Okay. Anything else that you believe
7  comprised the campaign of harassment?
8    A   Because of the time, I can't tell you
9  everything right now, but I listed most of it, a lot
10 of them, in my EEO complaint.
11   Q   Okay. So the two EEO complaints that we
12 referenced, paragraph 10 of this complaint, projects
13 without appropriate funding, the denial of leadership
14 training, the incident regarding deficient invoices,
15 the non-invitation to meetings, the Elizabeth Doyle
16 going to the chemistry meetings, not your biology
17 meetings, the general not showing of interest in your
18 work by Elizabeth Doyle, the performance evaluation
19 that you just described, the non-invitation to the
20 workshop you just described, and referring to you as a
21 member as opposed to a leader of CCL, these are the
22 activities that constituted the campaign of

Page 44

1  harassment?
2    A   That's --
3    Q   In general. I'm trying to understand what
4  your allegations are in this case, and I'm asking you
5  what constituted the campaign of harassment, and I
6  believe that we've done -- the items that --
7    A   The charges --
8    Q   -- let me just finish -- the items that I
9  just listed, your two complaints, what you say here in
10 paragraph 10. What else?
11   A   Okay. The charges of misconduct.
12   Q   Can you please what you mean by "charges and
13 misconduct"?
14   A   The charges of misconduct that were formed
15 the basis for me being terminated.
16   Q   Okay.
17   A   That's another set of harassments.
18   Q   Okay. I understand and that what you
19 described earlier as the third group or discriminatory
20 act that we went through earlier. So you said the
21 termination. You have what you've described as the
22 constant harassment and you have the promotion. I'm

Page 45

1  trying to focus on the constant harassment.
2    A   Okay.
3    Q   And what we've gone through here in
4  paragraph 10, which you agreed summarized your
5  constant harassment, refers to two EPA complaints, and
6  then the nine things that I listed in my prior
7  question. Is there anything else that you believe
8  constituted the campaign of harassment?
9    A   Yes.
10   Q   What?
11   A   In travel.
12   Q   Travel?
13   A   Yes.
14   Q   Can you please describe that?
15   A   For example, there was a time I wanted to go
16 for training -- I've forgotten where -- for to support
17 my -- support one of my projects, and she said no,
18 that I could go and take it with the USDA, the USDA
19 rather than paying for me to go. And I know that
20 others were being given the opportunity to enhance
21 their skills. And, you know, but I wasn't given that.
22       And then she was always being rude to me.

Page 46

1  She was always rude to me.  Sometimes, for example, I
2  may be talking to a fellow colleague and she cut me --
3  she would come in there and cut me short, you know.
4          Oh, yes, I remember another one.  She saw me
5  Xeroxing at the Xerox machine.  And she called me,
6  "Nena," and stuck something in my hand.  I opened it
7  up and it was a code of conduct.  I was shocked.
8          I said, "What is this for?"  And she said
9  because Brendlyn Faison said that I was singing in my
10 cube.  I would like to sing, but I can't sing, you
11 know?  And she just -- she didn't even ask me or
12 anything.
13         So I went -- no, she didn't say Brendlyn
14 Faison.  She said somebody said I was singing in my
15 cube.  So I went to my two neighbors, Steve -- what's
16 his name -- forgotten their name -- my two neighbors,
17 and I said, "Elizabeth just said that I was singing in
18 my cube."  And it was just -- it was hilarious.
19         They said, "Oh, Nena, I didn't even know
20 that you can sing."
21         Another person said no, they never heard me.
22 I continued investigating or finding out how that

Page 47

1  came about.  And I found out that it was Brendlyn
2  Faison that reported that I was singing in my cube.
3          Now Brendlyn Faison's cube is about one,
4  two, three, four, five, five cubes away from mine, the
5  distance of five cubes or four cubes.  And she comes.
6  She didn't ask anybody but she sticks code of conduct
7  in my hand that I was singing in my cube.  That never
8  happened.
9      Q   Okay.  Anything else that you believe
10 constituted the campaign --
11     A   It's daily accounting.  I just could not --
12 it was daily overwhelming constant harassment.
13     Q   Okay.  Now you believe that all these things
14 were motivated because of your race or national
15 origin, correct?
16     A   She would not do it a White, Caucasian
17 employee.
18     Q   My question is a little bit different.  You
19 believe that all these things that you've listed here
20 today were motivated because of your race or national
21 origin; is that what you're alleging in this case?
22     A   I believe that all these were motivated

Page 48

1  because, number one, I filed a complaint; number two,
2  I'm African-American of different African, ethnic
3  origin and because I'm Black.
4      Q   So those three things are the things that
5  motivated the list that you've given us here today?
6          MR. SHAPIRO:  Objection.  She said four
7  things.
8          BY MR. HUDAK:
9      Q   I'm sorry.  Those four things.  The
10 retaliation.
11     A   Uh-huh.
12     Q   You being an African-American.
13     A   Retaliation, I'm African-American to
14 discriminate against me, and in fact one time I asked
15 her, "Elizabeth, why are you so nasty and rude to me?"
16         And she said that she used to live in Prince
17 George's County.  What has that got to do with me?
18     Q   Okay.  I'm just asking what you believe
19 motivated this list.  And I think you mentioned
20 retaliation.  You mentioned your national origin being
21 from Africa.
22     A   Yes.

Page 49

1      Q   And you mentioned your race being Black.
2      A   Right.
3      Q   Is there anything else you believe motivated
4  these items?
5          MR. SHAPIRO:  She also said retaliation.
6  She  said --
7          MR. HUDAK:  That was the first one that I
8  listed.  Retaliation, national origin, race.
9          MR. SHAPIRO:  She also said color.
10         MR. HUDAK:  And color, okay.
11         MR. SHAPIRO:  Four items.
12         THE WITNESS:  Yes.
13         BY MR. HUDAK:
14     Q   Four items:  color, national origin, race,
15 retaliation.  Is there anything else that you believe
16 motivated these actions which you have described as a
17 campaign of harassment?
18     A   I'm sure there were others, but these are
19 the ones that come to me at this time.
20     Q   Do you believe that you were discriminated
21 against or this campaign of harassment was put upon
22 you because you're a microbiologist and not a

819e58e5-a886-4c27-899f-40458c11c240

Page 58

1 in the department that she even went to report to
2 Ephraim King.
3    Q   Anyone else that you know of that had
4 problems with Elizabeth Doyle as their boss or found
5 her to be rude?
6    A   No.  She was -- she believed in click.  She
7 had her own favorites, favorite employees,
8 subordinates.
9    Q   During your time at EPA -- now you were in
10 the health and ecological criteria division; am I
11 correct?  Did I get that right?  And it's okay if I
12 refer to it as HECD?
13    A   Yes.
14    Q   And HECD is a division in the Office of
15 Science and Technology.
16    A   Right.
17    Q   And the Office of Science and Technology is
18 an office with inside Office of Water?
19    A   Correct.
20    Q   Under the HECD, there are -- when you left
21 EPA, there are two branches, or three branches?
22    A   Yes, three.

Page 59

1    Q   And what are the three branches?
2    A   You know one we coined --
3    Q   What was yours?
4    A   Risk assessment -- health and risk
5 assessment -- HRAB.
6    Q   Human -- health and risk assessment is --
7    A   Yes.  Human risk assessment branch.
8    Q   Okay.  And in general the three branches
9 were a human branch, a ecological branch, and a
10 ecological processes branch.
11    A   Right.
12    Q   Those are the three.  And you were in the
13 human branch.
14    A   Right.
15    Q   Okay.  And when you first began your
16 immediate supervisor was who?
17    A   In the HRAB?  Oh, you mean when I started?
18    Q   When you started.
19    A   It's Rita.
20    Q   And after Rita came?
21    A   After Rita came Tony Maciorowski for three
22 months.  He was supervising two branches at the same

Page 60

1 time.
2    Q   Okay.  And what three months were those; do
3 you recall?
4    A   As soon as Rita left, it's in my response to
5 summary judgment.
6    Q   Okay.
7    A   I put in all my performance evaluation.  His
8 was only temporary for three months.
9    Q   Three months.  Okay.  And after Anthony who
10 was next?
11    A   Elizabeth Doyle.
12    Q   Okay.  So you only had three direct
13 supervisors during your time there?
14    A   Yeah.  Yeah.
15    Q   Okay.  Now above them was the director of
16 the HECD?
17    A   Right, division director, yes.
18    Q   Okay.  And can you just give me the
19 chronology of who was the division director while you
20 were there at the EPA?
21    A   Okay.  We had Jeannette Wiltsie.  And when
22 Jeannette Wiltsie left, they had rotation of acting.

Page 61

1 Ed acted.
2    Q   That's Ed Ohanian?
3    A   Yes.  And then Christopher Zarba acted.  I
4 don't remember if Rita acted.  No, maybe not.  I don't
5 remember.  But I think it's Ed who acted and
6 Christopher Zarba acted.
7    Q   Okay.  So when Wiltsie, Ed --
8    A   Wiltsie was permanent.
9    Q   Permanent?
10    A   And then she retired.
11    Q   And then Chris was next?
12    A   No.
13    Q   Or Ed was next?
14    A   Ed was next, and he had it longer.
15    Q   He had it longer.  And then Chris?
16    A   Right.
17    Q   And then did someone come in on a permanent
18 basis?
19    A   Yes.  And then Ed became a manager again.
20 He used to be a manager and then he got down to senior
21 science advisor and then he became acting division
22 director, management, and then Christopher Zarba and

819e58e5-a886-4c27-899f-40458c11c240

1  then he became permanent.

2     Q   Okay.  I forgot to ask earlier.  When do you

3  believe the campaign of harassment began?

4     A   As soon as I got in there.

5     Q   Okay.  As soon as you joined until when you

6  left, the campaign on the present?

7     A   Right, because I came in as GS-13.  PhD, I'm

8  post-doc.  And in our team we had GS-9, GS-12, and I

9  was labeled junior, junior scientist.

10     Q   Now the label of junior scientist, was that

11  something that was commonly used in OST?

12     A   No.

13     Q   No.  So it was just specifically aimed at

14  you?

15     A   Yes.

16     Q   Okay.

17     A   Nena.  And emails were being sent.  They

18  labeled me junior scientist and then Latisha Parker,

19  who was -- who came in as GS-9.  But I had come in as

20  a GS-13 at high performance level and with ten years'

21  experience in the industry.

22     Q   I understand.  But let me just correct my

1  understanding because you just said something that --

2  Latisha Parker was also labeled junior.

3     A   Right.

4     Q   So it just wasn't you who was labeled junior

5  in the department?

6     A   She was a GS-9.

7     Q   I understand.  I'm not asking about grades.

8  I'm just asking who was labeled junior within the

9  department when you joined.

10     A   Not department.  Within our team, MWAB.

11  They labeled me junior to -- in the team.  I was a

12  junior scientist.  GS-13 is not a junior scientist,

13  especially with my qualifications.

14     Q   Okay.  I understand.  But that was your

15  title as a junior scientist and that was something

16  that was applied by the EPA to your position?

17     A   No.  I was --

18     Q   That was just on a ad hoc basis that people

19  called you a junior scientist?

20     A   Right.  In our team, they labeled me junior

21  scientist to the GS -- I came in higher than another

22  person who was a GS-12.  And then -- and she was only

1  about maybe four months older in the division than

2  myself when I came in.

3     Q   Okay.

4     A   And they gave me that label for almost

5  seven-to-eight months despite the fact that I

6  continued bringing this up to my supervisor.

7     Q   I understand.  All right.  Without regards

8  to grade, I'm not asking anything about what GS level

9  people were.

10     A   Uh-huh.

11     Q   You said Latisha Parker was called a junior

12  scientist.  You said you were called a junior

13  scientist.

14     A   Uh-huh.

15     Q   Who else in the department while you were

16  there was called a junior scientist?

17     A   Nobody.  Even before I came in, nobody had

18  been labeled junior scientist.  And after it was

19  removed on me, nobody was called junior scientist.

20  And I am the junior scientist and I am the one

21  explaining things to a GS-12.

22     Q   I understand.

1     A   About science.

2     Q   I understand.  I'm not asking about what

3  activities you had.  I'm just asking about the label

4  junior.

5     A   Okay.

6     Q   You said Latisha had it.  You said that you

7  had it.  And you just said that no one else had it; is

8  that correct?

9     A   Correct.

10     Q   Okay.

11     A   And if I'm GS-9 and somebody labeled me a

12  junior, she just came out of school.  There was no

13  experience whatsoever.  There will be no problem with

14  me for that.  But for me to have been in the industry

15  for ten years after being a PhD and post-doc, and for

16  me to so humiliated and labeled a junior was really,

17  you know, it did something to me.

18     Q   Okay.

19     MR. SHAPIRO:  Can we take a short break?

20  We've been going for an hour-and-a-half.

21     MR. HUDAK:  Sure.

22     (A brief recess was taken.)

Page 94

1    A   No, not employees.
2    Q   Okay.  But none of these people did?
3    A   No.
4    Q   Okay.  Did anyone use any racial sleights,
5  tell any racial jokes, while you were at the EPA, that
6  you can recall, any of the people that you listed that
7  were in your branch?
8    A   No.  Only Charles Abernathy was always
9  telling dirty jokes.
10    Q   Okay.  But that wasn't race-based.  The
11  dirty jokes were not racial jokes?
12    A   No, not that I can recall at this time.
13    Q   Did any one of the individuals in your
14  branch ever denigrate you because of your race?
15    A   No.
16    Q   Okay.
17    A   Not that I can recall.
18    Q   Okay.  Did any of these individuals in your
19  branch denigrate you because of your national origin?
20    A   No, not that I can recall.
21    Q   Okay.  Do you know who Dana Thomas is?
22    A   Yes, I do.

Page 95

1    Q   What is your relationship like with Dana
2  Thomas?
3    A   I have no relationship with Dana Thomas.
4    Q   Do you know any reason why Dana Thomas would
5  have a motivation to lie to harm you?
6    A   Yes.  Any reason?
7    Q   Any reason?  Why --
8    A   I have no idea except that she is -- she's
9  close with Elizabeth Doyle.
10    Q   Okay.
11    A   Uh-huh.  Okay.
12    Q   But how many personal interactions have you
13  ever had with Dana Thomas?
14    A   I've never had any personal interaction with
15  Dana Thomas.  There was one time I was working, trying
16  to finish up some work on a Sunday or Saturday.  And
17  then she was bringing in her stuff from another floor.
18   And I was helping her, showing her things.  I've
19  never had any interaction with Dana Thomas at all.
20    Q   Great.  Great.
21    A   And she's on the other side.
22    Q   Do you know who Cary Johnson is?

Page 96

1    A   Cary Johnson.  Yes, I know Cary Johnson.
2  Cary Johnson is the one who was promoted.
3    Q   Okay.  He's a White male?
4    A   Yes.
5    Q   And during the promotion, we talked about it
6  earlier, he was one of the two people that was
7  promoted from GS-13 to 14, based upon an accretion of
8  duties; is that correct?
9    A   Correct.  And it wasn't even announced.
10    Q   Okay.  That's fine.  What division and
11  branch is he in?
12    A   He's in EAD.
13    Q   Okay.
14    A   EAD, yes.
15    Q   Did you work with him at any point?
16    A   I never worked with him.
17    Q   Did you review his work at any point?
18    A   I didn't review his work at any point.
19    Q   Does he have a different job than you did in
20  OST?  Is his job different than yours?
21    A   He is in EAD and the work in EAD is
22  different from our work in HECD.

Page 97

1    Q   Right.
2    A   And there had been -- three people had
3  already been promoted and they promoted another person
4  and that was him.
5    Q   Okay.
6    A   So I didn't see the fairness.
7    Q   Okay.  But EAD's work is different from
8  HECD's work?
9    A   Well, it's -- the branches are different.
10    Q   Yes.  And his work is different from your
11  work?  I mean he's not a PhD microbiologist?
12    A   Well, he's --
13    Q   Is he?  I'm --
14    A   He's not a microbiologist, no.
15    Q   He didn't do microbiological work at OST,
16  did he?
17    A   No.  But the guideline that was given was
18  for all of us.
19    Q   I understand.  But he's in a position
20  different than yours?
21    A   Yeah.
22    Q   And his first-line supervisor is different

819e58e5-a886-4c27-899f-40458c11c240

Page 98

1 than yours at the time of the promotion?
2     A    Yes.
3     Q    And his second-line supervisor is different
4 than yours at the time of the promotion?  It would be
5 the director of EAD as opposed to the director of
6 HECD, right?
7     A    Division.  Yes.
8     Q    Yes.
9     A    Uh-huh.
10     Q    Do you know a woman by the name of Vera
11 Williams-Bowers?
12     A    Yes.
13     Q    And she is a Black female in OST?
14     A    Right.
15     Q    And she was the other person at the time of
16 the promotions to receive an accretion of duty
17 promotion from GS-13 to GS-14?
18     A    After I complained to Mr. Grubbs.
19     Q    But she was the other one at the time of the
20 accretion of duty promotions that we talked about
21 earlier that received an accretion from 13 to 14?
22     A    I found that out later.  We didn't know

Page 99

1 because it wasn't announced.  It was a hush-hush.
2     Q    You later learned that she was the second
3 person in addition to Cary Johnson that was promoted
4 on accretion of duties basis from GS-13 to GS-14?
5     A    Much, much later.
6     Q    But you learned that?
7     A    Much, much later, and it was through gossip.
8 We didn't even know.
9     Q    Okay.  Vera Williams-Bowers is not in your
10 branch in HECD, is she?
11     A    No.  She's the -- no.
12     Q    She's an information support and technology
13 support?
14     A    Yes.  Correct.
15     Q    She wasn't in HECD at all?
16     A    Uh-uh.  No.
17     Q    Her first line supervisor at the time of the
18 promotion was not Rita Shoney or Anthony Maciorowski
19 or whoever yours was?
20     A    No.
21     Q    Her second line supervisor was not Chris
22 Zarba?

Page 100

1     A    No.
2     Q    Okay.  Did anyone within HECD receive an
3 accretion of duties promotion at the time of the
4 promotions that we discussed earlier, from GS-13 to
5 GS-14?
6     A    I have no idea.  I don't know.
7     Q    Based upon your knowledge?
8     A    No.  I don't know because it's never -- they
9 don't -- it's always hush-hush.  So I wouldn't know.
10     Q    Did you ever hear that anyone did received a
11 promotion?
12     A    If somebody did receive a promotion, I
13 wouldn't know because that's what they usually do.  I
14 wouldn't know.
15     Q    But you talk with people in your division,
16 right?
17     A    But they don't always know.
18     Q    I'm just saying.  But you talk with people
19 in your division at the time of the promotions, right?
20     A    Yeah.  But I could be talking to somebody
21 who doesn't even know.
22     Q    Okay.  But all the people that you talk to

Page 101

1 certainly they didn't mentioned that they had received
2 accretion of duties promotion from 13 to 14?
3     A    We weren't talking about this.  We weren't
4 talking about it.  The only time we talked was when
5 the guideline went to everybody.
6     Q    Okay.  Now you mentioned earlier that --
7          MR. SHAPIRO:  Do you need to take a break?
8          MR. HUDAK:  Yeah, if you need to take a
9 break --
10          MR. SHAPIRO:  You need to take a break?
11          MR. HUDAK:  Yeah.
12          (A brief recess was taken.)
13          BY MR. HUDAK:
14     Q    Switching topics a bit, did you attend the
15 American Society for Microbiology Annual Conference in
16 2004?
17     A    Yeah.
18     Q    Did you make a presentation there?
19     A    Yes.
20              (The document was marked
21              Nwachuku No. 3 for
22              identification.)

Page 106

1   AMS '04 annual meeting?
2        MR. SHAPIRO: Objection. Could you give us
3   a time? When do you want her to say? Did she before
4   she traveled, did she do it after she traveled or
5   what?
6        BY MR. HUDAK:
7   Q    At any point during 2004, did you review the
8   information on this page?
9   A    Did I at any point in 2004?
10  Q    Yes.
11  A    Oh. Okay.
12  Q    This page.
13  A    This page. No.
14  Q    All right. At any point at anytime?
15  A    Oh, at anytime.
16  Q    Did you review the information on this page?
17  A    Yes.
18  Q    When?
19  A    After I come back.
20  Q    After you came back from the ASM conference
21  in '04?
22  A    Yes.

Page 107

1   Q    Okay. And you reviewed the information on
2   this page and verified that it was correct?
3   A    I reviewed it for the money, not for all
4   this, because many -- all this, I don't even
5   understand. I only look for the money.
6   Q    Okay.
7   A    And how do I explain this?
8   Q    Okay. Why don't we --
9        MR. SHAPIRO: She's trying to explain
10  something.
11       MR. HUDAK: I understand.
12       MR. SHAPIRO: If you don't want to hear it,
13  just say so.
14       MR. HUDAK: I don't. Let me --
15       MR. SHAPIRO: He doesn't want to hear it.
16       BY MR. HUDAK:
17  Q    Let me go to the third page.
18  A    Okay.
19  Q    It says "applicant sign here," right in kind
20  of the middle of the form.
21  A    Uh-huh.
22  Q    That is your signature, right?

Page 108

1   A    Yes.
2   Q    Look at the third page.
3   A    Okay. Okay. Yes.
4   Q    Third page. And the date you've dated it,
5   May 10, 2004, right?
6   A    Right.
7   Q    Okay. Now flipping back to the first page,
8   first page, first page in the middle, it says "date of
9   travel from May 23, 2004 to May 29, 2004?
10  A    Yes. Right.
11  Q    Okay. Do you recall signing the third page
12  of this exhibit before you went to the ASM annual
13  meeting in '04?
14  A    Okay. Yes.
15  Q    Okay.
16  A    Because there was a lot of time.
17  Q    Okay. But my only question was --
18       MR. SHAPIRO: The question is before you
19  went. Just answer the question.
20       THE WITNESS: Okay.
21       BY MR. HUDAK:
22  Q    Before you went. Now the forms contained on

Page 109

1   page 2 and 3 --
2   A    Right.
3   Q    -- Would you please generally describe what
4   these forms are as you understand them to be.
5   A    These are travel forms. These are travel
6   request forms. On page --
7   Q    Two and three.
8   A    Okay. These are travel forms.
9   Q    And why are these prepared based upon your
10  understanding?
11  A    To make sure that this is not a new travel,
12  that it is approved.
13  Q    Okay. Now you also attended the American
14  Society of Microbiology conference annual meeting in
15  2005, correct?
16  A    Right. Correct.
17            (The document was marked
18            Nwachuku No. 4 for
19            identification.)
20  Q    Okay. Let me hand you what has been marked
21  Nwachuku 4 for identification.
22       Oh, before we go there, could we go back to

819e58e5-a886-4c27-899f-40458c11c240

Page 114

1    A   No.
2    Q   And I believe that next to hotel cost, the
3  handwriting that is different than the first entry
4  there, the one that reads "one, zero, dot, one, zero
5  per night, seven through ten, one, seven, zero, comma,
6  one, zero per night, five and six," that's not your
7  handwriting?
8    A   No.
9    Q   Okay.  The rest of the document, though,
10 when you stated earlier, the rest of the document is
11 your handwriting?
12   A   On page 1?
13   Q   On page 1.
14   A   Yes.
15   Q   You see the date of the request is
16 05/27/2006, right?
17   A   Correct.
18   Q   And that was before you went to the ASM
19 2005, annual meeting, correct?
20   A   Correct.
21   Q   You also went to the 2006 annual conference
22 or ASM in Florida, correct?

Page 115

1    A   Correct.
2    Q   When did you depart, if you recall?
3    A   On Saturday, May 19 -- May 20.
4    Q   Okay.  I believe it said -- okay.  Strike
5  what I just said.
6        And where was the conference?
7    A   Atlanta.
8    Q   How did you get there?
9    A   By air.
10   Q   Do you recall what airline you flew?
11   A   I think it was Southwest.  It should be in
12 my thing.  I think it was Southwest.
13   Q   Who paid for your tickets to travel on
14 Southwest?
15   A   I did them by credit card, my personal
16 credit card.
17   Q   So you paid for the tickets?
18   A   I gave the Rogers Travel my credit card to
19 call for the tickets.
20   Q   Were you ever charged for the tickets?
21   A   Yes.  They charged my credit card for the
22 tickets and, yes, they did.

Page 116

1    Q   EPA forms were not used to purchase your
2  ticket on Southwest?
3    A   They later on cancelled my -- that amount on
4  my credit card on the -- I think -- I believe two days
5  later.  And then -- two days later -- but after I give
6  them the credit card, Rogers Travel then sent me an
7  itinerary and called me back to say that everything
8  was okay.
9    Q   Let me see if I understand.  You gave your
10 credit card information to Rogers Travel.
11   A   On Friday.
12   Q   Friday the 19th?
13   A   Correct.
14   Q   Of May?
15   A   Correct.
16   Q   And you asked for tickets to Orlando,
17 departing the 20th?
18   A   Right.  But I had asked for the ticket
19 earlier, not that day.
20   Q   Okay.  When did you ask for the ticket?
21   A   On 05/10/06, when the reservation was made.
22   Q   Okay.  Why did you call Rogers Travel if you

Page 117

1  had already requested your ticket on 05/10/06?
2    A   I didn't call them.  They called me.
3    Q   Okay.  What did they say on the phone?
4    A   They called me to say that they had been
5  trying to reach a Sherry Howard, our travel officer.
6    Q   Okay.
7    A   And that they haven't been able to reach
8  her.
9    Q   Okay.
10   A   So that they can get the number from her.
11   Q   Okay.  And let me just stop you there so I
12 understand what the number is.  The number is the
13 approval number or authorization number to use, the
14 EPA billing system, that paid for your airline ticket?
15   A   They were calling for the ticket number, for
16 the -- I don't know what number.  But that's the way
17 they asked me, that she didn't give them the number.
18 She hasn't given them the number.
19   Q   Okay.  What's the point of the number?
20       MR. SHAPIRO:  If you know?
21       THE WITNESS:  I don't know.
22

819e58e5-a886-4c27-899f-40458c11c240

Page 118

1      BY MR. HUDAK:
2      Q   What did you understand them to be saying
3  when he said she didn't give him the number?
4      A   She didn't give them the number because I
5  don't have a credit card.  If I don't have -- if I
6  have credit card, I will do it myself.  I'm going the
7  assistant, but I have to go through Sherry Howard, and
8  each time they call me, I refer them to Sherry Howard.
9  They call me and I referred them to Sherry Howard.
10      Q   So it's a number to process the billing for
11  the ticket because you don't have a credit card?
12          MR. SHAPIRO:  Objection.  She didn't say she
13  understands what the number is for.  Objection.
14          BY MR. HUDAK:
15      Q   Do you have any understanding when the
16  Rogers Travel guy called you and he said, "Sherry
17  Howard has not given me the number," what the purpose
18  of the number was with regards to your travel?  Do you
19  have any understanding?
20      A   Well, as he explained it, he told me that I
21  do not have a ticket yet because they haven't been
22  able to reach Sherry Howard.

Page 119

1      Q   Okay.  Why were they trying to reach Sherry
2  Howard?
3      A   Because she --
4      Q   Did he explain to you?
5      A   Sure.  Whenever -- she's the travel person.
6  I can't do it directly because I don't have credit
7  card to go into the system and do it myself.  I have
8  to go -- that's the -- you have two pathways.  I have
9  to go through Sherry, and they have to go through
10  Sherry.
11      Q   Okay.  Is the process of going through
12  Sherry to authorize the travel that you're trying to
13  book for Rogers Travel?
14      A   Correct.
15      Q   Okay.  So if they hadn't gone through
16  Sherry, what did he explain to you on May 10th?  He
17  was calling you, saying he didn't have the number from
18  Sherry.
19      A   No, no.
20          MR. SHAPIRO:  No, no.
21          THE WITNESS:  Method was okay.  Method was
22  when I -- that was the date of my request.

Page 120

1      BY MR. HUDAK:
2      Q   Okay.  On May 19th -- I'm sorry -- on May
3  19th, when he called you saying I haven't gotten the
4  number from Sherry yet --
5      A   Okay.
6      Q   -- what did he then say?  Did you then
7  provide him your credit card information?
8      A   No.  I told -- when he -- I said, "Well, you
9  call Sherry."  And then when he called me again, I
10  said that Sherry was not there.  That was when I found
11  out that Sherry was sick because I called.  And for
12  the first time, I found out that Sherry hadn't even --
13  wasn't there, for the first time and this was late on
14  Friday.
15      Q   Okay.
16      A   And so when he called back to tell me that
17  Sherry wasn't there, so I went looking for Sherry, and
18  that's when I found out she hadn't even come in that
19  day.
20      Q   And that was Friday the 19th.
21      A   Exactly.  Friday the 19th.  So when he
22  called me back, I gave him my own personal credit

Page 121

1  card.
2      Q   Okay.
3      A   To call by the tickets.  And he took it, and
4  then sent me the travel itinerary --
5      Q   Okay.
6      A   -- on my own credit card.
7      Q   Okay.
8      A   And he sent back two with my credit card
9  number.
10      Q   Okay.
11      A   Uh-huh.
12      Q   What happened next?  So were you ever
13  reimbursed by the EPA for the amount of the price for
14  your travel to Orlando?
15      A   As I was explaining earlier, when I gave him
16  my credit card and he charged my credit card, then he
17  sent me this itinerary with my credit card.
18      Q   Sure.
19      A   And later on he called me again, maybe about
20  an hour or two hours later, to tell me that everything
21  is settled, that everything has been -- what was the
22  word he was using -- something like everything has

819e58e5-a886-4c27-899f-40458c11c240

Page 122

1  been resolved.
2      Q    Okay.  So your credit card was never charged
3  for the tickets?
4      A    It was charged for the tickets.  And then
5  two days later, the credit card was --
6      Q    The charges were reversed?
7      A    Yes.
8      Q    Okay.  So it was Friday.  When were the
9  chargers reversed?
10     A    The charges were reversed about two or three
11 days later.
12     Q    Who do you understand ultimately paid for
13 the cost of your airline ticket to Orlando, Florida?
14     A    They were the ones who called me, Rogers
15 Travel, told me that EPA has resolved everything.  So
16 my understanding was that because he couldn't reach
17 Sherry, they were working with Cincinnati, either
18 Cincinnati or another office, and that was why he
19 called me back.  I don't know the term between them
20 and Cincinnati or Sherry and Cincinnati.  All I know
21 is my interaction with Sherry.
22     Q    With Rogers Travel.

Page 123

1      A    With Sherry.  The Rogers who called me, my
2  interaction with Rogers Travel is to make reservation.
3      Q    I understand.
4      A    Which I did for 05/10.  Any other thing is
5  between Rogers Travel and Sherry.
6      Q    And Sherry.
7      A    Exactly.
8      Q    Okay.  So there were two phone conversations
9  on Friday, May 19th, with Rogers Travel.  They called
10 you once saying they hadn't gotten the number.  You
11 gave them your credit card.  And they called you back
12 later, saying everything was okay.
13     MR. SHAPIRO:  Objection.  That's not the
14 testimony.
15     THE WITNESS:  There were three.
16     BY MR. HUDAK:
17     Q    There were three.  Okay.  The first is when
18 they called you saying we haven't gotten the number
19 from Sherry yet.
20     A    Yes.  We haven't heard from Sherry.
21     Q    Okay.  The second time, what did they say?
22     A    When they told me that Sherry was not

Page 124

1  answering, I called Sherry, and I went to her cube and
2  found out that she wasn't there for the first time.
3  So they were accurate when they were saying they
4  haven't -- I didn't even know.  That's for the first
5  time I found out.
6      Q    Okay.
7      A    Uh-huh.
8      Q    So the second phone conversation is after
9  you found out that Sherry was gone today?
10     A    Yes.  When they called me.
11     Q    When they called you.  And that's where you
12 provided your credit card information to book the
13 travel?
14     A    Yes.
15     Q    Okay.
16     A    Well, the travel has been booked.
17     Q    To pay for the travel?
18     A    To pay for the travel.
19     Q    The third conversation you had with Rogers
20 that day is when they called you back and said
21 "Everything has been processed"?
22     A    Yes.  Everything has been resolved.

Page 125

1      Q    Resolved.
2      A    Yes.
3      Q    You specifically remember they used the word
4  "resolve"?
5      A    Yes.
6      Q    Okay.
7      A    Uh-huh.
8      Q    And what did you understand that to mean?
9      A    Okay.  What I understood that to mean was
10 that when they called me, they were looking for the
11 number.  They couldn't find it.  And remember Rogers
12 Travel was also in communication with Cincinnati who
13 are in charge of travel.  So Sherry works hand-in-hand
14 with Cincinnati if you don't have a credit card.
15 Okay.  So since Sherry wasn't there, they were also
16 communicating with Cincinnati.
17     Q    Did they tell you they were communicating
18 with Cincinnati?
19     A    Yes, because when they --
20     Q    Rogers told you on one of the phone calls,
21 one of the three phone calls, "We're talking to
22 Cincinnati to try to resolve this."  Did they say in

819e58e5-a886-4c27-899f-40458c11c240

Page 126

1  form or substance that?
2      A    The third time when they called me, they
3  told me they have been -- they have resolved it.
4      Q    Okay.  But they didn't go into how they
5  resolved it.  They just said they resolved it, right?
6      A    They resolved it because since -- what's
7  his name -- Sherry wasn't there, and my supervisor
8  wasn't there either and the second-line supervisor
9  wasn't there, they were communicating with EPA.
10     Q    In Cincinnati?
11     A    Yes.
12     Q    That's what you understood?
13     A    Yes.
14     Q    Okay.
15     A    Your itinerary that you received from Rogers
16 Travel, that came in by email, right?
17     A    Correct.
18     Q    So you were checking your email the day of
19 May 19th?
20     A    I wasn't checking all my email.  I was
21 checking specifically my emails for the experts.  I
22 click on the name I want to check on.  And that's how

Page 127

1  I will get ---
2      Q    And you were ignoring everything else?
3      A    Yes.
4      Q    Why?
5      A    Because I was working in five different
6  locations and was Xeroxing and was talking to seniors,
7  you know, the seniors.  I forgot what they call them.
8  And I was also working in a different location.
9      Q    Okay.  You're doing all those activities.
10     A    Alone.
11     Q    Alone.
12     A    Uh-huh.
13     Q    To prepare materials for the June 6th panel
14 hosted by CCL?
15     A    Yes, so that they will, as we agreed in the
16 workgroup, we were supposed to get everything ready by
17 Thursday so that the people with take their packages
18 to ASM.  All of them, most of them, were going to ASM.
19 And if we missed them and they are there, they will
20 be there for one week.  They will not have the two
21 weeks that are required for them to read all the
22 materials, a lot of materials, for them to be able to

Page 128

1  give the microbiologists meaningful input.
2      Q    Okay.
3      A    The workgroup meaningful input.
4      Q    Okay.  So you're working -- the materials
5  that you were preparing, part of the materials was a
6  document called the charge, right?
7      A    Yes.  Uh-huh.
8      Q    Okay.  So you were working, if I understand
9  you correctly, that the three groups of activities
10 that you described, was part of your work on the
11 charge?
12     A    No.
13     Q    No.
14     A    Not only part of my work on the charge, we
15 were getting background materials.
16     Q    Okay.  But it included work on the charge?
17     A    Right.
18     Q    So when you received the emails concerning
19 the charge, you read them, right?
20     A    Which emails?
21     Q    Emails that were -- had in the subject line,
22 CCL Charge, would you read those?

Page 129

1      A    No.
2      Q    For preparing the materials that were to go
3  out to the June 6th meeting, which you said included
4  the charge?
5      A    No, because we were the ones who had already
6  worked on the charge.  We had worked on it four times
7  already, and it was ready.  The workgroup -- it wasn't
8  Nena that was working on the charge.  It was the
9  entire workgroup, working on the charge, and we had
10 minutes of the meeting as to what we want to change
11 and what we want to remain.
12         So it wasn't just me.  They had already
13 worked on the charge.  My responsibility is to ship
14 these things and to the contractor, the logistics
15 contractor on Thursday.
16     Q    Okay.  I understand.  I understand what
17 you're saying.  My question may be a little bit
18 different.
19     A    Okay.
20     Q    On Friday, you're preparing the materials
21 which included the charge to go out to the
22 participants in the panel for June 6th, right?

819e58e5-a886-4c27-899f-40458c11c240

Page 130

1    A   Right.
2    Q   Okay.  As part of that, you were checking
3   certain emails regarding the work that you were doing
4   on the 19th.
5    A   The only thing that I was checking were
6   things from the experts because they were having
7   problems.  Some of them were still having problem
8   getting the advance number to be able to come.
9    Q   Okay.  So you were checking emails from the
10  experts regarding the materials that were going to go
11  out on the 19th?
12   A   Right.  And I was also checking emails from
13  the contractor.
14   Q   Okay.  Checking emails from the experts and
15  the contractor --
16   A   Right.
17   Q   -- with regard to the materials that were
18  going to go out on the 19th?
19   A   Right.  On the 18th.
20   Q   On the 18th?
21   A   Right.
22   Q   Did the materials go out on the 18th or did

Page 131

1   they go out on the 19th?
2    A   We were late.
3    Q   You were late.  So the materials actually
4   went out on the 19th?
5    A   Some materials went out on the 18th.
6    Q   Okay.  But others were held back?
7    A   No.  The ones, for example, there were
8   certain among us, some were going out earlier, the
9   background information that were old and didn't -- we
10  didn't need to work on.
11   Q   Let's just concentrate -- and I appreciate
12  that -- let's just concentrate on the charge.
13   A   Okay.
14   Q   Okay?
15   A   Uh-huh.
16   Q   Because I know there are a whole host of
17  other materials that went out with the charge, right?
18   A   Correct.
19   Q   Okay.  The charge, though, was the operative
20  document for asking the panel, proposing questions and
21  summarizing the materials for the panel for June 6th?
22   A   Not summarizing, telling them what we want

Page 132

1   them to do for us, the workgroup.
2    Q   Okay.  And that was an important document,
3   right?
4    A   Yes, it is.
5    Q   It is?
6    A   Uh-huh.  But the charge -- okay -- maybe --
7   no, that's okay.
8    Q   And you were continuing to work on the
9   charge on May 19th?
10   A   We had already finished working on the
11  charge.
12   Q   Okay.  But you sent out a -- a newer version
13  was sent?  You sent out a version on the evening of
14  May 19th.  You sent a version of the charge out on the
15  evening of May 19th.
16   A   Say that again.  I didn't quite catch it.
17   Q   You sent a version of the charge --
18   A   Right.
19   Q   -- out to the panel group --
20   A   Right.
21   Q   -- on the evening of May 19th?
22   A   Okay.  I sent --

Page 133

1    Q   Is that right?
2    A   No, not the panel group, to the contractor.
3    Q   To the contractor?
4    A   Yes.
5    Q   Not to the experts?
6    A   No.  I wasn't sending directly to the panel.
7   I was sending to the logistics contractor who will
8   send to the experts.
9    Q   Where were the experts from?
10   A   They were from all over United States,
11  California, Atlanta.
12   Q   Were they at universities or at --
13   A   Most of them were at universities.
14   Q   Can you just name a couple?
15   A   Yes.  Christian Moore, Dr. Christian Moore,
16  she's in Atlanta.  Charlise Garber, she's from
17  Arizona.  Dr. Dean Claver, he's from California.
18   Q   All right.  Hold on.  Slow down if you don't
19  mind.  Christian Moore is from where?
20   A   Atlanta.
21   Q   Atlanta.
22   A   She's in two places, Emory University and

819e58e5-a886-4c27-899f-40458c11c240

Page 134

1  CDC.
2      Q    Okay.
3      A    Uh-huh.
4      Q    And Garber?
5      A    University of Arizona.
6      Q    Okay.  University?
7      A    Yeah.  University of Arizona.  Yeah.  Yeah.
8      Q    Okay.
9      A    Yeah, University of Arizona.  And Dean
10  Claver, University of California.  Which one is it?
11  Is it -- and then some medical doctors.
12      Q    Okay.  I think that's fine.  I just wanted
13  to have a couple of the expert's names.
14      A    Okay.
15      Q    So on the evening of May 19th, you sent out
16  a version of the charge to the contractors?
17      A    Yes, to the contractor.
18      Q    Contractor.
19      A    Yeah.
20      Q    Singular?
21      A    To the logistics contractor because the
22  experts are also contractors.

Page 135

1      Q    Okay.  So to the logistics contractor.
2      A    Right.
3      Q    You sent that out on evening of May 9th.
4      A    Right.
5      Q    You didn't send out a version of the charge
6  to the logistics contractor on May 8th, the day
7  before?
8      A    No.
9      Q    Okay.  If I understand your prior testimony,
10  the reason you didn't send it out on the 18th and sent
11  it out on the 19th was that you were working on it on
12  the 19th; is that correct?
13      MR. SHAPIRO:  Working on it, being the
14  charge?
15      BY MR. HUDAK:
16      Q    The charge.
17      A    The charge.  Yeah.
18      Q    Okay.
19      A    And we were trying to meet our decision to
20  send it.  We were already late and we wanted to make
21  sure that they get it before the ASM starts on Monday.
22      Q    Okay.  Who had to, based upon your

Page 136

1  understanding, who had to approve the charge before it
2  was sent out to the logistics contractor?
3      A    The workgroup, EPA workgroup.
4      Q    Did your supervisor have to approve it?
5      A    The supervisors were in on all the emails
6  that were sent, and some supervisors sent any
7  correction that they wanted to see done.
8      Q    Okay.
9      A    And then the workgroup will look over it
10  again.
11      Q    Okay.
12      A    And then approve, and in our minutes, we
13  will say specifically, "Nena, do this.  This person do
14  this.  This has to be changed, blah, blah, blah,
15  blah."  And they did all the changes as they saw fit
16  and named the people to do them.
17      Q    Okay.  Did you understand that Beth Doyle
18  had to say I approve of this document in form or
19  substance before you sent the charge out to the
20  logistics contractor?
21      A    I understood that she didn't have anything
22  specific for us to change because I specifically asked

Page 137

1  her "What do you find in this that you do not like, so
2  that we can all go back and discuss it?"
3          She received it five times throughout the
4  time that it was being reversed -- it was being
5  revised.  And she never sent anything specific that
6  was wrong with that workgroup revised charge.
7      Q    Okay.  My question is a little bit
8  different.
9      A    Okay.
10      Q    When you entered into writing the charge
11  process --
12      A    Okay.
13      Q    -- did you understand before you sent it out
14  to the logistics contractor, the charge, that Beth
15  Doyle would have to say, "Yes, I approve it, please
16  send it out" in form or substance?
17      MR. SHAPIRO:  Asked and answered.
18      THE WITNESS:  No.
19      MR. SHAPIRO:  Go ahead and answer.
20      THE WITNESS:  No, because --
21      BY MR. HUDAK:
22      Q    That's enough.

819e58e5-a886-4c27-899f-40458c11c240

1  responding to your email and your question about
2  specific problems with the CCL?
3      A   Okay.  Sometimes if I open an email, I may
4  not read it because then I be called away by one of
5  the C's or I'm working on the Xerox machine, so I was
6  back and forth.  I wasn't there.  I would come back,
7  click on the name Hudak, because I want to know if you
8  received your dunce, but every other thing, I was -- I
9  had top priority, and I was looking at a top priority
10  items.
11     Q   And if there was urgency to getting out the
12  charge that week, because you were going to be gone
13  the next week, or at least you had plans to be gone
14  the next week --
15     A   Not because of me, but because the workgroup
16  made a decision that we need to put this in the hands
17  of the experts before they go to ASM, so that they
18  have two more -- two weeks to review and give us, the
19  workgroup, meaningful input.
20     Q   Okay.
21     A   And it is in our minutes.  And I sent it and
22  it was in my thing that I sent to the agency.

1      Q   But you also had a personal urgency to get
2  this document out because you weren't going to be
3  around the next week?
4      A   Okay.  Well, I wouldn't say that's my own
5  personal urgency.  It was more important than the
6  experts having it in their hands because they were the
7  ones who were going to give us this input.  And if we
8  want meaningful input, we need to give it to them for
9  two weeks for them to read.
10     Q   Okay.  But you knew if the charge wasn't
11  complete by Friday, the 19th --
12     A   It was complete.  I believe that it was
13  complete.
14     Q   Do you recall a meeting, or a scheduled
15  meeting, on May 18th at 11 o'clock?
16     A   No.  I didn't even know there was a meeting.
17     Q   You didn't?
18     A   No, because I went to the doctor and I was -
19  - I had sick leave for six hours, and I went to the
20  doctor in the morning, and I called in about 5:30 or
21  something a.m., to our -- to Sherry with whom we
22  usually would call.

1          And when I came in was four o'clock and the
2  only reason I came in was because of the scheduled
3  meeting.  That was all.  I was sick.
4      Q   What scheduled meeting?
5      A   I had a meeting to brief the managers on
6  what we are doing.
7      Q   Did that meeting take place?
8      A   Only Ed showed up.
9      Q   Okay.  Did you brief --
10     A   Oh, oh, excuse me.  The four -- you're
11  asking  about --
12     Q   No.  I'm asking about the four o'clock
13  meeting now.
14     A   Oh, okay.
15     Q   You mentioned the four -- you came in for a
16  four o'clock meeting.
17     A   Yes.
18     Q   And that was supposed to be with Ed Ohanian,
19  Pam Barr, Beth Doyle and Dr. Burneson?
20     A   Mr. Burneson.
21     Q   Mr. Burneson, I'm sorry.
22     A   Yes.  Uh-huh.

1      Q   And Tom Carpenter, or was he not supposed to
2  be there?
3      A   Well, he's my co-chair.
4      Q   Okay.  So you six were going to meet and
5  brief the directors?
6      A   I was the one who was going to brief.
7      Q   You were the one that was going to brief the
8  directors?
9      A   Yes.  And I was one who initiated this on my
10  own.
11     Q   Okay.
12     A   They didn't ask me to set up the meeting.  I
13  set it up so that I will inform them.
14     Q   Okay.
15     A   As a courtesy.
16     Q   Okay.  But once you set it up, I mean they
17  wanted to, of course, hear the briefing about the
18  panel?
19         MR. SHAPIRO:  Objection.
20         BY MR. HUDAK:
21     Q   Did they ever say that they wanted to hear
22  the briefing about the panel and confirm that they

Page 150

1  were interested in having the meeting?
2      A    When I sent the schedule, the meeting
3  request, everybody accepted except Elizabeth Doyle.
4      Q    Okay.
5      A    It was only at the last minute, you know.
6  Everybody accepted and I showed Ed also.
7      Q    Okay.
8      A    And it wasn't surprising to me either.
9      Q    Did you ever get a chance to  brief Pam Barr
10  as you intended to do at the four o'clock meeting that
11  was cancelled?
12      A    As I was -- I said earlier, the only person
13  who came was --
14      Q    Subsequent to that meeting when only Ed
15  showed up, did you ever have an opportunity to brief
16  Pam Barr as you said you were going to do with regard
17  to the charge?
18      A    No, because I was gone for a week and then
19  there was holiday.  And this was just a courtesy
20  briefing.  It wasn't a high-powered briefing.  They're
21  usually -- the managers are usually not interested in
22  this.  The only person who is interested is Ed

Page 151

1  Ohanian.
2      Q    Okay.  I want to mark what is Nwachuku 5.
3                  (The document was marked
4                   Nwachuku  No. 5 for
5                   identification.)
6      Q    For the record, the top email is an email
7  from Nena Nwachuku to Brenda Mosley, dated May 16,
8  2006, 9:17 a.m., subject, forward, do you have any
9  comments.  Do you see that?
10      A    Yes, I do.
11      Q    Do you recall sending that top email?
12      A    Which top email?
13      Q    The one that's forwarding the below emails
14  to Brenda Mosley.
15      A    Okay.  I can recall forwarding it.
16      Q    But when you forward an email, it generally
17  looks like that.  It has the forward, do you have any
18  comments in the subject line?
19      A    Uh-huh.  Most -- when you go to my computer,
20  I have, oh, about 500-and-something items that I
21  wouldn't be opened, and during this time, as I
22  explained earlier, I was in several places.  And this,

Page 152

1  I don't recall, when I forwarded it.
2      Q    Well, it has the date of May 16, 2006, at
3  9:17 a.m.
4      A    Okay.  That's what I mean.  I --
5      Q    You don't recall, sitting here today that
6  you forwarded it at that point?
7      A    Uh-huh.
8      Q    Okay.  That's fine.  Who is Brenda Mosley?
9      A    Brenda Mosley is the microbiologist, a
10  colleague who reviews a whole lot of the CCL
11  materials.  And she has reviewed so many documents
12  that I've written which support EPA regulations.
13      Q    Okay.  You would call her a friend?
14      A    Well, I would call her, yes, I would call
15  her a friend, just like other people who have taken
16  their time in Cincinnati to review my documents.  And
17  they will also call me a friend.
18      Q    Okay.  What office is Brenda Mosley in?
19      A    Brenda Mosley is OECA.
20      Q    What does that stand for?  I'm sorry.
21      A    Office of -- OECA -- Office of -- I'm sorry
22  -- O-E-C-A.

Page 153

1      Q    Okay.  I think that's plenty fine.
2      A    Yeah.
3      Q    I'll learn the acronyms as some point.
4      A    We go by acronyms.
5      Q    I understand.  She wasn't a member of the
6  CCL workgroup, right?
7      A    No.  She is -- but she participates in
8  review CCL work.  She does.
9      Q    Was she -- did she have a formal capacity in
10  reviewing the CCL work that was for the June 6th
11  panel?
12      A    Nobody has formal capacity.
13      Q    Certainly Beth Doyle is your supervisor,
14  right?
15      A    Yes.
16      Q    And so in a formal capacity, she supervises
17  your work?
18      A    Yes.  But she helps us more than Beth --
19  Elizabeth Doyle will, help us, because this is a
20  technical thing.
21      Q    I understand.  But formally, Beth Doyle is
22  your supervisor?

819e58e5-a886-4c27-899f-40458c11c240

Page 154

1   A   Sure.
2   Q   And supervises your work?
3   A   Sure.
4   Q   And you submit work through her?
5   A   Sure.
6   Q   That she can review it?
7   A   I've never sent anything to her that she has
8  reviewed.  In fact, when I wrote documents and I give
9  to her, she doesn't review.  She gives it to another
10 person.  She has never reviewed anything I've written.
11  Q   She's in charge of managing your activities
12 as her employee?
13  A   She does.
14  Q   Now you said that you don't recall
15 specifically when you forwarded this email to Brenda?
16  A   I don't.
17  Q   Do you recall at some point that you did
18 forward it to Brenda?
19  A   I was forwarding -- sometimes when I move
20 away with them reviews, because not so many people
21 want to review, I will forward some things to her that
22 she will help me with and she does give me stuff to

Page 155

1  review for her, too.
2   Q   Okay.  Now May 16, 2006, was the Tuesday of
3  the week we've been talking about, right?  The 16th
4  was Tuesday.  The 17th was Wednesday; 18th was a
5  Thursday and 19th was the Friday, and the 20th is when
6  you left on the Saturday.
7   A   Right.
8   Q   Okay.  Now the email that you forward is a
9  string of emails and the top email in that string
10 appears to be an email from Elizabeth Doyle to you,
11 dated May 16, 2006, at 9:05 a.m., subject, re:  do you
12 have any comments.
13      Do you recall receiving this email and
14 reading it?
15  A   No.  I didn't read this.  I was forwarding
16 this because it has to do with comments and I don't
17 recall reading it.
18  Q   You don't recall reading this.  Okay.
19  A   Reading it completely or even reading it, I
20 don't recall.
21  Q   Okay.  Let's go down to the third email in
22 the chain.

Page 156

1   A   Okay.
2   Q   Now stay on the first page because it goes
3  over.  I'm sorry.
4   A   Oh, so.
5   Q   It's on the first page.  This is an email
6  from you to Elizabeth Doyle.
7   A   Right.
8   Q   Dated May 15, 2006, at 4:47 p.m.
9   A   Okay.
10  Q   Copying Edward Ohanian, Eric Burneson,
11 Thomas Carpenter, subject, do you have any comments?
12  A   Yes.
13  Q   Do you see that?
14  A   Yes.
15  Q   And do you recall writing this email?
16  A   Yeah.
17  Q   Now is this the email that you referred to
18 earlier where you asked Elizabeth if she had any
19 specific problems with the charge?
20  A   This was, yeah -- yeah -- this is the email
21 and this is one email, and then I talked to her
22 personally also.

Page 157

1   Q   Okay.  Now since the email above this, this
2  second email in the chain on the first page, is an
3  email from Elizabeth the next morning after you sent
4  this on Monday, the 15th, at 4:47 p.m.
5   A   Uh-huh.
6   Q   She replies at 5/16/2006, at 9:05 a.m.  Do
7  you see that?
8   A   Uh-huh.
9   Q   So you understood that the middle email was
10 her response to your questions that you're posing
11 below?
12  A   Sometimes, no.  Sometimes when you have
13 these series email, it's very difficult to keep up.
14  Q   Okay.  But you asked her a specific question
15 here.  "What comments are you referring to
16 specifically, Elizabeth?"
17  A   Uh-huh.
18  Q   And she wrote back.  Didn't you want to hear
19 what she was saying?
20  A   Well, she -- we -- I already talked to her,
21 too.  So if it's the same thing that we're talking
22 about here, I didn't even pay attention because we

819e58e5-a886-4c27-899f-40458c11c240

Page 158

1   already talked about it one-on-one.
2       Q   But if you didn't read this, you wouldn't
3   know whether it was the same or not, right?
4       A   It's the same.  We are talking about
5   comments to the charge.
6       Q   But unless you read this email when you
7   received it --
8       A   Okay.
9       Q   -- how did you know that what she was saying
10  in this email was the same you guys had talked about
11  earlier?
12      MR. SHAPIRO:  Objection.  Argumentative.  Go
13  ahead.
14      THE WITNESS:  That is because I thought it
15  is -- I was so overwhelmed with work.  That's constant
16  hours so overwhelmed with emails from everybody, 12
17  experts, from so many -- the contractor, the
18  contractor's assistant, the workgroup, everybody is
19  calling on Nena.  I didn't have help.  I was working
20  18 hours, 16 hours a day, and I didn't have any help,
21  and I was sick.
22      So -- and I was working in different places,

Page 159

1   including Xeroxing and typing and so on and so forth.
2   So I wasn't focusing too much on things that were not
3   priority.
4       BY MR. HUDAK:
5       Q   Okay.  So it's possible you forwarded this
6   email to Brenda Mosley without reading it?
7       A   Yes, it's possible.
8       Q   All right.  Let's go to the next one.
9       MR. SHAPIRO:  Oh, so you don't want to go
10  through the other emails on this page 2 then?
11      MR. HUDAK:  No.
12      MR. SHAPIRO:  Okay.
13      MR. HUDAK:  Mark Nwachuku 6.
14          (The document was marked
15          Nwachuku No. 6 for
16          identification.)
17      BY MR. HUDAK:
18      Q   Nwachuku 6 appears to be an email chain with
19  a top email from Nena Nwachuku to Brenda Mosley, dated
20  May 16, 2006, at 12:53 p.m., subject, forward CCL
21  expert workshop agenda and charge.  Please review.
22      I know that from the copy it looks like the

Page 160

1   last page of the chain -- the last email in the chain
2   is not complete, but I'm not going to refer to it.
3       MR. SHAPIRO:  Excuse me.  That's the first
4   email in the chain.  The first chronological, last as
5   it appears flowing down --
6       MR. SHAPIRO:  Right.  But it's an email
7   chain.  The first one in the chain is --
8       THE WITNESS:  The last one.
9       MR. HUDAK:  The one that came first is at
10  the end.
11      MR. SHAPIRO:  The one that came first --
12      THE WITNESS:  Yes.
13      MR. SHAPIRO:  Yes.
14      MR. HUDAK:  I agree.
15      MR. SHAPIRO:  That's the way email chains
16  work.
17      MR. HUDAK:  I 100 percent agree with you,
18  Mr. Shapiro.
19      BY MR. HUDAK:
20      Q   I am not going to refer to that email chain,
21  so if your answer requires that, we can get another
22  copy of this at a break.

Page 161

1       Do you recall forwarding this email chain to
2   Brenda Mosley on Tuesday, May 16th, at 12:53 p.m.?
3       A   As I stated earlier, I was forwarding CCS
4   staff for how to help us review.  And I don't remember
5   when, I see the date and time, because I was really
6   bombarded with work.
7       Q   Okay.  Now as you said before, Eric Burneson
8   was a supervisor in Office of Groundwater, Drinking
9   Water, that was the first-line supervisor for the
10  scientists from Office Groundwater, Drinking Water,
11  that were on the CCL work team.
12      A   There were only -- there was only one
13  person.
14      Q   Tom Carpenter?
15      A   Yes.
16      Q   His supervisor was Burneson?
17      A   Right.
18      Q   And Office of Groundwater, Drinking Water,
19  was the customer with regards to this CCL workgroup.
20      A   correct.  But we were doing this -- the
21  technical part.  They relied on us and the workgroup
22  to do the technical part.

819e58e5-a886-4c27-899f-40458c11c240

Page 166

1  "Forwarded by Nena Nwachuku, DC/ USEPA, slash US on
2  5/16/2006, 4:38 p.m.," and then a email that follows
3  that is from Elizabeth Doyle to you, May 16, 2006,
4  2:42 p.m., subject, travel to Orlando.
5       Referring to the bottom email --
6     A   Okay.
7     Q   -- do you recall receiving this email?
8     A   I don't remember.
9     Q   If an email from Elizabeth Doyle, your
10  supervisor of the EPA, popped up in your email box on
11  May 16th, 2:42 p.m., with the subject travel to
12  Orlando, would you have opened it?
13    A   What was the question?  Would I have opened
14  it?
15    Q   Do you have any reason to -- let me ask you
16  a new question.  Do you have any reason to doubt that
17  you received this on May 16, 2006, shortly after 2:42
18  p.m.?
19    A   Yes, I --
20       MR. SHAPIRO:  Sorry.  Objection.  Define
21  "received," please.
22       BY MR. HUDAK:

Page 167

1     Q   Reviewed.
2     A   Yes.
3     Q   Why do you doubt?
4     A   Because I was working in so many different
5  places.  Sometimes I can open it and an email, and
6  I'll be called off right away.  And then I'll come
7  back.  When I come back, I may not continue with the
8  email.  I may continue with something else, or I may
9  be gone for some time.
10       And some of those emails that I was
11  forwarding to Ms. Mosley, Brenda Mosley, many of them
12  were, you know, maybe about the same time, and I may
13  have forgotten or it may have been a mistake. I can't
14  tell you why.
15    Q   Okay.  And this email, there's introduction,
16  Nena, comma, right, see at the bottom?
17    A   Uh-huh.  Okay.
18    Q   Nena, comma?
19    A   Yes.
20    Q   And there's a conclusion at the bottom of
21  the email, thank you, right?
22    A   Thank you, yes.

Page 168

1     Q   I'm just confirming that that's what it
2  says.
3     A   Yes.
4     Q   And then the only two -- the only substance
5  of the email is two sentences that read, "I cannot
6  sign your travel or Orlando until you have resolved
7  the issues around the charge to the CCL panel.  Please
8  read my emails and attend to the matter promptly."
9       Did I read that correctly?
10    A   Yeah.  Yes.
11    Q   This wasn't a long email, right?
12    A   No.
13    Q   I mean you receive pretty long emails in
14  your work at EPA, right?
15    A   Yeah.  But during this time, long shot, they
16  were all the same to me.
17    Q   Okay.  Why did you want to go to the ASM
18  conference the week, beginning on May 20, 2006?
19    A   Why did I want to?
20    Q   Yeah.  Why did you want to?
21    A   This was approved travel to go to ASM to
22  make a presentation at the International American

Page 169

1  Society for Microbiology conference.
2     Q   Did you want to go to the conference?
3     A   Yeah.
4     Q   And why?
5     A   Because my paper was selected, two papers,
6  were selected for presentation, and I was supposed to
7  be there. And I was -- I believed also that I was
8  approved to go. So it is -- I'm not questioning why.
9     Q   You say it was important for you to be able
10  to go to this conference?
11    A   It was important for me to go?  It was also
12  important for -- it was like also a mission travel
13  because I was going to make a presentation on EPA
14  work.
15    Q   My question I think was a little bit
16  different.  To you personally, Dr. Nwachuku --
17    A   Right.
18    Q   -- was it important for you to go?  Did you
19  believe it was important for you to go to the ASM
20  conference in May 2006?
21    A   Yes, it was important.
22    Q   You said your paper was selected, right?

819e58e5-a886-4c27-899f-40458c11c240

1    Q   So because you forwarded this thing, this
2  email, to Brenda Mosley, that the subject on the
3  forwarded email is "forward, travel to Orlando," you
4  saw an email that was entitled "subject, travel to
5  Orlando," didn't you?
6    A   No.  I don't remember.  I don't recall.  As
7  I was telling you, I wasn't thinking.  I was so
8  overwhelmed with work, and I was sick.  I wasn't
9  getting enough sleep, you know, and I was so jumpy,
10  and with Elizabeth harassing me, I was just going,
11  just to keep going.
12    Q   Right.  And you were looking forward to your
13  trip to Florida as a nice break of sorts.
14    A   No.  It wasn't a break.  As I said the
15  reason why I was going was to make that presentation.
16  It wasn't even a break because when I went there, I
17  was still working.
18    Q   Was it mandatory, based upon your job at the
19  EPA, to go to the ASM conference in Florida?
20    A   Well, that paper presentation was also in
21  support of -- it was kind of also mission travel
22  because this -- the presentation came out of my work

1  at EPA, and in fact I had two papers, you know, two of
2  them.  But I was the senior author on one of them, and
3  that was the one where I would have received three
4  years' sanction of not making any presentation.
5    Q   Okay.  But you submitted these papers for
6  consideration to the ASM, right?
7    A   Right.
8    Q   Okay.  Was it mandatory that you submit
9  papers to the ASM for presentation at an annual
10  conference?  Did EPA mandate you to do that?
11    A   Well, usually --
12    Q   Just --
13    A   Yes.
14    Q   -- yes or no at this point because I'm just
15  trying to walk through a couple of things here, and I
16  will let you have an opportunity to explain.
17    A   Yes.  Part of my responsibility as a
18  scientist in EPA, and Office of Science and
19  Technology, is that you go to conferences and make
20  presentations.
21    Q   Would you have been sanctioned for not
22  submitting the papers that you were presenting at the

1  ASM conference in May of '06, by the EPA?
2    A   No.  That's sanctioned by --
3    Q   Were there consequences for you not
4  submitting papers to the ASM conference?
5    A   No.  There was no consequence for not
6  submitting.  However, it doesn't get me at that level
7  of expertise because part of my technical brush-up on
8  something is to go to ASM to learn new things, you
9  know, because it's an international conference.
10    Q   If you had seen an email, this email, the
11  second email --
12    A   Right.
13    Q   -- based upon your general practice, because
14  you had gone to the ASM conference a couple of times
15  before as we have seen, at least a couple of times
16  before.
17    A   Sure.
18    Q   Saw an email regarding your potential travel
19  to that conference, think you would have opened it?
20    MR. SHAPIRO: Objection.  Speculation.
21    BY MR. HUDAK:
22    Q   Based upon your general practice?

1    A   If -- yes.
2         (The document was marked
3          Nwachuku No. 8 for
4          identification.)
5    Q   All right.  I'm marking what's -- or handing
6  you what has been marked Nwachuku 8.
7    A   Okay.
8    MR. HUDAK:  Here you go, David.
9    BY MR. HUDAK:
10    Q   Nwachuku 8 appears to be an email from
11  Elizabeth Doyle to Ed Ohanian, cc'ing Nena Nwachuku,
12  May 17, 2006, 1:05 p.m., Subject, "Re:  Charge to CCL
13  Expert Panel.  Your input in requested."
14        As a general matter, if Beth Doyle asked for
15  your input on something, something regarded to the CCL
16  expert panel, would you give her your input?
17    A   Yeah.  But she is copying me on this.  She's
18  writing to Ed Ohanian.  She's copying me.
19    Q   Now when an email pops up in your list of
20  its inbox, the fields that are displayed -- correct me
21  if I'm wrong -- the fields that are displayed
22  typically in the list of emails -- and I understand

Page 178

1  you can sort the list by name.
2      A  Yes, I do.
3      Q  But the fields that are in kind of the list
4  are, you know, the date and time it was received, who
5  it was from, and what the subject is, as a general
6  matter.  There may be others, correct?
7      A  Uh-huh.
8      Q  Is that yes?
9      A  Yes.
10     Q  Okay.  And you see this email reads "Ed, I
11 have placed a meeting on your calendar for Nena, Eric,
12 Tom and I for tomorrow at 9:00.  I'll let you know if
13 our issues are resolved successfully.  Otherwise I
14 will let you know that we need to reschedule the
15 meeting for next week.  Thanks."
16         And then an email from Edward Ohanian
17 follows.  Do you see that?
18     A  Yeah, I see these.
19         MR. SHAPIRO:  Objection.  Follows on the
20 page.  It's actually the other way around.
21         BY MR. HUDAK:
22     Q  I -- follows on the page.  I'm sorry.  I

Page 179

1  understand the difference.  I apologize if my question
2  was unclear.  It follows on the page, right?
3      A  Yes.
4      Q  Okay.  Do you recall opening this email on
5  Wednesday, May 15th?
6      A  No, not at all.  I don't even recall
7  receiving it or opening it or when I did if I did,
8  because at this time, as I explained earlier, I was
9  overwhelmed, you know.  I was really overwhelmed and I
10 don't even know when or if I saw this.
11     Q  It's possible you saw it, though, right?
12     A  I don't know that I did.
13     Q  Okay.  Did Beth ever tell you about a
14 meeting on May 18th at 9:00 in the morning?
15     A  No.  That was the -- no -- because I
16 remember I took six hour sick leave.
17     Q  We'll get to it, but did she ever tell you
18 before that, that there was going to be a meeting?
19     A  They never did.
20     Q  Okay.  They meaning who?
21     A  I just come in and I was told that there was
22 a meeting.  That's when she was so furious that she

Page 180

1  attacked me on that 18th, because I had just come from
2  the doctor's meeting.  And she was asking me, "Where
3  were you," and so on and so forth and carrying on.
4      Q  Okay.  But before this email was sent on May
5  17th, the Wednesday --
6      A  Okay.  Uh-huh.
7      Q  -- did Nena, Eric -- or did Eric, Tom or
8  Beth or Ed tell you that there was a meeting scheduled
9  for 9:00 on Thursday morning?
10     A  I don't recall that they did.
11     Q  Okay.
12     A  I don't recall that they did.
13     Q  It's possible that they did?  You don't
14 recall one way or the other?
15     A  No.
16     Q  Okay.
17              (The document was marked
18              Nwachuku  No. 9 for
19              identification.)
20     Q  This is nine.  Before we get to this, I
21 believe I asked this question with regards to
22 colleagues within HECD, but I'm not positive I asked

Page 181

1  you just about your supervisors.        At any point
2  during your employment at the EPA, did you ever hear
3  any of your supervisors use a racial pejorative?
4      A  It may have been Elizabeth Doyle.
5      Q  You recall Elizabeth Doyle using a racial
6  pejorative?
7      A  Yes.
8      Q  When did she use that?
9      A  When I was telling you about I had said
10 earlier when I was asking her why she's always so
11 nasty to me and so rude, and she was talking about she
12 used to live in Prince George's County.
13     Q  Okay.
14     A  And all that.
15     Q  I believe, and correct me if I'm wrong, but
16 I believe you earlier said that you had no idea what
17 she meant by that?
18     A  That's particular in living in Prince
19 George's County.  But then there was also sometime
20 when she was using some racial -- how will I say it --
21 some racial language about Black people.
22     Q  Okay.  And what specifically did she say?

819e58e5-a886-4c27-899f-40458c11c240

Page 182

1    A    Well, I -- for example, when she stuck that
2    thing in my hand to give me code of conduct, and she
3    is always doing this to me.  She is always bullying
4    me, harassing me, you know?  It's all the time. I may
5    even be speaking to somebody in the hallway and she
6    will just, you know?
7    Q    I understand.  And I think we've heard about
8    that when we were talking about the pattern of hostile
9    behavior that we discussed earlier.
10    A    Yeah.
11    Q    But my question was just a little bit
12    different.  What specifically -- you said you recalled
13    her using racial language -- what specific language,
14    racial language, do you recall her using?
15    A    She had used -- there was a time when
16    Elizabeth was so rude to me, she said something about
17    Africans, that I just blanked out.
18    Q    So you don't recall what she said?
19    A    I don't recall specifically what she said,
20    but it was very demeaning.
21    Q    Okay.  And it concerned Africans?
22    A    Yes.

Page 183

1    Q    Not all Black people, just specifically
2    Africans?
3    A    No.  I am -- what I mean is the ethnic, not
4    Black Americans.
5    Q    Okay.
6    A    We separate.
7    Q    Okay.  But against people that are from
8    Africa?
9    A    No, not in nice way like you just said.
10    Q    No, I understand.  I'm just trying to get
11    the category.  I understand.  I'm just trying to get
12    the category of people that this language was used to
13    denigrate.  And it was people from Africa?
14    A    Yes.
15    Q    Okay.  When did this incident occur?
16    A    This happened during the period that
17    Elizabeth, you know, has collected her maybe -- let's
18    see -- and -- okay.  And I remember one other time.
19    Q    Okay.  Well, let's talk about this first
20    time, and then we'll get to the second time.
21    A    Okay.
22    Q    Now if you can give me a date, and if you

Page 184

1    can't, just let me know, but can you give me a date or
2    a month in which this first incident occurred?
3    A    No.  There's no way I can give you a date.
4    Q    Okay.
5    A    This is how many years ago?
6    Q    Okay.  But it only happened twice that she
7    used these terms, right?
8    A    Yes.
9    Q    Okay.
10    A    And I remember another time when my mom
11    passed away.
12    Q    Okay.  Well, we'll get to the second time.
13    But for the first time, I'm just trying to direct your
14    attention to the first time, where were you when this
15    language -- where were you physically when this
16    language was used?
17    A    In EPA work environment.  I was at work.
18    Q    Okay.
19    A    It wasn't outside work.
20    Q    Where specifically in the office -- I want
21    your physical location if you can recall it?
22    A    Most of the times when she's abusing me and

Page 185

1    harassing me, it's usually in the hallways.
2    Q    Okay.  It probably was in the hallways?
3    A    Yes.  It was either where I -- in hallway
4    where I'm Xeroxing, or something near the -- near her
5    office.
6    Q    Okay.  Did anyone else hear her use this
7    pejorative?
8    A    No.
9    Q    Did you notify anyone of Beth's use of this
10    pejorative at or about the time?
11    A    I had talked to Ed Ohanian about Elizabeth
12    Doyle three times, and she told me -- and he told me
13    that this is the way she talks.
14    Q    Okay.  All right.  Do you recall a specific
15    -- maybe I just misunderstand your answer.
16    A    And I had to report it to Mr. King also.
17    Q    Okay.  So you -- let me -- and it's just me
18    -- I'm just kind of dense at times -- did you -- do
19    you recall a specific -- you have a specific
20    recollection that after this first time that Beth used
21    this pejorative regarding people from Africa, that you
22    went and complained specifically about this to Ed

819e58e5-a886-4c27-899f-40458c11c240

Page 190

1  call for the production of those notes and ask that
2  they -- that a reasonable search be made.
3        MR. SHAPIRO:  Are they within the confines
4  of your request for documents?
5        MR. HUDAK:  I'm not implying that you did.
6  If not, we'll make a supplemental request and this
7  will serve as my supplemental request.
8        MR. SHAPIRO:  If you'll look, though, if you
9  look and see and you can make a supplemental request,
10 if it's not covered by your request initially, if
11 you'll make a supplemental request, we'll take it up.
12       MR. HUDAK:  Okay.
13       MR. SHAPIRO:  All right?  We're willing to
14 take it up if it's --
15       MR. HUDAK:  Even if it's after the Friday
16 deadline?
17       MR. SHAPIRO:  Well, I suppose by tomorrow,
18 you can get us a supplemental request.
19       MR. HUDAK:  Well, I'm out of the -- I told
20 you I'm not in the office tomorrow, so.  Explain to
21 him as well, that I was not --
22       THE WITNESS:  I'm assuming in those -- okay.

Page 191

1        MR. SHAPIRO:  We'll consider it.
2        MR. HUDAK:  If not, I will make a written
3  request this evening and get it off to you.
4        MR. SHAPIRO:  Get it off to us.
5  BY MR. HUDAK:
6     Q   Now you mentioned a second time Elizabeth
7  used racial pejoratives or demeaning language
8  concerning at or about the time or regarding when your
9  mother was sick?
10    A   Yes.
11    Q   Can you please describe what words she used?
12    A   Okay.  My mom was sick, and I was going back
13 and forth to Africa, you know, from one hospital to
14 another.  And then when she passed away, when I came
15 back, and I went into Ed Ohanian's office and told
16 him.  And then I went into Elizabeth's office and I
17 told her what happened and the cultural things that
18 needed to be done, you know.
19       She wasn't going to be buried right away,
20 and so on and so forth.  And the way she captured --
21 how will say -- captured -- the way she -- there was
22 no sensitivity from Elizabeth when I was telling her

Page 192

1  about the culture that surrounds the fact that she
2  will not be buried right away like we do here in the
3  United States.  And it kind of took me aback.
4     Q   Okay.  So it was in her tone that you
5  thought that she was insensitive about the ordeal that
6  you were going through?
7     A   Not ordeal, but our culture, what we do that
8  she will not be buried right away.
9     Q   The very important things that were
10 occurring in your life with your mother?
11    A   Exactly.
12    Q   So it was in her tone, that she didn't
13 necessarily use any specific words that were demeaning
14 towards people from Africa as a group?
15    A   Yeah, by her tone and from what she was
16 saying, you know?  I just felt so -- and at that time
17 I was just going through a very low time of my life at
18 that time.  So I didn't care anymore.
19       And then when people were asking, "Nena,
20 where have you been?  We haven't seen you for six
21 weeks," or something like that.  And I told them my
22 mom died.  And they were shocked that nobody told

Page 193

1  them.
2        And I said, "Well, I reported to Elizabeth
3  and Ed Ohanian."  But they never sent an email to the
4  whole group so that all people will come and comfort
5  you like they do for others.
6     Q   Did you ask them to send an email to the
7  whole group?
8     A   No, you don't ask.
9     Q   But did you?  I'm not asking as a general
10 practice.  Did you in this specific instance?
11    A   No, I didn't ask.
12    Q   Okay.  Now just getting back specifically to
13 what she said because you said it wasn't only her tone
14 and her insensitivity about what was going on after
15 your mother died.
16    A   Uh-huh.
17    Q   But also in the words that she used.
18    A   Yes.
19    Q   What words did she use that you believe were
20 demeaning to people from Africa as a group and not
21 just, you know, an insensitivity as to what was going
22 on in your life?

819e58e5-a886-4c27-899f-40458c11c240

Page 194

1    A    The insensitivity is what I just described
2  about not announcing so people can comfort you and so
3  on and so forth. But what I'm pointing at was when I
4  was telling him -- excuse me -- was when I was
5  telling her about the culture and what needed to be
6  done before she can be buried, you know, which would
7  take -- it took much, much longer than what's done
8  here in the United States when people die.
9    Q    Okay.
10    A    They bury them a week or two weeks, but
11  that's not the case, you know, that we had to go
12  through some cultural things and for my mom because of
13  where she went. I didn't particularly appreciate her
14  tone and what she was saying when I was telling her
15  all that was going on and the cultural things that
16  were happening, and why.
17        You know, it's like the way she was looking
18  at the way like, "oh. And we keep the dead body for
19  long, and blah, blah, blah, blah, blah," you know, and
20  so but this is to honor her and not because it's a
21  dead body.
22        The way she was representing it showed me

Page 195

1  that, you know, the way she's -- I don't know who to
2  describe it to you, but I was kind of down because of
3  the way she looked at my culture and her tone and the
4  questions she was asking and what she was saying.
5    Q    Yeah. She was asking you and saying stuff
6  about the specific rituals or practices?
7    A    Right.
8    Q    That were going to go on now that your
9  mother had died?
10    A    Yes.
11    Q    Okay. Have you ever heard Beth Doyle tell a
12  racist joke?
13    A    Well, I will put both of them on the same
14  category. When she's telling me that she used to live
15  in Prince George's County, but I don't recall
16  listening for racial jokes from her.
17    Q    When she said that she used to live in
18  Prince George's County, were you offended by that
19  remark, or did you know what to make of it?
20    A    I live in Prince George's County, and I know
21  that Prince George's County is made up of many of
22  Black people. And for her to -- when I asked her why

Page 196

1  she was always nasty and rude to me, and she said,
2  "Well, I used to live in Prince George's County." I
3  had to draw the inference.
4    Q    But she didn't specify that what she was
5  saying is demeaning --
6    A    I could make --
7    Q    Well, she didn't -- just let me finish --
8  she didn't further specify with her words that the
9  comment that "I used to live in Prince George's
10  County" was intended to be demeaning race or national
11  origin? I'm just asking about what she said. I'm not
12  asking you about how you inferred because --
13    A    To me when I'm asking her why she is always
14  nasty to me, not to everybody, but to me, not to -- I
15  don't see her being that nasty to White, Caucasian
16  employees, but to me all the time. I asked her that.
17
18        And then her reply was, "I used to live in
19  the Prince George's County."
20    Q    Okay. I'm asking after she said she used to
21  live in Prince George's County, did she say anything
22  else that specified that that comment was intended to

Page 197

1  be demeaning towards African-Americans or people from
2  Africa or Black people?
3    A    I don't recall.
4    Q    Okay. Any other supervisor of you, and
5  beyond the two incidents we talked about, the one with
6  your mother, the other one -- or you believe she said
7  something demeaning to people from Africa and this "I
8  used to live in Prince George's County" remark, was
9  there any other remarks that you believe are demeaning
10  towards Black people or people from Africa as a group?
11    A    You mean from other supervisors?
12    Q    No, from Beth.
13    A    From Beth.
14    Q    Besides these three that we've heard that
15  you talked -- that we just talked about.
16    A    I don't recall. I just don't know.
17    Q    Okay. As far as the remark that "I used to
18  live in Prince George's County," when did she make
19  that remark?
20    A    When she was -- maybe about -- maybe in the
21  '04, 2004.
22    Q    Where were you when she made this remark,

1  physically?
2      A   In the office.
3      Q   Okay.  Specifically where in the office?
4      A   I think it was in my cube, in my cubicle,
5  and I was asking her --
6      Q   Were you sitting down?
7      A   I don't remember.  Maybe I was sitting down
8  when I asked her, "Elizabeth, why are you so always
9  nasty to me?"
10     Q   Okay.
11     A   I was trying to reach out to her.
12     Q   Did you, beyond putting a statement
13 concerning this in any way formal EEO complaint or --
14     A   I did.
15     Q   -- no, no, no, I'm saying besides that.  I
16 understand you've testified you put it in your
17 affidavit.  Besides that, besides what appears in your
18 affidavit --
19     A   Right.
20     Q   -- did you write it down as or immediately
21 after it occurred?
22     A   By me putting it in there, I would have

1  written it down plus I went to Ed Ohanian, and I also
2  told Ed.
3      Q   But that's a verbal communication with Ed
4  Ohanian.
5          MR. SHAPIRO:  Listen to the question and
6  answer the question.
7          THE WITNESS:  Okay.  Okay.  Uh-huh.
8          BY MR. HUDAK:
9      Q   You said it happened in 2004?
10     A   Yes.
11     Q   And she made the remark?
12     A   Uh-huh.
13     Q   And then in September of '05, you put in
14 your affidavit in connection with your formal EEO
15 complaint?
16     A   Right.
17     Q   I'm not asking about what you put in here.
18     A   Okay.
19     Q   I'm asking at or shortly after the time that
20 she said it, did you write an email, put it in writing
21 anywhere that Beth Doyle said this to me?
22     A   I may have put it in my notes.

1      Q   Okay.  But you can't recall one way or
2  another, sitting here today, whether you actually did
3  put it in your notes or did not?
4      A   For me to remember to put it in my
5  complaint and also to tell Ed, I must have put it in
6  my notes, too.
7      Q   Did you ever write an email at or about the
8  time --
9      A   No, not that I recall.
10     Q   Any other supervisor, first tier, second
11 tier, third tier, when you were at the EPA that used
12 racial pejoratives that you heard or used language
13 demeaning to Black people or people from Africa as a
14 group?
15     A   Tony was my supervisor.  He never used -- he
16 was never unprofessional with me.  No.
17     Q   Okay.  So you never Chris Zarba use any of
18 that language, did you?
19     A   Not that I can recall.
20     Q   Never heard Ed Ohanian use any of that
21 language, did you?
22     A   Not that I can recall.

1      Q   Never heard Jeff Grubbs use any of that
2  language?
3      A   Not that I can recall.
4      Q   You never heard Ephraim King use any of that
5  language, did you?
6      A   Not that I can recall.
7      Q   Anthony Maciorwoski, did you hear him use
8  any of that language?
9      A   Not that I can recall.
10     Q   Pam Barr, even though she wasn't your direct
11 supervisor, did she ever use any of that language?
12     A   No.  We were never together.
13     Q   Rita Shoney, did she use any of that
14 language?
15     A   No, not that I can recall.
16     Q   Dr. Burneson, did he ever us any of that
17 language?
18     A   Mr. Burneson was never my supervisor.
19     Q   I understand.  I understand he wasn't your
20 supervisor, but --
21     A   He's in a different office.
22     Q   Okay.  But did you ever hear him use any of

819e58e5-a886-4c27-899f-40458c11c240

Page 210

1    A   I don't remember.

2    Q   Generally?  Was it 11:00, approximately?

3    A   Okay.  This was on the 18th, Thursday.  I

4  must have left every late because during this time, I

5  was putting in 16 hours of work.

6    Q   Okay.  I understand.  I'm just trying to --

7  when you say "very late," that can be one thing to one

8  person, one thing to another.  I'm just trying to

9  understand what you mean by "very late."

10        In a general range of time, I'm just trying

11  to get your estimate.  Was it 11:00 in the evening,

12  midnight, one o'clock the next day?

13    A   I don't remember.  I don't specifically

14  remember at this time.

15    Q   Okay.  I'm just asking for a general

16  recollection.

17    A   I can't give you a general recollection

18  because I don't remember.  This was --

19    Q   Was it after five o'clock?  If you came in

20  at four, was it after five?

21    A   Oh, it was much later.

22    Q   After six?

Page 211

1    A   Must have been.

2    Q   After seven?

3    A   I don't -- this is also tying me down to the

4  time.

5    Q   No.  I'm just -- I'm not trying to tie you

6  down at all.  I'm just trying to get an idea of how

7  long you were there in the office.  Maybe this is a

8  better way.  How many hours did you spend in the

9  office that day?

10    A   I can't tell you how many hours, but I know

11  that I came in just a little bit before four, because

12  I had that written by four.

13    Q   Okay.

14    A   So --

15    Q   How many conversations did you have, face-

16  to-face conversations, did you have with Beth Doyle

17  that day?

18    A   That day the only face-to-face was when she

19  came, saw me and started yelling and attacked me and

20  touched me aggressively as I sat down and sorted

21  papers on the floor.

22    Q   Okay.  We're going to get to that in just

Page 212

1  one second.  So there was just one meeting, face-to-

2  face meeting between you and Beth that day?

3    A   Because it was towards the end of the day

4  for her and others.

5    Q   Was it approximately or around 4:30, 5:00,

6  approximately that time?

7    A   It was approximately because I was in the --

8  I'm trying to -- I was in the conference room from

9  4:15, 4:20, waiting.  And then Ed came.  And then I --

10  that's when I went out when he said he's coming back,

11  but I should continue working.

12        So I went out and sat on the desk, sorted

13  things.  That's when she stormed out of her office and

14  started yelling at me, and so aggressively and was

15  touching me.

16    Q   Okay.

17    A   You know, physically.

18    Q   Okay.  So if I understand, you went to the

19  meeting that you thought was going to happen with Ed

20  Ohanian?

21    A   Right.

22    Q   At four o'clock?

Page 213

1    A   Yes.

2    Q   You waited there a little bit?

3    A   Yes.

4    Q   No one showed up.

5    A   Edward Ohanian showed up.

6    Q   Ed Ohanian then showed up.

7    A   Exactly.

8    Q   And said, "I'll be back in a few, but go

9  ahead and continue to do your work."

10    A   Right.

11    Q   So approximate time for when you and Beth

12  had your face-to-face conversation, it would have been

13  4:30, 5:00 p.m., somewhere in that area?  I'm just

14  trying to get a --

15    A   Right.

16    Q   -- general time area.

17    A   Yeah, but not conversation because she was

18  yelling at me.

19    Q   Okay.  Whatever you want to call it.  When

20  you and Beth --

21    A   That's what it was.

22    Q   When you and Beth were in -- whatever word

819e58e5-a886-4c27-899f-40458c11c240

Page 214

1  you want to use for when you and Beth were in the same
2  place at the same time --
3      A   Yes.
4      Q   -- that occurred right around 4:30?
5      A   Yes.
6      Q   Okay.  Now where specifically in the office
7  did this face-to-face meeting between you and Beth
8  occur?
9      A   Okay.  It was right at the Xerox machine and
10  the chair.
11     Q   Okay.  And what were you doing immediately
12  before Beth and you had your face-to-face meeting?
13     A   I put in my documents to Xerox while I'm
14  taking out time and I'm sorting.
15     Q   Did you see anyone else in the area at that
16  time?
17     A   There was nobody at that vicinity.
18     Q   All right.
19     A   Nobody.
20     Q   You specifically recall there was not a
21  single person there?
22     A   I specifically recall because of -- I

Page 215

1  specifically recall.
2      Q   Okay.
3      A   There was nobody else there.
4      Q   And who sits, whose cubicles are close to
5  the Xerox machine area that you're describing?
6      A   It's Fred -- was it Fred -- senior, he's a
7  senior and he comes in once a week.
8      Q   He's a "C" -- senior?
9      A   Senior.
10     Q   Okay.  I understand.
11     A   Senior employee.
12     Q   He's an individual -- the EPA has a program
13  for people that are retired to come in and perhaps
14  work part-time schedules?
15     A   Sure.
16     Q   And he was one of those?
17     A   Yes.
18     Q   Okay.  Was he in that day?
19     A   No.
20     Q   And how do you know that?
21     A   Because he was gone and I pulled his seats
22  to sort the -- to sort on the floor.

Page 216

1      Q   Okay.  So you were sitting down?
2      A   Uh-huh.
3      Q   In a chair.
4      A   Uh-huh.
5      Q   Sorting documents on the floor?
6      A   Uh-huh.
7      Q   When Beth walked up to you?
8      A   Yes.
9      Q   Okay.
10     A   From my back.
11     Q   From your back?
12     A   Uh-huh.
13     Q   And was your back facing her office?
14     A   No.  Yes.  My back was facing her office.
15     Q   Okay.
16     A   Uh-huh.
17     Q   And that was the only conversation -- strike
18  that.
19         Beth approached you.  What did she say?  I'm
20  not asking for a description of what transpired.  I
21  just want to first get what she said.  What did she
22  say to you?  Words.

Page 217

1      A   Okay.
2      Q   Just the words.
3      A   Okay.  As soon as she -- I was with my back,
4  she said, "Where have you been?"  And she just grabbed
5  me like this, because I was sitting, and yelling at
6  me.  "Where have you been all day," you know?
7          And then she was giving me, reading me the
8  riot act about how to report because I was telling her
9  that I was at the doctor's and that I called in by
10  5:30.
11     Q   Okay.
12     A   By 5:30.  And she was telling me that I
13  never -- she was -- I should never report to anybody
14  but her.
15     Q   Okay.  Anything else she said?
16     A   Yes.  She was asking me where have you been.
17  "Where have you been all morning?"
18         I said, "I went to the doctor, and I called
19  in sick."
20         And then she was telling me that I shouldn't
21  report to anybody but her.
22     Q   Okay.  Anything else besides that?

819e58e5-a886-4c27-899f-40458c11c240

Page 230

1  side corridors?
2      A   Okay.  I see what -- the offices are on the
3  other side with the walls.
4      Q   Okay.  What about the cubicles?
5      A   Yeah.  That's where the cubicles are.
6      Q   Okay.  And did the walls go to the ceiling?
7      A   Yes.  These walls go to the ceiling.
8      Q   To the ceiling?  They don't stop at around
9  my height?
10     A   No, they don't stop because it's hallway.
11 This is what they call -- what do they call it --
12 connecting wing.
13     Q   Okay.
14     A   So people walk through.  People walk through
15 there.
16     Q   Okay.  Do you know of anyone else, learned
17 subsequently, that can verify that Elizabeth was
18 screaming at you at or about this time?
19     A   As I explained before, there was nobody at
20 that vicinity when I was Xeroxing.  It was at the end
21 of the day.  And that was why my -- I was able to
22 swivel my chair into the middle of the hallway.

Page 231

1      Q   Okay.  My question was a little bit
2  different.  Do you know of anyone that overheard this
3  face-to-face meeting between you and Elizabeth?
4  Sitting here today, do you know of anyone?
5      A   I don't know of anybody who heard because I
6  was sitting in Fred's chair and there was nobody.
7  This is Xerox location.
8      Q   Okay.  You mentioned Dana Thomas earlier in
9  these proceedings.  And you understand that Ms. Thomas
10 contends that she overheard a meeting, a face-to-face
11 meeting, between you and her -- and Elizabeth Doyle at
12 or about the time you were just describing.
13     MR. SHAPIRO:  Objection.  That's not the
14 record.  But answer the question.
15     THE WITNESS:  Okay.  Answer.
16     BY MR. HUDAK:
17     Q   Have you read Dana Thomas's statement in
18 connection with this proceeding or the MSPB proceeding
19 --
20     A   No.  I was there during the MSPB when she
21 testified.
22     Q   Okay.  And you heard what she testified?

Page 232

1      A   Yes.  If she testified to God in heaven, if
2  she testified that she was in this vicinity and she
3  heard, she was completely lying.  She was nowhere
4  near.  Dana Thomas was nowhere near.
5      And if you remember, Maria Gomez-Taylor took
6  a report, and three days later, they rewrote the --
7  revised the report and they never showed it to me.
8      Q   Okay.
9      A   I revised the report and put Dana Thomas in.
10     Q   I'm going to move to strike that last part
11 as nonresponsive to the question.
12     MR. SHAPIRO:  Motion denied.
13     MR. HUDAK:  Thank the Lord that you're not
14 the judge.
15     BY MR. HUDAK:
16     Q   Okay.  Had Elizabeth Doyle ever previously
17 touched in a threatening manner?
18     A   No, but she has -- as I explained to you
19 before, she has always been bullying me and very nasty
20 towards me.  And I complained about it, too.
21     Q   Okay.  One last topic that I want to cover
22 and then I think that's it.

Page 233

1      On June 6th, the panel, you learned
2  immediately before the panel meeting that Ed Ohanian
3  and Beth Doyle once again distributed a revised charge
4  that was different from the one that you had prepared,
5  correct?
6      A   Uh-huh.
7      Q   Is that a yes?
8      A   Can you -- excuse me -- I didn't quite --
9      MR. SHAPIRO:  I don't think she heard the
10 first part.
11     THE WITNESS:  I didn't -- that's right.
12     MR. HUDAK:  Okay.
13     BY MR. HUDAK:
14     Q   That's fine.  That's fine.  I kind of
15 trailed off.  It's fine.  I have a tendency to mumble
16 and I have a tendency to get loud at times.  I do not
17 have volume control as they would say.
18     On June 6th at the panel presentation,
19 immediately before the panel presentation was to
20 begin, you learned that Beth Doyle and Ed Ohanian
21 wanted to distribute a revised charge that was
22 different than the one that you had previously

819e58e5-a886-4c27-899f-40458c11c240

Page 234

1  prepared, correct?
2      A   Yeah.  When I came in, they wanted to talk
3  to me or something.
4      Q   Okay.  And in fact the charge that you had
5  sent out on May 19th, was not the charge that was used
6  at the meeting?
7      A   No.
8      Q   Okay.  You got upset that they were going to
9  use a revised charge and not the charge that you had
10  prepared, correct?
11      A   I did not get upset.  I was excited at the
12  experts who were in the room.  I just got in, and they
13  were calling "Nena, Nena."  That's how I decided to
14  act at the beginning of conference.  I was so happy.
15  It wasn't until they called me in the room.  I wasn't
16  upset because the meeting is about to begin, and the
17  thing they gave me to read, there wasn't much
18  difference between the one that's the workgroup
19  approved and decided on using, and the one that was
20  given to the contractor to substitute.
21      Q   Did you have a conversation with Beth Doyle
22  in the hallway outside of the meeting room in which

Page 235

1  the panel was meeting, in which you raised your voice
2  at Beth?
3      A   We were all talking.  I never had one-on-one
4  with Elizabeth Doyle.  I was talking to Ed.  Ed was
5  talking to me, and Elizabeth joined in.  She didn't
6  even talk much.  So I never raised my voice like she
7  was -- she has been claiming.
8      Q   You didn't get in her face and yell at you -
9  - yell at her?
10      A   No.  I never got in her face.  We were in
11  the room with all the experts.
12      Q   I'm talking about outside of the room with
13  the experts.
14      A   In --
15      Q   Let me just finish.
16      A   Okay.
17      Q   I'm talking about outside the room of the
18  experts, did you ever raise your voice, yell, scream
19  at, get in the face, of Elizabeth Doyle merely before
20  the panel meeting on June 6th?
21      A   No, I did not get in the Elizabeth's voice
22  (sic) and yell at her.  We were all talking together

Page 236

1  in the hall door.  I never got in her face or yelled
2  at her at all.
3      Q   So anyone -- strike that.
4          So you said that Elizabeth didn't say much.
5  Did you -- I just want to make sure the record is
6  clear -- did you ever have a one-on-one conversation
7  with Elizabeth in the hallway that day?
8      A   No.  I didn't have a one-on-one.  We were
9  talking in a group.  Ed Ohanian was the one leading
10  the conversations.
11      Q   Did Ed Ohanian ever tell you to step back
12  from Elizabeth Doyle in the hallway?
13      A   No, not that I can recall.  Ed Ohanian did
14  not tell me to step back.  There was no room there.
15  Where we had more room was in the room.
16      Q   Okay.
17      A   In the conference room.
18      Q   And certainly there was no reason for Ed to
19  have ever told you to step back because you weren't in
20  Elizabeth's face yelling at her, right?
21      A   No.  I wasn't in her face, yelling at her.
22  And this is not the first time that Ed has lied on

Page 237

1  record against me.
2      Q   So you believe Ed Ohanian is lying with
3  regard to this?
4      A   Okay.  Okay.  So --
5      Q   No, I want you to answer the question.
6      MR. SHAPIRO:  Answer the question.
7      BY MR. HUDAK:
8      Q   Do you believe that --
9      A   I don't recall.
10      Q   Please.
11      MR. SHAPIRO:  Just answer the question.
12      BY MR. HUDAK:
13      Q   Please, please --
14      A   Okay.
15      Q   You believe that Ed Ohanian lied when he
16  said that he told you to step back, and that you were
17  yelling at Elizabeth in her face in the hallway?
18      A   If he said that I was yelling at Elizabeth
19  in the hallway, then he lied.
20      Q   Okay.  You heard him testify at the MSPB
21  hearing, right?
22      A   I don't know that he testified on this.  I

819e58e5-a886-4c27-899f-40458c11c240

Page 242

1       (Whereupon at 5:55 p.m., the deposition of
2    NENA NWACHUKU was concluded.)
3             * * * * *
4       I have read the foregoing pages, which are a
5    correct transcript of the answers given by me to the
6    questions therein recorded.
7
8           Deponent _____
9           Date _____
10
11
12
13
14
15
16
17
18
19
20
21
22

819e58e5-a886-4c27-899f-40458c11c240