# EXHIBIT
# 3

Page 1

1           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                  BALTIMORE DISTRICT OFFICE
2

   NENA NWACHUKU
3           Complainant          EEOC Case No.
        vs.                      100-2004-011025X
4

   MICHAEL LEVITT, ADMINISTRATOR
5  ENVIRONMENTAL PROTECTION       Agency Case Nos.
   AGENCY                         2003-0065-HQ
6           Agency                2004-0050-HQ

7  _____/

8           The above-entitled matter came on for

9  Hearing before Laurence Gallagher, Administrative

10 Judge, on Tuesday, October 25, 2005, commencing at

11 8:10 A.M. at the Equal Employment Opportunity

12 Commission, City Crescent Building, 10 South Howard

13 Street, 3rd floor, Baltimore, Maryland, before Chuck

14 Peppler, a Notary Public.

15 APPEARANCES:

16          LAURENCE J. GALLAGHER, ADMINISTRATIVE JUDGE

17          ROY J. BUCHOLTZ, ESQUIRE
              On behalf of the Complainant
18
            PAUL M. WINICK, ESQUIRE
19            On behalf of the Agency

20

21 REPORTED BY:   Chuck Peppler

Page 2

1    P-R-O-C-E-E-D-I-N-G-S
2    Q    Good morning. My name is Judge Gallagher.
3    Today is October 25th, 2005. We're here today at
4    Baltimore District Office of the Equal Employment
5    Opportunity Commission to hear and review and
6    eventually decide the case of Nena Nwachuku
7    N-W-A-C-U-K-U, versus the Environmental Protection
8    Agency, EEOC Case No. 100-2004-01025X, Agency Case
9    Number EPA 2003-0065-HQ. Present in the hearing room
10   at this present time, which is October 25 at
11   approximately 8:15 a.m., is the Complainant, Nena
12   Nwachuku, Complainant's counsel, Roy Bucholtz,
13   Esquire, Agency counsel Paul Winick, W-I-N-I-C-K?
14        MR. WINICK: Yes.
15   Q    Esquire, the administrative judge and
16   Chuck Peppler, the court reporter.
17        The claims before me are the following:
18   Did the Agency unlawfully discriminate against the
19   Complainant on the basis of her race, African
20   American, national origin, which was African, color
21   black, and reprisal when on June 5th, 2003,

Page 3

1    Complainant learned that she would not promoted to the
2    GS-14 level based on accretion of duties.
3        The second issue is whether or not there
4    was unlawful harassment based on those bases when
5    first her promotional opportunities were suppressed.
6    Number two, when she was portrayed as being an angry
7    person. Number three, when she was subjected to a
8    hostile work environment and number four, when she was
9    administered improper performance evaluations.
10       We have the first witness, who is the
11   Complainant, on the stand right at the moment.
12   Ms. Nwachuku, please raise your right hand.
13   Whereupon,
14        NENA NWACHUKU,
15   called as a witness, having been first duly sworn
16   to tell the truth, the whole truth, and nothing but
17   the truth, was examined and testified as follows:
18        JUDGE GALLAGHER: Thank you very much.
19   State your full name again for the record.
20        THE WITNESS: Nena Nwachuku.
21        JUDGE GALLAGHER: Ms. Nwachuku, let's just

Page 4

1    go over, your race is black.
2        THE WITNESS: Yes, Your Honor.
3        JUDGE GALLAGHER: You're African American.
4        THE WITNESS: Yes, Your Honor.
5        JUDGE GALLAGHER: Your national origin
6    again is?
7        MR. WINICK: African.
8        JUDGE GALLAGHER: Your color? Wait a
9    minute. Did we have that?
10       MR. BUCHOLTZ: Color black.
11       JUDGE GALLAGHER: Color black. Now, your
12   prior EEO activity consists of what?
13       THE WITNESS: The grievance that I filed.
14       JUDGE GALLAGHER: When was this grievance
15   filed, approximately?
16       THE WITNESS: It was in 2001.
17       JUDGE GALLAGHER: Now, this grievance, did
18   it concern civil rights aspects or what was it about?
19       THE WITNESS: It concerned several issues.
20   One was removal of me from the team coordination
21   responsibilities just after four months of serving as

Page 5

1    the team coordinator. Number two, exclusion from
2    several opportunities, training opportunities and from
3    meetings that impacted my work at EPA.
4        JUDGE GALLAGHER: Was there any civil
5    rights violations alleged in that grievance?
6        MR. BUCHOLTZ: Do you understand what the
7    judge is asking you?
8        THE WITNESS: No, I don't.
9        JUDGE GALLAGHER: Civil rights means, did
10   you reference your race, color?
11       THE WITNESS: I did, I believe, but those
12   things were done because I'm an African American and
13   my ethnic origin is Africa. One other issue was that
14   I was labeled a junior. Just by the fact I have a
15   Ph.D. in microbiology, postdoc, and at the time, I was
16   hired, I was hired as a GS-13, full performance level,
17   and in addition I had about 10 to 12 years of
18   experience in the industry.
19       JUDGE GALLAGHER: We'll get into that as
20   we go on. I guess that's basically it, I think.
21   Okay. Mr. Bucholtz, you can go with your direct.

2 (Pages 2 to 5)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

3c59bdbb-f324-496c-a92c-ccceb147713f

Page 6

1        EXAMINATION BY MR. BUCHOLTZ:
2      Q    Dr. Nwachuku, with regard to the grievance
3   you just testified to, I want to refer you to your
4   actual grievance. This is attached to your
5   declaration as Exhibit 9A and we ask that this be
6   Hearing Exhibit 1.
7        JUDGE GALLAGHER: Is this in the
8   investigative file?
9        MR. BUCHOLTZ: Yes, it is. It's attached
10  to Dr. Nwachuku's declaration as Exhibit 9A.
11       JUDGE GALLAGHER: I'm not necessarily
12  against making those exhibits, but do you think we
13  really need to do.
14       MR. BUCHOLTZ: That's really up to you,
15  Judge. What I'm going to be doing here is referencing
16  a number of the exhibits that are attached to
17  Dr. Nwachuku's declaration. Some of the exhibits
18  attached to my file in opposition to the motion for
19  summary judgment, other exhibits that are already in
20  the Report of Investigation, and then we have some
21  exhibits which are not in any of those where we have

Page 7

1   extra copies for everybody.
2        JUDGE GALLAGHER: So, this will be called
3   Investigative File Exhibit 9A.
4        MR. WINICK: It's not in the investigative
5   file.
6        MR. BUCHOLTZ: It's not in the Report of
7   Investigation. It's attached to the declaration that
8   Dr. Nwachuku filed. I believe it was September 2nd,
9   2005.
10       JUDGE GALLAGHER: In response to the
11  motion for summary judgment. You can call that
12  Hearing Exhibit 1, if you want. We'll call it
13  Complainant Exhibit Number 1.
14       (Complainant's Exhibit Number 1 was marked
15  for purposes of identification.)
16     Q    Dr. Nwachuku, I want to show you
17  Complainant's Exhibit 1, which is that grievance, so
18  you can identify it for the record.
19       JUDGE GALLAGHER: This is Exhibit 9A.
20       MR. BUCHOLTZ: Attached to the declaration
21  of Dr. Nwachuku of December 2nd, 2005.

Page 8

1.       THE WITNESS: Yes, this is the grievance
2   that I filed on November 21st, 2001 through the
3   National Treasury Employees Union.
4      Q    Dr. Nwachuku, was Geoffrey Grubbs involved
5   with that grievance?
6      A    Yes, it was.
7      Q    What other managers were involved with the
8   grievance?
9      A    Rita Schoeny, who was my supervisor from
10  January 1998 until January of 2003.
11     Q    Were there any other managers involved in
12  that particular grievance?
13     A    Yes. Jeanette Wiltse, Dr. Jeanette
14  Wiltse. She was the division director at that time.
15       JUDGE GALLAGHER: What's the spelling of
16  that last name?
17       THE WITNESS: Wiltse, W-I-L-T-S-E. Her
18  first name is Jeanette.
19     Q    Are there any other managers involved in
20  that grievance?
21     A    I can't remember.

Page 9

1      Q    Was Ohanian involved in the grievance?
2      A    Edward Ohanian was the senior advisor to
3   Jeanette at that time. He was not a manager.
4      Q    Thank you. Does the grievance state what
5   you've just explained to the judge when he asked you
6   what it was about?
7      A    Yes, it does.
8        MR. BUCHOLTZ: May I have the document,
9   please. Do I need to move for the admission?
10       JUDGE GALLAGHER: Yes.
11       MR. BUCHOLTZ: All right. Then I move the
12  admission of Complainant's Exhibit 1.
13       JUDGE GALLAGHER: Any objection?
14       MR. WINICK: No, Your Honor.
15       JUDGE GALLAGHER: It's been moved.
16       (Complainant's Exhibit Number 1 was
17  admitted into evidence.)
18     Q    Thank you. Dr. Nwachuku, when were you
19  hired at EPA?
20     A    I was hired January 26th, 1998.
21     Q    When you were hired, what was your

3 (Pages 6 to 9)

Page 10

1  position?
2    A    GS-13, environmental scientist.
3    Q    Dr. Nwachuku, I want to show you a
4  document which we'd like marked as Complainant's
5  Exhibit 2. This is not in the file already. I have a
6  copy for Your Honor and a copy for Mr. Winick.
7        (Complainant's Exhibit Number 2 was marked
8  for purposes of identification.)
9        Dr. Nwachuku, please take a look at this
10 document. Have you seen this before?
11   A    Yes, I have.
12   Q    Would you please tell us what this
13 document is?
14   A    This document is U.S. Environmental
15 Protection Agency document showing the mission of EPA.
16   Q    Is that actually on the first page?
17   A    Yes, it is.
18   Q    The mission, reading from the one
19 paragraph that says our mission, it has words about a
20 cleaner healthy environment. Do you, in your work
21 since you came to the EPA, have you been working in

Page 11

1  that area?
2    A    Yes. That's all I've worked on for all my
3  projects and all the work I have done for EPA is about
4  the protection of human health and the environment.
5    Q    I'd ask you to turn to page 2. There is a
6  paragraph that's in bold print that says offer
7  financial assistance. It's talking about giving
8  financial assistance to states. It references to
9  support high quality research that will prove a
10 scientific basis for decisions of national
11 environmental issues and help EPA achieve its goals.
12 Have you worked in that area to achieve the high
13 quality research and the national issues?
14   A    Precisely. That's why I was hired as a
15 scientist, because every rule or regulation that EPA
16 promulgates would depend on a sound scientific basis.
17 My work is based on the scientific basis for all those
18 rules and regulations put out by EPA.
19       MR. BUCHOLTZ: Thank you. I move the
20 admission of Hearing Exhibit 2.
21       JUDGE GALLAGHER: Any objection?

Page 12

1        MR. WINICK: No objection.
2        JUDGE GALLAGHER: Basically, it's a
3  four-page document. It's an explanatory document
4  about what the U.S. Environmental Protection Agency
5  does. Were you going to say something?
6        MR. WINICK: No.
7        (Complainant's Exhibit Number 2 was
8  admitted into evidence.)
9        (Complainant's Exhibit Number 3 was marked
10 for purposes of identification.)
11   Q    Dr. Nwachuku, I'm going to show you
12 another document of the EPA which I have marked as
13 Complainant's Exhibit 3. Again, this is a document
14 not in the file. There is a copy for you and a copy
15 for Mr. Winick. Here's a copy for Dr. Nwachuku. Is
16 this also from the EPA, Dr. Nwachuku?
17   A    Yes.
18   Q    The title is Water?
19   A    Yes.
20   Q    Then in bold print, it says a short
21 introduction to the water elements of the new EPA

Page 13

1  strategic plan. Dr. Nwachuku, have you been workin
2  in an area to support a strategic plan?
3    A    Oh, yes.
4    Q    Do you work in the area of water?
5    A    Yes.
6    Q    Would you please explain what you do
7  setting these criteria?
8    A    Okay. I'm in the Health and Ecological
9  Criteria Division, which is under the Office of
10 Science and Technology. The Office of Science and
11 Technology is under the Office of Water. So, this is
12 clearly for the Office of Water. I'm an environmental
13 scientist in the Office of Water. All my projects and
14 all my work is involved with doing sound science for
15 the protection of the human environment and
16 protection, particularly water since I'm in the Office
17 of Water, as opposed to another program office that's
18 in air. Mine is under water.
19       MR. BUCHOLTZ: Can I have the document,
20 please. I move the admission of Complainant's Exhibit
21 3.

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

3c59bdbb-f324-496c-a92c-ccceb147713f

Page 14

1      MR. WINICK: No objection.
2      JUDGE GALLAGHER: No objection. Okay.
3  It's admitted.
4      (Complainant's Exhibit Number 3 was
5  admitted into evidence.)
6      (Complainant's Exhibit Number 4 was marked
7  for purposes of identification.)
8      Q    Dr. Nwachuku, I'm going to show you now a
9  document we'll mark as Complainant's Exhibit 4. I
10  will give a copy to Your Honor and to Mr. Winick.
11      Dr. Nwachuku, is this an EPA document?
12      A    Yes, it is.
13      Q    It says HR policy bulletin. Does that HR
14  mean Human Resources?
15      A    Right.
16      Q    It says the Office of Human Resources and
17  Organizational Services. In bold print, it says
18  accretion of duties, 335-1. Dr. Nwachuku, have you
19  read this document?
20      A    Yes, I have, Mr. Bucholtz.
21      Q    Do you discern from this document what the

Page 15

1  criteria are for accretion of duties promotion?
2      A    Yes. There are two main items under the
3  accretion of duties. One is the increase in the
4  duties that you're performing at the higher level.
5  Number two is the impact of the person on the job.
6      Q    Dr. Nwachuku, do you believe you have met
7  those criteria?
8      A    Yes, I have and I've exceeded them. I
9  believe I have.
10      Q    Would you speak to first the increase in
11  duties and responsibilities? Let me just say we're
12  going to have various documents where you explain
13  specific things you've done. So, this explanation
14  is going to be a little more general. If you want to
15  throw in something specific, fine, but don't feel you
16  have to state every single thing you've done right
17  now. How have you met the requirements for increased
18  duties and responsibilities for accretion of promotion
19  or like some say accretion of duties of promotion?
20      A    Okay. When I got hired, I was doing, like
21  assisting the division and the branch, my supervisor,

Page 16

1  the branch manager with development of criteria
2  documents. That's one example. But, as the years
3  went by, my duties accreted to the national level
4  where I was doing work at the national level and my
5  work was impacting several offices. That's reflected
6  in my evaluation. Even my supervisor, Dr. Rita
7  Schoeny, was also discussing it in all my performance
8  evaluations as to how my work has impacted all the
9  program areas and how it has impacted work at the
10  national level. It made the office look good, too.
11  That's what she included in my performance evaluation.
12      I have also published at the national and
13  international level. Some of the people I've
14  successfully collaborated with were experts at the
15  national level and at the international level. I have
16  also collaborated with experts where I have even
17  instructed them as to the policy of EPA.
18      Q    Dr. Nwachuku, please turn your attention
19  then to the second criteria that you mentioned, which
20  is called impact of the person on the position as a
21  basis for promotion by accretion of duties. How have

Page 17

1  you met that? Again, a general statement.
2      A    A general statement. Right now, I'm the
3  lead for the Contaminant Candidate List. The CCL, the
4  Contaminant Candidate List team lead for the Office of
5  Science and Technology and the first year for a work
6  group, Agency work group consisting of
7  microbiologists, public health scientists, biologists
8  that are working through the selection of the
9  Contaminant Candidate List. If I may, I would like to
10  explain what this means.
11      Q    That's a good idea. What is a Contaminant
12  Candidate List?
13      A    The Sediment Water Act as modified in 1996
14  mandates EPA to come up with a list of contaminants
15  that are likely to be a problem. Every five-year
16  cycle, we are going to further evaluate these
17  contaminants to see if they can be regulated or not.
18  But, before that is done, you have to do the science,
19  look at the health effects, how does it affect the
20  humans, and also look at every aspect of that organism
21  to see if you get a meaningful deduction for health

Towson Reporting Company        GORE BROTHERS        Whitman Reporting-Rockville
410-828-4148                    410-837-3027          301-279-7599
                                                      3c59bdbb-f324-496c-a92c-ccceb147713f

Page 18

1  protection, if that organism were to be regulated.
2        Now, the first one was done in 1996. EPA
3  was bringing a panel of microbiologists to select the
4  microbes that were regulated. EPA was criticized that
5  it was not transparent enough.
6        MR. BUCHOLTZ: Speak to the judge.
7        THE WITNESS: Your Honor, EPA was
8  criticized that the method of use in selecting these
9  contaminants was not robust enough and it was not
10 transparent. It was not actually totally objective,
11 because a group of scientists in microbiology came and
12 selected.
13       So, because of the criticism, EPA asked
14 the National Research Council to evaluate what they
15 did and give them a critique on recommendations for
16 the next level. So, the NRC evaluated what EPA did
17 and recommended that we should try a new approach.
18 Okay. That new approach is the CCL 3 or CCL future.
19 That is what I'm leading, because this is an
20 unchartered territory. We don't know whether it will
21 work or not. So, you have to have a good background

Page 19

1  and knowledge of microbiology to be able to look at
2  the microbes that will be regulated the next time.
3        Now, NRC recommended that we should look
4  at the universe of contaminants. Actually, we're
5  looking at 1,400 microorganisms. They comprise of
6  viruses, bacteria and parasites. So, for you to be
7  able to do this work effectively, you have to have a
8  thorough knowledge of all these organisms, their
9  health effects, how they operate in water. By the
10 way, these are waterborne microbes. So, you have to
11 have a thorough knowledge. In addition, you have to
12 be an authority, not just taking the class. It takes
13 time to be an expert, so you have to have had
14 knowledge of what you're talking about. This is what
15 I'm doing right now. In the work group, I'm leading
16 this work group. There are several of them across the
17 Agency and in our office. What we do is we come
18 together and look at the process and try it out and
19 see if it will work before EPA goes to the next level.
20   Q    Dr. Nwachuku, when did you become the lead
21 of this CCL 3 team?

Page 20

1   A    I was the lead. I became the lead in
2  2002. I remember something also. I was also the lead
3  for CCL 1 for Acanthamoeba. In CCL 1, remember
4  earlier I was explaining how EPA came on that
5  criticism for that CCL 1. When it came time to pick
6  the ones that were to be regulated, Acanthamoeba is
7  the only microorganism that EPA had made a decision on
8  and I was the lead. The policy, EPA policy on that
9  Acanthamoeba was because of the work I did. The
10 guidance documents and the health report document is
11 the most current information anywhere on that
12 Acanthamoeba. That was what was used by the
13 administrator to say Acanthamoeba will not be
14 regulated.
15       JUDGE GALLAGHER: How do you spell that?
16       THE WITNESS: A-C-A-N-T-H-A-M-O-E-B-A. It
17 is the organism that causes eye infections in contact
18 lens wearers.
19       MR. BUCHOLTZ: Can I have the document
20 back. Thank you. I move the admission of
21 Complainant's Exhibit 4.

Page

1        MR. WINICK: No objection.
2        JUDGE GALLAGHER: Complainant's Exhibit 4,
3  which is roughly a 10-page document, HR policy
4  bulletin for the Office of Human Resources
5  Organizational Services, accretion of duties, 335-1.
6  It is admitted to the record. There is no objection.
7        (Complainant's Exhibit Number 4 was
8  admitted into evidence.)
9        (Complainant's Exhibit Number 5 was marked
10 for purposes of identification.)
11   Q    Dr. Nwachuku, I'll show you a document
12 which we marked as Complainant's Exhibit 5, which is a
13 position description for the environmental scientist,
14 GS-13-01-13. This is copy to Your Honor and
15 Mr. Winick.
16       Dr. Nwachuku, is that your position
17 description?
18   A    Yes, Mr. Bucholtz. This is my position
19 that was given to me when I got hired in January of
20 1998.
21   Q    Has it remained your description position

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
3c59bdbb-f324-496c-a92c-ccceb147713f

Page 306

1   Now, you are mentioned in the next line. It says the
2   additional work completed under your task will be
3   broken out into several work assignments. What does
4   that mean?
5       A   Okay. CDM tried to overcharge EPA. As I
6   was reviewing the progress report, I saw that. I
7   pointed it out to Joanna Taylor, their project
8   officer. She was telling me, well Nena, there's money
9   there. Some of the problems I see with this
10  contractor is that they know that there is money in
11  the pot. So, they feel like they can be taking from
12  that pot anyhow they like. I'm not trying to judge my
13  colleagues, but a lot of my colleagues do not pay
14  attention to something and they check it off and they
15  get paid. But, I always make sure that I read and go
16  through the progress report and match it with what I'm
17  asking them to do for EPA. That was how this came
18  about. It was investigated. We had a meeting to
19  discuss this. It was decided that they will pay back.
20  They agreed they were wrong, so they paid back the
21  money. It was decided they would pay back the hours,

Page 307

1   because we had more work assignments with them, so
2   they paid back 45 hours of work.
3       MR. BUCHOLTZ: May I have the document. I
4   move for the admission of Complainant's Exhibit 52.
5       MR. WINICK: No objection.
6       JUDGE GALLAGHER: No objection. It's
7   admitted.
8       (Complainant's Exhibit Number 52 was
9   admitted into evidence.)
10      (Complainant's Exhibit Numbers 53 was
11  marked for purposes of identification.)
12      Q   Dr. Nwachuku, I want to show you another
13  document regarding what has been called interpersonal
14  relations. This is attached to your declaration of
15  September 2 as Exhibit 27. This will be Complainant's
16  Exhibit Number 53.
17      JUDGE GALLAGHER: 27?
18      MR. BUCHOLTZ: 27, yes. Hearing Exhibit
19  53, a e-mail from Dr. Nwachuku to Edward Ohanian and
20  Elizabeth Doyle. It's over the separate written
21  statement by Ann Howell. Dr. Nwachuku, please take a

Page 308

1   look at this.
2       A   I know what it is.
3       Q   Dr. Nwachuku, would you please explain to
4   us why you gave that e-mail to Dr. Ohanian?
5       A   There was a job that needed to be done,
6   Xeroxing of a disability study to be sent out.
7       Q   Dr. Nwachuku, before we get into that
8   detail, why did you give the e-mail to Dr. Ohanian?
9   That's what I asked you.
10      A   Okay. I gave this as an eyewitness
11  account by Amie Howell, who sits pretty close away
12  from me, to give to Edward Ohanian.
13      Q   Why would you be giving Edward Ohanian an
14  eyewitness account by Amie Howell of anything? What
15  was the reason?
16      A   Because Edward Ohanian accused me of being
17  angry and also accused me -- this is all in the
18  e-mail -- and blamed me for Barbara --
19      JUDGE GALLAGHER: Leftwich.
20      THE WITNESS: Barbara Leftwich's bad
21  behavior and conduct.

Page

1       JUDGE GALLAGHER: So, she called you these
2   names.
3       THE WITNESS: Yes, she called me crap and
4   she called me crazy. I was the one who went to Ed,
5   Dr. Ohanian to report the incident. He turned it
6   around and blamed me. It was the most humiliating day
7   of my life.
8       Q   Why did you feel humiliated?
9       A   Okay. Barbara stands up over me cussing,
10  calling me crap in an official environment. I went to
11  Ed, to Dr. Ohanian to tell him what happened. He got
12  me together with Barbara Leftwich. Barbara, the
13  contractor is SEE, not SES, SEE.
14      Q   SEE is S-E-E?
15      A   S-E-E, which is the senior employment
16  employee.
17      MR. WINICK: Senior environmental
18  employee.
19      JUDGE GALLAGHER: Senior environmental
20  employee.
21      THE WITNESS: Senior environmental

78 (Pages 306 to 309)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
3c59bdbb-f324-496c-a92c-ccceb147713f

Page 310

1   employee.  These are people who have already retired
2   and they come back to work as contractors on wage.
3   They are the ones who do our Xeroxing for us or just
4   some of the administrative work.
5          JUDGE GALLAGHER:  What grade has she been?
6          THE WITNESS:  No grade.
7          JUDGE GALLAGHER:  Like a low grade.
8          THE WITNESS:  Yes, no grade, just wage
9   like five dollars or six dollars.
10         JUDGE GALLAGHER:  I mean, is she rehired
11  new?
12         MR. WINICK:  No.  We have like grantees
13  that provide that.
14      Q    Is Barbara Leftwich white?
15      A    No.
16      Q    What is she?
17      A    She's black, African American.
18      Q    Is she African?
19      A    No.
20      Q    Do you know if she has ever filed an EEO
21  complaint?

Page 311

1       A    No.  She's with SEE.
2           MR. WINICK:  I'm sorry.  It's not in
3   response to the question.
4       Q    Dr. Nwachuku, just pay attention to me,
5   not to Mr. Winick.
6           JUDGE GALLAGHER:  So, no known, we'll call
7   it.
8           THE WITNESS:  Okay.  No known.
9           JUDGE GALLAGHER:  So, how would we know?
10      Q    Dr. Nwachuku, the question was do you know
11  whether or not Barbara Leftwich ever filed an EEO
12  complaint?
13      A    No, because contractors do not file EEO
14  complaints.
15          MR. WINICK:  Objection, not responsive to
16  the question that was asked.
17          MR. BUCHOLTZ:  That was responsive.
18          JUDGE GALLAGHER:  Why can't a contractor
19  file an EEO complaint?
20          MR. WINICK:  They can.
21          JUDGE GALLAGHER:  They can file private

Page 312

1   sector complaints on the outside to the EEO.
2           THE WITNESS:  Okay.
3       Q    Dr. Nwachuku, you said that Dr. Ohanian
4   blamed you.  Would you please go into a little bit
5   more detail about what he said to you, what he did and
6   why to follow-up on what you said, as to why you felt
7   so humiliated?
8       A    I went to Ed to report what happened.  He
9   said okay, I will call Alice to look into it.  He gave
10  the document to Alice to count.  We have a box where
11  we place documents to be Xeroxed.  I put it in there
12  this morning and that was the only one when I put it
13  there in the morning.  So, come 2 o'clock or
14  3 o'clock, I go back to look to see if it has been
15  done.  It wasn't done.  So, I reminded them that
16  something is in the box to be Xeroxed.  So, as she was
17  Xeroxing, she came back to me and she was asking me a
18  question.  She was furious as to why she should be
19  doing this.  I said I don't know.  I just put it in
20  the box.  She called me that's crap, you are crazy.  I
21  got up from my cube and went straight to Ed's office

Page 313

1   just like that.
2           JUDGE GALLAGHER:  What was the document?
3           THE WITNESS:  It's a disability study
4   document which was supposed to be Xeroxed for OGWDW
5   for a regulation.
6           JUDGE GALLAGHER:  But, why would she say
7   that?  Is there a reason for her saying that?  I don't
8   understand.
9           THE WITNESS:  For her to say that?
10          JUDGE GALLAGHER:  Yes.
11          THE WITNESS:  Your Honor, some of these
12  people are not that concerned, so they want to do
13  barely the minimum.  There was another, Delores, who
14  is very effective.  As soon as you put it in there,
15  she Xeroxed it immediately, but Barbara was just all
16  day long.
17      Q    Dr. Nwachuku, I wanted to refer you to the
18  e-mail by Amie Howell.  It says that Amie Howell said
19  she heard Barbara say something about a copy request
20  and not getting paid for working overtime.  Did
21  Barbara say anything to you that she doesn't get paid

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599

3c59bdbb-f324-496c-a92c-ccceb147713f

# EXHIBIT
# 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x

NENA NWACHUKU                  :

        Plaintiff,       :

   vs.                        : Civil Action No.

STEPHEN L. JOHNSON,            : 06-0946 (RJL)

       Defendant.         :

- - - - - - - - - - - - - - - x

Washington, D.C.


Monday, January 14, 2008


Deposition of

CHRISTOPHER ZARBA

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before PETER

K. SHONERD, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 Eye

Street, N.W., Suite 1290, Washington, D.C., 2005,

commencing at 3:23 p.m.



Page 2

APPEARANCES:

On behalf of the Plaintiff:
DAVID H. SHAPIRO, ESQ.
ALANA M. HECHT, ESQ.
Swick & Shapiro P.C.
1225 Eye Street N.W., Suite 1290
Washington, D.C. 20005
(202) 842-0300

On behalf of the Defendant:
BRIAN HUDAK, ESQ.
Assistant U.S. Attorney

U.S. Department of Justice

Civil Division

555 4th Street, N.W.

Washington, D.C. 20530

(202) 514-7143

---

Page 3

CONTENTS

EXAMINATION BY:

PAGE

Counsel for the Plaintiff          4

ZARBA DEPOSITION EXHIBITS:

1    02/17/05 Declaration          47

---

Page 4

1          P R O C E E D I N G S
2    Whereupon,
3          CHRISTOPHER ZARBA
4    was called as a witness and, having been first duly
5    sworn, was examined and testified as follows:
6          THE REPORTER:  Would you please state your
7    name for the record?
8          THE WITNESS:  Christopher Zarba.  Z-a-r-b-
9    a.
10         THE REPORTER:  Thank you.  For the record,
11   my name is Peter K. Shonerd.  I'm a Notary Public for
12   the District of Columbia.  My Commission expires June
13   15, 2010.
14         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
15         BY MR. SHAPIRO:
16   Q    Can you tell us your current residential
17   address, sir?
18   A    115 Indian Lane, Annapolis, Maryland.
19   Q    Zip code?
20   A    21403.
21   Q    And the telephone number there?
22   A    410-990-4948.

---

Page 5

1    Q    Any plans to move from there?
2    A    I hope not.
3    Q    Are you currently employed?
4    A    Yes.
5    Q    Where are you employed?
6    A    U.S. Environmental Protection Agency.
7    Q    How long have you been at EPA?
8    A    Twenty-seven years.
9    Q    What is your current job?
10   A    I am the acting deputy director for the
11   National Center for Environmental Research.
12   Q    What grade is that?
13   A    It's a GS-15.
14   Q    How long have you been an acting director?
15   A    Since I left the HECD position, which would
16   be around May of 2003, from May of 2003 to present.
17   Q    Is that your first 15 job?
18   A    No.  I've had quite a few.
19   Q    Can you tell us the one before this?
20   A    I was chief of staff for the Office of
21   Research and Development.  I was the director of the
22   Health and Ecological Criteria Division in the Office

Page 26

1  level, see opportunities, create opportunities, and
2  make the job something new, actually move the job to
3  another, or some combination of the two.
4      BY MR. SHAPIRO:
5   Q   All right.  You went to this meeting.  Your
6  job, at least initially at the meeting, was to
7  identify people in your division --
8   A   Correct.
9   Q   That you thought were worthy of promotion
10  because their jobs had grown?
11   A   Because they were either functioning at the
12  next level --
13   Q   Or could?
14   A   Or could.
15   Q   Did you find anybody?
16   A   At that meeting, I was quite clear that I
17  did not think there was anybody in HECD at the GS-13
18  level that was approaching the level of a 14.
19      I said there may be some individuals --
20   Q   Let me ask you a question --
21      MR. HUDAK:  Let him finish.
22      MR. SHAPIRO:  Let me ask a question first.

Page 27

1      MR. HUDAK:  Please let the witness finish
2  his answer.
3      MR. SHAPIRO:  No, I want to ask another
4  question.
5      BY MR. SHAPIRO:
6   Q   Was there anybody who was a 14 in your
7  division at the time?
8      MR. HUDAK:  I'll object to the form and I
9  believe it's quite inappropriate not to let the
10  witness fully answer the question as posed to him.  I
11  believe that is violative of the Federal rules.  I
12  would appreciate the witness being allowed to answer
13  the question in the way he sees fit.
14      This is a deposition.  We're not at trial.
15  He's allowed to answer the way he sees fit.
16      BY MR. SHAPIRO:
17   Q   I just want to know first whether there
18  were 14s in your division.
19   A   Yes.
20   Q   You had people who were 14s?
21   A   Yes.
22   Q   Did you have any 15s?

Page 28

1   A   Yes.
2   Q   Other than yourself?
3   A   Yes.
4   Q   We are talking now about 13s to 14s at the
5  meeting?
6   A   Yes.
7   Q   You were saying about the 14s?
8   A   That I did not have anybody at the GS-13
9  level that I thought was even approaching the level
10  of a 14.
11   Q   How many 13s did you have?
12   A   I don't know.
13   Q   How many people were in the division?
14   A   About 50.
15   Q   Did you ask your branch chiefs?
16   A   Yes.
17   Q   Did they suggest anybody from a 13 to a 14?
18   A   I had a meeting, several meetings, with
19  branch chiefs.  We do this all the time, talking
20  about performance.  We were all in agreement that
21  there really was nobody that we wanted to take
22  forward.

Page 29

1   Q   Who were the branch chiefs at the time?
2   A   Tony Maciorowski was one of them.  Bob
3  Cantilli, I believe, was another.  I don't remember
4  who the others were.
5   Q   How many branches were there?
6   A   I don't remember.
7   Q   More than three?
8   A   About three.
9   Q   You can't remember one of the people?
10   A   Well, there was some movement around, too.
11  Some people came and went.
12   Q   In that six month period?
13   A   Yes.
14   Q   The two people you mentioned were white
15  men?
16   A   No.  Bob Cantilli and Tony Maciorowski,
17  yes, they were.
18   Q   And you're a white male?
19   A   Yes.
20   Q   What about your boss?
21   A   White male.
22   Q   That would be Mr. Grubbs?

Page 30

1   A   Yes.
2   Q   How about the other two division directors?
3   A   One white male, one white female.
4   Q   You said there were other branch chiefs
5 during this period who were on your staff, there was
6 movement among the three.  Who are the others?
7   A   I'd have to go back.  It's been five years.
8   Q   Anybody who is not a white male?
9   A   I think so; yes.
10  Q   Anybody who is not white?
11  A   I don't remember.  I don't think so.
12  Q   You didn't recommend anyone of your 13s in
13 your branch for a 14?
14  A   Right.
15  Q   How many 14s were being accorded the
16 division?
17  A   It didn't work that way.
18  Q   How many 14s were accorded to the Office of
19 Science and Technology?
20  A   I believe we were discussing the
21 possibility of two.  It really didn't make a
22 difference as far as my argument.  I was going to

Page 31

1 make the case whether there was none or 12 about who
2 was eligible.
3   Q   I understand, but you found none eligible?
4   A   Right.
5   Q   Was anyone found to be eligible for the 14
6 in the Office of Science and Technology?
7   A   I believe there were.
8   Q   How many?
9   A   I think there were two.
10  Q   Between the three division directors and
11 the Office of Science and Technology director, the
12 boss, you came up with two people to --
13  A   Promote.
14  Q   Promote from a 13 to a 14?
15  A   Uh-huh.
16  Q   Because their jobs had grown or because
17 their performance was splendid?
18  A   Well, since none of them are in my
19 division, I don't know.  I don't remember what the
20 rationale was.  There was discussion at that meeting
21 about what the person was doing and how both the job
22 had grown and they had actually risen to the next

Page 32

1 level and were performing at that level.
2   Q   Before you became the acting director of
3 this division, you worked as the chief of staff for
4 R&D, a different division?
5   A   Right; an office.
6   Q   A different office, not even the Office of
7 Science and Technology?
8   A   No, it was in the Office of Research and
9 Development.
10  Q   Within Water?
11  A   No, within the Office of Research and
12 Development.  There is an Office of Water and there's
13 an Office of Research and Development.
14  Q   Not even in the Office of Water?
15  A   Correct.
16  Q   You worked there as the division chief --
17  A   Chief of staff.
18  Q   Chief of staff for seven years?
19  A   Correct.
20  Q   Before that, you had been a branch chief
21 somewhere in the Water Division?
22  A   Correct.

Page 33

1   Q   But not in Science and Technology?
2   A   Yes.
3   Q   In Science and Technology?
4   A   Yes.
5   Q   But not in the Health and Ecological
6 Criteria?
7   A   Actually, I was in that division.
8   Q   When?
9   A   Before I came to the Office of Research and
10 Development.  It was called the Criteria and
11 Standards Division.  When I left, it got changed to
12 be the Health and Ecological Criteria.
13  Q   How many people -- do you recall how many
14 13s were in your division when you decided that none
15 were really eligible for the 14?
16  A   I don't remember the number.  There was a
17 number.  There was more than a few.
18  Q   Do you know Nena Nwachuku?
19  A   Yes.
20  Q   How long did you know her?
21  A   I met her when I showed up in HECD.
22  Q   As the acting division director?

Page 34

1    A    Correct.
2    Q    There were 50 people in the division?
3    A    Yes.
4    Q    You met her along with meeting other
5    people?
6    A    Yes.
7    Q    You were never her immediate supervisor?
8    A    Correct.
9    Q    How much contact did you have with her?
10   A    I think I had more contact with Nena than
11   everyone else, anyone else in the division, other
12   than Tony Maciorowski.
13   Q    She worked for Tony Maciorowski?
14   A    Yes.
15   Q    Why did you have so much contact with Nena?
16   A    She sought time, attention and counseling
17   from me.
18   Q    What kind of counseling?
19   A    She had difficulties getting along with
20   people in the organization and issues in getting what
21   she thought were the priorities done, and she wanted
22   to convey her thoughts and feelings and passions to

Page 35

1    somebody, and there was me.
2    Q    Did you like her?
3    A    Yeah.
4    Q    Was she an able scientist?
5    A    She was okay.  I didn't see brilliance
6    coming from her, but I liked her.  The issue we had
7    is that we would have discussions on issues.  I think
8    we would make progress.  I would try to coach her and
9    lead her in a direction --
10   Q    Coach her in what way?
11   A    Getting along with people, finding
12   solutions to problems she had.  Better working
13   relationship with her customers.
14   Q    Who did she not get on with?
15   A    A good chunk of the people and the staff.
16   Q    Did she work with all 50 people on the
17   staff?
18   A    No.
19   Q    Who did she work with?
20   A    There was a variety of people in her area
21   that she worked with.
22   Q    You mean in her branch?

Page 36

1    A    Yeah.
2    Q    Who did she work with there?
3    A    I'll have to get a roster of names and go
4    back.
5    Q    Can you recall people complaining about
6    her?
7    A    Oh, quite a bit.
8    Q    Who?
9    A    Her name was Cindy Roberts.
10   Q    Cindy Roberts.
11   A    Was one.
12   Q    Ms. Roberts was in her branch?
13   A    Yeah.
14   Q    Nena's branch?
15   A    Right.
16   Q    She was what kind of scientist?
17   A    She worked on toxicology issues.
18   Q    Toxicology issues.  Nena, was she a
19   toxicologist?
20   A    She was a microbiologist, as I remember.
21   Q    Do microbiologists and toxicologists work
22   together in the branch?

Page 37

1    A    Quite a bit.
2    Q    They do?  On what would they work together?
3    A    Well, the issues were not on science
4    issues.
5    Q    What were they on?
6    A    These were -- one of the bigger issues I
7    remember was on an awards board.  There was a panel
8    of people put together to help make decisions on who
9    would get awards.
10   Q    Performance awards?
11   A    Right.
12   Q    Was Nena on the panel?
13   A    Yes.
14   Q    This is awards for scientists or for --
15   A    Meritorious achievement.  Could be on
16   science, could be on anything.
17   Q    Nena was appointed to the panel?
18   A    Right.
19   Q    Ms. Roberts was appointed to the panel?
20   A    Right.
21   Q    Ms. Roberts was a Ph.D. also?
22   A    Don't remember.

1    Q    But Nena was a Ph.D.?
2    A    I think so.
3    Q    What was the problem?
4    A    She would accuse people of --
5    Q    Who would accuse?
6    A    Nena.
7    Q    Would accuse people of what?
8    A    Being disreputable, lying.
9    Q    Disreputable.  What do you mean
10   "disreputable?"
11    A    Don't remember the details of the
12   discussion, but she --
13    Q    What do you mean when you say the word
14   "disreputable?"
15    A    Well, saying things about their behavior.
16   These are people who -- both Nena and some of the
17   other people that came in -- I'll have to dig to get
18   the names -- are typically introverts, quiet, soft
19   spoken, do their job, rarely complain.
20         They were coming into my office on a fairly
21   regular basis, many of them with tears in their eyes.
22    Q    Because?

1    A    Because Nena had accused them of this.
2   Nena was slandering them.
3    Q    Accusing them of what?
4    A    Of lying about what they were saying.  I
5   don't remember the details, but questioning things
6   they were saying as being true or not and doing it in
7   a very hostile way.
8    Q    I'm still not getting the point.  I'm
9   trying to understand what it is she did.  She was on
10   this panel about awards.  Did she refuse to give
11   people awards?
12    A    She was on this panel of awards.  There
13   were a number of people on it, and they needed to
14   work through issues about who got the award and what
15   for.
16         The way I understood the complaints is that
17   when Nena wasn't getting her way, she would fire
18   hostile statements against the people on the panel,
19   to the point where people were coming into my office
20   with tears in their eyes saying they want off the
21   panel, they can't work like this any more, to the
22   point where Tony Maciorowski sent an e-mail out

1   because much of this communication back and forth was
2   going via e-mail, saying he wanted everyone to stop
3   sending e-mails about this, and that we are going to
4   talk it through.
5         There was just a lot of hostility and
6   difficulty around Nena.
7    Q    Do you know if she was telling the truth
8   when she said people were not telling the truth about
9   things?
10    A    I knew what they were being accused of and
11   I knew what they were being accused of was not true.
12    Q    What were they being accused of?
13    A    I don't remember.  Trivial things.
14    Q    You don't remember any of this?
15    A    I don't remember what the accusations were.
16    Q    The accusations were trivial?
17    A    They were not anything that -- that people
18   were stealing money from the bank accounts.  They
19   were things like your statements about this person or
20   that program or the value of this thing, this
21   activity, were untrue.
22    Q    And you knew that wasn't so?

1    A    Yes.
2    Q    How did you know that?
3    A    Because I did my homework.  I went to other
4   sources and checked to find out really what was going
5   on here.
6    Q    What other sources?
7    A    Other people in the division.
8    Q    Did you discipline Nena about this?
9    A    I had a number of conversations with her on
10   this topic about things she could do, about not
11   immediately getting hostile about the things that she
12   was feeling, and what I was a bit frustrated with is
13   that I feel like we would have the conversation and
14   we would make progress.  I feel like we would
15   understand what we needed to do next time so that
16   what happened wouldn't happen again.
17         And then two days would go by, and when she
18   would come back into my office, it was as if we never
19   had the conversation.
20    Q    When she would come back or somebody else
21   came back complaining?
22    A    She would come back.

1    Q   I thought you said other people were the
2  ones coming to your office.
3    A   There were other people coming, too. I'm
4  talking about my relationship with Nena.
5    Q   What was the problem, that she just didn't
6  get the point?
7    A   I believe so. I think you might ask her.
8    Q   The point was what?
9    A   I was guiding her on how to work with
10  people in the organization and in other offices.
11    Q   What were you telling her?
12    A   To listen to what they were saying, to be
13  objective about her feedback, when she was getting
14  hostile, to take a deep breath and think about what
15  she was going to say; those types of things.
16    Q   Did you judge Nena's scientific output?
17  Were you in a position to judge what kind of
18  microbiologist she was?
19    A   Yes.
20    Q   How so?
21    A   We had a customer in the Office of Ground
22  Water and Drinking Water, of which Nena was working

1  to provide support for. They had microbiologists.
2  We were actually -- the Health and Ecological
3  Criteria Division manages science for our customers
4  in other parts of the Office of Water.
5    Q   Manages science?
6    A   Right.
7    Q   Meaning?
8    A   Meaning if the Drinking Water Office wants
9  to write a regulation and they need to base that
10  regulation on sound science, there are two sources
11  they get it from. One is the Research Office, where
12  I am now, and the other is from the Office of Science
13  and Technology, that may get much of the research
14  done by the Research Office, and other people outside
15  of EPA, and synthesize it and put it in a form.
16    Q   What did this customer tell you about Nena?
17    A   That she was not providing value added,
18  that she had her own agenda, that they had different
19  needs and she wouldn't leave the things she wanted to
20  work on. She would just work on the things she
21  wanted to work on.
22    Q   Who was the person you would hear from from

1  the Office of Drinking Water, is it?
2    A   Ground Water and Drinking Water.
3    Q   Who was that?
4    A   I don't remember the names.
5    Q   You don't remember any of their names?
6    A   No.
7    Q   Who got the promotions, these two 14 job
8  promotions that were given to people in the Office of
9  Science and Technology?
10    A   I made my comments to Jeff Grubbs. I had
11  in my mind a mental list of the 13s, who they were
12  and how I would rank them. Just to be clear, Nena
13  was at the bottom of the list. Of all the other 13s
14  in the office, I would have put before her.
15    Q   All?
16    A   All. There were two people identified. I
17  don't remember their names. None of them were in my
18  division. One was an African American female and I
19  think the other was a white female, but I'm not sure.
20    Q   Did they get the promotion?
21    A   As far as I know, they did.
22    Q   Let me show you -- let me get a copy of

1  this.
2        MR. HUDAK:  Do you mind if we take five?
3        MR. SHAPIRO:  Sure; absolutely.
4        (A brief recess was taken.)
5        MR. SHAPIRO:  Back on the record.
6        BY MR. SHAPIRO:
7    Q   Did you identify any people to be promoted
8  from 14 to 15?
9    A   There were some movements in the management
10  chain while I was there, and I don't remember what
11  they were. I think they were just lateral, moving
12  people from a 15 to a supervisory position, but I
13  don't remember.
14    Q   There were no increases from 14 to 15 in
15  non-supervisory?
16    A   No. The only movement there may have been
17  in the upper levels were if somebody was taking on a
18  supervisory position.
19    Q   But then there would be a vacancy and there
20  would be an announcement?
21    A   Yes; right.
22    Q   It wouldn't be like one of these accretion

Page 58

1    A   Not that I could tell.
2    Q   Not that you could tell, in the six months
3  you were there?
4    A   Correct.
5    Q   Is there anything in here that you could
6  add from  your personal knowledge now, or are there
7  things in here that you really don't remember except
8  that they are in here?
9    A   No, it's about right.
10    Q   Anything you can add to it?
11    A   No.
12    Q   Nothing at all?  Okay.
13      MR. SHAPIRO:  I don't have anything
14  further.
15      MR. HUDAK:  Great.  Thank you.
16      MR. SHAPIRO:  Thank you.
17      (Whereupon, at 4:30 p.m., the deposition of
18  CHRISTOPHER ZARBA was concluded.)
19          * * * * *
20      I have read the foregoing pages, which are
21  a correct transcript of the answers given by me to
22  the questions therein recorded.

Page 59

1    Deponent_____

2      Date _____

3

4

5

# EXHIBIT
# 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
NENA NWACHUKU,                    :
                                  :
          Plaintiff,              :
                                  :
     v.                           : Civil Action No.
                                  : 06-0946 (RJL)
STEPHEN L. JOHNSON,               :
                                  :
                                  :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, January 15, 2008

Deposition of

EDWARD OHANIAN

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Jon G.

Hundley, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 I
Street, Northwest, Suite 1290, Washington, D.C.,

commencing at 10:39 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200



Page 2

APPEARANCES:
On Behalf of the Plaintiff:
DAVID H. SHAPIRO, ESQ.
ALANA M. HECHT, ESQ.
SWICK & SHAPIRO
1225 I Street, Northwest, Suite 1290
Washington, D.C. 20005
202/842-0300

On Behalf of the Defendant:

BRIAN HUDAK, ESQ.
Assistant U.S. Attorney, Civil Division
555 4h Street, Northwest
Washington, D.C. 20530
202/514-7143

PAUL M. WINICK, ESQ.
United States Environmental
Protection Agency
1200 Pennsylvania Avenue, Northwest
Ariel Rios Building North
Room 7454D
Washington, D.C. 20004

Page 3

CONTENTS

EXAMINATION BY:                          PAGE

Counsel for Plaintiff                       4

Page 4

1     PROCEEDINGS
2   Whereupon,
3          EDWARD V. OHANIAN
4   was called as a witness and, having been first duly
5   sworn, was examined and testified as follows:
6          EXAMINATION BY COUNSEL FOR PLAINTIFF
7          BY MR. SHAPIRO:
8     Q   Could you state your name, please, sir?
9     A   Edward, middle initial V., Ohanian, O-H-A-
10  N-I-A-N.
11    Q   Mr. Ohanian, can you tell us where you
12  live?
13    A   Yes. 9500, that's 9-5-0-0, Duffer, that's
14  D-U-F-F-E-R, Way, Montgomery Village, Maryland
15  20886.
16    Q   Is that a private home?
17    A   Yes.
18    Q   Any plans to move?
19    A   No.
20    Q   Telephone number there?
21    A   301/590-8926.
22    Q   And you are currently employed, sir?

Page 5

1     A   Yes.
2     Q   And where are you employed?
3     A   U.S. Environmental Protection Agency.
4     Q   How long have you been with the EPA?
5     A   Since August 3rd, 2 -- I'm sorry, 1980.
6     Q   And what's your current job?
7     A   I am the director of Health and Ecological
8   Criteria Division in the Office of Water.
9     Q   How long have you been there in that job?
10    A   As a director?
11    Q   Yes, as the director.
12    A   The director, since April, I think, 23,
13  2003.
14    Q   Were you acting before that, before that?
15    A   Yes, I was acting before that. Yes. I was
16  acting -- I started my acting March 2002.
17    Q   Your prior position?
18    A   Prior position, for about five years, I was
19  the senior science advisor to the director in the
20  same office.
21    Q   Office of Water or in HECD?
22    A   In HECD, health and ecological --

Page 42

1  operations team?
2    A   We had seniors.
3    Q   Seniors?
4    A   We called them seniors.  They are part of
5  our program, senior --
6    Q   Seniors in high school who are working?
7    A   No, no, no, no.  Senior individuals -- we
8  call them -- let's see, we call them seniors program
9  where after a certain age, if they're retired, they
10  can come to the agency and they perform different
11  duties.
12    Q   So they're retirees?
13    A   They're retired, yes.
14    Q   From the agency or from other federal
15  agencies?
16    A   They actually apply to the agency.  There
17  is a certain program for retired individuals.
18    Q   And what do they do?
19    A   They do a number of things.  They probably
20  do some of the Xeroxing, binding documents.
21    Q   Office work?
22    A   Yes.

Page 43

1    Q   Office support?
2    A   Office -- yes, sir.
3    Q   How many of them were there?
4    A   I think at that time about two of them.
5    Q   White or black?
6    A   I'm sorry, I just -- for the two of them
7  for the office side, they were black.
8    Q   Females?
9    A   They were both females.  Then also had a
10  retired individual in the science side -- two of
11  them.
12    Q   Science seniors?
13    A   Yes, sciences, we call them.
14    Q   White or black?
15    A   White.
16    Q   Males or females?
17    A   One male, one female.
18    Q   And how are they paid, as GS employees?
19    A   No, they have a different schedule.
20    Q   And they work full time or part time?
21    A   Some of them, they do work full time.  Some
22  of them, they work part time.

Page 44

1    Q   Did you have a deputy?
2    A   No.
3    Q   Okay, did you have a secretary, other than
4  the people you have told us about?
5    A   No.
6    Q   Okay.  Now, in the branches, I take it the
7  branches had -- these two branches that you had, how
8  many people were in each branch, 10, 12?
9    A   When I was acting?
10    Q   Yes.
11    A   There were more, there were about 20, 20 in
12  one branch, the other one is about 22.
13    Q   So which branch had 20, 21?  Which branch
14  was that?
15    A   I think the eco had about 20.
16    Q   The eco had 20?
17    A   Yeah, human about 22.
18    Q   Under Ms. Schoeny?
19    A   Yes.
20    Q   Were there sections below Ms. Schoeny?  In
21  other words, were there other supervisors below the
22  branch chiefs at the time?  Or was the branch chief

Page 45

1  the only supervisor?
2    A   The supervisor of record were the branch
3  chief.
4    Q   All right, so there weren't any section
5  chiefs?
6    A   No.
7    Q   And is that the same Maciorowski's eco risk
8  management?  He's the only supervisor?
9    A   Only supervisor.
10    Q   Okay.  So you had about 50 people or so in
11  the branch, in the division?
12    A   Close to it.
13    Q   Right.  Okay.  Now, while you were -- did
14  the structure change after you became not acting, but
15  the permanent division director?  Did it still have
16  two branches and an administrative operations team?
17    A   No, the structure changed.
18    Q   Okay.  What was the structure then?
19    A   Now?
20    Q   Yes.
21    A   Well, we have three branches --
22    Q   Well, let me just ask you, when did the

Page 66

1      BY MR. SHAPIRO:
2      Q   Well, you already told me that was it in
3  Groundwater and Drinking Water, right?
4      A   That's right.
5      Q   So, from anywhere else, from your division,
6  from HECD, from --
7      A   Well, the microbiologist --
8      Q   Who complained about Nena and told you as
9  science advisor -- they gave you complaints about
10  Nena, leadership, teamwork, team building, that sort
11  of thing?
12         MR. HUDAK:  Object to the form.
13         THE WITNESS:  Or working as part of a team.
14         BY MR. SHAPIRO:
15      Q   Yes, or working as part of a team, yes.
16      A   Okay.  Latesha Parker.
17      Q   Latesha?
18      A   Parker.
19      Q   Who was she?
20      A   Microbiologist.
21      Q   What did she say about Nena?
22      A   In what way?

Page 67

1      Q   You said negative things about her team --
2  working on a team, teamwork, leadership, team
3  building, whatever it was.  She said -- I asked you
4  people who complained about Nena and you said Latesha
5  Parker.
6      A   As a team member --
7         MR. HUDAK:  Objection as to -- just let me
8  -- you need to pause after he finishes his questions
9  so I can object.
10         Objection to form.
11         BY MR. SHAPIRO:
12      Q   Okay, so go ahead.  You answer, sir.  So
13  what did she say what was negative about Nena?
14      A   I cannot --
15         MR. HUDAK:  Same objection.
16         Go ahead.  Whenever I object, you can
17  answer the question.  I just need to pose the
18  objection.
19         THE WITNESS:  I can probably give a
20  collective about the comments that I received from
21  Latesha Parker, Lisa Almodovar, I don't know whether
22  Jafrul was there, Jafrul Hassan.

Page 68

1      BY MR. SHAPIRO:
2      Q   Well, I don't want you to guess.  I want
3  you to remember who complained.
4      A   Okay --
5      Q   Jeff --
6      A   Jafrul Hassan.
7      Q   So these were the three people who
8  complained.  Anybody else?
9      A   Steve Schaub.
10      Q   Steve?
11      A   Schaub, S-C-H-A-U-B.
12      Q   Anybody else complain about Nena?
13      A   That's --
14      Q   Okay.  Schaub is a white man?
15      A   Yes.
16      Q   Hassan is --
17      A   Indian.
18      Q   From India?
19      A   That's right.
20      Q   Okay, so he's an Asian male?
21      A   Asian man.
22      Q   Latesha Parker is?

Page 69

1      A   Is black.
2      Q   Black female?
3      A   Yes.
4      Q   American or from Africa?
5      A   American.
6      Q   Okay, and Lisa Almodovar?
7      A   Puerto Rican.
8      Q   So she's a Hispanic female?
9      A   Hispanic, yes.
10      Q   Okay, and what was their complaints about
11  Nena?
12      A   As far -- the complaints being -- being
13  operating as a team member, sharing information with
14  the team members, responding to some of the specific
15  requests coming from the team members regarding her
16  involvement or her expert input.  He behavior or
17  reaction at times during meetings.
18      Q   Who complained about what?  They all
19  complained about all of these things?
20      A   Well, some of them.  I cannot -- that was a
21  number of years ago.  I just cannot be --
22      Q   What did Latesha Parker complain about?

18  (Pages 66 to 69)

Page 138

1    A    That's right.
2    Q    And what was the expert panel to examine?
3         MR. HUDAK: Objection to form.
4         THE WITNESS: A review the list of
5    microbials on the contaminant candidate list and
6    provide us with expertise.
7         BY MR. SHAPIRO:
8    Q    I see --
9    A    How to do the risk assessment.
10   Q    How to do the risk assessment. That's what
11   they were supposed to advise -- the panel was
12   supposed to advise on how to do a risk assessment for
13   these microbials?
14   A    That's right.
15   Q    And the experts on the panel, who got them
16   to serve? Nena?
17   A    Some of the members -- I'm not 100 percent
18   sure it was only Nena.
19   Q    And others were Nena and Tom Carpenter?
20   A    I don't know.
21   Q    Okay. Mr. Carpenter, is he a Ph.D.
22   scientist as well?

Page 139

1    A    No, he is not.
2    Q    What is he? Is he a scientist?
3    A    He's a scientist.
4    Q    What science is he --
5    A    I don't know.
6    Q    Is he a biologist?
7    A    He's not in by division.
8    Q    Is he a microbiologist?
9    A    I don't know.
10   Q    Okay, but you know he's a scientist.
11   Q    But you do not know his field, but he is
12   not a Ph.D., correct?
13   A    Correct.
14   Q    That you do know. Okay. But you don't
15   know his field.
16        MR. HUDAK: Objection to form.
17        BY MR. SHAPIRO:
18   Q    Correct?
19   A    No, I don't specifically.
20   Q    Okay. What grade is he?
21   A    I don't know. He's not in my division.
22   Q    I see. The charge document, it was wrong?

Page 140

1         MR. HUDAK: Objection to form.
2         BY MR. SHAPIRO:
3    Q    Do you know what I'm talking about, the
4    charge? What the panel was to examine, the question
5    that the panel was to examine. That's called a
6    charge, isn't it?
7    A    Yes.
8    Q    Okay, was it wrong?
9         MR. HUDAK: Objection to form.
10        THE WITNESS: I need clarification what you
11   mean by "wrong."
12        BY MR. SHAPIRO:
13   Q    The one that Nena had -- was prepared to
14   use, the one that had been discussed by the working
15   group, right? Was that wrong? Needed to be changed?
16        MR. HUDAK: Objection to form. Compound.
17        BY MR. SHAPIRO:
18   Q    Go ahead.
19   A    Yes, needed to be changed.
20   Q    And how -- did you change it?
21   A    No, I did not change it.
22   Q    Was it changed?

Page 141

1         BY MR. HUDAK: Objection to form.
2         BY MR. SHAPIRO:
3    Q    The one that was actually used by the -- by
4    the panel of experts --
5         MR. HUDAK: Objection to form.
6         BY MR. SHAPIRO:
7    Q    Was it different from the one that Nena
8    wanted to use?
9    A    The final charge that got to the panel,
10   yes, it was different than what Nena used.
11   Q    And how different was it?
12        MR. HUDAK: Objection to form.
13        BY MR. SHAPIRO:
14   Q    Do you remember the difference?
15        MR. HUDAK: Objection to form, vague.
16        THE WITNESS: There were a number of
17   differences.
18        BY MR. SHAPIRO:
19   Q    Yes, how many words were different?
20   A    That, I cannot tell.
21        MR. HUDAK: Objection to form.
22        BY MR. SHAPIRO:

Page 174

1  retaliating against her in May of 2006?

2     A   I'm not sure, my dates -- March 2006,

3  that's right before -- yes.

4     Q   You did know?

5     A   Yes.

6        MR. SHAPIRO:  Thank you.  I have nothing

7  further.

8        MR. HUDAK:  Thank you.

9        (Whereupon, at 1:43 p.m., the taking of the

10  deposition ceased.)

11

12        _____

13              EDWARD V. OHANIAN

# EXHIBIT
# 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
NENA NWACHUKU,                    :
                                  :
            Plaintiff,            :
                                  :
      v.                          : Civil Action No.
                                  : 06-0946 (RJL)
STEPHEN L. JOHNSON,               :
                                  :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, January 15, 2008

Deposition of

EPHRIAM KING

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Jon G.

Hundley, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 I

Street, Northwest, Suite 1290, Washington, D.C.,
commencing at 4:00 p.m.

          Diversified Reporting Services, Inc.
                  (202) 467-9200



Page 2

APPEARANCES:

On Behalf of the Plaintiff:
  DAVID H. SHAPIRO, ESQ.
  ALANA M. HECHT, ESQ.
  SWICK & SHAPIRO
  1225 I Street, Northwest, Suite 1290
  Washington, D.C. 20005
  202/842-0300

On Behalf of the Defendant:

  BRIAN HUDAK, ESQ.
  Assistant U.S. Attorney, Civil Division
  555 4h Street, Northwest
  Washington, D.C. 20530
  202/514-7143

  PAUL M. WINICK, ESQ.
  United States Environmental
  Protection Agency
  1200 Pennsylvania Avenue, Northwest
  Ariel Rios Building North
  Room 7454D
  Washington, D.C. 20004

Page 3

CONTENTS

EXAMINATION BY:                          PAGE

Counsel for Plaintiff                      4

Page 4

1        PROCEEDINGS
2   Whereupon,
3           EPHRIAM KING
4   was called as a witness and, having been first duly
5   sworn, was examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR PLAINTIFF
7      BY MR. SHAPIRO:
8      Q   State your full name, please, sir.
9      A   Ephriam King.
10     Q   And, Mr. King, can you give us your
11  residential address?
12     A   7300 Baltimore Avenue, Takoma Park,
13  Maryland 20912.
14     Q   912?
15     A   Um-humm.
16     Q   And is that a private home?
17     A   Yes.
18     Q   Any plans to move?
19     A   Yes.
20     Q   When?
21     A   I hope in June. I'm going to move into the
22  backyard.

Page 5

1      Q   I'm sorry?
2      A   We're downsizing. We're building a smaller
3   house in the backyard.
4      Q   So it will be 7300?
5      A   It will be 7305, I think. I'm not sure. I
6   think it's 05.
7      Q   Telephone number?
8      A   301/589-8578.
9      Q   Mr. King, you are currently employed?
10     A   I am.
11     Q   And where are you employed?
12     A   U.S. Environmental Protection Agency.
13     Q   How long have you been at the Environmental
14  Protection Agency?
15     A   Since October of 1979.
16     Q   And your current job?
17     A   Director of the Office of Science and
18  Technology.
19     Q   How long have you held that job?
20     A   Since May of 2005.
21     Q   And prior to that -- that's an SES job?
22     A   Yes, it is.

Page 46

1    Q    Was it shared with you at the time, in the
2  spring of 2006?
3        MR. HUDAK: Objection to form.
4        THE WITNESS: Not to my recollection.
5        BY MR. SHAPIRO:
6    Q    Okay, so you found about it because of the
7  proposed removal and the reaction to the proposed
8  removal, that's your recollection?
9        MR. HUDAK: Objection --
10       THE WITNESS: The way I tend to manage, my
11  recollection is somebody would have mentioned to me
12  that there was an issue, that they were addressing it
13  or handling it. I would have said something to the
14  effect of, thank you for sharing it; if there is a
15  continuing concern or issue, come back to me; if you
16  have it resolved, I would leave it at the division or
17  the branch level.
18       BY MR. SHAPIRO:
19   Q    Did anybody come back to you with it?
20  Other than in the context of the removal proceedings?
21   A    Not that I recall.
22   Q    And you don't remember who, if anyone,

Page 47

1  brought it to you initially?
2    A    It would have been either Dr. Ohanian or
3  Dr. Doyle
4    Q    Now, Nena complained to you about Dr.
5  Doyle.
6    A    She came and she said to me that she
7  thought she was being -- harassing, I think, was the
8  word she used.
9    Q    Did she say it was a -- hostile
10  environment?
11   A    I believe she said it was a hostile
12  environment.
13   Q    Did she indicate that it was racial?
14   A    I don't recall if she said that. I recall
15  words like harassment, hostile --
16   Q    Do you recall the words retaliation,
17  retaliatory?
18       MR. HUDAK: Objection to form.
19       THE WITNESS: That is a word that she may
20  well have used.
21       BY MR. SHAPIRO:
22   Q    Okay. Do you recall her saying it was

Page 48

1  because she was African? Not racial, but because she
2  was African?
3    A    I don't recall that.
4    Q    Could be, but you don't recall it?
5    A    Yeah, I don't recall it.
6    Q    Okay, same thing with racial? Could be,
7  but you don't recall it?
8    A    I don't recall, yeah.
9    Q    Okay. Did you know that Nena had made an
10  EEO complaint regarding nonpromotion?
11   A    When I first became the director of the
12  Office of Science and Technology --
13   Q    2005.
14   A    May of 2005 -- I went through a fairly
15  lengthy list of issues with the departing office
16  director.
17   Q    And who was the departing office director?
18   A    Jeff Grubbs.
19   Q    Okay.
20   A    And one of the issues that he mentioned was
21  that there was an EEO proceeding involving Nena, but
22  that it did not involve me. And I remember turning

Page 49

1  to Pam Barr, who was the deputy office director, who
2  had more familiarity with it, and I said basically,
3  please keep me informed if there is something you
4  think I need to do about this.
5    Q    And did she?
6    A    I think she may have mentioned it from time
7  to time, but it wasn't -- at least in terms of things
8  I was focusing on or the human resources issue I was
9  focusing on, it was not a -- it was not an issue that
10  was beyond her ability to manage.
11   Q    I heard, and I wonder if you heard, that
12  there was an issue where Nena and several other black
13  employees made an EEO complaint or had an EEO
14  complaint going, jointly.
15       MR. HUDAK: Objection to form.
16       BY MR. SHAPIRO:
17   Q    Do you recall that coming to your
18  attention?
19   A    I don't recall that.
20   Q    Some sort of negotiated settlement that the
21  office would do certain things in a certain way with
22  regard to Nena and others?

Page 66

1  feel compelled to share that information with Dr.
2  Ohanian and Dr. Doyle.
3         I don't recall the conclusion in the note
4  that somehow automatically, Dr. Ohanian would do
5  something of an adverse nature.
6         BY MR. SHAPIRO:
7  Q    Well, what was it that Dr. Ohanian refused
8  to disavow that Nena came to you about?
9         MR. HUDAK:  Objection to form.
10        BY MR. SHAPIRO:
11  Q    What didn't he disavow?
12        MR. HUDAK:  Same objection.
13        THE WITNESS:  I believe that the reference
14  that Dr. Faison made that Dr. Ohanian did not disavow
15  was that there had been interpersonal issues
16  regarding Nena.  That was the part that Dr. Ohanian
17  declined to disavow, and that there had been
18  management discussions regarding that.
19        BY MR. SHAPIRO:
20  Q    How would Dr. Faison know about management
21  discussions about Nena if Dr. Doyle or Dr. Ohanian or
22  both of them had not told her?

Page 67

1         MR. HUDAK:  Objection to form.  Calls for
2  speculation.
3         THE WITNESS:  I don't know.
4         BY MR. SHAPIRO:
5  Q    Nena came to you in tears didn't she over
6  this?
7  A    She did.
8  Q    And Dr. Faison at the time was only there a
9  few months, correct?
10  A    I don't recall.
11  Q    She was a new employee, wasn't she?
12        MR. HUDAK:  Objection to form.
13        THE WITNESS:  I don't recall precisely the
14  number of months she had been there.
15        BY MR. SHAPIRO:
16  Q    And she was a black employee.
17  A    She was a black employee.
18  Q    And a microbiologist?
19  A    Yes.
20  Q    And a GS-13?
21  A    I don't have an independent recollection of
22  that.

Page 68

1         MR. SHAPIRO:  Give us a couple of minutes.
2  We're closing down.
3         (Recess.)
4         MR. SHAPIRO:  Back on the record.
5         I don't actually have any more questions.
6         MR. HUDAK:  Oh, well, that's fantastic.  I
7  don't have any questions, either.
8         MR. SHAPIRO:  Fabulous.
9         Mr. King, always a pleasure.
10        (Whereupon, at 5:16 p.m., the taking of the
11  deposition ceased.)
12

13  _____

14              EPHRIAM KING