# EXHIBIT
# 7

| | |
|---|---|
| Case 1:06-cv-01946-RJL **PERFORMS** *Appraisal Cover Sheet* | **Employee Name:** Nena **SSN:** **Office:** OW/OST/Health and Ecological Criteria Division **Calendar Year:** 2003 |

**Formal Progress Review(s):**  (dated & initialed)

| *To derive summary level:* | **Summary Level:**  ☑ *Successful*  ☐ *Unacceptable* |
|---|---|
| *1) If the rating for any critical element is unacceptable, then the summary level is unacceptable;* *2) Otherwise the summary level is successful.* *3) Additional elements do not factor into summary level.* | *My supervisor and I have discussed my performance for this period in relation to my performance measures and standards, and my supervisor has informed me of my rating of record.* **Employee's Signature/Date:** ~~Ne Drouchky~~ 3/26/04 **Supervisor(s)'s Signature/Date:** E. A. Doyle 2/26/04 |

**Supervisor's Comments:**

Nena's performance highlights are attached. As is evident from the list, she had a highly productive year, working on a variety of project teams and producing publications and presentations. Nena has requested to attend a leadership training course at OPM this year. This will be considered during the prioritization over the next few months.

**Employee's Comments:**

**Employee's Signature/Date:**
*(Discussion and/or agreement with the performance plan)*

**Supervisor(s)'s Signature/Date:**

EPA Form 3115-35 (3/98)

Complainant's
Ex 13 HRG

ROI Att 2 Tab 53

Exhibit # 6B



14

| **HQ EPA PERFORMS Appraisal Cover Sheet** | **Employee Name:** Nena Nwachuku<br>**Office:** OW/OST/HECD<br>**Calendar Year:** 2004 |
|---|---|

**Formal Progress Review(s):** _Nn 7/15/04_      *(dated & initialed)*

| *To derive summary level:*<br><br>*1) If the rating for any critical element is unacceptable, then the summary level is unacceptable;*<br>*2) Otherwise the summary level is successful*<br>*3) Additional elements do not factor into summary level.* | **Summary Level:**   ☑ Successful    ☐ Unacceptable<br><br>My supervisor and I have <u>discussed</u> my performance for this period in relation to my performance measures and standards, and my supervisor has informed me of my rating of record.<br><br>**Employee's Signature/Date:**<br>_Nne Nwachuku_   3/16/05<br><br>**Supervisor(s)'s Signature/Date:**<br>_Elizabeth A Doyle_   3/1/05 |
|---|---|

**Supervisor's Comments:**

As is evident from her attached performance highlights Nena has had a very productive year. Her activities have spanned the gamut of OGWDW activities as well as demonstrating her continued commitment to her subject area. Of particular note was Nena's efforts to develop exposure/occurrence data for CCL3 in developing activities. She showed great initiative in developing and coordinating a highly complex activity in a very short time. Her interactions with her peers have improved greatly over the past year. She is an asset to HECD

**Employee's Comments:** This statement included "Her interactions with peers have improved greatly over the past year."
This is a biased and prejudicial statement.
At no time during my midterm evaluation, or during the course of the year did this supervisor Elizabeth Doyle advise me either orally or in writing about my interaction with my peer. So the biased, statement is an unwarranted complaint

EPA Form 3115-35 (3/98)

Complainant's
EX 14
HRC

_E.An2..._
_for_
_N),_
_Del._

# EXHIBIT
# 8

COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT
BECAUSE OF
RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION
(Please type or print)

(FOR AGENCY USE)
received
May 11, 2004  BU

**1. YOUR (COMPLAINANT'S) FULL NAME:**
Nena Nwachuku

STREET ADDRESS (OR POST OFFICE BOX NUMBER):
7413 Shrewsbury Ct

CITY  STATE  ZIP CODE
Beltsville MD  20705

**2. WHAT IS YOUR TELEPHONE NUMBER INCLUDING AREA CODE?**
HOME PHONE: 301-210-3661

WORK PHONE: 202-566-1116

**4. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?**
☒ YES (ANSWER A, B, C AND D BELOW)
☐ NO (CONTINUE WITH QUESTION 5)

**3. WHICH FEDERAL OFFICE DO YOU BELIEVE DISCRIMINATED AGAINST YOU?**
(Prepare a separate complaint form for each office.)
OW/OST/HECD

A. NAME OF OFFICE WHICH YOU BELIEVE DISCRIMINATED AGAINST YOU:
OST/HECD

B. STREET ADDRESS OF OFFICE:  MC4304T
1200 Pennsylvania Ave. N.W.

C. CITY  STATE  ZIP CODE
Washington DC.  20460

**A. NAME OF AGENCY WHERE YOU WORK:**
US EPA

B. STREET ADDRESS OF YOUR AGENCY:
1200 Pennsylvania Ave. N.W.

C. CITY  STATE  ZIP CODE
Washington DC  20460

D. WHAT IS THE TITLE, SERIES, AND GRADE OF YOUR JOB?
Environmental Scientist GS-13

**5. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE:**
MONTH: 03  DAY: 04  and continuing. YEAR: 2004

**6. NAME AND ADDRESS OF REPRESENTATIVE:**
Roy J. Bucholtz Esq.

**7. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST. BECAUSE OF YOUR:**
☒ RACE, IF SO, STATE YOUR RACE  African American
☒ COLOR, IF SO, STATE YOUR COLOR  Black
☐ RELIGION, IF SO, STATE YOUR RELIGION
☐ SEX, IF SO, STATE YOUR SEX
☒ NATIONAL ORIGIN, IF SO, STATE YOUR NATIONAL ORIGIN  African
☐ AGE, IF SO, STATE YOUR DATE OF BIRTH
☐ DISABILITY, IF SO, STATE YOUR DISABILITY
☒ RETALIATION, IF SO, STATE YOUR CHARGE  Prior EEO Activity
(Complaints of discrimination because of age apply only to employees or applicants who are at least 40 years of age at the time of the alleged discriminatory actions.)

**8. EXPLAIN HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST (TREATED DIFFERENTLY FROM OTHER EMPLOYEES OR APPLICANTS) BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION. (For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. You may continue your answer on another sheet of paper if you need more space.)**
HECD Management officials Elizabeth Doyle and Edward Ohanian have consistently harassed me (non sexual), suppressed promotional opportunities, created a hostile adverse working conditions, profiled me wrongly as an angry person, given improper performance evaluation

**9(a). I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR:**
☒ YES  ☐ NO

**9(b). NAME OF COUNSELOR:**
Bassie McCain III.

**10. WHAT CORRECTIVE ACTION ARE YOU SEEKING?** (If additional space is needed, use separate sheet.) Cease and desist harassment, profiling me wrongly, equal treatment, fair treatment, same as accorded people who have not filed EEO complaint & not african origin & same race color, correction of evaluation

**11. DATE OF THIS COMPLAINT**
MONTH: 05  DAY: 11  YEAR: 2004

**12. SIGN YOUR (COMPLAINANT'S) NAME HERE:**
Nena Nwachuku.

Continued Block 10. Give me Equal opportunity for promotion to GS-14, attorney's fees and payment for pain and suffering.  Tab  A  p.  1

# EXHIBIT
# 9

May 13, 2004 EEO complaint- second complaint
Nena Nwachuku, Ph.D.
Environmental Scientist, USEPA/OW/OST/HECD

**Elizabeth Doyle, Branch Chief, Health and Ecological Criteria Division**
Acting Branch Chief from June 2, 2003 to January 2004 when she became permanent in HECD

Has discriminated against me, harassed me, given me Improper Performance Evaluation,
Suppressed my opportunities for Promotion, profiles me as an angry person and created a hostile
working condition for me and is continuing.

Feb.10/2004- 2003 Annual Performance Evaluation with Elizabeth Doyle
See evaluation and list of accomplishments attached (2/26/04) I asked for 1 hr
evaluation meeting instead of 45minutes to make sure I had enough time to go
through all the items on 6 pages of my accomplishments.
I talked mostly. Elizabeth told me I did outstanding work for HECD and that
there was no reason why I should not get ahead. She told me I was organized and
had accomplished a tremendous amount of work and published a lot and she
appreciates my work efforts in Ground Water Rule, CCL, Acanthamoeba and the
two technical studies. At no time did she say any thing negative or complain about
my work. In fact we chatted amicably after my evaluation.

March 4/2003 Three and a half weeks later Elizabeth Doyle gave me a write up of her evaluation
and asked me to sign it and back date it to 2/26/04. (See evaluation attachment).
I told her I would read it first. I was stunned to see the negative entry she made "
Nena does not include team members." This was the first I had heard that I
exclude any of the members in my team. I questioned her how that came about
and she named Lisa Almodovar, Jafrul Hasan, and Latisha Parker. She also told
me that Eric Burneson, a branch Chief in OGWDW told her that "He cannot get
me to participate in LT2 work group." I told her that this was the first time
anyone had written anything negative in my performance evaluation. She had
only been my supervisor for 6 months. I told her she never ever brought this up
during our evaluation. Why did she enter an item in my annual evaluation she
never even discussed with me. I told her she wrote lies in my performance
evaluation to hurt me and to retaliate against me because I filed for an EEO
complaint and because she was biased against me and I have consistently
complaint to the division director Edward Ohanian about the way Elizabeth
Doyle treated me differently and supervised me differently. Please see the attached
emails 4/22/04. I informed her that I would file another EEO complain against her
about continued discrimination by her despite the outstanding work I do for
HECD. She called me back in to say she would remove it. She rewrote the form
but I was not satisfied with the write up. I inform Edward Ohanian and asked him
to do rectify the situation. He did not.

March 23/04 I scheduled a meeting with Elizabeth Doyle about her continued discrimination of

Complainant
Ex 63 HRG

Exh. # 19



me (see email of 3/23/04 and attachment copied to the division Director, Ohanian) At this meeting, I brought a huge amount of emails, meeting notes and folders showing that I more than any microbiologist shared with all the members and even wrote up an award for them and they won. She changed her story yet again and said what she meant was if another person has a different scientific opinion from mine, I get angry. Elizabeth my supervisor spends so much time lying and gossiping about me and now she is profiling me as an angry person. This is the situation I am subjected to everyday in HECD. My Director, Ohanian does nothing

about the situation. He encourages it. He knows how hard I work. He saw my long list of accomplishments. There are 5 microbiologists in HECD and only two cover the microbial work efforts. We now have 4 since 14 days ago as one has taken a job in OGWDW. Nena on drinking water and Steve Schaub on Clean water tasks. The other 3 Lisa Almodovar and Latisha Parker are on detail in OGWDW. Jafrul Hasan is only 50 % in HECD and 50% in homeland security.

4/6/04    I met with Eric Burneson, branch Chief OGWDW at 12.50pm. I asked him about what Doyle placed in my performance evaluation that Eric said " He cannot even get me ti participate in LT2 workgroup discussion. Eric categorically denied it and told me that he never said that to Doyle. He told me that discussions on CCL reviews, he said that comments have not come in yet from many folks but that was no problem. My supervisor Elizabeth Doyle, does not even have a handle on the work and who was doing what. But she places a lie about me not participating in LT2 just to hurt my career and to suppress my promotion to a GS-14.

## Unethical Contract Management practices and Conspiracies by Elizabeth Doyle and Edward Ohanian regarding contract invoice approval rating (See the emails)

4/27/04    The Office of Water gets an overall  rating for the contract invoice approvals made by project officers . On 4/27/04 Ted Johnson told me that my name was black listed as 33.3% rather than 100% compliance in invoice approvals for the projects I manage. He told me that my name was discussed at meeting with the office director Mr. Geoffrey Grubbs. I was stunned. He told me he informed the HECD contact person, Kathy Crawford who should have told me.  I went to Kathy and asked her why she did not give me a information that pertains to my work. She told me that my 1st line supervisor, and branch Chief  Elizabeth Doyle, and the division director, Edward Ohanian  instructed her not to tell me. That they would tell me. They conspired and kept this vital information about my work from me. Two weeks later when she saw my email to Nancy Muzzy, the contracting officer, Kathy went to Elizabeth Doyle to ask her why she did not inform Nena as she said she would and that Nena was 100% in compliance all along and was not negligent. Shew told her not to worry about it. This incident went all the way to the office director (see email of 4/28/04 to Mr Grubbs, office director and his reply 4/29/04), I had to report it to clear my name and to make him aware the double standard that exists in HECD management, who were willing to pull the

entire rating of OST down just so they can make me look bad.

I am the project officer for an EPA contract on acanthamoeba. I went to Shirley
Harrison, the HECD project Officer to ask her if I can designate her as my
alternate to sign invoices in my absence as I will be in Geneva Switzerland on
5/15/04 at the invitation of World Health Organization to participate in the
reviews of WHO Water Quality Guideline. I was stunned when Shirley told me
on 5/4/04 that Elizabeth Doyle designated herself as an alternate on a contract that
I manage. Shirley was surprised that I, Nena The PO of record did not know
about it. A contract has to be modified in other to add an alternate to sign
invoices. Elizabeth Doyle my supervisor, the same supervisor who conspired and
kept the erroneous invoice rating from me designated herself to be my alternate
and did not tell me the EPA project officer of record. This exemplifies the daily
hostile work environment I work in everyday dealing with a supervisor who uses
her power to hurt me, discriminate against me and interferes in government work
that I handle that deals with money.

**Harassment and hostile working conditions.**
I have made my supervisor, Elizabeth Doyle and division director aware of the constant
harassment and hostility I am subjected to by both of them. Nothing has been done to correct
this. I have made several complaints to the division director about daily harassment of Elizabeth
Doyle in the way she supervises me or talks to me.
10/28/03 email to Ohanian
12/4/03 Harassment email to Ohanian
12/16/03 Harassment and discrimination email to Ohanian
12/28/03 harassment email to Ohanian
01/16/04 Discrimination discussion meeting email

**Hostile Working Conditions**
A staff member Denis Borum sent me a rude email (email 3/18/04),about using the conference
room. I refused to get into it with him bit rather took the matter to Edward Ohanian. Elizabeth
Doyle called me into her office and insulted me. She did not ask me any thing but proceeded to
say can you see my computer so I can show you how to look up the room. I quietly left the room
and told Ohanian about it. He did nothing about it. He just said you man she did not even ask
you what happened? But he did nothing about it.

**Profiling me wrongly as an Angry person** and tolerating insults and obscene language used on
me by contract workers, the SEES.
A SEE Barbara Leftwich called me crap and crazy and insulted me in the performance of my
duties even in the presence of witnesses. I took the matter to the division director and he blamed
me and in fact told me to apologize to Barbara. It was so unbelievable and humiliating. An
effective manager would have come down on Barbara Leftwich. In fact a SEE in 1999 was fired
by the former division director, Janette Wiltse for cussing at Latisha Parker who complained to
Dr. Wiltse. But Edward Ohanian, did nothing but blamed and humiliated me and profiled me as
angry. Even with the statement of Amie Howell who sits two cubicles away from me who heard

barbara yelling at me and calling me crazy., the division director blamed and humiliated me (See email of about anger and stress management and code of conduct) and his synthesis of the truth 4/09/04, 3/29/04 email

### Instigating fellow employees to lie against me.

Even in my daily activities, Elizabeth Doyle instigates employees under her supervision to lie against me and put it in writing. ( see email of sherry Howard)

Sherry Howard is one of the administrative assistant. On I went to see her about my people plus ans the deputy Director wanted everyone to sign in. Some names were kicked out. It was urgent. Elizabeth Doyle was off that Day. I went to Sherry to ask her to see if ..She was socializing. I went back she was on the phone and I wait for 2minutes It was not work conversation. I went beck she was gone for the day I went to the division director who opened and told me I had been satisfactorily entered. The next morning I went to see he about my comp time that was not in my pay stub. She told me she was eating breakfast. I came back an hour later, Sherry told me she was busy she will get back to me. She never did. I told her when ever I came to see her about work, she was either eating breakfast or socializing. I have to keep coming several times. Sometime she would hand you her Avon book and other times she will say "have I shown you the latest picture of my son?" All these are during normal office working hours. Elizabeth got Sherry to write down a statement for her against me that I was rude. Unbelievable. Elizabeth Doyle will stop at nothing. One of the behaviors that I have complained to Ohanian about Doyle is the way she talks to me, nasty and rude. Elizabeth has told me it is because she lived in Prince Georges County for many years. Now she gets Sherry who spends so much time socializing, eating breakfast during working hours, pressuring you to buy her Avon products, socializing with her mother who works in the employee recreational store and come to Sherry's cubicle often, pressuring you to go through her latest stack of baby photos when you need to have her answer quick questions on your pay stub, leave, or travel to lie against me.

All that I have listed above have damaged me, my work and my health and has added tremendous pressure on me in terms of the extent my supervisors are willing to go by any means necessary to damage me.

How can my immediate supervisor go behind me to volunteer herself and try to set up a system for her to be an alternate on an EPA contractual project that I manage with huge sums of money involved and not tell me, the P.O. of record about this. It is unethical for my supervisor to do this since I have shown over and over again and recently that she conspired with Ohanian to cover up vital work information that was connected to the contractual project she wants to be alternate on and sign money vouchers?

Elizabeth Doyle and Ohanian hold me down for promotion by treating me differently in the way they harass me and all the above are this is continuing. Both Elizabeth Doyle and Ohanian are doing all the above because of my race- African American, my color- black and national origin-African, and as a reprisal and retaliation. I have engaged in prior EEO activity against Edward Ohanian and I told Elizabeth Doyle that I filed for an EEO complaint.

# EXHIBIT 10

Page 652

1               EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                     BALTIMORE DISTRICT OFFICE
2                          VOLUME III
   NENA NWACHUKU
3               Complainant          EEOC Case No.
        vs.                          100-2004-011025X
4
   MICHAEL LEVITT, ADMINISTRATOR
5  ENVIRONMENTAL PROTECTION          Agency Case Nos.
   AGENCY                            2003-0065-HQ
6               Agency               2004-0050-HQ

7  _____/

8               The above-entitled matter came on for

9  Hearing before Laurence H. Gallagher, Administrative

10 Judge on Friday, October 28, 2005, commencing at

11 8:10 A.M. at the Equal Employment Opportunity

12 Commission, City Crescent Building, 10 South Howard

13 Street, 3rd floor, Baltimore, Maryland, 21201, before

14 Chuck Peppler, a Notary Public.

15 APPEARANCES:

16               LAURENCE H. GALLAGHER, ADMINISTRATIVE JUDGE

17          ROY J. BUCHOLTZ, ESQUIRE
                 On behalf of the Complainant
18
            PAUL M. WINICK, ESQUIRE
19               On behalf of the Agency

20

21 REPORTED BY:    Chuck Peppler

Page 701

1  thought they performed, and often we discuss
2  opportunities for improvement, places where they need
3  growth or where they would like to have growth that
4  would help them to improve their performance.
5        My practice with Dr. Nwachuku has been the
6  same. I write very briefly. Again, it's a
7  performance evaluation and not a recommendation. Yes,
8  I treat her pretty much like I treat everyone else. I
9  try to be as level as possible. I don't see any
10  reason to be distinctions in that area.
11     Q    With respect to the options that you've
12  had during your tenure in evaluating Dr. Nwachuku, was
13  it a five tier grading system, a two tier grading
14  system?
15     A    It's a pass/fail system.
16     Q    Did Dr. Nwachuku pass in all of the
17  evaluations?
18     A    Yes, she has.
19     Q    Has anyone during your tenure received
20  anything other than a pass?
21     A    No.

Page 702

1     Q    Another one of the criticisms that
2  Dr. Nwachuku raised against you is your failure to, I
3  think adequately devote attention to her work. I
4  would like, if you could, for you to address that
5  issue as well.
6     A    The particular area which she had
7  addressed most frequently is there are two work
8  groups, something called the Candidate Contaminant
9  List. One is for chemicals. One addresses chemicals
10  and the selection of new chemicals for potential
11  listing. The other addresses microbes. When I came
12  into the office, I was asked to pay particular
13  attention, by my supervisor, to pay particular
14  attention to the chemical group, because that
15  particular group was centered totally in HECD, our
16  division. It was an internal group. It was not a
17  cross agency work group. I have never attended the
18  OGWDW housed cross office work group for chemicals,
19  not even one. But, I have attended the internal
20  chemical meetings with my staff that are held. I was
21  originally asked to attend those, because the woman

Page 703

1  that runs those is somewhat junior to the majority of
2  the people on the work group. She was having a
3  difficult time achieving a level -- she also has a
4  lower educational level. This became an issue that
5  she was having a difficult time obtaining their
6  respect and controlling their participation. They
7  were not making headway because the meetings would
8  break down into arguments and disagreements. So, I
9  interjected myself in there to support her to try to,
10  first of all, regain control of that group and then to
11  get them moving forward in a constructive fashion, and
12  also as a way of coaching her in how deal with people
13  of that sort.
14        The other aspect of it is, it was a group
15  of toxicologists and I am by training a toxicologist.
16  That's where my Ph.D. is and I could make substantive
17  contributions there of a technical nature.
18        Dr. Nwachuku's group is microbiology. It
19  was a cross office team comparable to the other one on
20  the chemicals that I have not attended either.
21  However, there were issues that arose as far as her

Page 704

1  interaction with the team leader and some of the team
2  members. So, instead of attending the meetings, what
3  we developed was a process, which I think has worked
4  quite well, where the team leader, Tom Carpenter or
5  Nena, Dr. Nwachuku would set up a meeting between his
6  supervisor, myself, Dr. Nwachuku. The four of us
7  would sit down and talk about the process that was
8  going on in the meeting, how was it going, where were
9  there issues. We would try to resolve issues that way
10  or plan how to go forward, what the next steps should
11  be. This has been fairly successful, I think.
12     Q    I gave you Dr. Nwachuku's affidavit in
13  this matter, the portion of it that related to. I
14  would just ask you to discuss now your feelings as to
15  basically how you reacted to reading that affidavit.
16     A    To tell you the truth, I wasn't that
17  surprised, because the verbiage in there, she said
18  many of the same things to my face. It was kind of a
19  calm version of things that I've heard. So, in fact,
20  there is nothing there I have not heard before.
21  Initially, if I were in my first year, I would have

14 (Pages 701 to 704)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
5f617d62-925f-4a6b-87fc-33329d9dfbb6

Page 741

1   A   Yes.

2   Q   Isn't it fact that Dr. Nwachuku was
3   successful in having EPA receive a refund from the
4   contractor?

5   A   That I don't know, but I wouldn't be
6   surprised.

7   Q   Isn't it a fact that Dr. Nwachuku has done
8   this with a contractor called Gram, G-R-A-M?

9   A   I don't know. I know that she was very
10  successful with another contractor, though, in
11  pressing him for work. Mark Sobsey, certainly, she
12  recouped. So, she's put a great effort into that one
13  and was very successful.

14  Q   Was Mark Sobsey the contractor working for
15  a company?

16  A   No, he was an independent.

17  Q   With regards to training, isn't it a fact
18  that the evaluations say that there is an assumption
19  that funding is available to support development and
20  implementation of the program if adequate resources
21  are provided?

Page 742

1   A   That's true in everyone's, yes.

2   Q   Right. But, the OPM leadership course has
3   never been approved to Dr. Nwachuku, those resources
4   have never been provided, have they?

5   A   Those are not specifically required for
6   any of her particular activities within. Besides,
7   she's been given funding for other training, but has
8   not necessarily accepted it.

9   Q   Dr. Nwachuku is the only African in your
10  office?

11  A   No, that's not true.

12  Q   Who is the other African?

13  A   Ifey Davis is from Nigeria and also, I
14  think she's an African and Steven Kueberuwa.

15  Q   When did the first person join your
16  office?

17  A   I don't know. It was before me.

18  JUDGE GALLAGHER: How do you spell
19  Kueberuwa again?

20  THE WITNESS: K-U-E-B-E-R-U-W-A. Both,
21  all three ladies and gentleman were there when I

Page 743

1   arrived, so I don't know when they came. I've never
2   inquired.

3   JUDGE GALLAGHER: They're in your --

4   THE WITNESS: They're in our division.
5   Two were in my branch, Nena Nwachuku and Steven
6   Kueberuwa are in my branch. All three are in our
7   division.

8   Q   What are their grades?

9   A   Steven is a 13, Nena or Dr. Nwachuku is a
10  13, and I don't know what Ifey's grade is.

11  Q   Are they microbiologists?

12  A   No. Again, I'm not sure what Ifey's
13  designation is, but Steve Kueberuwa is a toxicologist.
14  Dr. Nwachuku is a microbiologist. Ifey, I'm not sure
15  what she is.

16  Q   Do you remember telling Dr. Nwachuku that
17  you wanted certain work done and you said to her this
18  might be an exact quote, don't let it slide?

19  A   Yes, I do.

20  Q   Isn't it true that Dr. Nwachuku does her
21  work?

Page 744

1   A   Generally, yes.

2   Q   Isn't it true that you have spoken to
3   Dr. Nwachuku orally now at times which would be
4   considered rude?

5   A   Not by me, no, sir. I'm never rude to my
6   staff if I can avoid it.

7   Q   Didn't you once explain the manner you
8   speak relating to the fact that you lived in Prince
9   George's County?

10  A   It was specifically with regard to me
11  saying to her that this is an important issue, please
12  don't let it slide meaning follow-up on it quickly. I
13  use idiomatic speech. I use idiomatic speech with
14  everyone. I use common idioms and they have no intent
15  to be rude, nor do I think most people would consider
16  them to be.

17  Q   You signed an affidavit for the official
18  investigator in this case, right?

19  A   Karen Desco.

20  Q   Then you signed another declaration for
21  Mr. Winick, didn't you?

24 (Pages 741 to 744)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
5f617d62-925f-4a6b-87fc-33329d9dfbb6

# EXHIBIT 11

### Declaration of Elizabeth Doyle

I, Elizabeth Doyle, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.      I presently serve as the Branch Chief of the Human Risk Assessment Branch of the Health and Ecological Criteria Division (HECD) in the Office of Science and Technology (OST). I have served in this capacity, with Edward Ohanian as my immediate supervisor, the HECD Division Director, since June 2, 2003.

2.      At the time that I assumed the role of Branch Chief, Dr. Nwachuku was an immediate subordinate, and she has remained so to the present. I played no role whatsoever in the 2003 selection process that it is my understanding Dr. Nwachuku has challenged as discriminatory.

3.      I understand that Dr. Nwachuku has alleged that I have created a hostile work environment for her and that one episode that reflects my animus toward her was my failure to timely advise her of a number of overdue unpaid invoices from contractors whose performance she was responsible for overseeing.

4.      With respect to circumstance noted in paragraph 3., above, I did advise Kathy Crawford that I would bring the matter of the delinquent invoices to Dr. Nwachuku's attention, because it seemed clear to me that Ms. Crawford preferred not to do so. Dr. Nwachuku frequently react hostilely to unfavorable news, a trait of which everyone in HECD is aware. It was my perception that Ms. Crawford was concerned about the reception she might receive from Dr. Nwachuku, and I sought to relieve her anxiety by acting the messenger myself.

5.      Ms. Crawford conveyed to both me and Mr. Ohanian simultaneously the matter of the delinquent invoices, and I am confident that, based on my representation that I would inform Dr. Nwachuku, Mr. Ohanian felt that the matter would be taken care of and that nothing on his part would be demanded.

6.      Unfortunately, I dropped the ball (primarily because I, too, did not relish the thought of advising Dr. Nwachuku of the delinquencies) and neglected to advise Dr. Nwachuku prior to the annual resolution meeting at which the matter of the delinquencies was communicated to Geoffrey Grubbs. I was present at that resolution meeting, and despite the Division's concern that the OST Office Director would be rather upset, that proved not to be the case. Mr. Grubbs inquired as to whether Dr. Nwachuku had a prior history of delinquencies, which we assured him was not the case, and then he simply dismissed the matter with the observation that we would do better next time.   No adverse consequences were visited upon Dr. Nwachuku as a consequence of the delinquencies.

7.      Subsequent to the resolution meeting at which the delinquencies were addressed, Dr. Nwachuku became aware of them, and we were able to establish that the contractor had been forwarding its invoices to an improper address and that Dr. Nwachuku's failure to timely make





payment had resulted from her never even having received the invoices. Before this explanation presented itself, however, HECD personnel had been discussing how best to defend against delinquencies, and I had decided that having a back-up program manager for Dr. Nwachuku during her absences would be the simplest and most effective solution.

8.     In that regard, Lisa Almodovar was asked if she would consent to be Dr. Nwachuku's back-up. Ms. Almodovar, however, had a very adversarial relationship with Dr. Nwachuku. She frequently bore the brunt of Dr. Nwachuku's criticism, and she ultimately transferred out of HECD to escape Dr. Nwachuku's demeaning and hostile manner. Ms. Almodovar declined the invitation to act as a back-up.

9.     I then advised Dr. Nwachuku that I would act as her back-up, but Dr. Nwachuku vehemently objected to such proposal characterizing my acting in the capacity of her back-up as some ethical impropriety on my part. I disagreed with Dr. Nwachuku's assessment, but rather than allow the matter to become confrontational, I requested that she find an alternative back-up. She requested that Shirley Harrison assume this responsibility.

10.     Even after the explanation for the delinquencies came to light and "exonerated" Dr. Nwachuku of any responsibility, I still regarded the matter of her having a back-up as something advisable to implement.

11.     With respect to the whole delinquencies episode, which took place in the March/April 2004, time frame, I never took an action or intentionally failed to act in order to paint Dr. Nwachuku in an unfavorable light before Mr. Grubbs or anyone else. Nor did I behave as I did because of any discriminatory or retaliatory animus. (With respect to the latter, I had no real appreciation of Dr. Nwachuku's past history and certainly had never had any personal involvement, never previously having been in her supervisory chain.) I recognized then, as I do now, that I was guilty of negligently failing to timely advise Dr. Nwachuku of the delinquencies situation. It was for such reason that, shortly after the delinquencies incident, I sent her an e-mail expressly apologizing for having dropped the ball.

12.     I understand that Dr. Nwachuku has sought to depict a number of my dealings with her as hostile and disrespectful. One such interaction involved my advising her "not to let [certain work] slide." In such alleged problematic exchange, I never raised my voice, nor did I employ profanity or speak condescendingly. In fact, I have never spoken harshly or used crude language or pejoratives associated with Dr. Nwachuku's race, color, or national origin when communicating with her either face-to-face or via e-mail.

14.     To conclude, I have not treated Dr. Nwachuku inappropriately in any way, nor have I, either singly or in combination with Mr. Ohanian or anyone else in OST, subjected her to a hostile work environment. Furthermore, any treatment toward Dr. Nwachuku on my part that she might characterize as hostile was not motivated by any discriminatory or retaliatory animus. During my tenure as Dr. Nwachuku's immediate supervisor, I have invariably behaved toward

2

her in a fair, professional and restrained manner.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on July 8, 2005.

Elizabeth Doyle
Branch Chief
Human Risk Assessment Branch
Health and Ecology Criteria Division
Office of Science and Technology

3

# EXHIBIT
# 12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x

NENA NWACHUKU                    :

          Plaintiff,       :

    vs.                          : Civil Action No.

STEPHEN L. JOHNSON,              : 06-0946 (RJL)

          Defendant.       :

- - - - - - - - - - - - - - - x


Monday, January 14, 2008

Washington, D.C.


Deposition of

ELIZABETH A. DOYLE

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before PETER

K. SHONERD, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 Eye

Street, N.W., Suite 1290, Washington, D.C., 2005,

commencing at 10:41 a.m.



Page 30

1  your Ph.D.?
2      A    I think it was 1987.
3      Q    At all times you were working in the EPA,
4  you were a Ph.D. in toxicology?
5      A    That's correct.
6      Q    That's the field that you worked in,
7  toxicology?
8          MR. HUDAK:  Objection to form.
9          THE WITNESS:  Primarily; yes.
10         BY MR. SHAPIRO:
11     Q    Where did you get your Ph.D.?
12     A    American University.
13     Q    And your Master's degree?
14     A    University of Maryland.
15     Q    And when did you get that?
16     A    I think 1978.
17     Q    That was in?
18     A    Agronomy, microbiology.
19     Q    Your Bachelor's degree?
20     A    1975.
21     Q    From?
22     A    University of Maryland.

Page 31

1      Q    Did you go to school in Maryland?
2      A    Yes, I did.
3      Q    High school?
4      A    Yes, I did.
5      Q    Where did you go to high school?
6      A    Suitland High School, Suitland, Maryland.
7      Q    Prince George's County?
8      A    That's correct.
9      Q    That would have been you graduated in 1971?
10     A    1972.  Actually, I think my Ph.D., to
11  correct what I previously said, was in 1985.  I hate
12  to say I don't know any more, but I'd have to look.
13     Q    Did you grow up in Suitland?
14     A    No, I did not.
15     Q    Where did you grow up?
16     A    Between Upper Marlboro, near Andrews Air
17  Force Base and near Upper Marlboro.
18     Q    Was your father in the Air Force?
19     A    No, he was not.
20     Q    What did he do?
21     A    He was a machinist who worked at the Bureau
22  of Printing and Engraving in his last job.

Page 32

1      Q    And your mother?
2      A    She was a homemaker.
3      Q    When did you first meet Nena?  When you
4  first came to the branch?
5      A    Yes; that's correct.
6      Q    In June of 2003?
7      A    Yes; that's correct.
8      Q    Was she already there as a biologist, as a
9  microbiologist?
10     A    Yes, she was there already.
11     Q    The people that you gave us when you talked
12  to us before, I asked about people who served when
13  Nena was there, you can remember nine people
14  including Nena.
15     A    Uh-huh.
16     Q    That's a "yes?"
17     A    Yes.  I'm sorry.
18     Q    Anybody besides Nena that is no longer
19  there?
20     A    Yes.
21     Q    Who is that?
22     A    I'm trying to think of the order in which

Page 33

1  they left.  Charles Abernathy has retired.
2      Q    Charles Abernathy is not somebody you have
3  mentioned before.
4      A    Yes, because I don't remember if he was
5  there at the time she left or if he had retired
6  before that.  I don't remember the order.  He's one
7  I'm not sure of.
8          Julie Du retired before Nena left.
9      Q    She was there when you came?
10     A    Yes, but I believe not when Nena left.
11     Q    Julie?
12     A    Julie D-u.  She's an Asian female.
13     Q    She left before Nena?
14     A    That's correct.
15     Q    Mr. Charles Abernathy?
16     A    Yes; that's correct.
17     Q    He's a?
18     A    White male.
19     Q    He left before Nena left?
20     A    Yes.  I know who I forgot before.  I just
21  remembered another person who was in the branch at
22  the time she left.

Page 42

1    Q    Was it when you were branch chief or when
2    you were a section chief there?
3    A    Section chief.
4    Q    Did you order him not to be on flexi-place
5    or propose that he not to the branch chief?
6    A    It was my prerogative to bring him back.
7    Q    He was a male?
8    A    Yes.
9    Q    White?
10    A    Yes.
11    Q    It was on performance grounds that you did
12    this?
13    A    Yes.
14    Q    You didn't think his performance was up to
15    speed?
16    A    Yes.
17    Q    Did he turn it around once he came back to
18    the branch?
19    A    It improved.
20    Q    He continued in your section when you left
21    being a section chief?  Was he still there?
22    A    Yes.

Page 43

1    Q    Where is he now?
2    A    He is in the Anti-Microbial Division of the
3    Office of Pesticide Programs.
4    Q    Anti-Microbial Division?
5    A    Uh-huh.
6        THE REPORTER:  Yes?
7        THE WITNESS:  Yes.  I'm sorry.
8        BY MR. SHAPIRO:
9    Q    Of PPTD?
10    A    OPP.  That's it.
11    Q    Office of Pesticide?
12    A    Programs.
13    Q    Who is his boss now?
14    A    I believe his supervisor is Norm Cook.
15    Q    At the time you were a 14, what grade was
16    he?
17    A    He was a 13.
18    Q    And what grade is he now?
19    A    I believe he's still a 13.
20    Q    Did his performance appraisal go up after
21    you brought him off flexi-place?
22    A    I don't recall.

Page 44

1    Q    Did he ever receive a less than fully
2    successful performance appraisal?
3    A    No.
4    Q    You rated him fully successful at all
5    times?
6    A    Yes.
7    Q    Did other people have flexi-place in your
8    branch at that time?
9    A    Yes.
10    Q    Did you have flexi-place?
11    A    No.
12    Q    Have you ever had flexi-place?
13    A    I have it now.  Not flexi-place.  I'm
14    sorry.  No, I have never had flexi-place.
15    Q    What do you have now?
16    A    Compressed schedule.
17    Q    You work four days?
18    A    Five and four, alternating.
19    Q    You work nine days in every pay period?
20    A    Yes.
21    Q    You first met Nena -- I'm just going to
22    call her "Nena," Dr. Nwachuku; right?

Page 45

1    A    Yes.
2    Q    I'm just going to refer to her as "Nena."
3    You were on a first name basis with everybody in your
4    branch?
5    A    That's correct.
6    Q    Including Nena?
7    A    Yes.
8    Q    And she with you?
9    A    Yes.
10    Q    She would call you what?
11    A    She called me Elizabeth.
12    Q    Did other people call you Elizabeth as
13    well?
14    A    No.
15    Q    What did they call you?
16    A    They call me Beth.
17    Q    She called you Elizabeth?
18    A    That's correct.
19    Q    You referred to her as Nena?
20    A    That's correct.
21    Q    When you first met Nena, did you hear
22    anything before meeting her about her from anyone?

Page 66

1    presentation went, the one at issue?  Did you ever
2    talk to him about it?
3        A    No.
4        Q    Did he attend it?
5        A    I don't know.
6        Q    Did you ever ask him about it?
7        A    No.
8        Q    Dr. Hasan and Nena did not get along or
9    they did get along?
10        MR. HUDAK:  Objection to form.
11        THE WITNESS:  They had sort of come to a
12   meeting of the minds.
13        BY MR. SHAPIRO:
14        Q    An arrangement?
15        A    Yes.
16        Q    And what was the arrangement?
17        A    That they worked together, they worked
18   civilly with each other, they treated each other with
19   respect.  Yes.  To that extent, yes, they got along.
20        Q    Had they already had that meeting of their
21   minds by the time you came there as an acting branch
22   chief?

Page 67

1        A    No.
2        Q    Initially, when Dr. Hasan first talked to
3    you about Nena upon your coming to the branch, they
4    had not reached this accord?
5        A    That's correct.
6        Q    Did Nena ever come to you and say bad
7    things about Dr. Hasan?
8        A    I don't recall.
9        Q    You don't recall that happening; is that
10   correct?
11        A    No, I don't recall if she did or not.
12        Q    You do recall Hasan coming to you and
13   saying negative things about Nena?
14        A    He said he had a difficult time working
15   with her.
16        Q    You told me he also said she was stubborn
17   and she didn't listen to him.
18        A    That's correct.
19        MR. HUDAK:  Objection.
20        BY MR. SHAPIRO:
21        Q    Anything else that he said negative about
22   her in that early meeting that he had with you?

Page 68

1        A    Not that I recall.
2        Q    How soon after you were coming to the
3    branch as acting branch chief did Dr. Hasan come to
4    you and talk to you negatively about Nena?
5        A    When I first came to the branch, I asked
6    everyone within the first months to come and have an
7    interview with me and talk about what was happening
8    in the branch, what their work was, any issues they
9    had that they would like to see me work with them on.
10   It would have been during that first month.
11        Q    In that meeting, Dr. Hasan mentioned to you
12   these negative things about Nena?
13        A    I believe so.
14        Q    Anything else that you recall he said
15   negative about Nena?
16        A    No, I don't believe so.
17        Q    How about the other person who you said
18   spoke to you about Nena?
19        A    Lisa Almadover?
20        Q    Yes, Ms. Almadover.  I think you said she
21   has a Master's degree.  Was she the one who has a
22   Master's degree in microbiology or toxicology?

Page 69

1        MR. HUDAK:  Objection; compound.
2        THE WITNESS:  Microbiology.
3        BY MR. SHAPIRO:
4        Q    Did she also tell you these negative things
5    in that first conversation when you asked everybody
6    to come to you and talk to you?
7        MR. HUDAK:  Objection.
8        THE WITNESS:  Yes.
9        BY MR. SHAPIRO:
10        Q    What did she say negative about Nena?
11        MR. HUDAK:  Objection.
12        THE WITNESS:  Essentially, the same things.
13        BY MR. SHAPIRO:
14        Q    The same things that Dr. Hasan said?
15        A    Uh-huh.
16        Q    Is that a "yes?"
17        A    Yes.  I'm sorry.
18        Q    Did anyone else say negative things in that
19   first month's series of conversations you had with
20   the staff about Nena?
21        A    Not that I recall.
22        Q    Did Nena say anything negative about any of

Page 110

1    Q    That continues to be true for you, that
2    it's work time and you get paid for the travel and
3    you're on the clock, that is to say it's considered
4    time at work?
5    A    That's correct.
6    Q    When was the last time you went?
7    A    I could not go last year.  Two years ago.
8    Q    In 2006?
9    A    Yes.
10   Q    When did you find out in terms of the time
11   of the actual meeting in Florida for the American
12   Society for Microbiology, that meeting, the one we're
13   talking about here?        How close to the time
14   that meeting took place did you find out that Nena
15   was going to be presenting?
16   A    I don't recall when I found out she was
17   presenting.
18   Q    Within six months?
19   A    I think so.
20   Q    Within three months?
21   A    I don't know.
22   Q    It could have been longer than three

Page 111

1    months?
2    A    Yes, it could have been.
3    Q    It was certainly within six months --
4    A    Yes.
5    Q    Of the actual event?  Is that a "yes?"
6    A    Yes.
7    Q    Are there consequences in your professional
8    society for being on the agenda as a presenter and
9    not showing up?
10   A    No.
11   Q    None at all?
12   A    No.
13   Q    When did you find out there were
14   consequences for Nena, for the American Society for
15   Microbiology?
16   A    At the MSPB hearing.
17   Q    You didn't know beforehand?
18   A    No.
19   Q    No one ever told you?
20   A    Not that I'm aware of; no.
21   Q    When did you tell her that she couldn't go,
22   compared to the date that she actually went?

Page 112

1    A    I specifically told her she could not go, I
2    think it was March -- I mean May 18th.
3    Q    When did she depart?
4    A    May 20th.
5    Q    Two days before she was to go, you told her
6    she may not go?
7    A    That's correct.
8    Q    How did you tell her?
9    A    I sent her an e-mail and I also walked up
10   to her in the hallway and told her.
11   Q    Both on the 18th?
12   A    Yes.
13   Q    Of May?
14   A    Yes.
15   Q    What day of the week was that?
16   A    Thursday.
17   Q    The 19th was Friday, but she was not
18   actually leaving until Saturday; is that right?
19   A    That's correct.
20   Q    Tell me, did you send her the e-mail first
21   or did you go up to her in the corridor first?
22   A    I sent the e-mail first.

Page 113

1    Q    What prompted you to go up to her in the
2    corridor?  You just happened upon her in the
3    corridor?
4    A    I wanted to make sure that I had closed the
5    loop and that everything was -- she was very clear,
6    there was no way she could have missed it.
7    Q    Did she have a history of missing e-mails?
8    A    She tended to be very e-mail literate, but
9    she sent a lot of time, but I just wanted to be sure,
10   because of the nature of past work, that she would
11   know for sure.
12   Q    I don't understand "the nature of past
13   work."  What do you mean?
14   A    Nena tended to be very heavy in keeping
15   records.  I wanted to make sure that I had documented
16   that I had in fact spoken with her so that if it
17   became an issue later, it was clear that I had, and
18   there was no misunderstanding.
19   Q    Did you document that you had spoken to
20   her?
21   A    I don't know if I did or not.  I don't
22   recall.

Page 118

1  recipients of the recommendations that would come out
2  of the workshop.
3      Q   The workshop was being run by Nena?
4          MR. HUDAK:  Objection to form.
5          THE WITNESS:  She was the organizer, but we
6  were doing it on behalf of OGWDW and developing the
7  charge and the questions in conjunction with them and
8  other members on the work group.
9          BY MR. SHAPIRO:
10     Q   Other members of the work group?
11     A   Yes.
12     Q   Was Ground Water and Drinking Water on the
13 work group?
14     A   Yes.
15     Q   Who was on the work group for them?
16     A   Tom Carpenter, Jitendra Saxena, Tracy Bone.
17     Q   The other people on the work group was
18 Nena?
19     A   Yes.
20     Q   Anybody else from Science and Technology?
21     A   At that time, no.
22     Q   And contractors?  Scientists that were on

Page 119

1  contracts?
2      A   Yes.
3      Q   Anybody else?
4      A   Folks from the Office of Research and
5  Development.
6      Q   EPA?
7      A   Yes.
8      Q   Anyone else?
9      A   No.
10     Q   Had the work group been meeting on what the
11 charge would be?
12     A   Yes.
13     Q   Had they come to an arrangement of what the
14 charge would be, at least the members of the group?
15         MR. HUDAK:  Objection to form.
16         THE WITNESS:  The Office of Ground Water
17 and Drinking Water folks felt they had not come to
18 consensus and they were not satisfied that their
19 concerns or comments had been addressed.
20         BY MR. SHAPIRO:
21     Q   Who did they bring that to, you?
22     A   To me.

Page 120

1      Q   When did they bring it to you?
2      A   Gosh.  It was a week or two before -- some
3  time in early May, I think.
4      Q   When was the work group supposed to start
5  meeting?
6      A   The workshop, you mean?
7      Q   The workshop; yes.
8      A   June 6th.
9      Q   All the people on the work group from the
10 Drinking Water people didn't feel that the topics
11 were properly framed?
12         MR. HUDAK:  Objection to form.
13         BY MR. SHAPIRO:
14     Q   That is the charge was properly framed?
15         MR. HUDAK:  Same objection.
16         THE WITNESS:  There was a gentleman named
17 Jitendra Saxena who felt his had not been.
18         BY MR. SHAPIRO:
19     Q   His?  What do you mean "his?"
20     A   He provided comments.
21     Q   That his comments had not been taken into
22 account?

Page 121

1      A   Right.  Thomas Carpenter, who was the work
2  group chair, felt that his had not been.  Tracy Bone
3  also.
4      Q   Everybody from Drinking Water didn't feel
5  the charge was properly framed?
6          MR. HUDAK:  Objection to form.
7          THE WITNESS:  That was my understanding;
8  yes.
9          BY MR. SHAPIRO:
10     Q   You got that understanding from whom?
11     A   Eric Burneson.
12     Q   Your co-equal, the branch chief over in
13 Drinking Water?
14     A   That's correct.
15     Q   Did you have this meeting with Burneson?
16 Did it take place?
17     A   Which meeting?
18     Q   The meeting that was to end at 11:00.
19     A   Yes, was to start at 11:00.
20     Q   It was just the two of you, but you didn't
21 actually meet because Nena wasn't there?
22     A   No, we met.

Page 130

1    THE WITNESS: I don't remember. I don't
2    know.
3        BY MR. SHAPIRO:
4    Q    When Nena was sick that morning, that was
5    the end of her going on the trip, because you
6    couldn't meet on Friday and it was essential that you
7    meet with her with your colleague before she met with
8    Ohanian and his colleague; right?
9        MR. HUDAK: Objection. Argumentative.
10       BY MR. SHAPIRO:
11   Q    Correct? Do I have the sequence right?
12   A    Yes.
13       MR. HUDAK: Same objection.
14       BY MR. SHAPIRO:
15   Q    When was this meeting of the American
16   Society for Microbiology?
17   A    I think it started on May 22nd.
18   Q    Monday?
19   A    Yes, I think so.
20   Q    When did it run to?
21   A    Through the end of the week.
22   Q    When was Nena presenting?

Page 131

1    A    I don't know.
2    Q    Did you ever find out when she was
3    presenting?
4    A    No.
5    Q    Did she make a presentation?
6    A    I don't know.
7    Q    Did she stay the whole week?
8    A    Yes.
9    Q    The next time you saw her was Monday, the
10   following Monday?
11   A    I think so, the 29th. I think so; yes.
12   Q    When you saw her on the 18th in the
13   corridor, you went specifically to find her and tell
14   her this, that you may not go to this meeting?
15   A    Yes.
16   Q    Where did you find her?
17   A    She was standing in a hallway a little ways
18   up from my office.
19   Q    Talking to somebody or just standing idly
20   in the hallway?
21   A    She was packing boxes.
22   Q    Packing boxes in the hallway?

Page 132

1    A    Yes.
2    Q    What was she packing?
3    A    I think she was packing materials to send
4    to the workshop participants.
5    Q    The workshop we were talking about, the
6    charge of which needed to be modified?
7    A    Yes.
8    Q    To accommodate the comments of Drinking
9    Water?
10       MR. HUDAK: Objection to form.
11       THE WITNESS: Yes.
12       BY MR. SHAPIRO:
13   Q    She was working on the workshop matter?
14   A    Yes.
15   Q    And the workshop was supposed to take place
16   in June, June 6th?
17   A    That's correct.
18   Q    She was sending materials out?
19   A    Yes.
20   Q    The workshop would have been eight people?
21   How big was the workshop?
22   A    I don't recall.

Page 133

1    Q    Had you ever attended one of her workshops,
2    one of the workshops Nena was involved in?
3    A    No.
4    Q    You had never done that?
5    A    No.
6    Q    Had you ever attended workshops from other
7    people in your branch?
8    A    No.
9    Q    This happened in the corridor not far from
10   your office?
11   A    Yes.
12   Q    How many paces from your office?
13   A    Fifteen.
14   Q    Where is Nena's office?
15   A    It was around on the other corridor.
16   Q    What was she doing packing boxes in your
17   corridor?
18   A    I think it was just a convenient work
19   place.
20   Q    Was there anybody else around?
21   A    Yes.
22   Q    Who?

34   (Pages 130 to 133)

Page 134

1    A    Dana Thomas and Frank Bell.
2    Q    Dana Thomas?
3    A    And I believe Frank Bell was there.
4    Q    They were helping her pack boxes?
5    A    No.
6    Q    What were they doing in the corridor?
7    A    Dana was Xeroxing.
8    Q    The Xerox machine was in the corridor?
9    A    Yes.
10   Q    Dana was Xeroxing.  And Mr. Bell?
11   A    Sitting at his desk.  He had a desk out in
12   the hallway.
13   Q    He had a desk in the hallway.  How many
14   Xerox machines are there in the hallway?
15   A    Only one, one that works.
16   Q    There are other Xerox machines besides the
17   one that works?
18   A    There was another one that rarely worked
19   that was down directly in front of my office or a
20   little bit past it on the other side.
21   Q    The other way?
22   A    Uh-huh; yes.

Page 135

1    Q    There was just one photocopier in the
2    corridor at the place where you had the conversation
3    with Nena?
4    A    Yes.
5    Q    Nena wasn't using that?
6    A    No.
7    Q    How many times did you talk to Nena that
8    day in the corridor?  Once?  More than once?
9    A    I think only once.
10   Q    Could you have seen her another time and
11   passed words with her?
12         MR. HUDAK:  Objection to form.
13         THE WITNESS:  That was the only time that I
14   saw her.
15         BY MR. SHAPIRO:
16   Q    You're sure that the only time you saw her
17   that day in the corridor was when she was packing
18   boxes and near the working Xerox machine?
19   A    That's my recollection; yes.
20   Q    What time of day did you have this
21   conversation with her in the corridor?
22   A    I think it was around 4:30.

Page 136

1    Q    You sent her an e-mail at 11:00?
2    A    No, a little after 1:00.
3    Q    The e-mail was a little after 1:00.  The
4    meeting was supposed to be at 11:00?
5    A    Yes.
6    Q    And you met with your colleague but
7    couldn't do very much --
8    A    Right.
9    Q    Because Nena wasn't there.  Did you find
10   out where Nena was?  Did you make inquiries, where's
11   Nena, when she didn't show up for this meeting?
12   A    I went around to see if her desk -- if
13   there was anyone at her desk or if her machine was
14   turned on, and it was not.
15   Q    Which indicates what, she hadn't been in
16   yet today, on that day?
17   A    That was my assumption.
18   Q    So, at 4:30, you went to find her because
19   you would not be in the next day?
20         MR. HUDAK:  Objection to form.
21         BY MR. SHAPIRO:
22   Q    Is that right?

Page 137

1          MR. HUDAK:  Same objection.
2          THE WITNESS:  Yes.
3          BY MR. SHAPIRO:
4    Q    What time did you actually find her?  As
5    soon as you walked out of your office and saw her in
6    the corridor packing?
7    A    Yes.
8    Q    And you went up to her and told her what?
9    Tell us what you said.  Everything that you can
10   recall that was said by you to her, by her to you, or
11   by anybody else who was in the area.
12   A    No one else spoke to me but Nena.  I did
13   tell her that I --
14   Q    Did you speak to anybody else besides Nena?
15   A    I don't believe so; no.
16   Q    Go ahead.  Tell us what the conversation
17   was.
18   A    I told her that I wanted to be sure she was
19   aware that I had not approved her travel.  She said
20   something to me about not being a doctor.
21   Q    "Not being a doctor?"  What do you mean
22   "not being a doctor?"

Page 146

1    Q    Had you spoken to her before about Nena?
2    A    Yes.
3    Q    About what?
4    A    I think Nena raised an issue about our not
5    giving her adequate support because I was a
6    toxicologist and she was a microbiologist.
7    Q    What did Labor Relations know about that?
8    A    It was just a question. They are the
9    people that handle what to do with grievances and
10   complaints.
11   Q    Did she make a grievance over that or an
12   EEO complaint about that?
13   A    I think that may have been an EEO
14   complaint.
15   Q    What did Labor Relations have to do with an
16   EEO complaint?
17   A    I was looking for someone who could advise
18   me on what to do with it, and I didn't have any place
19   else that I knew to go.
20   MR. HUDAK: One moment, please.
21   (Counsel conferring with witness.)
22   BY MR. SHAPIRO:

Page 147

1    Q    An EEO counselor came and spoke to you?
2    A    Yes.
3    Q    Before or after the 18th of May?
4    A    Before, I think. I'm not sure. No, I'm
5    not sure. I remember the gentleman but I don't
6    remember the date.
7    Q    What did he speak to you on? Did he speak
8    to you on the refusal to let her go or did he speak
9    to you on the stuff that happened before, the ongoing
10   harassment claim?
11   MR. HUDAK: Objection.
12   THE WITNESS: It didn't have to do with the
13   18th.
14   BY MR. SHAPIRO:
15   Q    It probably was before; correct?
16   A    Yes, it could be. I don't know.
17   Q    At the time on the 18th, what else happened
18   on the 18th? You said "You know I'm not approving
19   you to go?"
20   A    Uh-huh; yes.
21   Q    And she said "You're not a medical doctor."
22   What else was said in that incident?

Page 148

1    A    I told her that we would meet the following
2    week.
3    Q    What did she say?
4    A    I don't recall.
5    Q    How long did this incident take?
6    MR. HUDAK: Objection to form.
7    THE WITNESS: I would guess two minutes
8    maybe. It was very short.
9    BY MR. SHAPIRO:
10   Q    Two minutes is a long time to say "Nena, I
11   want to make sure you understand I'm not approving
12   that trip," and she says "You're not a medical
13   doctor," and you say one other thing to her. That's
14   less than ten seconds.
15   What took place in the two minutes?
16   MR. HUDAK: Objection to form.
17   THE WITNESS: She was slamming boxes
18   around. She was outside packing her boxes, in the
19   process of doing it.
20   BY MR. SHAPIRO:
21   Q    As you were talking to her, she would
22   continue to pack the boxes?

Page 149

1    A    Yes.
2    Q    Nothing else happened at that meeting?
3    A    No.
4    Q    Did you get close to her, in her face?
5    A    No, not at all.
6    Q    Aggressively threaten her?
7    A    No, not at all.
8    Q    Did you threaten her with violence at all?
9    A    No.
10   Q    Did you do anything that could have been
11   mistaken for a threat of violence?
12   MR. HUDAK: Objection to form.
13   THE WITNESS: No.
14   BY MR. SHAPIRO:
15   Q    It was just a casual conversation in the
16   corridor a few steps from your office?
17   A    It was casual for me certainly; yes.
18   Q    Was it casual for her? She was doing other
19   things throughout the time, packing boxes?
20   MR. HUDAK: Objection to form. Calls for
21   speculation.
22   BY MR. SHAPIRO:

1    Q   Is that right?
2        MR. HUDAK: Same objection.
3        THE WITNESS: She seemed to be irritated,
4    agitated. I don't know why.
5        BY MR. SHAPIRO:
6    Q   You don't know why?
7    A   No.
8    Q   When did you learn that she made a
9    complaint that you threatened her in that
10   conversation?
11   A   I think it was the week after she came back
12   from Orlando. I think it was the following week.
13   Q   That's when you learned?
14   A   Yes.
15   Q   When did she make the complaint?
16       MR. HUDAK: Objection to form.
17       THE WITNESS: I don't know.
18       BY MR. SHAPIRO:
19   Q   Did she make it on the Friday you were out?
20       MR. HUDAK: Objection to form.
21       THE WITNESS: I don't know.
22       BY MR. SHAPIRO:

1    Q   When did you find out that she was in
2    Orlando at the American Society for Microbiology
3    meeting?
4    A   The 22nd, Monday.
5    Q   How did you find out?
6    A   I came in to listen to my voicemail Monday
7    morning and had a referral of a message from the
8    people in Cincinnati that fund air travel for people
9    that have credit cards asking that somebody confirm
10   that it was an approved trip and do the paperwork to
11   get it done.
12   Q   When did the message come in, Friday?
13   A   I think the preceding Friday.
14   Q   When you were out?
15   A   Yes.
16   Q   Is somebody on your staff supposed to
17   listen to your voicemails?
18       MR. HUDAK: Objection to form.
19       BY MR. SHAPIRO:
20   Q   When you are out?
21   A   The call didn't come to me. It came to
22   another branch chief.

1    Q   What branch chief?
2    A   Robert Cantilli.
3    Q   And then it was forwarded to you?
4    A   Yes.
5    Q   By him?
6·   A   Yes.
7    Q   Why did it come to him?
8    A   Because we have a situation where any of
9    the three branch chiefs can approve, if it's
10   authorized, for any staff member.
11   Q   Did he approve it?
12   A   No.
13   Q   Why did it come to him to begin with? I
14   see, because the travel people called him. They just
15   happened to call him?
16   A   He's alphabetically the first on the list.
17   Q   I see. So, they called him?
18   A   Right.
19   Q   If he came to the other branch chief, he
20   would forward whatever came?
21   A   Well, and I had also informed him and my
22   co-worker not to approve it because I had not

1    authorized her travel.
2    Q   When did you inform them?
3    A   On Thursday.
4    Q   And how did you do that? By e-mail?
5    A   No, I walked around to their offices.
6    Q   Why? Why not just send them an e-mail?
7    A   Because I was trying to be polite to them,
8    let them know that they shouldn't approve it.
9    Q   Who is the other person?
10   A   William Swietlik.
11   Q   He got this thing on Friday?
12   A   Uh-huh; yes.
13   Q   He didn't send it back saying it's not
14   approved, he left you a voicemail? He forwarded the
15   voicemail to you rather than calling the Cincinnati
16   people and saying it's not approved?
17       MR. HUDAK: Objection to form.
18       THE WITNESS: I don't know if Bob got it on
19   the Friday or if he got it Monday morning himself.
20       BY MR. SHAPIRO:
21   Q   Was he out Friday?
22   A   The time at which the voicemail -- I don't

Page 182

1    MR. HUDAK:  Objection to form.
2    BY MR. SHAPIRO:
3    Q    You never did find out when it was during
4    the week that she was to do the presentation?
5    A    No.
6    Q    There was an incident of work place
7    violence after this --
8    MR. HUDAK:  Objection to form.
9    BY MR. SHAPIRO:
10    Q    Where you accused Nena of being violent
11    with you, having a violent incident with you?
12    MR. HUDAK:  Objection to form.
13    BY MR. SHAPIRO:
14    Q    Was that before or after the week of
15    absence in Florida?
16    MR. HUDAK:  Same objection, and in
17    addition, compound.
18    THE WITNESS:  I think what you're referring
19    to is on the morning of June 6th, when she came in to
20    the workshop and she discovered we were presenting a
21    revised charge, proposed to pass it out at that
22    meeting, she became extremely agitated.

Page 183

1    BY MR. SHAPIRO:
2    Q    When she came back the next week, not the
3    week of the 22nd but the following week, the 29th,
4    Monday the 29th; correct?
5    A    Yes.
6    Q    You dealt with her that week on the revised
7    CCL, the charge?
8    A    Yes.
9    Q    Did you meet with her and your co-equal in
10    Drinking Water that week?
11    A    No.
12    Q    Why?
13    A    I attempted to talk to her and she told me
14    that she would not have conversation with me except
15    by voicemail or e-mail, and walked away from me.
16    Q    You sent her an e-mail you said, we are
17    meeting at such and such a time with Drinking Water
18    to revise this thing; right?
19    A    I don't recall.  We sent her -- I sent to
20    her the charge that Eric -- the revised charge and
21    Eric and I developed during her absence, and asked
22    her to send it out.

Page 184

1    Since she would not respond to me or my e-
2    mails or she would get up and walk away if I tried to
3    talk with her, I asked Dr. Ohanian to contact her.
4    Q    Did he?
5    A    Yes.
6    Q    Did the revised charge go out?
7    A    No.
8    Q    Why not?
9    A    I guess you'd have to ask her.
10    Q    Why didn't you send the revised charge out
11    to the group?
12    A    I did not feel it appropriate for me to
13    mail out a revised charge.  The normal path for a
14    thing of this sort is to deal through the contractor,
15    the contractor that is running the workshop.
16    Q    Why didn't you contact the contractor?
17    A    Because I was not on the work assignment or
18    the contract that was used as a vehicle for sending
19    it out.  It would not be legal for me to contact them
20    directly.
21    When I went to the workshop that next day -
22    -

Page 185

1    Q    Were you supposed to be at the workshop?
2    A    Yes.
3    Q    You were a member of the team, the workshop
4    team?
5    A    I was asked to attend by my supervisor.
6    Q    When did he ask you to attend?
7    A    He asked me to be sure that I was there
8    during that week of the 29th, to make sure that I was
9    there with him at the beginning of the meeting.  He
10    was the tick off person that was supposed to give the
11    introductory address and
12    explain --
13    Q    Ohanian?
14    A    Yes, that's right.
15    Q    You were both there at the beginning?
16    A    Yes.
17    Q    How did Nena behave?  Were you the only one
18    there to tell her it was a revised charge?
19    A    No, I was not.
20    Q    Who else was there?
21    A    Ed Ohanian was there.  Eric Burneson was
22    there.  The workshop members were inside a room

Page 190

1    Q    Where did it come from?

2         MR. HUDAK:  Again, I'll object to the form

3    and I'll direct the witness, to the extent the

4    question calls for disclosure of attorney-client

5    communications, that she is not to disclose any such

6    communications.

7    BY MR. SHAPIRO:

8    Q    Did you propose her removal before or after

9    you found out that the IG was not going to pursue

10   this?

11   A    I did not propose her removal until Edward

12   Ohanian told me that he had been informed that the

13   Inspector General would not take it up.

14   Q    Take it up as a criminal matter?

15   A    Well, at all.  He just said they declined

16   to take it up.

17   Q    How soon after you came to the office did

18   your relationship with Nena break down?

19        MR. HUDAK:  Objection to form.

20        BY MR. SHAPIRO:

21   Q    Did you begin having trouble with Nena?

22        MR. HUDAK:  Same objection.

Page 191

1         THE WITNESS:  I think the first issues that

2    I encountered were probably within six months, but I

3    wouldn't characterize it as my relationship with her

4    having broken down.

5         BY MR. SHAPIRO:

6    Q    When did the relationship break down?

7         MR. HUDAK:  Objection to form.

8         BY MR. SHAPIRO:

9    Q    People have issues all the time.  I'm

10   talking about when did the relationship break down?

11        MR. HUDAK:  Objection to form.

12        THE WITNESS:  Until the travel issue, I did

13   not believe that we had such a serious problem.

14        BY MR. SHAPIRO:

15   Q    "Travel issue," meaning that trip?

16   A    Yes.

17   Q    Really?  She had already accused you of

18   retaliation and harassment well before that trip

19   happened; correct?

20   A    Yes.

21        MR. HUDAK:  Objection to form.

22        MR. SHAPIRO:  I have nothing further.

Page 192

1         (Whereupon, at 1:50 p.m., the deposition of

2    ELIZABETH A. DOYLE was concluded.)

3              * * * * *

4         I have read the foregoing pages, which are

5    a correct transcript of the answers given by me to

6    the questions therein recorded.

7    Deponent_____

8    Date  _____