# EXHIBIT 13



**Geoffrey Grubbs**
Sent by: Yvonne Turner

10/16/2002 02:16 PM

To: OST-EVERYONE
cc:
Subject: OST's 14/15 Promotions

As many of you know, OST's Engineering and Analysis D[ ] working for the past year under some very challenging demands. Recognizing the tremendous pressure this organization is under to meet numerous court-ordered deadlines for the development of regulations and the resulting increase in workload, Deputy Assistant Administrator Diane Regas worked with Deputy Administrator Linda Fisher to find ways to enhance EAD's resources and provide recognition to those who are currently handling more senior-level responsibilities. As a result of their efforts, EAD was provided additional contract funding to keep rule-writing projects going until the FY03 budget is available, given approval to backfill, hire, and go over FTE ceiling to bring detailees into EAD to help with the ever increasing workload. Most recently, the Deputy Administrator approved for an EAD-specific increase to their GS14/15 ceiling. This special increase to the GS14\15 ceiling allows EAD to promote up to 4 individuals within the Division to a GS14 level of performance. EAD also has some additional flexibility to detail into the Division senior-level employees currently at the GS14 or 15 levels elsewhere in the Agency to help EAD meet its work demands through the next year.

I am very pleased that the Agency's senior leadership recognized EAD's increasingly challenging demands and has provided me and the EAD managers with the necessary incentives to both attract and retain qualified staff in this critical program area. It is also important to note that this special effort for promotions for EAD did not change the current 14/15 ceiling imposed on OST by OW for promotions in OST's Immediate Office, the Standards and Health Protection Division, and the Health and Ecological Criteria Division. But, here is the good news. OST is finally at a point where there is room in our GS14/15 ceiling to allow for 2, and possibly 3, promotions to the 14 level in the near future. I will be meeting with the OST managers to determine how these additional slots can most fairly be allocated and how best to conduct the selection process. I am also open to your suggestions on this issue.

In the meantime, I want to thank everyone in OST for your continued hard work and delivery of quality products and please join me in congratulating EAD on the recognition of their accomplishments.

Thanks

Geoff
(202) 566-0430

STREET ADDRESS:
1301 Constitution Ave, NW
Room 5231
Washington, DC



Exhibit 16 p. 1-8

# EXHIBIT 14

Page 328

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                   BALTIMORE DISTRICT OFFICE
2                        VOLUME II
NENA NWACHUKU
3           Complainant          EEOC Case No.
        vs.                      100-2004-011025X
4
MICHAEL LEVITT, ADMINISTRATOR
5   ENVIRONMENTAL PROTECTION      Agency Case Nos.
    AGENCY                        2003-0065-HQ
6            Agency               2004-0050-HQ

7   _____/

8          The above-entitled matter came on for

9   Hearing before Laurence Gallagher, Administrative

10  Judge, on Wednesday, October 26, 2005, commencing at

11  8:10 A.M. at the Equal Employment Opportunity

12  Commission, City Crescent Building, 10 South Howard

13  Street, 3rd floor, Baltimore, Maryland, before Chuck

14  Peppler, a Notary Public.

15  APPEARANCES:

16          LAURENCE GALLAGHER, ADMINISTRATIVE JUDGE

17          ROY J. BUCHOLTZ, ESQUIRE
                On behalf of the Complainant
18
            PAUL M. WINICK, ESQUIRE
19              On behalf of the Agency

20

21  REPORTED BY:   Chuck Peppler

Page 429

1  you please describe the practice in the office when
2  somebody has a death in the family or an illness in
3  the family?
4      A    When something happens to somebody bad, to
5  any of us, we rally around them.  We take up a
6  collection and get a card and comfort them and Ed will
7  usually send.  Dr. Ohanian will usually send an e-mail
8  telling all of us that something bad, somebody's
9  mother has died.
10     Q    The first e-mail you're looking at is a
11 two-page document.
12     A    This is just an example.  We stop and talk
13 to them, sign cards and comfort them.
14     Q    Dr. Nwachuku, look at page 2.  That's
15 another e-mail from Edward Ohanian in reference to the
16 illness of Rita Schoeny's mother.
17     A    Right.
18     Q    Is that the type of e-mail you're talking
19 about?
20     A    Yes, when somebody dies.
21     Q    Dr. Nwachuku, did your mother have an

Page 430

1  illness in 2004 and 2005?
2      A    Yeah, and she passed away.
3      Q    Was there an e-mail or message sent by
4  Edward Ohanian to the office about your mother?
5      A    No.  I went to him and I told him.  I went
6  to my supervisor and I told him.
7      Q    Who was that?
8      A    Elizabeth Doyle.  I told her, too.  They
9  never said anything to anybody, to the office.  Nobody
10 knew at the all hands meeting.  Amal told me they
11 didn't see me and that was unusual.  They asked him,
12 where is Nena?  Where is Nena?  We haven't seen her at
13 work.  She went to Africa.  They didn't even say that
14 my mother passed away.  So, when they saw me last week
15 and I looked very bad, they hadn't seen me like that
16 before.  I told them about my mother.
17     Q    Dr. Nwachuku, just calm yourself a little
18 bit.  You testified about the practice in the office
19 that the group would sign cards or talk to each other,
20 comfort each other.  Did you have any of that while
21 your mother was ill?

Page 431

1      A    No.
2      Q    Did you have any of that when the time
3  came and your mother actually passed away?
4      A    No.
5          MR. BUCHOLTZ:  I have no other questions
6  at this time.  I move the admission of number 72.
7          MR. WINICK:  No objection.
8          JUDGE GALLAGHER:  That's admitted.
9  Doctor, we're going to take a short break.  Let's make
10 it five minutes.  Is that okay?
11         (Complainant's Exhibit Number 72 was
12 admitted into evidence.)
13         (There was a brief recess at 10:00 a.m.)
14         JUDGE GALLAGHER:  Good morning,
15 Mr. Grubbs.  My name is Administrative Judge
16 Gallagher.  I think you know what we're here for.  You
17 know everybody here.  I need you to be sworn in.
18 Could you please raise your right hand.
19 Whereupon,
20         GEOFFREY H. GRUBBS,
21 called as a witness, having been first duly sworn

Page 432

1  to tell the truth, the whole truth, and nothing but
2  the truth, was examined and testified as follows:
3          JUDGE GALLAGHER:  Your name for the record
4  is?
5          THE WITNESS:  Geoffrey Grubbs,
6  G-R-U-B-B-S.  The first name is with a G,
7  G-E-O-F-F-R-E-Y.
8          JUDGE GALLAGHER:  Mr. Grubbs, we're
9  dealing with a case that involves race, national
10 origin and retaliation.  Your race for the record is?
11         THE WITNESS:  Caucasian.
12         JUDGE GALLAGHER:  I think color also.
13 Your color is, of course, white.
14         THE WITNESS:  Mm-hmm.
15         JUDGE GALLAGHER:  National origin?
16         THE WITNESS:  Born in this country.
17         JUDGE GALLAGHER:  American.  Have you ever
18 filed an EEO complaint?
19         THE WITNESS:  Never.
20         JUDGE GALLAGHER:  Have you been an EEO
21 witness before in EEO proceeds before?

27 (Pages 429 to 432)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 441

1    happen through the budgeting process, I would make my
2    arguments. But, then the president through the Office
3    of Management and Budget, the administrator's office
4    and a lot of other places that actually construct the
5    budget. The end result of this is that there would be
6    restrictions on hiring. Restrictions on hiring came
7    in the form of full time equivalent positions, which
8    is just how many people you could have calculated at
9    2,080 work hours a year per person and you have to do
10   all the math and all this stuff. How many people
11   could you have? That in term was coupled with how
12   many dollars will we give you to pay for these people.
13   So, I only had X dollars and Y people that I could
14   hire up against at any one time. I was responsible
15   for that. At the end of the year when my own
16   performance evaluation came around with the assistant
17   administrator, it was well, how are you doing on your
18   own budget target was part of it. We had periodic
19   reviews over the course of the year on that. That's
20   just hiring. That was definitely the biggest problem,
21   because there was a substantial push back on EPA.

Page 442

1    It's a regulatory agency. Even the last
2    administration, which liked a lot of regulations, it
3    was difficult. In this administration, it's been very
4    difficult and there has definitely been some shrinkage
5    just from simple budget pressures. Now, that's just
6    how many people can you have.
7         The second part of this is within whatever
8    number of people you have, there is also a ceiling put
9    in place for the Agency and in turn to me on how many
10   people you could have in sum total, GS-14s and 15s
11   combined. This was an administrative ceiling. If I
12   went one over or one down, nothing was going to really
13   happen to me. What are they going to fire me.
14        Running over your budget was a different
15   problem. If you started spending money you didn't
16   have, then that's a real problem. But, for managing a
17   promotion, it was the ceiling for which the
18   administrator took it seriously, but it was not
19   enforceable numbers. But, I had numbers of
20   responsible managers I needed to aim for and as a team
21   player, I did.

Page 443

1    Q    With respect to your tenure in OST, did
2    you develop some sort of promotion program when you
3    were there?
4    A    Right. When I came in in 1999 and started
5    getting briefed about kind of what was the practice
6    and how things were being done, I frankly was bothered
7    by two parts of the historic practice. The first was
8    in the area of hiring, that the division directors and
9    others who would come in to my predecessor and sort of
10   the management team he had in place would seek hires
11   one at a time. So and so had just left and I need a
12   replacement. There would be sort of a one at a time
13   replacement for that. It was not in place kind of a
14   way that targets could be set at the beginning of the
15   year and people were held responsible for those
16   targets. It wasn't anything like that with budgeting,
17   just the number of people you could have. Likewise,
18   with the number of how things were managed to the 14
19   and 15 level against the administrative ceiling of 14s
20   and 15s, I did find that there was a draft put in
21   place with some criteria that could be talked about,

Page

1    but I was not aware of and was never told of a process
2    that could be used by which people could first make
3    rational decisions and second the staff in the office
4    could understand how things were made there was just a
5    lot of sort of concern because these decisions seemed
6    to made in a vacuum and nobody knew what they were.
7         So, with that in mind, shortly after I
8    came like in January of 2000, I decided to adopt sort
9    of a process that was fundamentally corporate in
10   nature. That's how I really thought of it. I needed
11   my division directors to manage as division directors.
12   I needed them to make the personnel choices and the
13   strategic choices they had to make to run the
14   division. What I wanted was the corporate
15   understanding of how these decisions were to be made.
16   Second, I cared that the sum total of the 14s and 15s
17   that were managed, not division by division, but at
18   the OST level. In other words, we'd look at all of us
19   together on this to make sure when there was a vacancy
20   in one place, let's just say it's a low priority area,
21   they have a merging area where we really need to get

30 (Pages 441 to 444)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 445

1  some new senior people in.  That I would have the
2  freedom and the group would have the freedom to sit
3  and take a look at how that transfer might be
4  effected.
5        So, I put out a e-mail in January of 2000
6  basically saying I intended to use a corporate
7  approach in making promotion decisions that all of the
8  senior executives in OST, myself, my deputy and the
9  three division directors would meet as a group to
10  consider all the needs of the office.  First, we would
11  look at the need for supervisors.  For example, if you
12  got a vacant branch chief or a vacant GS-15 level
13  supervisor, that was a big problem and I wanted to
14  make sure those things were looked at first, that they
15  were just taken care of.  Second, that any individuals
16  who were deserving of promotion be looked at as
17  well in order to get some idea about what it is we
18  might use as a benchmark on that or sort of a guide on
19  how to make decisions.  I drew upon the draft guide
20  that I had found when I came to OST coupled with some
21  other stuff I was able to dig up and drafted pretty

Page 446

1  much myself, the seven or so kind of touchstones we
2  would use to look at and sort describe broadly
3  GS-14 kinds of behavior and characteristics that we
4  would be looking for.  That was coupled with about, I
5  don't know, 15 or 20 or so sort of questions that
6  could be asked by supervisors in order to say what
7  this is.  I was looking for just a way to sort of
8  normalize the way in which everyone looks at GS-14s.
9  No one was super special.  We had a whole lot of
10  people who would be eligible for a 14 promotion.  I
11  was looking for some way to sort of describe the kinds
12  of characteristics we had and to try and normalize the
13  way in which all the supervisors approached this.
14        So, I did that in 2000 for the first time.
15  Then about a year later, and we've made some decisions
16  at that time, frankly I can't remember all the details
17  of the decision, but we used that to make the first
18  set of decisions.  Then about a year later, there had
19  been some more vacancies created.  We were able to do
20  some more hires, but once again, I put out another
21  note to everybody in the Office of Science and

Page 447

1  Technology in 2001 of largely reaffirming the approach
2  I was using and informed people of what it was
3  we were doing.  I don't think I made any editorial
4  changes to the characteristics we were looking for as
5  a guide, but I might be forgetting something.
6        Then again, two years later in 2003 when
7  we did the process, which is sort of being challenged
8  here today, I had put out in January of that year sort
9  of the third round of this.  I did make a couple of
10  changes to it at the time.  It had been brought to my
11  attention that one of the terms that was in the text
12  that I put out earlier in 2000, namely the use of word
13  junior in context of junior staff was offensive to
14  some.  It was not something I intended or had in mind.
15  But, when I was made aware of that, that was a term
16  that was just dropped out.  The other thing I did in
17  2003 was to kind of beef up the part about asking each
18  of the supervisors to review each of the individuals
19  who worked for them keeping in mind the guides that we
20  were using as sort of the characteristics of the 14
21  behavior we were sort of looking for.  But,

Page 448

1  specifically asking each of the supervisors in OST to
2  make sure they really talked about each individual and
3  to review that in their fashion before we sat down
4  together.
5        Q    It sounds like you just described three
6  different promotion panels essentially that you
7  convened.  Were the participants in those panels all
8  the same?
9        A    Well, they were by position, but not by
10  individual.  They were always the senior management
11  team of OST.  This is a team that makes budgeting
12  decisions when we have strategic decisions to make or
13  had.  I'm speaking in the past tense here, when we had
14  specific strategic decisions to make are real
15  challenges.
16        For example, a change in administration
17  where we had to kind of get together to decide how
18  we're going to brief the new political people coming
19  in, how we're going to really position themselves.
20  The senior management team consisting of the six
21  members of the Senior Executive Service, who I used

31 (Pages 445 to 448)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 449

1  all the time in a lot of context. So, the thing that
2  was constant through all of these promotion panels
3  were the same positions. Now, the individuals did
4  evolve over time through both attrition and through a
5  rotation of the senior managers, not all, but a
6  substantial portion of the senior managers by 2002
7  when the Bush administration came in. So, there were
8  changes going on all the time. From one panel to the
9  next, there would often be one or two people who would
10  be there before, but I was the only person who was
11  there all the way through.
12      Q    With respect to how the decisions were
13  made as to who would be promoted, let's say, did you
14  require unanimity? Was it a majority rule?
15      A    It was absolutely unanimous, but it never
16  got to voting as a thing. The way we approached, and
17  this is in common with all the meetings we had. But,
18  first, we sat down and we made sure we knew what all
19  the supervisor and managerial needs were. There was
20  always some reorganization going on some place. There
21  was always somebody that had just vacated the position

Page 450

1  and had taken another job or something and there was
2  always some crisis we were dealing with. We needed to
3  make sure we knew what the supervisor positions were.
4  We would go through that first and make sure we really
5  had that all stacked up. Part of that equation and
6  just --
7      JUDGE GALLAGHER: By consensus sort of?
8      THE WITNESS: Yes. The end result, it was
9  consensus. But, I want to make a point that some of
10  these supervisory jobs have to be GS-15s. So, we had
11  to make sure that in order to hire a supervisor, we
12  had a 15, because it's a 15 that it would count
13  against a 14, 15 ceiling. That was why we wanted to
14  make sure of that in this context.
15      But, at the end, we would look at that and
16  we would say is everybody comfortable with this?
17  Well, actually I'm not sure about this because of da,
18  da, da and we'd stop and really talk about all that.
19  Likewise, when we got all done with that, then there
20  would be a process of looking at the individuals, the
21  people who they would like to put forward as really

Page 451

1  being ready and that they would like to support for
2  promotion to 14 level. They would always be
3  prioritized ahead directly, but they just would come
4  in this way. The strongest one is so and so and I
5  think he's really ready and da, da, da. But, it would
6  be sort of one, two, three priority always. But, then
7  we would go through those individuals and talk about
8  where they were. The person would present them.
9  Sometimes people would know them. Sometimes people
10  wouldn't. By the end of the discussion, there would
11  be a real feeling of first, yes, this is the right
12  thing to do and we're really there with respect to all
13  the characteristics. At the end of the day, it would
14  be a unanimous process. It never came to voting of
15  three to one or anything like that.
16      Q    With respect to the promotion process that
17  Dr. Nwachuku has challenged here, would you briefly
18  describe what occurred in that promotion process?
19      A    Well, it went along pretty similarly.
20  Now, I'm sure we'll get to this in either your
21  questions or Mr. Bucholtz's questions. Some of the

Page 452

1  people were new in their position or had been there
2  temporarily. One person in particular, Mary Smith,
3  who was the director of Engineering Analysis Division
4  had just been there about three or four weeks. So, we
5  all talked as a group beforehand, that this wasn't
6  going to work. It couldn't. At the same time, it was
7  against my interest, against the office's interest and
8  everybody else's interest to put this off for six
9  months until these positions were picked.
10      JUDGE GALLAGHER: The new people were
11  thrown out.
12      THE WITNESS: Right. This is the one
13  exception. This was only one time that we had a brand
14  new person that really did not have her bearings. In
15  that case, she brought with her her deputy, a woman
16  named Debbie Nicoll, N-I-C-O-L-L, who had been in the
17  office forever, had terrific sound judgment. She was
18  a very welcomed member of the group. So, at this
19  meeting, we did have one extra member at this meeting
20  and that was Debbie. Now, Debbie acted not as a
21  principal, but was just making sure all the

32 (Pages 449 to 452)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 453

1  information was put forward.
2        At that meeting, we followed the pattern
3  as I described before. This is all to the best of my
4  recollection. I'm doing this without notes in front
5  of me. We went through each of the supervisory
6  positions. There was at that time a reorganization,
7  which was either final or done, close to final for the
8  Health and Ecological Criteria Division, which
9  involved putting in place a new deputy, division
10  director and putting in place a third branch chief.
11  Historically, it had no deputy and it historically had
12  two branch chiefs. So, there were two new supervisors
13  in play that required GS-15 positions that needed to
14  be on the table and they were put on the table. Chris
15  Zarba was the acting director at that time. Likewise,
16  there was a need in the Engineering Analysis Division
17  for one of her branch chiefs as I recall, and in the
18  Standards Group, there was a need for, I think three
19  different supervisors, two GS-14s and one GS-15,
20  including your vacant branch chief of the 15 level and
21  then two subordinate GS-14 supervisors. So, there was

Page 454

1  seven supervisor positions put on the table. There
2  was no question around the table of those that really
3  needed to be done. I think out of them all, to
4  editorialize, the Health and Ecological Criteria
5  Division was probably the highest priority. Getting a
6  new supervisor in there to spread out the supervisor
7  responsibilities, getting a deputy in there to help
8  run the division, so Ed can start working on some
9  policy stuff that needed to be done or Chris or the
10  director at that time was a real important thing to
11  do.
12        Now, when that was all done, you know, we
13  had nine positions that we had determined we could
14  fill. Doing the math, it wasn't that hard. We came
15  up two additional ones that we could then begin to
16  look at individuals about. At that point, again, we
17  went around. My best recollection is that Peter
18  Grevatt, G-R-E-V-A-T-T, first name Peter, he is the
19  acting director of the Standards Division. My best
20  recollection is he put two individuals forward for the
21  group to consider. The first was an American Indian,

Page 455

1  a woman of American Indian heritage, and the second
2  was a woman of Asia descent. Chris Zarba did not put
3  forward anybody for HECD after concluding his process,
4  although he did indicate that one person, I think a
5  South Asian, a person of South Asian descent, I'm not
6  actually certain, was in his words sort of on deck,
7  who was really nearing the point where somebody could
8  be put forward, but he was not putting forward that
9  person that day. There were two people put forward by
10  Mary Smith, who was the brand new director for the
11  Engineering and Analysis Division. I can't think of
12  the name, the person who actually got the promotion.
13     Q    Carey Johnston.
14     A    Carey Johnston. I'm sorry. I kept
15  wanting to say Chris. Carey Johnston, who was an
16  engineer, was Caucasian, and the second was a guy
17  named Khouame Dithvong, which I can't even begin to
18  spell. I know it's, D-I-T-T-A-Z-O-N-G, or something
19  like that. His first name is Khouame, and he was also
20  Asian. So, we had that set of people to talk about.
21  At that point, there was no sort of who else do we

Page 456

1  need. I take that back. We did ask is there anybody
2  that needs to put forward. Everybody said no, this is
3  it. So, that was our pool to talk about. As we sort
4  of went through all this with two people, it was
5  pretty clear that of those -- oh, I left out Vera.
6        JUDGE GALLAGHER: Vera Williams-Bower?
7        THE WITNESS: Right. Excuse me. It was
8  my mistake. Vera Williams. She goes by Vera Williams
9  mostly, although her formal name is Vera
10  Williams-Bower.
11        JUDGE GALLAGHER: She was put forth as
12  somebody in computers.
13        THE WITNESS: She was put forth by Pam
14  Barr. Pam Barr did so basically because the front
15  office staff had no supervisory representation on that
16  group. Pam Barr really took care of making sure --
17        JUDGE GALLAGHER: No supervisory
18  representation in that section.
19        THE WITNESS: In the panel, right, that's
20  right. Again, Ellen reported directly to me. Pam
21  Barr handled all of the day-to-day supervision of

33 (Pages 453 to 456)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 457

1  Ellen and her staff. So, it had a lot of purposes,
2  including this since I was sort of chairing the
3  meeting and trying to be impartial. Pam was the
4  person who actually made sure the needs of the front
5  office were represented and that's normal. She would
6  normally do that. Pam put forward Vera Williams,
7  African American, who is in IT, information technology
8  specialist is my memory. She might have a different
9  title.
10      So, we went through all those individuals,
11  talked all the way through and kind of just both with
12  our reflections of the managers and of the group
13  really looked at sort of the broad comfort level and
14  sense of where their strength was. At the end of the
15  day, we were unanimous that the two that should be put
16  forth were Vera and Carey.
17      JUDGE GALLAGHER: So, you put forth two of
18  these approximately seven.
19      THE WITNESS: Seven or so.
20      JUDGE GALLAGHER: Two of the seven were
21  promoted.

Page 458

1      THE WITNESS: That's right at that time.
2  I mean, that's not prejudicing that time around. I'm
3  just saying out of the competition. I might also
4  mention, if I didn't say it before, and this is
5  typical, we had about 55 people at the GS-13 level who
6  were technically eligible to be a 14. So, the initial
7  screening of those 55 people to sort of get it down to
8  the point where we could have an intelligent
9  conversation around some common contact first came at
10  the division level.
11      MR. BUCHOLTZ: I got five. Grevatt, two,
12  two by Smith and one by Barr.
13      JUDGE GALLAGHER: Two by Grevatt, two by
14  Smith.
15      MR. BUCHOLTZ: One by Barr, so it's five.
16      THE WITNESS: Is that right?
17      JUDGE GALLAGHER: You're right.
18      THE WITNESS: We had two by Mary. That's
19  right.
20      JUDGE GALLAGHER: You did say seven.
21      THE WITNESS: That's five. I'm sorry.

Page 459

1      MR. BUCHOLTZ: No, there were seven
2  supervisory positions that had to be filled first.
3      JUDGE GALLAGHER: Got you.
4      THE WITNESS: That's a good clarification.
5  Thank you. I think that's right.
6      JUDGE GALLAGHER: You're awake.
7   A   Does that give you everything you need?
8   Q   Yes, that's great. You mentioned that
9  Chris Zarba was acting at that time. Could you
10  explain for us how he came to be the acting division
11  director?
12   A   Right. The office had been through a fair
13  amount of transition. We had the previous director of
14  the Health and Ecological Criteria Division. This is
15  the one that Dr. Nwachuku is in, Jeanette Wiltse,
16  W-I-L-T-S-E. Now, she had retired, I think in 2002,
17  if my memory is right. It's in the record. In
18  addition, the other two division directors had been
19  rotated out as part of a management shuffle that
20  happened in 2002. In order to deal with that
21  change -- plus my deputy had been rotated out.

Page

1      JUDGE GALLAGHER: The name of the deputy?
2      THE WITNESS: The previous one or the
3  current one?
4      JUDGE GALLAGHER: The one that rotated out
5  or left.
6      THE WITNESS: His name was Jim Hanlon,
7  H-A-N-L-O-N. He was actually promoted to be one of my
8  peers in another office. So, my deputy, Jim Hanlon,
9  was rotated out, two division directors were rotated
10  out and a division director retired leaving me sort of
11  high and dry with all the court orders and stuff. It
12  was not all at the same time. It was just in a course
13  of about a year to a year and a half. There is some
14  overlapping time. In the course of all of this, there
15  was absolutely some change going on. There's no
16  question. The process was the usual bureaucratic one
17  where first I would bring in -- well, first I would
18  advertise, kind of both formally and just spreading
19  the word of what I was looking for people to come in
20  and serve in an acting capacity each of these jobs
21  while the formal process of advertisement, recruitment

34 (Pages 457 to 460)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 465

1  Management. Then I could bring anybody I needed in to
2  help serve in a temporary capacity and acting. I
3  advertised for both. The real prize is getting
4  permanent position job and in the end that finally
5  went to Dr. Ohanian.
6      Q    With respect to the selection of Vera
7  Williams-Bower for one of those two promotions, could
8  you briefly discuss how well she's known among the
9  senior managers that were on the panel discussing the
10  promotion?
11      A    Right. Vera is a person who serves in a
12  job which by it's nature gives a lot of exposure to
13  people. She manages the information systems in the
14  office, which isn't just sort of attending to the
15  computers and that kind of stuff. It also deals with
16  the information security. In the Engineering and
17  Analysis Division, particularly this is the
18  engineering group, we were responsible for
19  confidential business information, which enjoys
20  special protection under the law. It has to be
21  really, really walled off. There are substantial

Page 466

1  penalties for any sort of inadvertent disclosure for
2  it. Information security in my office was a
3  particular concern at that time. This was really the
4  height of the hacking the Microsoft, you know, all the
5  worms and viruses were really at the height in terms
6  of compromising the systems and then in terms of
7  hackers. There were lots of vulnerabilities that
8  people were breaking into in various agencies. So,
9  information security was a really big deal. Vera
10  spent a lot of time on information security, in
11  addition to just sort of managing the systems
12  themselves. In that vein, she got to know just about
13  everybody, because there was a lot of that kind of
14  work that went on inside the Agency and elsewhere
15  where she needed to be able to represent Mary Smith,
16  who heads the engineering group, who had the
17  confidential business information and so forth. Vera
18  was well-known to each of the division directors and
19  the deputies and Pam and myself in the discussions we
20  had.
21          JUDGE GALLAGHER: Pam?

Page 467

1          THE WITNESS: Pam Barr. I guess it would
2  be better for the record to use full names.
3      Q    Let me ask you quickly about your
4  understanding of how the accretion of duties promotion
5  process works. Can you describe your understanding of
6  that?
7      A    Right. My understanding of the process is
8  a layperson's understanding, so let's just put this
9  out here. If there is an expert or there's someone
10  that's going to come through and say that's not
11  exactly right, I give up. They're going to be right.
12  But, my layperson's understanding of this, in the way
13  it's historically been used, is that the responsible
14  manager, again it was never me; it was a manager who
15  worked for me, would go through the process with their
16  counterparts with the Office of Personnel inside EPA
17  to look at the specific responsibilities for the job
18  the person was serving in. For a GS-13, it is common,
19  actually, that people are asked to do a lot in their
20  job beyond which they're initially asked to do. Jobs
21  change, demand changes. There is a lot that people

Page 468

1  are asked to do. In some cases, accretion of duty,
2  it's my understanding can be justified if the person
3  serving as his or her capacity is operating at the
4  GS-14 level with responsibilities that justify a GS-14
5  grade, and then that would go through the personnel
6  process and you'd end up with a promotion for that
7  person sitting in his or her position where the duties
8  have accreted in that position. I've never actually
9  done the process, so that may be a little off.
10      Q    So, the job that the person, who has been
11  promoted to an accretion of duties process, is doing
12  the day after they get this promotion, how is that
13  different from the job they were doing the day before
14  they got the promotion?
15      A    I don't think it is. My picture is what
16  happened, the job itself has accreted and the
17  responsibilities have accreted to the point where
18  what's been asked of this person and demanded of this
19  person is at that higher level. They're clearly
20  performing at that level. So, the position itself is
21  classified, not the person is my understanding. So,

36 (Pages 465 to 468)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

# EXHIBIT 15

## Declaration of Christopher Zarba

I, Christopher Zarba, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.      I served as the Acting Director of the Health and Ecological Criteria Division (HECD) in the Office of Science and Technology (OSW) from November of 2002 - May of 2003. My immediate supervisor during that time, and the individual that invited me to serve in such capacity was Geoffrey Grubbs, the OST Division Director.

2.      At the time Mr. Grubbs appointed me the Acting Division Director, I was serving as Chief of Staff for the Office of Research and Development (ORD). Prior to assuming my ORD position, I had served in OST, and in particular in HECD, in staff and supervisory capacities for a number of years. Dr. Nena Nwachuku was hired after my initial departure from HECD and as a result I met her for the first time when I returned to HECD as Acting Director.

3.      In March 2003, toward the end of my tenure as the Acting HECD Director, Mr. Grubbs convened a promotion panel composed of himself, his Deputy, Pamela Barr, and the three Division Directors, myself, Peter Grevatt, Director, Standards and Health Protection Division (SHPD), and Mary Smith, Director, Engineering and Analysis Division (EAD).

4.      The purpose of the panel was to identify GS-14/15 supervisory/management positions in OST that needed to be filled, as well as to, if our personnel authorizations would permit it, select employees to promote to the GS-14 level on an accretion of duties basis.

5.      There were nine (9) GS-14/15 promotions available for allocation throughout OST, and the panel identified seven (7) that we felt should be reserved for supervisory/management positions. Of these seven reserved promotions, three (3) went to my Division based on my advocacy (and the panel's concurrence) that HECD had vacant supervisory/management positions that, for operational reasons, needed to be filled.

6.      All seven of the supervisory/management promotions were made through competitive processes overseen by the Division Director whose office had secured such promotions. Insofar as my HECD Acting Directorship expired in late March 2003, my successor, Edward Ohanian, was responsible for filling the three supervisory GS-14/15 positions awarded to HECD.

7.      The panel had but two (2) accretion of duties promotions available, and each panel participant agreed that Vera Williams-Bower was the most deserving candidate. Ms. Williams-Bower is an informational technology professional, and her job responsibilities impact significantly on every division of OST. Consequently, every panelist was quite familiar with Ms. Williams-Bower's contributions and excellence.

8.      The second individual chosen by the panel for an accretion of duties promotion was Carey Johnston, an environmental engineer from EAD. The panel agreed unanimously that





Mr. Johnston was an appropriate choice.

9.    I did not advocate for anyone in HECD for an accretion of duties promotion, insofar as I did not think that anyone on my staff at that time was a viable promotion candidate. Dr. Nwachuku was clearly not such a candidate in my mind, primarily in light of her difficulty working acceptably with others. It is crucial for an OST GS-14 to work collaboratively across a broad spectrum of disciplines, to foster good will with colleagues/professionals inside and outside of her office and EPA, and to be diplomatic and tactful in her professional dealings. My personal observation of Dr. Nwachuku and feedback that I received from those with whom she worked persuaded me that she did not possess these requisite attributes. In my opinion, not advocating for Dr. Nwachuku's promotion was the right, and a simple, decision. No other panelist suggested that Dr. Nwachuku was an appropriate promotion candidate.

10.    My failure to consider Dr. Nwachuku a viable GS-14 promotee was unrelated in any way to her race, color, or national origin. There existed compelling non-discriminatory reasons for regarding Ms. Williams-Bower and Mr. Johnston as far more deserving promotion candidates than Dr. Nwachuku. And, in fact, of the probably fifty (50) or so GS-13s eligible for promotion consideration, I am confident that the panel would have regarded any number as better qualified than Dr. Nwachuku, based on her notorious history of problematic interpersonal relations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on February , 2005.

_____  2/17/05

Christopher S. Zarba
Title:  Acting Deputy Director, National Center for
        Environmental Research

Office: Research and Development

2

# EXHIBIT 16



**Geoffrey Grubbs**
Sent by: Yvonne Turner

01/24/2003 04:07 PM

To: OST-EVERYONE
cc: Maryt Smith, Sue Gilbertson/DC/USEPA/US@EPA
Subject: Promotions to GS-14 and GS-15 levels in OST

**NOTE TO:**   All OST Employees
**SUBJECT:**   Promotions to GS-14 and GS-15 levels in OST
**DATE:**   January 24, 2003

OST, like other EPA program offices, has been given an administrative ceiling for the total number of people we can support at the GS-14 and GS-15 grade levels combined. Our current combined ceiling is 66. This ceiling includes a recent increase given to OST but directed specifically to EAD, as I explained in an e-mail to you on October 16, 2002.

I am pleased to announce that OST is now able to fill nine positions at the GS-14 and GS-15 levels. Many of these positions will be used to backfill current vacancies and there will also be some accretion of duty promotions, as well. Many positions will be filled through a competitive process as explained below. All actions must be consistent with the federal laws, rules, and regulations governing promotions.

As I have explained on several occasions, I manage the GS-14/15 ceiling at the OST-wide level to maximize management flexibility and career growth opportunities throughout the Office. OST managers and selected staff discussed OST's processes for managing the GS-14/15 ceiling at our recent management retreat, and largely affirmed our historic approaches. However, we agreed to modify the OST's guidelines for performance evaluation discussion to more clearly include people in administrative assignments and eliminated references in the guidelines to "senior" and "junior," which are unnecessarily judgmental.

Based on these changes, OST will use the following process for promotions to the GS-14/15 levels.

Each Division Director and the Director of the Resources Management and Information Staff in the Immediate Office will review (a) each vacant position suitable for competitive advertisement, for example, a vacant supervisory position; (b) each GS-13 employee eligible for promotion to GS-14 via accretion of duties; and (c) each GS-14 employee eligible for promotion to GS-15 via accretion of duties, to identify his or her top priority nominations. To help assure that no eligible employee's qualifications are overlooked during this process, I am directing all OST supervisors to review every eligible GS-13 and GS-14 employee under their supervision for their potential for promotion through accretion. As has been our practice in the past, the attached guidelines for performance evaluation discussion will be used by each Director as a guide in making priority decisions for promotions through accretion.

I will then meet with the Deputy Office Director and three Division Directors to discuss potential promotions to the GS-14 and GS-15 levels. The discussion will include vacant positions at the 14/15 levels that could be competed through merit promotion announcements as



Exhibit___16___p. _2_

well as promotions for individuals that could be accomplished through accretion of duties. The limited number of possible promotions are not allocated to one OST work unit or another, but rather are discussed based on relative merit, need, and priority. The guidelines for performance evaluation discussion are considered as a guide.

I am pleased that OST is able to offer additional promotion opportunities. I will continue to use these limited opportunities to advance EPA's and OST's goals of meeting our critical mission needs and for providing individual career growth and advancement. I welcome your thoughts and suggestions on any part of this process.

Thanks.

Attachment: OST Guidelines for Performance Evaluation Discussion

Geoff
(202) 566-0430

## ATTACHMENT
## GUIDELINES FOR PERFORMANCE EVALUATION DISCUSSION

### PART I

**Subject Matter Expertise** -- demonstrated and widely-recognized expertise in one or more disciplines such as statistics, economics, chemistry, toxicology, biology, engineering, management analysis, resources management, information technology, or communications. Could include expertise such as demonstrated mastery of a program area, establishing regulations or making criteria.

**Understanding and Proficiency in Creating National Policy** -- policy and science policy sense, knowledge of not only Agency, but executive and legislative policy directions. Demonstrated ability to apply and anticipate policies, and accomplish work that creates sound policy for the long term. This includes the ability to assess implications of policy shifts, identify and involve key partners, and to make recommendations to meet policy needs.

**Recognition and Interactions** -- this includes interacting with high-level decision makers at EPA, OMB, other Federal agencies, States, and Tribes as a recognized member of the decision making team, representation of work at these levels, nationally and internationally, being called upon (not just assigned by supervisor) by people outside the Division or Office to participate in Agency-wide or cross-program task groups, or in professional society activities. Interactions include leading groups, chairing meetings, interaction with peers, staff and managers -- effective and diplomatic, creating good will and good working relationships with numerous people in other programs, other agencies, and the scientific community.

Exhibit __16__ p. __3__

**Ability to Clearly and Persuasively Articulate and Represent Work and Policy to a Variety of Differing Audiences** -- this is high-quality briefing, quick thinking on one's feet, effectively presenting to large groups and decision makers, dealing with stakeholders of differing levels of sophistication, outside and inside experts, Science Advisory Board, Human Resources Council, etc. Also includes consistently clear written expression embodied in work products, memos, issue papers, letters, etc.

**Strategic Vision and Operational Planning** -- this is demonstrated ability to set long term goals and directions and plan the work to get there. Includes engaging appropriate participants, stakeholders, customers, necessary resources, timing, identifying issues and the level of decision making needed to resolve them, and efficiently getting needed decisions.

**Initiative and Independence** -- ability to reach for and accomplish new work, employing the competencies listed above to carry out the work with only general policy and operational guidance from supervisors. Ability to judge what level of information is appropriate to keep managers, co-workers, and key players informed. Takes advantage of professional development opportunities and continually builds competency related to area of responsibility.

**Leadership** -- demonstrated ability to lead and mentor others in programmatic issues and approaches necessary to carry out the mission of the Office, including the ability to develop and guide staff without direct supervisory authority or responsibility.

## PART II

1.  What is the specific program area of expertise required by this position? What are the employee's main contributions in this area? Have these had a significant impact on the program?

2.  How has the employee helped advance the creation and establishment of environmental policy for the Nation?

3.  To what extent has the employee represented program work nationally and internationally? To what extent has the employee presented the work to high-level Agency decision makers?

4.  To what extent has the employee been called upon by people outside the program to participate in Agency-wide task forces or cross-program task groups? Has the employee been invited to present to professional associations, participate in workshops, working groups with other agencies? What groups or programs rely on the employee for expert advice?

5.  Is the employee effective and diplomatic in dealing with people in the program and elsewhere?

6.  How has the employee shown ability to strategically plan for the future, establish work

Exhibit____16__ p. __4__

goals, and manage tasks to accomplish the goals? How has the employee shown ability to identify and effectively communicate with stakeholders and others important to program success?

7.    What issue papers, technical documents, presentations or other writings has the employee done that show ability to be clear and effective in written expression? What meetings, presentations, speeches, expert testimony or similar actions show the employee's ability to be clear and effective in oral communication?

8.    Is the employee a self-starter, showing initiative and independence in new areas of accomplishment? In what work has the employee shown this?

9.    What staff has this employee helped to lead or guide in accomplishing program assignments? What tangible results resulted? Do people led or mentored by the employee show a significant improvement in understanding and competency? How has this been demonstrated?

Exhibit__*16*__p. *5*__

# EXHIBIT 17



**Christopher Zarba**
02/06/2003 04:56 PM

To: OST-HECD
cc: Geoffrey Grubbs/DC/USEPA/US@EPA, Pamela
    Barr/DC/USEPA/US@EPA
Subject: Zmail - HECD News

I know it has only been a few days since the last HECD News report but this is a big news week and I thought a Early Edition was warranted.   Here are the latest development.

1) The **HECD reorganization** team met with Geoff and Pam to discuss the two most recent reorganization proposals, functional statements, staffing and staff comments (you all should have received copies last week).  The meeting was very positive and we are one giant step closer to finishing this phase of the reorganization.  The one issue we were stuck on was what to call the 3rd branch.  This was the branch identified as Environmental Indicators and Emerging Programs in the proposals.  We asked Geoff and Pam for a few more days to come up with options/recommendations for them to consider.  To help identify options and to help educate ourselves of the pros/cons of the different options we will have a all inclusive HECD brown bag meeting next week to discuss options.  The Spot team is setting up the meeting and will let you know the time and location shortly.   To help stimulate your creativeness we have started a "Name that Branch" contest.  Prizes will be given to the person that first identifies the winning name as well as the worst name.   Charles Abernathy is in the lead for the worst name with " B (1) (c)" but I am sure someone can top that.  Tony suggested "Fred".  Please submit your suggestions on the white writing board out side my office before the brown bag meeting.

2) In two weeks we have a **biweekly with Geoff and Pam**.  We are going to use this opportunity to update management on a whole list of HECD items (e.g. filling vacant position, status of criteria documents and strategies, $$ commitments, new commitments to OGWDW).  We can have the meeting in a large location so all who need to or are interested in attending can.  Kathy Crawford is assembling a list of items and a brief description of issues and status.  If you have items you would like to include on this list please provide that information to Kathy by the end of next week.   Tony and Bob will elaborate on this at your next staff meeting.  We can use this meeting to get feed back on what we want to feature in future biweekly meetings.

3) **OPM Training** - It has been some time since we visited the HECD prioritized list of OPM training candidates.  Ed Ohanian will lead an effort to update the process and the list.  If you were involved in earlier efforts in this area please let Ed know.  Your previous experience will help ensure consistence and continuity.

4) **Promotions (13 to 14 & 14 to 15)** - As a result of the January 24th, 2003 note from Geoff on this topic we have assembled a list of eligible HECD candidates.  Alice will be sending individual emails to each person on the list identifying their level and status.   If you are eligible and do not get an email from Alice by COB on Monday please let me know so we can be sure you are included on the list.   Candidates should begin to prepare their paperwork (2-4 pages)  consistent with the guidelines identified in Geoff's memorandum (copy attached).  Alice will keep and maintain these files for future use.

5) Tony, Ed and I will meet with the HECD awards team next week to work through unresolved issues.

That is it for now.   Stop by if you have questions.

**:-)**

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++

# EXHIBIT 18

**Alice Moss**

02/06/2003 05:07 PM

To: Nena Nwachuku/DC/USEPA/US@EPA
cc:
Subject: Promotions

Per Geoff's earlier memo on promotions, we are identifying the list of HECD candidates for potential promotion (GS-13 to GS-14 and GS-14 to GS-15).

You have been identified as eligible for GS-13 to GS-14.

Please let me know if this is incorrect.



Exhibit____ /6 __p. 7____

# EXHIBIT
# 19



## DECLARATION OF GEOFFREY H. GRUBBS

I, Geoffrey H. Grubbs, make the following statement, with knowledge that any material false representation on my part would subject me to a charge of perjury.

I serve as the Director of the Office of Science and Technology (OST) in the Office of Water at EPA and have served in this capacity since September 1999.

Among my many responsibilities is managing the overall total number of GS-14s and GS-15s in OST to stay within an administrative ceiling established by the Office of Water. Only periodically does OST have the authority to make promotions to the GS-14 and GS-15 levels, since the number of personnel occupying such positions is tightly controlled as an administrative matter and since departures at these grade levels are relatively infrequent.

I found shortly after my arrival in OST that we had the opportunity to promote a small number of individuals to the GS-14 and GS-15 levels, but that there was no established or clearly communicated approach in OST about how decisions would be made regarding promotions at those levels. Accordingly, on January 10, 2000, I sent an email to all OST employees announcing my approach. I explained that "the fairest and most efficient way to manage the overall GS-14/15 pool in OST is at the OST-wide level, in order to maximize the promotion and career growth opportunities." Further, I explained that decisions would be made collaboratively by OST's SES-level Senior Management Team, consisting of myself, my Deputy, and the three Division Directors within OST. I included the general competencies that I considered vital to the determination of who the best qualified candidates might be.

I decided upon this collegial approach because OST is a relatively small office and because there had been a long tradition of significant interplay among staff and managers within

   Page 1 of 7 

FEB 1 1 2005

and among the three Divisions and Immediate Office of OST. I was confident that, as a rule, each Division Director, as well as myself and my Deputy, would be familiar with the work of professionals throughout the office. Since September 1999, all three Division Directors and the Deputy Office Director have changed in OST (and at some points in time there were individuals serving in acting capacities). Thus, when the senior managers in OST would be convened to discuss possible promotions to the GS-14 and 15 levels, the composition of the group changed periodically, with me as the sole constant. Nonetheless, I have found that without exception, OST's Senior Management Team had excellent knowledge of individuals inside and outside of their organizational units, worked well together collegially, and were always able to reach consensus.

On January 24, 2003, I sent another email to all OST to announce that again, OST could fill a small number of positions at the GS-14/15 level. I affirmed the collegial approach I had adopted in 2000 because I felt it was working well, and affirmed the criteria for promotion with some minor editorial changes. To make sure that no eligible employee's qualifications were overlooked, I added a direction to supervisors to individually review the qualifications of every eligible GS-13 under their supervision for their potential for promotions through accretion of duties.

This is the process that was in place for making decisions on promotions to the GS-14 and GS-15 levels at the time that Nena Nwachuku has claimed she was discriminated against. The OST Senior Management Team met on March 21, 2003, to decide on nine available promotion opportunities at the GS-14/15 levels. Consistent with the approach outlined in my January 24, 2003 email, we identified seven slots that we would reserve for identified needs at management/supervisory levels. We also identified two individuals, from among about fifty-five eligible GS-13s in OST, for advancement to the GS-14 level via the accretions of duties process, subject to proper personnel procedures. One of these individuals, Carey Johnston, is a white male. The other, Vera Williams-Bower, is an African American female. As always, the decisions were by consensus.

Page 2 of 7 

Among the Senior Managers in attendance at the March 23 meeting was Christopher Zarba, Acting Director of the Health and Ecological Criteria Division. At that time, Chris Zarba was serving an approximately seven-month tour as Acting Director. He succeeded Edward Ohanian as Acting Director, who in turn succeeded Jeannette Wiltse, who retired as the permanent HECD Director in early 2002. Following Chris Zarba's tour, I selected Edward Ohanian as the permanent Director of the Division.

Christopher Zarba was permanently employed in EPA's Office of Research and Development (ORD) when he temporarily came to OST as the Acting Director of HECD. Prior to his service in ORD, Chris had spent a number of years in HECD, serving in staff and supervisory capacities. I selected him as Acting Director of the Division following a general advertisement and interviews of eligible candidates. I was familiar with him and his history, confident that he could serve effectively as the Acting Director of HECD, and certain that he would do an outstanding job. Chris served ably and effectively, and I was never disappointed in his judgment or performance.

In all the GS-14/15 advancement processes that I have chaired as the OST Director, including the one in March 2003 that Nena Nwachuku has challenged, the protocol has been largely the same. Each Division Director or Acting Division Director, and my Deputy, in her capacity as representative for the Immediate Office, would identify for his or her organizational unit any supervisory positions that needed to be filled. If there was sufficient promotion authority to accommodate everyone's needs and there was a consensus that the positions identified did, in fact, warrant the assignment of a GS-14 or GS-15 grade level, then each affected Division Director would be charged with instituting the appropriate open and competitive process to fill the vacant supervisory position.

If there still remained authority for additional promotions, each Division Director and my Deputy would identify those individuals on his/her staff that he or she regarded as the most deserving of a promotion. The entire SES-level management of OST, myself included, would

Page 3 of 7 

FEB 1 1 2005

then discuss the proposed candidates and reach agreement as to who might be advanced under an accretion of duties approach. Once such persons were identified, it was incumbent upon the Division Director or supervisor under whose command the selectee worked to process the requisite paperwork, including the necessary revision to the promotee's position description. It is important to understand, however, that the threshold decision for promotion had been a collaborative process among all the Senior Managers and that the paperwork aspect undertaken by any particular Division Director or supervisor was largely a ministerial task.

At no time during the promotion panel process that Nena Nwachuku has claimed was tainted by discrimination, nor any prior promotion panel process during my tenure, did any OST senior manager ever identify her as a candidate for an accretion of duties promotion. Jeanette Wiltse never nominated Nena when Jeanette was Director of HECD, nor did Chris Zarba when he was Acting Director. (Edward Ohanian, the only other Director of HECD during my tenure as the OST Office Director, did not participate in any meetings of the OST Senior Management Team regarding promotions to the GS-14 & 15 levels since no meetings occurred during his tenure.) Further, although any Senior Management Team member was free in any of our senior management meetings to propose someone from a different organizational unit if he or she considered such individual's qualifications sufficiently impressive to warrant promotion consideration, at no time in any promotion meeting during my tenure has anyone ever put forward Nena Nwachuku's name as a candidate.

From my perspective, if Nena's name had been put forward by anyone, I would have had great difficulty in seeing her as more competitive than the large number of other GS-13s in OST eligible for promotion to the GS-14 level. In particular, based on my familiarity with Nena Nwachuku's history of problematic interpersonal relations, I would have had many serious questions about promoting her to a GS-14, a position demanding significant tact and diplomacy and a strong capacity to work effectively with high-level professionals both inside and outside of EPA. In fact, for each advancement panel process instituted during my tenure as OST Director, one critical promotion competency has been the ability to work collaboratively and

Page 4 of 7 

FEB 11 2005

diplomatically with peers, staff, managers, and senior level professionals in any number of disciplines across the Government, industry, and academia, and to create good will and good working relationships. I do not perceive Nena as possessing such aptitude. I was aware that her supervisors have documented complaints from people inside and outside of EPA concerning Nena's interpersonal skills, and was aware of the history of difficulties between Nena and her supervisors. It is my understanding that no one on OST's senior management team regards her as a viable GS-14 candidate for these reasons.

I am aware that Nena Nwachuku has filed a second EEO complaint, alleging that she is the victim of a campaign of harassment and is being subjected to a hostile work environment orchestrated by her immediate and second-level supervisors, Elizabeth Doyle and Edward Ohanian, respectively. Elizabeth Doyle was chosen to become a Branch Chief in OST through an open and competitive promotion panel process. She is very highly regarded by myself, by Pamela Barr, the Deputy Office Director, and by her colleagues. Following an open and competitive announcement through the Senior Executive Service selection process, I chose Edward Ohanian as the permanent HECD Division Director in early 2003. He assumed his position in April of that year and has served wonderfully well. I have every confidence in his competency and professionalism and respect his judgement. My high regard for Ed is shared by his peers and by many members of the Senior Executive Service inside and outside of EPA.

Both Ed Ohanian and Beth Doyle have kept me apprised of the accusations that Nena Nwachuku has raised in this proceeding, and I am familiar with the challenges that these subordinates confront in managing Nena. I do not regard any behavior that either Ed Ohanian or Beth Doyle has directed at Nena Nwachuku as inappropriate. I would characterize their actions as prudent and measured and wholly without hostility, notwithstanding Ms. Nwachuku's perception to the contrary. In short, I consider Nena Nwachuku's second EEO complaint completely frivolous.

Page 5 of 7    GHG

FEB 1 1 2005

Finally, I have conducted and overseen every OST promotion process since assuming the Directorship of the Office, and I can state unequivocally that no one's race, color, national origin, sex, age or any other "protected" characteristic has ever been a consideration in determining OST's promotion decisions. With respect, specifically, to Nena Nwachuku's non-selection in the Spring 2003 promotion process, she was not a viable candidate for reasons completely unrelated to her race, color or national origin. In fact, one of the individuals chosen in that process for an accretion of duties promotion, Vera Williams-Bowers, is an African-American female, with coloration that I perceive to be at least as dark as Nena Nwachuku's. Any suggestion, therefore, that Nena's race or color could have played any role in her non-selection is belied by Vera Williams-Bower's promotion.

In addition, Nena Nwachuku's suggestion is ill-founded that an examination of the OST promotion processes of 2000 and 2001, out of which Raoul Scott and Marla Smith (2000) and Shari Barash and Dennis Borum (2001) were identified for accretion of duties promotions, could shed any light on the GS-14/15 promotion process of 2003 that she has challenged. After all, the Senior Management Team making decisions at the 2003 meeting had only myself remaining among those who had served on the 2000 and 2001 panels.

The 2000 OST Senior Management Team advancement panel was composed of me, Jim Hanlon, my Deputy Office Director, Jeanette Wiltse, HECD Division Director, Betsy Southerland, SHPD Division Director, and Sheila Frace, EAD Division Director. The 2001 panel had all the same participants as its predecessor with the exception that Debra Nicoll, serving as Acting Deputy Office Director, replaced Jim Hanlon. The March 2003 advancement panel included me, Pamela Barr, my Deputy Office Director, Christopher Zarba, Acting HECD Division Director, Peter Grevatt, Acting SHPD Division Director, and Mary Smith, EAD Division. (Debra Nicoll, the Deputy Director of EAD, accompanied Mary Smith to that meeting in an advisory capacity since Mary had been in her position only for a short time.)



FEB 1 1 2005

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on February 11, 2005.

Geoffrey Grubbs, Director
Office of Science and Technology

FEB 1 1 2005

# EXHIBIT
# 20

## Declaration of Mary Smith

I, Mary Smith, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1. I presently served as the Director of the Engineering and Analysis Division (EAD) in the Office of Science and Technology (OST). I have served in this capacity, with OST Director Geoffrey Grubbs as my immediate supervisor, since February 2003.

2. At the time that I assumed the role of the EAD Director, the Office of Water (OW) was under two judicial consent decrees and one settlement agreement that had imposed significant workload and personnel challenges for EAD. In response to such challenges, it is my understanding that four EAD staff had been awarded GS-14 accretion of duties promotions in 2002. These individuals, John Fox, William Anderson, Timothy Connor and Debbi Hart were on my staff when I assumed the Directorship of the Division.

3. In the summer of 2003, with the anticipated completion in mid-2004 of the remaining three effluent guidelines under the NRDC consent decrees, the Assistant Administrator of OW recognized that EAD's personnel needs would diminish and asked that EAD design a plan that would redeploy 20 FTEs in EAD to other components in OW over the course of 2004.

4. OW senior level management emphasized that, incident to such redeployment, no EAD personnel would lose their grade or suffer any pay reduction.

5. During the course of the redeployment in 2004, John Fox and William Anderson applied for and secured positions outside of EAD. John Fox accepted a position in the Office of Research and Development, and William Anderson took the position of Associate Director of the Water Policy Staff in OW's front office.

6. Debbi Hart has remained in EAD, having not been reassigned incident to the redeployment process.

7. Timothy Connor has been redeployed to the Standards and Health Protection Division of OST. He is the only one of the four 2002, GS-14 accretion of duties promotions to be affected by the redeployment occasioned by the expiration of the NRDC consent decree.

8. In approximately March 2003, I participated in a promotion process with Geoffrey Grubbs, Pamela Barr, Peter Grevatt, and Christopher Zarbar, OST's senior managers. Since I was a relatively new Division Director, Debra Nicoll, my Deputy also participated. As part of that process, each Division Director and Pamela Barr identified positions under his/her authority that needed to be filled with GS-14/15 supervisory personnel. OST, as an office, had the authorization to fill a number of GS-14/15 positions at that time.

9. Our panel identified a number of supervisory positions, and several of the





available promotions were reserved for the individuals who would be chosen for such supervisory positions in the ensuing competitive processes. The remaining were set aside for accretion of duties promotions.

10.    With respect to the two available accretion of duties promotions, there were a substantial number of professionals in OST eligible for consideration. Each Division Director and Pamela Barr had the opportunity to identify his/her prime promotion candidates. Chris Zarba did not propose anyone at that time. From this pool, the panel agreed that Vera Williams-Bower and Carey Johnston were the most deserving, and these individuals were subsequently promoted.

11.    I specifically recall that everyone was familiar with the work of Vera Williams-Bower and agreed that she merited a promotion. Carey Johnston was less well known by all, but, based on his credentials, they agreed unanimously that he deserved to be promoted, as well.

12.    I am certain that no one put forth Nena Nwachuku's name as a promotion candidate.

13.    I understand that Nena Nwachuku is claiming that her non-selection in the March 2003, promotion process noted above was motivated by discrimination based on her race, color, and national origin. I can state unequivocally that the process was in no way tainted by such impermissible considerations. The panel made its selections based on a consensus good faith assessment concerning the relative promotion worthiness of a number of candidates. Nena Nwachuku was but one of a significant number of disappointed aspirants, none of whom was passed over because of discriminatory animus.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on February 11, 2005.


Mary T. Smith, Director
Engineering and Analysis Division
Office of Science and Technology