# EXHIBIT 21

## Declaration of Pamela Barr

I, Pamela Barr, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.      Up until Friday October 14, 2005, I served as the Deputy Director of the Office of Science and Technology (OST). I was serving in such capacity, under the then-Director Geoffrey Grubbs, in the spring of 2003, when he convened a promotion panel on which I served as one of the five panelists.

2.      In my position as the Deputy Office Director, OST's Resource Management Staff came under my command, and the Director of that Team, Ellen Haffa, reported to me as her first line supervisor.

3.      Incident to the promotion exercise referenced in paragraph 1, above, I solicited from Ms. Haffa her recommendation for GS-14 accretion of duties promotion candidates. Ms. Haffa strongly recommended Vera Williams-Bower, OST's Information Technology specialist.

4.      During the promotion panel's discussion of the most deserving GS-14 aspirants, I put forth Ms. Williams-Bower's name, concurring in Ms. Haffa's assessment of her excellence. The nature of Ms. Williams-Bower work is such that the three Division Directors, Geoffrey Grubbs, and I were all very familiar with her contributions, and the panel was unanimous in its endorsement of Ms. Williams-Bower's promotion.

5.      If anyone has suggested that I put forth Ms. Williams-Bower's name on my own initiative, without having first received an unqualified endorsement from Ellen Haffa, then that person would either be lying or ignorant of the true facts surrounding the spring 2003 promotion process. I recommended Ms. Williams-Bower to the promotion panel, based on the strong recommendation that Ms. Haffa gave to me.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 24, 2005.

Pamela Barr
Director, Standards and Risk Management Division
Office of Groundwater and Drinking Water
EPA, Office of Water



# EXHIBIT 22

## Declaration of Anthony Maciorowski

I, Anthony F. Maciorowski, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.    I presently serve as the Associate Director for Science at the Science Advisory Board Staff in the Office of the Administrator, I have served in this capacity since October 2004.

2.    Prior to assuming my present permanent position, I was the Associate Director for Ecology in the Health and Ecology Criteria Division (HECD) in the Office of Science and Technology (OST) from 2001 to 2004. Edward Ohanian, the HECD Division Director served as my immediate supervisor. Prior to Mr. Ohanian's permanent appointment, Mr. Chris Zarba served as the Acting Associate Division Director for HECD, and I served as the Acting Associate Director for Health. In the latter capacity, Mr. Zarba served as my immediate supervisor.

3.    At the time that I assumed the role of Acting Associate Division Director for Health, Dr. Nwachuku was an immediate subordinate, and remained so throughout my tenure in that position.

4.    I understand that Dr. Nwachuku has claimed that she was discriminated against when she was not selected for one of the two accretion of duties promotions that OST made in the spring of 2003. As Dr. Nwachuku's immediate supervisor at the time that this promotion process took place, had I considered her a viable promotion candidate I would have so advised Mr. Zarba. As it is, I did not regard Dr. Nwachuku as suitable to serve in a GS-14 lead technical scientist position, and would not have supported such a promotion had someone else recommended her for the position.

5.    As an OST GS-14 lead technical scientist, an employee must function beyond a purely scientific role. Lead technical scientist positions require the development of science policy, and the implementation of science policy in Agency risk management decision-making. This latter understanding is crucial, as lead technical scientists are often called upon interact with diverse groups of technical and non-technical professionals and managers, and to develop decision options, often in controversial and contentious non-scientific arenas. Additionally, such activities require tact, diplomacy, and demonstrated inter-personal and negotiating skills. These characteristics are as important as scientific skills for lead technical scientists.

6.    In my opinion, Dr. Nwachuku is a good scientist. However, her primary focus is on scientific and technical aspects of HECD work, rather than the broader science and regulatory policy context in which the work is applied. As such, Dr. Nwachuku can be highly inflexible in dealing with scientific and non-technical colleagues whose opinion and perspectives differ fromn her own. In my opinion, Dr. Nwachuku has not demonstrated the combined science, policy, and risk management decision-making perspective, nor the appropriate negotiating and interpersonal skills necessary for a GS-14 lead technical scientist.

7.    During my tenure supervising Dr. Nwachuku, I recall two specific episodes that required





management intervention. In the first, Dr. Nwachuku refused to pay a contractor's invoice, based on what she characterized as that party's non-performance. I intervened in this matter due to a telephone complaint on behalf of the contractor who stated that Dr. Nwachuku had called to change artistic requirements as the deadline approached, and was offensive and unreasonable during the exchanges. I determined that an appropriate deliverable was received by the Agency, and directed that the Agency honor the invoice.

In the second incident, Dr. Nwachuku was serving on an HECD awards committee by virtue of once having been a recipient of an Employee of the Quarter award. Differences of opinion and conflict arose within the committee, and at least three of the committee members complained to me about Dr. Nwachuku's behavior. Feverish e-mail was exchanged between the Awards Committee Members that included accusations and counter-accusations, reflecting a heightened degree of tension and animosity. After talking to Dr. Nwachuku and several other Awards Committee members, it was decided that management intervention was necessary. Mr. Chris Zarba, Dr. Edward Ohanian, and I unsuccessfully attempted to broker a reconciliation within the team. Mr. Zarba then chose to disband the awards committee and returned the awards process exclusively to HECD management.

8.    Based on my experience with Dr. Nwachuku as an immediate subordinate, I would say that she had a penchant for antagonizing persons with whom she worked, both those whose work she oversaw, such as contractors, and those with whom she might be called upon to collaborate, such as OST colleagues. In my judgment, Dr. Nwachuku's interpersonal and negotiating skills are not sufficiently for dealing with the broader science and regulatory policy development and resolution duties that a GS-14 lead technical scientist position in OST must assume. Therefore, I do not find any legitimacy to Dr. Nwachuku's claim that she was the victim of discrimination in connection with her non-selection for one of the two GS-14 accretion of duties promotions granted in the spring of 2003.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 15, 2005.

Anthony F. Maciorowski
Associate Director for Science
Science Advisory Board Staff Office

# EXHIBIT
# 23

Page 328

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                BALTIMORE DISTRICT OFFICE
2                      VOLUME II

NENA NWACHUKU
3          Complainant              EEOC Case No.
        vs.                         100-2004-011025X
4
MICHAEL LEVITT, ADMINISTRATOR
5  ENVIRONMENTAL PROTECTION          Agency Case Nos.
   AGENCY                            2003-0065-HQ
6          Agency                    2004-0050-HQ

7  _____/

8          The above-entitled matter came on for

9  Hearing before Laurence Gallagher, Administrative

10 Judge, on Wednesday, October 26, 2005, commencing at

11 8:10 A.M. at the Equal Employment Opportunity

12 Commission, City Crescent Building, 10 South Howard

13 Street, 3rd floor, Baltimore, Maryland, before Chuck

14 Peppler, a Notary Public.

15 APPEARANCES:

16          LAURENCE GALLAGHER, ADMINISTRATIVE JUDGE

17          ROY J. BUCHOLTZ, ESQUIRE
                 On behalf of the Complainant
18
            PAUL M. WINICK, ESQUIRE
19               On behalf of the Agency

20

21 REPORTED BY:   Chuck Peppler

Page 585

1  your current position?
2      A    I'm senior science advisor for the Office
3  of Water.
4      Q    Is that the position you received February
5  1, 2003?
6      A    That's correct.
7      Q    Are you aware that Dr. Nwachuku
8  collaborated with a broad spectrum of experts in peer
9  reviewed published articles?  Are you aware of that?
10     A    I know that Dr. Nwachuku collaborated with
11 people on peer reviewed articles, yes.
12     Q    Are you aware of the identity of any of
13 those people she collaborated with on those articles?
14     A    I really don't know at this point.  There
15 were several articles.
16     Q    Several?
17     A    I believe so.  The reason I say this is
18 because at one point when I was a supervisor, I asked
19 people to give me self-appraisals both at midyear and
20 at the end of the year, and one of the opportunities
21 people had at that point was to list articles.

Page 586

1      Q    Isn't it true that Dr. Nwachuku has
2  published approximately 25 to 30 times?
3      A    I don't know the number.  I would suspect
4  you are telling me the correct number.
5      Q    Because you said several.  That could be
6  three or four.
7      A    Indeed it could.
8      Q    Do you believe 25 to 30 might be more
9  correct?
10     A    Without seeing the list, I couldn't say.
11     Q    So, you don't know one way or the other?
12     A    Not now, no, sir.
13     Q    Was there ever a time you did?
14     A    I did not ever count up publications for
15 any of the folks with whom I was working.
16     Q    Do you remember when you did evaluations
17 for Dr. Nwachuku, she would give you a list of her
18 achievements for the year, you would read it and then
19 you would write a commentary and do the evaluation and
20 sit down with her?
21     A    Almost.  What I would do was ask

Page 587

1  Dr. Nwachuku, as well as the other people for whom I
2  was doing evaluations, to give me a self-evaluation.
3  I would read those.  We would have a meeting with
4  whomever I was doing the evaluation, then I would
5  write-up the comments usually in the presence of the
6  person who was being evaluated and I would ask the
7  person to sign it.
8      Q    So, then when Dr. Nwachuku would go
9  through this process, she would be giving you a list
10 of her achievements?
11     A    That's correct.
12         MR. BUCHOLTZ:  Your Honor, I have no other
13 questions.
14         MR. WINICK:  No redirect.
15         JUDGE GALLAGHER:  I don't think I have
16 any.  Thank you Dr. Schoeny for your testimony.  I ask
17 you not to discuss your testimony with anyone while
18 this matter is pending before me.  You're excused from
19 the hearing room.
20         THE WITNESS:  Thank you.
21         (A discussion was held off the record.)

Page

1          JUDGE GALLAGHER:  Okay.  Mr. Zarba, my
2  name is Administrative Judge Gallagher.  You know
3  everybody else.  Would you please raise your right
4  hand.
5  Whereupon,
6          CHRISTOPHER ZARBA
7  called as a witness, having been first duly sworn
8  to tell the truth, the whole truth, and nothing but
9  the truth, was examined and testified as follows:
10         JUDGE GALLAGHER:  Your name again for the
11 record.
12         THE WITNESS:  Christopher Zarba,
13 Z-A-R-B-A.
14         JUDGE GALLAGHER:  Mr. Zarba, we're dealing
15 with a case that is involving race, color, national
16 origin and reprisal.  What is your race for the
17 record?
18         THE WITNESS:  Caucasian.
19         JUDGE GALLAGHER:  What is your national
20 origin?
21         MR. WINICK:  Italian, Irish and English.

66 (Pages 585 to 588)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763

Page 593

1    Q    Yes, that promotion process.
2    A    Promotion within the Agency and within
3  Water from the GS-13 to the 14 level and GS-14 to the
4  15 level are a big deal.  These are very important
5  positions.  There are many people that are interested
6  in them.  So, Geoff had a very organized and open
7  process to make sure that when those decisions were
8  made, they were made in best of conditions as
9  possible.  He let us, me and the other supervisors
10  within the Office of Science and Technology know that
11  we were approaching a time where some of those
12  positions, we might look for opportunities to see
13  which people would be most qualified for accretion of
14  duties.  My division had already received several
15  GS-15 positions, in that we had filled some
16  supervisory slots within the division, so I had
17  already received several.  Now, we were talking about
18  at this meeting, nonsupervisory 14 and 15 positions.
19  He asked all of us to get our thoughts together,
20  paperwork together.  I had asked the folks within the
21  Health and Ecological Criteria Division, that they

Page 594

1  knew this was coming.  I said I was going to go to
2  that meeting.  If they chose to, they could provide
3  any documentation they wanted to me, because I had
4  only been there for four or five months at the time.
5  If they felt like I didn't understand their background
6  or their full job range of responsibilities, they
7  could put that in writing.  It wasn't a requirement.
8  It was just something if they wanted to, they could.
9  If they didn't do that, they would not be precluded
10  from being considered for a promotion, but it was just
11  something they had the option to do or not to do.
12       I got those documents from a number of
13  people and a number of other ones didn't provide that
14  information.  I looked through it.  I went to the
15  meeting where each of the division directors talked
16  about the people in their division that they thought
17  were potential candidates for an accretion of duties.
18  It wasn't just the discussion on who had worked best
19  for their boss, which is typically or more commonly
20  what happens in the Agency.  What I thought was unique
21  and special about Geoff's process, he was concerned

Page 595

1  about how well the people we were considering were
2  working across the organization.  Were they just
3  supporting their boss and doing what their boss
4  needed, or were they reaching out to others within the
5  organization?  So, that's what the discussions were
6  about, about who were the people who were most
7  qualified, what the rationale was and how well had
8  they done, supported other parts of the organization,
9  not just their immediate supervisor.
10       Q    When you said all of us, the division
11  directors, could you identify by name who participated
12  in this process?
13       A    It was myself.  It was Peter.  What's his
14  name?
15       Q    Grevatt?
16       A    Grevatt.  There was a Mary, I can't
17  remember her last name.
18       Q    Mary Smith?
19       A    Mary Smith.  It's been two and a half
20  years since I have been over there.
21       JUDGE GALLAGHER:  Anybody else?

Page 596

1       THE WITNESS:  I believe that was it.
2       JUDGE GALLAGHER:  So, you were in the
3  panel basically or not?
4       THE WITNESS:  I was in the panel, yes.
5  There may have been other people there.  Pam Barr may
6  have been there.  I don't remember.
7       JUDGE GALLAGHER:  Pam Barr, not Haffa,
8  Barr.  Yes, I think Barr.
9       THE WITNESS:  Ellen Haffa, I believe was
10  there.
11       JUDGE GALLAGHER:  You believe she was
12  there.
13       THE WITNESS:  I don't know for sure, but
14  she could have been there.
15       JUDGE GALLAGHER:  Could have been.
16       Q    How long had you been in HECD in your
17  acting capacity at the time of this promotion process?
18       A    I believe it was four or five months.
19       Q    Other than soliciting from people
20  write-ups, let's say, what other process did you
21  engage in to get some sort of sense of who in the

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

Page 597

1  division would be a good candidate for a promotion?
2      A    Well, upon coming into the division, I met
3  with every single employee of the division. There was
4  approximately 50 people. So, I put a fair amount of
5  time in meeting with each other to start things off.
6  As the half a year went by, I could see people's work.
7  I could see the written material. I talked to the
8  supervisors of the employees to see their assessment.
9  I also talked quite a bit to the customers we support.
10  That division supports the science needs of other
11  parts of the Agency and we provide a service. I was
12  very interested in finding out whose work was filling
13  critical needs and whose work really wasn't filling
14  critical needs. I was looking at that as an
15  opportunity to maybe reassign some people out of areas
16  that were less critical into areas that were more
17  critical.
18          JUDGE GALLAGHER: I just want to jump in
19  for a second. Are you saying you met with each of the
20  50 people that might have been up for these types of
21  promotions?

Page 598

1          THE WITNESS: No, I met with each of the
2  50 people within the division. This had nothing to do
3  with promotions. It just had to do with I'm the new
4  boss and I want to meet with everybody.
5          JUDGE GALLAGHER: So, this is the
6  one-on-one thing?
7          THE WITNESS: Right. What's working,
8  what's not, that kind of stuff.
9      Q    Do you recall whether you recommended
10  anyone be promoted on an accretion of duties basis
11  within your division?
12      A    I remember that when I went in, I didn't
13  feel that there was anybody at the current GS-13 level
14  that I thought was functioning at a 14 level or anyone
15  at a 14 ievei that was functioning at a 15 ievei. So,
16  the basis of my discussion with Geoff was that I
17  thought there was some upcoming stars in the
18  organization, that they weren't there yet, but they
19  were coming down the road and they should be kept an
20  eye on and coached and helped to the extent they
21  could. But, that I didn't feel that there was

Page 599

1  somebody that I could make a case for at that time
2  that would warrant an accretion of duties. I had
3  also, as I mentioned earlier, had several GS-15
4  positions filled within the division to fill
5  supervisory slots, not that affected my decision, but
6  the division had got a number of important slots
7  filled during my tenure.
8      Q    How were those supervisory slots filled?
9      A    From competition. They were advertised,
10  competed and review panels were selected.
11      Q    You mentioned that there was some up and
12  coming people in HECD. Could you identify them by
13  name?
14      A    Yes.
15      Q    Could you tell us who they were?
16      A    Two names come to mind. The first one was
17  Ambika Bathija. She is a woman from India. She was
18  working on perchlorate, which is a chemical that's
19  found when explosives are manufactured and used. They
20  are particularly a problem around Department of
21  Defense facilities. It was and still is an important

Page 600

1  issue. She was responsible for pulling together some
2  scientific information, briefing management and
3  supporting the Office of Ground Water and Drinking
4  Water. So, I thought she had some promise, but she
5  still needed some coaching. There was another
6  gentleman, I spoke very highly of and his name was
7  Jafrul Hasan. Where he is from. He's from
8  Bangladesh. He was at a GS-12 level at the time, but
9  extremely motivated and very competent and also very
10  interested in moving up. He has since done that by
11  seeking additional responsibilities.
12      Q    So, you didn't identify anyone then at
13  that meeting who you felt was at that point a viable
14  candidate?
15      A    That's correct.
16      Q    Do you recall who was proposed as viable
17  candidates?
18      A    There were several names discussed. I
19  don't remember.
20      Q    If I throw out the names of two people who
21  were chosen, could you recall perhaps a discussion

69 (Pages 597 to 600)

Page 601

1    concerning those people?
2       A    It might sound familiar to me.
3       Q    How about Vera Williams-Bower?
4       A    Sounds familiar.
5       Q    Do you recall who proposed her name for
6    promotion?
7       A    No, I don't.
8       Q    Do you recall what the discussion
9    concerning her might have been?
10      A    The discussion on all the people that were
11   discussed is whether they were actually functioning at
12   the next level. There's some very detailed criteria
13   on the issues. Having been in the government for a
14   number of years, it's pretty obvious to me when
15   somebody is functioning at a different level. So,
16   it's actually doing that job and it's also taking on
17   additional responsibilities and working across the
18   organization. As I mentioned earlier, what I thought
19   was particularly valuable about Geoff's process, it
20   just wasn't how well of a job are you doing for your
21   boss, it's how well are you doing a job to support the

Page 602

1    mission of the organization and were you helping
2    others who needed your help in the organization.
3       Q    Would it be fair to say at this point in
4    time, you don't have any distinct recollection of the
5    specifics of this discussion?
6       A    I don't.
7       Q    With respect to your determination in the
8    case to who in HECD might be a viable promotional
9    candidate, you mentioned you spoke to customers. Did
10   you speak to any of your predecessors who had served
11   as the division director or did you speak to any of
12   the branch chiefs in HECD?
13      A    Certainly all the supervisors. I spoke to
14   Rita and to Tony Maciorowski. I talked to Ed Ohanian
15   and I spoke to Jeff Grubbs.
16      Q    Do you recall at this time, the nature of
17   those discussions?
18      A    Well, I talked about many people. Again,
19   I was putting together my own observations, my own
20   review of written material that was coming across my
21   desk, my own reading of e-mail that were going back

Page 603

1    and forth between staff, supervisors assessment,
2    customers assessment. When all of those informatio
3    points were pointing me in the same direction, my own
4    assessment and other peoples assessment, I felt
5    relatively comfortable in my assessment. Where in
6    some cases I got conflicting information, then I would
7    go in deeper to make sure I was comfortable with the
8    assessment.
9       Q    Do you recall whether there was
10   discussions concerning Dr. Nwachuku?
11      A    Yes, there were.
12      Q    Could you describe the nature of those
13   discussions and whether you had conflicting
14   information or not?
15          MR. BUCHOLTZ: Objection. Could we have
16   it narrowed down, because he said he talked to four
17   people? He said he talked to Schoeny, Maciorowski,
18   Ohanian and Grubbs. That was just a question of with
19   who?
20      Q    Let's start with the Dr. Schoeny.
21          JUDGE GALLAGHER: He's going to specify

Page ?

1    now.
2       Q    Let's start with Dr. Schoeny. Do you
3    recall your discussions with Dr. Schoeny?
4       A    In a general way, yeah.
5       Q    Do you recall whether you discussed with
6    her Dr. Nwachuku?
7       A    I did.
8       Q    What was the nature of the exchange
9    between you and Dr. Schoeny concerning Dr. Nwachuku?
10      A    I think it went something like me sharing
11   my assessment and me asking her for her assessment and
12   seeing whether those two matched.
13      Q    What was your assessment?
14      A    My assessment is there were some real
15   issues with Nena, that they involved a number of
16   things. One is her aligning her research consistent
17   with the needs of the customers. Two, and this was a
18   big one, her ability to work cooperatively across the
19   organization and get along with other employees. Her
20   ability to prepare written material that I felt
21   approached the level of the current GS level she was

Page 625

1  A    I would assume they would if they invited
2  her.
3  Q    There are other presentations and
4  publications listed in here. Would your answers
5  generally be the same as the type that you're giving
6  now as far as thinking that Dr. Nwachuku would have
7  gotten along with anyone she published with?
8  A    I'm sure she did. I don't doubt that.
9  Q    Can I have the document, please. With
10 regards to the criteria, the GS-14 that Mr. Winick
11 told you that you might be asked about, I want to show
12 you Exhibit 42. Can we please turn to ROI 1, Exhibit
13 16, page 2.
14       JUDGE GALLAGHER: That's Complainant's
15 Exhibit what?
16       MR. BUCHOLTZ: It's 42. It's
17 Complainant's Exhibit 42.
18       JUDGE GALLAGHER: ROI 1.
19       MR. BUCHOLTZ: ROI 1, Exhibit 16, pages 2
20 through 5. Here's an e-mail from Jeffrey Grubbs dated
21 January 24, 2003 in reference to the promotion. Then

Page 626

1  on the Second and third page and fourth page, he has
2  various criteria for promotion. Do you remember ever
3  getting this e-mail?
4        THE WITNESS: I'm sure I did.
5  Q    Do you remember it now?
6  A    No, I don't. It was discussed. I don't
7  remember specifically getting this e-mail in my e-mail
8  box. I get a hundred a day. We did discuss the
9  criteria. I knew I had copies of it. Whether I got
10 it via e-mail or something that was hand delivered to
11 me, it might have been.
12 Q    Do you remember looking at this document
13 in preparing for this testimony?
14 A    Yes.
15 Q    How recently did you look at this
16 document?
17 A    I haven't seen this document since I left
18 HECD.
19 Q    Which was when?
20 A    Two and a half years ago.
21 Q    I asked you if you remember looking at

Page 627

1  this to prepare for this testimony.
2  A    Right.
3  Q    When did you start preparing for this
4  testimony?
5  A    I'm sorry. My apologies. I thought you
6  asked when did I look at it when I was in HECD. The
7  question is when did I look at it in preparing for
8  this testimony and I did not look at it preparing for
9  this testimony.
10 Q    You have not seen this in the recent past?
11 A    No, I haven't.
12 Q    You haven't seen it today?
13 A    No.
14 Q    Did you use this document to determine
15 which candidate, whether from your division or
16 somebody else's division, met the qualifications for
17 GS-14?
18 A    What I did was I read this document and I
19 also looked at the OPM guidelines, and then I looked
20 at the people within my division that were candidates.
21 It was abundantly clear to me that I did not have

Page

1  somebody in the division that I felt comfortable, that
2  their work and their experience and their behavior and
3  everything warranted a promotion from either a 13 to a
4  14 or a 14 to a 15. So, I knew well in advance of
5  going to that meeting that I was not going to be
6  submitting anyone's name for a promotion. I knew in
7  my mind that I had a ranked a list of basically --
8  maybe ranked isn't the right word. But, I had kind of
9  up and coming people who were good candidates. I had
10 people that maybe middle of the road that could go
11 either way and then I had people that I thought were
12 not really a contender for a promotion.
13 Q    Did you use this document by Geoffrey
14 Grubbs to help you determine who you thought was
15 eligible or not eligible or qualified or not
16 qualified?
17 A    I reviewed it and I don't think it
18 influenced me, because I knew what the OPM criteria
19 were. So, I didn't get much use out of it or any use.
20 I remember looking at it. It didn't add to my
21 thinking about what I was going to go forward with.

Towson Reporting Company        GORE BROTHERS        Whitman Reporting-Rockville
410-828-4148                    410-837-3027          301-279-7599
                                                      bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

# EXHIBIT
# 24

## AFFIDAVIT OF CHRISTOPHER ZARBA

I, Christopher Zarba, being duly sworn on April 9, 2004, depose and state the following:

*In accordance with Public Law 93-579 (Privacy Act of 1974), as an individual furnishing information for inclusion in a system of records, I have been informed that the authority for collection of the information was derived from one or more of the following: Title 5, Code of Federal Regulations, Section 55.2 and 5.2; Title 29, Code of Federal Regulations, Section 1613.216; Title 5, United States, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16 and Executive Order 11478, as amended.*

*I have also been informed that the information supplied will be used as part of the record in an equal employment opportunity discrimination complaint and may not be considered confidential. The record will be furnished to designated agency representatives as part of the complaint process and may also be disclosed to any agents of the Federal Government having oversight or review authority or to others as published in the Federal Register.*

Signature                           Date  4/ 14/ 2004

I, Christopher Zarba, do solemnly swear and affirm that:

1. My name is Christopher Zarba. I am Caucasian and I have not previously participated in EEO activities. I have worked for the Environmental Protection Agency for approximately twenty-four years.

2. I am currently the Acting Deputy Director of National Center for Environmental Research, Office of Research and Development, at the United States Environmental Protection Agency Headquarters. I have held this position since May of 2003.

3. Prior to my current position, I was the Acting Director of the Health and Ecological Criteria Division, Office of Science and Technology, Office of Water,

Page _1_ of _3_                                          Initials



Exhibit __12__ p. _1-3_

at the United States Environmental Protection Agency Headquarters. I was Nena Nwachuku's second line supervisor.

4. On January 24, 2003, Geoffrey Grubbs, the Director of the Office of Science and Technology, circulated a memo stating that there were GS-14 and GS-15 positions available. I assembled a list of eligible candidates based on time in grade. On February 6, 2003, I emailed those eligible individuals, which included Ms. Nwachuku, and asked for submittals of rationale behind promotions. This was not required, but used as an additional means to measure the abilities of the individuals.

5. I attended a meeting with Mr. Grubbs, senior management, and the two other Division Directors to discuss the promotions. We discussed those eligible for promotions.

6. I had in my mind a ranked list of the candidates from my division. Mr. Nwachuku was at the bottom of my list. I felt that her work was not at a GS-14 level, and barely met a GS-13 level. I had been working with Ms. Nwachuku for approximately three months and had a large amount of direct interaction with her. I had about twice as much interaction with her than any other employee. Ms. Nwachuku sought out guidance from me and she needed more help than others. I had concerns about the quality and timeliness of her work. Her writing ability was limited and she did not fully understand how her work fit in to the overall mission of the organization. She had problems balancing her workload, managing her time, resources, and exchanging information with others, including our offices and other offices.

7. At the top of my list of the candidates from my division was a female who is from India. Although she was at the top of my list, I still did not feel that she was performing at a GS-14 level. I felt that she would be performing at a GS-14 level in the near future and at that time she could be presented as a serious candidate.

8. There were only a few promotions that were awarded in the entire Office of Science and Technology and nobody in my division was selected.

9. I, along with the other two Division Directors, were the recommending officials and Mr. Grubbs was the selecting official.

10. Ms. Nwachuku was not discriminated against.

11. I have no further information about this matter.

*I have read the above statement consisting of ___ pages. It is true and complete to the best of my knowledge and belief. I have made all necessary corrections and additions, initialing next to each. I have also signed or initialed each page. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties. In accordance with 28 U.S.C. Section 1746, I declare under penalties of perjury that the above statements are true and correct to the best of my knowledge, information and belief.*

| | |
|---|---|
| _____ | 4/19/04 |
| Signature | Date |

*I, REBECCA CLARK, have witnessed the above sign this affidavit and I am an impartial third party.*

| | |
|---|---|
| _____ | 4/14/04 |
| Signature | Date |

*I, Nicole Lovelock, hereby certify that I obtained the above affidavit in connection with a duly authorized EEO complaint investigation.*

| | |
|---|---|
| _____ | 4/16/04 |
| Signature | Date |

Page 3 of 3

Initials __

Exhibit 12 p. 3

# EXHIBIT
# 25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
NENA NWACHUKU,                    :
                                  :
            Plaintiff,            :
                                  :
      v.                          : Civil Action No.
                                  : 06-0946 (RJL)
STEPHEN L. JOHNSON,               :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - x


Washington, D.C.

Tuesday, January 15, 2008


Deposition of

RITA SCHOENY

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Jon

G. Hundley, Notary Public in and for the District of

Columbia, in the offices of Swick & Shapiro, 1225 I

Street, Northwest, Suite 1290, Washington, D.C.,

commencing at 1:43 p.m.


Diversified Reporting Services, Inc.
(202) 467-9200



Page 46

1    A    Yes.
2    Q    Now, you said Almodovar --
3    A    Almodovar.
4    Q    Almodovar, she was a microbiologist?
5    A    That's correct.
6    Q    And I think you also said that Hassan was
7    a microbiologist?
8    A    That's correct.
9    Q    And Ms. Parker was a microbiologist?
10    A    That's correct.
11    Q    And those were the three that didn't get
12    along with Nena or said they didn't?
13          MR. HUDAK:  Objection to the form.
14          BY MR. SHAPIRO:
15    Q    Or was there another?
16          MR. HUDAK:  Objection to the form.
17          THE WITNESS:  And Robin.
18          BY MR. SHAPIRO:
19    Q    Robin?
20    A    Oshiro.
21    Q    And she must have been a microbiologist as
22    well?

Page 47

1    A    That's correct.
2    Q    She was replaced by Hassan, right?
3    A    Yes.
4    Q    Any other microbiologists that got along
5    with Nena or at least didn't tell you they didn't?
6    A    Steve never said much one way or the
7    other.
8    Q    Um-humm.
9    A    Steve Schaub.  He's a microbiologist.
10    Q    Anybody else?
11    A    Yes.  There were a number of people both
12    in the office and also in the Office of Groundwater
13    and Drinking Water who had difficulty with what they
14    saw as Nena withholding information or behaving in
15    an inappropriate fashion.
16    Q    What do you mean inappropriate?
17    A    The kind of behavior I mentioned before,
18    being argumentative.  I don't know if -- since I
19    don't have any quotes, whether I can -- largely
20    argumentative and obstreperous.
21    Q    What do you mean by obstreperous?
22    A    In the vernacular, in your face.

Page 48

1    Q    In your face, meaning?
2    A    Not treating people with respect.
3    Q    And who were the people in Groundwater who
4    found that with Nena?
5    A    Jim Taft.
6    Q    Jim Taft.  What does Jim Taft do?
7    A    Jim was a branch chief at the time.  He
8    has since taken another job.  There were some of the
9    microbiologists -- I'll have to really get back to
10    my memory bank on this one.  Phil Berg, Crystal
11    Rogers, and I'm blanking on names now.  I couldn't
12    recall anybody else.
13    Q    Berg and Rogers.  Anybody else that you
14    can recall?
15    A    I just don't recall.
16    Q    These were microbiologists in the Office
17    of Groundwater and Drinking Water?
18    A    Groundwater and Drinking Water.
19    Q    And they mentioned this to you directly?
20    A    Yes.
21    Q    That they found Nena inappropriate --
22    A    Right.

Page 49

1    Q    Or in your face?
2    A    Not a team player, withholding
3    information.
4    Q    Did you ever put any of these comments
5    that you heard from any of these people in Nena's
6    written performance appraisal in any of the periods
7    that you appraised her?
8    A    I don't recall.
9    Q    Okay.  Now, do you recall -- this would
10    have been at the very end of your time as the
11    person, do you recall -- as the I guess the
12    assistant of associate director where you were
13    Nena's supervisor, do you recall being asked who in
14    your division was -- should be promoted to a 14 of
15    the 13s?
16    A    That happened at various times while I was
17    in a supervisory position.
18    Q    Well, I'm talking about the time when you
19    were reporting to Zarba.
20    A    Zarba?  And I don't recall a conversation
21    of that sort.
22    Q    You don't?

Page 50

1    A    No.
2    Q    Do you recall being asked by Zarba's boss?
3    A    No.
4    Q    Okay.  When was the last time that you
5    recall being asked?
6    A    Probably the last time we had the ability
7    for 14s.  I couldn't tell you when that was.
8    Q    Did you ever recommend any of your people
9    for promotion?
10   A    Yes.
11   Q    To 14?
12   A    Yes.
13   Q    Who?
14   A    Dennis Borum, I recall.
15   Q    Now, you haven't mentioned Mr. Borum.
16   A    Right.  Sometimes, he was in my half of
17   the house, sometimes he was in the other half of the
18   house.
19   Q    He's a white man?
20   A    Yes.
21   Q    Dennis Borum.  And you did recommend him
22   for a 14?

Page 51

1    A    That's correct.
2    Q    Did he get the 14?
3    A    Yes, he did.
4    Q    Okay.  And that would have been early on
5    in your tenure?
6    A    No.
7    Q    Later?
8    A    Later.
9    Q    And what was he?  Was he a toxicologist?
10   A    He is an exposure assessment specialist.
11   Q    Which would make him what kind of science?
12   A    Health risk assessment.
13   Q    Field of science?
14   A    Field of science really is exposure
15   assessment.  It's not easily --
16   Q    Biology?
17   A    Biology, and largely chemistry.
18   Q    Toxicology?
19   A    It could be considered toxicology.
20   Q    Okay, and did you ever recommend anybody
21   else for a 14 from the 13s?
22   A    I'm sure that I did, but I don't recall

Page 52

1    any other names at that point.
2    Q    Okay.  Did you ever recommend any 14s for
3    15s?
4    A    No.
5    Q    Okay.  Do you recall a time when you were
6    asked if there was anybody who was a 13 who should
7    be promoted to a 14 and you indicated that there
8    wasn't anybody?  In other words, you didn't
9    recommend anybody?
10   A    It -- the conversation probably would have
11   been a little different than that, because again,
12   back in the day when I was an associate director, we
13   usually looked at people across the office.  So it
14   would have been a little more holistic a
15   conversation.  Here is our 13s, whom do you think is
16   ready for a promotion to a 14.
17        It's -- again, I'm speculating because I
18   don't remember any of these things specifically.
19   It's very likely I would have said no one in my half
20   of the house, but someone on the other side would be
21   ready.
22   Q    Maybe?

Page 53

1    A    Yeah.
2    Q    Okay.  Did you ever recommend Nena for
3    promotion?
4    A    No.
5    Q    Were you ever asked?
6    A    I never recommended Nena for a promotion
7    to a 14.
8    Q    That's what I mean.
9    A    Okay.
10   Q    But she came in as a 13?
11   A    I think that's correct.
12   Q    Now, 13 is the journeyman level?
13   A    No, 12, I think, is more of the journeyman
14   level.
15   Q    So to get a 13, there has to be either an
16   advertised vacancy --
17   A    Yes.
18   Q    Or an accretion of duties.
19   A    An accretion of duties, correct.
20   Q    Any other way to get a 13 if you are a 12?
21   A    I think that's not even the case in ORD.
22   No, I think that's basically it.

Page 58

1  pass and for really, really good, as I remember, but
2  don't quote me on that.
3      When they went to numerical ratings,
4  again, they were specific criteria or descriptors of
5  how one would be average, above average, below
6  average.
7      Q    But the descriptors or the standards were
8  the same for the same kind of employee?
9      A    There were some standards that were
10 absolutely identical. Not standards. There were
11 some critical job elements that were absolutely
12 identical and those had identical standards or
13 descriptors. There were some critical job elements
14 that varied depending on the work that that person
15 was doing and the standards would be somewhat
16 different.
17     Q    And those -- this drafting of standards
18 and approval of standards by you, that was the
19 beginning of a performance year, correct?
20     A    Yes.
21     MR. HUDAK: Objection to the form.
22     BY MR. SHAPIRO:

Page 59

1      Q    So the standards would be in place before
2  the person was performing?
3      MR. HUDAK: Objection to form.
4      BY MR. SHAPIRO:
5      Q    Correct?
6      MR. HUDAK: Same objection.
7      THE WITNESS: Yes.
8      BY MR. SHAPIRO:
9      Q    And then they would be rated against those
10 very same standards?
11     A    That's correct.
12     Q    At the middle and at the end of the year?
13     MR. HUDAK: Objection to form.
14     THE WITNESS: Okay, midyear evaluation was
15 less formal, but, yes, you would go over the CJEs,
16 critical job elements. And that was also a good
17 opportunity to adjust those if your work changed.
18     BY MR. SHAPIRO:
19     Q    And the midyear rating is written also,
20 isn't it?
21     A    Yes, it is.
22     Q    There is a written place on the form.

Page 60

1      A    That's correct.
2      Q    Somewhat less -- somewhat less --
3      A    Formal.
4      Q    -- formal and large than the final rating
5  area. But there is a place for written --
6      A    There is a place for written comments.
7      Q    Midyear evaluation.
8      A    Yes.
9      Q    And the evaluations were annual, correct?
10     A    Evaluations were annual.
11     Q    What time of year were they done in your
12 last few years there?
13     A    Last few years, I think we were on
14 calendar year.
15     Q    So the ratings would be done sometime at
16 the beginning of the next year for a calendar year.
17 So in January, February, you would be doing ratings
18 for the last January through December?
19     A    Yeah. Generally speaking, one had to have
20 all the evaluations completed by the end of January.
21     MR. SHAPIRO: Okay. Good. Let's take a
22 break. We're almost done.

Page 61

1      (Recess.)
2      BY MR. SHAPIRO:
3      Q    You know, I was wondering, do you know
4  what a CCL is?
5      A    The contaminant candidate list.
6      Q    Okay, now, there are groups formed around
7  CCLs, right? It's a group -- there's like a working
8  group?
9      A    There were. A contaminant candidate list
10 is the way EPA is now dealing with their regulatory
11 agenda for drinking water.
12     Q    And there would be, for example, a CCL for
13 biological and a CCL for toxicological, correct?
14     A    In truth, both the chemicals and the bugs
15 wind up on the same list. We had at one time, and
16 this was a while ago, put together two separate
17 working groups to help come up with procedures for
18 determining what would go on to a CCL.
19     Q    Right. At it's these working groups. One
20 would be a CCL working group for biologicals and one
21 would be a CCL group for toxicological?
22     A    Chemicals.

Page 74

1 divisions.
2    Q    So Ms. Bower, Vera --
3    A    Yeah. Vera.
4    Q    Right. She was a Ph.D.?
5    A    I don't know what her degree is.
6    Q    All right. But she was promoted. And
7 what position did she hold?
8    A    She is the major IT person for the Office
9 of Science and Technology.
10    Q    I see, she is the major IT person, so she
11 is not a biologist or chemist. She does the IT
12 support for a office?
13    A    She does -- yeah, all of the IT support.
14    Q    Right. And so she was -- and you recall
15 her being promoted, but you were already the science
16 advisor?
17    A    That's correct.
18    Q    All right. Anyone else? Do you recall
19 any scientists -- now, I don't mean IT support. I
20 mean somebody who is doing the work of the division,
21 not supporting it -- chemists, toxicologists,
22 biologists, biochemists, microbiologists,

Page 75

1 pharmacologists, the actual people that do the work
2 of the division or the Office of Science and
3 Technology, not supporting but working, do you
4 recall any of them who were African American or
5 blacks in the way I have defined it who were 14s?
6    MR. HUDAK: Objection to the form.
7    THE WITNESS: I didn't pay any attention
8 to other divisions. There would be -- we would see
9 lists of promotions, but if I didn't know the
10 person, I didn't internalize it.
11    BY MR. SHAPIRO:
12    Q    So you don't know anybody who is a black
13 who is a 14, other than this IT person?
14    MR. HUDAK: Objection to the form.
15    BY MR. SHAPIRO:
16    Q    Is that right?
17    A    I know of Vera. People don't necessarily
18 talk about their grades.
19    Q    I'm asking you if you know anyone else
20 besides Vera.
21    MR. HUDAK: Objection to form.
22    BY MR. SHAPIRO:

Page 76

1    Q    Know of anybody else besides Vera.
2    MR. HUDAK: Same objection
3    THE WITNESS: In OST?
4    BY MR. SHAPIRO:
5    Q    Yes.
6    A    Again, I don't know.
7    MR. SHAPIRO: I don't have anything
8 further. Thank you. Thank you, ma'am.
9    (Whereupon, at 3:42 p.m., the taking of
10 the deposition ceased.)
11
12
13    _____
         RITA SCHOENY

# EXHIBIT
# 26

## Declaration of Rita Schoeny

I, Rita Schoeny, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.    I served as Nena Nwachuku's immediate supervisor from the time of her hire until I left the Health and Ecology Criteria Division (HECD) February 1, 2003 to assume my current responsibilities as the Senior Science Advisor for the Office of Water (OW).

2.    I served as a member of the committee that interviewed Dr. Nwachuku and that chose to extend her an offer of employment. Dr. Nwachuku and a Caucasian male were the two prime candidates in that selection process, and the committee decided on Dr. Nwachuku, based on the fact that she had the superior academic credential, a Ph.D.

3.    During Dr. Nwachuku's one-year probationary period, I and others in HECD management were sufficiently concerned about her inability to perform the functions for which she was hired that the most serious consideration was given to terminating her. Among the functions in which her performance was considered to be inadequate was the ability to interact well with her colleagues.

4.    In fact, despite a consensus among HECD management that the Agency should remove her before the expiration of her probationary period, higher level management in the Office of Water (OW) decided, for political reasons, that we could not do so.

5.    Throughout my entire tenure of supervising Dr. Nwachuku, she proved a most challenging subordinate. Dr. Nwachuku routinely refused to share information with her colleagues and frequently accused other HECD staff of "getting into her business," or words to that effect; that is, intruding into her area of expertise or projects.

6.    Dr. Nwachuku's failure to share information frequently created programmatic difficulties and interfered with HECD and the Office of Science and Technology's (OST) timely performance of its mission. Her accusations against usurpation of her work responsibilities were unfounded, disruptive and destructive of morale.

7.    Dr. Nwachuku was also often verbally abusive, referring to me, other HECD staff, and OW clients and contractors with pejoratives highly demeaning of our intellects and professional competence. Dr. Nwachuku's conduct created an atmosphere of ill-will. Her reputation for abrasiveness is widespread in OW, reaches into other offices of the Agency, and extends to the externally funded community with which she has interacted.

8.    In HECD, for example, there were a number of scientists so put off by Dr. Nwachuku's unwarranted argumentativeness, her verbal abuse, (in particular her penchant for impugning their intelligence), her false accusations, and generally slanderous/libelous conduct,



that they transferred out of the Division.

9.    During my tenure as Dr. Nwachuku's immediate supervisor, she regularly demeaned colleagues less well-credentialed than she, but she was not hesitant to act in a similar manner toward other Ph.D. holders, such as myself. It was my observation that several people with whom Dr. Nwachuku interacted refused to work with her again.

10.    During my tenure as Dr. Nwachuku's immediate supervisor, she regularly shared with me her interest in being promoted to a GS-14. I advised her numerous times that OST had defined criteria which must be met in order to be considered for this grade. These written criteria included a demonstrated ability to work collaboratively with others, including HECD staff, other OW scientists, other Agency professionals, and contractors. I advised her that her deficits in this area precluded her from promotion consideration.

11.    For all but about the initial year of my OST tenure, and throughout the entire period of time that I supervised Dr. Nwachuku and she was theoretically eligible for a promotion, a critical written requirement for advancement to the GS-14 level has always been one's capacity to foster good working relationships with a broad spectrum of professionals both inside and outside of EPA. Dr. Nwachuku, since the commencement of her EPA career, has exhibited a degree of ineptitude in her interpersonal relations, which disqualifies her from promotion consideration. At no time during my tenure as her immediate supervisor, did I consider Dr. Nwachuku a viable promotion candidate, and my assessment with respect to such matter was shared by Jeanette Wiltse, the HECD Division Director, to whom I reported.

12.    It is my understanding that Dr. Nwachuku has challenged as discriminatorily motivated her June 2003, non-selection for one of the two GS-14 accretion of duties promotions that went to Vera Williams-Bower and Carey Johnston. I played no role in that selection process, and I do not recall providing any feedback to Christopher Zarba, the Acting HECD Division Director. I was familiar with the contributions and competence of one of the two selectees; I can state unequivocally that the selected candidate was substantially more qualified than Dr. Nwachuku for advancement.

13.    Insofar, as approximately fifty-plus (50+) GS-13s were eligible for promotion consideration in June 2003, and, in my opinion, any number of these individuals would have been more qualified for advancement than Dr. Nwachuku, I consider her allegations of discrimination absurd on their face.

14.    During my tenure as Dr. Nwachuku's immediate supervisor, she and I had a rather contentious relationship, and I felt compelled to counsel her numerous times about her disrespect for her co-workers as well as about her issues with display of anger. My difficulties with Dr. Nwachuku, however, were unrelated in any way to her race, color, or national origin. In my experience, Dr. Nwachuku has an abrasive personality, with an exaggerated sense of her own excellence. She routinely antagonizes those with whom she works. It is primarily this incapacity

to interact effectively with others that has stymied Dr. Nwachuku's professional advancement. Her technical competence is adequate, but not impressive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on March 3, 2005.


Rita Schoeny, Ph.D.
Senior Science Advisor,
Office of Water

3

# EXHIBIT
# 27

Page 328

1          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
              BALTIMORE DISTRICT OFFICE
2                     VOLUME II

NENA NWACHUKU
3          Complainant        EEOC Case No.
     vs.                      100-2004-011025X
4
MICHAEL LEVITT, ADMINISTRATOR
5   ENVIRONMENTAL PROTECTION    Agency Case Nos.
     AGENCY                     2003-0065-HQ
6          Agency              2004-0050-HQ

7   _____/

8          The above-entitled matter came on for

9   Hearing before Laurence Gallagher, Administrative

10  Judge, on Wednesday, October 26, 2005, commencing at

11  8:10 A.M. at the Equal Employment Opportunity

12  Commission, City Crescent Building, 10 South Howard

13  Street, 3rd floor, Baltimore, Maryland, before Chuck

14  Peppler, a Notary Public.

15  APPEARANCES:

16              LAURENCE GALLAGHER, ADMINISTRATIVE JUDGE

17              ROY J. BUCHOLTZ, ESQUIRE
                   On behalf of the Complainant
18
                PAUL M. WINICK, ESQUIRE
19                 On behalf of the Agency

20

21  REPORTED BY:   Chuck Peppler

Page 553

1  I do not know everything that they have ever done. I
2  had far too many supervisors and far too many people
3  working for me to keep track of all that.
4      Q    A second question, but not with respect to
5  this. With respect to the accretion of duties process
6  that occurs after your panel identifies people that
7  you think should be promoted, what office in the
8  agency handles that?
9      A    The personnel office. I think that's in
10 the Office of Administration or Resources Management
11 or something like that.
12     Q    So, OST does not play a role?
13     A    Well, the manager will play a role both in
14 requesting that the process begin and in making sure
15 all the information is provided. But, in the end, my
16 understanding of the process is that the evaluation
17 itself is done by the personnel office in accordance
18 with established HECD requirements for the accretion
19 process. The manager does not do that. We just put
20 forward the threshold decision of which individuals
21 would go forth as candidates to go through that formal

Page 554

1  process.
2      Q    Thank you. With respect to the EDA
3  promotion that Mr. Bucholtz was inquiring about. I
4  think it was Ms. Hart, Anderson, Connor and Fox.
5  Could you address what prompted the promotion of those
6  four individuals?
7      A    Right. There were four promotions that
8  were given to a single division, that is the
9  Engineering and Analysis Division, that's the EAD, as
10 well as some additional authorizations for hiring
11 additional people. They were given very specifically
12 and narrowly to that division by the deputy
13 administrator of the Agency, whose name was Linda
14 Fisher. That was in consequence of the extreme
15 workload that division was handling at that time. My
16 memory is that at that time, which was 2002-ish, they
17 were running at about 25 to 30 court ordered deadlines
18 per year and were having great difficulty on both
19 keeping up with it and retaining staff because there
20 was a lot of burnout. Tim Connor, for example, on one
21 of his deadlines, I recall him staying in the office

Page 555

1  at his desk for five straight days, he never left, in
2  order to meet the court ordered deadline. There was
3  lot of burnout. So, the deputy administrator at the
4  request of sort of a person between me and her granted
5  additional hiring authority and granted additional
6  administrative ceiling for four additional GS-14s that
7  was clearly limited to that single division. They
8  were not to go for other purposes. They were in
9  recognition of the extreme crunch and workload that
10 division had at that time on court deadlines and it
11 was limited to that division. I always regarded that
12 and still regarded that as sort of extraordinary. It
13 was outside the normal process. It was handled by the
14 division. We all talked about it as a senior
15 management team, all SES talked about it and agreed
16 that the director for that division, whose name was
17 Shelia Frace at the time would go ahead and manage
18 that process inside the division to make the decisions
19 on those four people. They ended up with Tim Connor
20 and Debbie, and I can't remember the other two.
21         JUDGE GALLAGHER:  Fox and Anderson.

Page

1          THE WITNESS:  Yes. But, those four came
2  out of that. It's a separate process which is not a
3  part of this.
4          MR. WINICK:  No further questions.
5          EXAMINATION BY MR. BUCHOLTZ:
6      Q    Just real briefly. Carey Johnston, did
7  you read his write-up for his position?
8      A    I did not. I didn't read any of them.
9          MR. BUCHOLTZ:  Thank you. No other
10 questions.
11         JUDGE GALLAGHER:  Thank you Mr. Grubbs for
12 your testimony. I ask you not to discuss your
13 testimony while this matter is pending before me.
14 You're excused.
15         Ms. Schoeny, can you please raise your
16 right hand.
17 Whereupon,
18         RITA SCHOENY,
19 called as a witness, having been first duly sworn
20 to tell the truth, the whole truth, and nothing but
21 the truth, was examined and testified as follows:

58 (Pages 553 to 556)

Page 573

1  question, but it's a general question regarding
2  promotability. I'm going to overrule. I'm going to
3  allow this and we can move on.
4      MR. BUCHOLTZ: The record shows Jeanette
5  Wiltse not in this case.
6      JUDGE GALLAGHER: I'm going to allow this
7  question and we're going to move on. You can answer.
8      THE WITNESS: Yes, we discussed everyone
9  who was at the GS-13 level.
10     JUDGE GALLAGHER: The question was, did
11 Dr. Nwachuku's name surface as a viable candidate?
12     THE WITNESS: Not as a viable candidate,
13 no.
14     MR. BUCHOLTZ: I have a continuing
15 objection to that.
16     JUDGE GALLAGHER: We're done with this and
17 move on.
18     Q    Could you describe the role in the
19 selection process that's being challenged here today,
20 the one in which Dr. Nwachuku was not chosen and, I
21 guess Carey Johnston and Vera Williams-Bower were?

Page 574

1      A    Okay. I was no longer in Dr. Nwachuku's
2  or anyone's supervisory chain at that point. So, I
3  signed my statement that I was not part of the
4  decision-making.
5      Q    Do you recall at this time whether you had
6  any discussions with anyone concerning that promotion
7  process?
8      A    I really don't recall.
9      Q    If Chris Zarba were to testify under oath
10 that he spoke to you concerning candidates, would you
11 say that is untrue?
12     A    No, I would believe Chris.
13     JUDGE GALLAGHER: You would believe Chris
14 over yourself?
15     THE WITNESS: In terms of recollection at
16 that particular point in time, I was in the throws of
17 a new job.
18     JUDGE GALLAGHER: Okay.
19     Q    Could you identify for me some of the
20 individuals who complained to you directly about
21 Dr. Nwachuku's behavior?

Page 575

1      A    Jafrul Hasan, Dr. Hasan, Lisa Almodovar,
2  Latisha Parker, Robin Oshiro. There were folks from
3  outside the offices including Paul Berger, Tori
4  Carpenter, Octavia Conerly. She was in HECD at the
5  time. I'm trying to remember. Jim Taft, he was a
6  former supervisor in one of our sister divisions.
7  Those are some of the names I can recall.
8      Q    The first four you mentioned, Hasan,
9  Almodovar, Parker and Oshiro, what is their particular
10 science as a specialty?
11     A    They were all hired as microbiologists.
12     Q    So, that's the same specialty of
13 Dr. Nwachuku?
14     A    That's correct.
15     Q    Did these individuals ever work on a team
16 with Dr. Nwachuku?
17     A    Yes.
18     Q    What was that team?
19     A    Well, we had sort of our big teams, which
20 were sort of organizational and functional, organized
21 around expertise that would be the microbial risk

Page 576

1  assessment team. It was the microbial water
2  assessment program. That was one of the teams they
3  were on together. There were temporary teams that
4  would be put together to deal with a particular issue,
5  a particular project. Nena was on teams with some of
6  others. Often Nena worked on her own, her own team,
7  if you will.
8      Q    Paul Berger, Tom Carpenter, what office
9  are they with?
10     A    They are in the Office of Ground Water and
11 Drinking Water. That's one of the regulatory offices
12 in the Office of Water.
13     Q    Is that office a principal customer?
14     A    That is a principal customer.
15     Q    Are there any other principal customers?
16     A    We do the science work for the entire
17 Office of Water, so Office of Ground Water and
18 Drinking Water. So, is the Office of Oceans, Wetlands
19 and Watersheds, Office of Waste Water Management, all
20 of these. There are a lot of projects that cross as
21 well.

63 (Pages 573 to 576)

Towson Reporting Company
410-828-4148

GORE BROTHERS
410-837-3027

Whitman Reporting-Rockville
301-279-7599
bd710cb3-bb9b-4c07-9ac8-6fbd76e763fb

# EXHIBIT
# 28

## AFFIDAVIT OF GEOFFREY H. GRUBBS

I, Geoffrey H. Grubbs, being duly sworn on April 16, 2004, depose and state the

following:

> *In accordance with Public Law 93-579 (Privacy Act of 1974), as an individual furnishing information for inclusion in a system of records, I have been informed that the authority for collection of the information was derived from one or more of the following: Title 5, Code of Federal Regulations, Section 55.2 and 5.2; Title 29, Code of Federal Regulations, Section 1613.216; Title 5, United States, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16 and Executive Order 11478, as amended.*
>
> *I have also been informed that the information supplied will be used as part of the record in an equal employment opportunity discrimination complaint and may not be considered confidential. The record will be furnished to designated agency representatives as part of the complaint process and may also be disclosed to any agents of the Federal Government having oversight or review authority or to others as published in the Federal Register.*

Signature _____  Date _April 22, 2004_____

I, Geoffrey H. Grubbs, do solemnly swear and affirm that:

1. My name is Geoffrey H. Grubbs.  I am Caucasian.  I have not previously

   participated in EEO activities as a complainant or witness for a complainant,

   although I have participated in EEO activities as a manager of employees.

2. I am currently the Director of the Office of Science and Technology, within the

   Office of Water at the United States Environmental Protection Agency

   Headquarters.

3. I currently supervise approximately 160 individuals.

4. The Office of Science and Technology, like other organizational units within

   EPA's Office of Water, is allotted an administrative ceiling for the total number of

Page 1 of 6

Initials _____
Exhibit 11 p. 1-6

people that can be supported at the GS-14 and GS-15 grade levels. In January 2003, I determined that nine of these ceiling "slots" could be filled at the GS-14 and GS-15 levels, to stay within the overall administrative ceiling.

5. On January 24, 2003, I communicated via email to all OST employees my decision to move forward to fill these nine available slots. I explained that of these nine slots, some would be used to fill supervisory and management vacancies (which would be advertised competitively), and that some would be used for promotions for GS-13 employees to the GS-14 level via accretion of duties.

6. The January 24 communication explained my corporate approach to filling these nine available GS-14 and GS-15 slots. The three Division Directors of the Office of Science and Technology, the Deputy Director of the Office of Science and Technology, and myself, would meet and make decisions collectively.

7. The five people identified in the paragraph above came together in March 2003 to agree upon the positions that needed to be posted as competitive vacancies to fill the supervisory and management vacancies, and on individuals who would be promoted on the basis of accretion of duties. All decisions were reached by consensus.

8. We identified seven supervisory and management positions that needed to be filled at the GS-14 or GS-15 levels, which would be posted using EPA's competitive advertisement process. This left two GS-14 ceiling slots to be filled based on accretion of duties.

9. Chris Zarba, the Acting Director of the Health and Ecological Criteria Division, attended the March meeting and identified three supervisory positions that needed

to be filled in his division at the GS-14 and GS-15 levels, two branch chiefs and a deputy division director. The group agreed with these priority needs, so that three GS-14 and GS-15 slots were allotted to HECD for this purpose. Chris did not identify anyone from his division for possible promotion to the GS-14 level based on accretion of duties.

10. After the first seven GS-14 and GS-15 slots were allotted to supervisory and management positions for competitive advertisement, we decided upon the two remaining GS-14 and GS-15 slots available for individuals based on accretion of duties. They were allotted to an African American female who works in my immediate office under Ellen Haffa, the Director of the Resources, Management and Information Staff, and a white male who works in the Engineering and Analysis Division, under Mary Smith, the Director of the Engineering and Analysis Division.

11. On May 23, 2003, Nena Nwachuku came to my office to discuss why she was not selected for promotion to a GS-14 position. She brought a stack of publications and work products and asked why she was not qualified for a GS-14 and what could she do to become qualified. I told her that I did not understand her question, since I had made no judgment about whether she was "qualified" or not. I reminded her that I am not her direct supervisor (I am her third-line manager), so needed to defer to her first-line supervisor about her qualifications. Likewise, since I am not her supervisor I told her I could not tell her how to become "qualified."

12. I showed Nena Nwachuku the January 24 email message I had sent to everyone in OST describing the process for decision making and I explained it to her. While I did not mention names or give her specific numbers, I told Nena that of the nine

Exhibit ___ll___ p. __3__

available slots, many had been allotted to meet supervisory and management needs, leaving only a small number to be filled through accretion of duties. I also explained to her that there were about fifty-five people in OST at the GS-13 level who were eligible for a GS-14 and needed to be considered for this small number of opportunities, so that competition was very high.

13. This led to a discussion in which Nena Nwachuku asked how she could be fairly judged by supervisors, including Chris Zarba, who were in their positions in an acting capacity. I told her that all organizations are constantly in change and that some attrition in supervisory ranks – and the corresponding need for acting supervisors – was normal. I told her that her acting supervisors were fully empowered to make decisions and that I felt they were able to assess the eligible candidates for available GS-14 positions.

14. Through this process, the Health and Ecological Criteria Division was given three supervisory positions for competitive promotions. This is one third of the promotion slots that were available. Also, HECD already has approximately half of its staff at the GS-14 or GS-15 level. This is the highest percentage of any organizational unit within OST.

15. On June 5, 2003, I hosted an all hands brown-bag lunch with the Health and Ecological Criteria Division to discuss the issues or concerns of the people working in the Division. This was part of a regularly scheduled series of brown-bag lunches I hosted with employees in each of the major organizational units of the Office of Science and Technology. Approximately twenty to twenty-five individuals attended the June 5 lunch meeting with HECD.

16. At the June 5 meeting, I discussed promotions to the GS-14 and GS-15 levels in OST. I walked through my January 24 email message, the process we used, and

Exhibit____ll____p.____7____

*Page 4 of 6*

the numbers related to the administrative ceilings. I also took questions from those that attended. One of the questions was from Nena Nwachuku, who asked how acting supervisors could make judgments of employees for the purposes of promotion. I answered her question in the same way that I had during our May 23 private meeting, as described in paragraph 13 above.

17. Nena Nwachuku was not discriminated against in this process. The promotions were based on a corporate approach that was not discriminatory.

18. I am aware that Nena Nwachuku had participated in a union grievance and I served as a Step 3 decision official upon that grievance about two years ago. That personal history was not a factor at all in the process for managing the GS-14 and GS-15 ceiling for the Office of Science and Technology, nor to my knowledge, in any of the decisions concerning the nine available slots for the Office.

19. I have no further information about this matter.



*I have read the above statement consisting of ⟨₆⟩ pages. It is true and complete to the best of my knowledge and belief. I have made all necessary corrections and additions, initialing next to each. I have also signed or initialed each page. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties. In accordance with 28 U.S.C. Section 1746, I declare under penalties of perjury that the above statements are true and correct to the best of my knowledge, information and belief.*

_____          _____
Signature                                                        Date    *April 22, 2004*

*I, Yvonne Turner , have witnessed the above sign this affidavit and I am an impartial third party.*

_____          _____
Signature                                                        Date    *4-22-04*

*I, Nicole Lovelock, hereby certify that I obtained the above affidavit in connection with a duly authorized EEO complaint investigation.*

_____          _____
Signature                                                        Date    *4/23/04*

# EXHIBIT
# 29

Gov't HRG EX
8

## Declaration of Vera Williams-Bower

I, Vera Williams-Bower, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.      I currently serve as a Systems Administrator in the Office of Science and Technology (OST); and, at the time of the spring 2003 promotion process, I was serving as an Information Technology Specialist in OST. My promotion to a GS-14, incident to the spring 2003 process, resulted in my job title and series being modified.

2.      I am currently assigned to the Resource Management and Information Staff (RMIS), and my immediate supervisor is Ellen Haffa. I was assigned to RMIS at the time of the spring 2003 promotion process, and Ms. Haffa was my immediate supervisor then, as well.

3.      In the spring of 2003, I was a GS-13 with sufficient tenure to qualify for a GS-14 promotion. I was one of a large number of OST employees eligible for promotion consideration; and, pursuant to an invitation to submit materials documenting my qualifications, I submitted such a package to Ms. Haffa.

4.      At no time did Ms. Haffa or anyone else ever suggest to me that I should not submit my promotion write-up, and I was not dissuaded from doing so by the large number of competing candidates, because it was my sense that I was very well qualified.

5.      I never told Nena Nwachuku that Ms. Haffa had advised me not to submit my documentation, and I never had any conversation with Dr. Nwachuku concerning the GS-14 promotion process. If Dr. Nwachuku has stated differently, her recollection is flawed, insofar as such events never transpired.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 21, 2005.

Vera Williams-Bower
Systems Administrator
Resource Management and Information Staff
Office of Science and Technology

