# EXHIBIT 51

 **Elizabeth
Doyle/DC/USEPA/US**
05/18/2006 01:42 PM

To   Nena Nwachuku/DC/USEPA/US@EPA

cc

bcc

Subject   CCL Expert Panel Charge

Nena,

Eric and I met today at 11:00 to discuss the charge for the Expert Panel.  I am sorry that you could not attend.

We concluded that the charge is not yet ready to go forward for approval by Ed and Pam because OGWDW has remaining concerns that have not yet been resolved.  Therefore, I have recommended that the meeting scheduled with Ed and Pam today from 4:00 to 5:00 be cancelled until the charge is revised.  I will schedule a meeting with you for early next week to discuss the revisions that are required.  We can reschedule with Ed and Pam after we have agreement with Eric that the charge is ready.

I regret that I can not authorize your travel for next week because of the critical importance of finalizing the charge so that it can be forwarded to the Panel.

I want to remind you that you do not have authorization to travel on government.  I do not want you to incur costs because you are unaware that your TA has not been signed.



# EXHIBIT 52



## Declaration of Elizabeth Doyle

I, Elizabeth Doyle, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.    I presently served as the Branch Chief of the Human Risk Assessment Branch of the Health and Ecology Criteria Division (HECD) in the Office of Science and Technology (OST). I have served in this capacity, with Edward Ohanian as my immediate supervisor, the HECD Division Director, since June 2, 2003.

2.    At the time that I assumed the role of Branch Chief, Dr. Nwachuku was an immediate subordinate, and she has remained so to the present.

3.    On May 18, 2006, both in an e-mail and in a late afternoon face-to-face conversation with Dr. Nwachuku, I expressly advised her that I would not be executing a travel authorization (TA) for her attendance at the Orlando, Florida American Society of Microbiologists (ASM) conference the week of May 22nd. I made it clear to Dr. Nwachuku that her first priority the week of May 22nd was to complete the CCL *Charge* and that I expected her to remain in D.C. to do so.

4.    Prior to my communiques on May 18th, I had informed Dr. Nwachuku in a number of e-mails throughout the week of May 15th that her first priority was completion of the CCL *Charge*, and that I would not be authorizing her travel to the ASM conference absent such completion.

5.    Given the Office of Ground Water and Drinking Water's objections to the draft *Charge*, and my realization on May 18th that such objections could not be addressed until the week of May 22nd, I felt compelled to advise Dr. Nwachuku on May 18th of her ineligibility to attend the ASM conference. I had already been alerting Dr. Nwachuku to such prospect, however, so I did not regard my May 18th e-mail and face-to-face discussion as imparting surprising news.

6.    When I arrived at work on Monday May 22nd, I first discovered that Dr. Nwachuku was absent because my Branch's in/out board reflected that she would be at the ASM conference all week. I subsequently read an e-mail from Dr. Nwachuku dated Friday May 19, 2006 at 10:20 p.m., in which she advised Edward Ohanian and myself of her intended absence during the week of May 22nd.

7.    In addition, I had a May 19, 2006 voice mail message on my office telephone from Sarah J. Williams, an Agency employee in the Office of the Chief Financial Officer (OCFO), asking me to confirm that Dr. Nwachuku was authorized to travel to Orlando, Florida, departing May 20th and returning May 26th. I was out for my compressed day on May 19th.

8.    Aware that I had expressly instructed Dr. Nwachuku that she was not authorized to attend the ASM conference, I inquired from Dr. Ohanian as to whether he might have

countermanded that order. Dr. Ohanian advised me that he received Dr. Nwachuku's May 19th e-mail on Saturday morning and that he immediately sent a response informing her that she was absolutely not authorized to attend the ASM conference until after she had completed the CCL . *Charge*. Dr. Ohanian stated that he had not heard anything further from Dr. Nwachuku. I also inquired of Robert Cantilli, William Swietlik, and Maria Gomez-Taylor, two other branch chiefs and the Deputy Division Director in HECD. None of them had signed her travel authorization.

9.      I had not signed a TA for Dr. Nwachuku and had, in fact, expressly advised the HECD administrative person, Sherry Howard, who would have processed a TA, that I would not be executing one for Dr. Nwachuku. On Monday May 22, 2006, I called Ms. Williams to advise her that Dr. Nwachuku's travel was not authorized.

10.     I am aware that Dr. Nwachuku does not possess a Government travel credit card and routinely requests cash advances before she travels, so as to avoid having to incur out-of-pocket costs for per diem expenses such as food and lodging. It is my understanding that Dr. Nwachuku requested a cash advance in connection with her Orlando, Florida travel, but absent a signed TA, Dr. Nwachuku would not have been able to secure such an advance. And, in fact, she did not receive a cash advance with respect to her Florida travel.

11.     Furthermore, the invariable practice, with respect to Dr. Nwachuku's requests for travel advances was for me to sign the requisite travel authorization form and for Sherry Howard to then provide Dr. Nwachuku with an e-mail confirmation reflecting my endorsement of her travel advance request. In connection with Dr. Nwachuku's Orlando, Florida excursion, I never executed such form, which would have been a pro forma matter had I been willing for Dr. Nwachuku to travel to the ASM conference. I have never failed to authorize a travel advance for Dr. Nwachuku in circumstances where I endorsed the underlying travel. In addition, Ms. Howard never generated the confirmatory e-mail, insofar as the process never progressed to that stage.

12.     In my discussions with Ms. Williams, she revealed to me that, on May 19, 2006, Dr. Nwachuku had contacted Rogers Travel, the Agency's travel contractor, and made reservations at such time to travel to Orlando, Florida on May 20th, with the return flight on May 26th. I specifically requested that Ms. Williams provide me a copy of Dr. Nwachuku's itinerary, so that I would have evidence precluding Dr. Nwachuku from later claiming that any of her absences during the week of May 22nd might have been related to illness.

13.     It is my understanding that, at the time that she made her ticket reservations on May 19th, Dr. Nwachuku made a representation to the travel contractor that she was authorized to conduct such official travel. Ms. Williams told me that Dr. Nwachuku told the travel agent that her TA was in progress, but had not been completed before her travel, and that a CBA form and signed TA would be available on the following Monday. This representation was false.

14.     In contravention of my direct instruction that she not travel to the ASM conference during the week of May 22nd, it is my understanding that Dr. Nwachuku did so travel,

by employing the subterfuge of withholding from Rogers Travel the fact that she was not authorized to perform the Florida travel at issue and via such fraud securing airline tickets through that contractor. It is my further understanding that the cost of Dr. Nwachuku's airline tickets was charged directly against EPA.

15.     Ms. Williams advised me that, upon learning of the unauthorized status of Dr. Nwachuku's Orlando travel, OCFO's standard practice would have been to send out a recoupment e-mail to Dr. Nwachuku seeking recovery from her of the cost of the airline tickets. I understood, however, that Dr. Nwachuku's conduct had criminal implications, and I had been advised that any recoupment activities should be deferred until after the Office of Inspector General had had an opportunity to review the matter. I asked that Ms. Williams provide me with a copy of the recoupment e-mail that OCFO intended to send to Dr. Nwachuku so that I could forward it to the Office of General Counsel (OGC), and I also asked that OCFO hold off sending such correspondence until OGC endorsed such action.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on November 6, 2006.


Elizabeth Doyle, Branch Chief
Human Risk Assessment Branch
Health and Ecology Criteria Division
Office of Science and Technology

3

# EXHIBIT
# 53



**Edward**
Ohanian/DC/USEPA/US
05/20/2006 11:39 AM

To   Nena Nwachuku/DC/USEPA/US@EPA

cc   Eric Burneson/DC/USEPA/US, "Elizabeth Doyle".
    <doyle.elizabeth@epa.gov>, Pamela
    Barr/DC/USEPA/US@EPA

bcc

Subject   Re: Final Agenda, charge, list of experts and EPA observers

Nena,
As I indicated to you in my email last Thursday, both Pam and I need to hear from our respective BCs whether the agenda/charge is ready for DD review. Based on Beth's and Eric's feedback last TH, it isn't to date. Thus, you need to meet with them to incorporate their comments, followed by a meeting with Pam and me for our approval before going to your ASM meeting next week. Thanks, Ed

----------------------------
Sent from my BlackBerry Wireless Handheld
  Nena Nwachuku

> **From:** Nena Nwachuku
> **Sent:** 05/19/2006 10:20 PM
> **To:** Alfred Dufour; AngelaD Page; Brendlyn Faison; Carrie Moulton; Crystal Rodgers; E Hilborn; Gerard Stelma; George Hallberg <GHallberg@cadmusgroup.com>; Jafrul Hasan; James Sinclair; Jennifer Best; Jorge Santodomingo; Jo Anne Shatkin <JShatkin@cadmusgroup.com>; Kenneth Rotert; Keya Sen; Mary Rothermich; Michael Messner; Nelson Moyer <nmoyer@cadmusgroup.com>; Robert Luebke; Thomas Carpenter; Nena Nwachuku; Steve Schub/DC/USEPA/US@EPA; Stig Regli; Stephen Vesper; KSullivan@icfconsulting.com; PFlight@icfconsulting.com; Maggie Javdan; Tracy Bone; Hiba Shukairy; Cynthia Nolt-Helms; Jitendra Saxena
> **Cc:** Eric Burneson; Elizabeth Doyle; Barb Walton; Bruce Mintz; Pauline Mendola; Gregory Carroll; Edward Ohanian
> **Subject:** Final Agenda, charge, list of experts and EPA observers

Hi all,

1) As promised, please find attached below the final Agenda, Charge, Expert and EPA observer list for the CCL workshop.

2) The deliberative items in the charge and the NDWAC report (fedexed) were packaged and sent to the logistics contractor today for mailing/emailing to all the experts before ASM. About 50% of them will be at ASM. I worked with the contractors all day as they receive the items and cross check with me. Some were too big and I had to resend them bit by bit. So everything is on track with a little over two weeks to go.

3) The second note taker which was the outstanding item at our last meeting discussion has been resolved. We will now have a note taker to cover the second break out room also.

4) The preparation for the workshop is almost done. I will be at the Annual meeting of the American Society for Microbiology in Orlando next week for my presentations and knowledge update. Some of our members are going too. I know Jerry will be there.

5) Can some one help us talk to Mike Messner about taking a look at the compilation method to offer his statistical insight? Or will Jerry speak to the Cinci Larry?

Attachment
 A) Final agenda as discussed and agreed to by the workgroup. There is an adjustment in the time allotted for compilation presentation. Gerry has asked for a full 30 minutes instead of     20.
Judging from the confusions on the compilation methods, write up and results, at our last



meeting, not to mention the complexity, he has his work cut out for him.
B) The charge as discussed and revised within the workgroup and agreed to by the workgroup
C) The final expert list. All of them are on board. The EPA observers are included. I have     added Tracy
Bone to the final list.
    Thanks and good night.
---Nena


Nena Nwachuku, Ph.D.
U.S. Environmental Protection Agency
Office of Water, Mail Code 4304T
Office of Science and Technology
1200 Pennsylvania Ave. NW.
Washington, DC. 20460
Ph: 202-566-1116  Fax: 202-566-1139
nwachuku.nena@epa.gov

8

# EXHIBIT 54

Page 3

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

- - - - - - - - - - - - - - - - - - x

NENA NWACHUKU,

            Appellant,

    v.    : Docket No.
        : DC-0752-07-0259-I-1

ENVIRONMENTAL PROTECTION AGENCY,

           Agency.

- - - - - - - - - - - - - - - - - - x

        Merit Systems Protection Board
        Washington, D.C.

        Tuesday, March 20, 2007

    THE HEARING in the above-entitled matter commenced at
9:13 a.m., pursuant to notice.

    BEFORE:

        RAPHAEL BEN-AMI, Administrative Law Judge

---

## CONTENTS

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Elizabeth Doyle | 6 | 38 | — | — |
| Sarah Williams | 111 | 122 | 132 | — |
| Eric Burneson | 134 | 150 | — | — |
| Dana Thomas | 164 | 169 | — | — |
| Edward Ohanian | 174 | 196 | 228 | 228 |

| APPELLANT EXHIBITS: | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| D | Undescribed documents | 5 | 5 |
| E | Undescribed documents | 5 | 5 |
| F | E-mail from S. Howard | 5 | 5 |
| G | E-mail from N. Nwachuku, dated 5/17 | 5 | 5 |
| H | Undescribed documents | 5 | 5 |
| I | Undescribed documents | 5 | 5 |
| J | E-mail from T. Carpenter, dated 5/11 | 5 | 5 |
| K | Undescribed documents | 5 | 5 |
| L | Undescribed documents | 5 | 5 |
| M | Undescribed documents | 5 | 5 |
| N | Undescribed documents | 5 | 5 |
| O | Undescribed documents | 5 | 5 |
| P | Undescribed documents | 5 | 5 |

Page 2

## APPEARANCES:

On Behalf of the Appellant:

JAMES E. SIMPSON, ESQ.
Swick & Shapiro, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005

On Behalf of the Agency:

PAUL WINICK, ESQ.
Environmental Protection Agency
Office of General Counsel
Employment Law Practice Group
Mail Code 2377A
Ariel Rios North
Room 7454D
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Page 4

## CONTENTS

| APPELLANT EXHIBITS: | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Q | Undescribed documents | 5 | 5 |
| R | Written responses by Appellant | 5 | 5 |
| S | E-mail from J. Sinclair | 5 | 5 |
| T | Undescribed documents | 5 | 5 |
| U | Undescribed documents | 5 | 5 |
| V | Undescribed documents | 5 | 5 |
| W | Undescribed documents | 5 | 5 |
| X | Undescribed documents | 5 | 5 |
| Y | Undescribed documents | 5 | 5 |
| Z | Undescribed documents | 5 | 5 |

Page 141

1    Q   Okay. Was there any meeting subsequent to the one
2    that you had on the morning of May 18th with the managers you
3    have identified?
4    A   There was no meeting. That meeting was -- that had
5    tentatively been scheduled was canceled when we didn't
6    receive the revised charge.
7    Q   Okay. So at the end of the day on May 18th, there
8    has been no meeting with Pamela Barr and Ed Ohanian, correct?
9    A   That is correct.
10   Q   Okay. There has been no adoption by the Office of
11   Groundwater and Drinking Water of the charge at that point.
12   A   Correct. That is correct.
13   Q   Okay. What happened subsequent to that, say the
14   following week, May 22nd?
15   A   When I got to the office on May 22nd, I noticed in
16   my e-mail box that I had been copied by Dr. Nwachuku on a
17   transmission of a revised charge. The charge had been
18   disseminated to the entire working group as well as to the
19   external expert panel members. I noticed that the revised
20   charge had not addressed a number of comments that had been
21   provided by the OGWDW staff. I expressed -- I contacted
22   Dr. Doyle and expressed my concern that the revised charge
23   had been disseminated.
24   Q   Do you know what Dr. Doyle did after she had
25   received your information?

Page 142

1    A   Dr. Doyle and I discussed what should be the next
2    steps and we agreed that it would be appropriate to inform
3    the workgroup and the external experts that this charge did
4    not represent the Agency's charge. She went ahead and
5    transmitted an e-mail to the workgroup and to the external
6    workgroups indicating such and that we would be sending
7    another charge, another revised charge in the future.
8    Q   Okay. Now this is Monday, I take it, that this
9    happened.
10   A   Yes, it is.
11   Q   Were you aware of Dr. Nwachuku's absence during
12   these conversations with Dr. Doyle?
13   A   We may have discussed whether or not she was
14   present in the office. I think, yes, I was aware of the fact
15   that Dr. Nwachuku was not there to discuss this with us at
16   that time.
17   Q   Okay. How was the final charge developed at that
18   point in time? What steps did you take to effect that?
19   A   We agreed that we would work with the charge to
20   incorporate the edits that had been previously put forward by
21   the workgroup, particularly by the OGWDW staff, to prepare a
22   revised draft of the charge and circulate it amongst a group
23   consisting of myself, Dr. Doyle, Tom Carpenter and we
24   received some input from some other additional staff who had
25   been involved in the Office of Groundwater and Drinking

Page 143

1    Water.
2    Q   Okay. And this process was ongoing during the week
3    of the 22nd I take it.
4    A   That is right. We had targeted it Wednesday,
5    but --
6    Q   Okay. Was the charge that you were developing in
7    this process you have just described ever shared with Pamela
8    Barra and --
9.   A   Once the staff and myself and Dr. Doyle were
10   comfortable with it, I know that I shared and discussed with
11   Pamela Barr the revised charge and obtained her approval.
12   Q   Okay. So at some point in time during the week of
13   the 22nd, this process had reached its conclusion.
14   A   That is correct.
15   Q   And you had an acceptable charge that the Office of
16   Groundwater and Drinking Water adopted, OST was happy with
17   and this was the product that was going to get sent out to
18   the experts and the workshop participants.
19   A   That is correct. We had a charge that reflected
20   our concerns regarding the scope and the clarity of --
21   Q   Do you know whether that charge was ever
22   distributed to the workgroup and the experts prior to
23   June 6th?
24   A   To my knowledge, it was not distributed to the
25   experts prior to June 6th.

Page 144

1    Q   Did you get an e-mail from Beth Doyle on I guess it
2    was May 30th on instructing Dr. Nwachuku to distribute the
3    charge and to identify for you and Ms. Barr and Dr. Ohanian
4    that she had done so?
5    A   I did get such an e-mail indicating that she should
6    disseminate the revised charge, yes.
7    Q   Did Beth Doyle subsequently call you to acquire as
8    to whether you had ever gotten confirmation from --
9    A   She asked me, I believe, the next day if I had
10   heard or received this dissemination of the charge and I
11   responded that I had not.
12   Q   Okay. So as far as you knew, come May 31st, the
13   charge that you had developed, that final charge had not been
14   disseminated.
15   A   That is correct.
16   Q   Did you have any interaction with Beth Doyle on
17   June 5th concerning whether the charge had ever been
18   disseminated?
19   A   Yes. I believe we communicated with one another
20   once again trying to confirm whether or not a revised charge
21   had been disseminated to the experts who were due to meet the
22   next day.
23   Q   And as of that point in time, you still had not
24   received a confirmation.
25   A   At that point, we had no indication it had been

Page 145

1  disseminated.
2      Q   Okay.  Let's go to the next day, June 6th, which is
3  the start of the CCL workshop as I understand it.  Could you
4  describe for me the incident that occurred prior to the
5  commencement of that workshop, the participants, the nature
6  of it?
7      A   The workshop was being held in a hotel in the
8  Crystal City area of Arlington.  I arrived 15 minutes or so
9  before the scheduled start time.  At that time, Ed Ohanian,
10 director of health and ecological criteria division,
11 approached Beth Doyle and I and asked to speak to us in the
12 hallway immediately outside of the room in which the experts
13 were meeting.  And Dr. Nwachuku joined us for that
14 conversation.
15     Ed Ohanian indicated to me -- indicated to us
16 during the conversation he had spoken to Nena and he had
17 directed her to disseminate the revised charge that had been
18 provided to her by Dr. Doyle.  At that point, Dr. Nwachuku
19 explained that the -- that was ridiculous, that the charge
20 that had been disseminated was perfectly fine and there was
21 no reason to disseminate it and confuse matters.
22     Q   The charge that she felt was acceptable was the one
23 she had sent out on May 19th; is that correct?
24     A   I believe she was referring to a previously
25 submitted charge, yes.  We were immediately outside of the

Page 146

1  meeting room and I was between Dr. Ohanian and Dr. Doyle and
2  opposite Dr. Nwachuku and sort of looking over Dr. Nwachuku
3  into the meeting room itself and the external experts were
4  present there.  The conversation -- the tone of the
5  conversation was rising to a high enough volume it certainly
6  was drawing attention from the participants in that room.
7      At about that point, Pamela Barr, who is director
8  in the Office of Groundwater and Drinking Water, arrived at
9  the meeting and she noticed that we were having a
10 conversation and that it was happening at quite a loud level.
11 She joined the conversation and asked that -- requested
12 generally that the -- we try to keep the tone calm, remain
13 calm, so that given the location that we were with regards to
14 the external experts that were just preparing to meet with
15 them.
16     Q   And who was responsible for the volume primarily?
17     A   In my estimation, it was Dr. Nwachuku.  She
18 certainly raised the volume when she had explained her
19 concern about the ridiculousness of disseminating a revised
20 charge.
21     Q   How was this issue resolved?
22     A   Well, at that point, Dr. Doyle began to explain
23 that she had directed Dr. Nwachuku to -- previously directly
24 Dr. Nwachuku to disseminate the revised charge to the
25 workgroup and on a couple of occasions, had instructed her

Page 147

1  that that revised charge needed to incorporate the comments
2  submitted by the workgroup and also needed to obtain approval
3  from herself, myself as well as the division directors.
4      As Dr. Doyle was speaking, Dr. Nwachuku began
5  talking over her intimating that Dr. Doyle had a long history
6  of I believe the word she used was sticking her nose in
7  business where it didn't believe and that she had already
8  previously directed -- attempted to direct Dr. Nwachuku's
9  contractors in violation of contracting requirements
10 inappropriately.
11     Around this time, Pam Barr, you know, reiterated
12 her concern that we needed to remain calm in this
13 conversation if it was to proceed.  And if we weren't able to
14 conduct this conversation in a calm manner, she was
15 suggesting that we might need to consider not having the
16 conversation and perhaps not having the meeting.
17     Q   Okay.  So she raised the prospect of canceling the
18 workshop, Pam Barr did?
19     A   Yes.  At that point in the -- at Pam's suggestion,
20 I indicated that I believed the meeting should proceed and
21 that we should proceed with a revised charge being
22 disseminated to the workgroup, that we felt that it was an
23 important step to have this meeting conducted in the time
24 frame that it was scheduled and that if we could get that
25 disseminated charge, we believed that we could make the

Page 148

1  necessary progress to do that.
2      While I was speaking, Dr. Nwachuku raised -- also
3  began speaking indicating her doubts as to whether or not
4  there was any value to using the revised charge as opposed to
5  the charge that had been previously disseminated by herself.
6      Q   How would you describe Dr. Nwachuku's demeanor
7  during this incident?
8      A   Dr. Nwachuku was quite angry and again, raised her
9  voice, especially when others were speaking to -- and was
10 refuting quite loudly the statements that were made by
11 others.
12     Q   Did she ever invade anyone's personal space in the
13 course of this?
14     A   At a point in the conversation when Dr. Doyle was
15 speaking with regards to the revised -- having instructed
16 Dr. Nwachuku to submit a revised charge and when Dr. Nwachuku
17 began speaking over her, she did gesture in the direction of
18 Dr. Doyle's face when she referenced the degree to which she
19 had put her nose in another person's business.  At that
20 point, Dr. Doyle requested that Dr. Ohanian instruct
21 Dr. Nwachuku to get out or provide her with her personal
22 space.  And when Dr. Ohanian made that request, Dr. Nwachuku
23 stepped back.
24     Q   Did that happen more than one time?
25     A   With regards to gesturing and to Dr. Doyle's space,

# EXHIBIT 55



## <u>Declaration of Sarah J. Williams</u>

I, Sarah J. Williams, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.     I presently serve as a Financial Specialist in the Office of the Chief Financial Officer (OCFO).  In this capacity, I am responsible for processing travel voucher documents, interfacing with the Agency's travel contractor, Rodgers Travel, and generating financial documents that track funding obligations/payments associated with EPA employees' travel.  My additional duty is to make payments on the Centrally Billed Account (Corporate Credit card account).  I have been continuously serving in OCFO in the capacity noted above since February 7, 2004 to present.

2.     Late on the afternoon of Friday May 19, 2006, I received a phone call from a representative of Rodgers Travel, Anthony Crisomia, who advised me that he was missing a CBA for in connection with a travel request for Dr. Nena Nwachuku.  Mr. Crisomia advised me that the anticipated travel was for Saturday May 20th.

3.     Dr. Nwachuku does not possess a Government travel credit card, which means that, in connection with her travel, Rodgers Travel would ordinarily receive from my office, OCFO, a CBA form reflecting that the cost of her travel may be charged directly against EPA.  Once in possession of such a form, the travel contractor is authorized to purchase airline tickets at Government expense.  For those Agency employees who possess a Government travel credit card, no CBA form is generated, since the travel charges related to such individuals are billed directly to their personal accounts, and they, not the Agency, are liable.

4.     Upon receiving Mr. Crisomia's call, I tried to reach the four individuals reflected in our travel management system as being approving officials for Dr. Nwachuku's travel.  I phoned each named individual, but none returned my calls.  I was trying to confirm that, despite our office's want of a CBA form, Dr. Nwachuku's travel was indeed authorized.  I recall specifically leaving voice mail messages for each of the persons that I called.  One such person was Elizabeth Doyle.

5.     Having been unable to establish that Dr. Nwachuku's travel was authorized and recognizing that I would not be able to do so prior to the commencement of her scheduled travel, I made a command decision to advise Rodgers Travel to acquire the airline tickets and charge their cost to EPA's account.  I made such decision appreciating that, with some regularity, EPA personnel find themselves having to travel on a moment's notice, and a delinquent generation of a CBA form or its possible misplacement by OCFO is not a legitimate basis to thwart an employee's mission critical travel.  Obviously, my expectation is that EPA employees act in good faith and perform official travel only in circumstances for which they have received the requisite authorization.

6.     On Monday May 22, 2006, I received a phone call from Beth Doyle, who, in response to my voice mail message of the previous Friday, advised me that Dr. Nwachuku did

not have authorization to travel to Florida, that Dr. Doyle had expressly so informed her.   Upon notification of the unauthorized use of the Centrally Billed Account, I promptly informed my Supervisor Patrick Griffis of the situation.

7.    During my discussion with Dr. Doyle, she asked me to secure from Rodgers Travel an itinerary for Dr. Nwachuku's trip.  Dr. Doyle advised me that she wanted such itinerary in order to preclude Dr. Nwachuku from later claiming that any part of her absence from work. during the week of her Florida excursion was related to sickness. .

8.    After my discussion with Dr. Doyle, I spoke to Scott Sylvester, my principal contact at Rodgers Travel, and asked him to send me a copy of Dr. Nwachuku's itinerary, which he did.  I forwarded to Dr. Doyle such document, which reflected that Dr. Nwachuku would be departing Washington, D.C. on May 20, 2006 and returning to D.C. on May 26, 2006.

9.    Because of my understanding from Dr. Doyle that Dr. Nwachuku's travel had been under false pretenses, I sought to discover from Rodgers Travel the sequence of events that had led to Mr. Crisomia's call to me in search of the missing CBA form late on the afternoon of May 19th.

10.    My discussion with Rodgers Travel revealed that Dr. Nwachuku had made airline reservations on May 15, 2006, for travel to Orlando, Florida, but that she had subsequently cancelled such reservations at 4:26, 19 May 2006.  It is my understanding that Rodgers Travel never acquired airline tickets for Dr. Nwachuku incident to such reservations, insofar as there never existed a CBA form, authorizing them to do so.

11.    It is my further understanding that, in connection with the reservations that Dr. Nwachuku made on May 15th, she subsequently advised Rogers Travel, on the after-hours line, that someone named Sherry (Howard) would contact the travel contractor with a TA number.

12.    Mr. Sylvester additionally informed me that Dr. Nwachuku called Rogers Travel on Friday May 19, 2006 at 4:25, and made reservations a second time to travel to Orlando, Florida, departing on May 20, 2006 and returning on May 26, 2006.  I have confirmed that the ticket that Rogers Travel purchased based on this reservation was used.  The time frame is most likely because Dr. Nwachuku did not inform Mr. Crisomia of the initial reservations that were in the system until he had finished the second reservations.  Thus Mr. Crisomia cancelled the initial reservation.

13.    It is my understanding, based on my discussion with Mr. Sylvester, that when Rodgers Travel went to acquire Dr. Nwachuku's tickets for her May 19th reservation, the contractor realized that it lacked the requisite CBA form authorizing the contractor to charge the cost of such tickets directly to EPA.  It is my further understanding that Rodgers Travel reached that realization very late in the work day of Friday May 19th.  Mr. Sylvester confirmed for me that it was such discovery that led Rodgers Travel to contact me concerning such matter.

14.    Mr. Sylvester has also advised me that, in the normal course of operations, Rodgers

Travel would have processed Dr. Nwachuku's reservation request rather promptly, in light of the imminence of her scheduled travel. He also stated that the Travel Agent would have asked for a government travel card number if they noticed that there was not one in the system for the Traveler and the Traveler would have to say that this ticket was being charged to the house Account or be able to provide their government travel card number.

15.     After concluding my inquiries with the travel contractor and securing from the contractor what documentation it possessed of Dr. Nwachuku's Florida travel history, I contacted Dr. Doyle. I advised Dr. Doyle that Dr. Nwachuku had communicated with Rodgers Travel on May 19th and had obviously represented at such time that she was authorized to travel to Orlando, Florida, departing on May 20th and returning on May 26th. I further advised Dr. Doyle that the travel contractor had acquired airline tickets for Dr. Nwachuku, for which EPA had paid.

16.     At some subsequent time, I recall advising Dr. Doyle that Dr. Nwachuku's tickets had been used.

17.     OCFO's normal modus operandi concerning unauthorized travel, is that the office sends an e-mail to the wayward traveler requesting reimbursement for any expenses absorbed by the Agency incident to such travel. In Dr. Nwachuku's case, such an e-mail would have asked for reimbursement for the price of the airline tickets.

18.     During my discussions with Dr. Doyle, however, she advised me that Dr. Nwachuku's conduct was being referred to the Office of Inspector General (OIG) and that OCFO should defer sending Dr. Nwachuku our standard recoupment e-mail, until such time as we were informed, presumably by the Office of General Counsel, that doing so was appropriate.

19.     I shared a copy of OCFO's standard recoupment e-mail with Dr. Doyle, and I subsequently sent such e-mail (tailored to the individual circumstances) to Dr. Nwachuku on July 10, 2006, after being advised that our office could proceed with its recovery processes.

20.     I understand that Dr. Nwachuku claimed never to have received my July 10th e-mail, so I resent that recoupment e-mail on July 31, 2006. I received confirmation that this email had been opened by Dr. Nwachuku on August 16, 2006, and in August, I turned the matter over to OCFO's accounts receivable division, which I understand sent Dr. Nwachuku a formal bill on August 14, 2006, with a September 13, 2006 due date. I spoke to our account receivables to see if Dr. Nwachuku had contacted them in regards to the bill that was sent to her. Dr. Nwachuku did contact the Receivables team on August 28, 2006, they could not tell me if this was in regards to the outstanding bill for the airline ticket or an outstanding advance that she has also been billed for. To my knowledge, Dr. Nwachuku's debt is now in a delinquency status.

21.     Finally, I have examined OCFO records concerning Dr. Nwachuku's Florida travel herein at issue, and I have confirmed that Dr. Nwachuku did request a travel advance in connection with her Orlando trip. OCFO's records reflect, however, that no documentation authorizing such an advance was ever filed with our office. Such documentation would have included a specific signed endorsement for paying the advance at issue, and it is my

understanding that Dr. Doyle would have been the signatory of any such record. The absence of such documentation is consistent with Dr. Doyle's initial and consistent assertion to me that Dr. Nwachuku was never authorized to travel to Orlando, Florida. It is my conclusion that Dr. Nwachuku secured her airline tickets from Rodgers Travel under false pretenses.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 16, 2006.


Sarah J. Williams
Financial Specialist
Office of the Chief Financial Officer

4

# EXHIBIT 56

### Declaration of Elizabeth Doyle

I, Elizabeth Doyle, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1. I presently served as the Branch Chief of the Human Risk Assessment Branch of the Health and Ecology Criteria Division (HECD) in the Office of Science and Technology (OST). I have served in this capacity, with Edward Ohanian as my immediate supervisor, the HECD Division Director, since June 2, 2003..

2. At the time that I assumed the role of Branch Chief, Dr. Nwachuku was an immediate subordinate, and she has remained so to the present.

3. With the exception of Dr. Nwachuku's travel to Orlando, Florida in connection with her attendance at the May 2006, ASM conference, throughout her entire tenure as my immediate subordinate, Dr. Nwachuku has not a single time traveled on official business without Edward Ohanian or I having signed a travel authorization for her. I did not sign a travel authorization for her Florida trip, and I expressly advised her on May 18, 2006 that I would not be doing so.

4. Dr. Nwachuku has not possessed a Government travel credit card during the entire time that I have served as her immediate supervisor. Thus, during this time frame, the transportation costs that she has incurred incident to her travel have always been charged directly against the Agency at the time that her tickets were acquired by the travel contractor.

5. It is my understanding that, absent a signed travel authorization from a specifically authorized management official, the Office of the Chief Financial Officer (OCFO) will not generate a CBA Form, which is the document that authorizes EPA's travel contractor to charge the cost of an employee's tickets directly against the Agency.

6. It is also my understanding that OCFO has a register that identifies the authorized signatories for each Agency employee who might travel on official business and that I appear on such register as a signatory for Dr. Nwachuku. It is my further understanding that, in each instance of Dr. Nwachuku's travel under my supervision, with the sole exception of her May 2006, Florida trip, OCFO generated a CBA Form, based on a travel authorization that I had signed.

7. It is also my understanding that, absent a signed travel authorization, OCFO will not process an employee's request for a cash travel advance. I am aware that Dr. Nwachuku requested such an advance in connection with her Florida travel, but I have been advised that she never received one.

8. HECD's process for authorizing travel is as follows:

  a. In the beginning of the fiscal year, and continuing throughout the year,

Division employees are asked to identify travel opportunities of which they would like to avail themselves. Such travel would normally be to professional conferences and/or training scheduled well in advance, so that an employee would have a substantial lead time to identify matters of interest.

b.   The Division retains a register of this travel *wish list*, and management relies on such register when making specific travel decisions. The placement of an employee's travel interest on the *wish list*, however, does not constitute the requisite management authorization to perform the travel at issue.

c.   When the time for an employee's specific travel interest nears, she completes a travel request form expressly requesting authorization to travel to the conference and/or training at issue. Such form identifies the purpose of the travel, its expected duration, the manner of transportation the employee anticipates using, and any incidental expenses, such as cab fares, for example, that the employee expects to incur. The employee also notes on the travel request form whether she wants a cash advance.

d.   The employee then submits such form to Alice Moss, who confirms that funds are available to support the travel and that the travel requested is on the travel *wish list*. If both of these conditions are met, Ms. Moss forwards the travel request form to Sherry Howard.

e.   Ms. Howard then prepares the Travel Authorization (TA) in the Agency's Travel Manager system. Such preparation involves Ms. Howard's development of a cost estimate for the travel at issue, based on the information provided by the employee. Ms. Howard also secures a travel authorization number from the Travel Manager system. There is a specific place on the TA for noting an employee's cash advance request.

f.   Upon Ms. Howard's completion of the TA, she stamps it as ready, at which time the Travel Manager system sends an automated message to the traveler indicating that the TA has been "signed." This automated message indicates that the TA has been prepared but not approved Ms. Howard has no authority to authorize any HECD employee's travel; she has never possessed such authority and has never been held out as possessing such authority.

g.   At the same time that the Travel Manager system generates the automated message referenced in subparagraph f., above, Ms. Howard often herself sends an e-mail to the traveler advising them that the TA has been

2

completed. This additional notice from Ms. Howard, like the automated message sent by the Travel Manager system, is understood only to convey that the TA has been completed, not approved.

h.    The TA then moves forward through the Travel Manager system to the approving official, and an e-mail appears in such manager's mailbox advising her that a TA requiring approval awaits her action. The approving official with respect to HECD personnel at the staff level is a Branch Chief, or a higher level management official.

i.    At this point, it becomes incumbent upon the cognizant manager to determine whether or not to authorize the travel at issue.

j.    The decision whether or not to authorize is based on a multiplicity of factors, principally, the availability of travel funds. The manager also considers, however, any competing work priorities that might argue against allowing the travel. And, the manager also considers equitable issues, such as whether the requesting employee has used or promises to use an inordinate percentage of available monies. After all, no manager is willing to permit an employee to monopolize or to unduly usurp travel opportunities for her subordinates, as a whole.

k.    When the cognizant manager decides to authorize the requested travel, the TA goes forward in OST for funding, and the TA is assigned a Document Control Number (DCN) against which Agency accounts can be billed for any charges incurred related to the travel.

l.    If the cost of the traveler's transportation is to be charged directly against EPA (i.e., if the traveler does not have a Government travel credit card), Ms. Howard completes a form informing the Washington Finance Center (WFC) that the CBA Fund will be used to acquire the traveler's tickets. This *CBA Form* includes the DCN against which any monies paid out of the CBA Fund may be recouped from the appropriate OST account.

m.    Once a DCN has been assigned, an employee not having a Government travel credit card may secure a cash advance by signing a subsection of the TA acknowledging her request for an advance. However, only after the approving official has also separately signed the appropriate subsection of the TA, thereby endorsing such advance, will the employee be eligible to receive it.

n.    Sherry Howard then faxes the TA, including the request and authorization for a cash advance and the funding information, to the WFC in Cincinnati,

3

and the Finance Center places funds necessary to cover the cash advance into the traveler's account, issuing an e-mail to the traveler at the same time indicating as much.

o.   Simultaneously with the TA's transmission to WFC, Ms. Howard provides a copy of the TA to the traveler, who should retain it at all times during her travel, and, by regulation, must have a completed TA on her at the time of her departure. If the traveler has not been authorized to receive a cash advance, the place for the approving official's signature will be blank.

9.    I am confident that Dr. Nwachuku is familiar with the travel authorization process outlined above, insofar as she has traveled multiple times during her tenure as my immediate subordinate and has requested a cash travel advance in almost every instance.

10.    Given Dr. Nwachuku's familiarity with HECD's travel authorization process, I do not understand how she could have ever believed that her Florida travel was authorized. It is my understanding that in support of such a contention, Dr. Nwachuku has produced only documents that were generated incident to the steps identified in subparagraphs a. - g., above. However, because I never signed a travel authorization for Dr. Nwachuku's Florida trip, nor separately authorized her cash advance, Dr. Nwachuku never received any of the documents identified in subparagraphs n. and o., above. Having not received such documents, when in the past she had routinely done so, incident to her endorsed travel requests, Dr. Nwachuku would not have had any reason to believe that I had authorized her travel to attend the ASM conference.

11.    I know that I expressly, face-to-face, advised Dr. Nwachuku on May 18, 2006, that she was not authorized to travel to Florida and that she should not incur any Government expense in connection with such a trip. However, even had I not done so, I do not believe that Dr. Nwachuku could have reasonably believed herself authorized to conduct such travel, based on her receipt/generation of the travel documents that she referenced in her written submission challenging my Notice of Proposed Removal. Such documents do not reflect that the authorization process had progressed beyond the preliminary, pre-authorization stage.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 25, 2006.

*Elizabeth A. Doyle*

Elizabeth Doyle, Branch Chief
Human Risk Assessment Branch
Health and Ecology Criteria Division
Office of Science and Technology

4

# EXHIBIT
# *57*

## Declaration of Scott Sylvester

I, Scott Sylvester, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.  I am an employee of Rodgers Travel, EPA's travel contractor, and my position with this company is Lead Agent for EPA/VIP. In my job with Rodgers Travel, I am responsible for processing Agency personnel travel requests, and I have served in my present capacity continuously since October 2005.

2.  One of my responsibilities is to ensure ticketing for any EPA employee who does not possess a Government travel credit card. (i.e., prior to acquiring tickets whose cost will be charged directly against EPA.) I ensure that Rodgers Travel has received a CBA form from EPA's Office of the Chief Financial Officer (OCFO). This form represents Rodgers Travel's authorization to purchase tickets at EPA's expense.

3.  Sometime on Monday May 22, 2006, I received a phone call from Sarah Williams, my principal contact in EPA's Office of the Chief Financial Officer (OCFO). Sarah called to advise me that, with respect to the airline tickets that Rodgers Travel had booked for Nena Nwachuku on May 19, 2006 to be charged directly to the Agency, Dr. Nwachuku had not been authorized to travel. Ms. Williams asked me to research the matter and provide her with my understanding of what had transpired between Dr. Nwachuku and Anthony Crisomia, the Rodgers Travel employee who had handled Dr. Nwachuku's May 19th reservations request.

4.  Pursuant to Sarah William's call, I reviewed the reservation. I informed Sarah Williams that it appeared as though there were two reservations, or in other words, a second reservation had been created since the original reservation was booked on May 15, 2006. I remember telling Sarah that it looked as though Nena had requested a second reservation on May 19th, for the same itinerary and then had the original reservation cancelled. Since then, and after scrutinizing the reservation closely, I was made aware that Anthony may have created the second reservation because of a ticketing error on his part. The reservation indicates that Anthony had spoken to Nena that same day, but nothing indicates that Nena actually asked Anthony to book a second reservation and cancel the previous booking.

5.  Prior to ticketing, the reservation was documented by Anthony, on May 19, 2006, that Nena indicated that she had already purchased a ticket on her own personal credit card with Southwest. As an invitational traveler, Nena would not be required to use her own credit card for travel, and she would otherwise be eligible to use the CBA account, but since no documentation had been received accordingly, and Nena's travel was scheduled for the next day, and it was getting late on a Friday, Anthony called to get approval to use the CBA account. He received the "ok to ticket" from Sarah Williams, but Sarah was only looking out for the best interest of the traveler (Nena) based on Anthony's request and she had no knowledge of who Nena was at that point. In other words, as of May 19th, no one knew, including Sarah, that Nena wasn't actually authorized to travel. Nena simply had a reservation that we were told by her, needed to be charged against the CBA account. That hadn't happened yet, and Anthony asked Sarah for the ok to do so.

6. Rodgers Travel complied with Sarah's instructions and purchased Dr. Nwachuku's airline tickets for her trip to Florida. At no time prior to so acting did Rodgers Travel know that Dr. Nwachuku lacked travel authorization, and my company throughout had operated on the premise that she had such authorization, but that it just hadn't been sent to us. Rodgers Travel took Dr. Nwachuku at her word that she was authorized to travel to Orlando.

7.    As a result of Sarah's call to me on the 30th of May, I called Southwest Airlines to see if the tickets that Rodgers Travel purchased for Dr. Nwachuku were used. Southwest Airlines confirmed that such tickets had, in fact, been used, and I conveyed such information to Sarah.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 16, 2006.

_____
Scott Sylvester
Lead Agent/EPA/VIP
Rodgers Travel/American Express

# EXHIBIT
# 58

# TRAVEL REQUEST FORM (TRF)

OK!
Celia
4/22/04

CONFIDENTIAL

**DATE OF REQUEST:** 4/22/04

**NAME:** Nena Nwachuku

**PLACE:** City: New Orleans   State: Louisiana

**PURPOSE:** To make a presentation at the American Society for Microbiology annual conference

**INVITATIONAL TRAVEL :** Yes _____ No X
(*If yes submit ethics form along with Travel Request Form*)

**DATE OF TRAVEL:** FROM 5/23/04   THRU 5/29/04

**TRANSPORTATION:** AIRFARE COST: 474.30   TRAIN COST: _____   POV COST: _____

SATO FEE: 25.50   INCIDENTAL COST: 180

**TRAVEL ADVANCE** X YES OR NO _____
(*For staff without government credit card*)

**CAR RENTAL** YES _____ OR NO _____ COST:_____
(*If yes need Justification Along with Travel Request Form*)

**COST OF REGISTRATION:** $ 360  (ATTACH REGISTRATION DOCUMENT)

**HOTEL COST** (*government rate*): $ 818
(*If over government rate need approval by Supervisor*) Initial:_____

**TOTAL ESTIMATED COST:** $ 1832.00

(*Take completed form to Travel Officer Alice Moss*)

201B53C

1



**OFFICIAL TDY TRAVELER AUTHORIZATION**

(Note: See Privacy Act Statement on reverse)

| | |
|---|---|
| **1. AUTHORIZATION NO.** | TM0211464 |

**2. TRAVELER** *(first name, middle initial, last name)*
Nena Nwachuku

**3. TITLE**

**4. SOCIAL SECURITY NO.**

**5. ADDRESS TO WHICH REIMBURSEMENT CHECK WILL BE MAILED:**

**6A. OFFICE/SERVICE AND DIVISION**

**6B. CORR. SYMBOL**

**7. OFFICIAL DUTY STATION**

**8. OFFICE PHONE NO.**

**9. TYPE** [X] ORIGINAL  [ ] AMENDMENT

**10. CATEGORY** [X] SINGLE TRIP  [ ] LOA  ( [ ] COST  [ ] NO COST )

**11. TRAVEL PURPOSE** *(check one)*
[ ] SITE VISIT  [ ] INFORMATION MEETING  [ ] TRAINING ATTENDANCE  [ ] SPEECH OR PRESENTATION  [ ] CONFERENCE ATTENDANCE  [ ] ENTITLEMENT  [ ] SPECIAL MISSION  [X] OTHER (SPECIFY)

**12. SPECIFIC TRAVEL PURPOSE**  To make a presentation at the American Society for Microbilogy Annual Conference

### 13. AUTHORIZED OFFICIAL ITINERARY

NOTE: DO NOT include any personal sidetrips or modes of transportation that are for personal convenience and/or preference.

| DATE (a) | WEEK-DAY (b) | ITINERARY POINT (c) CITY | STATE | PER DIEM RATE M&IE RATE (d) | MAXIMUM LODGING (e) | TOTAL MAXIMUM (f) | ACTUAL EXPENSE RATE (g) | MODE OF TRANS. BETWEEN ITINERARY POINTS (h) | MODE OF LOCAL TRANSPORTATION (i) |
|---|---|---|---|---|---|---|---|---|---|
| | | FROM: | | | | | | | |
| 05/23/2004 | SUN | TO: NEW ORLEANS | LA | 47 | 146 | 193 | | AIR | PUB |
| 05/29/2004 | SAT | NEW ORLEANS | LA | --- | --- | | | | |
| ------- | --- | TO: ------------ | -- | --- | --- | --- | --- | ---- | ---- |
| ------- | --- | ------------ | -- | --- | --- | --- | --- | ---- | ---- |
| 05/29/2004 | SAT | TO: | | | | | | | |

| YES | NO | |
|---|---|---|
| | X | **14.** IS THE EMPLOYEE MAKING ANY DEVIATIONS FROM THE AUTHORIZED ITINERARY FOR PERSONAL CONVENIENCE, TAKING ANY ANNUAL LEAVE OR USING A DIFFERENT MODE OF TRANSPORTATION FOR PERSONAL CONVENIENCE? *(If YES, explain in item 22, REMARKS.)* (Note: any deviations from the authorized itinerary requires a comparative cost statement on the SF 1012, Travel Voucher.) |
| X | | **15.** IF AIR TRANSPORTATION IS THE AUTHORIZED MODE OF TRAVEL BETWEEN ITINERARY POINTS, IS THE LOWEST PRICED CONTRACT CARRIER BEING USED BETWEEN ALL ITINERARY POINTS? *(If NO, justify in item 22)* |
| | X | **16.** IS EXTRA AIR FARE (first class, business class, etc.) OR RAIL (Metroclub, pullman, etc.) AUTHORIZED? *(If YES, justify in item 22)* |
| | X | **17A.** WILL POV BE USED FOR ANY TRAVEL BETWEEN ITINERARY POINTS? *(If YES, check one box below and complete item 17B)*  [ ] USE OF POV IS ADVANTAGEOUS TO THE GOVERNMENT.  [ ] USE OF POV IS NOT ADVANTAGEOUS TO THE GOVERNMENT, USE OF POV HAS BEEN DETERMINED TO BE FOR PERSONAL CONVENIENCE AND REIMBURSEMENT LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER   **17B.** MILEAGE RATE AUTHORIZED PER MILE. |
| | X | **18.** IS ACTUAL EXPENSE UNUSUAL CIRCUMSTANCES AUTHORIZED? *(If YES, justify in item 22)*  IF ACTUAL EXPENSE IS AUTHORIZED, THE FOLLOWING APPLY: (1) EXPENSES MUST BE ITEMIZED EACH DAY. (2) RECEIPTS ARE REQUIRED FOR LODGING AND EACH MEAL OVER $25.00. (3) REIMBURSEMENT FOR MEALS AND MISCELLANEOUS SUBSISTENCE EXPENSE MAY NOT EXCEED 150% OF THE AMOUNT IN ITEM 13(d). |

**19. TRAVELER IS** *(check one)*
[X] a. GOVT CHARGE CARD HOLDER  [ ] b. GOVT CHARGE CARD DECLINEE  [ ] c. INFREQUENT TRAVELER

**20.** METHOD OF OBTAINING COMMON CARRIER TICKETS *(check one)* (Note: If item 19a was checked and you check 20b or c, explain in item 22)
[ ] a. INDIVIDUAL GOVERNMENT CHARGE CARD  [ ] b. BLANKET GOVERNMENT CHARGE CARD  [ ] c. GOVERNMENT TRANSPORTATION REQUEST  [X] d. OTHER (explain in item 22)

**21.** FUNDS OBLIGATED

**A. INITIALS**

**B. DATE**

**22. REMARKS**
traveler doesn't have a credit card

**23. EST. COST TO GOVERNMENT**

| | |
|---|---|
| A. TOTAL COMMON CARRIER COST | $ 474.00 |
| B. TOTAL PER DIEM AND OTHER | $ 1780.00 |
| C. TOTAL ESTIMATED COST | $ 2254.00 |

**24. TRAVEL ADVANCE WILL BE OBTAINED BY** *(check one)*
[ ] a. GOVERNMENT ISSUED CHARGE CARD  [X] b. SF 1038, ADVANCE OF FUNDS APPLICATION AND ACCOUNT

**25. ADVANCE AUTHORIZED** $ 1000.00

### IMPORTANT: SAFETY BELT USE IS MANDATORY. DRIVE SAFELY

A SF 1012, TRAVEL VOUCHER MUST BE SUBMITTED TO THE VOUCHER APPROVING OFFICIAL WITHIN 5 WORKING DAYS OF COMPLETION OF TRIP.

| 26. NEAR ACCOUNT CLASS. | FUND | BUDGET ACTIVITY | OBJECT CLASS | FUNCTION | COST ELEMENT | PROJECT / PROSPECTUS | COST CENTER A | WORK ITEM | COST CENTER B |
|---|---|---|---|---|---|---|---|---|---|
| | TH4041 | 20042005 | B | 28H | 201B53C | | AP99 | | |

**27A. NAME AND TITLE OF AUTHORIZING OFFICIAL**
Edward Ohanian, Director HECD

**27B. SIGNATURE** *(PRESS FIRMLY USE BALL POINT PEN)*

**27C. DATE**  5/11/04

GENERAL SERVICES ADMINISTRATION

GSA FORM 87 (REV. 8/86)

2

| ADVANCE OF FUNDS APPLICATION AND ACCOUNT | 1.TYPE OF ADVANCE [X] CASH [ ] CHECK | 2.TYPE OF TRAVEL [X] TEMPO-RARY [ ] PERMA-NENT | 3. NAME (Last, first, middle initial) Nwachuku, Nena | | 4. ACCOUNT NO. |
|---|---|---|---|---|---|

5. TELEPHONE NUMBER(S)                                    6. SOCIAL SECURITY ACCOUNT NO.

In compliance with Privacy Act of 1974 the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chapter 57 as implemented by the Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, E.O. 11012 of March 27, 1962, and E.O. 9397 of November 22, 1943. The primary purpose of the information is to facilitate the review, approval, accounting, and advancement of funds for travel and certain relocation allowance expenses to be incurred under appropriate administrative authorization. The requested information will be used by officers and employees of this agency who have a need for such information in the performance of their official duties. The information will be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, security clearances, or other investigations of the performance of official duty while in Government service. Your Social Security Number (SSN) is solicited for use as an employee identification number. Disclosure of the requested information is voluntary; however, failure to provide the information required may result in delay or suspension of your advance of funds request.

7. DEPARTMENT OR ESTABLISHMENT                8. BUREAU, DIVISION OR OFFICE

9.                     APPLICATION -     (For completion by applicant)

An advance of funds is hereby requested for travel and other expenses to be incurred by me.

| e. BALANCE DUE U.S FROM PREVIOUS ADVANCE | $ | 0.00 |
|---|---|---|

a. UNDER AUTHORIZATION NUMBER   TM0211464

b.DATE OF AUTHORIZATION   04/27/2004

| f. AMOUNT HEREIN APPLIED FOR | $ | 1,000.00 |
|---|---|---|

c. TRAVEL PERIOD   From 05/23/04   To 05/29/04

| g.     TOTAL | $ | 1,000.00 |
|---|---|---|

d. MAIL CHECK TO: [ ] OFFICE  [ ] RESIDENCE
(Give address - number, street, city, State, ZIP code)

Note: Outstanding advances not fully recovered by deductions from reimbursement vouchers must be promptly repaid. When travel is canceled or indefinitely postponed, the full amount of any outstanding advance shall be repaid immediately.

| APPLICANT SIGN HERE | *[signature]* | DATE 5/10/04 |
|---|---|---|

10. APPROVAL   SIGNATURE AND TITLE OF APPROVING OFFICIAL   *[signature]*

DATE APPROVED   5/10/04

11. APPROPRIATION TO BE CHARGED
TH4.20042005.B.28H.201B53C...
P99..

| 12. REMARKS | 13.CASH PAYMENT RECEIVED | DATE |
|---|---|---|

1038-108

STANDARD FORM 1038 (REV. 10-77)
Prescribed by GSA, FPMR (41 CFR) 101-7

3

# EXHIBIT
# 59

Ⓐ

URGENT !!!   OK!
Alice

# TRAVEL REQUEST FORM (TRF)

**DATE OF REQUEST:** 5/27/05

**NAME:** Nena Nwachuku

**PLACE:** City: Atlanta     State: GA

**PURPOSE:** To make a technical presentation on CCL at the American Society for Microbiology conference

**INVITATIONAL TRAVEL :** Yes _____   No X
*(If yes submit ethics form along with Travel Request Form)*

**DATE OF TRAVEL: FROM** June 5   **THRU** June 10

**TRANSPORTATION: AIRFARE COST:** 224⁴⁰  **TRAIN COST:** _____ **POV COST:** ___

**SATO FEE:** 28.50    **INCIDENTAL COST:** 120

**TRAVEL ADVANCE** X **YES OR NO** _____
*(For staff without government credit card)*

**CAR RENTAL**    YES ___ **OR NO** X  **COST:** _____
*(If yes need Justification Along with Travel Request Form)*

**COST OF REGISTRATION:** 320    (ATTACH REGISTRATION DOCUMENT)

**HOTEL COST** *(government rate):* 535⁰⁰  170.10 per night 7 & 40
*(If over government rate need approval by Supervisor)* Initial:_____
107.10 per night 5 & 6

**TOTAL ESTIMATED COST:** $1,200

*(Take completed form to Travel Officer Alice Moss)*

201 - _____

6

**OFFICIAL TDY TRAVELER AUTHORIZATION**

(Note: See Privacy Act Statement on reverse)

| | |
|---|---|
| **1. AUTHORIZATION NO.** | TM0327974 |

COMPLETED

**2. TRAVELER** (first name, middle initial, last name)
Nena Nwachuku

**3. TITLE**

**4. SOCIAL SECURITY NO.**

**5. ADDRESS TO WHICH REIMBURSEMENT CHECK WILL BE MAILED:**

**6A. OFFICE/SERVICE AND DIVISION**

**6B. CORR. SYMBOL**

**7. OFFICIAL DUTY STATION**

**8. OFFICE PHONE NO.**

**9. TYPE** [X] ORIGINAL  [ ] AMENDMENT

**10. CATEGORY** [X] SINGLE TRIP  [ ] LOA  [ ] COST  [ ] NO COST

**11. TRAVEL PURPOSE** (check one)
[ ] SITE VISIT  [ ] INFORMATION MEETING  [ ] TRAINING ATTENDANCE  [ ] SPEECH OR PRESENTATION  [ ] CONFERENCE ATTENDANCE  [ ] ENTITLEMENT  [ ] SPECIAL MISSION  [X] OTHER (SPECIFY)

**12. SPECIFIC TRAVEL PURPOSE** To make a technical presentation on CCL at American Society for Microbiology Conference

### 13. AUTHORIZED OFFICIAL ITINERARY

NOTE: DO NOT include any personal sidetrips or modes of transportation that are for personal convenience and/or preference.

| DATE (a) | WEEK-DAY (b) | ITINERARY POINT (c) CITY | STATE | PER DIEM RATE M&IE RATE (d) | MAXIMUM LODGING (e) | TOTAL MAXIMUM (f) | ACTUAL EXPENSE RATE (g) | MODE OF TRANS. BETWEEN ITINERARY POINTS (h) | MODE OF LOCAL TRANSPORTATION (i) |
|---|---|---|---|---|---|---|---|---|---|
| | | FROM: | | | | | | | |
| 06/05/2005 | SUN | TO: ATLANTA | GA | 43 | 113 | 156 | | AIR | PUB |
| 06/10/2005 | FRI | ATLANTA | GA | --- | --- | | | | |
| -------- | --- | TO: --------------- | -- | --- | --- | --- | --- | ---- | ---- |
| -------- | --- | --------------- | -- | --- | --- | --- | --- | ---- | ---- |
| 06/10/2005 | FRI | TO: | | | | | | | |

| YES | NO | |
|---|---|---|
| | X | **14.** IS THE EMPLOYEE MAKING ANY DEVIATIONS FROM THE AUTHORIZED ITINERARY FOR PERSONAL CONVENIENCE, TAKING ANY ANNUAL LEAVE OR USING A DIFFERENT MODE OF TRANSPORTATION FOR PERSONAL CONVENIENCE? (If YES, explain in item 22, REMARKS) (Note: any deviations from the authorized itinerary requires a comparative cost statement on the SF 1012, Travel Voucher.) |
| X | | **15.** IF AIR TRANSPORTATION IS THE AUTHORIZED MODE OF TRAVEL BETWEEN ITINERARY POINTS, IS THE LOWEST PRICED CONTRACT CARRIER BEING USED BETWEEN ALL ITINERARY POINTS? (If NO, justify in item 22) |
| | X | **16.** IS EXTRA AIR FARE (first class, business class, etc.) OR RAIL (Metroclub, pullman, etc.) AUTHORIZED? (If YES, justify in item 22) |
| | X | **17A.** WILL POV BE USED FOR ANY TRAVEL BETWEEN ITINERARY POINTS? (If YES, check one box below and complete item 17B) [ ] USE OF POV IS ADVANTAGEOUS TO THE GOVERNMENT. [ ] USE OF POV IS NOT ADVANTAGEOUS TO THE GOVERNMENT. USE OF POV HAS BEEN DETERMINED TO BE FOR PERSONAL CONVENIENCE AND REIMBURSEMENT LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER **17B. MILEAGE RATE AUTHORIZED PER MILE.** |
| X | | **18.** IS ACTUAL EXPENSE UNUSUAL CIRCUMSTANCES AUTHORIZED? (If YES, justify in item 22) IF ACTUAL EXPENSE IS AUTHORIZED, THE FOLLOWING APPLY: (1) EXPENSES MUST BE ITEMIZED EACH DAY. (2) RECEIPTS ARE REQUIRED FOR LODGING AND EACH MEAL OVER $25.00. (3) REIMBURSEMENT FOR MEALS AND MISCELLANEOUS SUBSISTENCE EXPENSE MAY NOT EXCEED 150% OF THE AMOUNT IN ITEM 13(d). |

**19. TRAVELER IS** (check one)
[X] a. GOV'T CHARGE CARD HOLDER  [ ] b. GOV'T CHARGE CARD DECLINEE  [ ] c. INFREQUENT TRAVELER

**20. METHOD OF OBTAINING COMMON CARRIER TICKETS** (check one) (Note: If item 19a was checked and you check 20b or c, explain in item 22)
[ ] a. INDIVIDUAL GOVERNMENT CHARGE CARD  [ ] b. BLANKET GOVERNMENT CHARGE CARD  [ ] c. GOVERNMENT TRANSPORTATION REQUEST  [X] OTHER (explain in item 22)

**21. FUNDS OBLIGATED**
A. INITIALS
B. DATE

**22. REMARKS**
Hotel two night difference in hotel prcie.
Traveler doesn't have a government credit card

**23. EST. COST TO GOVERNMENT**

| | | |
|---|---|---|
| A. TOTAL COMMON CARRIER COST | $ | 224.40 |
| B. TOTAL PER DIEM AND OTHER | $ | 1524.30 |
| C. TOTAL ESTIMATED COST | $ | 1748.70 |

**24. TRAVEL ADVANCE WILL BE OBTAINED BY** (check one)
[ ] a. GOVERNMENT ISSUED CHARGE CARD  [X] b. SF 1038, ADVANCE OF FUNDS APPLICATION AND ACCOUNT

**25. ADVANCE AUTHORIZED** $ 1280.00

### IMPORTANT: SAFETY BELT USE IS MANDATORY. DRIVE SAFELY

A SF 1012, TRAVEL VOUCHER MUST BE SUBMITTED TO THE VOUCHER APPROVING OFFICIAL WITHIN 5 WORKING DAYS OF COMPLETION OF TRIP.

| 26. NEAR ACCOUNT CLASS. | FUND | BUDGET ACTIVITY | OBJECT CLASS | FUNCTION | COST ELEMENT | PROJECT / PROSPECTUS | COST CENTER A | WORK ITEM | COST CENTER B |
|---|---|---|---|---|---|---|---|---|---|
| | TMH504 | 20052006 | | | | | | | |
| | TH5 | 20052006 | B | 28H | 201B53G | 28 | AP27 | | |

**27A. NAME AND TITLE OF AUTHORIZING OFFICIAL**
E. A. Doyle

**27B. SIGNATURE** (PRESS FIRMLY USE BALL POINT PEN)
E A Doyle

**27C. DATE** 6/1/05

GENERAL SERVICES ADMINISTRATION

GSA FORM 87 (REV. 8/86)

7

| ADVANCE OF FUNDS APPLICATION AND ACCOUNT | 1. TYPE OF ADVANCE | 2. TYPE OF TRAVEL | 3. NAME *(Last, first, middle initial)* Nwachuku, Nena | | 4. ACCOUNT NO. |
|---|---|---|---|---|---|
| | [X] CASH  [ ] CHECK | [X] TEMPO-RARY  [ ] PERMA-NENT | 5. TELEPHONE NUMBER(S) | 6. SOCIAL SECURITY ACCOUNT NO. | |

In compliance with Privacy Act of 1974 the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chapter 57 [] 101-7), E.O. 11609 of July 22, 1971, E.O. 11012 rch 27, 1962, and E.O. 9397 of November 22, [].3. The primary purpose of the information is to facilitate the review, approval, accounting, and advancement of funds for travel and certain reloca-tion allowance expenses to be incurred under appro-priate administrative authorization. The requested in-formation will be used by officers and employees of this agency who have a need for such information in the performance of their official duties. The informa-tion will be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecu-tions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, security clearances, or other investiga-tions of the performance of official duty while in Government service. Your Social Security Number (SSN) is solicited for use as an employee identifica-tion number. Disclosure of the requested informa-tion is voluntary; however, failure to provide the informa-tion required may result in delay or suspension of your advance of funds request.

| 7. DEPARTMENT OR ESTABLISHMENT | 8. BUREAU, DIVISION OR OFFICE |
|---|---|
| | |

| 9. | APPLICATION - *(For completion by applicant)* | | |
|---|---|---|---|
| An advance of funds is hereby requested for travel and other expenses to be incurred by me. | | e. BALANCE DUE U.S FROM PREVIOUS ADVANCE | $  0.00 |
| a. UNDER AUTHORIZATION NUMBER  TM0327974 | b. DATE OF AUTHORI-ZATION  06/01/2005 | f. AMOUNT HEREIN APPLIED FOR | $  1,280.00 |
| c. TRAVEL PERIOD | From 06/05/05  To 06/10/05 | g.  TOTAL | $  1,280.00 |
| d. MAIL CHECK TO:  [ ] OFFICE  [ ] RESIDENCE  *(Give address - number, street, city, State, ZIP code)* | | *Note: Outstanding advances not fully recovered by deductions from reimburse-ment vouchers must be promptly repaid. When travel is canceled or indefinitely postponed, the full amount of any out-standing advance shall be repaid immedi-ately.* | |

| APPLICANT SIGN HERE   *Nena Nwachuku* | DATE  6/1/05 |
|---|---|

| 10. APPROVAL | SIGNATURE AND TITLE OF APPROVING OFFICIAL  *E A Wayne* | DATE APPROVED  6/1/05 | 11. APPROPRIATION TO BE CHARGED  TH5.20052006.B.28H.201B53C28. .AP27.. |
|---|---|---|---|
| 12. REMARKS  Hotel and Registration fee | | | 13. CASH PAYMENT RECEIVED  DATE |

1038-108

STANDARD FORM 1038 (REV. 10-77)
Prescribed by GSA, FPMR (41 CFR) 101-7

8

# EXHIBIT
# 60

**OFFICIAL TDY TRAVELER AUTHORIZATION**

*(Note: See Privacy Act Statement on reverse)*

| | 1. AUTHORIZATION NO. |
|---|---|
| | TM0427922 |

| 2. TRAVELER *(first name, middle initial, last name)* | 3. TITLE | 4. SOCIAL SECURITY NO. |
|---|---|---|
| Nena Nwachuku | | |

| 5. ADDRESS TO WHICH REIMBURSEMENT CHECK WILL BE MAILED: | 6A. OFFICE/SERVICE AND DIVISION | |
|---|---|---|
| | 7. OFFICIAL DUTY STATION | 8. OFFICE PHONE NO. |
| | 9. TYPE [X] ORIGINAL [ ] AMENDMENT | 10. CATEGORY [X] SINGLE TRIP [ ] LOA ( [ ] COST [ ] NO COST ) |

**11. TRAVEL PURPOSE** *(check one)*

[ ] SITE VISIT  [ ] INFORMATION MEETING  [ ] TRAINING ATTENDANCE  [ ] SPEECH OR PRESENTATION  [ ] CONFERENCE ATTENDANCE  [ ] ENTITLEMENT  [ ] SPECIAL MISSION  [X] OTHER *(SPECIFY)*

**12. SPECIFIC TRAVEL PURPOSE**   To attend ASM Annual Meeting

## 13. AUTHORIZED OFFICIAL ITINERARY

NOTE: DO NOT include any personal sidetrips or modes of transportation that are for personal convenience and/or preference.

| DATE (a) | WEEK-DAY (b) | ITINERARY POINT (c) CITY | STATE | PER DIEM RATE M&IE RATE (d) | MAXIMUM LODGING (e) | TOTAL MAXIMUM (f) | ACTUAL EXPENSE RATE (g) | MODE OF TRANS. BETWEEN ITINERARY POINTS (h) | MODE OF LOCAL TRANSPORTATION (i) |
|---|---|---|---|---|---|---|---|---|---|
| | | FROM: | | | | | | | |
| 05/20/2006 | SAT | TO: ORLANDO | FL | 49 | 83 | 132 | | AIR | PUB |
| 05/26/2006 | FRI | ORLANDO | FL | --- | --- | --- | | | |
| -------- | --- | TO: -------------- | -- | --- | --- | --- | --- | ---- | ---- |
| | | -------------- | -- | --- | --- | --- | --- | ---- | ---- |
| 05/26/2006 | FRI | TO: | | | | | | | |

| YES | NO | | |
|---|---|---|---|
| | X | **14.** IS THE EMPLOYEE MAKING ANY DEVIATIONS FROM THE AUTHORIZED ITINERARY FOR PERSONAL CONVENIENCE, TAKING ANY ANNUAL LEAVE OR USING A DIFFERENT MODE OF TRANSPORTATION FOR PERSONAL CONVENIENCE? *(If YES, explain in item 22, REMARKS)* (Note: any deviations from the authorized itinerary requires a comparative cost statement on the SF 1012, Travel Voucher.) | |
| X | | **15.** IF AIR TRANSPORTATION IS THE AUTHORIZED MODE OF TRAVEL BETWEEN ITINERARY POINTS, IS THE LOWEST PRICED CONTRACT CARRIER BEING USED BETWEEN ALL ITINERARY POINTS? *(If NO, justify in item 22)* | |
| | X | **16.** IS EXTRA AIR FARE (first class, business class, etc.) OR RAIL (Metroclub, pullman, etc.) AUTHORIZED? *(If YES, justify in item 22)* | |
| | X | **17A.** WILL POV BE USED FOR ANY TRAVEL BETWEEN ITINERARY POINTS? *(If YES, check one box below and complete item 17B)* [ ] USE OF POV IS ADVANTAGEOUS TO THE GOVERNMENT [ ] USE OF POV IS NOT ADVANTAGEOUS TO THE GOVERNMENT. USE OF POV HAS BEEN DETERMINED TO BE FOR PERSONAL CONVENIENCE AND REIMBURSEMENT LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER | **17B.** MILEAGE RATE AUTHORIZED PER MILE. |
| | X | **18.** IS ACTUAL EXPENSE UNUSUAL CIRCUMSTANCES AUTHORIZED? *(If YES, justify in item 22)* IF ACTUAL EXPENSE IS AUTHORIZED , THE FOLLOWING APPLY: (1) EXPENSES MUST BE ITEMIZED EACH DAY. (2) RECEIPTS ARE REQUIRED FOR LODGING AND EACH MEAL OVER $25.00. (3) REIMBURSEMENT FOR MEALS AND MISCELLANEOUS SUBSISTENCE EXPENSE MAY NOT EXCEED 150% OF THE AMOUNT IN ITEM 13(d). | |

| 19. TRAVELER IS *(check one)* | 20. METHOD OF OBTAINING COMMON CARRIER TICKETS *(check one)* (Note: If item 19a was checked and you check 20b or c, explain in item 22) | 21. FUNDS OBLI- GATED | |
|---|---|---|---|
| [X] a. GOVT CHARGE CARD HOLDER  [ ] b. GOVT CHARGE CARD DECLINEE  [ ] c. INFREQUENT TRAVELER | [ ] a. INDIVIDUAL GOVERNMENT CHARGE CARD  [ ] b. BLANKET GOVERNMENT CHARGE CARD  [ ] c. GOVERNMENT TRANSPORTA- TION REQUEST  [X] d. OTHER *(explain in item 22)* | A. INITIALS | |
| | | B. DATE | |

| 22. REMARKS | 23. EST. COST TO GOVERNMENT | |
|---|---|---|
| | A. TOTAL COMMON CARRIER COST | $ 245.60 |
| | B. TOTAL PER DIEM AND OTHER | $ 1291.50 |
| | C. TOTAL ESTIMATED COST | $ 1537.10 |

| 24. TRAVEL ADVANCE WILL BE OBTAINED BY *(check one)* | 25. ADVANCE AUTHORIZED | |
|---|---|---|
| [ ] a. GOVERNMENT ISSUED CHARGE CARD  [X] b. SF 1038, ADVANCE OF FUNDS APPLICATION AND ACCOUNT | | $ 800.00 |

**IMPORTANT: SAFETY BELT USE IS MANDATORY. DRIVE SAFELY**

A SF 1012, TRAVEL VOUCHER MUST BE SUBMITTED TO THE VOUCHER APPROVING OFFICIAL WITHIN 5 WORKING DAYS OF COMPLETION OF TRIP.

| 26. NEAR ACCOUNT CLASS. | FUND | BUDGET ACTIVITY | OBJECT CLASS | FUNCTION | COST ELEMENT | PROJECT / PROSPECTUS | COST CENTER A | WORK ITEM | COST CENTER B |
|---|---|---|---|---|---|---|---|---|---|
| | TH6 | 20062007 | B | 28H | 201B53C | | AP27 | | |

| 27A. NAME AND TITLE OF AUTHORIZING OFFICIAL | 27B. SIGNATURE *(PRESS FIRMLY USE BALL POINT PEN)* | 27C. DATE |
|---|---|---|
| | | |

GENERAL SERVICES ADMINISTRATION

GSA FORM 87 (REV. 8/86)

| ADVANCE OF FUNDS APPLICATION AND ACCOUNT | 1. TYPE OF ADVANCE | 2. TYPE OF TRAVEL | Nwachuku, Nena | | |
|---|---|---|---|---|---|
| | [X] CASH | [X] TEMPO-RARY | 3. NAME *(Last, first, middle initial)* | | 4. ACCOUNT NO. |
| | [ ] CHECK | [ ] PERMA-NENT | 5. TELEPHONE NUMBER(S) | 6. SOCIAL SECURITY ACCOUNT NO. | |

In compliance with Privacy Act of 1974 the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chapter 57 as implemented by the Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, E.O. 11012 of March 27, 1962, and E.O. 9397 of November 22, 1943. The primary purpose of the information is to facilitate the review, approval, accounting, and advancement of funds for travel and certain relocation allowance expenses to be incurred under appropriate administrative authorization. The requested information will be used by officers and employees of this agency who have a need for such information in the performance of their official duties. The information will be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, security clearances, or other investigations of the performance of official duty while in Government service. Your Social Security Number (SSN) is solicited for use as an employee identification number. Disclosure of the requested information is voluntary; however, failure to provide the information required may result in delay or suspension of your advance of funds request.

| 7. DEPARTMENT OR ESTABLISHMENT | | 8. BUREAU, DIVISION OR OFFICE | | |
|---|---|---|---|---|
| **9.** APPLICATION - *(For completion by applicant)* | | | | |
| An advance of funds is hereby requested for travel and other expenses to be incurred by me. | | | a. BALANCE DUE U.S. FROM PREVIOUS ADVANCE | $ 0.00 |
| a. UNDER AUTHORIZATION NUMBER TM0427922 | | b. DATE OF AUTHORIZATION 05/15/2006 | f. AMOUNT HEREIN APPLIED FOR | $ 800.00 |
| | | *From* | *To* | |
| c. TRAVEL PERIOD | | 05/20/06 | 05/26/06 | g. TOTAL | $ 800.00 |
| d. MAIL CHECK TO: [ ] OFFICE    [ ] RESIDENCE *(Give address - number, street, city, State, ZIP code)* | | | *Note: Outstanding advances not fully recovered by deductions from reimbursement vouchers must be promptly repaid. When travel is canceled or indefinitely postponed, the full amount of any outstanding advance shall be repaid immediately.* | |
| APPLICANT SIGN HERE | | | | DATE |

| 10. APPROVAL | SIGNATURE AND TITLE OF APPROVING OFFICIAL | DATE APPROVED | 11. APPROPRIATION TO BE CHARGED TH6.20062007.B.28H.201B53C28..AP27.. |
|---|---|---|---|
| 12. REMARKS | | | 13. CASH PAYMENT RECEIVED | DATE |

STANDARD FORM 1038 (REV. 10-77)
Prescribed by GSA, FPMR (41 CFR) 101-7