# EXHIBIT 70



**Nena**
Nwachuku/DC/USEPA/US
05/30/2006 06:11 PM

To   Pam Parker/DC/USEPA/US@EPA

cc

bcc  Nena Nwachuku/DC/USEPA/US

Subject  Workplace violence incident

Date: May 30, 2006

To: Pam Parker
Workplace Violence Policy contact

From: Nena Nwachuku, Ph.D.
OW/OST/HECD

Re: A report of Workplace Violence

Dear Pam,
I was referred to you by OHR in Las Vegas as Tonya Hamlett listed on the website has left.  I am writing to report an incident that occurred on Friday May 19, 2006, with my supervisor, Elizabeth Doyle who in a rage accosted me in the hallway as I sat and labelled impending workshop documents. She physically put her hand on me.  As I looked up at her demanding to know where I was in the morning, after she touched me, she threatened me and waved her finger at me wildly ordering me to report to her only and not the time keeper when I call in sick. I was distressed and went into a small meeting room in tears. I was in an EPA- controlled space and performing my duties when Elizabeth Doyle, my supervisor put her hand on me.

I would like to know the procedure by which I could  lodge a formal complaint about this incident because I am afraid of her and concerned that it will happen again as she continuously harasses and intimidates me at work.  Thank you.
---Nena.
Nena Nwachuku, Ph.D.
U.S. Environmental Protection Agency
Office of Water, Mail Code 4304T
Office of Science and Technology
1200 Pennsylvania Ave. NW.
Washington, DC. 20460
Ph: 202-566-1116  Fax: 202-566-1139
nwachuku.nena@epa.gov



# EXHIBIT 71

June 5, 2006 (**Revised June 12, 2006**)

**SUBJECT:**  Report on Investigation of Allegations Stated in Nena's Note to Ephraim King
Dated 5/30/2006 About a Workplace Violence Incidence

**TO:**  Edward Ohanian, Director
Health and Ecological Criteria Division

**FROM:**  Maria Gomez-Taylor, Deputy Director    *Maria Gomez-Taylor*
Health and Ecological Criteria Division

I have interviewed the parties involved about the allegations in Nena's note to Ephraim King dated 5/30/2006 describing an incident between Nena and her supervisor, Elizabeth Doyle. These interviews were conducted at Ephraim's request to investigate whether the allegations in Nena's note indicate that there is a threat of violence in the workplace or concern for the safety of staff involving the parties involved in this incident report.

**Nena Nwachuku**

I met with Nena on June 1 at 10 am. I started the interview by telling Nena that I was asked by Ephraim to interview the parties involved in the incident described in her note. I mentioned that I would take notes because I had been asked to prepare a report for you. I also mentioned that I would also talk to Beth Doyle when Beth returns to the office. I then asked Nena to describe what happened on the afternoon of Thursday, May 18. Nena began by telling me that she was near the copier on the 18th around 4:45 pm (around where Frank Bell seats) sorting out some papers when Beth came and put her hand on her. Nena told me that Beth was on a rage and asked her where she had been earlier that day. Nena told Beth that she left a message in Sherry Howard's voice mail telling her that she had to see her doctor in the morning and would be on sick leave. When I asked Nena when she came to the office that day, Nena responded that she was not in my office for an interrogatory and appeared ready to walk out. To calm her down and continue the dialogue, I stopped talking notes and told her to just continue to describe the incident. Nena then continued telling me about how Beth was yelling at her and Beth told Nena that she has to call Beth personally if she is going to be out, not the timekeeper. Nena said that she was so upset that she went to the small team/conference room in tears. I asked Nena if there were any witnesses around when this incident happened and she replied that she was so upset that she can not remember whether there was anybody else around at the time.

Nena then proceeded to state that Beth has singled her (Nena) out for this kind of treatment and that Beth frequently does this in front of colleagues. I then inquired about her willingness to explore mediation between her and her supervisor. Nena stated that things

*1*



between her and Beth have gone too far for mediation. I asked Nena about any suggestions that she can give me about how Beth should interact with her that may help improve their relationship. Nena did not provide any suggestions and indicated that she is pursuing other avenues in the Agency because upper management have not responded satisfactorily to her previous complaints about Beth.

### Elizabeth Doyle

I met with Beth Doyle on June 5 at 4 pm. I asked Beth to recount for me the events of May 18 because Nena had sent a written complaint about her to Ephraim King. I also asked Beth if I could take notes during the interview. She said "you have to." Beth then told me that she sent an e-mail to Nena earlier that day denying her request to go to the American Society for Microbiology (ASM) Conference. Beth said that Nena missed an 11 am meeting with her and OGWDW staff regarding the charge for a CCL Microbial Expert meeting. Beth confirmed that Nena put in for sick leave early that afternoon after returning to the office. When Beth saw Nena late that afternoon (sometime between 4 and 5 pm), Beth says she approached Nena, who was near Frank Bell's desk, and told Nena that she (Beth) had not approved Nena's travel to the ASM, and Beth told Nena that she wanted to schedule a meeting with Nena the following week to finalize the charge for the CCL Microbial Expert meeting. Beth stated that she also told Nena that she needs to call Beth directly when she is not going to be in the office. Beth says that Nena replied that she had called Sherry Howard, the timekeeper, and that it is all that is required. According to Beth, Sylvia Ball later forwarded Nena's voice mail to her.

Beth says that she returned to her office at that point and got ready to leave for home. I read the statements about the allegation that Beth put her hand on Nena and waved her finger at Nena and Beth emphatically replied that she never touched Nena or waved her finger at her. Beth said that Nena was agitated when Beth asked her to notify Beth directly when she was on unscheduled leave. I asked Beth if she remembers whether Nena left and went to the small team room as Nena describes in her e-mail and whether there were any witnesses to their interaction that afternoon. Beth told me that she does not know what Nena did after the conversation. Beth said that she does not remember if there were any witnesses (Beth indicated that there may have been someone at the copier but can not be sure).

I asked Beth whether she would be willing to go through some mediation with Nena about the issues between them. Beth told me that she had suggested mediation/facilitation before but Nena had declined. Beth says that she has no history of violence and she has never had a charge of violence brought against her before. Beth added that she does not follow Nena around as Nena alleges. Beth also stated that Nena has even complained in the past that Beth does not show enough interest in her work. Beth added that she only approaches Nena in the hallway about urgent matters and that Nena often turns her back at her. Beth stated that she believes Nena's motivation for the allegations is that Beth did not approved her travel to ASM.

### Observations

There are inconsistencies about the version of events in the afternoon of May 18 based on my interview with the parties involved. Nena was consistent with her version of events as

described in the 5/30/06 e-mail to Ephraim. Nena did not deviate from her account of events and did not add any new information but rather emphasized several times that Beth has targeted her for harassment. Beth emphatically denied any physical contact with Nena or threatening behaviour. Nena never mentioned during my interview with her about Beth denying Nena's travel to ASM. Neither Nena or Beth could recollect if there were witnesses to corroborate their version of events. However, I found it odd that Nena did not mention the (lack of) approval of her trip to ASM during the exchange between them. Nena also seemed defensive when I asked her for more details about the events that day (beyond those in the e-mail) and she seemed ready to terminate the interview at one point.

I have reviewed both the Agency's policy on prohibiting discrimination and harassment and on preventing violence in the workplace. Based on my reading of the policies, I conclude that the description of events between the two parties does not constitute harassment or violence in the workplace by Beth Doyle, Nena's supervisor.

### New Information

On Thursday June 8, I asked Beth Doyle again if she was able to remember whether there was a witness to the incident reported by Nena on May 18. Beth was not sure about whether there was a witness when I first interviewed her. Beth told me on June 8 that she remembers that there was someone at the copier and believes that it was Dana Thomas. I left a message for Dana that same day to come see me. Dana came to my office today (6/12/06) and told me that she did not get back to me last week because she was on travel. I asked Dana if she had observed an incident between Nena and Beth on May 18. Dana recalls being at the copier that day when Beth came to talk to Nena. I asked Dana if she observed anything unusual between Beth and Nena and Dana told me "no." Dana does not remember the substance of the conversation between Nena and Beth but indicated that Beth was talking to Nena about something that Nena needed to do. When I asked if she witnessed any violence, touching or anything out of the ordinary or inappropriate with Beth, Dana told me that she does not remember anything unusual happening between them. Dana added that she would have paid more attention if she had noticed something inappropriate. Dana's account of events supports my conclusion that the interaction between Beth and Nena on May 18 does not constitute harassment or violence in the workplace.

# EXHIBIT
# 72

## Declaration of Dana A. Thomas, Ph.D.

I, Dana A. Thomas, Ph.D., make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

1.     I presently serve as an Environmental Scientist, GS-1301-14 in the Office of Water, Office of Science and Technology, Health and Ecological Criteria Division. I have been serving in such capacity since October 30, 2005; my workstation is located in 7231R of the EPA Connecting Wing, and I have been sitting in such location since October 30, 2005.

2.     Sometime during the first couple of weeks in June 2006, Maria Gomez-Taylor, who is the Deputy Division Director of the Health and Ecological Criteria Division, contacted me to inquire as to whether I had witnessed an interaction between Nena Nwachuku and Elizabeth Doyle late on the afternoon of May 18, 2006. Maria informed me that such interaction would have occurred in close proximity to a xerox machine in 7231 of the EPA Connecting Wing and that May 18th was a Thursday.

3.     Maria did not advise me as to why she was inquiring if I had witnessed this interaction, and I did not ask her.

4.     I advised Maria that I distinctly recalled overhearing a conversation between Nena and Elizabeth while I made copies at the xerox machine around the date and time in question. I further advised Maria, however, that, to the extent I overheard any discussion that took place between them, I no longer had any recollection of the specific topic of conversation or the exact day in question. I do however, distinctly recall thinking to myself while overhearing the conversation that Elizabeth was handling well Nena's abrasive demeanor, and that this must be the reason why Elizabeth recently won a manager of the year award.

5.     In answer to Maria's questions, I further informed her that I did not observe Elizabeth speaking loudly, gesturing aggressively, or touching Nena, and that I did not observe Nena behaving in any way that would have suggested to me that Elizabeth had so treated her. Essentially, I told Maria that my observation of the interaction between Elizabeth and Nena indicated to me that nothing unusual had occurred.

6.     Furthermore, I told Maria that I was confident that, had the interaction been hostile, I would have seen that, remarked upon that to myself, and I would have had a clear recollection of that being the case when Maria asked me about the incident.

7.     Finally, I do not remember whether Maria asked me if I witnessed the interaction in its entirety, i.e., whether I was at my observation post when Nena and Elizabeth commenced their interaction and was still there when they went their separate ways. I am certain, however, that I did witness the conclusion of the interaction and that, at its conclusion, Elizabeth moved off in one direction and Nena another. Upon their separation, I had no reason to believe from the conduct that I had overseen that their interaction had been remarkable in any way.

8.     I understand that Nena has claimed that Elizabeth committed a violence in the workplace incident against her late on the afternoon of May 18th in close proximity to a xerox machine located in 7231 of the EPA Connecting Wing. I observed an interaction between Nena and Elizabeth on or around May 18th at that time and place, and I saw nothing to suggest to me that Elizabeth had behaved in an inappropriate manner toward Nena or that Nena had perceived herself as having been victimized in any way.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on October 23, 2006.

Dana A. Thomas, Ph.D.
Environmental Scientist, GS-1301-14
Office of Water
Office of Science and Technology
Health and Ecological Criteria Division

2

# EXHIBIT
# 73

**SWICK & SHAPIRO, P.C.**
ATTORNEYS AT LAW
1225 EYE STREET, N.W., SUITE 1290
WASHINGTON, D.C. 20005

(202) 842-0300
FAX (202) 842-1418

September 5, 2006

**VIA HAND DELIVERY**

Ephraim King
Director
Office of Science and Technology
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W., Room 5233A
Washington, D.C. 20004

Re:    Written Response to Proposed Termination of Nena Nwachuku

Dear Mr. King:

I am writing on behalf of Nena Nwachuku, a GS-1301-13 Environmental Scientist at the United States Environmental Protection Agency ("EPA"), who has retained me to represent her with regard to the July 11, 2006, notice of proposed termination of employment issued by Elizabeth A. Doyle, Supervisory Biologist in the EPA's Human Risk Assessment Branch, Health and Ecological Criteria Division, Office of Science and Technology. Please consider this Dr. Nwachuku's written response to the proposal.[1]

The termination proposal at issue is purportedly premised on Dr. Nwachuku's having failed to follow supervisors' instructions, being absent without leave (AWOL), having made false statements to and false claims with the government, having made an unfounded accusation against her immediate supervisor, and having engaged in disrespectful conduct toward her supervisors and other management officials - - all within the span of less than a three week period, May 18 to June 6, 2006.

As an initial matter, the "actions" in which Dr. Nwachuku is alleged to have engaged are patently unfounded, and the proposed termination bespeaks a vindictive and retaliatory effort by her first-line supervisor, Elizabeth Doyle, to terminate Dr. Nwachuku because she had the temerity to file administrative complaints of discrimination and retaliation against Ms. Doyle, as well as filing a Title

---

[1]Presentation of a supplemental oral reply to the termination proposal is now scheduled for September 7, 2006, at 9:30 a.m.

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 2**

VII civil lawsuit in May 2006. Indeed, we will demonstrate here the specious and spurious allegations against Dr. Nwachuku contained in Ms. Doyle's July 11, 2006, letter simply fall apart under an objective analysis. Moreover, in light of the totality of facts and circumstances surrounding the alleged incidents of misconduct, and under an objective analysis of the factors to be considered in any disciplinary action for employee misconduct pursuant to *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), Dr. Nwachuku ought not be subjected to the ultimate employment penalty of dismissal. Accordingly, the proposal to terminate Dr. Nwachuku's employment should be rejected in its entirety.

## Dr. Nwachuku's Educational Background and Federal Service Career

Nena Nwachuku is a naturalized citizen of the United States of America. She is an African-American female of African origin, having been born in Nigeria. Dr. Nwachuku holds both a Bachelor of Science degree and a Masters of Science in microbiology from Howard University, as well as a Ph.D in microbiology from George Washington University. She has worked as an Environmental Scientist in the Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, U.S. Environmental Protection Agency for more than eight years, and has more than sixteen years of federal service, with nearly twenty years overall experience in the environmental industry.

Dr. Nwachuku's employment record amply demonstrates that she has consistently excelled in the performance of her duties. Her performance evaluations have been nothing short of exceptional. In addition to receiving cash performance awards during her entire period of assignment to EPA (1998-2005), just within the last several years, Dr. Nwachuku has received numerous awards and distinctions to include:

- Level I Scientific and Technical Achievement Award in 2004 ($5,000, plaque and certificate), which is the EPA's highest scientific and technical award;

- USEPA Bronze medal for Commendable Service in Office of Water for NDWAC CCL classification approach, 2005;

- USEPA Bronze medal for Commendable Service in Office of Water for regulation Determination for CCL-1, 2003;

- Plaque Award, 2006 for scientific support, LT2 Enhanced Surface Water Treatment Rule;

- Employee of the quarter, 2006, Health and Ecological Criteria Division for conducting CCL expert workshop Phase1;

2

SWICK & SHAPIRO, P.C.

Ephraim King
September 5, 2006
Page 3

- Employee of the quarter, 2004, Health and Ecological Criteria Division for conducting Coliphage workshop;

- Employee of the quarter, 2002, Office of Science and Technology, for work on *acanthamoeba*;

- Employee of the quarter, 2003, Health and Ecological Criteria Division, for work efforts as microbial team leader on CCL future;

- Team of the quarter Member, 2005, Office of Science & Technology, for developing outreach brochures, fact sheets for health care providers, general population, and teenage contact lens wearers in the U.S.;

- Team of the quarter Member, 2003, for work on contaminant candidate classification approach;

- Team of the quarter, Member, 2004, World Health Organization (WHO), for serving as an EPA expert microbial scientific advisor on Drinking Water Quality Guidelines in Geneva Switzerland; and

- On the spot cash award for Office of Science & Technology, 2001.

Dr. Nwachuku is an accomplished research scientist and has been widely published within her professional association - the American Society for Microbiology (ASM). She has authored and co-authored numerous scientific papers that have been selected for presentation at ASM General Meetings, most recently in May 2006. These hallmarks of professionalism have reflected most favorably upon Dr. Nwachuku and the EPA. In short, Dr. Nwachuku has proven that she is valued member of EPA, as well as the scientific community in her chosen field of microbiology.

<u>Dr. Nwachuku's Participation in the EEO Complaint Process</u>

The matter of Dr. Nwachuku's proposed termination is a blatant attempt by Dr. Nwachuku's superiors to retaliate against her because she has filed and is pressing EEO complaints against her EPA managers. In addition to several administrative EEO complaints, in May of this year she filed a civil lawsuit against the EPA - - a civil suit that was served upon EPA just before the proposed removal action was drafted and sent to Dr. Nwachuku. *See* TAB A, Nena Nwachuku Declaration at ¶ 2. Most recently, she has again engaged in the EPA EEO complaint process regarding a matter that Ms. Doyle unabashedly includes as a charge in support of Dr. Nwachuku's proposed termination - the incident on May 18, 2006, when Ms. Doyle physically and verbally threatened Dr. Nwachuku. *See* TAB A at ¶ 9.

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 4**

Since she became Dr. Nwachuku's supervisor in 2003, Elizabeth Doyle has embarked on a campaign to discriminate against and harass Dr. Nwachuku. More telling are the recent acts of retaliation that have culminated in the instant proposed termination. Given the circumstances, there can be no doubt that in proposing her termination, Ms. Doyle is clearly retaliating against Nena Nwachuku because of her protected EEO activity, including Dr. Nwachuku's unsuccessful attempts to seek Mr. Ephraim King's intercession to obtain relief from Ms. Doyle's acts of discrimination, harassment, and retaliation in January and February 2006. *See* TAB A at ¶ 3. Ms. Doyle's retaliatory motives are strikingly transparent upon reviewing the facts surrounding Dr. Brendlyn Faison's January 2006 meeting with Dr. Nwachuku and Dr. Faison's subsequent January 17, 2006, e-mail to Ms. Doyle, Mr. Ohanian, and Mr. Robert Cantilli (with a copy to Dr. Nwachuku). *See* TAB A at ¶ 3, and Attachment 1. In fine, there can be no doubt that Nena Nwachuku was a marked employee because she has engaged in protected EEO activity.

Circumstances Surrounding The Charges Contained in Dr. Nwachuku's Proposed Termination

A careful examination of the facts and circumstances occurring during the period from May 18 to June 6 - - the time-frame surrounding Dr. Nwachuku's alleged misconduct - - demonstrates that these charges upon which the proposed termination is based are nothing more than a trumped-up attempt by Elizabeth Doyle to justify what is her retaliatory animus against Nena Nwachuku for her EEO claims.

1. Charge I - Failure to Follow Supervisors' Instructions

In the proposed termination letter, Ms. Doyle asserts that this charge is based upon three incidents of Dr. Nwachuku's failure to adhere to supervisory instructions: (a) that on May 18, 2006, Ms. Doyle personally advised Dr. Nwachuku in a face-to-face discussion that she could not travel to Orlando on May 20 until the final charge had been fully coordinated and approved by management; (b) that on May 30, Ms. Doyle sent an e-mail to Dr. Nwachuku directing her to send out the revised charge no later than 4:00 p.m. on May 31, 2006; and (c) that Edward Ohanian had also directed Dr. Nwachuku to send out the revised charge no later than 4:00 p.m. on May 31. While these claims are grave indeed, the evidence amply demonstrates that Dr. Nwachuku did not receive the aforementioned instructions in a timely manner and that she thus was unable to take any action as a result of them.

As an initial matter, during the first two weeks in May 2006, Dr. Nwachuku was focused exclusively on coordinating and finalizing the charge within the CCL EPA Microbial Work Group. *See* TAB A at ¶¶ 6-8. As a result, Dr. Nwachuku simply did not see an e-mail from Ms. Doyle advising her that she would not be allowed to travel - - as previously planned and approved - - to the ASM General Meeting in Orlando on May 20. Moreover, Ms. Doyle did not express that directive to Dr. Nwachuku in person on May 18. *Id.*; *see also* TAB A at ¶ 7. Dr. Nwachuku had scheduled a briefing to her superiors, to include Ms. Doyle, and other OST management officials to discuss the charge at 4:00 p.m. on May 18. Ms. Doyle did not attend this briefing. Rather, the only discussion on May

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 5**

18 between Ms. Doyle and Dr. Nwachuku involved the issue of Dr. Nwachuku requesting sick leave. There was no mention of Ms. Doyle precluding Dr. Nwachuku from traveling to Orlando on May 20 as previously approved. Therefore, Dr. Nwachuku was not aware of Ms. Doyle's instructions as alleged in Specification 1 to Charge I.

When Dr. Nwachuku returned to work on May 30, 2006, she was still working on the final coordination efforts for the expert panel meeting scheduled to begin on June 6. She did not review Ms. Doyle's May 30 e-mail directing her to send out a revised charge. *See* TAB A at ¶ 11. In fact, Dr. Nwachuku did not review this e-mail until after the expert panel meeting was concluded on June 8. Thus Dr. Nwachuku was not aware of, and therefore could not comply with, Ms. Doyle's instruction as alleged in Specification 2 to Charge I.

With regard the contention that Edward Ohanian communicated an instruction to Dr. Nwachuku that she was required to send out the revised charge by 4:00 p.m. on May 31, there is no documentary evidence to support this allegation. *See* TAB A at ¶ 11. Neither Dr. Nwachuku nor her attorney has been provided with any such document. It should be no surprise then that Dr. Nwachuku was not aware of the claimed directive from Edward Ohanian, as alleged in Specification 3 of Charge I.[2]

    2. <u>Charge II - Absent Without Leave (AWOL)</u>

This particular charge by Ms. Doyle is simply not supported by the facts. Rather, Ms. Doyle's representation that Dr. Nwachuku was AWOL demonstrates the extent to which Ms. Doyle will go to invent charges to harass and retaliate against Dr. Nwachuku and to unfairly and maliciously effect her termination. As discussed immediately above and contrary to her assertions, Ms. Doyle did not affirmatively advise Dr. Nwachuku that she could not travel to Orlando for the ASM meeting as previously authorized. *See also* TAB A at ¶ 10 (Dr. Nwachuku unaware of e-mails or voice mail messages during the week of May 20-26, 2006). Moreover, Dr. Nwachuku was not aware of any written guidance from Ms. Doyle that precluded the planned travel to Orlando. As far as Dr. Nwachuku was aware, and contrary to Ms. Doyle's written representation in the proposed termination letter that Dr. Nwachuku's "absence was not approved," her travel authorization had been approved, and there was no intervening written notification to Dr. Nwachuku of which she was aware that the EPA approval for that trip had been officially rescinded. *See* TAB A at ¶ 4. Therefore, Dr. Nwachuku believed that she was traveling on an approved TDY in her trip to the ASM meeting.

_____

[2]Indeed, in an e-mail, dated May 30, 2006, Edward Ohanian requested that Dr. Nwachuku prepare talking points for him to open the expert panel meeting. *See* TAB B. There is no mention in that document of a requirement that she send out a revised charge or that she do so by a specific time or date. Dr. Nwachuku responded to Mr. Ohanian's e-mail that she would provide talking points to him by the date that he requested. *Id.*

SWICK & SHAPIRO, P.C.

Ephraim King
September 5, 2006
Page 6

### 3. Charge III - Making a False Statement

This charge stretches the bounds of common sense, based upon the underlying fact that Dr. Nwachuku's travel to the ASM meeting in Orlando was approved and she was not aware of any written rescission of that approval. *See* TAB A at ¶¶ 4, 8, and Attachment 6 (email from Sherry Howard). There is simply no support for this charge under the facts and circumstances present herein.

As a matter of law, in order to sustain a charge of making a false statement, the EPA must prove by a preponderance of evidence that Dr. Nwachuku "knowingly and intentionally made false statements with the intention of defrauding the agency." *See Mooney v. Department of Defense*, 44 M.S.P.R. 524, 526 (1990). In *Mooney*, the Merit Systems Protection Board affirmed an administrative judge's reversal of an agency termination against an employee. The Board determined that the agency had not proven by a preponderance of the evidence that the employee knew or believed that statements he had made were false. *Id.* As with *Mooney*, there is no evidence here to prove that Dr. Nwachuku knew that her statement concerning her approved travel was false, and that she intentionally made the statement knowing it was false. Indeed, the overwhelming evidence established just the opposite. Dr. Nwachuku had traveled to previous ASM general meetings at government expense. *See* TAB A at ¶ 4. In this particular instance, Dr. Nwachuku had been advised in writing that her travel authorization was approved. *See* TAB A at ¶ 4, and Attachment 6 (email from Sherry Howard). Dr. Nwachuku has stated that she was not aware of any written instructions via e-mail from Ms. Doyle nor had Ms. Doyle orally advised her that she was precluded her from traveling to Orlando. *See* TAB A at ¶ 8. Accordingly, this charge cannot be sustained.

### 4. Charge IV - Making/Causing False Claim Against Federal Government

This particular charge is fundamentally an outgrowth of the previous charge (making a false statement), and, therefore, is gratuitous surplusage in the proposed termination. However, as with the prior charge, Ms. Doyle has presented no evidence, nor has Dr. Nwachuku's attorney been provided any evidence, that demonstrates Dr. Nwachuku knew that her statement to the travel agency was false. *See Yoder v. Department of the Air Force*, 8 M.S.P.R. 634 (1981) (Agency must proved by preponderance of evidence that employee deliberately submitted false travel claims in order to defraud the government); *Heller v. Department of the Army*, 36 M.S.P.R. 675 (1988) (Agency must prove intent to deceive with respect to fraudulent claim). As with the preceding charge that Dr. Nwachuku knowingly and intentionally made a false statement, there is no evidence to prove her intent to deceive or defraud the government. Indeed, the evidence demonstrates that Dr. Nwachuku had a good faith belief that her travel was approved, based on both prior history of EPA funding her TDY for prior professional trips to ASM meetings and the specific approval of her travel authorization for the trip to Orlando in May 2006. *See* TAB A at ¶¶ 4, 8. As with the false statement charge, therefore, this charge of false claims cannot be sustained.

6

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 7**

5. <u>Charge V - Making Unfounded Accusation Against Immediate Supervisor.</u>

This charge is simply incredible. It is antithetical and abusive for a federal management official to postulate that a federal employee should be punished for reporting what that employee believes to be harassment or work place violence. In this instance, Dr. Nwachuku reported a May 18, 2006, incident during which she believed that Ms. Doyle threatened her and physically accosted her. For Ms. Doyle to then base a termination proposal on the reporting of that incident is the height of supervisory malice. Indeed, as Dr. Nwachuku initiated an EEO complaint about this incident, Ms. Doyle's charge as part of this proposed removal is a direct act of retaliation under Title VII of the Civil Rights Act. On these bases alone, this charge should be dismissed.

Ms. Doyle's characterization that Dr. Nwachuku made an "unfounded accusation" against her is based upon an investigation conducted by Ms. Maria Gomez-Taylor, who determined that there was no harassment or violence in the workplace by Ms. Doyle. *See* TAB C. In the first instance, simply because an opinion is offered that there was no such motive or conduct does not denote that there was no such harassment or violence or to have reported it as such was wrong. In this particular instance, the report of investigation submitted by Ms. Gomez-Taylor was revised after her initial investigation, and there is ample reason to doubt the validity of the information upon which Ms. Gomez-Taylor relied in revising her report. It appears that after speaking with both Dr. Nwachuku and Ms. Doyle, an alleged witness was identified by Ms. Doyle.[3] Indeed, Ms. Thomas' account of her time at the copy machine on May 18 is critically short of details, including, but not limited to: What time did Ms. Thomas arrive at the copy machine? How long was Ms. Thomas present at the copy machine? What exactly did she overhear and/or observe?[4] Did she observe Dr. Nwachuku crying or otherwise showing signs that she was upset? Did she discuss this incident with Ms. Doyle before speaking with Ms. Gomez-Taylor? These questions are vital to establish the reliability, indeed the applicability of Ms. Thomas' observations and information. However, there is no evidence that such questions were posed. It is equally unnerving to realize that Ms. Gomez-Taylor would rely on one party's - Elizabeth Doyle - additional information but not discuss this new revelation with Dr. Nwachuku. All this considered, the report of investigation by Ms. Gomez-Taylor is suspect regarding its usefulness as a foundation to conclude that no harassment or violence took place during the May 18 incident between Ms. Doyle and Dr. Nwachuku, or that there was a reliable witness to the

---

[3] It is highly suspect that Ms. Gomez-Taylor approached Ms. Doyle three days after finalizing her investigation report and queried her again about the existence of any witnesses to the May 18 incident. It was not until this point that Ms. Doyle indicated that she believed Ms. Dana Thomas witnessed the incident. Moreover, there is no record that Ms. Gomez-Taylor asked Dr. Nwachuku whether Ms. Thomas was ever in the vicinity at the time of the incident about which she complained.

[4] Ms. Thomas' answer to Ms. Gomez-Taylor's leading question - did she observe anything unusual between Ms. Doyle and Dr. Nwachuku - could reasonably be based upon Ms. Thomas' observations during the final moments of the incident complained of, by which time Dr. Nwachuku had moved into the small team room to escape Ms. Doyle's harassing and violent behavior.

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 8**

incident, much less as a basis for concluding that Dr. Nwachuku's reporting of the incident constituted an unfounded allegation the making of which is worthy of punishment!

In addition to the foregoing discussion about the impropriety of the May 18 incident serving as any part of a foundation for the proposed termination of Dr. Nwachuku, Ms. Doyle's motives for including this as a charge are highly indicative of her retaliatory motive regarding Dr. Nwachuku's May 30, 2006, complaint to Mr. King, not to mention Dr. Nwachuku's earlier efforts to have Mr. King address Ms. Doyle's harassment and retaliation and her EEO protected activity identifying Ms. Doyle as the key alleged discriminating official. To sustain this charge in the face of the present facts would amount to the Agency condoning retaliation against an employee who affirmatively seeks to be free of harassment, work place violence, discrimination, and/or retaliation.

### 6. Charge 6 [sic] - Disrespectful Conduct Against Supervisory Chain and OW Management.

Dr. Nwachuku denies that she was disrespectful to Ms. Doyle, or any other EPA management official on the morning of June 6, 2006. *See* TAB A at ¶ 13. It is ironic that there are no statements or other timely independent documentation regarding Dr. Nwachuku's behavior. Such a glaring lack of evidence bespeaks the tenuous basis for this charge. Certainly, if as Ms. Doyle has portrayed the incident as having occurred in the presence of Edward Ohanian, Dr. Nwachuku's second-line supervisor, why would Ms. Doyle, or even Dr. Ohanian for that matter, wait over one month to bring this matter to light. Again, the logical conclusion here is that Ms. Doyle's malicious and retaliatory animus requires that she manufacture allegations of misconduct against Dr. Nwachuku to support a proposed termination. This charge simply has no foundation in fact and should be dismissed.

Analysis of the *Douglas* Factors.

In *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), the Merit Systems Protection Board identified twelve criteria to be applied in determining the appropriate sanction in a misconduct case. Applying those twelve *Douglas* factors to the facts existing in the instant matter, with good reason and fair judgment, compels the conclusion that the proposed penalty of removal is not warranted. A factor-by-factor analysis makes the point:

*Factor 1.    The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated*

Dr. Nwachuku would certainly agree that an employee who disregards instructions from a superior, goes AWOL, knowingly and intentionally makes false statements/claims, or is disrespectful to supervisors, should be subject to discipline for such misconduct. However, as has been amply demonstrated above and in the record evidence, Dr. Nwachuku did not engage in the misconduct alleged in the proposed termination. Dr. Nwachuku has presented credible evidence that she was not aware of certain directives that Ms. Doyle relies upon in proposing her termination. Indeed, except to the extent that Ms. Doyle represents that Dr. Nwachuku's absence without leave occurred over

8

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 9**

a five-day period, none of the charges can be said to represent repeated misconduct. Even if one assumes that Dr. Nwachuku actually engaged in the misconduct as presented (an assumption that she adamantly denies and the circumstances do not support) there is no evidence that Dr. Nwachuku's conduct was malicious or intentional - contrary to Ms. Doyle's representations in the July 11, 2006 letter proposing termination. Quite the contrary, the record evidence demonstrates that if there is any culpability on Dr. Nwachuku's part, it was inadvertent or unintentional. Therefore, none of the charges in the proposed termination can be sustained under the circumstances present herein.

*Factor 2.      The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position*

Dr. Nwachuku is not a supervisor, has no fiduciary responsibilities regarding EPA or government funds and, while she does interact within the professional scientific community - - to the great benefit of the EPA, she does not deal routinely with the general public.

*Factor 3.      The employee's past disciplinary record*

It is undisputed that Dr. Nwachuku has absolutely no past disciplinary record in more than sixteen years of federal service. That Ms. Doyle will include what would be properly considered "performance" matters (i.e., non-specific reference to "counseling on several occasions regarding inappropriate behavior and inability or unwillingness to work in cooperation with supervisors, co-workers and customers") under the guise of prior disciplinary actions bespeaks only the level of animus that Ms. Doyle harbors for Dr. Nwachuku and the extent to which she will go to effect Dr. Nwachuku's termination.

*Factor 4.      The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability*

It bears repeating here that Dr. Nwachuku has been a federal employee for more than sixteen years and is in the midst of a distinguished career at the EPA. As previously noted, in addition to repeatedly being given outstanding written performance appraisals and cash awards for those exemplary performance evaluations every year from 1998 through 2005, Dr. Nwachuku has received numerous EPA awards and other forms of positive recognition, to include selection as employee of the quarter several times. In addition, Dr. Nwachuku has been selected to make numerous scientific presentations before the American Society of Microbiologists and in other professional fora, as being a well-respected representative of the microbiology and EPA communities. In short, Dr. Nwachuku is a highly successful, effective, and award-winning employee of the EPA.

*Factor 5.      The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform duties*

Given that she has consistently performed in an outstanding manner in the past, Dr. Nwachuku can be expected to perform her future duties in a more than satisfactory manner. Accordingly, there

*9*

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 10**

ought be no doubt that she can continue to be a valued EPA employee -- if only she is provided the opportunity to do so.

*Factor 6.        Consistency of the penalty with those imposed upon other employees for the same or similar offenses*

We have not been provided information upon which to address penalties imposed upon other EPA employees for the same or similar offenses. Thus, we have no basis upon which to analyze this factor. However, given the factual "support" offered regarding the charges, the proposed penalty seems extreme.

*Factor 7.        Consistency of penalties with applicable table of penalties*

We know of no table of penalties currently being used within the EPA, and thus are unable to address this factor.

*Factor 8.        The notoriety of the offense or its impact upon the reputation of the agency*

Any notoriety of Dr. Nwachuku's alleged misconduct would be the direct result of Ms. Doyle's efforts to rid herself of an excellently performing employee who has the temerity to oppose harassment, violence, discrimination, and retaliation, in the work place. Indeed, there is ample evidence that Dr. Nwachuku's performance regarding the June 6-8, 2006 expert panel meeting was exemplary, just as her whole federal career has been. *See* TAB D (E-mails from several senior EPA employees regarding Dr. Nwachuku's efforts involving the charge and the expert panel meeting generally). There has been no adverse media coverage, nor has there been any negative impact on the reputation of the EPA from the incidents as Ms. Doyle has characterized them.

*Factor 9.        The clarity with which the employee was on notice of any rules that had been violated in committing the offense, or had been warned about the conduct in question*

The evidence presented in this written response establishes that Dr. Nwachuku was not aware that Ms. Doyle had in any way revoked the approval fro her to attend the ASM general meeting or that she had been required to send out a revised charge by a date specific. Moreover, as Dr. Nwachuku believed that her travel to Orlando was approved, she could not have violated 18 U.S.C. §§ 287, 1001. Finally, as Dr. Nwachuku traveled to Orlando on an approved authorization and had not been advised that she could not attend the ASM meeting, she was not at all aware that she was subject to being placed in an AWOL status. In short, she was not on notice that she was violating any rules or supervisory instruction, nor was she warned about the conduct in question.

*Factor 10.        Potential for the employee's rehabilitation*

Given all the circumstances here, Dr. Nwachuku has clear potential for rehabilitation. There is no reason why she should not be provided that opportunity. Her work history, her consistently excellent,

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 11**

award-winning job performance, and her standing in the scientific community both inside and outside of EPA militate for that opportunity.

*Factor 11.    Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter*

An objective review of the facts and circumstances involved in this matter illuminates the multiplicity of mitigating factors at work here. And they surely warrant consideration in the final determination of discipline.

We start with the fact that Dr. Nwachuku has an exemplary record of service as an employee with EPA for more than eight years, with a total of more than sixteen years of outstanding federal service. Dr. Nwachuku's performance of duty has been highly rated; in this same vein, she has no record of prior discipline of any sort. She has received numerous awards and other recognition from the EPA, as well as by outside professional organizations. In sum, her exceptional service bespeaks a valued member of the EPA.

Ms. Doyle's proposed termination of Dr. Nwachuku in essence involves multiple charges that have as their foundation two events - the finalization of a charge for an expert panel and travel to the ASM meeting in Orlando. Ms. Doyle has totally mischaracterized Dr. Nwachuku's conduct in a personal and vindictive effort to justify her termination proposal. Most telling in these circumstances is that Dr. Nwachuku had engaged in protected EEO activity, both within the agency's administrative EEO complaint process and the filing of a civil lawsuit naming Ms. Doyle as an alleged discriminating official immediately prior to the proposal being made. Nearly eight weeks after that lawsuit was filed, Ms. Doyle proposed Dr. Nwachuku's termination based on trumped-up allegations. The underpinnings of retaliation in these circumstances are stark and clear. Sustaining the proposal, therefore, will constitute official approval of plainly unlawful retaliation.

*Factor 12.    The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others*

As the charges in this matter cannot be sustained, there is no principled reason to believe that any sanction is appropriate in Dr. Nwachuku's situation. However, even if a penalty is deemed appropriate under the circumstances, termination is plainly an overreach (at best).

Conclusion

In view of all the circumstances, including the foregoing discussion of the *Douglas* factors, the proposal to terminate Nena Nwachuku's employment at the EPA is unwarranted and should not be undertaken. Moreover, there is more than ample evidence that Ms. Doyle's underlying motive in proposing Dr. Nwachuku's dismissal is retaliatory for Dr. Nwachuku's protected EEO activity - - activity that is ongoing and was plainly known to Ms. Doyle at the time she prepared and issued the

SWICK & SHAPIRO, P.C.

**Ephraim King**
**September 5, 2006**
**Page 12**

dismissal proposal. In all fairness, the only reasoned decision in this matter is to deny the termination proposal in its entirety. This is precisely what Dr. Nwachuku urges you to do.

I look forward to discussing this matter with you on Thursday during Dr. Nwachuku's oral reply.

Very truly yours,

David H. Shapiro

Enclosures

cc:    Nena Nwachuku

# EXHIBIT
# 74



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF
WATER

November 13, 2006

David H. Shapiro, Esq.
Swick & Shapiro, P.C.
1225 I Street, N.W.
Suite 1290
Washington, D.C. 20005



Re:    Dr. Nena Nwachuku Notice of Proposed Removal Matter

Dear Mr. Shapiro:

Incident to the defenses that Dr. Nwachuku raised in her written submission and oral presentation, I have found it purposeful to collect further evidentiary materials in order to best reach a just decision. Primarily, I have examined additional e-mail traffic that was sent to Dr. Nwachuku during the critical time frame and Agency travel records that reflect Dr. Nwachuku's regular practice.

In addition, I solicited statements from Office of Water managers who witnessed the June 6, 2006, episode that occurred prior to the commencement of the CCL Workshop. I also secured statements from Agency and contractor personnel with more direct knowledge of Dr. Nwachuku's May 19, 2006 reservation request. Furthermore, I asked Dr. Doyle to provide me a declaration that details her Branch's standard travel protocol. I also secured a declaration from Dr. Dana Thomas, the individual who witnessed the May 18th interaction between Dr. Doyle and Dr. Nwachuku. And, I received a declaration from Bassie McCain, the employee in EPA's Office of Civil Rights, to whom Dr. Nwachuku claimed to have made her violence in the workplace complaint.

I would characterize the materials noted above as germane to the issue of Dr. Nwachuku's guilt or innocence of the charges of which Dr. Doyle accused her. Because I appreciated that it would also be incumbent upon me, as well, to address Dr. Nwachuku's mitigation argument that she was an exceptional performer, I examined her past performance appraisals, as well as affidavits from a number of personnel who have served in her supervisory chain and who had been asked to opine on Dr. Nwachuku's work history.

I also asked Dr. Brendlyn Faison for a copy of her EEO investigative affidavit, because I understood that Dr. Nwachuku had accused Dr. Faison of some hostile conduct towards her, and I was interested in Dr. Faison's perspective on their interactions.

As an enclosure to this cover letter, I am providing you with the additional evidentiary materials, as noted above, that I have examined in connection with Dr. Nwachuku's proposed removal action. Should you wish to offer any commentary on these materials, I will entertain any written response which I receive by no later than close of business Tuesday November 21, 2006.

Should I receive nothing from you by such deadline, I will proceed to issue my decision based on the presently existing record, as augmented by the materials that I am forwarding to you with this correspondence.

Sincerely,

Ephraim King, Director
Office of Science and Technology
Office of Water

Enclosure

2

# EXHIBIT
# *75*

**SWICK & SHAPIRO, P.C.**
ATTORNEYS AT LAW
1225 EYE STREET, N.W., SUITE 1290
WASHINGTON, D.C. 20005

(202) 842-0300
FAX (202) 842-1418

November 30, 2006

**VIA HAND DELIVERY**

Ephraim King
Director
Office of Science and Technology
U.S. Environmental Protection Agency
1201 Pennsylvania Avenue, N.W., Rm 5233A
Washington, D.C. 20004

Re:    Supplemental Written Response to Proposed Termination of Nena Nwachuku

Dear Mr. King:

This letter provides a supplemental written response on behalf of Dr. Nena Nwachuku based upon a review of the additional documents received in this office on November 14, 2006. This supplemental response will address those documents, as they relate to the pending proposal to terminate Dr. Nwachuku from her employment as a GS-1301-13 Environmental Scientist at the United States Environmental Protection Agency ("EPA"), Human Risk Assessment Branch, Health and Ecological Criteria Division, Office of Science and Technology.

This supplemental response will follow the format contained in Dr. Nwachuku's initial September 5, 2006, written response[1] by addressing the additional documentation and any relation to each of the charges pending against Dr. Nwachuku.

In the first instance, we are compelled to point out that certain information recently provided to this office is not only irrelevant to Dr. Nwachuku's proposed termination, but supports our contention that the proposal, and now the decision, to terminate Dr. Nwachuku is based upon unlawful retaliation because she had the temerity to file administrative complaints of discrimination and retaliation against EPA management officials, as well as filing a Title VII civil lawsuit in May 2006. We continue to maintain that, in light of the totality of facts and circumstances surrounding the alleged incidents of

---

[1]Dr. Nwachuku incorporates into this supplemental response, by reference, both her written response of September 5, 2006, and her oral response of September 7, 2006.



SWICK & SHAPIRO, P.C.

**Ephraim King**
**November 30, 2006**
**Page 2**

misconduct, to include an analysis of the *Douglas* factors, Dr. Nwachuku ought not be terminated. Accordingly, the proposal to terminate Dr. Nwachuku's employment should be rejected in its entirety.

Dr. Nwachuku's Work Performance

Your November 13, 2006, letter states that you "examined [Dr. Nwachuku's] past performance appraisals, as well as affidavits from a number of personnel who have served in her supervisory chain and who had been asked to opine on Dr. Nwachuku's work history." We would note that you did not provide copies of any of Dr. Nwachuku's performance appraisals that you have reviewed. We can only speculate that the reason you did not do so is that they bear out emphatically that Dr. Nwachuku has performed her duties in an exemplary manner. Indeed, there are no documents that you provided that refute the fact that Dr. Nwachuku's employment record clearly demonstrates that she has consistently excelled in the performance of her duties, as her performance appraisals have been exceptional and she has received cash performance awards during her entire period of assignment to EPA (1998-2005). In addition, there has been no refutation regarding the numerous awards and distinctions that Dr. Nwachuku received during the period 2001-2006, as highlighted in her September 5 written response. Moreover, the record evidence demonstrates unquestionably that Dr. Nwachuku is an accomplished research scientist and has been widely published within her professional association - the American Society for Microbiology (ASM). The EPA simply cannot deny that Dr. Nwachuku is a proven and valued member of EPA, as well as the scientific community.

The "affidavits" that you provided from some of Dr. Nwachuku's previous supervisors do not refute her demonstrated excellence as a scientist, nor do they support any contention that her performance as an EPA employee has been lacking. Indeed, with the exception of Dr. Ohanian's February 25, 2005 declaration, the declarations from three of Dr. Nwachuku's prior supervisors cover a time period that pre-dates your arrival as the Director of OST, as well as predating the incidents that are the subject of her proposed termination. We must note that the declarations from Christopher Zarba, Geoffrey Grubbs, and Rita Schoeny[2] were prepared by the EPA and submitted as government exhibits in Dr. Nwachuku's earlier matter before the U.S. Equal Employment Opportunity Commission (EEOC). We find your introduction and review of these declarations to be objectionable, at the least, but certainly retaliatory, in the instant matter of Dr. Nwachuku's proposed termination. The decision process in the pending termination matter appears to have been tainted by the mere consideration of

---

[2] To the extent that it is postulated that these three declarations, as well as Dr. Ohanian's February 25, 2005, declaration, represent a record that Dr. Nwachuku has been counseled regarding allegations that she does not get along with other employees, we note that only Ms. Schoeny's declaration addresses this issue of "counseling." In that regard, Dr. Nwachuku denies that Ms. Schoeny counseled her about such an allegation. Indeed, Dr. Nwachuku's annual appraisals and performance-based cash awards illustrate her overall outstanding performance.

SWICK & SHAPIRO, P.C.

**Ephraim King**
**November 30, 2006**
**Page 3**

those declarations. In that regard, we can only urge you in the strongest of terms not to rely on those documents in making your final decision.

## Dr. Nwachuku's Participation in the EEO Complaint Process

The introduction of documents that are directly related to Dr. Nwachuku's past and current complaints of discrimination and retaliation support our contention that the proposed termination of Dr. Nwachuku is more than just tainted by a retaliatory animus on the part of EPA's management, to include yourself. In addition to the foregoing discussion of the irrelevancy of and objections to the declarations from some of Dr. Nwachuku's former supervisors whose tenures predate the time period in the instant matter, we emphatically object to the introduction and consideration of what appears to be an unofficial copy of Brendlyn Denise Faison's affidavit that was prepared as part of an investigation into Dr. Nwachuku's current EEO complaints of discrimination and retaliation.[3] Dr. Nwachuku's declaration and copies of e-mails, regarding her January-February 2006 meetings with Dr. Faison and Dr. Ohanian, as well as you, that were attached to Dr. Nwachuku's September 5 written response speak for themselves and pointedly address a retaliatory animus by Dr. Nwachuku's supervisory chain, to include you. Indeed, it is ironic that Dr. Faison's representation that Dr. Nwachuku's supervisors intended to take an adverse action against her has come true. Once again, I urge you not to consider Dr. Faison's affidavit in your final decision in this matter.

## Circumstances Surrounding The Charges Contained in Dr. Nwachuku's Proposed Termination

It is unfortunate that several of the documents that were provided to our office in mid-November - more than two months after Dr. Nwachuku's oral response - were not available for Dr. Nwachuku to consider and address in her initial written and oral responses to you. It appears that the documentation that was collected after September 7, 2006, shares a common theme - without exception, the documents reflect wholly negative characterizations of Dr. Nwachuku during her career at the EPA. For instance and as noted earlier in this supplemental response, you indicated that you reviewed Dr. Nwachuku's performance appraisals, but you did not provide copies to my office. We can only surmise that your failure to provide copies is because those documents do not portray Dr. Nwachuku in a negative light. We, therefore, must conclude that, rather than being "objective information," the additional documents were deliberately manufactured and/or collected for the express purpose of buttressing management's intention to terminate her. Those documents reinforce our conclusion that these charges upon which the proposed termination is based are nothing more

---

[3] Any consideration of a single document, which is clearly part of a Report of Investigation (ROI) regarding Dr. Nwachuku's formal complaints of discrimination and retaliation, in isolation from other documents that make up the ROI, is suspect as to its relevancy in this matter. We reiterate that you should not consider such documents in your decision in this matter.

SWICK & SHAPIRO, P.C.

Ephraim King
November 30, 2006
Page 4

than a trumped-up attempt by the management of the EPA to justify what is pure retaliatory animus against Nena Nwachuku for her EEO claims.

    1. <u>Charge I - Failure to Follow Supervisors' Instructions</u>

As noted in Dr. Nwachuku's initial written response, the proposed termination letter asserts that this charge is comprised of three incidents. Dr. Nwachuku's initial written response addressed these issues specifically. However, at no time, either in the original documents that Ms. Doyle relied upon in proposing Dr. Nwachuku's termination or in the supplemental information provided to this office in mid-November 2006, has the EPA provided documentation that Dr. Nwachuku saw any of the aforementioned e-mails; nor has EPA offered unrebutted evidence that Ms. Doyle personally told Dr. Nwachuku on May 18 that she was not authorized to travel to the ASM Conference. Therefore, there is no evidence to refute Dr. Nwachuku's assertions that she either did not receive the aforementioned instructions in a timely manner or, in the press of business in preparing for the upcoming expert panel, does not remember seeing them. Thus, Dr. Nwachuku was unable to take any action as a result.

With regard to the contention that Edward Ohanian communicated an instruction to Dr. Nwachuku that she was required to send out the revised charge by 4:00 p.m. on May 31, there remains no documentary evidence to support this allegation. Dr. Nwachuku was not aware of the claimed directive from Edward Ohanian, as alleged in Specification 3 of Charge I.[4]

    2. <u>Charge II - Absent Without Leave (AWOL)</u>

The documents provided in mid-November include declarations from Alice Moss and Arlene Plunkett. Upon examination, these declarations simply do not support a charge that Dr. Nwachuku was AWOL during the period May 22-26, 2006. In the first place, there is no evidence that Ms. Doyle told Ms. Moss to inform Dr. Nwachuku that she was being carried in an AWOL status, and there is no evidence that Ms. Moss addressed this matter to Dr. Nwachuku at all. Neither declaration from Ms. Moss nor Ms. Plunkett addresses the issue of Dr. Nwachuku being AWOL. Additionally, Ms. Moss states that Ms. Doyle told her to memorialize her conversation with Dr. Nwachuku, and Ms. Moss states that she did so in an e-mail sent to Ms. Doyle. *See* Declaration of Alice Moss at ¶ 6. However, neither the memorandum nor e-mail from Ms. Moss has been provided to Dr. Nwachuku or her attorney. Therefore, the two aforementioned declarations provide no evidence relating to the charge that Dr. Nwachuku was AWOL. Indeed, there is no evidence that Dr. Nwachuku was aware that Ms. Doyle had put her in an AWOL status until she returned from Orlando and to work.

---

    [4]Indeed, in Dr. Ohanian's September 14, 2006, affidavit, he neither states that he sent an e-mail on May 31, 2006, nor does he assert that he communicated a directive to Dr. Nwachuku to distribute the revised charge on that date.

SWICK & SHAPIRO, P.C.

**Ephraim King**
**November 30, 2006**
**Page 5**

Dr. Nwachuku did have several short conversations with Ms. Moss on May 23, but there was no discussion by either party concerning a need for Dr. Nwachuku to contact Ms. Doyle during these very short telephone conversations. Rather, the only discussion between Ms. Moss and Dr. Nwachuku involved Dr. Nwachuku's preferences for work cube locations in the office.

### 3. Charge III - Making a False Statement

Dr. Nwachuku's September 5 written response articulated EPA's burden to prove that she had the intent to defraud the government by a preponderance of evidence, so this does not bear repeating here. The additional documents provided to our office actually support our contention that, not only did Dr. Nwachuku not intend to defraud the government, she did not commit the EPA to pay for the airline tickets to/from Orlando. One of EPA's administrative staff employees, Sarah Williams, specifically admitted that she "authorized" Dr. Nwachuku's tickets to be issued and charged to the EPA account. *See* Declaration of Sarah J. Williams at ¶ 5 ("I made a command decision to advise Rodgers Travel to acquire the airline tickets and charge their cost to EPA's account"). Moreover, Scott Sylvester, lead agent for the EPA account with Rodgers Travel, provided a declaration that we received in mid-November. In his declaration, Mr. Sylvester notes that Anthony Crisomia, a Rodgers Travel employee, processed Dr. Nwachuku's airline tickets for her trip to Orlando.[5] In addition, Mr. Sylvester states that Ms. Williams was the approval authority that Mr. Crisomia relied upon to book the tickets. *See* Declaration of Scott Sylvester at ¶ 5 (Mr. Crisomia "received the 'ok to ticket' from Sarah Williams"). Moreover, Mr. Sylvester stated that Dr. Nwachuku did not ask Mr. Crisomia to change her airline reservations. *Id.* at ¶ 4 ("nothing indicates that [Dr. Nwachuku] actually asked [Mr. Crisomia] to book a second reservation and cancel the previous booking"); *id.* (Mr. Crisomia "created the second reservation because of a ticketing error on his part").

There is simply no evidence to prove that Dr. Nwachuku made a false statement to a representative of Rodgers Travel. Actually, the overwhelming evidence establishes just the opposite. Therefore, this charge cannot be sustained.

### 4. Charge IV - Making/Causing False Claim Against Federal Government

As previously addressed in her September 5 written response, Dr. Nwachuku had a good faith belief that her travel was approved, based on the prior history of EPA funding her TDY for professional trips to ASM meetings and the specific approval of her travel authorization for the trip to Orlando in May 2006. Moreover, the preceding section that addressed Charge 3 (Making a False Statement)

---

[5]We find it puzzling that Mr. Crisomia did not provide a declaration in this matter. Notwithstanding the absence of such a document, Ms. Williams and Mr. Sylvester both indicate that Dr. Nwachuku did not make a false statement to Mr. Crisomia and that Dr. Nwachuku was not responsible for obligating the expenses for the airline tickets being charged to the EPA account.

·SWICK & SHAPIRO, P.C.

**Ephraim King**
**November 30, 2006**
**Page 6**

illustrates that Dr. Nwachuku was not the approval authority for her airline tickets to be charged to the EPA travel account. Accordingly, as with the false statement charge, this charge of false claims cannot be sustained.

### 5. Charge V - Making Unfounded Accusation Against Immediate Supervisor.

After reviewing the additional information provided to this office, this charge remains simply incredible. The two documents most germane to this issue, declarations from Bassie McCain and Dana Thomas, do not provide support for this charge, and the charge should be dismissed.

We presume that Mr. McCain provided a declaration based upon Dr. Nwachuku's representations that she reported the incident of Ms. Doyle's workplace violence against her to the Office of Civil Rights (OCR). Dr. Nwachuku contacted OCR on May 30, 2006 to initiate her right to make a complaint of discrimination/retaliation against Ms. Doyle. Mr. McCain's declaration bears this out. *See* Declaration of Bassie McCain III at ¶ 3 ("records reflect that Dr. Nwachuku contacted me on May 30, 2006 and left me a voice mail message advising me of her interest in invoking the EEO discrimination complaint process"). In engaging in this process, Dr. Nwachuku understood at that time that she did not have to specify the exact nature of her complaint. She has accurately stated that she contacted OCR on that date. Mr. McCain also admits that once their respective schedules could accommodate a meeting between Dr. Nwachuku and a member of the OCR staff, Dr. Nwachuku articulated the nature of her EEO complaint of discrimination and retaliation, which included her violence in the work place complaint. However, it bears noting that Mr. McCain has inaccurately represented that "at not time prior to July 10, 2006, did Dr. Nwachuku reveal that she had a violence in the workplace allegation." *Id.* at ¶ 7. While it may be true that he was not aware of Dr. Nwachuku's complaint of workplace violence, the evidence demonstrates that on May 30, Dr. Nwachuku sent an e-mail to Pam Parker reporting the incident with Ms. Doyle. *See* Attachment 1.

As discussed in Dr. Nwachuku's initial written response, there remain serious issues as to whether Dana Thomas witnessed the May 18 incident between Dr. Nwachuku and Ms. Doyle. Indeed, Dr. Thomas's declaration fails to clearly establish that she was present on May 18, 2006, when Ms. Doyle threatened Dr. Nwachuku. *See* Declaration of Dana A. Thomas at ¶ 7 ("I advised Maria that I distinctly recalled overhearing a conversation between Nena and Elizabeth while I made copies at the xerox machine *around the date and time in question*. I further advised Maria, however, that, to the extent I overheard any discussion that took place between them, *I no longer had any recollection of the specific topic of conversation or the exact day in question*.") (emphasis added). There is no evidence that what Dr. Thomas witnessed or heard was actually the incident on May 18. By her own admission when discussing the matter with Maria Gomez-Taylor "sometime during the first couple of weeks in June 2006," *id.* at ¶ 2, Dr. Thomas cannot specifically state that what she witnessed occurred on May 18. Dr. Thomas's recollection could just have easily been any recent verbal exchange between Dr. Nwachuku and Ms. Doyle on any day, other than on May 18, 2006. Therefore, this "evidence" does not satisfy EPA's burden of proof by a preponderance of evidence.

SWICK & SHAPIRO, P.C.

Ephraim King
November 30, 2006
Page 7

In addition, Dr. Nwachuku's own recollection of the incident of workplace violence perpetrated by Ms. Doyle occurred late in the business day when Dr. Nwachuku was involved in xeroxing multiple documents and utilizing both copier machines in that particular area. Therefore, it is not likely that Dr. Thomas would have been able to use the xerox machine, as both were printing Dr. Nwachuku's documents during the incident with Ms. Doyle. It is clear from the evidence that Ms. Doyle's version of events on May 18 differ from Dr. Nwachuku's version. Everything considered, Ms. Gomez-Taylor's report remains suspect regarding its usefulness as a foundation to conclude that no harassment or violence took place on May 18 between Ms. Doyle and Dr. Nwachuku. Even with the introduction of Dr. Thomas's declaration, there is no proof that her account makes her a reliable witness to the incident. As there is no basis for concluding that Dr. Nwachuku made a false or unfounded complaint of the incident, this charge cannot be sustained. Otherwise, the Agency would be condoning retaliation against an employee who affirmatively sought to be free of harassment, work place violence, discrimination, and/or retaliation.

### 6. Charge 6 [sic] - Disrespectful Conduct Against Supervisory Chain and OW Management.

The heart of this charge is Ms. Doyle's allegations that Dr. Nwachuku "spoke loudly and aggressively," "thrust [her] finger in front of [Ms. Doyle's] face," stated [to Ms. Doyle] "No, don't you say anything," and upon returning to the meeting room said "Just you wait. Brace yourself." As noted in her September 5 initial written response, no supporting documents were provided either to Dr. Nwachuku or her attorneys up to that point. It is unfortunate that you, as the deciding official in this matter, had to collect what has been represented as support for this charge; it is clear that Ms. Doyle failed to provide documentary support for her proposal to terminate Dr. Nwachuku at the time she initiated this adverse action. Dr. Nwachuku denies that she acted disrespectfully towards Ms. Doyle or any other OW manager. She does realize that she should have remained more calm during the discussions on that morning, but, despite months and months of hard work and long hours to make the expert panel a success, she still did not intend to be disrespectful in any manner.

The documents provided to this office in November included affidavits from Edward Ohanian and Eric Burneson and provided some information concerning the incident of June 6, 2006. However, we must note that the accounts from Dr. Ohanian and Mr. Burneson factually differ from each other, as well as differing from Ms. Doyle's representations. Dr. Ohanian states that Dr. Nwachuku did get very close to Ms. Doyle and on one occasion told Ms. Doyle not to say anything. *See* Affidavit of Edward V. Ohanian at ¶ 3. Dr. Ohanian does not state that Dr. Nwachuku pointed or stuck her finger in front of Ms. Doyle's face, nor does he state that Dr. Nwachuku was aggressive. On the other hand, Mr. Burneson states Dr. Nwachuku pointed her finger towards Ms. Doyle's face, but does not state that Dr. Nwachuku told Ms. Doyle not to say anything or that Dr. Nwachuku was aggressive. *See* Affidavit of Eric G. Burneson. In other words, there are inconsistent recollections of the same incident from three EPA managers who represent that they were all present for the incident.

Nothing in the additional documents address any affirmative steps by Ms. Doyle or Dr. Ohanian to deal with this alleged incident of "disrespect" nearer in time to the incident. Dr. Nwachuku's superiors should have initiated some corrective action immediately, rather than waiting more than one

SWICK & SHAPIRO, P.C.

**Ephraim King**
**November 30, 2006**
**Page 8**

month after the incident to do so. Again, the logical conclusion here is that Ms. Doyle's malicious and retaliatory animus drove her to pile allegation upon allegation with the intent to have Dr. Nwachuku terminated. In view of the fact that Dr. Nwachuku had no intention of disrespecting Ms. Doyle, or any supervisor or manager, on June 6, 2006, this charge should be dismissed.

Analysis of the *Douglas* Factors.

Dr. Nwachuku's September 5, 2006, written response provided a factual, objective, and reasoned analysis of the twelve *Douglas* factors, so there is no need to repeat that here.

Conclusion

In view of all the circumstances, including careful consideration of the *Douglas* factors, the proposal to terminate Nena Nwachuku's employment at the EPA is unwarranted and should not be undertaken. There is more than ample evidence that Ms. Doyle's underlying motives in proposing Dr. Nwachuku's dismissal are clearly retaliation for her protected EEO activity - - activity that was known to Ms. Doyle prior to preparing the dismissal proposal. Additionally, given the foregoing discussion of the documentation received in our office on November 14, there are indicia that retaliatory motives are present in the decision process. In all fairness, the only reasoned decision in this matter is to rescind the termination proposal in its entirety.

Very truly yours,

James E. Simpson

Enclosure

cc:    Nena Nwachuku