# EXHIBIT
# 76



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

December 4, 2006        OFFICE OF
WATER

Dr. Nena Nwachuku
7413 Shrewsbury Court
Beltsville, Maryland 20705

Subject: <u>Final Decision on Proposed Removal</u>

Dear Dr. Nwachuku:

The purpose of this letter is to notify you of my decision regarding your removal from the Federal service which was proposed on July 11, 2006, by Elizabeth Doyle, Supervisory Biologist, Human Risk Assessment Branch, Health and Ecological Criteria Division, Office of Science and Technology, Office of Water, U. S. Environmental Protection Agency (EPA or Agency). Dr. Doyle proposed to remove you for misconduct under Title 5, United States Code, Chapter 75, and Title 5 of the Code of Federal Regulations, Part 752. Dr. Doyle charged you with the following:

I.      Failure to Follow Supervisors Instructions;
II.     Absent Without Leave (AWOL);
III.    Making a False Statement in a Matter within the Jurisdiction of a Federal
        Agency, in Violation of 18 U. S. C Sec 1001;
IV.     Making/Causing to be Made a False Claim Against the Federal
        Government in Violation of 18. U. S. C. Sec 287;
V.      Making an Unfounded Accusation Against Your Immediate Supervisor;
VI.     Disrespectful Conduct Toward Your Supervisory Chain and OW
        Management Outside of your Office.

The July 11, 2006, Notice of Proposed Removal informed you of your right to provide an oral and/or written reply to the proposal for my consideration. You provided a written response dated September 5, 2006. In addition, I met with you and your attorney Mr. David Shapiro on September 7, 2006 and gave you an opportunity to provide an oral reply to the proposal. On November 14, 2006, I served supplemental evidence upon your attorney, and I allowed him until November 30, 2006 to respond to such evidence. I received your counsel's written response to the supplemental evidence on November 30th.



1

Internet Address (URL) ● http://www.epa.gov
**Recycled/Recyclable** ● Printed with Vegetable Oil Based Inks on 100% Postconsumer, Process Chlorine Free Recycled Paper

Based on my review of the proposal notice and its supporting documentation, your oral and written responses to such notice, and the supplemental evidence and your response to such materials, I have determined that the specifications and charges, with the exception of Specification 3 in Charge I, in the proposal are supported by the evidence and that your removal is warranted in order to promote the efficiency of the Federal service. A detailed decision document on this matter is attached.

## Appeal Rights

You have the right to appeal this action to the U. S. Merit Systems Protection Board (MSPB.) Should you elect to do so, you should direct your appeal to the Regional Director, MSPB, Washington Regional Office, 5203 Leesburg Pike, Suite 1109, Falls Church, Virginia 22041-3473, telephone (702) 756-7112. In order for your appeal to be timely filed, it must be submitted to the MSPB no later than thirty (30) calendar days after the effective date of this removal or no later than thirty (30) calendar days after your receipt of the Agency's decision, whichever is later.

However, should EPA and you agree in writing to attempt to resolve your removal through an alternative dispute resolution process prior to the timely filing of an appeal, the time limit for filing the appeal is extended by an additional 30 days, for a total of 60 days. An MSPB appeals form and instruction are attached. You can find specific instruction for the appeal process and electronic copies of the forms at the MSPB website: http:www.mspb.gov/howtoappeal.html.

If you believe that this action was taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age (40 or over) and/or reprisal, you may include this allegation in your appeal to MSPB, or you may file a discrimination complaint with EPA by contacting the EEO counselor within forty-five (45) calendar days of the effective date of your removal in accordance with the procedures contained in Title 29, Code of Federal Regulations, Part 1614.

You also have the right to appeal this action under the grievance procedures contained the negotiated agreement between EPA and NTEU. For further information concerning appeal rights under the negotiated procedures you should contact your NTEU representative. Please note that you must choose between filing a grievance under the negotiated grievance procedures, filing an appeal with the MSPB or filing a discrimination complaint with EPA; you cannot elect to follow more than one of these three (3) procedures.

3

Should you have any questions concerning your appeal rights, you should contact Diane Wright, Human Resources Specialist (Labor and Employee Relations) at (702) 798-2424.

Sincerely,

Ephraim King, Director
Office of Science and Technology
Office of Water

Attachments:   Final Decision Document
               MSPB Appeal Form
               MSPB Regulations

cc:  Elizabeth Doyle

**FINAL DECISION ON PROPOSED REMOVAL OF NENA NWACHUKU, 12/4/06**

<u>Analysis and Conclusion:</u>

I.     **Charge I: Failure to follow Supervisor's Instruction**

       A.     **Specification 1:**

Failure to comply with direct order on May 18th to finalize the *Charge*, including securing HECD and SRMD supervisory sign-off at the earliest possible time during the week of May 22, 2006.

Analysis & Conclusion:

Charge I, Specification 1, states that you were given a direct and lawful order on May 18, 2006, by your supervisor, Dr. Elizabeth Doyle, and that you failed to follow that order. More specifically, this charge indicates that you were directed to 1) finalize the CCL *Charge*, 2) secure supervisory sign off as early as possible during the week of May 22, and 3) not to travel to an ASM conference in Florida the week of May 22. The Charge concludes that you did not finalize the *Charge* (e.g., complete it in a way that reflected full consensus and agreement of key offices); that you did not obtain supervisory sign-off as directed, and that you chose to travel to Florida against your supervisor's instruction.

In your oral and written responses to these charges you said 1) that you that were unaware of Dr. Doyle's written instructions and did not receive them in a timely manner because you generally did not read your e-mails during the weeks leading up to finalization of the *Charge;* 2) that you did not receive verbal instructions from Dr. Doyle on May 18; and 3) that you believed you had accomplished the mission given to you by Dr. Doyle.

This specification turns upon the factual question of whether you were, indeed, aware of Dr. Doyle's e-mail and/or verbal instructions regarding finalization of the *Charge* and travel to the ASM conference in Florida. Your attorney, Mr. Shapiro, alleged that had you received such instructions, you assuredly would not have traveled to Florida.

Regarding the question of your notice, the record is clear that numerous e-mails were directed or copied to you on the issue of travel and finalization of the *Charge* during the week of May 15. The evidence shows, beginning on Monday, May 15, through Thursday, May 18, you received either directly or by copy 14 e-mails, either from Dr. Doyle or Ed Ohanian, all relevant to finalization of the *Charge,* five of which expressly refer to the issue of additional work in Washington, D.C. the following week of May 22, and three of which (on three separate days) directly communicated to you that your travel to Florida was not authorized. Eleven of these fourteen e-mails had a subject heading that clearly related to the CCL *Charge*, and one had a subject heading of "Travel to Orlando". Each of these e-mails indicated that issues had not been fully addressed, remained to be resolved, or were not ready for management review and approval.

The record is equally clear that you used and relied upon your EPA e-mail system before and during the week of May 15 to transmit information and communicate on the CCL *Charge* and ASM Conference issues. In your Declaration submitted with your September 5, written response, you indicated that you worked "exclusively on the expert panel charge and related documents" and that while you did not generally read your e-mails during this period, you did read e-mails related the CCL EPA Microbial Workgroup's effort.

Your use of e-mail related to CCL issues is confirmed by the e-mail record. On Monday, May 15, you sent an e-mail to Dr. Doyle specifically requesting her comments on issues related to the *Charge* - to which Dr. Doyle responded early the following day, clearly indicating that the *Charge* was not ready. Given, first, that you specifically asked for Dr. Doyle's comments, second, that these comments were directly related to and addressed aspects of the CCL EPA Microbial Workgroup's efforts, third, that Dr. Doyle responded within 24 hours, and fourth, that you stated in your written and oral statement that you did review e-mails related to the CCL workgroup's work, it is not credible that you would have overlooked or failed to read this particular e-mail from your first line supervisor as you claim.

On Tuesday, May 16, at 11:42 am, Eric Burneson, a manager with OGWDW sent an e-mail to Dr. Doyle with a copy to you 1) explicitly referring to the CCL *Charge*, 2) clearly indicating that the charge was not yet satisfactorily completed, and 3) affirming the need for distribution of a revised *Charge* to the workgroup (which you never did) before making a judgement on its adequacy. This e-mail put you on clear notice that the *Charge* was not complete and further work was needed before finalization and management sign-off.

The record is also clear that you were aware of and read this e-mail because slightly more than an hour later, you forwarded it directly to an associate, Dr. Brenda Mosley at 12:53 pm. The short time interval (71 minutes) between receiving and forwarding this e-mail confirms not simply that you read it but that you were actively engaged in reviewing your incoming e-mail related to CCL issues, as one would expect of a professional.

Later in the day on Tuesday, May 16, at 2:42 pm, Dr. Doyle sent an e-mail to you specifically entitled "Travel to Orlando" in which she wrote "Nena, I can not sign your travel for Orlando until you have resolved the issues around the *Charge* to the CCL panel." It is difficult to imagine a more explicit notification to you that your travel was not authorized and would remain that way until you resolved CCL panel issues. You argue that you were unaware of any notification from Dr. Doyle that your travel was not approved. Yet, approximately two hours later, at 4:38 pm., you forwarded to your associate, Dr. Mosley, the very same e-mail indicating your unapproved travel status.

On Wednesday, May 17, you sent an e-mail to Dr. Ohanian specifically requesting his comments on the *Charge* - to which he also responded early the next day specifically asking whether your supervisor, Dr. Beth Doyle, and the Office of Ground Water and Drinking Water, Eric Burneson, were "OK" (i.e., did they concur?). Both of these e-mails reflect your

engagement via e-mail on CCL *Charge* issues as well as your recognition that comments from Drs. Doyle and Ohanian were relevant and significantly related to the CCL workgroup's effort.

This understanding and anticipation of senior manager input on the CCL *Charge* is further confirmed by an earlier e-mail on the preceding Friday, May 12, in which, you reminded workgroup members that the charge still must undergo management review in the upcoming week and that you anticipated that "Ed Ohanian . . . will definitely give us his suggestions for refining the *Charge*."

In prioritizing which e-mails to address, you benefitted from EPA's e-mail system which provides a summary screen not only showing a list of who is sending the incoming e-mail, but also including a subject matter heading associated with the incoming message. As indicated above, eleven of the fourteen e-mails, sent directly to, or copied to, you by Drs. Doyle and Ohanian, clearly indicated in the subject heading that the message was from a supervisor and that it related to finalization of the CCL *Charge*.

An example of this is Dr. Doyle's May 18 e-mail to you with a subject heading entitled "CCL Expert Panel *Charge*." The brief text of this e-mail clearly communicated 1) that the *Charge* was not ready to go forward to management, 2) that a meeting with you would be scheduled for the week of May 22, and 3) that your travel to Florida was not authorized, nor were you authorized to incur costs on behalf of the government.

On the question of whether you were aware of and read your e-mails related to the CCL *Charge* - including those from Dr. Doyle, I find and conclude based on the evidence in the record that it is substantially more likely than not that you were aware of and did read your e-mails from both Drs. Doyle and Ohanian.

This conclusion is based on the following facts: 1) that you were clearly using your EPA e-mail system to conduct business related to finalization of the CCL *Charge* before and during the week of May 15th ; 2) that, on the same day that you received from Dr. Doyle her May 16th e-mail which stated clearly the unlikelihood that you would be authorized to travel to Florida to attend the ASM conference, you forwarded that e-mail (as well as Eric Burneson's earlier e-mail on the same day indicating the charge was not ready and had remaining issues) Dr. Brenda Mosley, an EPA colleague; (3) that the subject heading of Dr. Doyle's May 18th e-mail clearly referenced the "CCL Expert Panel *Charge*", and 4) that you knew, understood, and accepted management's role in reviewing the *Charge* and thus would have expected to get e-mail traffic from your supervisors concerning such matter.

Based on your stated focus of finalizing the CCL *Charge* and the facts noted above from the record, I find that it is not credible that you "simply did not see an e-mail" from Dr. Doyle on May 18th on the very same subject. I find that you did receive and read that May 18th e-mail contemporaneously with its delivery.

On the question, of whether Dr. Doyle verbally communicated her instructions to you on the afternoon of May 18th, you and Dr. Doyle disagree. Dr. Doyle stated in her signed July 11, 2006 Notice of Proposed Removal and subsequently executed declarations, that she did verbally communicate these instructions. You maintained in your signed September 5, 2006, written submission 1) that the May 18th conversation focused on the issue of sick leave, 2) that Dr. Doyle was aggressive and yelled at you regarding requested sick leave, and 3) that there was no discussion of your travel to the ASM Conference in Florida.

In evaluating the two disparate accounts, it is useful to consider the events leading up to this conversation. You both agree that a verbal exchange took place on the afternoon of May 18th; that this exchange took place at a single meeting between you; and that such meeting occurred near a xerox machine.

As you indicated in your declaration, you were focused on completing the CCL *Charge* and related materials, and your e-mails are consistent with this. Dr. Doyle was likewise focused on the CCL *Charge*; however her e-mails both to you and to Dr. Ohanian indicate an ongoing and reemphasized concern that the *Charge* had not been finalized and that your travel to Florida could not be and was not authorized because completion of the CCL *Charge* with OGWDW concurrence and management sign-off was a higher and more important priority to the Agency. Dr. Doyle sent four e-mails directly to you over the period May 16 to May 18 communicating her growing concern that the charge was not ready or that work on it would need to continue into the week of May 22nd.

Three of Dr. Doyle's e-mails directly addressed the issue of travel to the Florida ASM conference. They indicate 1) on May 16 "that I cannot sign your travel to Orlando" until the CCL issues are resolved, 2) on May 17 "I cannot approve your travel request" unless agreement on the *Charge* is reached with OGWDW, and 3) on May 18 "I cannot authorize your travel" and further emphasizing in the same e-mail that "I want to remind you that you do not have authorization to travel." Over this time period, Dr. Doyle also sent two e-mails to Dr. Ohanian (with copies to you) raising concern that agreement had not been reached with OGWDW and that the *Charge* was not ready for management approval.

In light of Dr. Doyle's (1) unambiguous May 18th e-mail; (2) prior e-mail traffic conveying her clear and repeated concern about the need to complete the charge; (3) recognition of your strong interest in taking the Florida trip; and (4) non-receipt of an acknowledgment from you concerning the May 18th e-mail, I find it entirely predictable and persuasive that Dr. Doyle, an experienced manager, would communicate her instructions in person directly to you, particularly given the importance of this issue to OW senior management and the national CCL program.

Further consideration of whether Dr. Doyle raised the CCL *Charge* and ASM conference matters with you on May 18th, in a face-to-face meeting, hinges on your and Dr. Doyle's respective credibility, insofar as each of you have made diametrically opposite assertions.

Consequently, I have examined the record for testimonial evidence that would support a finding that either Dr. Doyle's or your word is the more trustworthy. In that regard, I have identified the following representations by you, which fundamentally lack credibility.

One, you insisted during you oral presentation that your conduct on the morning of June 6th, just prior to the commencement of the workshop, was in no way inappropriate. Yet, I have received verbal communications from Pam Barr and declarations from Dr. Ohanian and Eric Burneson that are at odds with your assertion. In the face of consistent statements by these three witnesses corroborating Dr. Doyle's account that your behavior was disrespectful and unprofessional, I am compelled to find that you have not spoken truthfully about this incident.

Two, Alice Moss, contemporaneously with her phone conversation with you in Florida, sent Dr. Doyle an e-mail, in which she noted that she had advised you of Dr. Doyle's interest in speaking with you immediately, but that you had expressed a disinclination to do so. Ms. Moss' e-mail and subsequent declaration to the same effect are directly at odds with your representation that during your discussion with Ms. Moss, you were told nothing about Dr. Doyle's interest in speaking to you.

Furthermore, Arlene Plunkett, who observed Ms. Moss' phone conversation with you, has corroborated Ms. Moss' statement that she specifically advised you of your need to call Dr. Doyle as soon as possible. Insofar as Ms. Moss and Ms. Plunkett are neutral parties, with no reason/motive to be other than scrupulously honest, I am compelled to find that you were dishonest with me about this matter as well.

Three, in response to a direct inquiry from me during your oral presentation, you denied that the travel contractor spoke to you about a travel authorization (TA) when you made reservations for your Orlando, Florida trip on May 19th. However, I have declarations from Scott Sylvester, a manager of Rogers Travel, as well as from Sarah Williams, an EPA employee in the Office of the Chief Financial Officer, and Dr. Doyle, which reflect that you advised the travel representative with whom you spoke that you were authorized to travel at Government expense.

Insofar as neither Ms. Williams nor Mr. Sylvester would have any reason not to be candid, and the normal operation of the travel process renders it virtually impossible for you not to have spoken with the travel contractor about your TA status, I find that you misrepresented to me the facts concerning your interaction with the Rogers Travel representative.

Four, Bassie McCain, the individual in the Office of Civil Rights (OCR) who you identified as the recipient of your violence in the workplace complaint, asserts in a declaration that the earliest *contact* that he, or anyone in OCR, had with you concerning such matter was a voice mail that you left him on May 30, 2006, in which you noted your interest in invoking the EEO process but failed to provide any information with respect to the nature of your complaint. Mr. McCain further asserts that no one in OCR became aware of the nature of your complaint until July 12th, because prior to such time you never revealed such information. Insofar as you

represented to me during your oral presentation, in response to a direct inquiry on such issue, that you had contacted OCR on May 19th, the day after the alleged workplace violence incident, I find that you were untruthful with me about this matter also.

I believe the first three falsehoods are material and are designed to disguise your culpability for specific charges, i.e., failure to follow your supervisor's instructions, the disrespectful behavior toward Dr. Doyle, and your five straight days of AWOL. The fourth untruth accelerates the timing of your workplace violence complaint and would tend to establish your greater conviction in its authenticity, given that you would have raised such matter almost contemporaneously with Dr. Doyle's alleged hostile conduct. However, the fact that the evidence reflects that you made no such contemporaneous complaint, strengthens the appearance that you made this complaint as a preemptive strike to shield yourself against an inevitable disciplinary action.

Regarding the question of whether your May 18th conversation with Dr. Doyle addressed the *Charge* and travel issues, I find that there is a strong indicia of reliability, based on the surrounding circumstances, in Dr. Doyle's assertion that she did advise you in person, face-to-face, on the afternoon of May 18th of your ineligibility to attend the ASM conference and of your need to complete the CCL *Charge* the week of May 22nd. In addition, I find that you have exhibited a pattern of dishonesty in the course of defending against the disciplinary action at issue that seriously compromises your credibility.

Thus, I find and conclude that it is substantially more likely than not that Dr. Doyle, consistent with her signed statement and her record of e-mails did, in fact, communicate and emphasize, in person, face-to-face on May 18th the same instructions that she articulated in her May 18th e-mail.

Having found that you had knowledge as of May 18th of Dr. Doyle's orders of that date, and having also found that by traveling to Orlando, Florida to attend the ASM conference, you acted in direct contravention of such orders, I find that Charge I, Specification 1 is supported by the evidence.

### B.    Specification 2

Failure to comply with a direct order 1) to finalize the CCL charge as revised by Eric Burneson and Dr. Doyle, 2) to send the charge out no later than 4 p.m. on May 31, 2006, and 3) to notify Dr. Doyle, Dr. Ohanian, Pam Barr, and Eric Burneson by e-mail as soon as the task was completed.

Analysis & Conclusion:

Specification 2 states that you were given a direct and lawful order on May 30, 2006, by your supervisor, Dr. Elizabeth Doyle, and that you failed to follow that order. The record

indicates that Dr. Doyle sent you an e-mail at 12:50 p.m. on May 30th explicitly directing you to send the revised *Charge,* as attached to Dr. Doyle's e-mail, to CCL Expert Panel members with a notification that the revised *Charge* superseded the one that you had sent to the Panel on May 19, 2006. The May 30, 2006, e-mail further directed you to complete this task by 4:00 p.m. the next day, May 31, 2006, and to advise Dr. Doyle, Dr. Ohanian, Ms. Barr, and Mr. Burneson by e-mail once you had complied with this directive. The record also includes a declaration by Dr. Doyle that on the morning of May 30th, prior to sending this e-mail, she tried to verbally communicate to you the instructions at issue, but that you interrupted her and told her to communicate with you only via e-mail or voice mail.

In your response you stated that you did not review Dr. Doyle's e-mail of May 30th until after the CCL expert panel meeting was concluded on June 8th. Thus, you defended your failure to adhere to Dr. Doyle's May 30th instructions on the grounds of unintentional ignorance.

Specification 2 turns upon the factual question of whether you had timely knowledge of Dr. Doyle's instructions to (1) finalize the *Charge* as revised; (2) send it out; and (3) notify the relevant managers. There is no dispute but that you failed to carry out such instructions.

Six factors would appear to bear on this question: first, your admission in your September 7th oral response that you checked your e-mail in-box and sent out e-mails on May 30th; second, the fact that May 30th was your first day back in the office after an extended absence and addressing e-mail traffic after such a hiatus is customary; third, your acknowledged awareness, as of May 26th, of Dr. Doyle's urgent voicemail instructing you to return immediately from Florida and the obvious necessity for responding forthwith to such matter upon your return to the office on May 30th; fourth, your representation in the course of your oral presentation that, upon your return to the office on May 30th, you became aware, from at least one CCL workgroup member, of controversy concerning the finality of the May 19th CCL *Charge;* fifth, the fact that the subject heading of Dr. Doyle's May 30th e-mail, which was entitled "Distribution of the Revised Charge for CCL Expert Panel to Panelists," clearly signaled the subject and relevance of such e-mail to your ongoing responsibilities; and sixth, Dr. Doyle's assertion that she tried to speak with you on the morning of May 30th on the need to finalize and distribute the CCL *Charge,* but that you insisted that such communiqué be via e-mail or voice mail.

With respect to the final factor above, I find compelling Dr. Doyle's assertion concerning her earlier attempt to convey to you, in person, the essence of the instruction that she subsequently, pursuant to your direction, communicated via her May 30th e-mail.

After all, incident to your extended AWOL and your failure to complete the CCL *Charge* prior to such absence, it became incumbent upon Dr. Doyle and Eric Burneson to devote themselves to the *Charge* finalization process. Furthermore, Dr. Doyle recognized that the CCL workshop was imminent and that the revised *Charge* needed to be distributed to the expert panelists as soon as possible. Thus, Dr. Doyle would have had every incentive to instruct you at the earliest opportunity on the first day of your return to the office, May 30th, to finalize and

distribute the revised *Charge*. And to have initially tried to so instruct you face-to-face would be consistent with how an experienced manager such as Dr. Doyle could be expected to operate, given the indisputable fact that the CCL *Charge* matter was one of some considerable urgency on May 30th. Based on the evidence identified above, I do not find credible your assertion that you did not receive or review Dr. Doyle's instructions on May 30th.

In addition, the lack of credibility of your response is underscored by the improbability of your assertion on page 5 of your written submission, that you "In fact, ... did not review this [May 30[th]] e-mail until after the expert meeting was concluded on June 8[th]." Given that you, on page 7 of the same submission, admit that you were "aware of an e-mail from Ed Ohanian regarding the same issue ... a day or two prior to the actual expert meeting," I am hardpressed to understand how you can claim such an extended ignorance of Dr. Doyle's May 30th e-mail. Considering further your statement that on May 30th you were "still focused on final logistical and administrative preparations for the expert meeting" it is for the same reason unlikely, at best, that in the midst of reviewing other e-mails on the same day, you did not see or would not review an e-mail from your supervisor directly related to the same subject. It is even more unlikely that you would come to work on a daily basis and yet, somehow, neglect to notice and read the e-mail until a week later - after the meeting in question was no longer relevant. I find that your professed ignorance of the May 30th e-mail is not credible.

In light of my earlier discussion identifying four material misrepresentations by you in the course of your response to the proposed removal action, I am further persuaded that your protestations of ignorance of Dr. Doyle's May 30th e-mail are not credible.

Therefore, I find and conclude that it is substantially more likely than not that you were, on May 30th, aware of the instructions contained in Dr. Doyle's e-mail of that date; had timely knowledge of Dr. Doyle's May 30th order; and failed to comply with such order. I find that Charge I, Specification 2, is supported by the evidence.

## C.    Specification 3

I did not find enough evidence to sustain this specification and therefore, I am not considering Specification 3 of Charge I in making my decision.

## D.    Conclusion: Charge I

I have found that the evidence demonstrates that you engaged in misconduct with respect to Specifications 1 and 2 of Charge I, and I find nothing mitigating in your defense of this Charge. Your protestations of ignorance lack credibility and your suggestion that Dr. Doyle's proposal to remove you was motivated by a retaliatory animus, I also find unpersuasive.

I find that Dr. Doyle began contemplating a disciplinary action against you as soon as she realized that you had disregarded her orders concerning the CCL *Charge*; had traveled without

authority; and likely would be absent from work for five straight days (the length of the ASM conference), i.e., by May 22, 2006. I further find that your misconduct occurred before Dr. Doyle was aware either that you had filed a federal district court action on your EEOC case or that you had accused her of committing a workplace violence offense against you. Dr. Doyle only became aware of your lawsuit appeal on May 24th and of your workplace violence allegation after May 30th (when you e-mailed your workplace violence complaint to me), and, prior to the earlier date, she was already contemplating a disciplinary action against you and had raised such matter with an employee on the Agency's Labor and Employee Relations Staff.

It is my understanding that the EEOC Administrative Judge found that you had not been victimized by discrimination or retaliation. I further find that your filing of the exact same lawsuit in district court as that in which you were unsuccessful administratively does not transform your current litigation into "new" protected activity.

Thus, I find that Dr. Doyle's decision to propose disciplinary action was not motivated by a retaliatory or discriminatory animus.

## II.    Charge II: Absent Without Leave (AWOL)

### Specification 1:  AWOL on May 22

### Specification 2:  AWOL on May 23

### Specification 3:  AWOL on May 24

### Specification 4:  AWOL on May 25

### Specification 5:  AWOL on May 26

Specifications 1 through 5 relate to the week of May 22, 2006, during which you were not in the office. Each Specification states that you failed to report for duty at your EPA worksite, that your travel to Florida was not authorized, and that therefore your were charged AWOL for each day of your absence. There is no dispute that you were absent from the office. There also is no dispute that you did not request nor were you granted either sick or annual leave. The validity of this Charge thus turns upon the factual question of whether you had any legitimate reason to believe that your absence was authorized.

Analysis & Conclusion:

In your September 5, 2006, written response, you stated that Dr. Doyle did not advise you, in person, on May 18, 2006 (or at any other time) that you could not travel to Orlando, Florida to attend the ASM conference. You further stated that, at the time that you departed for Florida, you were unaware of any e-mail traffic to such effect. In addition, you stated that, during

the period May 20 through 26, you were unaware of any e-mails, voice mails, or other communiqués that would have alerted you to the illegitimacy of your Orlando travel.

You indicated that it was your understanding, at the time that you traveled to the ASM conference, that such travel had been approved and that you did not become aware until after you had returned from Orlando that Dr. Doyle felt otherwise. Finally, you stated, in your written submission, that "As far as I was concerned, I accomplished the mission that had been given to me by Ms. Doyle, and had done so prior to setting out on what I believed to be an authorized trip . . ."

Having already found (1) that Dr. Doyle advised you in person on May 18th of your ineligibility to travel to Florida and (2) that; before departing for the ASM conference, you had received and read e-mail traffic to such effect, as well, I find that you could not have had any belief that you had authority to travel to Florida.

Furthermore, the travel documents that do exist and the other records that you have produced in your defense do not suggest that you could have reasonably believed yourself authorized to travel to Florida, even had Dr. Doyle not expressly communicated to you on May 18th both verbally and by e-mail that you lacked such authorization.

Dr. Doyle has explained in her declaration, the standard operating procedure with respect to travel in her Branch of HECD. Furthermore, the record includes evidence of five trips (including three that are documented at Tab A-4 of your September 5th written response), which reflect that you have traveled with sufficient frequency to be familiar with your Branch's practice.

You have asserted that, in February 2006, incident to an invitation from the American Society of Microbiologists (ASM) that you serve as a presenter at ASM's annual conference in Orlando, Florida in May of that year, you advised Dr. Doyle of your interest in participating and received Dr. Doyle's endorsement that you plan to do so. You also asserted that your acceptance of the Society's invitation committed you to attend the conference and that, had you subsequently failed to do so, such failure would have occasioned a severe penalty - your ineligibility to serve as a presenter for the next three years. Finally, you asserted that Dr. Doyle was cognizant of ASM's penalty policy in February 2006, when Dr. Doyle advised you that she endorsed your attendance at the conference.

As I understand your argument, it is that, as of May 19, 2006, you regarded Dr. Doyle's February 2006 endorsement as a continuing "authorization" to travel to the ASM conference, insofar as, to your knowledge, such endorsement had never been rescinded. You also produced documentation (including a Travel Request Form) that was generated in the May 10 through May 15 time frame, incident to your intention to travel to the ASM conference, and you claimed that such documentation evidences the Agency's execution of a travel authorization for you.

With respect to Dr. Doyle's February 2006 endorsement, it is Dr. Doyle's practice to solicit from each of her employees work-related travel opportunities of which such individuals would like to avail themselves. Dr. Doyle's Branch maintains a register of such "travel requests," and HECD management, based on budget constraints, equitable considerations, and work priorities, relies on such register when making travel authorization decisions. The mere fact that an employee has identified a travel opportunity and such opportunity has been placed on the register (there is no dispute that this happened in connection with your ASM conference travel), does not mean that the requisite management authority to travel has been granted. Placement on the register alone has never connoted a specific authorization to conduct the travel at issue. In this regard, your own submission of an official Travel Request Form in May for the Florida trip appears to confirm your own understanding that further action was needed to move from the February "endorsement" to official signed travel documents authorizing you to travel on behalf of the Agency.

In order to be authorized to travel to a destination on the register, an employee of Dr. Doyle's Branch must follow a number of defined steps (including submission of a Travel Request Form), which result, ultimately, in a travel authorization signed by Dr. Doyle. An employee would, incident to such an approval, receive specific confirmation that she is authorized to travel. As a rule, an employee would not expect to proceed through the authorization process until such time as the travel at issue was fairly imminent. And, certainly, an employee would expect to receive the documentary evidence of their authorization prior to commencing their travel. In fact, the Agency's travel policy requires that an employee possess in hand a fully executed travel authorization prior to commencing, and at all times incident to, their travel.

The record evidence reflects that you instituted the travel authorization process on May 10th; first called Rogers Travel on May 15th to make reservations; and called Rogers Travel a second time on May 19th to place the identical reservations. The record evidence further reflects that at no time from May 10th through May 19th did Dr. Doyle, or anyone else possessing the authority to commit EPA funds to your official travel, ever sign off on a travel authorization for you.

The record evidence shows that during your tenure as Dr. Doyle's immediate subordinate, you have traveled a number of times, and in each instance but one, your travel was authorized by Dr. Doyle. (In the exceptional instance, Dr. Ohanian was the authorizing signatory). That is, either Dr. Doyle or Dr. Ohanian invariably has been the signatory on an executed Travel Authorization. Thus, it is simply not believable that you would regard as evidencing the requisite endorsement for your travel, documents *not signed* by either Dr. Doyle or Dr. Ohanian.

In addition, your assertion that you considered yourself as in compliance with Dr. Doyle's instruction that you complete the *Charge* by May 19th is not credible. There is no evidence of you ever having received any verbal or written communication establishing that consensus with OGWDW had been reached or that your management concurred in the *Charge*. To the contrary,

the e-mail traffic sent to you from your first and second line supervisors for the entire week of May 15th unambiguously conveyed that issues and problems with the *Charge* remained. Thus, at no time prior to May 19th at 10:20 p.m., at which time you transmitted an e-mail evidencing your "completion" of the *Charge*, had you ever been sent a single communique from which you could have reasonably concluded that the *Charge* which you had developed was final.

Furthermore, had you legitimately believed yourself authorized to travel to Florida, your behavior while at the ASM conference would have been at odds with the reality. In that regard, I find that, on Wednesday May 24th, you were expressly made aware of Dr. Doyle's interest in speaking to you immediately and you chose to avoid making contact with her. I find that you would have had no motivation/justification for failing to comply with Ms. Moss's instruction that you call Dr. Doyle right away other than your knowledge that your travel was not authorized.

In light of the evidence of Ms. Plunkett and Ms. Moss confirming the latter's instruction to you on May 24th to call Dr. Doyle immediately, and the indisputable evidence that you never placed any call to Dr. Doyle during your Florida trip, I find that you intentionally evaded speaking to Dr. Doyle.

I further find that you must either have learned of your illegitimate travel status during your time in Florida or have known of it prior to even departing for the ASM conference. Since you have adamantly denied learning anything, while in Florida, concerning your travel status, I find that you must have acquired such knowledge before you even left for the ASM conference.

To conclude with respect to the AWOL Charge, your defense is that 1) Dr. Doyle did not affirmatively advise you that you could not travel, 2) you were unaware of any e-mails or voice mail messages during the week of May 20 – 26 notifying you of your unauthorized travel status; 3) you were not aware of any written guidance from Dr. Doyle that precluded the travel; 4) there was "no intervening written notification to you of which you were aware that travel had been officially rescinded," and 5) you "accomplished the mission that had been given me by Dr. Doyle." I do not find these contentions supportable, and thus, I conclude (1) that your travel was not, in fact, authorized at any time prior to or during your travel to Florida; and (2) that you had no reasonable basis at any time upon which to conclude to the contrary. As a result, I find that you were AWOL from May 22 through May 26, 2006.

### III.    Charge III: Making a False Statement

On May 19, 2006, despite Dr. Doyle's instructions, you falsely told the Travel Contractor that your Travel Authorization (TA), authorizing your travel to Orlando, Florida, was a work in process.

Analysis & Conclusion:

With respect to this charge, I find that you made a false statement to the Agency's travel contractor on May 19, 2006, when you represented to an employee of such contractor (Rogers

Travel) that your travel authorization for your trip to Florida was a work in process. The fact of such misrepresentation is supported by declarations from Sarah Williams in EPA's Office of the Chief Financial Officer, Scott Sylvester, a manager in Rogers Travel, and Dr. Doyle.

I find that you had no reasonable belief at such time that Dr. Doyle intended to execute such a travel authorization, and that your assertion to the travel contractor to the contrary was an intentional misrepresentation, designed to ensure an action (i.e., your receipt of airline tickets), inimical to EPA's best interests.

I find that making an intentional misrepresentation to EPA's travel contractor in order to secure the means of conducting travel that you had been expressly advised was unauthorized, constitutes a material false statement in a matter within the jurisdiction of a federal agency, and violates Sec. 1001 of Title 18 of the United States Code.

Even accepting as true your denial of ever having discussed with the Rogers Travel representative your travel authorization status, I find that, in requesting on May 19th that your tickets be charged directly against EPA, you had a duty to advise the representative of your true travel status. Insofar as the price of your Florida trip tickets was charged against the Agency and would never have been so were you not believed to be in an authorized travel status, I find that you failed to comply with such duty.

I further find that implicit in any assertion of EPA's responsibility for the expense of your travel was the assertion that you were properly authorized to travel. Insofar, as I have found that not to be the case and I have also found your professed ignorance of such fact not credible, I further find that your failure to advise the travel contractor of your want of authorization was the type of concealment and artifice proscribed by 18 U.S.C., Sec. 1001(a)(1).

Thus, I find that Charge III is supported by the evidence. Additionally, in my judgment, I have been presented with no evidence that would support finding mitigating factors concerning your misconduct.

## IV.    Charge IV:  Making/Causing to be Made a False Claim Against the Federal Government

On May 19, 2006, incident to your false representation that your travel authorization was a work in process, Rogers Travel, with EPA's erroneous concurrence based upon your misrepresentation, acquired for your Florida trip, airline tickets whose price was charged directly to the Agency.

Analysis & Conclusion:

On May 19th, when you contacted the Agency's travel contractor to make your travel reservations to Orlando, Florida, you were aware that you did not possess a Government travel

16

card against which the price of the air fare could be charged. Thus, you were aware that some entity other than yourself would be charged the cost of your airfare.

Furthermore, I have found that you had been expressly notified by your supervisor on the previous day that you were not authorized to travel to Orlando, Florida, and that you did not possess any reasonable belief that you were authorized to travel to Florida. Thus, you had to understand that, for any entity other than yourself to bear the airline costs associated with your travel to at the ASM conference, would be dishonest.

As I have discussed at length above, I find that you either knowingly provided false information to the travel contractor about being authorized to travel to Orlando or, despite a duty to disclose your want of authorization, concealed such fact from the contractor. I further find that your conduct, i.e., your false statements to Rogers Travel, caused a false claim to be filed against the Agency in violation of 18 U.S.C. Sec. 287.

As a result, I find that Charge IV is supported by the evidence. Thus, I find that you violated Section 287 of Title 18 of the United States Code. I further find that I have been presented with no evidence that would support finding mitigating factors concerning your commission of this offense.

## V.    Charge V: Making an Unfounded Accusation Against One's Immediate Supervisor

On May 30, 2006, you sent me an e-mail in which you accused Dr. Doyle of having committed, on May 19, 2006, a violence in the workplace incident against you.

Analysis and Conclusion:

In your September 5th written response to this being an unfounded accusation, you characterize Charge V as "simply incredible". You argue that it is "antithetical and abusive" for a federal official to consider punishing an employee for reporting what is believed to be harassment or workplace violence. You also assert in response to this charge that it is a "direct act of retaliation" on Dr. Doyle's part. Finally, you challenge the investigation and report of this incident by Ms. Gomez-Taylor, the Deputy Division Director, stating that Ms. Gomez-Taylor's investigation is "highly suspect" and arguing that "simply because an opinion [on the part of Ms. Gomez-Taylor as a result of her investigation] is offered that there was no such motive or conduct does not denote that there was no harassment or violence or to have reported it as such was wrong". In addition, you apparently challenge the fact that Ms. Gomez-Taylor amended her report to reflect new information from a possible witness to the event. Further you assert that there is "ample reason to doubt the validity of the information" provided by the witness indicating it is "critically short of details".

On the subject of "details", it is worth noting that even though Charge V explicitly raises the issue of veracity and accuracy regarding your May 30th charge of workplace violence, you offer no

additional facts, evidence or information in your written statement or declaration to rebut or respond to Dr. Doyle's charge that the accusation of workplace violence is knowingly unfounded and false. In addition, you identify no witnesses and offer no specific dates or incidents beyond events on May 18th to corroborate and support your broader charge of continuous threats, ridicule, harassment, and intimidation by Dr. Doyle.

In terms of the underlying record, I begin with the June 12, 2006 Report from Maria Gomez-Taylor who investigated the charge of violence in the workplace. Ms. Gomez-Taylor first met with you on June 1st and then with Dr. Doyle on June 5th. As discussed below, she also met with Dr. Thomas the following week on June 12th. You repeated your description of events consistent with your written charge submitted two days earlier. Ms. Gomez-Taylor reports that Dr. Doyle emphatically denied any physical contact with you or threatening behavior. Ms. Gomez-Taylor asked each party if there were any witnesses to their May 18th conversation and both initially indicated that they could not remember any. However, in response to a follow-up question from Ms Gomez-Taylor three days after their first conversation, Dr. Doyle did recall a witness and indicated her belief that it was Dr. Dana Thomas.

Ms. Gomez-Taylor interviewed Dr. Thomas, who specifically and independently confirmed Dr. Doyle's recollection of her presence at the copier on the day that you and Dr. Doyle had a conversation. When specifically asked whether she had witnessed any violence, touching, or anything out of the ordinary or inappropriate, Dr. Thomas indicated that she does not remember anything unusual happening between you and Dr. Doyle. In her affidavit on the same issue, Dr. Thomas more specifically states that "I did not observe [Dr. Doyle] speaking loudly, gesturing aggressively, or touching [Dr. Nwachuku], and that I did not observe Nena behaving in any way that would have suggested to me that [Dr. Doyle] had so treated her." In commenting upon the conversation she overheard, Dr. Thomas indicates in her affidavit that she distinctly recalls thinking that Dr. Doyle was "handling well [Dr. Nwachuku's] abrasive demeanor".

In summary, Ms. Gomez-Taylor concludes in her June 12 Report that the "interaction between Beth and Nena on May 18 does not constitute harassment or violence in the workplace". Dr. Thomas's affidavit and interview supports this conclusion. As noted above, your written statement in response to this charge characterizes this Report as simply an "opinion" and states that there is "ample reason to doubt the validity of the information" from Dr. Thomas. In characterizing this investigative report as simply an "opinion", your response seems to overlook the seriousness of your accusation and the responsibility upon Ms. Gomez-Taylor to undertake the investigation with diligence, care, thoroughness and a commitment to impartiality. And while referring to "ample reason" for doubting the information from Dr. Thomas, your written statement, your written declaration, and your verbal response simply fail to offer any information, evidence, or analysis to support this skepticism. In the absence of information to the contrary, I believe that Ms. Gomez-Taylor's report, and Dr. Thomas's information are, in fact, accurate and entitled to substantial weight and consideration.

There is other information in the record that is also relevant to evaluating Charge V. You make one specific and then several broad assertions regarding Dr. Doyle's alleged intimidating, threatening, and ridiculing behavior. In reviewing the e-mail traffic directly, and by copy, between you and Dr.

Doyle over the two week period before you submitted your *Charge*, I find over 10 emails from Dr. Doyle either directly to you, or by copy to you, relating to Dr. Doyle's increasing concern that the directions she had given you were not being followed, and that the critical path *Charge* to the Expert CCL Panel was not being developed appropriately.   In the face of what could be characterized as insubordination, i.e., your increasingly apparent failure to produce a key document for which you are responsible and your circulation of an incomplete, unauthorized, and misleadingly characterized *Charge* to workgroup, the tone and language of Dr. Doyle's e-mails remain forthright, clear, professional and courteous.  These e-mails serve to substantiate and provide credence to Dr. Doyle's position that she maintained professional courtesy and respectful behavior toward you during your meeting on May 18th.

    An equally important consideration in reviewing this Charge is the underlying credibility of yourself and Dr. Doyle.  In evaluating this record and comparing your assertions to available information and evidence, there are significant issues on which your credibility must be called into question.  For example, you assert that you believed that the CCL *Charge* had been completed and was ready to be distributed prior to your trip to Florida.  Yet you received, reviewed and forwarded to a Brenda Mosley a May 16th e-mail from Dr. Doyle clearly indicating just the opposite.  Moreover, you could not fail to be aware that you had not received management review and final approval of the document you sent out, even though you knew and told others that management review was to be part of the process in finalizing the *Charge*.  In this regard, Dr. Ohanian has stated that when he saw you at the cancelled management meeting on the afternoon on May 18th, he specifically told you that the meeting had been cancelled because OGWDW's issues had not been addressed and the *Charge* was not complete or ready for management review.

    In addition, you assert that you believed you were authorized to travel to Florida.  Yet, you knew that you had never received or seen a signed travel authorization or a cash advance form for this particular trip, as you had on prior trips to the same conference.  You also argue that you were unaware of any written communication from Dr. Doyle indicating that you lacked authorization to travel; yet, on precisely that subject, on May 16th, you received, reviewed and forwarded to a Dr. Mosley an e-mail from Dr. Doyle stating "Nena, I can not sign your travel for Orlando until you have resolved the issues around the *Charge* to the CCL panel."  In other instances, you continue to maintain in your written statement and declaration that you simply were unaware of written e-mail instructions from your first and second line supervisors and thus could not carry out directions such as a May 30th direction from Dr. Doyle to distribute a new revised charge no later than 4 pm on May 31st.   Yet the record shows that you were using your e-mail on May 30th and 31st both before and after Dr. Doyle's e-mail was received.  In light of these contradictions, your credibility is weak at best.

    One of your main themes in responding to Charge V is that it represents retaliation by Dr. Doyle in response to "protected activity," i.e., your filing in federal district court of the same EEO complaint which you had lost before an administrative law judge.  I would note that Dr. Doyle appreciated the likelihood of your filing such a suit and does not regard herself as exposed by it in any way.  Thus, I see no reason for her to harbor a retaliatory animus.

    Furthermore, on the question of retaliation, I am led to consider whether your own motives for

filing an unsubstantiated workplace violence charge could possibly reflect retaliation by you against Dr. Doyle for 1) her role in insisting on oversight and direction in reviewing and possibly revising workgroup recommendations (see your May 15 email to Dr. Ohanian with the subject heading "Managers dismiss Agency CCL micro workgroup work decisions . . .", 2) her decision not to approve your travel to Florida and to charge you with AWOL status for the five days you were in Florida, and 3) her May 30th 12:50 p.m. e-mail to you in which she very clearly lays out grounds for a charge of insubordination for failing to meet with managers as directed and for sending out the *Charge* without prior management approval.

In that regard, I would note that you transmitted your violence in the workplace accusation to me 30 minutes after you received Dr. Doyle's 12:50 p.m. e-mail, and that, later that day, you e-mailed Pam Parker inquiring about the procedure to lodge a formal complaint. The timing of your accusation to me and your inquiry to Ms. Parker is suspicious and raises substantial questions in my mind about your motivation for raising your violence in the workplace charge against Dr. Doyle.

With respect to this Charge of your having made a false accusation, based on further evidence from Dana Thomas, the individual whom Ms. Gomez-Taylor interviewed as a witness to the May 18th interaction between you and Dr. Doyle, I am confident that your recitation of this incident is a fabrication. Given 1) my reservations, as previously noted, concerning your credibility; 2) the consistent accounts that I have received from both Dr. Thomas and Dr. Doyle of the latter's innocent conduct; and 3) the apparent retaliatory nature of your accusation, I find that Dr. Doyle did not in any way engage in the conduct of which you have accused her.

Your attorney, Mr. Shapiro, argued that you had a right and an obligation to report what you sincerely believed to be a violence in the workplace incident. Mr. Shapiro additionally maintained that the fact that you regarded such matter as having a discriminatory/retaliatory motivation insulates you from the charge at issue. I do not agree.

You have the undeniable right to allege that an adverse action to which you have been subjected was motivated by discriminatory/retaliatory animus, but you do not have the right to report as fact an adverse action that never happened. If the alleged violence in the workplace episode never occurred (and I find that it did not), you are not insulated from a false accusation charge, simply because you cloaked your allegation in the fabric of discrimination/retaliation.

I believe that you made a false and unfounded accusation against Dr. Doyle. First, I find that Dr. Doyle did not engage in the conduct that you alleged. Second, I find that no reasonable person being exposed to the same circumstances that you confronted during your interaction with Dr. Doyle on May 18th would have characterized Dr. Doyle's behavior as offensive or intimidating. Third, I find that your accusation against Dr. Doyle likely was motivated by a retaliatory animus, and/or by your need to establish a retaliatory predicate on her part for any inevitable disciplinary action that she would impose based on your unauthorized Orlando travel.

20

In that latter regard, I have been unable to establish that you raised your violence in the workplace complaint to anyone, either in the Office of Human Resources (OHR) or in the Office of Civil Rights (OCR), prior to sending your May 30th e-mail complaint to me. There does not exist any documentary evidence of you having done so, and you have produced no testimonial evidence to such effect. Furthermore, what record evidence does exist reflects that on May 30, 2006, you sent to Pam Parker, an EPA employee in OHR, an e-mail which raised the violence in the workplace matter. Thus, it would seem that prior to May 30th, you never flagged to anyone your violence in the workplace concern.

I find that you had a very strong motive for making a false accusation against Dr. Doyle at the time that you filed the complaint with me and Ms. Parker and first contacted Mr. McCain, since, by May 30th, you would have been aware of Dr. Doyle's perception that your absence the prior week was entirely unauthorized (after all, you advised me that, upon your return from Orlando, you had played back the voice mail message that Dr. Doyle had left on your home phone), and you would have understood the inevitability of a disciplinary action and would have been motivated to take a preemptive action.

Thus, I find that, irrespective of when, and to whom, you made your complaint concerning your interaction with Dr. Doyle on May 18th, you had a powerful motive to misrepresent the truth with respect to that episode. Given the falsity of your allegations, your motive to fabricate them, and your suspect credibility as exhibited by your dishonesty concerning other critical matters, I find that your accusations against Dr. Doyle were intentionally untrue.

As I understand it, you claim that a primary mitigating factor with respect to this False Accusation Charge is Dr. Doyle's alleged retaliatory animus and her personal distaste for you, as well. I do not find, however, that Dr. Doyle has been motivated by any such illegal and/or improper considerations.

It is clear that your relationship with Dr. Doyle is an antagonistic one from your perspective, but the evidence supports that your behavior towards Dr. Doyle, another supervisor and co-worker has been disrespectful, unprofessional and hostile. I have reviewed a declaration from Dr. Doyle's predecessor as your long-term immediate supervisor, Rita Schoeny, in which she states that she experienced antagonism from you also. Furthermore, Brendlyn Faison, a Ph.D microbiologist in OST has provided me with her EEO affidavit from which it is clear to me that Dr. Faison, as well, considered herself victimized by your antagonistic and demeaning behavior towards her.

In summary, I find that Charge V is supported by evidence in the record. Based on the record, I find that your treatment of Dr. Doyle has been problematic, that Dr. Doyle's treatment of you has been fair and even-handed, and that there exist no mitigating circumstances with respect to the sustained charge of you raising false accusations against your immediate supervisor.

**VI.     Charge VI:  Disrespectful Conduct Toward One's Supervisory Chain and
         OW Management Outside of One's Office**

On June 6, 2006, just prior to the commencement of the CCL Workshop, in view of
expert scientists external to EPA, you engaged in unprofessional and disrespectful conduct
toward Dr. Doyle, in particular, and toward other OW managers both inside and outside of your
supervisory chain of command.

Analysis and Conclusion:

Dr. Doyle's recollection of this incident is summarized in Charge VI, in which she
indicates that you 1) engaged her and other managers in a hostile confrontation regarding the
adequacy of the CCL *Charge*, 2) took violent exception with the managerial consensus that the
*Charge* sent out by her was inadequate, 3) accused Dr. Doyle of undermining your credibility
and persecuting you and told Dr. Doyle not say anything, and 4) spoke loudly, aggressively, and
thrust your finger in front of Dr. Doyle's face.

Dr. Ohanian confirms the substance of Charge VI.  In his affidavit, he states that in a
conversation related to the adequacy of the CCL *Charge*, you "got very angry with me, as
manifested by her loud voice and body language."  He goes on to note that you stood next to Dr.
Doyle "shouting at her that she was responsible for creating all this problem" and then "got very
close (within a couple of inches) to Dr. Doyle and told her not to say anything."  Dr. Ohanian
reports that you accused Dr. Doyle again as being "responsible" notwithstanding Mr. Burneson's
statement that it was he who had insisted on a revision to address OGWDW's comments.  Dr.
Ohanian indicates that he had to tell you to step back and lower your voice several times.
Finally, Dr. Ohanian reports that "a number of experts and other attendees were watching us and
looked extremely surprised.  It was obvious that Dr. Nwachuku's screaming got their attention
too."

Mr. Burneson, a Branch Chief with OGWDW who participated in development of the
charge, indicated that "Nena exclaimed that distributing a revised charge was ridiculous . . . and
that Beth was meddling in affairs she should not be involved in."  Mr. Burneson indicated that
when Dr. Doyle began explaining that she had asked that the charge be revised, you "also began
speaking and pointing her finger towards Beth's (Dr. Doyle's) face."  He also confirms that Dr.
Doyle was forced to ask Dr. Ohanian to direct you to provide her with more space, and that you
then stepped back.

Ms. Barr entered this conversation after it began.  Nonetheless, her recollection as
explained to me confirms that your voice was raised during this conversation, that you did point
your finger at Dr. Doyle, and that Dr. Ohanian did have to ask you to step back because of your
close proximity to Dr. Doyle.

With respect to this charge, I find the consistent testimony of the witnesses who were present at the incident persuasively supports the conclusion that you did behave in a highly unprofessional, intimidating and threatening manner toward Dr. Doyle, in particular, and, to a lesser degree, toward all of the OW participant managers also. Your remarks during the oral presentation also established that CCL workshop attendees outside of OW and the Agency were witnesses to the exchange that occurred between you and the HECD and OGWDW managers. This admission corroborates Dr. Doyle's representation in her notice of proposed removal.

Given the unanimity with which senior OW managers found your conduct to be highly inappropriate, I find your protestations to the contrary to be unsupportable. I am confident that Division Directors and Branch Chiefs would not conspire to misrepresent facts and that, indeed, the OW managers who were firsthand witnesses to your behavior on the morning of June 6th, sincerely and in good faith believed such conduct to be way out of line. Thus, I sustain this charge against you.

## VII.    Consideration of Douglas Factors

Based on my review of the proposal notice and supporting documentation, your oral and written replies to such notice, the supplemental evidence and your counsel's response thereto, I find, with the exception of Charge I, Specification 3, that you engaged in the misconduct enumerated in the notice of proposed removal. I have determined that the Charges contained in the proposal are supported by the evidence and that your removal is warranted in order to promote the efficiency of the Federal service.

In reaching my determination I have considered the factors derived from the Merit Systems Protection Board (MSPB) decision in *Douglas v. Veterans Administration*, 81 FMSR 7037, that are pertinent to your case. Furthermore, I have carefully considered Dr. Doyle's factor analysis and I concur with her that, with regard to the majority of factors, a most severe sanction is warranted and that, with respect to the remaining factors, they are at best neutral.

### 1. Seriousness of Offense

With respect the nature and seriousness of your offenses, I would characterize making the false statement and false claim against the Federal government and also the false accusation against your supervisor as conduct which is generally criminal, infamous, dishonest, immoral and notoriously disgraceful. Moreover, I would note a pattern of repeated insubordination and willful conduct to avoid management oversight of a document necessary to guide the deliberations of nationally recognized experts in advising EPA on CCL3, a congressionally mandated public health tool to screen and prioritize potentially high risk pollutants for possible future drinking water regulation and safeguards. In addition, I have found all of your misconduct to be intentional and self-serving, and, in the case of your unfounded accusations against your supervisor, also malicious, all of which further intensifies its seriousness. I would also note, that in your defense of the charges, you relied on false and inherently uncredible

testimony, and that such deceit only further exacerbates your misconduct. As concerns this Douglas Factor, I find that this factor weighs heavily in favor of the most severe sanction.

## 2. Offender's Job Level

With respect to your job level and type of employment, I would note that you enjoy a relatively prominent stature as a senior environmental scientist, one whose position involves substantial public contact. As such, your judgment, professionalism and reliability should be of the highest caliber and beyond reproach. In that regard, I find that your exposing the CCL Panel to your disrespectful conduct towards management and other Agency professionals with an integral involvement in the Panel's responsibilities shows exceptionally poor judgment and an insensitivity to the principal of professional comity. As an EPA employee in a senior level position you are in a position of trust. Your misconduct and lack of candor seriously undermines your supervisors' trust in your judgment and reliability. Thus, with respect to the second Douglas Factor, I find that such factor also weighs in favor of severity.

## 3. Past Disciplinary Record

I recognize that you have not previously been disciplined for any misconduct, which may technically qualify as a mitigating factor. However, I find that such mitigation is greatly outweighed by the seriousness of the repeated misconduct of which I have found you responsible.

## 4. Past Work Record

With respect to your past work record, I understand that your eight year Agency career has been marred by interpersonal conflicts. I have reviewed a number of declarations to such effect from your management chain. Such declarations reflect that your EPA tenure, which is not particularly lengthy, has been marked by a consistent inability to effectively interact with your colleagues, a number of whom have felt compelled to abandon HECD in order to minimize their contact with you. Dr. Brendlyn Faison's recent decision to withdraw from any role in the CCL process, as evidenced by her EEO investigative affidavit, offers the latest example of your penchant for antagonizing your coworkers.

Again, based on my review of declarations from your management chain, it is my understanding that, over the course of your EPA career, you have offended colleagues in the Division, in OST, in the Office of Water, in the Agency at large, and in the contractor community. Sowing such antagonism clearly is inimical to the Agency mission and compromises your dependability and job performance. In this regard, I would note the sworn declaration of the supervisor who first hired you into EPA and HECD and described your "unwarranted argumentativeness, her verbal abuse,...her false accusations, and generally slanderous/libelous conduct" as conduct that has "stymied" your professional advancement.

Thus, I find that as concerns the Douglas Factor of your past work record, such factor weighs very heavily in favor of a more extreme penalty.

### 5. Effect of Offense on Supervisor's Confidence

Your inappropriate, disrespectful and unprofessional behavior has had a serious effect on your supervisors' confidence in your willingness and/or ability to effectively carry out the duties and responsibilities of your position. In addition, I find that the unfounded accusations against your supervisor, your lack of candor and integrity, and disrespect for authority have created a serious breach of trust and has undermined your supervisors' confidence in your ability to function in your position. In considering the numerous affidavits and declarations that contradict or undermine assertions made by you as part of this proceeding, I find a strong and consistent record of intentional and self-serving conduct including misstatements, misinformation, and untrue allegations by you. I think that it is fair to say that your management regards you as an unreliable and untruthful individual whose harmful interpersonal behavior; intentional failure to follow supervisory instructions, and willingness to make claims in support of your own parochial interests disserve your colleagues, the Office of Water and the Agency. I can hardly imagine misbehavior that could have a greater adverse impact on your supervisors' confidence than that of which I have found you responsible. Consequently, with respect to this Douglas Factor, again, I find that it weighs very strongly in favor of a more extreme penalty.

### 6. Consistency of Penalty with Those Imposed Upon Other Employees for the Same or Similar Offenses

I am personally unaware of any misconduct by any other employee that so seriously touches on the issues of a want of integrity and lack of respect for authority as does your misbehavior. I am, therefore, unaware of comparable cases upon which to make a "consistency" determination.

### 7. Consistency of Penalty with Applicable Table of Penalties

With respect to the consistency of a removal sanction with the Agency's applicable Table of Penalties, I know that removal is an appropriate penalty for a first offense that is generally criminal, infamous, dishonest, immoral, or notoriously disgraceful. I also know that removal is an appropriate penalty for a first offense of making against your supervisor, false, malicious or unfounded statements, which tend to damage the reputation of such person and/or undermine her authority. Having already noted my assessment that your conduct satisfies this standard, I find that your removal would be consistent with the governing EPA regulations/guidance.

In addition, I would note that the Table of Penalties recognizes the propriety of imposing a more serious sanction for multiple incidents of misconduct. Thus, your five (5) days of AWOL; your failure on two occasions to comply with supervisory orders; and your disrespectful conduct in connection with the CCL Workshop all magnify your fraud and false accusation

offenses and further support imposition of a removal penalty. Thus, as concerns this Douglas Factor, I find that your removal would be consistent with EPA's Table of Penalties.

### 8.    Notoriety of the Offense

The fact of your unauthorized trip is a matter of substantial notoriety among OW's management team, insofar as your conduct was so unprecedented and occasioned much speculation and discussion. Furthermore, given the nature of the workplace and the inevitable spread of news, it is fair to say that knowledge of your misconduct vis-à-vis your Orlando travels, disrespectful behavior, and unfounded accusations is now widespread. These types of incidents, despite management's sincere efforts to limit dissemination, is guaranteed to generate significant "publicity." I also consider that as a result of your unauthorized distribution of the *Charge* characterized as "final," Management was forced to send an e-mail on May 22, not simply to EPA colleagues but also to outside experts and members of the public, apologizing on behalf of the Agency and recharacterizing the *Charge* as a draft for comment. Due to the egregious nature of your behavior, Management is expected to deal with your misconduct as severely as possible. Therefore, I find that this Douglas Factor also weighs strongly in favor of a more severe penalty.

### 9.    Notice of the Impropriety of the Conduct

With respect to the travel matter, it is inconceivable to me that a reasonable person could not have appreciated the wrongfulness of your behavior. Intentionally providing false information and knowingly misrepresenting the facts is unethical behavior that you should have been acutely aware is unacceptable, inappropriate, harmful, and egregious. In addition, you should have appreciated, as well, that making untrue accusations against any employee is malfeasance of the most serious kind.

Furthermore, as a senior level employee with over 8 years of EPA service you must have recognized that being AWOL for an extended period of time was inappropriate and that blatantly disregarding a supervisor's lawful orders and, traveling without approval and using unauthorized EPA funds also constituted sanctionable misconduct.

Thus I conclude that you had more than adequate notice of the impropriety of your conduct, and that with respect to this Douglas Factor, again more severity is warranted.

### 10. Rehabilitation Potential

Affidavits from your supervisors and co-workers indicate a consistent 8-year EPA employment history of verbal abuse, abrasiveness, false accusations, antagonizing and alienating behavior toward your co-workers and supervisors regardless of their race, national background, or educational status. The current record indicates that you have repeatedly failed to take direction from your supervisors and repeatedly made assertions or provided information that is

contradicted by the facts or affidavits of others who participated or witnessed particular situations. The current series of charges indicate that you knowingly and intentionally elevated your personal interests above those of the Agency and then lied to defend against the consequences of that behavior. You have been characterized by those who have worked most closely with you as acting in a hostile, demeaning and condescending manner toward anyone you perceive as being a professional threat or as having a dissenting opinion. Because of the consistent characterization of your damaging, unreliable, and self-serving conduct during your tenure with EPA, as described above by a number of people over a number of years, I find the information in multiple affidavits to be credible and well documented. As a result, I do not believe that you possess or have demonstrated rehabilitative potential.

Your defense to the charges that Dr. Doyle leveled against you further argues against such potential. In my evaluation and findings regarding Dr. Doyle's charges, I have evaluated and analyzed the record, facts, and associated responses and information offered by you. I have also collected and made available to your attorney supplemental information relevant to these issues, including additional e-mails received or sent by you and a series of affidavits bearing on many of the charges in question. As explained in detail above, I have found that it is substantially more likely than not that you have testified untruthfully about numerous material matters in your attempt to exonerate yourself. Such behavior is antithetical to the concept of rehabilitative potential. I have found that your defense to the misconduct charges is marked by a lack of remorse, a pervasive dishonesty, and a patent unwillingness to acknowledge your responsibility for what I consider egregious behavior. I cannot see that you possess any rehabilitative potential. Based upon this extensive record and the repeated pattern and consistently well documented nature of your negative and disruptive conduct, I find that this Douglas Factor also weighs heavily in favor of a more severe penalty.

## 11.    Mitigating Circumstances

My interpretation of your written submission and your oral presentation is that you raised primarily only two mitigating factors, your alleged outstanding EPA career and the asserted motive of retaliation that has allegedly inspired Dr. Doyle to propose your removal.

With respect to your alleged outstanding federal career, I would begin by noting that such career spans only your 8-year tenure at EPA. You have produced no evidence of a federal career that predated your EPA employment. In addition, based on representations made by Drs. Schoeny and Doyle, the two immediate supervisors under whom you have worked for almost the entirety of your 8-year EPA career, as well as from Geoffrey Grubbs, Christopher Zarba, and Dr. Ohanian, individuals who have served in your second and third tier management chain, I find that you have been anything but a model employee. For example, Dr. Schoeny, the supervisor who hired you and had the highest hopes for your performance, has noted that based upon her experience in working with you that "Her technical competence is adequate but not impressive." The record also offers consistent and compelling documentation to the effect that you have had a career long incapacity to work effectively with your colleagues and that your

26

27

failure to work effectively with your co-workers has created serious challenges for your Division. I would also note that one fairly recent manifestation of your problematic interpersonal relations has been Dr. Faison's decision to withdraw from the CCL workgroup, in order to insulate herself from having to interact professionally with you.

In light of a well documented pattern of negative conduct, verbally abusive actions, self-serving and unreliable behavior attested to by numerous individuals and spanning your 8 year career at EPA, I do not find that your career, on balance, has been particularly more beneficial to the Agency than not. While I appreciate that you have not received anything less than an successful" performance rating and have received awards, I find that your inability and/or unwillingness to work effectively with others and your egregious misconduct which has resulted in a serious breach of trust and confidence outweighs your length of service and performance.

With regard to your second mitigating factor relating to Dr. Doyle's alleged retaliatory animus and fundamental hostility towards you which you suggest motivates your proposed removal, the record is simply and impressively without persuasive documentation or support for this allegation. Ironically and to the contrary, the record offers repeated documentation and evidence illustrating your hostility and negative conduct toward your management and co-workers that preceded and has continued through Dr. Doyle's selection as the Branch Chief in HECD. With respect to Dr. Doyle's conduct and behavior, the evidence contained in this record reflects a well-documented and consistent pattern toward you of forbearance, respect, responsiveness, and courteous professional conduct - even under trying circumstances.

The sole basis for your assertions of retaliation relate to the timing of Dr. Doyle's charges. This argument is unpersuasive in that the Notice of Proposed Removal was dated approximately one-month after the final incident covered in the Notice. Given the seriousness of these charges, the number and detail of specifications included, and the fact (as noted below) that Dr. Doyle began consideration of this action prior to learning of your federal district court action or workplace violence allegation, I find there is nothing automatic, inherent, or persuasive in this sequence of events to substantiate or confirm a retaliatory motive on Dr. Doyle's part.

In point of fact, Dr. Doyle did not control 1) the timing of your conduct in connection with the events leading up to your unauthorized trip to Florida; 2) your misrepresentations to obtain Federally procured airline tickets; or 3) your incomplete preparations for CCL 3 expert workshop. Nor does the record indicate that Dr. Doyle delayed or protracted unnecessarily or inappropriately the development and documentation of the record to support the July 11 Notice of Proposed Removal. Dr. Doyle acted with due diligence to complete the Notice of Proposed Removal in a timely manner, and insofar as the Notice is well founded in the record, clearly not frivolous, and addresses very grave charges, Dr. Doyle certainly had no reason for delay in submitting this Notice.

With regard to your federal district court case, I would note for the record that you have the absolute prerogative to file this appeal. However, there is nothing in this appeal that has not

already been considered and argued extensively at the administrative level and decided affirmatively and clearly in favor of Dr. Doyle and the Agency. As I previously noted, your federal district court case is basically just a continuation of the complaint process of your administrative case, which concluded in Dr. Doyle's and the Agency's vindication. Insofar as that process commenced some years ago, there is a substantial time lapse between your protected activity and the adverse action that Dr. Doyle has proposed and which is presently under consideration. In addition, Dr. Doyle did not learn of your federal district court action until May 24th, and by such time, she had already consulted with OHR and OGC personnel, with respect to effecting a disciplinary sanction. Also, Dr. Doyle had been participating in HECD's generation of a referral to the Office of Inspector General. Thus, I find that Dr. Doyle was already focused on adopting a most severe disciplinary response at the time that she was advised that you had filed a federal district court action.

Consequently, rather than your filing being any causative agent in Dr. Doyle's disciplinary calculus, I find that such filing played no role in her decision to propose your removal.

You also raised your violence in the workplace claim as an alleged precipitating event for the instant disciplinary action that Dr. Doyle proposed. Because I find that accusation to be false and thus not qualifying as protected activity, I find that Dr. Doyle could not have illegally retaliated against you, with respect to the violence in the workplace allegations. It is entirely appropriate for a manger to discipline a subordinate employee for raising slanderous, malicious charges, and I find that Dr. Doyle was within her rights to do so in the case of your meritless violence in the workplace charges.

Furthermore, by the time Dr. Doyle had even become aware that you had raised such charges against her, she was assisting OGC and OHR in preparing a referral to the Office of Inspector General (OIG) regarding your misconduct in regards to your travel and she was discussing an appropriate disciplinary response, in the event that the OIG declined such case. Thus, Dr. Doyle's acquisition of the knowledge that you had accused her of an assault, post-dated Dr. Doyle's contemplation of an appropriate sanction for your travel offense.

You also noted that you had filed other EEO complaints against Dr. Doyle, principally the one involving Dr. Faison, and that there exists, from your perspective, a well-documented history of Dr. Doyle having carried out some discriminatory/retaliatory vendetta against you. I have not found any evidence that Dr. Doyle has conducted herself in a prejudicial manner toward you. I find that your suggestion that Dr. Doyle's alleged animus should constitute a mitigating factor is without merit.

Thus, I do not find mitigating factors that would support a less severe penalty than removal.

12.    **Adequacy of Alternative Sanctions for Deterrence**

In light of the weight of the previous Douglas Factors, all but one of which favored severity, and my assessment that your negative conduct will continue into the future and represents a damaging, significantly counterproductive, and undercutting influence on the accomplishment of OW's mission, I cannot find any sanction short of removal will serve the Government's interest or deter you from behaving in a manner inimical to such interest.

I would add that your defense of the misconduct charges, a defense that I would characterize as pervasively dishonest, does nothing to suggest to me that your retention could ever redound to EPA's best interest. Thus with respect to this Douglas Factor, I find that removal is the sole purposeful penalty.

## VIII. Decision

To conclude, I find that, with the exception of Charge I, Specification 3, you engaged in the misconduct detailed in the Notice of Proposed Removal; that your actions were knowing and intentional; that the charges are of the utmost gravity; and that you have not identified nor have I found any mitigating factors that would warrant leniency. Therefore, I concur in Dr. Doyle's proposal that you be removed from your EPA employment and Federal service to promote the efficiency of the service. You will be removed effective on December 4, 2006.