UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NENA NWACHUKU | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 06-0946 (RJL) |
| v. | ) | |
| | ) | |
| STEPHEN L. JOHNSON, Administrator | ) | |
| U.S. Environmental Protection Agency | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

David H. Shapiro
D.C. Bar No. 961326
Alana M. Hecht
D.C. Bar. No. 494097
SWICK & SHAPIRO
1225 Eye Street, N.W., Suite 1290
Washington, D.C. 20005
(202) 842-0300
Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Education, Work History, and Professional
            Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Dr. Nwachuku Is a Highly Productive Member
            of EPA Staff and Receives Glowing Performance
            Evaluations During Her Time at EPA . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   Dr. Nwachuku Files a Grievance After Her Supervisor
      Undermines Her Professional Standing at the EPA
      Because of Her Race and National Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  Dr. Nwachuku's Supervisors Deny Her the
      Opportunity to Compete for a Promotion by
      Circumventing the EPA Merit Protection Policy . . . . . . . . . . . . . . . . . . . . . . 8

      A.    EPA's Merit Protection Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Instead of Allowing for a Competitive Promotion,
            Management Informally Chooses Two Selectees . . . . . . . . . . . . . . . . . . 9

IV.   After Dr. Nwachuku Files an EEO Complaint,
      She Is Subjected to a Campaign of Harassment
      by her Supervisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Dr. Nwachuku's Supervisors Make
            Disparaging Remarks About her National
            Origin and Then Her Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Management Recruits a Disgruntled
            Coworker to Confront Dr. Nwachuku
            and Gather Information to Fire Her . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

V.    Dr. Nwachuku Served as the Leader of the CCL3
      Workgroup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.   While Dr. Nwachuku Attends a Scientific
      Conference, her Supervisors Arrange to
      Have Her Terminated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VII.  Doyle Proposes Dr. Nwachuku's Termination . . . . . . . . . . . . . . . . . . . . . . . . 22

VIII. In Retaliation for Continuing to Pursue Her
      Complaints, King Does his Own Investigation
      into Dr. Nwachuku's Employment and Terminates
      Her on Trumped up Charges of Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.    Legal Standard on Summary Judgment in
      the Title VII Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.   Dr. Nwachuku Has Made Out a *Prima Facie*
      Case of Race Discrimination With Respect to
      the Accretion of Duties Promotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      A.    There Are Issues of Fact Regarding
            Management's Assertion that Johnston
            and Williams-Bower were Promoted
            Because of an Accretion of Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      B.    There are Issues of Fact Regarding
            Whether the EPA Properly Followed
            Its Own Procedures for Promoting
            Employees Without Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.  A Jury Could Reasonably Infer that Defendant's
      Alleged Reasons for Not Promoting Dr. Nwachuku
      Are Pretextual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      A.    A Reasonable Jury Could Find that
            Management's Assertion that Johnston
            and Williams-Bower Were Working at
            the GS-14 Level is False . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ii

B.     **A Reasonable Jury Could Reject the EPA's Assertion That It Did Not Promote Dr. Nwachuku Because She was Not Performing at a GS-14 Level** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV .   **Dr. Nwachuuku Has Made Out a *Prima Facie* Case of Retaliation With Respect to her Termination** . . . . . . . . . . . . . . . . 35

    A.     **Temporal Proximity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    B.     **Additional Evidence Raising an Inference of Retaliation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

         1.    **A Reasonable Jury Could Conclude That Management Targeted Dr. Nwachuku for Termination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

         2.    **A Reasonable Jury Could Find Management's Effort to Have Dr. Nwachuku Criminally Prosecuted to be Mendacious** . . . . . . . . . . . . . . . . . . . . . 39

         3.    **There is Evidence That Doyle Proposed Dr. Nwachuku's  Termination Because Dr. Nwachuku Had Named Her as the Discriminating Official in Previous EEO Complaints** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

V .    **A Jury Could Reasonably Conclude that EPA's Claim That It Terminated Dr. Nwachuku for Misconduct is Pretextual** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## Statutes

5 U.S.C. § 2301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Cases

*Aka v. Washington Hospital Center,*
    156 F.3d 1284 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 41

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ball v. Tanoue,*
    133 F. Supp.2d 84 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Buggs v. Powell,*
    293 F. Supp.2d 135 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Burlington Northern and Santa Fe Ry. Co. v. White,*
    ____ U.S. ___, 126 S.Ct. 2405 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brown v. Brody,*
    199 F.3d 446 (D.C.Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Clark County School Dist. v. Breeden ,*
    532 U.S. 268 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*George v. Leavitt,*
    407 F.3d 405 (D.C. Cir.2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Glekten v. Democratic Congressional Campaign Committee,*
    199 F.3d 1365 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Greene v. Dalton ,*
    164 F.3d 671 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

*Griffin v. Wash. Convention Ctr* .,
    142 F.3d 1308 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Haynes v. Williams*,
    392 F.3d 478 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jackson v. Gonzales*,
    469 F.3d 703 (D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Johnson v. Lehman*,
    679 F. 2d 918 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*Mastro v. Potomac Elec. Power Co.*,
    447 F.3d 843 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McKenna v. Weinberger*,
    729 F.2d 783 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Mesnick v.General Elec. Co.* ,
    950 F.2d 816 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pierce v. Mansfield*,
    __ F.Supp.2d __, 2008 WL 101709 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . 24

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Salazar v. Washington Metropolitan Transit Authority*,
    401 F.3d 504, 511 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Singletary v. District of Columbia,*
    351 F.3d 519 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*St. Mary's Honor Center v. Hicks,*
    509 U.S. 502 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*Texas Dep't of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# INTRODUCTION

Dr. Nena Nwachuku claims that her employer, the US Environmental Protection Agency (EPA), violated Title VII of the Civil Rights Act of 1964 when her EPA supervisors discriminated against her based on her race, her national origin (African), and protected activity. She has presented evidence that because of her race and national origin, she was denied promotion to the GS-14 level, and when she complained about that discrimination, her EPA managers subjected her to a campaign of abuse and harassment, including physical intimidation in the workplace, that culminated in her termination based on trumped charges of fraud, AWOL, and insubordination.

Notwithstanding evidence that Dr. Nwachuku is a highly regarded and competent scientist that has worked successfully with a broad range of people, in its pending motion for summary judgment, the EPA now asks this Court to credit its claim that there are "defects in her interpersonal skills," which justified her being denied an opportunity to compete for promotion while employees from outside her protected group were noncompetitively promoted instead of her. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.") at 16, 38. Defendant also asserts that, although Dr. Nwachuku was actively pursuing her complaints of discrimination when she was terminated, including this law suit, her retaliation claim should be dismissed because months had passed between the time she *filed* her complaint and her termination. *Id.* at 15-16, 39. Regarding Dr. Nwachuku's termination, the EPA asserts that this Court should credit the contested claims of her supervisors that she committed voucher fraud and ignore evidence that, when she claimed travel expenses to attend a professional conference, Dr. Nwachuku did not know that her supervisor had revoked approval for the conference at the last minute. Similarly, the EPA asserts that this Court must weigh the evidence

and reject Nwachuku's sworn testimony that she was accosted by her supervisor and credit the supervisor's testimony instead.  However, based upon the evidence and the outstanding issues of material fact, we submit that the EPA's motion for summary judgment must be denied because:

(1)    Based upon Dr. Nwachuku's record and achievements, both in academia and during her time with the EPA, a reasonable jury could determine that the EPA discriminated against her when it circumvented its own Merit Promotion (competitive) process and promoted lesser qualified employees from outside her protected group;

(2)    Her EPA managers subjected her to a severe and pervasive course of abuse, including physical intimidation, at the very time she was actively pursuing her complaints of discrimination, a reasonable jury could reject the EPA's claim that there is a lack of temporal proximity between Dr. Nwachuku's protected activity and the adverse treatment heaped upon her; and

(3)    It is for a jury to determine whether Dr. Nwachuchu's evidence that the EPA terminated her employment based upon trumped-up allegations that she made a fraudulent travel claim to the EPA, made false accusations against her supervisor for physically accosting her, and was insubordinate to her supervisors, should be credited instead of her supervisors' assertions that they fired her for valid business reasons.

Dr. Nwachuku, therefore, respectfully urges this Court to deny Defendant's Motion for Summary Judgment and let a jury to decide who is telling the truth.

I.      **Background**.

     A.      **Education, Work History, and Professional Experience.**

     Nena Nwachuku is an African-American female who is currently employed as a scientific

advisor and independent environmental consultant for Howard University, Department of

Comprehensive Sciences.  Defendant's Exhibit ("DX") 1 at 4, 6.  She holds a Bachelor of

Science Degree and a Master of Science Degree in Microbiology from Howard University, and a

Ph.D. in Microbiology from The George Washington University.   Plaintiff's Exhibit ("PX") 1 at

1. She also received post doctoral training from GWU. *Id.* at 11-12.

     Dr. Nwachuku joined the EPA as a GS-13 Environmental Scientist in the Health and

Ecological Criteria Division (HECD) of the Office of Science and Technology in the Office of

Water in January of 1998.  DX 1 at 6; PX 2 (EEOC transcript) at 13.  From January 1998 through

February 1, 2003, Rita Schoeny was her first-line supervisor. PX 3 (Schoney Depo.) at 5.  From

February of 2003 through May of 2003, Tony Maciorowski acted in that role.  DX 1 at 59.  Then,

from June of 2003 through Nwachuku's termination in December of 2006, Elizabeth Doyle was

her first-line supervisor.  PX 4 (Doyle Depo.) at 5.  Nwachuku's second-level supervisors were

Jeanette Wiltse from January of 1998 through March of 2002, (DX 1 at 60-62),  Edward Ohanian

from March 2002 through November 2002, (PX 5 (Ohanian Depo.) at 5), Christopher Zarba from

November 2002 to April of 2003, (PX 6 (Zarba Depo.) at 6, 10), and Edward Ohanian from May

of 2003 through her termination.  PX 5 at 5.  Geoffrey Grubbs was Nwachuku's third-line

supervisor, as the Director of the Office of Science and Technology (OST) from January of 1998

until May of 2005 when Ephriam King took that role.  PX 7 (King Depo.) at 48

     Dr. Nwachuku has been actively involved in the water and environmental industry for

over twenty years.  Even before she worked for the EPA, Nwachuku served as an expert peer

reviewer on EPA grant proposals for the Office of Research and Development.  PX 1.  She has

been a member of the American Society for Microbiology since 1985 and represented the EPA's

Office of Science and Technology (OST) at national and international meetings throughout her

tenure at EPA.  *Id.*  Dr. Nwachuku has authored numerous articles in peer reviewed scientific

journals, made presentations at national and international conferences, such as the EPA Science

Forum, and has co-authored papers with noted university professors and scientists in the industry,

many of which discuss the projects she handled at the Office of Water.  *Id.*  She serves on the

editorial board of a major international science journal, the Journal of Water and Health.  *Id.*

Nwachuku has also received the highest Agency scientific award - a Level 1 Scientific and

Technological Achievement Award (STAA) - for a publication that she authored on

Acanthamoeba.  *Id.*  Dr. Nwachuku authored the criteria document for Enteroviruses and co-

authored a second criteria document for viruses, which provided the scientific basis for the

Ground Water Rule.  *Id.*

**B.     Dr. Nwachuku Is a Highly Productive Member of EPA Staff and Receives
Glowing Performance Evaluations During Her Time at EPA.**

As an EPA microbiologist, Dr. Nwachuku studied the various microbes in drinking and

recreational water and made policy recommendations and presentations regarding the health

effects of these microbes on humans.  PX 4 (Doyle Depo.) at 27-28. In addition, Nwachuku

served as the OST contact and lead scientist on the Ground Water Rule beginning in 1999.  PX 1.

She was also the OST Contaminant Candidate List (CCL) microbial team leader, and the co-chair

of an agency-wide microbiology technical workgroup made up of scientists from offices across

the EPA, which she co-founded with Dr. Paul Berger.  *Id.*  Nwachuku also served as the OST

lead scientist for Acanthamoeba, the only microbe on the CCL1 list that had a regulatory

determination of "do not regulate."  *Id.*

Nwachuku received excellent performance reviews throughout her employment in

HECD.  In 1998, Nwachuku was rated "exceeds expectations" by her first-line supervisor, Rita

Schoeny.  DX 2 at 4.  From 1999-2001, she was consistently given praise for her high quality

technical work and timeliness.  *See id.* at 14-15.  In 2002, Schoeny noted that, "Nena's technical

work is excellent....Her work... is leaving a major impact on regulatory programs and policy in

OW."  PX 8 (HQ EPA PERFORMS Appraisal Cover Sheet, 1/25/2002).   In fact, Schoeny gave

Nwachuku a Quality Step Increase (QSI) in 2002 because of her "substantial contribution to the

documentation in support of the regulatory determinations from the Contaminant Candidate List"

and explained that Nwachuku was "responsible for developing and publishing a critical health

assessment document on Acanthamoeba...This work set precedents in EPA microbial

assessment." PX 9 (QSI dated 8/19/2002).  Nwachuku was awarded the Office of Science and

Technology Employee of the Quarter for the first quarter of FY 2002 for her outstanding work in

managing the preparation of the "Health Effects Document for Acanthamoeba."  PX 10.

Nwachuku's next supervisor, Elizabeth Doyle, also gave her outstanding performance appraisals.

In 2003, Doyle stated that "Nena is known for expending extra energy and time as needed to

come to a successful evaluation... this year she took a leadership role in the process of developing

a new CCL." PX 11 (HQ EPA PERFORMS Appraisial Cover Sheet, 1/30/2003).

Nwachuku's expertise was so integral to HECD that her second-level supervisor, Ed

Ohanian, referred to her as a "Senior Microbiologist," touted her expertise in things such as

SARS, and offered her as a resource for scientists from outside the agency. PX 12 (Email from Ed Ohanian to Dennis Juranek, 5/2/2003). Nwachuku received similar comments on her scientific acumen and accomplishments in 2004, (PX 13 (HQ EPA PERFORMS Appraisal Cover Sheet, 2/26/2004)) ("As is evidenced from the [attached list of performance highlights], she had a highly productive year working on a variety of project teams and producing publications and presentations."), and 2005, (PX 14 (HQ EPA PERFORMS Appraisal Cover sheet by Doyle, 3/1/2005)) ("As is evident from her attached performance highlights, Nena has had a very productive year...She showed great initiative in developing and coordinating a highly complex activity in a very short time... She is an asset to HECD."). In fact, in 2005, Nwachuku was awarded with a Level 1, Science and Technology Achievement Award (STAA), recognizing her "exceptionally high-quality of research or technological effort." DX 2 at 26.

In 2006, the year she was terminated, Nwachuku's performance appraisals continued to show she was an asset to the Agency. Her January 2006 Performance Appraisal indicated that she "exceed[ed] expectations" on each of the criteria evaluated and praised her for "fully participate[ing] in team activities as Lead (CCL micro team, GWR, LT2) and member of Human Health Team, and contribut[ing] technical assistance to team collaboration activities to meet program milestones" and "assist[ing] other team members in fulfilling their responsibilities and maintains constructive team relationships in achieving overall team goals."[1] PX 44 (EPA Performance Appraisal and Recognition System 1/31/2006).

Several of Nwachuku coworkers have testified that they had a good working relationship

---

[1]Doyle rated Dr. Nwachuku as "fully successful." However, these ratings were crossed out and changed to "exceeds expectations," a higher rating. *Id.*

with her.  See PX 15 (Stelma Affidavit 8/22/2006) at 2 ("I believe Dr. Nwachuku and I have a

very good working relationship; she frequently calls me and asks for my opinion on issues

regarding bacterial pathogens."); PX 16 (Saxena Affidavit 8/24/2006) at 2 ("my working

relationship with Dr. Nwachuku was very friendly and professional."); PX 2 (EEOC transcript of

Brenda Mosley) at 952 ("I never found her to be an angry person.  As a matter of fact, I found her

to be quite easy to deal with and to work with... she was also cooperative, collegial.  She was

always receptive.").

**II.     Dr. Nwachuku Files a Grievance After Her Supervisor Undermines Her
          Professional Standing at the EPA Because of Her Race and National Origin.**

          In November of 2001, Nwachuku filed a grievance complaining that she was treated

differently than her coworkers based on her race and National Origin (*see* DX 34 (Grievance of

6/21/2001); DX 1 at 62) because: (1) even though she came in as a GS-13 scientist with a Ph.D.

and ten years of experience in the industry, she was labeled a "junior scientist," a term that had

not been used in OST before, while other scientists in her department, even those who were of a

lower-grade, were not labeled in that way (DX 1 at 62);  (2) her supervisor refused to

communicate with her as the MWAP team leader in the same manner she communicated with

other team leaders and ignored her emails providing important team information and one-on-one

meetings that Nwachuku scheduled to review her work (DX 34 at 6); (3) she was excluded from

activities within the division (*id.* at 2); (4) she was denied training opportunities (*id; see also*

EEOC transcript, Volume I at 77 (explaining that Dr. Nwachuku was only approved for one

training in 8 years)); (5) she was not recognized for her work even when it had wide-reaching

implications for the scientific community (DX 34 at 3); (6) she was removed as an MWAP team

coordinator and member after only serving four months of her 12-month term (*id.*); and (7) she

was denied travel opportunities (*id.*).  Nwachuku's grievance went through three levels of review,

and were denied sometime in early 2002.  PX 2 at 490-495.

III.    **Dr. Nwachuku's Supervisors Deny Her the Opportunity to Compete for a Promotion by Circumventing the EPA Merit Protection Policy.**

A.      **EPA's Merit Protection Program.**

The EPA Merit Promotion Program requires that "applicants be evaluated, considered,

and selected on the basis of merit."  PX 17 (EPA Merit Promotion Manual) at Chapter (Ch.) 1, ¶

3 at 1-1.  To implement this policy, the EPA has established competitive procedures which

require the posting of a Merit Promotion Announcement. *Id.,* Ch. 3, ¶ 3.b. at 3-3, Figure 2.  The

Merit Promotion Announcement must include Quality Ranking Factors so that the knowledge,

skills, and abilities of an applicant can be assessed in light of the requirements of the position.

*See id.,* ¶ 3.f. at 2-2.  The Quality Ranking Factors are used to review the applications and to

determine the "Best Qualified" candidates.  *Id.,* Ch.3, ¶ 5., at 3-5 through 3-8.  The "Best

Qualified" candidates are referred to the selecting official for an interview.  *Id.,* Ch.3, ¶ 6. at 3-8

through 3-10.  Based upon the information available, the selection official is required to select

the best qualified candidate.  *Id.,* Ch.1, ¶ 3 at 1-1, *see also* 5 U.S.C. § 2301.

In exceptional circumstances, EPA policy allows non-competitive promotions, also

known as "Accretion of Duties" promotions.  PX 17, Ch.3, ¶ 1.b.(1)b. at 3-1.  However, the use

of Accretion of Duties promotions as a means to avoid the requirements of the Merit Promotion

Plan or for reasons of expediency is explicitly prohibited.  PX 18 (HR Policy Bulletin: Accretion

of Duties) at 5.  EPA policy strictly limits these "Accretion of Duties" promotions to

circumstances where:

- the employee continues to perform the same basic functions, working for the same supervisor.
- the additional duties and responsibilities assigned to or accrued by the incumbent do not adversely affect or impact the grade controlling duties and responsibilities of the other positions within the unit.
- the accretion is supported by an analysis of the position (based upon a review of the actual duties being done by the employee).

*Id.* at 1-2. EPA policy also requires managers to determine if a desk audit is necessary before promoting an employee without competition and "strongly encourages" evaluation statements. *Id.* at 2.

**B.     Instead of Allowing for a Competitive Promotion, Management Informally Chooses Two Selectees.**

On October 16, 2002, Geoffrey Grubbs notified all OST staff members that three GS-14 slots were available. DX 13 (Email from Grubbs 10/16/2002). On March 26, 2003, Zarba sent a follow-up email indicating that those who wished to be considered for promotions should submit a two-to-four page write-up of their qualifications by April 10, 2003. PX 19 (Zarba email to HECD 3/26/2003). Despite giving this deadline, Zarba had met with Mary Smith, Pamela Barr, and Peter Grevatt on March 21, 2003, and decided who would be promoted to the GS-14 level. *See* PX 6 (Zarba Depo.) at 21-22. Thus, when Nwachuku submitted the requested write-up on March 26, 2003, she did so in vain. PX 2 (EEOC transcript) at 502.

Nwachuku learned that she had been passed over for the accretion of duties promotion on May 13, 2003, at an all-hands meeting of HECD. PX 20 (Nwachuku Affidavit 4/30/2004). Ohanian, who had become the division director on April 28, 2003, told the group that according to Mr. Zarba, no one in HECD was qualified for a promotion to a GS-14. *Id.* On June 5, 2003,

at an all-hands meeting of HECD, Nwachuku openly objected to the selection process for the GS-14 promotions. *Id.* She expressed concern that Mr. Zarba had made the determination of who was qualified after serving only 4 months as acting division director. *Id.* Zarba claimed that he had consulted with Edward Ohanian and Rita Schoeny before making the decision, but Schoeny denies this. *Id; But see* DX 26 (Declaration of Rita Schoeny) at 2 (claiming that she did not give any feedback to Zarba on who should receive an accretion of duties promotion). On June 6, 2003, the day after the all-hands meeting, Ohanian stated that Zarba had asked about only one HECD employee. PX 20 (Nwachuku Affidavit 4/30/2004); *but see* PX 5 (Ohanian Depo.) at 57-58 (testifying that he had been asked about a number of individuals and specifically discussed Nwachuku's promotion potential with Zarba); *compare* DX 35 (Declaration of Ohanian) at 1 ("I had no role whatsoever in the 2003 selection process").

## IV. After Dr. Nwachuku Files an EEO Complaint, She Is Subjected to a Campaign of Harassment by her Supervisors.

### A. Dr. Nwachuku's Supervisors Make Disparaging Remarks About her National Origin and Then Her Work.

After Nwachuku filed her EEO complaint regarding the accretion of duties promotion, Doyle's harassment escalated. Doyle made racially pejorative remarks to Nwachuku, which Nwachuku reported to upper management. DX 1 at 181, 196 (testifying that she asked Doyle why she was always so rude to her and Doyle's response was that she "used to live in Prince George's County"), 182 (testifying that Doyle made a negative remark about Africans that was demeaning), 191–94 (testifying that Doyle made offensive remarks about African burial rituals following the death of her mother). Even though Doyle was not supportive of her work, Nwachuku copied Doyle on all the EPA workgroup communications including the weekly

10

meeting notes and member comments.  However, Doyle used this information to undermine

Nwachuku.  PX 21 (Email from Nwachuku to Doyle 10/15/2003); *See* PX 2 (EEOC transcript) at

125.  Although Doyle did not attend the microbial workgroup meetings and knew nothing about

the interactions of its members or Nwachuku's role in the workgroup, she insisted that

Nwachuku was not acting as a team leader.  *See* PX 22 (Doyle Email to Ohanian 4/9/2004)

("With regard to Nena's performance as the CCL3 team leader, I did not reference it because I

have not seen evidence of her functioning in this role since I arrived in June 2003.  Nena has not

called team meetings of the micro team within HECD.  She has not engaged the other members

in discussion of the CCL3 deliberative process with OGWDW."); *see also* DX 1 at 42

(explaining that Doyle would only refer to her as a member of the CCL workgroup, not the

leader).

      Doyle and Ohanian began to require Nwachuku to give management bi-weekly briefs on

her projects, although other staff members in HECD were not made to do the same. PX 23

(Email from Doyle to Ohanian 12/10/2003);  PX 24 (Email from Nwachuku to Ohanian

12/4/2003).  Nwachuku was also denied the resources she needed to do her job effectively.  In

2003, the CCL3 chemical workgroup's budget was $25,000, but the microbial group was not

allotted any money.  *See* DX 1 at 33.  This prevented Nwachuku from effectively carrying out the

mission of the microbial workgroup.  *See* PX 25 (Email from Nwachuku to Carmen Abell,

12/9/2003) ("Obviously the work of CCL 3 microbes will be greatly hampered if there is no

budget."); DX 1 at 33-34 ("I can't do the job with no money").  She was also denied training

opportunities, even though it was written in her Individual Development Plan (IDP) that she

needed additional training.  *See* DX 2 at 50; DX 1 at 34 (testifying that she was not permitted to

take leadership training in West Virginia), 45; PX 2 (EEOC Transcript) at 698 (Doyle admitting that she would not allow Dr. Nwachuku to attend the OPM leadership training). This denial of adequate training impaired her promotional opportunities. DX 2 at 50.

Doyle even prevented Nwachuku from getting credit for work that she did on behalf of the EPA. When Nwachuku invited two colleagues in Research and Development to participate in presenting a poster at an international meeting in North Carolina, Doyle said that the only way the poster could be presented at the meeting was if Nwachuku's name was removed. DX 1 at 55. Her colleagues chose not to present the poster at all rather than exclude Dr. Nwachuku, who was its senior author. *Id.* Doyle also caused Nwachuku's reputation to suffer, when in April of 2004, she and Ohanian directed an employee not to tell Nwachuku that her invoice approval rating was only 33%. DX 9; PX 2 (EEOC transcript) at 483-84. When the issue was investigated, however, it was determined that Nwachuku's invoice approval rating was actually 100%. DX 9; PX 2 (EEOC transcript) at 484. Doyle did not apologize for this incident until Nwachuku complained to Grubbs.

Finally, while her white colleagues were given the opportunity for temporary promotions, Nwachuku was not. For example, when Mary Reiley, a GS-14 program manager, went on maternity leave, Eric Winchester and Heidi Bell were given temporary promotions to take over her job responsibilities. DX 2 at 58. When Reiley was acting in a GS-15 position temporarily, Tala Henry also received a temporary promotion to a GS-14. *Id.* However, when Nwachuku took over Lisa Almodovar's GS-14 responsibilities, her request for a temporary promotion to the GS-14 level was denied. *Id.* By denying Nwachuku the opportunity to serve as a temporary GS-14, management decreased the likelihood that she would be promoted to the GS-14 level. *See*

12

PX 2 at 334-335; DX 2 at 58.

As Nwachuku pursued her EEO complaints, she faced increasing scrutiny and negative comments regarding her job performance. For instance, while Doyle had given Nwachuku glowing performance evaluations before she complained of discrimination, she began to criticize her work as "chaotic" and claimed that Nwachuku "feels pressure, but most of the time it is self-imposed, because she is not a good time manager and she takes on more work than she can do." PX 26 (Doyle affidavit of 1/6/2005) at 3. Ohanian also began to criticize Nwachuku's performance and question her leadership ability after she filed EEO complaints. PX 27 (Ohanian Affidavit of 1/6/2005) at 3, 4. Even, Rita Schoeny, who had praised Nwachuku early on and had selected Dr. Nwachuku to chair the CCL group, (PX 3 (Schoeny Depo.) at 64-65), later accused Nwachuku of being "inappropriate on many occasions" and "argumentative," (*see id.* at 37), and claimed that the Agency "gave the most serious consideration" to terminating Nwachuku during her one-year probationary period because they believed that she was unable to perform the duties of her job. *See* DX 2 at 3; DX 26 (Declaration of Rita Schoeny) at 1; *but see* DX 2 at 4 (Schoeny rating Nwachuku "exceeds expectations" for all the elements of evaluation during 1998, her probationary year). Despite touting "Nena's technical work" as "excellent," (PX 8), and rewarding her with a QSI in 2002, (PX 9), Schoeny later claimed that Nwachuku's scientific acuity and credibility were "able, average, but not remarkable" and that she ranked "slightly below average amongst our people." PX 3 at 55, 57; *see also* DX 26 (Declaration of Rita Schoeny) at 3 (claiming that Dr. Nwachuku's "technical competence is adequate, but not impressive"); *but see* PX 8 ("Nena's technical work is excellent....Her work... is leaving a major impact on regulatory programs and policy in OW")

13

On May 11, 2004, Nwachuku filed an EEO Complaint alleging that she had been subjected to a hostile work environment and naming Doyle and Ohanian as the discriminating officials.[2] DX 8 (EEO Complaint 5/11/2004).

**B.    Management Recruits a Disgruntled Coworker to Confront Dr. Nwachuku and Gather Information to Fire Her.**

Brendyln Faison began working at the EPA in June of 2005 as a GS-13 Microbiologist. PX 30 (EEO complaint dated March 24, 2006); PX 31 (Faison Depo.) at 5. On June 15, 2005, Nwachuku invited Faison to join the CCL3 microbial workgroup. PX 43 (Nwachuku Affidavit August 26, 2006). Then, on June 16, Nwachuku gave Faison a 90-minute orientation on CCL, including what the group did, Nwachuku's role as the OST lead and co-chair of the workgroup, the workgroup members, weekly meetings, and what the workgroup had accomplished. *Id.*

Faison had problems with the workgroup from the beginning of her involvement. She was defensive towards other workgroup members when they tried to explain things to her because she felt that her scientific background was being questioned. PX 43 at 17; *see also* PX 15 (Stelma Affidavit August 22, 2006) (Faison "seemed a little too anxious to criticize decisions made by the workgroup, at times bringing up issues that were not even pertinent"). She had trouble understanding what she was supposed to be doing as a member of the workgroup. *See e.g,* PX 29 at 3,7; PX 30 (EEO complaint dated 3/24/2006), PX 31 (Faison Depo.) at 29-30. In fact, Faison later admitted that even after attending numerous meetings of the workgroup, she did not understand the purpose of the bi-monthly meetings. PX 31 (Faison Depo.) at 37.

---

[2]Dr. Nwachuku was not the only person who experienced a hostile work environment at the hands of Elizabeth Doyle. Amal Mahfouz, another scientist in HECD, complained that Doyle had belittled her, humiliated her, and created a hostile work environment for her based on her National Origin. PX 28 (Email from Amal Mafhouz, 1/13/2006).

On January 12, 2006, Bob Cantilli, Elizabeth Doyle, and Edward Ohanian met with Faison regarding her concerns about the CCL3 workgroup and Dr. Nwachuku. *See* PX 5 (Ohanian Depo.) at 123, 129. Despite Faison's generally negative attitude, Ohanian suggested that she view her interaction with Dr. Nwachuku as "harassment." PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Seizing the opportunity to gather information to use against Nwachuku, Doyle and Ohanian then sent Faison to meet with Nwachuku and demand answers to her questions regarding the CCL3 microbial workgroup. *Id.* While it was Ohanian's practice to bring the employees together for a conference when one employee complained about another, (PX 5 at 114-15), he did not even inform Nwachuku of Faison's concerns. *Id.* at 121-22.

Both Doyle and Ohanian told Faison to take notes during her meeting with Nwachuku and report back to them. PX 32 (Feb 1, 2006 memo to Cantilli and Doyle); *see also* PX 33 (Doyle Affidavit 8/10/2006) at 6 ("I suggested that it would be prudent for her to make note of her conversations"); PX 29 (Faison Affidavit 8/25/2006) at 5 ("Ed Ohanian, during a separate private meeting in which we discussed my objections to Nena's behavior, had encouraged me to keep careful records of our encounters. Ed did not tell me why they advised me to keep records; nor did I ask."). At deposition, however, Faison denied that she was told to take notes of her encounters with Nwachuku, even though the script she used during her meeting with Nwachuku specifically states that she had been instructed to take notes, and both Doyle and Ohanian admitted that they advised Faison to take notes. *See* PX 31 (Faison Depo.) at 105; PX 29 at 5; PX 33 at 6. Additionally, Doyle and Ohanian both admit to telling Faison that they would take actions against Nwachuku if she did not satisfy Dr. Faison's requests. PX 33 (Doyle Affidavit 8/10/2006); PX 34 (Ohanian Affidavit 8/22/2006) ("we also told Dr. Faison that, if there will not

15

be a mutually-agreeable solution stemming from their meeting, the Agency has some set rules and regulations to deal with these problems. We were not about to lose a good employee like Dr. Faison").

To carry out her instructions from Doyle and Ohanian, Faison prepared three-pages of questions about the CCL3 project and presented it to Nwachuku on January 17, 2006. PX 44; PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Faison demanded that Nwachuku respond to this list within one week. *See* PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Faison created a similar version of the list which had an additional paragraph that explained management's role in the confrontation. PX 45 (January 17, 2006 Questions Re: CCL3 project- expanded version); *see also* PX 32. This list was provided to management but not Nwachuku. *Id.* The expanded version of the list threatened Nwachuku's job if she did not comply with Faison's demands, stating:

> Our management has told me their concerns about your historic behaviors within HECD... I have been strongly encouraged to document all my interactions with you, especially if they are negative. My data would possibly support some personnel action that does not involve me- at least yet. I am giving you fair warning that the Agency may be considering taking some serious action against you... I would strongly suggest you understand that poor behavior towards me may further complicate your employment situation. Good luck, and please do not give me a reason to become involved in your EPA career.

PX 45.

On January 17, 2006, Faison, who had only been an EPA employee for six months, met with Nwachuku and demanded that Nwachuku answer her questions regarding the CCL3 microbial workgroup. PX 30 (EEO complaint dated 3/24/2006). She brought the version of the list that she had sent to management to use as a script during this meeting. *Id.* Then, on February

16

9, 2006, Faison prepared a memorandum for Bob Cantilli and Elizabeth Doyle recounting her meeting with Nwachuku and the chain of events leading up to her January 17, 2006 meeting. Faison specifically proposed that Nwachuku be replaced as the CCL3 microbiology coordinator and that Faison be put in her place. PX 32 (Feb 1, 2006 memo to Cantilli and Doyle); *see also* PX 29 (Faison Affidavit 8/25/2006). However, in her deposition, Faison denied ever asking management to appoint her as the CCL3 microbial workgroup leader in Nwachuku's place. PX 31 (Faison Depo.) at 96.

Once it became clear that management supported Faison's actions against her, Nwachuku filed an EEO Complaint alleging that Doyle and Ohanian were harassing her. PX 30 (EEO complaint dated 3/24/2006); *see also* PX 35 (EEO Counselor's Report, 3/15/2006).

## V.     Dr. Nwachuku Served as the Leader of the CCL3 Workgroup.

As the leader of the CCL3 microbial workgroup, Nwachuku planned an expert workshop to be held in the Spring of 2006. *Id.* In order for the experts to be able to assist the CCL3 workgroup, a "charge" had to be prepared, which would designate the issues to be addressed by the panel. PX 4 (Doyle Depo.) at 117. Nwachuku and the other members of the CCL3 workgroup developed the charge over a period of several months and at least four revisions. *Id.* at 118, 125; DX 1 at 129. In finalizing the charge for the expert panel, Nwachuku had sent a draft to the workgroup members, her supervisors, and individuals from the Office of Ground Water and Drinking Water to make sure that all the comments that had been discussed in the CCL3 workgroup meetings had been incorporated. DX 1 at 136. On May 16, 2006, Ohanian and Doyle emailed Nwachuku asserting that she had not addressed the concerns from Tom Carpenter, an employee in the Office of Ground Water and Drinking Water. *See* DX 40; *see also* PX 5

(Ohanian Depo.) at 142-43; PX 4 (Doyle Depo.) at 120-21.

Because of the number of tasks that Nwachuku had to do to prepare the materials for the experts, she was working in several places and unable to regularly check her email. *See e.g.* DX 1 at 126, 158 ("I was so overwhelmed with work....with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was sick"). She was so busy that on occasion she would open an email, be called away before she could read it and, when she returned to her computer, she was not always able to continue reading that email because of other work that came up. *Id.* at 167. In fact, her workload was so overwhelming that she only checked emails that had to do with the contractor and the experts, some of whom were having problems with their travel arrangements. *Id.* at 130. Nwachuku even sought the help of a colleague to review the CCL materials and assist her in going through her emails. DX 1 at 152, 155 (testifying that she forwarded Brenda Mosley emails that she was unable to read so that Mosley could help her go through them). As a result, she was unaware of the concerns raised by Doyle and Ohanian in the May 16, 2006 email.

The workgroup decided that the materials for the workshop had to be ready for Thursday, May 18, 2006, because several of the experts were going to be attending the American Society for Microbiology (ASM) conference and would need to have their materials with them to have enough time to come to the workshop prepared. *Id.* at 127. Because she and the other members of the workgroup believed that the charge was complete after the final meeting of the CCL3 workgroup, Nwachuku turned her attention to getting the rest of the materials ready for the expert panel. DX 1 at 129; PX 4 at 12; PX 36 (Email from James Sinclair) ("I reviewed the charge to

the speakers and found it to be very complete.  It covered all the issues that I thought were important.  I also reviewed the agenda for the meeting and thought it was good.  Nena is to be commended for the amount of work she put into preparing these meeting materials").

Even though they claimed that these concerns were important and they saw Nwachuku every day at work, neither Doyle nor Ohanian spoke to Nwachuku in-person about her alleged failure to address Tom Carpenter's comments, nor did they confirm that she received or read their emails.  DX 67 (email from Ohanian to Nwachuku 6/5/2006); *see also* PX 5 (Ohanian Depo.) at 146-47; DX 36 at 26; DX 61 (Affidavit of Ohanian September 14, 2006); DX 66 (Email from Doyle to Nwachuku 5/30/2006).  As a result, Nwachuku did not learn that they wanted her to revise the charge before she left for the ASM conference in Orlando.

On May 18, 2006,  Nwachuku was sitting in the hallway next to the copy machine xeroxing packets to be sent to the experts and sorting papers on the floor, when Doyle came up behind Dr. Nwachuku and began yelling at her about missing a meeting earlier that day.  *See* DX 1 at 212, 212-214, 217; DX 70.  Then, Doyle grabbed Nwachuku's arm and swung her around in her office chair so that she was facing Doyle.  *Id.* at 225-226.   Doyle yelled at her for being on sick leave.  *Id.*  Nwachuku tried to explain that she had called in, as she always had done in the past, and had only come in because she had a 4:00 p.m. meeting, but Doyle kept screaming at her.  *Id.* at 218-219.  As a result, Nwachuku was afraid for her safety and in tears.  *Id.* at 218, 228; DX 70.

**VI.     While Dr. Nwachuku Attends a Scientific Conference, her Supervisors Arrange to Have Her Terminated.**

As part of her job, Dr. Nwachuku attended national and international conferences of the

ASM and frequently presented her EPA research. PX 4 (Doyle Depo.) at 106; *see also* DX 38.

Providing EPA research updates at these conferences was an important part of Dr. Nwachuku's

job. DX 1 at 175.  Nwachuku was asked to present a paper at the May 22-26, 2006, ASM

conference in Orlando. *Id.* at 169 (testifying that two of her papers were selected for presentation

at the ASM conference in Orlando).  Doyle approved Nwachuku's travel and participation in the

ASM conference, which took place two weeks before the expert panel would convene on June 6,

2006.  PX 4 (Doyle Depo.) at 108.

　　　　Nwachuku prepared the materials for the expert panel three weeks before the panelists

met so that the panelists had time to review them before the workshop.  DX 1 at 129. On the

evening of May 19, 2006, she sent the materials, including what she believed to be the final

"charge," to the logistics contractor so that it could be mailed to the experts. *Id; see also* DX 53

(email from Nwachuku to workgroup 5/19/2006, 10:20 p.m.)("Attachment...the charge as

discussed and revised within the workgroup and agreed to by the workgroup").  Then, on

Saturday, May 20 2006, Nwachuku traveled to Orlando to give her presentation at the ASM

conference.  DX 1 at 115.  Nwachuku had experienced some difficulty in getting her ticket to

Orlando.  *Id.* at 115-16.  Because Sherry Howard, the person responsible for making travel

arrangements, was out of the office that day, Nwachuku used her personal credit card to book the

travel arrangements. *Id.* at 115, 120-21; DX 57.  However, she received a call two hours later

explaining that everything had been resolved. *Id.* at 116, 122, 125.  Two days after her credit

card was charged, the charges were reversed. *Id.* at 122.

　　　　Unbeknownst to Nwachuku, Doyle had emailed Nwachuku two days before she was to go

on her trip to tell her the trip was no longer authorized. *See* DX 51 (email from Doyle to

Nwachuku 5/18/2006); *see also* PX 4 (Doyle Depo.) at 141.  However, because she had not had

the time to read her emails while she was preparing the materials for the expert panel, she did not

know that Doyle had revoked authorization for her to go to Orlando.  *See* DX 1 at 151 ("I have,

oh, about 500-and-something [emails] that...wouldn't be opened, and during this time... I was in

several places), at 169 (testifying that she believed she was approved to go on the trip and

believed that it was important to go because she was representing the EPA on work she had done

at the Agency); *but see* Doyle Depo. at 111 (claiming that she told Dr. Nwachuku in person that

was not allowed to attend the conference on May 18, 2006).

On May 22, Doyle contacted at least six different people at the Agency and told them that

Nwachuku was on "unauthorized" travel.  *See* PX 4 (Doyle Depo.) at 155-157, 169 (admitting

that she told Diane Wright, Ed Ohanian, Sarah Williams, Sonya Abraham, Ellen Hoffa, and Alice

Moss that Dr. Nwachuku had gone on unauthorized travel).  Doyle spent the week of May 22

contacting people at the Agency regarding Nwachuku's absence, even though she knew that she

had gone to the ASM conference.  *See e.g. id.* at 170.  In fact, the very first day that Doyle

learned Dr. Nwachuku was out of the office, Doyle contacted Diane Wright, the personnel

specialist in Las Vegas, in order to find out what actions could be taken against Dr. Nwachuku.

*Id.* at 172; DX 65 (Doyle's contemporaneous notes).

Doyle and Ohanian also took more extreme measures by contacting the Inspector General

to have Nwachuku criminally prosecuted.  *See* PX 5 (Ohanian Depo.) at 165; *see also* DX 52

(Declaration of Doyle 11/6/2006) at 3; DX 55 (Declaration of Sarah Williams).  Both Doyle and

Ohanian later denied that they had contacted the Inspector General.  *See* PX 5 (Ohanian Depo.) at

164 (denying that he contacted the IG's office and claiming Doyle was the one who made the

21

call; PX 4 (Doyle Depo) at 174 (claiming that Ohanian made the call to the Inspector General's office).

## VII.    Doyle Proposes Dr. Nwachuku's Termination.

On July 11, 2006, Doyle proposed Dr. Nwachuku's termination from the Agency. *See generally* DX 62 (Notice of Proposed Removal). Doyle admits she took this action only after she learned that the Inspector General would not pursue criminal charges against Nwachuku. PX 4 (Doyle Depo.) at 189. Doyle claimed that Nwachuku refused to revise the charge despite the emails from her supervisors, fraudulently obtained funds from the EPA to go on the trip to Orlando, falsely claimed that Doyle assaulted her at the office on May 19, 2006, and was disrespectful to her supervisors.[3] *See* DX 62.

On September 5, 2006, Dr. Nwachuku submitted a written response to the Proposed Termination, explaining that she was not aware that the authorization for her travel the week of May 22 through May 26, 2006 had been revoked. *See* DX 73. She also explained that she had not misrepresented information to the travel agent because she was under the impression that her trip was approved. *Id.* Finally, she explained that her allegation against Doyle regarding the workplace violence incident of May 18, 2006 was true, and that she did not act disrespectfully to her supervisors on June 6, 2006. *Id.*

Throughout this time, Nwachuku continued to pursue her EEO Complaint. On May 19, 2006, she filed a District Court complaint against the Agency alleging that she was the victim of discrimination and retaliation by management. *See* PX 37 (Docket Entry of 5/19/2006). She

---

[3]Despite the fact that Dr. Nwachuku filed an EEO complaint alleging Doyle discriminated and retaliated against her, Doyle claims that she had no serious problem with Dr. Nwachuku until she went on the trip to Florida. PX 4 (Doyle Depo.) at 191.

also filed an appeal in one of her EEO cases. DX 36 at 21. Then, on June 7, 2006, Nwachuku

amended her District Court Complaint. *See* PX 37 (Docket Entry of 6/7/2006). As part of her

EEO complaint, members of management were interviewed by the EEO investigator throughout

August of 2006 regarding their role in setting up the Brendlyn Faison encounter. *See e.g.* DX 56

(Declaration of Elizabeth Doyle, 8/10/2006), PX 34 (Ohanian Affidavit, 8/22/2006).

**VIII.    In Retaliation for Continuing to Pursue Her Complaints, King Does his Own Investigation into Dr. Nwachuku's Employment and Terminates Her on Trumped up Charges of Misconduct.**

Ephraim King was the deciding official in Dr. Nwachuku's termination. *See* PX 38

(Decision to Remove). However, he did more than consider the proposed removal, accompanying

documents, and Dr. Nwachuku's response in making his decision on whether to terminate Dr.

Nwachuku. *See* DX 74 (November 13, 2006, Notice by King). Rather, he made it his purpose to

obtain information to support Dr. Nwachuku's termination. Notwithstanding Dr. Nwachuku's

response (*See* DX 75), on December 4, 2006, King terminated her employment with the EPA.

DX 76.

**ARGUMENT**

**I.    Legal Standard on Summary Judgment in the Title VII Context.**

Summary judgment requires the Court to evaluate the evidence in the light most favorable

to the non-moving party and to deny summary judgment where the record taken as a whole could

lead a rational trier of fact to find for the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). (Where there is evidence that could lead a rational trier of fact to find for the nonmoving

party, the motion for summary judgment cannot be granted). Disputes over facts which might

affect the outcome of the suit under the governing law, preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In discrimination and retaliation cases, the Court evaluates the case using the *McDonnell Douglas* burden-shifting paradigm. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This provides that a plaintiff establish a *prima facie* case by presenting evidence that her employer took an adverse action against her under circumstances that raise an inference of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). "If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee." *Pierce v. Mansfield*, __ F.Supp.2d __, 2008 WL 101709 (D.D.C. 2008).

Then, the burden shifts to the employer to articulate a non-discriminatory reason for the adverse action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Pierce*, ___ F.Supp.2d ___ , 2008 WL 101709 (D.D.C. 2008); *citing Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000). The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *Reeves*, 530 U.S. at 147-48 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

II.     **Dr. Nwachuku Has Made Out a *Prima Facie* Case of Race Discrimination With Respect to the Accretion of Duties Promotion.**

A plaintiff may establish a *prima facie* case of race discrimination, by presenting evidence that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). Here, it is undisputed that Dr. Nwachuku is a member of a protected class and that she suffered an adverse action when she was denied a promotion. For the reasons that follow, plaintiff has also met her burden on the final element.

A.     **There Are Issues of Fact Regarding Management's Assertion that Johnston and Williams-Bower were Promoted Because of an Accretion of Duties.**

As the Supreme Court held in *Reeves,* "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," particularly because "the employer is in the best position to put forth the actual reason for its decision." 530 U.S. at 147; *see also Salazar v. Washington Metropolitan Transit Authority*, 401 F.3d 504, 511 (D.C. Cir. 2005)(finding questions about whether the employer provided fairly administered promotion selection process, and whether the failure to promote on grounds that successful candidate was more qualified precluded summary judgment). Here, EPA claims that it properly promoted Mr. Johnston and Ms. Williams-Bower through the accretion of duties process and that Nwachuku was not qualified for a promotion. However, there is ample evidence from which a jury could reasonably conclude that management deliberately circumvented the competitive selection process by pretending these were "accretion of duties" promotions. There is evidence that to select Mr. Johnston and Ms. Williams-Bower, the EPA bypassed the competitive Merit Promotion procedures in the EPA's Merit Promotion Plan. *See* PX 17 (EPA

25

Merit Promotion Manual) at 2-1. Moreover, the guidelines for accretion of duties promotions

explicitly prohibit the use of an accretion of duties promotion to circumvent the requirements of

the Merit Promotion Plan. *Id.* at 5. Other than the bald statement that there were positions open

which could be elevated by accretion of duties promotions, the EPA provides no cogent reasons

for its failure to allow competition for the promotion as required by the Merit Protection

regulations. *See e.g.* DX 16 (email from Grubbs to OST 1/24/2003) ("The discussion will

include vacant positions at the 14/15 level that could be competed through merit promotion

announcements as well as promotions for individuals that could be accomplished through

accretion of duties.")

**B.    There are Issues of Fact Regarding Whether the EPA Properly Followed Its Own Procedures for Promoting Employees Without Competition.**

When an employer fails to follow its established procedures, a reasonable juror could find

that his employer was acting with discriminatory animus. *See Johnson v. Lehman*, 679 F. 2d 918,

922 (D.C. Cir. 1982) (finding that "the adherence to or departure from internal hiring procedures

is a factor that the trier of fact may deem probative and choose to consider in determining the true

motivation behind the hiring decision" of an employer). The EPA has clearly defined regulations

and procedures that require competition. EPA competitive promotion procedures require

managers to post a vacancy announcement for available positions, (PX 17 (EPA Merit Promotion

Manual) at 3-3), accept applications from the candidates and evaluate the candidates through

either a rating panel, a personnel specialist, or subject matter expert, (*id.* at 3-5), interview

candidates, (*id.* at 3-8, 3-9), provide written notice to applicants of the selection, (*id.* at 3-11), and

maintain records that justify the selection. *Id.*

26

An accretion of duties promotion is limited to the unusual situation where an employee is performing additional duties and responsibilities that require the position to be reconstituted at a higher grade. *Id.* at 1. The EPA's established procedures allow accretion of duties promotions only where an analysis of a position shows that the incumbent has accrued additional duties and responsibilities. *See* PX 18 (HR Policy Bulletin) at 1-2. A desk audit may be used in the analysis of the position. *Id.* at 2. No such audit or analysis took place in this case. Rather, there is evidence that EPA managers purposefully violated the Merit Protection process under the cover of the accretion of duties promotion process by unilaterally choosing whom they wanted to promote within OST even though none of the requisite conditions were present.[4] *See e.g.* DX 19 (Declaration of Geoffrey Grubbs 2/11/2005) ("each Division Director would identify those individuals on his/her staff that he or she regarded as the most deserving of a promotion. The entire SES-level management of OST, myself included, would then discuss the proposed candidates and reach an agreement as to who might be advanced under the accretion of duties approach."); DX 14 (testimony of Grubbs at EEOC hearing) at 450-451, 458 (explaining that there were 55 individuals who were eligible to be a GS-14 so the managers held the March 21 meeting to "get to the point where [they] could have an intelligent conversation" about individual candidates).

Instead of allowing competition, Grubbs created his own criteria for deciding who to promote to the GS-14 level without doing any type of analysis of the responsibilities to determine whether an employee was already performing at a higher grade level. *See* DX 16 (Email from

---

[4]In fact, Grubbs admitted that every candidate whom the managers decided to promote from March 21, 2003 had been given an accretion of duties promotion. *See* PX 2 (EEOC transcript) at 526.

Grubbs to OST 1/24/2003) ("as has been our practice in the past, the attached guidelines for performance evaluation discussion will be used by each Director as a guide in making priority decisions for promotions through accretion."); PX 2 (Grubbs testimony) at 501 ("What I said in my email was that I expected each of the supervisors to review each of the individuals for their potential for a promotion and I wanted them to use these guidelines in doing so.")  Under *Johnson,* a jury could infer discrimination based upon the deviation from the Merit Promotion Plan and EPA policies regarding accretion of duties promotions.  *See Johnson*, 679 F. 2d at 922 ; PX 18 (HR Policy Bulletin) at 4 (requiring the Agency to use the position description of that grade to determine whether an employee should receive an accretion of duties promotion).

III.   **A Jury Could Reasonably Infer that Defendant's Alleged Reasons for Not Promoting Dr. Nwachuku Are Pretextual.**

   A.   **A Reasonable Jury Could Find that Management's Assertion that Johnston and Williams-Bower Were Working at the GS-14 Level is False.**

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves,* 530 U.S. at 146-147.  Here, while an "accretion of duties" promotion was allowed only where the employee was already performing the basic functions of the higher graded position,  PX 18 (EPA Policy Bulletin) at 1, a jury could conclude from the evidence that neither Johnston nor Williams-Bower were performing at the GS-14 level.  A comparison of Johnston's and Williams-Bower's write-ups for the GS-14 promotions reveals that neither of them was qualified for an accretion of duties promotion. Johnston's own write-up of his qualifications illustrated that he was not performing at the GS-14 level, as he lacked in many of the areas identified by  Grubbs as important for promotion to the GS-14 level.  *See* PX 2 (EEOC transcript) at 350-356 (comparing

28

Johnston's write-up with the qualifications set forth in Grubbs' criteria for accretion of duties promotions). For instance, while Johnston asserted that he had "managed and led several large interdisciplinary teams for the development of national environmental policy," the teams are not identified and there is no evidence that they impacted the work of OST. *Id.* at 350. Likewise, his vague assertion that he "coordinated and developed research, field experiences on pollution prevention with water pollution control," is not supported by any specific accomplishments. *Id.* at 351. Johnston asserts that he was a "recognized expert," yet three is no description of his "expertise" or explanation of how it served OST. *Id.* Further, he asserts that he "demonstrated a tendency to deliver a high quality product on time," but fails to give specific examples of what he produced for the EPA and how this positively impacted the work of OST. *Id.* at 352. For "other professional training," Johnston listed "American Society for Testing of Material" and stated that he completed a course in environmental statistics. *Id.* at 353. Yet, no details were provided about what those courses entailed or how many credit hours he got for taking those courses. There is no evidence that Johnston published any scientific or technical articles or made any presentations at seminars or workshops that would have satisfied Grubbs' criteria. *Id.* at 355. Based on Johnston's own write-up of his qualifications, a jury could infer that he did not satisfy the guidelines set forth by Grubbs and should not have received an accretion of duties promotion, much less a promotion ahead of Dr. Nwachuku. A jury could therefore reject EPA's assertion that he was promoted ahead of Dr. Nwachuku because he was already performing at the GS-14 level and she was not.

With respect to Ms. Williams-Bower, Grubbs asserted that her job entailed managing the information systems in the office and information security and that because of the nature of her

job, she was "well-known" by management. *Id.* at 465-66. However, when confronted with the

fact that Williams-Bower was not a nationally recognized expert and therefore might not be

qualified for the GS-14 promotion, Grubbs back-pedaled and explained that "nationally

recognized expert" was meant to identify employees who were widely known within the agency

and to identify employees that would come into contact with a broad sphere of people. *Id.* at

509-10. Grubbs admitted that he was not aware of any articles or papers that Williams-Bower

published during her time at EPA and did not know whether she was involved in any agency-

wide task forces or cross program task forces. *Id.* at 514, 515-16. He also admitted that Ms.

Williams-Bower was not involved in the creation or establishment of environmental policy, (*id.*

at 515), did not represent the EPA nationally or internationally, (*id.*), did not make any

presentations to professional associations, and that it was likely she did not provide any expert

testimony in any litigation. *Id.* In fact, Grubbs' testimony revealed that Williams-Bower's job

mostly involved ministerial tasks such as answering calls at the help desk, taking calls from

people at the EPA who were having computer problems, changing ink cartridges, and ordering

equipment for employees that needed to take work home with them. *Id.* at 516-518. When asked

to justify the Williams-Bower's promotion, Grubbs claimed that she had subject matter

knowledge because of the work she had done for information security and that "there was a lot of

comfort that she could deal with high level people." *Id.* at 521-22. Even Williams-Bower's own

write-up shows that she lacked the qualifications to be promoted to the GS-14 level. When asked

to what extent she represented program work, nationally and internationally, Williams-Bower

wrote "I represent OW/OST nationally when I'm in travel attending training sessions,

conferences, and seminars." *Id.* at 523. However, Grubbs admitted that Williams-Bower did not

deliver substantive work to anyone during trainings, conferences, or seminars. *Id.* at 524. Given the fact that Vera Williams-Bower did not have any of the qualifications that Grubbs identified as important in considering whether an employee should receive an accretion of duties promotion, a reasonable jury could reject the EPA's claim that she was promoted instead of Dr. Nwachuku because she was already working at the GS-14 level and Dr. Nwachuku was not.

**B.      A Reasonable Jury Could Reject the EPA's Assertion That It Did Not Promote Dr. Nwachuku Because She was Not Performing at a GS-14 Level.**

The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511-12 (1993) ("rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, '[n]o additional proof of discrimination is required.'"); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (*en banc*). Here, a jury could find that the defendant has offered false explanations for denying Dr. Nwachuku an accretion of duties promotion and thereupon infer that their false explanations are a pretext for discrimination. According to EPA guidelines and procedures, the proper inquiry when determining whether an employee should be promoted through the accretion of duties promotion process is whether he or she is already performing their job at the higher grade level. PX 18 (HR Policy Bulletin) at 1.   A jury could reject EPA's assertion that Johnston and Williams-Bower were performing at the GS-14 level, but Dr. Nwachuku was not. *See* PX 2 at 519 (Grubbs admitting that he had no records showing that Williams-Bower met the criteria for promotions more closely than Nwachuku did).

31

A comparison of Dr. Nwachuku's accomplishments and expertise with the requirements

for a GS-14 Environmental Scientist reveals that she was much more qualified for promotion to

the GS-14 level than Johnston or Williams-Bower because she really was working at the GS-14

level. For instance, at the GS-14 level, employees were expected to have "master[ed] the

principles, theory and practices of the specific field to serve as an authority in extending existing

approaches and applying new developments to investigate critical problems in the specialty area."

PX 39 (GS-14 Grade Level Criteria- Professional/Administrative/Scientific Position).  Dr.

Nwachuku clearly met this qualification, as she has a Ph.D. in Microbiology from George

Washington University and came to the EPA with ten years of experience in the industry. PX 2

(EEOC transcript) at 24.  She has published over 20 articles in peer review journals, is on the

editorial board of the Journal of Water and Health, and has made numerous presentations at the

ASM conferences.  *Id.*  Additionally, Nwachuku is an expert in the field of coliphage, has

collaborated with well-known scientists, and has been invited to the World Health Organization.

*Id.*  In 2000, Nwachuku led an expert panel for one year on the exposure route of waterborne

diseases.  *Id.* at 25.  She coordinated and led a workshop that presented the results of the panel on

behalf of the EPA.  *Id.*  In fact, Nwachuku was the recipient of the highest award given to any

scientist at the EPA, the STAA award, level 1, which is only given to 4% of scientists at the

EPA.  *Id.* at 25-26.  Another requirement of a GS-14 Environmental Scientist is that the

employee "represent HECD as a member of Agency work groups and teams on matters of

science and program policy related to human health exposure." PX 40 (Position Description -

GS-14 Environmental Scientist, HECD).  Nwachuku met that qualification too, having worked

on the CCL1, CCL2, and CCL3 workgroups, and the exposure route work group.  PX 2 (EEOC

hearing transcript) at 26-27. Nwachuku also met the Grade 14 requirement to serve as a "an authoritative liaison on assessment activities and policies with outside scientists, government officials and the public," (PX 40), as she successfully served as the liaison on several risk assessments at the Center for Disease Control. PX 2 at 29.

> Another requirement for a Grade 14 scientist is to
>
> handle a variety of expert level tasks assigned by the Associate Director or Director, HECD, using initiative with little supervision. In this regard, ensures the quality and appropriate peer review of products produced by HECD for its customers. The incumbent independently prepares reports, publications, speeches, or other outputs.

*See* PX 40. Based upon the awards and ratings given to her, Nwachuku met this criteria throughout her tenure at EPA. The position description for the GS-14 scientist also includes a requirement that the employee be involved with a "sophisticated scientific programmatic test of national importance." *Id.* Nwachuku met that requirement through her work on Acanthamoeba, in which she drafted the guidance document regarding how the 34 million contact lens wearers in the United States can avoid getting the disease. PX 2 at 33-34. Nwachuku also met the requirement that she conduct briefings for the Office of Water managers and the Assistant Administrator. *See* PX 40. As the OST lead for the Ground Water Rule, Nwachuku managed and reported program progress to her supervisor and co-briefed the office Director about the Rule. PX 2 at 36-37. Nwachuku also performed the duties of a GS-14 with regards to the budget for the CCL. She received the money for the workgroup and budgeted according to the needs of the group. PX 41 at 38-39. In short, she used resourcefulness and perception in her capacity as lead of the CCL workgroup. *See* PX 39 (GS-14 Grade Level Criteria-Professional/Administrative/Scientific Position).

She is recognized as an expert in her field, having been invited to conferences by Health

Canada, the World Health Organization, and the University of Texas. PX 2 at 55. She has also

been asked to review work of her colleagues and to collaborate with many experts in her field,

even publishing important scientific documents with national and international experts, and is

visible in the scientific community. *Id.* at 55, 63. She has worked on controversial and complex

projects such as the Ground Water Rule, which sets regulations for small utilities. *See* PX 39;

PX 2 at 56. Nwachuku has also worked on projects with wide national and international

implications when she worked on the exposure route of microbial pathogens and worked with the

World Health Organization to review the drinking water quality guidelines that had been

established. *Id.* at 57. Many of Nwachuku's projects affect a large number of people, including

the Ground Water Rule, the Contaminant Candidate List (CCL), and her work on Acanthamoeba.

*See* PX 39; PX 2 at 58. The work that Nwachuku has done has required her to collaborate with

contractors outside EPA and with experts in the field. *See* PX 39; PX 2 at 59. For example, she

had to work with Dr. Steve Edberg on the Ground Water Rule indicator, who disagreed with her

regarding the inclusion of coliphage in the Rule. *See* PX 2 at 59. Dr. Nwachuku invited him into

the discussion precisely because he had a differing viewpoint than she did on the issue. *Id.*

Finally, Nwachuku is a leader in activities both inside and outside the EPA, organizing the CCL

workshop and acting as lead of the CCL3 microbial workgroup, as well as leading the exposure

route project with experts from the CDC and other organizations worldwide. *See* PX 39; PX 2 at

64-65.

Given Dr. Nwachuku's expertise and accomplishments on behalf of the EPA, a

reasonable jury could find management's claims that she was not qualified to be a GS-14

Environmental Scientist is a pretext for discrimination.  Zarba asserts,

> [Dr. Nwachuku's] work was not at a GS-14 level, and barely met a GS-13
> level...Ms. Nwachuku sought out guidance from me and she needed more
> help than others.  I had concerns about the timeliness of her work.  Her
> writing ability was limited and she did not fully understand how her work
> fit in to the overall mission of the organization.  She had problems balancing
> her workload, managing her time, and exchanging information with others,
> including our offices and other offices.

DX 24 (Zarba Affidavit 4/14/2004) at 2.  However, a jury could reject these claims because there

is evidence that Dr. Nwachuku was successfully performing at the GS-13 level, (*see e.g.* PX 1),

and that she was performing the duties of a GS-14 scientist.   Furthermore, a jury could reject

these claims because, while Zarba claims that Nwachuku sought out guidance from him and

needed "more help than others," there is evidence that Zarba only supervised Nwachuku for four

months and that he only met with her once during that time.  *See e.g.* DX 2 at 30.  Additionally,

there is evidence that Zarba is biased based against Nwachuku's national origin and believed that

because she was from Africa, she was not a good writer.  *See* PX 2 (EEOC transcript) at 636,

642.  Given Zarba's admitted issues with Dr. Nwachuku's African-origin, the fact that she had

the qualifications for a GS-14 Environmental Scientist, and the fact that Nwachuku satisfied

Grubbs' criteria for an accretion of duties promotions, a reasonable jury could find that the

allegations that Dr. Nwachuku was not qualified for a promotion to the GS-14 level were false,

and that the true reason she was not promoted was because of her race and national origin.

## IV.    Dr. Nwachuuku Has Made Out a *Prima Facie* Case of Retaliation With Respect to her Termination.

To establish a *prima facie* case of unlawful retaliation, an employee must show that: (1)

she engaged in statutorily protected activity; (2) her employer took an action against her, which

might have dissuaded her from engaging in the protected activity if she had known it would be the consequence of her activity; and (3) a causal connection exists between the protected activity and the negative action or actions. *Burlington Northern and Santa Fe Ry. Co. v. White*, ____ U.S. ___, 126 S.Ct. 2405, 2415 (2006). "At the prima facie stage of a retaliation claim, a plaintiff's burden is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive." *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006).

### A.    Temporal Proximity.

A plaintiff may satisfy the third element of a *prima facie* case of retaliation by, "showing the employer had knowledge of the employee's protected activity, and ...the adverse personnel action took place shortly after that activity." *Holcomb*, 433 A.3d at 903; *Gleklen v. Democratic Congressional Campaign Committee*, 199 F.3d 1365, 1368 (D.C. Cir. 2000). In fact, "this circuit has held that a close temporal relationship may alone establish the required causal connection." *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). In *Singletary*, the D.C. Circuit held that in evaluating temporal proximity, instead of focusing on the date that a formal complaint was filed, the Court must take into account all forms of protected activity, including actions taken in support of complaints of discrimination. *Singletary,* 351 F.3d at 524-25. For instance, activities such as writing a letter inquiring about the status of the complaint constituted protected activity because it established the "plaintiff's ongoing pursuit of protected activity." *Id.* (holding that the district court erred when it concluded there was no temporal proximity based only on the date of the complaint without considering the fact that the employee had continued to pursue her complaints).

36

Here, there is no doubt that Nwachuku engaged in protected activity when she filed and pursued her claims of race discrimination and reprisal. Nor can there be any dispute that her termination is an adverse employment action. Nwachuku has also established the third element of her *prima facie* case of retaliation because her supervisors retaliated against her while she actively pursued her EEO rights. On March 24, 2006, Nwachuku filed her third EEO Complaint alleging that management's actions regarding the Brendlyn Faison meeting were discriminatory and were taken in retaliation for her previous EEO activity. *See* PX 30 (EEO Complaint dated March 24, 2006). On May 19, 2006, Nwachuku filed this lawsuit. *See* PX 37 (Docket Entry of 5/19/2006). Just weeks later, on July 11, 2006, Doyle proposed Dr. Nwachuku's termination. Throughout August of 2006, members of management were interviewed by the EEO investigator regarding Dr. Nwachuku's EEO Complaint regarding management's role in the Brendlyn Faison meeting. *See e.g.* DX 56 (Declaration of Elizabeth Doyle 8/10/2006), PX 34 (Ohanian Affidavit, 8/22/2006). King spent September, October, and November of 2006 gathering additional information to support the termination of Dr. Nwachuku. *See* DX 74 (letter from King dated November 13, 2006) (explaining that he had elicited additional statements from management to assist him in making his decision). Then, on November 20, 2006, this Court ordered that the parties to the District Court action submit a joint status report within 30 days. Less than one month later, on December 4, 2006, King terminated Dr. Nwachuku from her job with the EPA.

Defendant's argument that King could not have discriminated against Nwachuku because he had never been named as a discriminating official in one of Nwachuku's EEO complaints must be rejected. *See* Def.'s Mem. at 40. While King was the ultimate decision maker in Nwachuku's termination, the evidence reveals that in making his decision on Nwachuku's

37

termination, King relied upon statements by Doyle and other management officials that were named in Nwachuku's prior EEO complaints. *See* DX 74 at 1 (explaining that before making his decision, he solicited affidavits from the Office of Water managers, Agency and contractor personnel, Elizabeth Doyle, Dana Thomas, and Bessie McCain).   As such, there is sufficient evidence for a reasonable jury to find that Nwachuku's termination was tainted by these managers' bias against Dr. Nwachuku. *See George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir.2005) (To the extent a non-decisionmaker "participated in and influenced . . .[a challenged]decision, her good-faith belief in the proffered reasons also becomes relevant); *see also Griffin v. Wash. Convention Ctr* ., 142 F.3d 1308, 1312 (D.C. Cir. 1998)(finding that "evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.")

**B.    Additional Evidence Raising an Inference of Retaliation.**

**1.    A Reasonable Jury Could Conclude That Management Targeted Dr. Nwachuku for Termination.**

While temporal proximity is a simple and common method for raising an inference of causal connection, "evidence other than temporal proximity could establish causation." *Ball v. Tanoue,* 133 F. Supp.2d 84, 92 (D.D.C. 2001); *see Clark County School Dist. v. Breeden* , 532 U.S. 268, 273-274 (2001) (discussing "mere temporal proximity" as one method for demonstrating causation in a retaliation case).   "Circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference [of retaliation]" *Buggs v. Powell*, 293 F. Supp.2d 135, 149 (D.D.C. 2003).   In this case, a jury could find, based on the expanded version of the list Faison created for her meeting with Nwachuku and

the way that management sent Faison to provoke Nwachuku, that there was antagonism on the

part of management and that management was looking for a reason to take adverse action against

Nwachuku during the eleven-month period before she was terminated.  *See* PX 45 ("I have been

strongly encouraged to document all of my interactions with you, especially if they are negative.

My data would possibly support some personnel action that does not involve me - at least, yet.  I

am giving you fair warning that the Agency may be considering taking some serious action

against you").  As such, a reasonable jury could infer that management fired Nwachuku because

of her protected activity.

> 2.    **A Reasonable Jury Could Find Management's Effort to Have Dr.**
> **Nwachuku Criminally Prosecuted to be Mendacious.**

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if

disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the

prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr.,* 509 U.S. at

511.  Here, a jury could find that management's actions following Nwachuku's travel to the ASM

conference in Orlando reveals that the EPA's claimed reasons for terminating Nwachuku were

false and a pretext for discrimination.   A reasonable jury could also find the efforts of

management to have Nwachuku criminally prosecuted to be vindictive.  On the very first day that

Doyle was in the office following Nwachuku's departure, and without consulting her, Doyle

contacted Diane Wright, the personnel specialist in Las Vegas, in order to find out what actions

could be taken against Nwachuku.  See PX 4 (Doyle Depo.) at. 172.  Then, still without talking to

Nwachuku or confirming whether she had checked her emails regarding her authorization to go to

Florida, Doyle accused Dr. Nwachuku of fraud.  *See* DX 52 (Declaration of Doyle 11/6/2006) at

3.  Before Nwachuku could return and explain the reasons why she went on the trip, Doyle and

Ohanian contacted the Inspector General in order to have criminal charges brought against her.

*See* PX 5 (Ohanian Depo.) at 165;  DX 55 (Declaration of Sarah Williams).  Based on Doyle's

eagerness to have Dr. Nwachuku criminally prosecuted and the proposal of her termination after

she learned that the Inspector General would not pursue a criminal case against her, (PX 4 (Doyle

Depo.) at 189), a reasonable jury could find that Doyle was trying to destroy Dr. Nwachuku for

filing EEO cases complaints that named Doyle as the discriminating official.

> **3.    There is Evidence That Doyle Proposed Dr. Nwachuku's Termination Because Dr. Nwachuku Had Named Her as the Discriminating Official in Previous EEO Complaints.**

A plaintiff may raise an inference of causal connection through "evidence of differential

treatment in the workplace" or "comments by the employer which intimate a retaliatory mindset."

*Mesnick v. General Elec. Co.* , 950 F.2d 816, 828 (1st Cir. 1991).  To survive summary judgment

on a retaliation claim, a "[p]laintiff merely needs to establish facts adequate to permit an

inference of retaliatory motive." *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C. Cir. 1984).

Doyle's claims regarding Dr. Nwachuku's wrongful conduct indicate the proposed removal was

at least partly based on Doyle's reaction to Nwachuku filing complaints against her with the

Agency.  Indeed, Doyle specifically refers to Dr. Nwachuku's "harassment complaint" in the

Proposed Removal.  *See* PX 41 (Proposed Removal) at 5-6.  A jury could reject Doyle's self-

serving assertion that she "behaved at all times in a professional and courteous manner" and

credit Dr. Nwachuku's testimony that Doyle was abusive, that she physically assaulted her, made

her fearful, and caused her to cry. *Id.*  Moreover, Doyle was also displeased because the

settlement agreement resulting from a grievance filed by Dr. Nwachuku and other foreign-born women required her to respond to communications by Dr. Nwachuku within 24 hours and she considered that unduly burdensome.  *See* PX 4 (Doyle Depo.) At 91-102

Additionally, a jury could find that Doyle lied when she claimed that management took efforts to limit the gossip surrounding  Nwachuku's allegedly unauthorized trip to the ASM conference, (See PX 41 (Proposed termination) at 8), because Doyle herself told numerous staff members at the EPA that Nwachuku was on unauthorized travel to Florida.  *See e.g.* PX 4 (Doyle Depo.) at 155-157, 169.  As such, a jury could conclude that Doyle spread the gossip around the agency and then used the notoriety of the offense as a pretext to terminate Nwachuku.

## V.      A Jury Could Reasonably Conclude that EPA's Claim That It Terminated Dr. Nwachuku for Misconduct is Pretextual.

One way that the plaintiff can show that the employer's alleged reasons for its action against an employee is pretext for discrimination is by showing that the employer's proffered reason is false.  *Aka ,* 156 F.3d at 1290-1291 ("a factfinder's reasonable rejection of the defendant's proffered explanation will support an inference of discrimination.")  This is because "rejection of the defendant's proffered reasons [for its actions] will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* Therefore, summary judgment is inappropriate if the plaintiff puts forth evidence that show the defendant's explanation for its actions is false as, "'no additional proof of discrimination is required' as a matter of course once a plaintiff has shown that a jury could reject the employer's proffered explanation." *Id.* at 1292. Furthermore, "in deciding whether there is a genuine issue of fact before it, the court must assume the truth of all statements proffered by the party opposing summary judgment... this is the

41

standard even when the court entertains grave doubts about such a statement." *Greene v. Dalton* , 164 F.3d 671, 674 (D.C. Cir. 1999).

Here, a reasonable jury could conclude that Dr. Nwachuku did not refuse to obey management's order to revise the "charge" because she was unaware of the order. She has testified that she was not able to check her email due to the overwhelming amount of work that she was doing in preparation for the expert panel. *See e.g.* DX 1 at 158 ("I was so overwhelmed with work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was sick"); DX 1 at 126 ("I wasn't checking all my email. I was checking specifically my emails for the experts... I was working in five different locations and was xeroxing). Notwithstanding this fact, even though they worked in the same office, Doyle sent e-mails to her directing her to make changes to the "charge" document without talking to her or confirming that she had received those emails. Moreover, Nwachuku had informed King of this breakdown in communications prior to her termination. Based upon this evidence, a juror could conclude that the insubordination charge against Nwachuku was pretextual. *See also* DX 47.

There is also an issue of fact about whether Nwachuku was aware that Doyle had revoked her authorization to travel to the ASM conference. A jury could credit Nwachuku's testimony that she was not able to check her emails during the week before she left for the ASM conference, and did not receive Doyle's email revoking authorization to go to the ASM conference. *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141. Nwachuku has consistently testified that she believed she was authorized to go to the trip.

DX 1 at 169. Indeed, when Nwachuku sent out what she believed to be the final charge on May

19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at

the ASM conference the following week. See DX 53. A jury could infer from this evidence that

Nwachuku was unaware that her managers had revoked her authorization to attend the ASM

conference.

There is also an issue of fact regarding whether Nwachuku submitted false claims for

travel against the federal government. Nwachuku has testified that she believed she was

authorized to go to the ASM conference when she left on May 20, 2006. *See* DX 1 at 169.

While she initially paid for the travel with her personal credit card, she later received a call from

the EPA's travel agent explaining that everything had been resolved. *Id.* at 116, 122.

Furthermore, Sarah Williams has testified that she gave the go ahead to book Dr. Nwachuku's

travel.   Williams testified that on the Friday before Dr. Nwachuku was to depart for Florida, she

had received a call from the travel agent stating that he did not have the proper paperwork to

process Nwachuku's travel request. DX 55 (Declaration of Sarah Williams) at 1. After speaking

with the travel agent, Williams tried to reach four different people at the EPA to determine if the

travel was authorized. *Id.* Because Doyle and others failed to respond to her inquiries, Williams

"made a command decision" to approve Nwachuku's travel. *Id.* With this evidence, a reasonable

jury could reject the EPA's claim that Dr. Nwachuku knowingly made a false claim for travel

funds.

Finally, there is an issue of fact regarding whether Doyle touched Nwachuku in an

offensive manner or whether Nwachuku's allegation was false. According to the EPA, there was

proof that Nwachuku filed a false complaint against Doyle because Dana Thomas testified that

she saw the incident and that Doyle had done nothing wrong.  See PX 41 (Proposed Removal) at

5-6.   However, a reasonable jury could find that Thomas's testimony did not show that

Nwachuku filed a false complaint against Doyle because Thomas did not view the actual

incident.  In fact, when the incident was investigated, Doyle made no claim that Thomas may

have witnessed the altercation.  It was not until days later that Doyle claimed Thomas was

present.[5]  DX 71 (Report on Investigation on Allegations Stated in Nena's Note to Ephraim King)

at 3 ("Beth was not sure if there was a witness when I first interviewed her.  Beth told me on June

8 that she remembers that there was someone at the copier and she believes it was Dana

Thomas.").  Then, when Thomas was interviewed, she was unable to identify the day that she

claimed to have seen Nwachuku and Doyle talking in the corridor.  See DX 72 (Declaration of

Dana Thomas) at 1; see also PX 42 (Thomas Depo.) at 34.  Because Thomas herself was not sure

of whether she saw Doyle and Dr. Nwachuku speaking on May 18, 2006, a reasonable jury could

determine that what Thomas observed happened on a different day and that Doyle did assault

Nwachuku, rejecting the EPA's claim that Nwachuku made a false allegation of workplace

violence.  This is especially so given that Nwachuku testified that no one was present when the

incident took place and that she was using both xerox machines.  See DX 70, DX 71.

Moreover, even if Thomas actually claims to have seen the incident, a jury could still

credit Nwachuku's testimony instead of that of Thomas and Doyle.  See Haynes v. Williams, 392

F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's personal testimony cannot be inadequate to raise a

genuine issue regarding his 'own experience.'"); Mastro v. Potomac Elec. Power Co., 447 F.3d

---

[5]In fact, Gomez-Taylor revised the incident report after Doyle claimed that Thomas had
been a witness to the confrontation but failed to interview Nwachuku a second time or give her
the report to read.  See DX 71.

843, 857 (D.C. Cir. 2006) ("Although a jury may ultimately decide to credit the version of the events described by [the employer] over that offered by [the employee], this is not a basis upon which a court may rest in granting a motion for summary judgment."); *See also Jackson v. Gonzales*, 469 F.3d 703, 715 (D.C. 2007) (ruling that summary judgment is inappropriate when credibility determinations must be made regarding the defendant's asserted non-discriminatory reason for its actions; *Greene* 164 F.3d at 674 (holding that a district court's granting of summary judgment for defendant invaded the jury's province because plaintiff's sworn affidavit was sufficient to support a verdict against the defendant and credibility determinations are within the "exclusive domain" of the fact-finder).

## CONCLUSION

As the evidence has established, there are numerous questions of material fact regarding Dr. Nwachuku's claims of race discrimination and retaliation. Therefore, this case must proceed to a jury trial to appropriately determine the true motivation for the EPA's actions against Dr. Nwachuku. As such, the plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

David H. Shapiro
D.C. Bar # 961326
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: dhshapiro@swickandshapiro.com

45