# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NENA NWACHUKU )<br><br>Plaintiff, )<br><br>v. )<br><br>STEPHEN L. JOHNSON, Administrator )<br>U.S. Environmental Protection Agency )<br>Defendant. )<br> ) | Civil Action No. 06-0946 (RJL) |

## STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), plaintiff hereby submits her statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

**I.    General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp. 2d 33, 39 (D.D.C. 2003).  In a discrimination action such as this, the material issues are the defendant's motives, whether defendant took adverse employment actions against Nwachuku, and the legitimacy of any alleged non-discriminatory reasons for those actions. Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues.  Thus, even if those facts are accepted, they do not entitle defendant to judgment. *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir. 1996) ("material fact" defined as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction").  As such, defendant's

statements do not satisfy the requirement of Local Rule 7.1(h) that defendant provide, "a

statement of *material* facts as to which the moving party contends there is no genuine issue."

Therefore, Defendant's Motion for Summary Judgment must be denied.

## II.    Genuine Issues of Material Fact.

### 1.    *Whether the EPA circumvented its Merit Promotion Plan in promoting Johnson and Williams-Bower through accretion of duties.*

The EPA claims that it properly promoted Mr. Johnston and Ms. Williams-Bower

through the accretion of duties process and that Nwachuku was not qualified for a promotion.

Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.")at 13.

However, there is ample evidence from which a jury could reasonably conclude that management

deliberately circumvented the competitive selection process by selecting Johnston and Williams-

Bower for promotions and pretending that these were "accretion of duties" promotions.  *See* PX

17 (EPA Merit Promotion Manual) at 2-1.  The EPA Merit Promotion Program requires that

"applicants be evaluated, considered, and selected on the basis of merit."  PX 17 (EPA Merit

Promotion Manual) at Chapter (Ch.) 1, ¶ 3 at 1-1.  To implement this policy, the EPA has

established competitive procedures which require the posting of a Merit Promotion

Announcement.  *Id.,* Ch. 3, ¶ 3.b. at 3-3, Figure 2.  The Merit Promotion Announcement must

include Quality Ranking Factors so that the knowledge, skills, and abilities of an applicant can be

assessed in light of the requirements of the position.  *See id.,* ¶ 3.f. at 2-2.  The Quality Ranking

Factors are used to review the applications and to determine the "Best Qualified" candidates.  *Id.,*

Ch.3, ¶ 5., at 3-5 through 3-8.  The "Best Qualified" candidates are referred to the selecting

official for an interview.  *Id.,* Ch.3, ¶ 6. at 3-8 through 3-10.  Based upon the information

available, the selection official is required to select the best qualified candidate.  *Id.,* Ch.1, ¶ 3 at

1-1, *see also* 5 U.S.C. § 2301. There is no dispute that the EPA management prevented OST

employees from competing for the available promotions by selecting Johnston and Williams-

Bower for promotion to the GS-14 level, even though the guidelines for accretion of duties

promotions explicitly prohibit the use of an accretion of duties promotion to circumvent the

requirements of the Merit Promotion Plan. *Id.* at 5. Other than the bald statement that there were

positions open which could be elevated by accretion of duties promotions, the EPA provides no

cogent reasons for its failure to allow competition for the promotion as required by the Merit

Protection regulations. *See e.g.* DX 16 (email from Grubbs to OST 1/24/2003) ("The discussion

will include vacant positions at the 14/15 level that could be competed through merit promotion

announcements as well as promotions for individuals that could be accomplished through

accretion of duties.")

### 2.    *Whether the EPA properly followed its procedures for promoting employees without competition.*

The defendant claims that Johnson and Williams-Bower were fairly and properly

promoted through accretion of duties. Def. Mem. at 13-14. However, there is evidence that the

EPA did not take the necessary steps to promote Johnston and Williams-Bower through accretion

of duties. The use of Accretion of Duties promotions as a means to avoid the requirements of the

Merit Promotion Plan or for reasons of expediency is explicitly prohibited. PX 18 (HR Policy

Bulletin: Accretion of Duties) at 5. EPA policy strictly limits these "Accretion of Duties"

promotions to circumstances where:

- the employee continues to perform the same basic functions, working for
  the same supervisor.
- the additional duties and responsibilities assigned to or accrued by the
  incumbent do not adversely affect or impact the grade controlling duties
  and responsibilities of the other positions within the unit.
- the accretion is supported by an analysis of the position (based upon a

review of the actual duties being done by the employee).

*Id.* at 1-2.  EPA policy also requires managers to determine if a desk audit is necessary before promoting an employee without competition and "strongly encourages" evaluation statements. *Id.* at 2.

Instead of allowing competition, Grubbs created his own criteria for deciding who to promote to the GS-14 level without doing any type of analysis of the responsibilities to determine whether an employee was already performing at a higher grade level.  *See* DX 16 (Email from Grubbs to OST 1/24/2003) ("as has been our practice in the past, the attached guidelines for performance evaluation discussion will be used by each Director as a guide in making priority decisions for promotions through accretion."); PX 2 (Grubbs testimony) at 501 ("What I said in my email was that I expected each of the supervisors to review each of the individuals for their potential for a promotion and I wanted them to use these guidelines in doing so.").  With this evidence, a jury could infer discrimination based upon the deviation from the Merit Promotion Plan and EPA policies regarding accretion of duties promotions.  *See Johnson v. Lehman*, 679 F. 2d 918, 922 (D.C. Cir. 1982); PX 18 (HR Policy Bulletin) at 4 (requiring the Agency to use the position description of that grade to determine whether an employee should receive an accretion of duties promotion).

**3.    *Whether Johnston and Williams-Bower were already performing at the GS-14 level before they were promoted through accretion of duties.***

The EPA claims that Johnston and Williams-Bower were given accretion of duties promotions because they were the most deserving and qualified for these promotions.  Def. Mem. at 13.  However, a comparison of Johnston's and Williams-Bower's write-ups for the GS-14 promotions reveals that neither of them was qualified for an accretion of duties promotion.

Johnston's own write-up of his qualifications illustrated that he was not performing at the GS-14

level, as he lacked in many of the areas identified by Grubbs as important for promotion to the

GS-14 level. *See* PX 2 (EEOC transcript) at 350-356 (comparing Johnston's write-up with the

qualifications set forth in Grubbs' criteria for accretion of duties promotions). For instance,

while Johnston asserted that he had "managed and led several large interdisciplinary teams for

the development of national environmental policy," the teams are not identified and there is no

evidence that they impacted the work of OST. *Id.* at 350. Likewise, his vague assertion that he

"coordinated and developed research, field experiences on pollution prevention with water

pollution control," is not supported by any specific accomplishments. *Id.* at 351. Johnston asserts

that he was a "recognized expert," yet three is no description of his "expertise" or explanation of

how it served OST. *Id.* Further, he asserts that he "demonstrated a tendency to deliver a high

quality product on time," but fails to give specific examples of what he produced for the EPA

and how this positively impacted the work of OST. *Id.* at 352. For "other professional training,"

Johnston listed "American Society for Testing of Material" and stated that he completed a course

in environmental statistics. *Id.* at 353. Yet, no details were provided about what those courses

entailed or how many credit hours he got for taking those courses. There is no evidence that

Johnston published any scientific or technical articles or made any presentations at seminars or

workshops that would have satisfied Grubbs' criteria. *Id.* at 355. Based on Johnston's own

write-up of his qualifications, a jury could infer that he did not satisfy the guidelines set forth by

Grubbs and should not have received an accretion of duties promotion, much less a promotion

ahead of Dr. Nwachuku. A jury could therefore reject EPA's assertion that he was promoted

ahead of Dr. Nwachuku because he was already performing at the GS-14 level and she was not.

With respect to Ms. Williams-Bower, Grubbs asserted that her job entailed managing the information systems in the office and information security and that because of the nature of her job, she was "well-known" by management. *Id.* at 465-66. However, when confronted with the fact that Williams-Bower was not a nationally recognized expert and therefore might not be qualified for the GS-14 promotion, Grubbs back-pedaled and explained that "nationally recognized expert" was meant to identify employees who were widely known within the agency and to identify employees that would come into contact with a broad sphere of people. *Id.* at 509-10. Grubbs admitted that he was not aware of any articles or papers that Williams-Bower published during her time at EPA and did not know whether she was involved in any agency-wide task forces or cross program task forces. *Id.* at 514, 515-16. He also admitted that Ms. Williams-Bower was not involved in the creation or establishment of environmental policy, (*id.* at 515), did not represent the EPA nationally or internationally, *(id.)*, did not make any presentations to professional associations, and that it was likely she did not provide any expert testimony in any litigation. *Id.*   In fact, Grubbs' testimony revealed that Williams-Bower's job mostly involved ministerial tasks such as answering calls at the help desk, taking calls from people at the EPA who were having computer problems, changing ink cartridges, and ordering equipment for employees that needed to take work home with them. *Id.* at 516-518. When asked to justify the Williams-Bower's promotion, Grubbs claimed that she had subject matter knowledge because of the work she had done for information security and that "there was a lot of comfort that she could deal with high level people." *Id.* at 521-22. Even Williams-Bower's own write-up shows that she lacked the qualifications to be promoted to the GS-14 level. When asked to what extent she represented program work, nationally and internationally, Williams-Bower

6

wrote "I represent OW/OST nationally when I'm in travel attending training sessions, conferences, and seminars." *Id.* at 523. However, Grubbs admitted that Williams-Bower did not deliver substantive work to anyone during trainings, conferences, or seminars. *Id.* at 524. Given the fact that Vera Williams-Bower did not have any of the qualifications that Grubbs identified as important in considering whether an employee should receive an accretion of duties promotion, a reasonable jury could reject the EPA's claim that she was promoted instead of Dr. Nwachuku because she was already working at the GS-14 level and Dr. Nwachuku was not.

**4.    *Whether Nwachuku was already performing at the GS-14 level when she was passed up for a promotion.***

The defendant claims that while Johnston and Williams-Bower were well qualified for a promotion to the GS-14 level, Nwachuku was not because of problems with her interpersonal skills. Def. Mem. at 16. However, a comparison of Dr. Nwachuku's accomplishments and expertise with the requirements for a GS-14 Environmental Scientist reveals that she was much more qualified for promotion to the GS-14 level than Johnston or Williams-Bower because she really was working at the GS-14 level. For instance, at the GS-14 level, employees were expected to have "master[ed] the principles, theory and practices of the specific field to serve as an authority in extending existing approaches and applying new developments to investigate critical problems in the specialty area." PX 39 (GS-14 Grade Level Criteria). Dr. Nwachuku clearly met this qualification, as she has a Ph.D. in Microbiology from George Washington University and came to the EPA with ten years of experience in the industry. PX 2 (EEOC transcript) at 24. She has published over 20 articles in peer review journals, is on the editorial board of the Journal of Water and Health, and has made numerous presentations at the ASM conferences. *Id.*

Additionally, Nwachuku is an expert in the field of coliphage, has collaborated with well-known scientists, and has been invited to the World Health Organization. *Id.* In 2000, Nwachuku led an expert panel for one year on the exposure route of waterborne diseases. *Id.* at 25. She coordinated and led a workshop that presented the results of the panel on behalf of the EPA. *Id.* In fact, Nwachuku was the recipient of the highest award given to any scientist at the EPA, the STAA award, level 1, which is only given to 4% of scientists at the EPA. *Id.* at 25-26.

Another requirement of a GS-14 Environmental Scientist is that the employee "represent HECD as a member of Agency work groups and teams on matters of science and program policy related to human health exposure." PX 40 (Position Description - GS-14 Environmental Scientist, HECD). Nwachuku met that qualification too, having worked on the CCL1, CCL2, and CCL3 workgroups, and the exposure route work group. PX 2 (EEOC hearing transcript) at 26-27. Nwachuku also met the Grade 14 requirement to serve as a "an authoritative liaison on assessment activities and policies with outside scientists, government officials and the public," (PX 40), as she successfully served as the liaison on several risk assessments at the Center for Disease Control. PX 2 at 29.

> Another requirement for a Grade 14 scientist is to handle a variety of expert level tasks assigned by the Associate Director or Director, HECD, using initiative with little supervision. In this regard, ensures the quality and appropriate peer review of products produced by HECD for its customers. The incumbent independently prepares reports, publications, speeches, or other outputs.

*See* PX 40. Based upon the awards and ratings given to her, Nwachuku met this criteria throughout her tenure at EPA. The position description for the GS-14 scientist also includes a requirement that the employee be involved with a "sophisticated scientific programmatic test of

8

national importance." *Id.* Nwachuku met that requirement through her work on Acanthamoeba, in which she drafted the guidance document regarding how the 34 million contact lens wearers in the United States can avoid getting the disease. PX 2 at 33-34. Nwachuku also met the requirement that she conduct briefings for the Office of Water managers and the Assistant Administrator. *See* PX 40. As the OST lead for the Ground Water Rule, Nwachuku managed and reported program progress to her supervisor and co-briefed the office Director about the Rule. PX 2 at 36-37. Nwachuku also performed the duties of a GS-14 with regards to the budget for the CCL. She received the money for the workgroup and budgeted according to the needs of the group. PX 41 at 38-39. In short, she used resourcefulness and perception in her capacity as lead of the CCL workgroup. *See* PX 39 (GS-14 Grade Level Criteria-Professional/Administrative/Scientific Position).

Nwachuku is recognized as an expert in her field, having been invited to conferences by Health Canada, the World Health Organization, and the University of Texas. PX 2 at 55. She has also been asked to review work of her colleagues and to collaborate with many experts in her field, even publishing important scientific documents with national and international experts, and is visible in the scientific community. *Id.* at 55, 63. She has worked on controversial and complex projects such as the Ground Water Rule, which sets regulations for small utilities. *See* PX 39; PX 2 at 56. Nwachuku has also worked on projects with wide national and international implications when she worked on the exposure route of microbial pathogens and worked with the World Health Organization to review the drinking water quality guidelines that had been established. *Id.* at 57. Many of Nwachuku's projects affect a large number of people, including the Ground Water Rule, the Contaminant Candidate List (CCL), and her work on Acanthamoeba.

*See* PX 39; PX 2 at 58.  The work that Nwachuku has done has required her to collaborate with

contractors outside EPA and with experts in the field.  *See* PX 39; PX 2 at 59.  For example, she

had to work with Dr. Steve Edberg on the Ground Water Rule indicator, who disagreed with her

regarding the inclusion of coliphage in the Rule.  *See* PX 2 at 59.  Dr. Nwachuku invited him into

the discussion precisely because he had a differing viewpoint than she did on the issue.  *Id.*

Finally, Nwachuku is a leader in activities both inside and outside the EPA, organizing the CCL

workshop and acting as lead of the CCL3 microbial workgroup, as well as leading the exposure

route project with experts from the CDC and other organizations worldwide.  *See* PX 39; PX 2 at

64-65.

  Given Dr. Nwachuku's expertise and accomplishments on behalf of the EPA, a

reasonable jury could find management's claims that she was not qualified to be a GS-14

Environmental Scientist is a pretext for discrimination.  Zarba asserts,

> [Dr. Nwachuku's] work was not at a GS-14 level, and barely met a GS-13
> level...Ms. Nwachuku sought out guidance from me and she needed more
> help than others.  I had concerns about the timeliness of her work.  Her
> writing ability was limited and she did not fully understand how her work
> fit in to the overall mission of the organization.  She had problems balancing
> her workload, managing her time, and exchanging information with others,
> including our offices and other offices.

DX 24 (Zarba Affidavit 4/14/2004) at 2.  However, a jury could reject these claims because there

is evidence that Dr. Nwachuku was successfully performing at the GS-13 level, (*see e.g.* PX 1),

and that she was performing the duties of a GS-14 scientist.   Furthermore, a jury could reject

these claims because, while Zarba claims that Nwachuku sought out guidance from him and

needed "more help than others," there is evidence that Zarba only supervised Nwachuku for four

months and that he only met with her once during that time. *See e.g.* DX 2 at 30. Additionally, there is evidence that Zarba is biased based against Nwachuku's national origin and believed that because she was from Africa, she was not a good writer. *See* PX 2 (EEOC transcript) at 636, 642. Given Zarba's admitted issues with Dr. Nwachuku's African-origin, the fact that she had the qualifications for a GS-14 Environmental Scientist, and the fact that Nwachuku satisfied Grubbs' criteria for an accretion of duties promotions, a reasonable jury could find that the allegations that Dr. Nwachuku was not qualified for a promotion to the GS-14 level were false, and that the true reason she was not promoted was because of her race and national origin.

### 5. *Whether management recruited a disgruntled co-worker to confront Nwachuku and gather information to fire her.*

The EPA claims that Nwachuku was properly terminated after she engaged in misconduct. Def. Mem. at 39. However, the plaintiff has put forth evidence showing that eleven months before she was terminated, management sent a disgruntled co-worker to confront Nwachuku and gather information against her that could be used to support her termination. On January 12, 2006, Bob Cantilli, Elizabeth Doyle, and Edward Ohanian met with Faison regarding her concerns about the CCL3 workgroup and Dr. Nwachuku. *See* PX 5 (Ohanian Depo.) at 123, 129. Despite Faison's generally negative attitude, Ohanian suggested that she view her interaction with Dr. Nwachuku as "harassment." PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Seizing the opportunity to gather information to use against Nwachuku, Doyle and Ohanian then sent Faison to meet with Nwachuku and demand answers to her questions regarding the CCL3 microbial workgroup. *Id.* While it was Ohanian's practice to bring the employees together for a conference when one employee complained about another, (PX 5 at

11

114-15), he did not even inform Nwachuku of Faison's concerns. *Id.* at 121-22.

Both Doyle and Ohanian told Faison to take notes during her meeting with Nwachuku and report back to them. PX 32 (Feb 1, 2006 memo to Cantilli and Doyle); *see also* PX 33 (Doyle Affidavit 8/10/2006) at 6 ("I suggested that it would be prudent for her to make note of her conversations"); PX 29 (Faison Affidavit 8/25/2006) at 5 ("Ed Ohanian, during a separate private meeting in which we discussed my objections to Nena's behavior, had encouraged me to keep careful records of our encounters. Ed did not tell me why they advised me to keep records; nor did I ask."). At deposition, however, Faison denied that she was told to take notes of her encounters with Nwachuku, even though the script she used during her meeting with Nwachuku specifically states that she had been instructed to take notes, and both Doyle and Ohanian admitted that they advised Faison to take notes. *See* PX 31 *(*Faison Depo.) at 105; PX 29 at 5; PX 33 at 6. Additionally, Doyle and Ohanian both admit to telling Faison that they would take actions against Nwachuku if she did not satisfy Dr. Faison's requests. PX 33 (Doyle Affidavit 8/10/2006); PX 34 (Ohanian Affidavit 8/22/2006) ("we also told Dr. Faison that, if there will not be a mutually-agreeable solution stemming from their meeting, the Agency has some set rules and regulations to deal with these problems. We were not about to lose a good employee like Dr. Faison").

To carry out her instructions from Doyle and Ohanian, Faison prepared three-pages of questions about the CCL3 project and presented it to Nwachuku on January 17, 2006. PX 44; PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Faison demanded that Nwachuku respond to this list within one week. *See* PX 32 (Feb 1, 2006 memo to Cantilli and Doyle). Faison created a similar version of the list which had an additional paragraph that explained management's role in

12

the confrontation.  PX 45 (January 17, 2006 Questions Re: CCL3 project- expanded version); *see*

*also* PX 32.  This list was provided to management but not Nwachuku.  *Id.*  The expanded

version of the list threatened Nwachuku's job if she did not comply with Faison's demands,

stating:

> Our management has told me their concerns about your historic behaviors
> within HECD... I have been strongly encouraged to document all my interactions
> with you, especially if they are negative.  My data would possibly support some
> personnel action that does not involve me- at least yet.  I am giving you fair
> warning that the Agency may be considering taking some serious action against
> you... I would strongly suggest you understand that poor behavior towards me may
> further complicate your employment situation.  Good luck, and please do not give
> me a reason to become involved in your EPA career.

PX 45.

On January 17, 2006, Faison, who had only been an EPA employee for six months, met

with Nwachuku and demanded that Nwachuku answer her questions regarding the CCL3

microbial workgroup.  PX 30 (EEO complaint dated 3/24/2006).  She brought the version of the

list that she had sent to management to use as a script during this meeting.  *Id.*  Then, on

February 9, 2006, Faison prepared a memorandum for Bob Cantilli and Elizabeth Doyle

recounting her meeting with Nwachuku and the chain of events leading up to her January 17,

2006 meeting.  In that memo, Faison specifically proposed that Nwachuku be replaced as the

CCL3 microbiology coordinator and that Faison be put in her place.  PX 32 (Feb 1, 2006 memo

to Cantilli and Doyle); *see also* PX 29 (Faison Affidavit 8/25/2006).  This evidence that

management and Faison were working together to gather information against Nwachuku is

sufficient to raise an issue of fact about whether management had already decided to terminate

Nwachuku almost a year before Doyle's proposed termination and whether the claims that

13

Nwachuku was terminated for misconduct are pretextual.

### 6. *Whether management arranged to have Nwachuku fired while she was away for the ASM conference.*

The defendant claims that Nwachuku was properly terminated after she engaged in misconduct. Def. Mem. at 39. However, there is evidence that management planned to have Nwachuku terminated while she was away for the ASM conference. On May 22, Doyle contacted at least six different people at the Agency and told them that Nwachuku was on "unauthorized" travel. *See* PX 4 (Doyle Depo.) at 155-157, 169 (admitting that she told Diane Wright, Ed Ohanian, Sarah Williams, Sonya Abraham, Ellen Hoffa, and Alice Moss that Dr. Nwachuku had gone on unauthorized travel). Doyle spent the week of May 22 contacting people at the Agency regarding Nwachuku's absence, even though she knew that she had gone to the ASM conference. *See e.g. id.* at 170. In fact, the very first day that Doyle learned Dr. Nwachuku was out of the office, Doyle contacted Diane Wright, the personnel specialist in Las Vegas, in order to find out what actions could be taken against Dr. Nwachuku. *Id.* at 172; DX 65 (Doyle's contemporaneous notes). Doyle and Ohanian even contacted the Inspector General to have Nwachuku criminally prosecuted. *See* PX 5 (Ohanian Depo.) at 165; *see also* DX 52 (Declaration of Doyle 11/6/2006) at 3; DX 55 (Declaration of Sarah Williams). Both Doyle and Ohanian later denied that they had contacted the Inspector General. *See* PX 5 (Ohanian Depo.) at 164 (denying that he contacted the IG's office and claiming Doyle was the one who made the call; PX 4 (Doyle Depo) at 174 (claiming that Ohanian made the call to the Inspector General's office). Once the Inspector General decided not to pursue criminal charges against Nwachuku, Doyle proposed her termination. PX 4 (Doyle Depo.) at 189. This raises an issue of fact about

14

whether Nwachuku was truly terminated for misconduct.

      7.     ***Whether management targeted Dr. Nwachuku for termination because of her protected activity.***

      The defendant claims that Nwachuku was properly terminated after she engaged in misconduct.   Def. Mem. at 39.   However, a reasonable jury could find that based on the expanded version of the list Faison created for her meeting with Nwachuku and the way that management sent Faison to provoke Nwachuku, that there was antagonism on the part of management and that management was looking for a reason to take adverse action against Nwachuku during the eleven-month period before she was terminated.  *See* PX 45 ("I have been strongly encouraged to document all of my interactions with you, especially if they are negative. My data would possibly support some personnel action that does not involve me - at least, yet.  I am giving you fair warning that the Agency may be considering taking some serious action against you")

      A reasonable jury could also find the efforts of management to have Nwachuku criminally prosecuted to be vindictive and in retaliation for her protected activity.  On the very first day that Doyle was in the office following Nwachuku's departure, and without consulting her, Doyle contacted Diane Wright, the personnel specialist in Las Vegas, in order to find out what actions could be taken against Nwachuku.  See PX 4 (Doyle Depo.*)* at. 172.  Then, still without talking to Nwachuku or confirming whether she had checked her emails regarding her authorization to go to Florida, Doyle accused Dr. Nwachuku of fraud.  *See* DX 52 (Declaration of Doyle 11/6/2006) at 3.  Before Nwachuku could return and explain the reasons why she went on the trip, Doyle and Ohanian contacted the Inspector General in order to have criminal charges

brought against her. *See* PX 5 (Ohanian Depo.) at 165; DX 55 (Declaration of Sarah Williams). Based on Doyle's eagerness to have Dr. Nwachuku criminally prosecuted and the proposal of her termination after she learned that the Inspector General would not pursue a criminal case against her, (PX 4 (Doyle Depo.) at 189), a reasonable jury could find that Doyle was trying to destroy Dr. Nwachuku for filing EEO cases complaints that named Doyle as the discriminating official.

### 8.    *Whether Doyle proposed Nwachuku's termination because Nwachuku had filed EEO complaints against her.*

The EPA claims that Doyle's Proposed Removal was justified because of Nwachuku's misconduct. Def. Mem. at 39. However, Doyle's claims regarding Dr. Nwachuku's wrongful conduct indicate the proposed removal was at least partly based on Doyle's reaction to Nwachuku filing complaints against her with the Agency. Indeed, Doyle specifically refers to Dr. Nwachuku's "harassment complaint" in the Proposed Removal. *See* PX 41 (Proposed Removal) at 5-6. A jury could reject Doyle's self-serving assertion that she "behaved at all times in a professional and courteous manner" and credit Dr. Nwachuku's testimony that Doyle was abusive, that she physically assaulted her, made her fearful, and caused her to cry. *Id.* Moreover, Doyle was also displeased because the settlement agreement resulting from a grievance filed by Dr. Nwachuku and other foreign-born women required her to respond to communications by Dr. Nwachuku within 24 hours and she considered that unduly burdensome. *See* PX 4 (Doyle Depo.) At 91-102. Additionally, a jury could find that Doyle lied when she claimed that management took efforts to limit the gossip surrounding Nwachuku's allegedly unauthorized trip to the ASM conference, (See PX 41 (Proposed termination) at 8), because Doyle herself told numerous staff members at the EPA that Nwachuku was on unauthorized travel to Florida. *See*

16

*e.g.* PX 4 (Doyle Depo.) at 155-157, 169.  As such, a jury could conclude that Doyle spread the

gossip around the agency and then used the notoriety of the offense as a pretext to terminate

Nwachuku.

> **9.     *Whether King did his own investigation into Nwachuku's employment in order to support her termination from the Agency.***

The defendant claims that King could not have discriminated or retaliated against

Nwachuku because he was not named in any of her previous EEO complaints.  Def. Mem. at 40.

However, there is evidence that King did more than consider the proposed removal,

accompanying documents, and Dr. Nwachuku's response in making his decision on whether to

terminate Dr. Nwachuku.  *See* DX 74 (November 13, 2006, Notice by King).  Rather, he made it

his purpose to obtain information to support Dr. Nwachuku's termination and relied on

information from management, including Doyle, in making his decision.

On November 13, 2006, two months after Doyle proposed Nwachuku's removal, King

sent Dr. Nwachuku a notice explaining that he would be conducting his own supplemental

investigation, which included talking to witnesses. *See* DX 74 at 1 (November 13, 2006 Notice

by King)("I have found it purposeful to collect further evidentiary materials in order to best reach

a judicial decision.  Primarily, I have examined additional e-mail traffic that was sent to Dr.

Nwachuku during the critical time frame and Agency travel records that reflect Dr. Nwachuku's

regular practice); PX 7 (King Depo.) at 61.  King also decided to elicit additional affidavits

before making his decision.  *See* DX 74 at 1 (explaining that he solicited statements from the

Office of Water managers who "witnessed the June 6, 2006 episode that occurred prior to the

commencement of the CCL Workshop," Agency and contractor personnel that had direct

knowledge of Dr. Nwachuku's May 19, 2006 reservation request, Dr. Doyle, Dr. Dana Thomas, "the individual who witnessed the May 18[th] interaction between Dr. Doyle and Dr. Nwachuku," and, Bessie McCain an employee in the EPA's Office of Civil Rights").

For instance, King elicited an affidavit from Dana Thomas, an individual that Doyle identified as a possible witness to the alleged workplace violence incident of May 19, 2006. Doyle did not tell the investigator who was looking into the incident, Maria Gomez-Taylor, that Thomas may have witnessed the interaction between herself and Dr. Nwachuku until June 8th, three days after she initially met with her about the incident. DX 71 (Report on Investigation on Allegations Stated in Nena's Note to Ephraim King) at 3 ("Beth was not sure if there was a witness when I first interviewed her. Beth told me on June 8 that she remembers that there was someone at the copier and she believes it was Dana Thomas.") In fact, when Thomas was interviewed, she was unable to remember the day that she recalled seeing Dr. Nwachuku and Doyle talking in the corridor. *See* DX 72 (Declaration of Dana Thomas) at 1 ("I distinctly remember overhearing a conversation between Nena and Elizabeth while I made copies at the xerox machine *around* the date and time in question)(emphasis added). Even when she was deposed in 2008, Thomas was not sure that the interaction she witnessed took place on May 18, 2006. *See* PX 42 (Thomas Depo.) at 34 ("The date, I wasn't sure when I was talking to Maria").. Still, King elicited Thomas's affidavit, and relied on it in making a determination that Dr. Nwachuku had made a false allegation against Doyle. PX 7 (King Depo.) at 57. Not only did King speak with so-called witnesses to the May 18[th] workplace violence incident and the June 6th confrontation outside the workshop meeting room, but he also "examined her past performance appraisals, as well as affidavits from a number of personnel who have served in her supervisory

18

chain and who had been asked to opine on Dr. Nwachuku's work history."  DX 74.

Once his investigation concluded, Dr. Nwachuku provided a Supplemental Written Response to the Proposed Termination, on November 30, 2006 providing additional information and objecting to the use of the supplemental information collected by Mr. King.  *See* DX 75 at 2 (Supplemental Written Response to Proposed Termination) ("the declarations from three of Dr.Nwachuku's prior supervisors cover a time period that pre-dates your arrival at the Director of OST, as well as predating the incidents that are the subject of her proposed termination... we find your introduction and review of these declarations to be objectionable, at the last, but certainly retaliatory, in the instant matter of Dr. Nwachuku's proposed termination."), 3 ("It appears that the documentation that was collected after September 7, 2006, shares a common theme- without exception, the documents reflect wholly negative characterizations of Dr. Nwachuku during her career at EPA").  However, King ignored Dr. Nwachuku's objections.  This evidence raises an issue of fact about whether King did his own investigation into Nwachuku's employment in order to gather evidence that would support her termination.

**10.    *Whether Nwachuku refused to follow management's order to revise the "charge" document.***

The EPA attempts to justify Nwachuku's termination from the Agency by claiming she refused to revise the "charge" document even though her direct supervisors directed her to do so.  Def. Mem. at 29.  However, a reasonable jury could conclude that Dr. Nwachuku did not refuse to obey management's order to revise the "charge" because she was unaware of the order.  She has testified that she was not able to check her email due to the overwhelming amount of work that she was doing in preparation for the expert panel.  *See e.g.* DX 1 at 158 ("I was so

overwhelmed with work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was sick"); DX 1 at 126 ("I wasn't checking all my email. I was checking specifically my emails for the experts... I was working in five different locations and was xeroxing). Notwithstanding this fact, even though they worked in the same office, Doyle sent e-mails to her directing her to make changes to the "charge" document without talking to her or confirming that she had received those emails. Moreover, Nwachuku had informed King of this breakdown in communications prior to her termination. Based upon this evidence, a juror could conclude that the insubordination charge against Nwachuku was pretextual. *See also* DX 47.

### 11.    *Whether Nwachuku was aware that Doyle revoked her authorization to go to the ASM conference.*

The defendant claims that Nwachuku's termination was also supported by the fact that she went to the ASM conference without authorization. *See e.g.* Def. Mem. at 28. However, Nwachuku has presented evidence showing that she was unaware that Doyle had revoked her authorization to travel to the ASM conference. A jury could credit Nwachuku's testimony that she was not able to check her emails during the week before she left for the ASM conference, and did not receive Doyle's email revoking authorization to go to the ASM conference. *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141. Nwachuku has consistently testified that she believed she was authorized to go to the trip. DX 1 at 169. Indeed, when Nwachuku sent out what she believed to be the final charge on May 19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at the

ASM conference the following week. See DX 53. A jury could infer from this evidence that Nwachuku was unaware that her managers had revoked her authorization to attend the ASM conference.

### 12. *Whether Nwachuku committed fraud on the federal government when she secured tickets for her travel to the ASM conference.*

The EPA claims that Nwachuku purposefully lied to the agent from Rodgers travel in order to secure plane tickets to Orlando with full knowledge that she was not authorized to go on this trip. Def. Mem. at 25. However, Nwachuku has testified that she believed she was authorized to go to the ASM conference when she left on May 20, 2006. *See* DX 1 at 169. While she initially paid for the travel with her personal credit card, she later received a call from the EPA's travel agent explaining that everything had been resolved. *Id.* at 116, 122. Furthermore, Sarah Williams has testified that she gave the go ahead to book Dr. Nwachuku's travel. Williams testified that on the Friday before Dr. Nwachuku was to depart for Florida, she had received a call from the travel agent stating that he did not have the proper paperwork to process Nwachuku's travel request. DX 55 (Declaration of Sarah Williams) at 1. After speaking with the travel agent, Williams tried to reach four different people at the EPA to determine if the travel was authorized. *Id.* Because Doyle and others failed to respond to her inquiries, Williams "made a command decision" to approve Nwachuku's travel. *Id.* With this evidence, a reasonable jury could reject the EPA's claim that Dr. Nwachuku knowingly made a false claim for travel funds.

### 13. *Whether Nwachuku filed a false claim against Doyle for workplace violence.*

The EPA also attempts to justify its Nwachuku's termination by claiming that Nwachuku

filed a false claim against Doyle for workplace violence upon her return from the ASM conference. Def. Mem. at 31. According to the EPA, there was proof that Nwachuku filed a false complaint against Doyle because Dana Thomas testified that she saw the incident and that Doyle had done nothing wrong. See PX 41 (Proposed Removal) at 5-6. However, a reasonable jury could find that Thomas's testimony did not show that Nwachuku filed a false complaint against Doyle because Thomas did not view the actual incident. In fact, when the incident was investigated, Doyle made no claim that Thomas may have witnessed the altercation. It was not until days later that Doyle claimed Thomas was present. DX 71 (Report on Investigation on Allegations Stated in Nena's Note to Ephraim King) at 3 ("Beth was not sure if there was a witness when I first interviewed her. Beth told me on June 8 that she remembers that there was someone at the copier and she believes it was Dana Thomas."). Then, when Thomas was interviewed, she was unable to identify the day that she claimed to have seen Nwachuku and Doyle talking in the corridor. See DX 72 (Declaration of Dana Thomas) at 1; see also PX 42 (Thomas Depo.) at 34. Because Thomas herself was not sure of whether she saw Doyle and Dr. Nwachuku speaking on May 18, 2006, a reasonable jury could determine that what Thomas observed happened on a different day and that Doyle did assault Nwachuku, rejecting the EPA's claim that Nwachuku made a false allegation of workplace violence. This is especially so given that Nwachuku testified that no one was present when the incident took place and that she was using both xerox machines. See DX 70, DX 71.

III.    **Specific Responses to "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue."**

A review of "Defendant's Statement of Material Facts as to Which There Is No Genuine

Issue" shows that instead of making an effort to identify material facts that are not in dispute, the

defendant simply numbered the sentences that comprise the statement of facts in its brief,

including statements about which there are stated disputes of fact, for example, whether Doyle

assaulted Dr. Nwachuku.  As a result, defendant's Statement does not even attempt to address

material questions, but merely mention background information or restate the claims of defense

witnesses, and asks the Court to draw inferences in its favor.  To the extent that defendant's

statements touch on the material facts in this case, there is ample evidence to dispute those.

**Statement No. 2:** Plaintiff purports to have a Ph. D. in microbiology from the George
Washington University and post doctoral training. *See* Nwachuku Dep. Tr. at 13-14, Attached
Ex. 1; Complainant's Opposition to Agency Motion for Summary Judgment and Declaration
("Nwachuku EEO Decl.") at 1, Attached Ex. 2.

Statement No. 2: **There are material issues of fact regarding this contention**.  The plaintiff

does have a Ph.D. in microbiology from the George Washington University and post doctoral

training.  If defendant now claims that they are unaware of the plaintiff's educational

background, there are issues of fact regarding this claim.  The defendant has been aware of the

plaintiff's educational background from the time that she was hired by the EPA.  At no time has

the defendant questioned Nwachuku's educational background.

**Statement No. 5:** Plaintiff's responsibilities included working on the Contaminant Candidate
List ("CCL"), which is a project aimed at identifying contaminants in drinking water. *See*
Nwachuku EEO Tr. at 17-19, Attached Ex. 3.

Statement No. 5: **There are material issues of fact regarding this contention.**  In addition to

her everyday work, the plaintiff's responsibilities included not only working on the Contaminant

Candidate List (CCL), but also acting as the the OST CCL3 microbial team leader and the co-

chair of an agency wide microbiology technical workgroup and the OST lead scientist for

Acanthamoeba, the only microbe on the CCL1 list. *See* PX 1.

**Statement No. 6:** In or about 2006, Plaintiff was the co-chair of a microbiological team or workgroup that worked on matters associated with the CCL list. *See id.*

Statement No. 6: **There are material issues of fact regarding this contention.** *See* Response

to Statement No. 5.

**Statement No. 13:** Plaintiff believes that from the "very beginning of [her] employment," she was subjected to harassment and a hostile work environment. Nwachuku EEO Decl. at 2, Attached Ex. 2.

Statement No. 13: **There are material issues of fact regarding this contention.** While the

plaintiff testified that she experienced discrimination from the time she became employed with

the EPA, she later clarified this statement by explaining that she did not begin to experience a

hostile work environment until after Elizabeth Doyle became her supervisor and began to harass

her. *See* PX 4 (Doyle Depo) at 66.

**Statement No. 14:** During the relevant period of time the Agency employed a binary, "successful"/ "unsuccessful", performance evaluation system. *See* Nwachuku 2004 & 2005 Perform. Evals. at 1, Attached Ex 7.

Statement No. 14: **There are material issues of fact regarding this contention.** The Agency

did not employ a binary rating system of "successful"/ "unsuccessful" the entire time that Dr.

Nwachuku worked for the EPA. For example, in her 1998 performance appraisal, Nwachuku

was rated "exceeds expectations" by her first line supervisor, Rita Schoeny (DX 2 at 4) and in

her January 2006 Performance Appraisal, she received a "exceeds expectations" on each of the

criteria evaluated. PX 44 (EPA Performance Appraisal and Recognition System 1/31/2006.)

**Statement No. 15:** Plaintiff was rated successful in all of her performance evaluations before she was terminated from the Agency. *See* Nwachuku EEO Decl. at 30, Attached Ex. 2

Statement No. 15: **There are material issues of fact regarding this contention and it is**

24

**immaterial.** First, as explained in the response to Statement No. 14, the Agency did not employ

a binary system using "successful" and "unsuccessful" to rate employees during Nwachuku's

time with the Agency. Furthermore, while it is true that Nwachuku's performance appraisals

showed her to be a highly successful employee throughout her tenure at the EPA, this is not

material to her discrimination case. Despite giving her outstanding evaluations during her time

with the Agency, Nwachuku's supervisors later claimed that she was not performing her job ably

and that her technical work was not superior. For instance, while Doyle gave Nwachuku

excellent performance evaluations during her time in HECD, she later stated that Nwachuku's

working conditions were "chaotic and she feels pressure, but most of the time it is self-imposed,

because she is not a good time manager and she takes on more work than she can do." PX 26

(Doyle affidavit of 1/6/2005) at 3. Ohanian also criticized Nwachuku's performance and

leadership ability after she filed EEO complaints. According to Ohanian, because of her one-on-

one visits with him, he spent at least 20% of his time with Nwachuku. PX 27 (Ohanian Affidavit

of 1/6/2005) at 3. Ohanian also questioned Dr. Nwachuku's leadership ability, despite her role

as CCL3 Microbial Team Leader and her numerous accomplishments on behalf of the EPA. *Id.*

at 4. Although Rita Schoeny had given Dr. Nwachuku excellent reviews during her time at EPA

and had asked Dr. Nwachuku to chair the CCL group (PX 3 (Schoeny Depo.) at 64-65), she later

accused Nwachuku of being "inappropriate on many occasions" and "argumentative" (*See Id.* at

37) and claimed that the Agency "gave the most serious consideration" to terminating

Nwachuku her during her one-year probationary period because they believed that she was

unable to perform the duties of her job. *See* DX 2 at 3; DX 26 (Declaration of Rita Schoeny) at

1. This was contradicted by Nwachuku's evaluations, where she received "exceeds

expectations" from Schoeny on her 1998 performance appraisal. *Id.* at 4. Despite touting

"Nena's technical work" as "excellent" (PX 8 (HQ EPA PERFORMS Appraisal Cover Sheet,

1/25/2002)) and rewarding her with a QSI in 2002 (PX 9 (QSI dated 8/19/2002)), Schoeny stated

in her deposition that, "in terms of her scientific acuity and credibility," Nwachuku was "able,

average, but not remarkable" and that in her mind, she ranked" slightly below average amongst

our people." PX 3 (Schoeny Depo). at 55, 57; *see also* DX 26 (Declaration of Rita Schoeny) at 3

(claiming that Dr. Nwachuku's "technical competence is adequate, but not impressive").

**Statement No. 16**: Based upon Plaintiff's Amended Complaint and its reference to her EEO
Complaint from Agency No. 2004-0050-HQ ("2004 EEO Compl."), Plaintiff alleges that the
harassment she suffered included:

      i.    Drs. Dolye and Ohanian allegedly suppressing Plaintiff's promotional
           opportunities;

      ii.   Drs. Doyle and Ohanian allegedly creating "hostile adverse working
           conditions;"

      iii.  Drs. Doyle and Ohanian allegedly profiling Plaintiff as an angry person;
           and

      iv.  Drs. Doyle and Ohanian allegedly giving Plaintiff successful, but
           improper performance evaluations.

*See* 2004 EEO Compl. at 1, Attached Ex. 8; Amd. Compl. at ¶ 10.

Statement No. 16:  **There are material issues of fact regarding this contention.** The plaintiff

admits that she alleged that these actions were part of the harassment she received at the hands

of the Agency. However, Nwachuku denies that this is an exhaustive list of the harassment she

suffered. Moreover, Nwachuku denies that it is possible for her to list all of the incidences of

harassment she suffered throughout her time at the EPA. *See* DX 1 (Nwachuku Depo.) at 39-40

(explaining that she reported many of the incidences of harassment but not all of them because

she was being harassed daily), 47.

**Statement No. 17**: Through discovery in this action, Plaintiff revealed that certain other actions
were part of an alleged "campaign of harassment," including the following allegations:

     v.     Dr. Doyle providing Plaintiff projects without appropriate funding, including funding for travel;

     vi.    Dr. Doyle denying Plaintiff the ability to go to leadership training;

     vii.   Dr. Doyle incorrectly reporting Plaintiff's level of compliance with invoicing guidelines;

     viii.  Dr. Doyle going to chemical workgroup meetings, but not to Plaintiff's microbiology workgroup meetings;

     ix.    Dr. Doyle generally not showing interest in Plaintiff's work;

     x.     Jafrul Hasan, a colleague of Plaintiff's, not inviting Plaintiff to a particular workshop;

     xi.    Dr. Doyle referring to Plaintiff as a member, as opposed to a leader, of a CCL workgroup;

     xii.   Dr. Doyle being rude to Plaintiff, by cutting her off in conversations;

     xiii.  Dr. Doyle asking Plaintiff to cease singing in her cubicle; and

     xiv.  Other action of Dr. Doyle on a daily basis.

Nwachuku Dep. Tr. at 32-47, Attached Ex. 1.

Statement No. 17: **There are material issues of fact regarding this contention**. *See* Response to Statement No. 16.

**Statement No. 18**: At one time or another Plaintiff has also asserted that the following allegations were part of the campaign of harassment purportedly carried out against her during her time with the EPA:

     xv.    Lisa Almodovar and Robin Oshiro, colleagues of Plaintiff's, and other unnamed individuals referring to Plaintiff as a "junior" employee (*see* Nwachuku EEO Decl. at 5, Attached Ex. 2);

     xvi.   On January 27, 1998, Lisa Almodovar "tore into [Plaintiff]" regarding Plaintiff's review of a Contaminant Candidate List ("CCL") report (*see id.* at 9-10);

     xvii.  Denis Borum, an Agency employee, sending Plaintiff an allegedly rude email on March 18, 2004, concerning conference room reservations, Dr. Doyle's instruction to Plaintiff on how to reserve conference rooms, and Dr. Ohanian's response to Plaintiff's complaints regarding Dr. Doyle's response to this situation (*see* Adden. to 2004 EEO Compl. at 3, Attached Ex. 9);

     xviii. Senior environmental employees ("SEEs") allegedly calling Plaintiff "crap and crazy" and insulting Plaintiff in the performance of her duties, and Dr. Ohanian's responses to Plaintiff's complaints concerning such conduct (*see id.*); and

     xix.   Dr. Schoeny allegedly refusing to "deal with the issues that were at hand and at the time they occurred," and "promoting and participating in the discriminatory environment" (*see* Nwachuku EEO Decl. at 22, Attached

Ex. 2).

Statement No. 18: **There are material issues of fact regarding this contention**. *See* Response

to Statement No. 16.

**Statement No. 20**: Plaintiff previously attributed deficiencies in her work environment to other factors, including, "*I knew from the very beginning of my employment in HECD, that I was in a dysfunctional group with no defined structure or boundaries and that I will be dealing with power struggles, cut throat competitions, and unusual personalities.*" Nwachuku EEO Decl. at 10, Attached Ex. 2 (emphasis and italics in original).

Statement No. 20: **There are material issues of fact regarding this contention and it is**

**immaterial**.  The plaintiff denies ever alleging that there were "deficiencies in her work

environment."  What the plaintiff alleged, and what the evidence supports, is that the plaintiff

experienced discrimination, retaliation, and harassment at the hands of management because of

her race and national origin.  Moreover, Nwachuku denies claiming that the harassment she

experienced was due to the fact that when she was hired, HECD was a "dysfunctional group

with no defined structure or boundaries" and that she would be "dealing with power struggles,

cut throat competition, and unusual personalities"  When Nwachuku made that statement, she

was explaining the structure of the MWAB team when she first came to the Agency.  DX 1

(Nwachuku Depo.) at 70-71.  She testified that when she was hired into HECD, a psychologist

had to be brought in to help form teams because the teams were not functioning properly.  *Id.*

Nwachuku specifically explained that this comment was not about HECD in general and

specifically about the MWAB team.  *Id.*  The plaintiff never alleged that these issues had

anything to do with the harassment that she was subjected to by her supervisors in HECD.

**Statement No. 21**: Because Dr. Doyle's background is in toxicology, she was more likely to attend chemical, as opposed to Plaintiff's biological, team meetings because she could make substantive contributions to the chemical team's efforts. *See* Doyle EEO Tr. 703, Attached Ex.

10.

Statement No. 21: **There are material issues of fact regarding this contention**.  The plaintiff

denies that Doyle attended the chemical work group meetings and not the microbial workgroup

meetings because of her background in toxicology.  Based upon the evidence, a reasonable jury

could find that Doyle refused to attend the microbial workgroup meetings because she was not

interested in being involved with Dr. Nwachuku's work.  DX 1 (Nwachuku Depo.) at 40

(explaining that Doyle showed no interest in the work Nwachuku was doing).  In fact, in an

email to Ohanian, Doyle admitted that after Nwachuku complained that she was not attending

the microbial workgroup meetings, she decided she would start attending those meetings.  *See*

PX 23 (Email from Doyle to Ohanian 12/10/2003).  Additionally, Doyle admitted that she felt it

was her responsibility to participate in the chemical workgroup because it was "totally internal to

HECD," whereas the microbiology workgroup is a cross-agency workgroup and therefore she

did not feel it necessary to attend those meetings, despite being Nwachuku's supervisor.  *Id.*

**Statement No. 22:** The chemical workgroup under Dr. Doyle, unlike the biological one, was
fully contained within the division in which Dr. Doyle worked, and the leader of that workgroup
was having problems controlling its participants. *See id.* at 702-04.

Statement No. 22: **Immaterial.**  The fact that the chemical workgroup was fully contained

within HECD is not material to Nwachuku's discrimination case.  Doyle was Nwachuku's

supervisor and had an obligation to be involved in Nwachuku's work.  A reasonable jury could

find that Doyle chose not to be involved in Nwachuku's work because she was discriminating

against her and retaliating against her for her prior EEO complaints.  DX 1 (Nwachuku Depo.) at

40.

**Statement No. 23:** Plaintiff does not recall Chris Zarba, Edward Ohanian, Geoffrey Grubbs,

29

Ephraim King, Anthony Maciorowski or Rita Schoeny using any pejoratives or language demeaning to black people or people from Africa as a group. Nwachuku Dep. Tr. at 200-02, Attached Ex. 1.

Statement No. 23: **Immaterial.** The fact that Nwachuku does not recall supervisors other than Doyle using racially pejorative language is not material to her discrimination case. It is not necessary for a plaintiff in a discrimination case to prove that management used racially offensive language in order to prevail. Furthermore, there is evidence that Doyle had used several racially pejorative terms towards Nwachuku in her time at the EPA, which Nwachuku had reported to upper management. DX 1 at 181, 196 (testifying that she asked Doyle why she was always so rude to her and Doyle's response was that she "used to live in Prince George's County"), 182 (testifying that Doyle had made a negative remark about Africans that was demeaning), 191–94 (testifying that Doyle had made offensive remarks about African burial rituals following the death of her mother).

**Statement No. 24**: While Plaintiff was an EPA employee she never heard any of other employee in her branch, HHRA, use any racial pejoratives or say anything insulting to a racial group or perpetuating a stereotype of a certain race. *Id.* at 93-94.

Statement No. 24: **Immaterial.** *See* Response to Statement No. 23.

**Statement No. 25**: Plaintiff's response to the question "Did any one of the individuals in your branch ever denigrate you because of your race?" is, "No....Not that I can recall." *Id.* at 94.

Statement No. 25: **Immaterial**. *See* Response to Statement No. 23.

**Statement No. 26:** As to Dr. Doyle, Plaintiff believes that Dr. Doyle may have used racial pejoratives on three occasions during Plaintiff's tenure with EPA.

Statement No. 26: **There are material issues of fact regarding this contention**. The plaintiff testified to three specific instances when Doyle used racially offensive language towards blacks and more specifically, people from Africa. DX 1 at 181, 196 (testifying that she asked Doyle

why she was always so rude to her and Doyle's response was that she "used to live in Prince

George's County"), 182 (testifying that Doyle had made a negative remark about Africans that

was demeaning), 191–94 (testifying that Doyle had made offensive remarks about African burial

rituals following the death of her mother). However, the plaintiff never claimed that these were

the only racially pejorative comments that were made by Doyle during Nwachuku's tenure at the

EPA.

**Statement No. 27**: Plaintiff claimed that Dr. Doyle once said "something about Africans, that I
just blanked out. ...I don't recall specifically what she said, but it was very demeaning." *Id.* at
182.

Statement No. 27:  The plaintiff testified under oath that Doyle said something demeaning about

Africans but that she did not remember the substance of the comment.  DX 1 at 182.  A

reasonable jury could credit Nwachuku's testimony regarding this incident and find that Doyle

did make a disparaging remark about Africans. *See Haynes v. Williams*, 392 F.3d 478, 482

(D.C. Cir. 2004) ("a plaintiff's personal testimony cannot be inadequate to raise a genuine issue

regarding his 'own experience.'").

**Statement No. 28**: Plaintiff cannot recall any details regarding Dr. Doyle's use of this language,
and conceded that no one else heard Dr. Doyle. *Id.* at 182-85.

Statement No. 28: **Immaterial**.  The fact that Nwachuku does not recall the specific language

used by Doyle or other details such as the dates, times, and circumstances under which these

terms were used is not material to her discrimination case.  It is not necessary for a plaintiff in a

discrimination case to prove that management used racially offensive language in order to

prevail.  Furthermore, Nwachuku presented evidence that Doyle made several racially offensive

remarks regarding blacks and people from Africa, which Nwachuku had reported to upper

31

management.  DX 1 at 181, 196 (testifying that she asked Doyle why she was always so rude to

her and Doyle's response was that she "used to live in Prince George's County"), 182 (testifying

that Doyle had made a negative remark about Africans that was demeaning), 191–94 (testifying

that Doyle had made offensive remarks about African burial rituals following the death of her

mother).

**Statement No. 29**: Plaintiff asserted that Dr. Doyle was insensitive when Plaintiff described the
customs that would be honored in burying Plaintiff's mother and in not sending an email to let
other HHRA employees know why Plaintiff was absent from work. *Id.* at 191-95.

Statement No. 29: **There is an issue of material fact regarding this contention**.  The plaintiff

testified under oath that Doyle was racially and culturally insensitive in the way she responded to

plaintiff's description of the burial rituals in Nigeria and in not notifying other HHRA employees

of her mother's death.  DX 1 at 191-195.  A reasonable jury could credit Nwachuku's testimony

regarding Doyle's behavior and find that Doyle was racist and xenophobic towards Nwachuku.

*See Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's personal testimony

cannot be inadequate to raise a genuine issue regarding his 'own experience.'").


**Statement No. 30**: Plaintiff cannot articulate any specific language used by Dr. Doyle in this
incident. *See id.*

Statement No. 30.  **Immaterial.**  *See* Response to Statement No. 30.

**Statement No. 31:** Plaintiff alleged that on one occasion when Plaintiff asked Dr. Doyle "why
she was always nasty and rude to me, and she said, 'well, I used to live in Prince George's
County.'" *Id.* at 195-96.

Statement No. 31: **There is an issue of material fact regarding this contention**.  The plaintiff

testified under oath that when she asked Doyle while she was always so nasty and rude to her,

Doyle responded, "well, I used to live in Prince George's County."  DX 1 at 195-96.  A

reasonable jury could credit Nwachuku's testimony regarding this incident and find that Doyle

made this remark because she was racist and xenophobic towards Nwachuku. *See* Haynes v.

Williams, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's personal testimony cannot be

inadequate to raise a genuine issue regarding his 'own experience.'").

**Statement No. 32**: Dr. Doyle did not elaborate on this comment and Plaintiff cannot recall Dr. Doyle saying anything else in which Dr. Doyle specified that such comment was intended to be demeaning toward African-Americans, people from Africa, or black people. *Id.* at 196-97.

Statement No. 32: **Immaterial.** *See* Response to Statement No. 30.

**Statement No. 33:** Dr. Doyle's remark that "I used to live in Prince George's County" had no racial overtones, and was not meant to be denigrating at all. *See* Doyle EEO Tr. at 744, Attached Ex. 10.

Statement No. 33: **There are material issues of fact regarding this contention**. Doyle's

statement, "I used to live in Prince George's County" was said in response to Nwachuku's

question about why Doyle was always rude to Nwachuku. *See* DX 1 at 181, 196. A reasonable

jury could find that there are racial overtones to that statement, and reject the defendant's claim

that the statement was not meant to be denigrating, especially given the other racially offensive

language that Doyle used regarding blacks and people from Africa. See *Id.* at 182, 191–94.

**Statement No. 34:** Dr. Doyle's remark was in response to Plaintiff's question about Dr. Doyle's use of the phrase, "don't let it slide," when reinforcing to Plaintiff the importance of a particular assignment. *See* Doyle EEO Tr. at 744, Attached Ex. 10.

Statement No. 34: **There are material issues of fact regarding this contention**. The evidence

shows that Doyle's comment "don't let it slide" was made in a different context than what the

defendant claims. While others in HECD were not asked to brief management on their projects

bi-weekly, Dr. Nwachuku was required to do so, even though the bi-weekly meetings were

originally set to make sure that Nwachuku's supervisor, Elizabeth Doyle, was involved in her

work and not to make sure that Dr. Nwachuku was actually performing her duties. PX 23 (Email

from Doyle to Ohanian 12/10/2003.) When Dr. Nwachuku was unable to make one of the bi-

weekly meetings because of her overwhelming workload, Doyle explained that she did not want

Dr. Nwachuku to "let it slide," insinuating that Dr. Nwachuku was delinquent in her duties. PX

24 (Email from Nwachuku to Ohanian 12/4/2003)

**Statement No. 35:** Dr. Doyle said "I used to live in Prince George's County" in an attempt to
explain that her use of the phrase "don't let it slide" was not intended to be rude, but rather was
an idiom that she learned while attending high school in Prince George's County. *See id.*; Doyle
Dep. Tr. at 31, Attached Ex. 12 (Dr. Doyle explaining that she attended high school in Prince
George's County).

Statement No. 35: **There are material issues of fact regarding this contention**. *See* Response

to Statement No. 33.

**Statement No. 36:** On October 16, 2002, Mr. Grubbs (Plaintiff's then third-line supervisor and
Director of OST) sent an email to all OST personnel announcing that OST "was at a point where
there [was] room" in OST's GS-14/15 administratively imposed ceiling to allow for two or three
promotions to the GS-14 level. *See* Email from Grubbs to OST of 10/16/2002, Attached Ex. 13.
Mr. Grubbs continued and said that he would be meeting with OST's managers "to determine
how these additional slots can most fairly be allocated and how best to conduct the selection
process." *Id.*

Statement No. 36: **There are material issues of fact regarding this contention**. Grubbs and

the OST directors decided to circumvent the EPA Merit Promotion plan by using the

competitive selection for the supervisory positions only, even though EPA policy required that

all the available positions be filled using the competitive process. A reasonable jury could find

that management deliberately circumvented the competitive selection process by pretending

these were "accretion of duties" promotions. In circumventing the Merit Promotion Plan, the

EPA bypassed a system that provided for a fair and open competitive process for selection and

protected against discriminatory animus. See PX 17 (EPA Merit Promotion Manual) at 2-1.

The guidelines set forth for the accretion of duties promotions explicitly prohibit the use of an

accretion of duties promotions as a means to avoid the requirements of the Merit Promotion

Plan. *Id.* at 5. However, other than the bald statement that there were positions open which

could be filled by accretion of duties promotions, the EPA provides no cogent reasons for its

failure to allow competition for the promotion as required by the Merit Protection regulations.

*See e.g.* DX 16 (email from Grubbs to OST 1/24/2003).

**Statement No. 37**: In total, OST believed it had nine spaces in its GS-14/15 ceiling with which
to work with during the 2003 GS-14/15 promotional process. *See* Grubbs EEO Tr. at 452-55,
Attached Ex. 14. Mr. Grubbs and the OST directors determined that seven of those spaces
should be allocated for supervisory positions within OST to be selected in a competitive fashion.
*Id.*

Statement No. 37: **There are material issues of fact regarding this contention** See Response

to Statement No. 36.

**Statement No. 38:** HECD, Plaintiff's division, was allocated three of these competitive
positions: (1) a permanent Director for HECD; (2) a deputy director for HECD; and (3) a branch
chief position for a newly created branch within HECD. *Id.* Accordingly, OST had two spaces in
its GS-14/15 ceiling that it used in evaluating candidates for accretion of duties promotions in
the 2003 process. *Id.*; *see also* Zarba EEO Decl. at ¶ 5-7, Attached Ex. 15.

Statement No. 38: **There are material issues of fact regarding this contention**. *See* Response

to Statement No. 37.

**Statement No. 39:** On January 24, 2003, Mr. Grubbs again wrote an email to all OST personnel
explaining the process OST would use to fill the two or three available GS-14 positions. *See*
Email from Grubbs to OST of 01/24/2003, Attached Ex. 16.

Statement No. 39: **There are material issues of fact regarding this contention**. While it is

true that Grubbs sent the email in question, the process he outlined was a violation of the EPA

Merit Promotion Plan which requires the Agency to allow employees to compete for available

positions.  See PX 17 (EPA Merit Promotion Manual) at 2-1.  A reasonable jury could find that

EPA managers purposefully violated the Merit Protection process using the accretion of duties

promotion process to fill the vacant GS-14 positions by unilaterally deciding which individuals

within the Office of Science and Technology they wanted to promote.  *See e.g.* DX 19

(Declaration of Geoffrey Grubbs 2/11/2005) ("each Division Director would identify those

individuals on his/her staff that he or she regarded as the most deserving of a promotion.  The

entire SES-level management of OST, myself included, would then discuss the proposed

candidates and reach an agreement as to who might be advanced under the accretion of duties

approach.")  DX 14 (testimony of Grubbs at EEOC hearing) at 450-451 (testifying that during

the March 21, 2003 meeting the supervisors talked about each individual and discussed whether

they were ready for promotion), 458 (explaining that there were 55 individuals who were eligible

to be a GS-14 so the managers held the March 21 meeting to "get to the point where [they] could

have an intelligent conversation" about individual candidates); DX 15 (Declaration of

Christopher Zarba 2/17/2006) ("the panel had but two (2) accretion of duties promotions

available, and each panel participant agreed that Vera Williams-Bower was the most deserving

candidate... the second individual chosen by the panel for an accretion of duties promotion was

Carey Johnston").

**Statement No. 40**: Specifically, Mr. Grubbs wrote that each division director, in conjunction
with the OST immediate office, would review, among other things, "each GS-13 employee
eligible for promotion to GS-14 via accretion of duties." *Id.*

Statement No. 40: **There are material issues of fact regarding this contention**.  *See* Response

to Statement No. 39.  While Grubbs did direct the managers to review the candidates to see who

they believed was qualified for a promotion, there is evidence that this was a purposeful

violation of the EPA Merit Promotion Plan. Instead of allowing competition, Grubbs directed

management to consider criteria he made up himself to promote the employees that management

decided to promote to the GS-14 level instead of doing any type of analysis of the position

descriptions for GS-14 scientists to determine whether an employee was already performing at a

higher grade level. *See* DX 16 (Email from Grubbs to OST 1/24/2003) ("as has been our

practice in the past, the attached guidelines for performance evaluation discussion will be used

by each Director as a guide in making priority decisions for promotions through accretion."); PX

2 (EEOC transcript) at 501 ("What I said in my email was that I expected each of the supervisors

to review each of the individuals for their potential for a promotion and I wanted them to use

these guidelines in doing so.") In addition to violating the Merit Protection Agreement, this also

contravened the policies of the EPA with regards to accretion of duties promotions requiring the

Agency to consider whether the person being promoted is performing the duties of the next

higher grade and to use the position description of that grade to justify the promotion. *See* PX

18 (HR Policy Bulletin) at 4.

**Statement No. 41:** Mr. Grubbs went on to state that "I am directing all OST supervisors to
review every eligible GS-13 and GS-14 employee under their supervision for their potential for
promotion through accretion." *Id.*

Statement No. 41: **There are material issues of fact regarding this contention**. *See*

Responses to Statements 39 & 40.

**Statement No. 42**: Further, Mr. Grubbs attached "Guidelines for Performance Evaluation
Discussion," which he said would be used by each OST director "as a guide in making priority
decisions for promotions through accretion." *Id.*

Statement No. 42: **There are material issues of fact regarding this contention**. *See*

Responses to Statements 39 & 40.

**Statement No. 43:** Such guidelines specifically included "interaction with peers, staff and managers -- effective and diplomatic," as a criterion. *See id.*

Statement No. 43: **There are material issues of fact regarding this contention.** *See*

Responses to Statements 39 & 40.

**Statement No. 44:** Mr. Grubbs concluded his January 24, 2003, email by saying that after supervisors have reviewed all eligible GS-13 and GS-14 employees, "I will then meet with the Deputy Office Director and [the] three Division Directors to discuss potential promotions to the GS-14 and GS-15 levels." *Id.*

Statement No. 44: **There are material issues of fact regarding this contention.** *See*

Responses to Statemeny 39 & 40.

**Statement No. 46:** In that email, Mr. Zarba, among other things, informed all HECD personnel that in response to Mr. Grubbs' email, a list of all eligible HECD candidates had been assembled, and that all eligible HECD employees would soon be receiving an email to confirm their eligibility. *Id.*

Statement No. 46: **There are material issues of fact regarding this contention.** While it is

true that Zarba sent this email, the fact that a list of employees was compiled that were "eligible"

for a promotion through accretion of duties is additional evidence that the proper procedures

were not being followed in using that process. The policies in place by the EPA for accretion of

duties promotion require the Agency to consider whether the person being promoted is

performing the duties of the next higher grade and to use the position description of that grade to

justify the promotion. *See* PX 18 (HR Policy Bulletin) at 4. A reasonable jury could find that

management improperly followed the procedures for accretion of duties promotions given that

they did not review the position descriptions of the employees within HECD and  instead claim

to have reviewed all GS-13s to see who management believed was most deserving of a

promotion.

**Statement No. 47**: Plaintiff was notified by email that she was "identified as eligible for GS-13 to GS-14." Email Moss to Plaintiff of 02/06/2003, Attached Ex. 18.

Statement No. 47: **There are material issues of fact regarding this contention.** *See* Response

to Statement No. 46.

**Statement No. 48**: In late-March 2003, the division directors, Mr. Grubbs and the Deputy Director of OST met to discuss the candidates and positions for promotion to GS-14/15. *See* Zarba EEO Decl. at ¶ 3, Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 8, Attached Ex. 20.

Statement No. 48: **There are material issues of fact regarding this contention.** *See* Response

to Statements 36, 39, & 40.

**Statement No. 49:** Specifically, present at the meeting were (i) Mr. Zarba as Acting Director of HECD; (ii) Mary Smith as Director of Engineering and Analysis Division ("EAD"); (iii) Debra Nicoll as Ms. Smith's deputy in EAD; (iv) Peter Grevatt as Acting Director of the Standards and Health Protection Division ("SHPD"); (v) Pamela Barr as Deputy Director of OST; and (vi) Mr. Grubbs as Director of OST. *See* Grubbs EEO Tr. at 452-57, Attached Ex. 14; Smith EEO Decl. at ¶ 8, Attached Ex. 20.

Statement No. 49: **There are material issues of fact regarding this contention**. *See*

Responses to Statements 36, 39, & 40.

**Statement No. 50:** Ms. Barr was invited to the March 2003 promotion meeting in part to discuss promotional candidates from the immediate or front office of OST, including the Resources Management and Information Staff. *See* Grubbs EEO Tr. at 456-57, Attached Ex. 14; Barr EEO Decl. at ¶ 2, Attached Ex. 21

Statement No. 50: **There are material issues of fact regarding this contention** *See* Responses

to Statements 36, 39, & 40.

**Statement No. 51:** Ms. Nicoll was invited to the March 2003 promotion meeting by Mr. Grubbs because Ms. Smith was "brand new" to her position within OST. Grubbs EEO Tr. at 452, Attached Ex. 14.

Statement No. 51: **There are material issues of fact regarding this contention** *See*

Responses to Statements 36, 39, & 40.

**Statement No. 52**: After discussing OST's competitive promotional needs, the panel discussed OST employees who were eligible for a potential accretion of duties promotion to GS-14. *See* Grubb EEO Tr. at 454-57, Attached Ex. 14; Smith EEO Decl. at ¶¶ 8-9, Attached Ex. 20; Grubbs EEO Decl. at 2, Attached Ex. 19; Zarba EEO Decl. at ¶¶ 5-6, Attached Ex. 15.

Statement No. 52:  **There are material issues of fact regarding this contention.**  See

Responses to Statements 36, 39, & 40.

**Statement No. 53:**  Prior to the March 2003 meeting, Mr. Zarba reviewed the write-ups that promotional candidates had submitted, discussed possible promotion candidates with the branch supervisors at the time -- including Anthony Maciorowski, who was Plaintiff's first line supervisor at the time (*see* Zarba Dep. Tr. at 29, Attached Ex. 4; Maciorowski EEO Decl. at ¶ 4, Attached Ex. 22) -- spoke with customers of HECD, and generally recalled his experiences with eligible HECD personnel. Zarba EEO Tr. at 594, 597, 602, Attached Ex. 23.

Statement No. 53:  **There are material issues of fact regarding this contention.**  There are

issues of fact about whether Zarba considered the write-ups from the promotional candidates

before meeting with management.  On March 26, 2006, Zarba emailed his staff explaining that

those who wished to be considered for promotions submit a two-to-four page write-up of their

qualifications by April 10, 2003.  PX 19 (Zarba email to HECD 3/26/2006).  However, that

email was written three days after management met and decided who they wanted to promote.

*See* PX 6 (Zarba Depo.) at 21-22 (explaining that Zarba had met with Mary Smith, Pamela Barr,

and Peter Grevatt, on March 21, 2003 and decided who would be promoted to the GS-14 level).

Nwachuku submitted a write-up for the GS-14 accretion of duties promotions on March 26,

2003 hoping to compete for one of the positions.  PX 1.  While Zarba made it appear through his

March 26, 2006 email that the entire HECD staff would have a fair chance to compete for the

GS 14 promotions, a reasonable jury could determine that Zarba knew that the write-ups would

not be considered because he knew that management had already decided who to promote. PX 2

(EEOC transcript) at 502.

**Statement No. 54:** Based upon Mr. Zarba's review, he believed that no GS-13s or 14s within HECD, including Plaintiff, met Mr. Grubbs's stated criteria for accretion of duties promotions. *See* Zarba Dep. Tr. at 26, 28, Attached Ex. 4; Zarba EEO Tr. at 598-99, Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15.

Statement No. 54: **There are material issues of fact regarding this contention**. A reasonable

jury could find that Zarba's decision not to promote plaintiff was based on discrimination and

was in retaliation for her previous EEO activity. There is evidence that Zarba was aware of Dr.

Nwachuku's expertise in her field, her accomplishments on behalf of the EPA, and her notoriety

within the scientific community, and yet claimed that she was not qualified for a GS-14 position,

stating that Nwachuku's "work was not at a GS-14 level, and barely met a GS-13 level... Ms.

Nwachuku sought out guidance from me and she needed more help than others. I had concerns

about the timeliness of her work. Her writing ability was limited and she did not fully

understand how her work fit in to the overall mission of the organization. She had problems

balancing her workload, managing her time, and exchanging information with others, including

our offices and other offices." DX 24 (Zarba Affidavit 4/14/2004) at 2. Despite these claims,

Zarba knew that Nwachuku was successfully performing at the GS-13 level because she had

received outstanding performance appraisals during her time at EPA (*see e.g.* PX 11 (HQ EPA

PERFORMS Apprasial Cover Sheet, 1/30/2003)).

Additionally, there is evidence that Zarba was intolerant of Dr. Nwachuku's national

origin and believed that she was not a good writer because she was from Africa. *See* PX 2

(EEOC transcript) at 636, 642 (testifying that Dr. Nwachuku did not use grammar correctly and

stating "you can't send a memo out and say excuse the writing because the person is from

Africa"). Given Zarba's admitted issues with Dr. Nwachuku's African-origin, the fact that she

had the qualifications for a GS-14 Environmental Scientist, and the fact that Dr. Nwachuku had

the criteria laid out by Grubbs in his email to OST regarding accretion of duties promotions, a

reasonable jury could find that Zarba's statement that Nwachuku was not qualified to be a GS-14

Environmental Scientist was pretext for discrimination and retaliation.

**Statement No. 56:** In Mr. Zarba's mind, after his review, Plaintiff was at the bottom of his
mental list of potential HECD promotion candidates given Plaintiff's deficiencies in her
interpersonal skills. *See* Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Zarba ROI Decl. at ¶ 6,
Attached Ex. 24; Zarba EEO Tr. at 627-28, Attached Ex. 23; Zarba Dep. Tr. at 44, Attached Ex.
4.
Statement No. 56: **There are material issues of fact regarding this contention.** Nwachuku

was a highly productive member of the EPA staff. In addition to her everyday work, Nwachuku

served as the OST contact and lead scientist on Ground Water Rule beginning in 1999. PX 1.

She was also the OST CCL3 microbial team leader and the co-chair of an agency wide

microbiology technical workgroup and the OST lead scientist for Acanthamoeba, the only

microbe on the CCL1 list. *Id.* The fact that Zarba allegedly considered Nwachuku at the

"bottom" of his mental list for promotion candidates raises an issue fo fact about whether he

considered either the criteria set out by Grubbs or the position description of the GS-14

Environmental Scientist in making his recommendations for promotions, as he was required to

do under the EPA's established procedures. *See* PX 18 (HR Policy Bulletin) at 4. A reasonable

jury could find that Zarba's claims regarding Nwachuku's lack of qualifications for a GS-14

position are tainted by his discriminatory and retaliatory animus. Zarba knew that Nwachuku

was successfully performing at the GS-13 level (*see e.g.* PX 11 (HQ EPA PERFORMS

Apprasial Cover Sheet, 1/30/2003)) and that she was performing the duties of a GS-14 scientist.

Additionally, there is evidence that Zarba was intolerant of Dr. Nwachuku's national origin and

believed that she was not a good writer because she was from Africa. *See* PX 2 (EEOC

transcript) at 636, 642 (testifying that Dr. Nwachuku did not use grammar correctly and stating

"you can't send a memo out and say excuse the writing because the person is from Africa").

Given Zarba's admitted issues with Dr. Nwachuku's African-origin, the fact that she had the

qualifications for a GS-14 Environmental Scientist, and the fact that Dr. Nwachuku had the

criteria laid out by Grubbs in his email to OST regarding accretion of duties promotions, there

are issues of fact about whether Zarba believed that Nwachuku was not qualified to be a GS-14

Environmental Scientist.

**Statement No. 57:** At the March 2003 promotion meeting, each division director and Ms. Barr
had an opportunity to put forth eligible employees who they believed might be qualified
candidates for an accretion of duties promotion. *See* Grubbs EEO Tr. at 454, Attached Ex. 14;
Smith EEO Decl. at ¶ 10, Attached Ex. 20.

Statement No. 57: **Immaterial.** *See* Responses to Statements 36, 39, & 40.

**Statement No. 58:** After discussion amongst the participants, the panel concluded that two
individuals were most deserving and qualified for accretion of duties promotions from GS-13 to
GS-14: Ms. Vera Williams-Bower and Mr. Carey Johnston, who Mr. Grubbs selected for
promotion. *See* Zarba EEO Decl. at ¶¶ 7-8, Attached Ex. 15; Grubbs EEO Tr. at 457, Attached
Ex. 14; Grubbs EEO Decl. at 2, Attached Ex. 19; Smith EEO Decl. at ¶ 10, Attached Ex. 20;
Barr EEO Decl. at ¶ 4, Attached Ex. 21.

Statement No. 58: **There are material issues of fact regarding this contention.** While

management claims that Johnston and Williams-Bower were the most "deserving and qualified"

for the accretion of duties promotions, a reasonable jury could find that management improperly

considered who they thought was most "deserving" of the promotions instead of allowing

employees to compete for these positions or considering the position descriptions of the

employees within the division to see if anyone within the division was already performing at the

GS-14 level. *See* Responses to Statements 36, 39, & 40.

There is an issue of fact about whether either Johnston or Williams-Bower was performing at the GS-14 level and therefore neither of them were "qualified or deserving" of a promotion through the accretion of duties process.Johnston's own write-up of his qualifications illustrated that he was not performing at the GS-14 level as he lacked in many of the areas identified by Grubbs' as important for promotion to the GS-14 level. *See* PX 2 (EEOC transcript) at 350-356 (comparing Johnston's write-up with the qualifications set forth in Grubbs' criteria for accretion of duties promotions). For instance, while Johnston asserted that he had "managed and led several large interdisciplinary teams for the development of national environmental policy," the teams are not identified and there is no evidence that they impacted the work of OST. *Id.* at 350. Likewise, his vague assertion that he "coordinated and developed research, field experiences on pollution prevention with water pollution control," is not supported by any specific accomplishments. *Id.* at 351. Johnston asserts that he was a "recognized expert" yet three is no description of his "expertise" or explanation of how it served OST. *Id.* Further, he asserts that he "demonstrated a tendency to deliver a high quality product on time," but fails to give specific examples of what he produced for the EPA and how this positively impacted the work of OST. *Id.* at 352. For "other professional training," Johnston listed "American Society for Testing of Material" and stated that he completed a course in environmental statistics. *Id.* at 353. Yet, no details were provided about what those courses entailed or how many credit hours he got for taking those courses. There is no evidence that Johnston published any scientific or technical articles or made any presentations at seminars or workshops that would have satisfied Grubbs' criteria. *Id.* at 355. Based on Johnston's own write-up of his qualifications, a jury could infer that he did not satisfy the guidelines set forth by

Grubbs and should not have received an accretion of duties promotion, much less a promotion

ahead of Dr. Nwachuku. A jury could therefore reject EPA's assertion that he was promoted

ahead of Dr. Nwachuku because he was already performing at the GS-14 level and she was not.

 With respect to Ms. Williams-Bower, Grubbs asserted that her job entailed managing the

information systems in the office and information security and that because of the nature of her

job, she was "well-known" by management. *Id.* at 465-66. However, when confronted with the

fact that Williams-Bower was not a nationally recognized expert and therefore might not be

qualified for the GS-14 promotion, Grubbs back-pedaled and explained that "nationally

recognized expert" was meant to identify employees who were widely known within the agency

and to identify employees that would come into contact with a broad sphere of people. *Id.* at

509-10. Grubbs admitted that he was not aware of any articles or papers that Williams-Bower

published during her time at EPA and did not know whether she was involved in any agency-

wide task forces or cross program task forces. *Id.* at 514, 515-16. He also admitted that Ms.

Williams-Bower was not involved in the creation or establishment of environmental policy (*id.*

at 515), did not represent the EPA nationally or internationally (*id.*), did not make any

presentations to professional associations, and that it was likely she did not provide any expert

testimony in any litigation. *Id.* In fact, Grubbs' testimony revealed that Williams-Bower's job

mostly involved ministerial tasks such as answering calls at the help desk, taking calls from

people at the EPA who were having computer problems, changing ink cartridges, and ordering

equipment for employees that needed to take work home with them. *Id.* at 516-518. When

asked to justify the Williams-Bower's promotion, Grubbs claimed that she had subject matter

knowledge because of the work she had done for information security and that "there was a lot

of comfort that she could deal with high level people." *Id.* at 521-22.  Even Williams-Bower's

own write-up shows that she lacked the qualifications to be promoted to the GS-14 level.  When

asked to what extent she represented program work, nationally and internationally, Williams-

Bower wrote "I represent OW/OST nationally when I'm in travel attending training sessions,

conferences, and seminars." *Id.* at 523.  However, Grubbs admitted that Williams-Bower did

not deliver substantive work to anyone during trainings, conferences, or seminars.  *Id.* at 524.

Given the fact that Vera Williams-Bower did not have any of the qualifications that Grubbs

identified as important in considering whether an employee should receive an accretion of duties

promotion, a reasonable jury could reject the EPA's claim that she was promoted instead of Dr.

Nwachuku because she was already working at the GS-14 level and Dr. Nwachuku was not.

**Statement No. 59:** The process employed by Mr. Grubbs in selecting Ms. Williams-Bower and
Mr. Carrey Johnston, was a well established process that had largely been used by Mr. Grubbs in
all GS-14/15 advancement processes he chaired as OST Director. *See* Grubbs EEO Decl. at 2, 4-
7,  Attached Ex. 19; Grubbs EEO Tr. at 443-50, Attached Ex. 14.

Statement No. 59: **Immaterial.**  Whether the process Grubbs used to fill the vacant positions in

HECD had been used previously is not material to Nwachuku's discrimination case.  A

reasonable jury could find that this process was a violation of the EPA's Merit Promotion Plan.

*See* Responses to Statements 36, 39, & 40.

**Statement No. 60:** Ms. Williams-Bower and Mr. Johnston were selected from approximately 55
eligible employees in OST. *See* Grubbs EEO Tr. at 458, Attached Ex. 14.

Statement No. 60 **There are material issues of fact regarding this contention**.  A reasonable

jury could reject EPA's assertion that there were 55 eligible employees for accretion of duties

promotions within HECD.  The accretion of duties process requires management to consider

whether the position has accreted, not to identify employees who are "eligible" for promotion.

See PX 18 (HR Policy Bulletin) at 4 (requiring the Agency to consider whether the person being

promoted is performing the duties of the next higher grade and to use the position description of

that grade to justify the promotion). Since no analysis was done to see whether anyone in HECD

was performing at the GS-14 level, there is no way of knowing how many HECD employees

were "eligible" for promotions. *See also* Responses to Statements 36, 39, & 40.

**Statement No. 63:** Ms. Williams-Bower's duties as an Information Technology Specialist
included managing OST's information systems, and implementing various information security
programs, which were vital to OST and in particular EAD due to the office's use of confidential
business information and omnipresent security threats. Grubbs EEO Tr. at 465-67, Attached Ex.
14.

Statement No. 63: **There are material issues of fact regarding this contention and it is**

**immaterial**. While the defendant characterizes Williams-Bower's duties as "vital to OST" in

order to justify her promotion, a reasonable jury could determine that Williams-Bower's job

mostly involved ministerial tasks such as answering calls at the help desk, taking calls from

people at the EPA who were having computer problems, changing ink cartridges, and ordering

equipment for employees that needed to take work home with them. *See* PX 2 (EEOC

transcript) at 516-518. Moreover, it is not material whether Williams-Bower's duties were "vital

to OST" because her promotion was not done in accordance with the EPA Merit Promotion Plan

nor was it properly done through the accretion of duties process. *See* Responses to Statements

36, 39, & 40.

**Statement No. 64**: Ms. Williams-Bower was highly recommended by her first-line supervisor,
Ellen Haffa, and was unanimously endorsed by the selection panel. *See* Haffa EEO Decl. at ¶ 3,
Attached Ex. 31; Barr EEO Decl. at ¶ 4, Attached Ex. 21; Zarba EEO Decl. at ¶ 7, Attached Ex.
15; Grubbs EEO Decl. at 2, Attached Ex. 19.

Statement No. 64: **Immaterial.** It is not material to Nwachuku's discrimination case that

Williams-Bower was "highly recommended" by her supervisor or that the selection panel

unanimously endorsed her, because a reasonable jury could find that the procedures used by the

selection panel were in violation of the EPA's Merit Promotion Plan and the available positions

in OST should have been filled through competition. *See* Responses to Statements 36, 39, & 40.

**Statement No. 67:** As with Ms. Williams-Bower, Mr. Johnston was unanimously endorsed by
the selection panel. *See* Smith EEO Decl. at ¶ 11, Attached Ex. 20; Zarba EEO Decl. at ¶ 8,
Attached Ex. 15; Grubbs EEO Decl. at 2, Attached Ex. 19

Statement No. 67: **Immaterial**.  It is not material to Nwachuku's discrimination case that

Johnston was unanimously endorsed by the selection panel, because a reasonable jury could find

that the procedures used by the selection panel were in violation of EPA's Merit Promotion Plan

and the available positions within OST should have been filled through competition. *See*

Responses to Statements 36, 39, & 40.

**Statement No. 68**: No GS-13 scientists in HECD were recommended for an accretion of duties
promotion in 2003. *See* Zarba Dep. Tr. at 30, Attached Ex. 4; Zarba EEO Tr. at 598-99,
Attached Ex. 23; Zarba EEO Decl. at ¶ 9, Attached Ex. 15; Smith EEO Decl. at ¶ 10, Attached
Ex. 20; Grubbs EEO Tr. at 455, Attached Ex. 14.

Statement No. 68: **Immaterial**.  It is not material that none of the scientists from HECD were

recommended for an accretion of duties promotion because none of the scientists were allowed

to compete for the promotion and a reasonable jury could find that this was a violation of the

EPA's Merit Promotion Plan. *See* Responses to Statements 36, 39, & 40.

**Statement No. 72:** Prior to March 2003 Plaintiff had not engaged in any EEO activities or filed
or sought counseling for any EEO administrative complaints. Nwachuku EEO Tr. at 4-9,
Attached Ex. 3.

Statement No. 72: **There are material issues of fact regarding this contention**.  The grievance

that Plaintiff filed in November of 2001 was protected activity because she alleged she was

discriminated against based on her race and national origin.  Any time an employee complains to

management that she is being discriminated against is sufficient to constitute protected activity.

**Statement No. 74:** Although this Union Grievance alleged discrimination, such grievance was never referred to the EEO or was meant as an EEO complaint. *See id.*

Statement No. 74: **There are material issues of fact regarding this contention**.  *See* Response

to Statement No. 72.

**Statement No. 75:** Plaintiff's Union Grievance (i) was filed almost a year and a half before Mr. Zarba did not recommend a single GS-13 in HECD to Mr. Grubbs for an accretion of duties promotion, and (ii) alleged wrongdoing on the part of Dr. Schoeny and Ms. Wiltse, not Messrs. Zarba or Grubbs. *See id.*; Nwachuku EEO Tr. at 4-9, Attached Ex. 3.

Statement No. 75: **Immaterial.**  While Plaintiff's 2001 Grievance alleged discrimination on the

part of Rita Schoeny and not Zarba or Grubbs, there is evidence that Schoeny was involved in

the recommendation process for the accretion of duties promotions given out in March of 2003.

Zarba admitted that he consulted with Edward Ohanian and Rita Schoeny before making the

decision that no one in HECD deserved an accretion of duties promotion.   PX 20 (Nwachuku

Affidavit 4/30/2004).

**Statement No. 76:** All of Plaintiff's supervisors believed that Plaintiff had problems with her interpersonal skills. *See* Schoeny EEO Decl. at ¶¶ 5-11, Attached Ex. 26; Maciorowski EEO Decl. at ¶¶ 4-8, Attached Ex. 22; Zarba EEO Decl. at ¶¶ 9-10, Attached Ex. 15; Ohanian EEO Decl. at ¶ 8, Attached Ex. 35; Grubbs EEO Decl. at 4-5, Attached Ex. 19; Zarba ROI Decl. at ¶ 6, Attached Ex. 24.

Statement No. 76: **There are material issues of fact regarding this contention**.  There is

evidence that Dr. Nwachuku's supervisors did not complain about her interpersonal skills until

after she filed her EEO complaints and that Nwachuku had a good working relationship with her

coworkers and received excellent performance reviews throughout her time with the Agency.

49

After engaging in protected activity, Nwachuku faced additional scrutiny and negative comments regarding her job performance. For instance, while Doyle gave Dr. Nwachuku excellent performance evaluations during her time in HECD, she later stated that Dr. Nwachuku's working conditions were "chaotic and she feels pressure, but most of the time it is self imposed, because she is not a good time manager and she takes on more work than she can do." PX 26 (Doyle affidavit of 1/6/2005) at 3. Ohanian also criticized Dr. Nwachuku's performance and leadership ability after she filed EEO complaints. According to Ohanian, because of Dr. Nwachuku's one-on-one visits with him, he spent at least 20% of his time with Dr. Nwachuku (PX 27 (Ohanian Affidavit of 1/6/2005) at 3). Ohanian also questioned Dr. Nwachuku's leadership ability, despite her role as CCL3 microbial team leader and her numerous accomplishments on behalf of the EPA. *Id.* at 4. Although Rita Schoeny had given Dr. Nwachuku excellent reviews during her time at EPA and had asked Dr. Nwachuku to be the chair of the CCL group (PX 3 (Schoeny Depo.) at 64-65), she later accused Dr. Nwachuku of being "inappropriate on many occasions" and "argumentative" (*See Id.* at 37) and claimed that the Agency "gave the most serious consideration" to terminating Dr. Nwachuku her during her one-year probationary period because they believed that she was unable to perform the duties of her job. *See* DX 2 at 3; DX 26 (Declaration of Rita Schoeny) at 1. This was not reflected in any of Dr. Nwachuku's evaluations. Dr. Nwachuku received "exceeds expectations" from Schoeny on her 1998 performance appraisal. *Id.* at 4. In fact, despite touting "Nena's technical work" as "excellent" (PX 8 (HQ EPA PERFORMS Appraisal Cover Sheet, 1/25/2002)) and rewarding her with a QSI in 2002 (PX 9 (QSI dated 8/19/2002)), Schoeny stated in her deposition that, "in terms of her scientific acuity and credibility," Dr. Nwachuku was "able, average, but not

50

remarkable" and that in her mind, she ranked" slightly below average amongst our people." PX 3
(Schoeny Depo). at 55, 57; *see also* DX 26 (Declaration of Rita Schoeny) at 3 (claiming that Dr.
Nwachuku's "technical competence is adequate, but not impressive").

     Moreover, several of Dr. Nwachuku coworkers indicated that they had a good working
relationship with her.  For instance, Gerard Stelma, an EPA employee and a member of HECD
who worked with Dr. Nwachuku on the CCL3 workgroup stated, "I believe Dr. Nwachuku and I
have a very good working relationship; she frequently calls me and asks for my opinion on
issues regarding bacterial pathogens."  PX 15 (Stelma Affidavit 8/22/2006) at 2.  Jitendra
Saxena, an EPA employee of the Office of Ground Water and Drinking Water ,who was also on
the CCL3 workgroup, also expressed that he worked well with Dr. Nwachuku.  *See* PX 16
(Saxena Affidavit 8/24/2006) at 2 ("my working relationship with Dr. Nwachuku was very
friendly and professional.") Brenda Mosley, a microbiologist that also works for EPA, stated that
in her dealings with Dr. Nwachuku, she "never found her to be an angry person.  As a matter of
fact, [she] found her to be quite easy to deal with and to work with... she was also cooperative,
collegial.  She was always receptive."  PX 2 (EEOC transcript) at 952.

     Finally, Dr. Nwachuku received excellent performance reviews from throughout her
employment in HECD.  In her 1998 performance appraisal, Dr. Nwachuku was rated "exceeds
expectations" by her first line supervisor, Rita Schoeny.  DX 2 at 4.  On her 1999-2001
performance appraisals, she was consistently given praise for her high quality technical work and
timeliness.  *See id.* at 14-15.  In 2002, Schoeny stated the following on her performance
appraisal:  "Nena's technical work is excellent and has surpassed what she has accomplished last
year and thus far. Her work... is leaving a major impact on regulatory programs and policy in

OW." PX 8 (HQ EPA PERFORMS Appraisal Cover Sheet, 1/25/2002). In fact, Schoeny gave

Dr. Nwachuku a Quality Step Increase (QSI) in 2002 because of her "substantial contribution to

the documentation in support of the regulatory determinations from the Contaminant Candidate

List (CCL1)" and explained that Dr. Nwachuku "was the scientist responsible for developing

and publishing a critical health assessment document on Acanthamoeba...This work set

precedents in EPA microbial assessment." PX 9 (QSI dated 8/19/2002). Dr. Nwachuku was

awarded the Office of Science and Technology Employee of the Quarter for the first quarter of

FY 2002 for her outstanding work in managing the preparation of the "health Effects Document

for Acanthamoeba." PX 10 (Memorandum from Geoffrey Grubbs to OST staff, 2/8/2002).

Elizabeth Doyle, Dr. Nwachuku's supervisor following Rita Schoeny's departure from the

division also gave her outstanding performance appraisals during her time with EPA. For

instance, in 2003, Doyle stated that "Nena is known for expending extra energy and time as

needed to come to a successful evaluation... this year she took a leadership role in the process of

developing a new CCL." PX 11 (HQ EPA PERFORMS Appraisal Cover Sheet, 1/30/2003).

Dr. Nwachuku's expertise was so integral to HECD that her supervisor, Ed Ohanian, referred to

her as a "Senior Microbiologist," touted her expertise in things such as SARS, and offered her as

a resource for scientists from outside the agency. PX 12 (Email from Ed Ohanian to Dennis

Juranek, 5/2/2003). Dr. Nwachuku received similar comments on her scientific acumen and

accomplishments in 2004 (PX 13 (HQ EPA PERFORMS Appraisal Cover Sheet, 2/26/2004))

("As is evidence from the [attached list of performance highlights], she had a highly productive

hear working on a variety of project teams and producing publications and presentations.") and

2005 (PX 14 (HQ EPA PERFORMS Appraisal Cover sheet by Doyle, 3/1/2005)) ("As is evident

from her attached performance highlights, Nena has had a very productive year...She showed

great initiative in developing and coordinating a highly complex activity in a very short

time...She is an asset to HECD.").   In fact, in 2005, Dr. Nwachuku was awarded with the a

Level 1, Science and Technology Achievement Award (STAA), which recognizes EPA

employees who have accomplished an exceptionally high-quality of research or technological

effort, and is recognized as a major scientific achievement within the field.   DX 2 at 26.   None

of Nwachuku's performance evaluations indicated that she had problems with her interpersonal

skills.   As such, a reasonable jury could reject the EPA's assertion that Nwachuku was not

promoted to the GS-14 level because management believed she had poor interpersonal skills.

**Statement No. 77:** Given Plaintiff's problematic interpersonal skills, throughout her time at
EPA numerous employees complained to Plaintiff's supervisors about her. *See* Ohanian Dep. Tr.
at 66-69,  Attached Ex. 5; Doyle Dep. Tr. at 67-69, Attached Ex. 12; Zarba Dep. Tr. at 37-41,
Attached  Ex. 4.

Statement No. 77:. *See* Response to Statement No. 76.

**Statement No. 80**: Prior to the 2003 promotion process, Plaintiff and Dr. Schoeny previously
discussed the competencies for GS-14 and Dr. Schoeny indicated areas in which Plaintiff should
work, including "areas of collaboration for 2001 and beyond mostly with microbiologists in
ORD in Cincinnati." *Id.* at 8.

Statement No. 80: **Immaterial.**  First, whether Nwachuku was collaborating with scientists in

Cincinnati it is not material to her discrimination case because the Agency has not alleged that

Nwachuku was denied a promotion or was terminated because of problems collaborating with

other scientists.   Second, Schoeny's statement that Nwachuku should work on "collaboration for

2001 and beyond with microbiologists in ORD in Cincinnati" does not indicate that she was not

collaborating with these scientists previously or that she somehow was deficient in her job

performance.   In fact, all of Nwachuku's evaluations from Schoeny reflect that Nwachuku was

excelling at her job, including collaborating with other scientists. In her 1998 performance

appraisal, Der. Nwachuku was rated "exceeds expectations" by Schoeny. DX 2 at 4. On her

1999-2001 performance appraisals, she was consistently given praise for her high quality

technical work and timeliness. *See id.* at 14-15. In 2002, Schoeny stated the following on her

performance appraisal: "Nena's technical work is excellent and has surpassed what she has

accomplished last year and thus far. Her work... is leaving a major impact on regulatory

programs and policy in OW." PX 8 (HQ EPA PERFORMS Appraisal Cover Sheet, 1/25/2002).

In fact, Schoeny gave Dr. Nwachuku a Quality Step Increase (QSI) in 2002 because of her

"substantial contribution to the documentation in support of the regulatory determinations from

the Contaminant Candidate List (CCL1)" and explained that Dr. Nwachuku "was the scientist

responsible for developing and publishing a critical health assessment document on

Acanthamoeba...This work set precedents in EPA microbial assessment." PX 9 (QSI dated

8/19/2002).

**Statement No. 86:** Plaintiff was tasked with drafting the Charge and ensuring that the rest of the
CCL Workgroup supported the Charge. *See* Doyle MSPB Tr. at 9, Attached Ex. 36; Nwachuku
Dep. Tr. at 128-29, 135-36, Attached Ex. 1.

Statement No. 86: **There are material issues of fact regarding this contention**. A reasonable

jury could reject the EPA's assertion that the plaintiff was "tasked with drafting the charge and

ensuring that the rest of the workgroup supported the charge" There is evidence that Nwachuku

was working on the charge with help from members of Office of Ground Water and Drinking

Water and the other members of the CCL3 workgroup. In fact, Nwachuku testified that she was

not able to make changes to the charge unilaterally. DX 1 at 129 ("It wasn't Nena that was

working on the charge. It was the entire workgroup, working on the charge, and we had minutes

of the meeting as to what we want to change and what we want to remain.  So it wasn't just me.

They had already worked on the charge.  My responsibility is to ship these things and to the

contractor, the logistics contractor, on Thursday"); *see also* DX 47 (email from Nwachuku to

Doyle, Ohanian, & Burneson) ("please find attached the CCL micro workgroup revised (by the

W/G) agenda and charge.  All the revisions were discussed extensively by the workgroup and

agreed upon by the members on 5/10/06 and 5/17/06"); DX 68 (Contemporaneous notes of Eric

Burneson) ("At this point Nena exclaimed that was ridiculous, that the already distributed charge

had been agreed to by the EPA workgroup).  Nwachuku's role in finalizing the charge was to

incorporate the comments that were agreed upon by the CCL3 workgroup and to get the charge

to the logistics contractor so that it could be distributed to the expert panel in advance of the

June 6, 2006 workshop.  DX 1 at 136.

**Statement No. 90:** Plaintiff had previously attended the annual ASM conference in 2004 and
2005 and wished to go to the 2006 ASM conference. *See* Nwachuku Dep. Tr. at 101, 109, 168-
69, Attached Ex. 1.

Statement No. 90: **There are material issues of fact regarding this contention**.  The plaintiff

mis-characterizes Nwachuku's reasons for attending the ASM conference by stating that she

"wished to go" to the 2006 conference in Orlando.  A reasonable jury could find that presenting

papers at national and international conferences was an important part of Dr. Nwachuku's job at

the EPA because she was acting on behalf of the EPA and discussing the work she did on behalf

of the Agency .  DX 1 at 175.  Because Nwachuku was asked to present a paper at the May 22-

26, 2006 ASM conference in Orlando she had requested that her travel for this trip be authorized

in September or October of 2005, well in advance of the trip *Id.* at 169.

A reasonable jury could also credit Nwachuku's testimony that she was unaware Doyle

had revoked her authorization to travel to the ASM conference.  There is evidence that

Nwachuku was not able to check her emails during the week before she left for the ASM

conference, and did not receive Doyle's email revoking authorization to go to the ASM

conference.  *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also*

PX Doyle Depo. at 141.  Nwachuku has consistently testified that she believed she was

authorized to go to the trip.  DX 1 at 169.  Indeed, when Nwachuku sent out what she believed

to be the final charge on May 19, 2006, the accompanying email, which was also sent to Doyle,

explained that she would be at the ASM conference the following week. See DX 53.

**Statement No. 92**: On Friday, May 12, 2006, Plaintiff emailed the group explaining that she incorporated certain comments, but not others. *See* Email from Ohanian to Nwachuku of 05/14/2006, attaching email from Nwachuku to various of 05/12/2006, Attached Ex. 37.

Statement No. 92: **Immaterial**.  The defendant is being misleading by making this statement.

Whether Nwachuku emailed the workgroup explaining that she had incorporated some

comments and not others is not material to her discrimination case.   At the time that she sent the

email in question, management had not yet emailed Nwachuku requesting that she make the

changes to the charge suggested by Tom Carpenter.


**Statement No. 93:** Specifically, Plaintiff stated that comments from Mr. Carpenter (her co-chair) were not included as they "were not understandable as written," and "some of the changes were already discussed by me at our last meeting[.]" *Id.*

Statement No. 93: **Immaterial.**  While Nwachuku did state that Carpenter's comments were

"not understandable as written" and that "some of the changes were already discussed by me at

our last meeting," this is not material to Nwachuku's discrimination case.  At the time that she

sent the email in question, management had not yet emailed Nwachuku requesting that she make

the changes to the charge suggested by Tom Carpenter. Additionally, Nwachuku's statements

indicate nothing except that the CCL3 workgroup had already discussed the changes suggested

by Carpenter and decided whether they should be incorporated.

**Statement No. 94**: After receiving Plaintiff's email, on Sunday, May 14, 2006, Dr. Ohanian suggested that Plaintiff and he meet with the "major players" to finalize the Charge document. *See* Email from Ohanian to Nwachuku of 05/14/2006, Attached Ex. 37.

Statement No. 94: **There are material issues of fact regarding this contention.** The defendant

mis-characterizes the communications between Nwachuku and Ohanian by stating that Ohanian

"suggested" that he and the plaintiff meet with the major players to finalize the charge. Even

though management claimed that their concerns regarding the charge were important and

Ohanian and Doyle saw Nwachuku everyday at work, all of the communications between

Ohanian and Nwachuku regarding the charge were through email. DX 67 (email from Ohanian

to Nwachuku 6/5/2006); *see also* PX 5 (Ohanian Depo.) at 146-47; DX 36 at 26; DX 61

(Affidavit of Ohanian September 14, 2006); DX 66 (Email from Doyle to Nwachuku

5/30/2006).

Furthermore, a reasonable jury could credit Nwachuku's testimony that she never read

any of the emails sent to her by her supervisors regarding attending meetings about the charge or

making changes to the charge. There is evidence that because of the number of tasks that

Nwachuku had to do to prepare the materials for the experts, she was working in several places

and unable to regularly check her email. *See e.g.* DX 1 at 126, 158 ("I was so overwhelmed with

work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so

many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I

didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was

sick"). She was so busy that on the occasion she would open an email, she would be called

away before she could read it and when she returned to her computer, she was not always able to

continue reading that email because of other work that came up. *Id.* at 167. In fact, Nwachuku's

work was so overwhelming during this time that she only checked emails that had to do with the

contractor and the experts, some of whom were having problems with their travel arrangements.

*Id.* at 130. Nwachuku even sought the help of a colleague to review the CCL materials and

assist her in going through her emails. DX 1 at 152, 155 (testifying that she forwarded Brenda

Mosley emails that she was unable to read so that Mosley could help her go through them).

**Statement No. 95:** The following day, Monday, May 15, 2006, Dr. Doyle responded to
Plaintiff's May 12, 2006, email asking Mr. Carpenter and his first-line supervisor, Eric
Burneson, whether they were content with Plaintiff's response to Mr. Carpenter's comments on
the Charge. *See* Email from Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to
various of 05/15/2006, Attached Ex. 40.

Statement No. 95:  **Immaterial.** While Doyle did write this email, it has no bearing on

Nwachuku's discrimination case because the email merely asked Carpenter and Burneson

whether they were content with the charge as written. At the time of this email, Nwachuku had

not been directed to make any changes to the charge. Furthermore, Nwachuku's response to this

email was to ask Doyle which comments Doyle was referring to specifically. A reasonable jury

could determine from this email that Nwachuku did not understand that management had

concerns over whether Tom Carpenter's comments were incorporated into the final charge.

**Statement No.96**: In that same email, Dr. Doyle informed Plaintiff (i) that Dr. Ohanian and
herself would be providing comments to Plaintiff on Tuesday, May 16, 2006, (ii) that after
incorporating such comments Plaintiff should redistribute the Charge to the CCL Workgroup,
and (iii) that Dr. Doyle wanted to see the comments from Mr. Carpenter that were rejected by
Plaintiff. *Id.*

Statement No.96: **Immaterial.** *See* Response to Statement No. 95.

**Statement No. 97** That same day, Plaintiff replied to Dr. Doyle's email and asked Dr. Doyle, among other things, "[w]hat about you? Do you have any [comments]? If you ever find time for the work please send me your own comments." *Id.*, attaching Email from Nwachuku to various of 05/15/2006.

Statement No. 97: **Immaterial.**  While Nwachuku did write this email, it is not material to

Nwachuku's discrimination case because at the time, management was not directing Nwachuku

to make changes to the charge.  Furthermore, this email by Nwachuku only serves as additional

evidence that Nwachuku was not clear about what comments management had concerns about.

**Statement No. 98**: The next morning, Tuesday, May 16, 2006, Dr. Doyle responded to Plaintiff's email, explaining her concerns that Plaintiff had not incorporated the comments from Mr. Carpenter (who was from the customer, OGWDW). *Id.*, attaching Email from Doyle to Nwachuku of 05/16/2006.

Statement No. 98: **Immaterial.**  While Doyle wrote this email, a reasonable jury could credit

Nwachuku's testimony that she never read it because of her overwhelming workload the week of

May 15, 2003.  *See e.g.* DX 1 at 126, 158 ("I was so overwhelmed with work.  That's constant

hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor,

the contractor's assistant, the workgroup, everybody is calling on Nena.  I didn't have help.  I was

working 19 hours, 16 hours a day, and I didn't have any help, and I was sick").  There is

evidence that Nwachuku was so busy that on the occasion she would open an email, she would

be called away before she could read it and when she returned to her computer, she was not

always able to continue reading that email because of other work that came up.  *Id.* at 167.  In

fact, Nwachuku's work was so overwhelming during this time that she only checked emails that

had to do with the contractor and the experts, some of whom were having problems with their

travel arrangements.  *Id.* at 130.  Nwachuku even sought the help of a  colleague to review the

CCL materials and assist her in going through her emails.  DX 1 at 152, 155 (testifying that she

forwarded Brenda Mosley emails that she was unable to read so that Mosley could help her go

through them).

**Statement No. 99:** Plaintiff forwarded this email from Dr. Doyle and the other emails contained
in the email string to her friend Brenda Mosley. *See* Email from Nwachuku to Mosley of
05/16/2006, Attached Ex. 40; Nwachuku Dep. Tr. at 152, Attached Ex. 1

Statement No. 99:  **There are material issues of fact regarding this contention**.  First, the

defendant is purposefully misleading when it characterizes Ms. Mosley as the plaintiff's

"friend."   While Nwachuku testified that she considered Mosley a friend, her testimony clarifies

that she was a coworker who Nwachuku considered a friend because she took the time from her

day to assist her with work related matters.  *See Id.* at 152 ("I would call her a friend just like

other people who have taken their time in Cincinnati to review my documents").

Furthermore, a reasonable jury could credit Nwachuku's testimony that Nwachuku only

forwarded Mosley emails because she was unable to read them herself due to her overwhelming

work load.  DX 1 at 152, 154-155 (testifying that she forwarded Brenda Mosley emails that she

was unable to read so that Mosley could help her go through them).  Nwachuku testified that she

forwarded these emails to Mosley because she had often assisted the CCL3 workgroup by

reviewing materials that were produced by workgroup members. *Id.*

**Statement No. 100:** In Dr. Doyle's email, Dr. Doyle also explained that she needed to hear from
OGWDW to see if they concurred with Plaintiff's handling of their comments, and if not, the
Charge would have to be negotiated with them. *Id.*

Statement No. 100: **Immaterial.** *See* Response to Statement No. 98.

**Statement No. 101:** Dr. Doyle further emphasized that the CCL Workgroup must be given a
further opportunity to review the draft Charge before it was distributed to the outside experts,
and recommended that if Plaintiff felt she had insufficient time before Friday, May 19, 2006, to
complete the Charge, that she might consider working on the document the following week. *Id.*

Statement No. 101: **Immaterial.** See Response to Statement No. 98.

**Statement No. 102:** The following week was when the 2006 ASM conference was scheduled, which Plaintiff wanted to attend. *See* Nwachuku Dep. Tr. at 114-15, 168-69, Attached Ex. 1; Doyle Dep. Tr. at 130, Attached Ex. 12.

Statement No. 102: **There are material issues of fact regarding this contention**. The plaintiff mis-characterizes Nwachuku's reasons for attending the ASM conference by stating that she "wanted to attend" to the 2006 conference in Orlando. Nwachuku testified that she "wanted" to go to the conference, but clarified that this was because two of her papers were selected for presentations at the conference, she was supposed to be there, and she believed she was authorized to go. *See* DX 1 at 169. Additionally, a reasonable jury could find that presenting papers at national and international conferences was an important part of Dr. Nwachuku's job at the EPA because she was acting on behalf of the EPA and discussing the work she did on behalf of the Agency . DX 1 at 175. Because Nwachuku was asked to present a paper at the May 22-26, 2006 ASM conference in Orlando she had requested that her travel for this trip be authorized in September or October of 2005, well in advance of the trip *Id.* at 169.

A reasonable jury could also credit Nwachuku's testimony that she was unaware that Doyle had revoked her authorization to travel to the ASM conference. There is evidence that Nwachuku was not able to check her emails during the week before she left for the ASM conference, and did not read Doyle's email revoking authorization to go to the ASM conference. *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141. Nwachuku has consistently testified that she believed she was authorized to go to the trip. DX 1 at 169. Indeed, when Nwachuku sent out what she believed to be the final

charge on May 19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at the ASM conference the following week. *See* DX 53.

**Statement No. 104:** Mr. Burneson further explained that OGWDW believed that Mr. Carpenter's prior comments were appropriate and would help clarify the Charge. *See id.* Plaintiff was included as a recipient on such email. *See id.*

Statement No. 104: **Immaterial.** A reasonable jury could determine that Nwachuku did not read this email because of her overwhelming work load. *See e.g.* DX 1 at 126, 158 ("I was so overwhelmed with work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was sick"). She was so busy that on the occasion she would open an email, she would be called away before she could read it and when she returned to her computer, she was not always able to continue reading that email because of other work that came up. *Id.* at 167. In fact, Nwachuku's work was so overwhelming during this time that she only checked emails that had to do with the contractor and the experts, some of whom were having problems with their travel arrangements. *Id.* at 130. Nwachuku even sought the help of a colleague to review the CCL materials and assist her in going through her emails. DX 1 at 152, 155 (testifying that she forwarded Brenda Mosley emails that she was unable to read so that Mosley could help her go through them).

**Statement No. 105:** After receiving Mr. Burneson's email, Dr. Doyle responded to the distribution, which included Plaintiff. *See* Email from Doyle to various of 05/16/2006, Attached Ex. 42.

Statement No. 105: **Immaterial.** *See* Response to Statement No. 106.

**Statement No. 106:** Dr. Doyle wrote that she agreed with Mr. Burneson's assessment that Mr. Carpenter's changes seemed to clarify the Charge, and directed Plaintiff to make Mr. Carpenter's changes and circulate the revised Charge to the CCL Workgroup. *See id.*

Statement No. 106: **Immaterial.** The defendant is misleading when stating that Doyle

"directed" Nwachuku to make changes to the charge. In fact, the only form of communication

that Doyle used to give instruction to Nwachuku was through email. Even after Dr. Nwachuku's

supervisors spent the week of May 22 preparing to take actions against her for going out of town

without their permission, none of them discussed with her face-to-face when she returned from

the ASM trip in Florida. PX 4 (Doyle Depo.) at 183. Even one day before the panel was to

convene, Ohanian emailed Dr. Nwachuku with the "revised" charge and asked her to distribute it

to the expert panel. DX 67 (email from Ohanian to Nwachuku 6/5/2006); *see also* Ohanian

Depo. at 146-47; DX 36 at 26 ("I sent an email to Ed and also talked to him direct- Ed Ohanian-

and asked him to contact her and order her to send forward the revised charge. He sent her

emails."); DX 61 (Affidavit of Ohanian September 14, 2006)(describing the emails that he sent

Dr. Nwachuku emails regarding the revised charge); DX 66 (Email from Doyle to Nwachuku

5/30/2006) ("By way of this email, I am directing you to send the attached, revised charge to the

panel with notification to the panel that this version supercedes the one that you sent them

previously.").

Furthermore, a reasonable jury could find that here is an issue of fact Nwachuku never

read the emails she was sent regarding the charge because of her overwhelming workload. *See*

*e.g.* DX 1 at 126, 158

**Statement No. 107:** That same day, Tuesday, May 16, 2006, after not hearing a response from
Plaintiff, Dr. Doyle sent Plaintiff an email informing Plaintiff that she could not sign off on

Plaintiff's travel to the ASM conference "until you have resolved the issues around the charge to the CCL Panel." *See* Email from Nwachuku to Mosley of 05/16/2006, attaching Email from Doyle to Nwachuku of 05/16/2006, Attached Ex. 43.

Statement No. 107: **Immaterial.** While Doyle wrote this email, a reasonable jury could determine that Nwachuku did not read it because of the overwhelming work she was doing preparing for the expert panel. *See e.g.* DX 1 at 126, 158

**Statement No. 108:** Dr. Doyle further instructed Plaintiff to "[p]lease read my emails and attend to the matter promptly." *Id.*

Statement No. 108: **Immaterial.** See Response to Statement No. 107.

**Statement No. 109:** Plaintiff subsequently forwarded this email to her friend Ms. Mosley. *Id.*

Statement No. 109: **There are material issues of fact regarding this contention**. First, the defendant is purposefully misleading when it characterizes Ms. Mosley as the plaintiff's "friend."   While Nwachuku testified that she considered Mosley a freind, her testimony clarifies that she was a coworker who Nwachuku considered a friend because she took the time from her day to assist her with work related matters.  *See Id.* at 152 ("I would call her a friend just like other people who have taken their time in Cincinnati to review my documents").

Furthermore, a reasonable jury could credit Nwachuku's testimony that she only forwarded Mosley emails because she was unable to read them herself due to her overwhelming work load.  DX 1 at 152, 154-155 (testifying that she forwarded Brenda Mosley emails that she was unable to read so that Mosley could help her go through them).  Nwachuku testified that she forwarded these emails to Mosley because she had often assisted the CCL3 workgroup by reviewing materials that were produced by workgroup members. *Id.*

**Statement No. 110:** The next morning, Wednesday, May 17, 2006, after not hearing a response to any of her directions to Plaintiff, Dr. Doyle emailed Dr. Ohanian (Dr. Doyle's supervisor), cc'ing Plaintiff and informing Dr. Ohanian that Plaintiff had not as of then incorporated OGWDW's comments into the draft Charge and that a meeting with Pam Barr to finalize the Charge scheduled for Thursday, May 18, 2006, would not be fruitful if OGWDW's comments were not resolved by that point. *See* 1st Email from Doyle to Ohanian, Nwachuku of 05/17/2006, Attached Ex. 44.

Statement No. 110: **Immaterial.** *See* Response to Statement 107.

**Statement No.111:** In response, Dr. Ohanian agreed with Dr. Doyle that if OGWDW's comments were not resolved, then the Pam Barr meeting would not be productive. *See* 2d Email from Doyle to Ohanian, Nwachuku of 05/17/2006, attaching email from Ohanian to Doyle, Nwachuku of 05/17/2006, Attached Ex. 45.

Statement No.111: **Immaterial.** *See* Response to Statement 107.

**Statement No. 112:** Still hearing no response from Plaintiff, Dr. Doyle again contacted Plaintiff on Wednesday, May 17, 2006, and told her that a meeting had been scheduled with Plaintiff and OGWDW the following morning at 11:00 a.m. to resolve OGWDW comments. *See* 3d Email from Doyle to Nwachuku of 05/17/2006, Attached Ex. 46.

Statement No. 112: **Immaterial.** There is evidence that Nwachuku was unaware that the

meeting was to take place at 11:00 because she was too busy to keep up with her emails (*see e.g.*

DX 1 at 130) and because she did not know that the managers thought there were problems with

the charge that had been finalized by the CCL3 workgroup. *See e.g. id.* at 147.

**Statement No. 113:** Dr. Doyle also sent Plaintiff an electronic meeting notice for this meeting. *See id.* In her email, Dr. Doyle again told Plaintiff that "I can not (sic) approve your travel request for next week if we are unable to come to agreement with OGWDW in the person of Eric Burneson tomorrow at 11:00." *Id.*

Statement No. 113: **Immaterial.** *See* Response to Statement No. 112.

**Statement No. 114:** On the evening of Wednesday, May 17, 2006, at 8:56 p.m., without replying to Dr. Doyle's prior emails or resolving the issues with the OGWDW comments,

Plaintiff sent via email a revised charge to Drs. Ohanian and Doyle and Mr. Burneson. *See* Email from Nwachuku to various of 05/17/2006, Attached Ex. 47

Statement No. 114: **Immaterial.**  A reasonable jury could conclude that plaintiff sent the revised charge to management on May 17, 2006 because she was not aware that management wished her to make additional changes to the charge and credit Nwachuku's testimony that she had not read the emails directing her to make such changes.  *See e.g.* DX 1 at 30.

**Statement No. 115:** Plaintiff claims that although she was reading certain emails during this time, and was responsible for the CCL Workgroup Charge, she was not necessarily reading emails from her first-line or second-line supervisor relating to the Charge or the CCL Workgroup because she was overwhelmed. *See* Nwachuku Dep. Tr. at 126-27, 179, Attached Ex. 1.

 Statement No. 115: **There are material issues of fact regarding this contention.**  The defendant is misleading by insinuating that the plaintiff was ignoring emails from her first and second-line supervisors regarding the charge.  A reasonable jury could credit Nwachuku's testimony that she was so overwhelmed with work during this time that she only emails dealing with the charge that were from either the contractor and the experts, some of whom were having problems with their travel arrangements.  DX 1 at 130.

**Statement No. 116:** Plaintiff forwarded an email from Dr. Doyle to her friend Ms. Mosley in which Dr. Doyle specifically informed Plaintiff that she would not be authorized to travel to the ASM conference unless OGWDW's concerns with the Charge were addressed. *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 43.

Statement No. 116: **There are material issues of fact regarding this contention.**  First, the defendant is purposefully misleading when it characterizes Ms. Mosley as the plaintiff's "friend."  While Nwachuku testified that she considered Mosley a freind, her testimony clarifies

that she was a coworker who Nwachuku considered a friend because she took the time from her

day to assist her with work related matters.  *See Id.* at 152 ("I would call her a friend just like

other people who have taken their time in Cincinnati to review my documents").

Furthermore, a reasonable jury could credit Nwachuku's testimony that Nwachuku only

forwarded Mosley emails because she was unable to read them herself due to her overwhelming

work load.  DX 1 at 152, 154-155 (testifying that she forwarded Brenda Mosley emails that she

was unable to read so that Mosley could help her go through them).  Nwachuku testified that she

forwarded these emails to Mosley because she had often assisted the CCL3 workgroup by

reviewing materials that were produced by workgroup members. *Id.*

**Statement No. 117:** In certain emails, Dr. Doyle was specifically responding to questions posed
directly by Plaintiff in previous emails, one of which Plaintiff subsequently forwarded to her
friend Ms. Mosley. *See* Email from Nwachuku to Mosley of 05/16/2006, Attached Ex. 40.

Statement No. 117: **Immaterial.**  Whether or not Doyle's emails were in response to questions

posed by Nwachuku is not material to her discrimination case because Nwachuku has presented

evidence that she did not read those emails due to her overwhelming schedule in preparation for

the expert panel.  *See e.g.* DX 1 at 30. Additionally, the fact that Nwachuku forwarded some

emails to Mosley is not material because there is evidence that she forwarded those emails to

Mosley precisely because she had no time to read the emails herself.  DX 1 at 152, 154-155

(testifying that she forwarded Brenda Mosley emails that she was unable to read so that Mosley

could help her go through them).

**Statement No. 118:** The subjects of Dr. Doyle's emails specifically referred to the Charge, the
June Workshop, the CCL Workgroup, and/or Plaintiff's travel to the ASM conference. *See*
Attached Exs. 40-46.

Statement No. 118: **Immaterial.** The subject of Doyle's emails to Nwachuku is not material to Nwachuku's discrimination case because there is evidence that Nwachuku did not read those emails due to her overwhelming schedule in preparation for the expert panel. *See e.g.* DX 1 at 30.

**Statement No. 119:** "Everyone in HECD knows how strict and dedicated I am about my work and that Nena keeps all the records." *See* Nwachuku EEO Decl. at 47, Attached Ex. 2.

Statement No. 119: **Immaterial.** Nwachuku made this statement when she was describing how she keeps records of compliance with small purchase invoices and why she was so upset that Doyle and Ohanian had refused to inform her that it appeared as though her compliance rate was only 33%. *See* DX 2 at 47. This statement was in no way related to Nwachuku's practices with regards to her emails.

**Statement No. 120:** Plaintiff is very email literate. *See* Doyle Dep. Tr. at 113, Attached Ex. 12

Statement No. 120: **Immaterial.** Whether Doyle believes that Nwachuku is email literate is not material to her discrimination case. A reasonable jury could credit Nwachuku's testimony that she was not able to keep up with her emails during the time in question because she was receiving hundreds of emails and was working from several different locations preparing for the June 6, 2006 workshop. *See e.g.* DX 1 at 126, 158 ("I was so overwhelmed with work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I didn't have any help, and I was sick").

**Statement No. 121:** Plaintiff did her best to check her emails. *See* Excerpt from Pl's Resp. to Def's Reqs. to Admit, No. 14.

Statement No. 121: **Immaterial.**  Whether plaintiff did her best to check her emails is not

material to Nwachuku's discrimination case given the evidence that despite her best efforts,

Nwachuku was unable to keep up with the number of emails she was receiving the weeks before

the expert workshop in addition to the work she had to do to prepare for the panel.  *See e.g.* DX

1 at 126, 158

**Statement No. 122:** The ASM conference was important to Plaintiff. *See* Nwachuku Dep. Tr. at
169, Attached Ex. 1.

Statement No. 122: **There are material issues of fact regarding this contention**.  The

defendant is being misleading my making it appear as if the reason the plaintiff went to the ASM

conference was that it was "important" to her.  A reasonable jury could credit the plaintiff's

testimony that presenting papers at national and international conferences was an important part

of Dr. Nwachuku's job at the EPA because she was acting on behalf of the EPA and discussing

the work she did on behalf of the Agency.  *See* DX 1 at 175.  Because Nwachuku was asked to

present a paper at the May 22-26, 2006 ASM conference in Orlando she had requested that her

travel for this trip be authorized in September or October of 2005, well in advance of the trip  *Id.*

at 169.

A reasonable jury could also find that Nwachuku was unaware that Doyle had revoked

her authorization to travel to the ASM conference.  There is evidence that Nwachuku was not

able to check her emails during the week before she left for the ASM conference, and did not

receive Doyle's email revoking authorization to go to the ASM conference.  *See e.g.* DX 1 at

151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141.

Nwachuku has consistently testified that she believed she was authorized to go to the trip.   DX 1

at 169. Indeed, when Nwachuku sent out what she believed to be the final charge on May 19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at the ASM conference the following week. *See* DX 53.

**Statement No.126:** Plaintiff submitted her work through Dr. Doyle. *See id.* at 153-54.

Statement No.126: **There are material issues of fact regarding this contention.** A reasonable jury could reject the EPA's assertion that plaintiff submitted all of her work to Doyle and credit Nwachuku's testimony that Doyle did not have to approve the final version of the charge that was prepared for the expert panel. *See* DX 1 at 137.

**Statement No. 128:** Early on the morning of Thursday, May 18, 2006, Dr. Ohanian and Dr. Doyle exchanged emails, in which Dr. Ohanian asked if the Charge sent by Plaintiff the previous evening resolved the issues with OGWDW, and Dr. Doyle explained that it did not. See 1st Email from Doyle to various of 05/18/2006, attaching Email from Ohanian to various of 05/18/2006, Attached Ex. 49.

Statement No. 128: **Objection.** The emails speak for themselves.

**Statement No. 129:** In her email, Dr. Doyle informed Dr. Ohanian that she, Plaintiff and OGWDW were meeting later that morning at 11:00 a.m. in an attempt to resolve their differences concerning the Charge. *Id.*

Statement No. 129: **Objection.** *See* Response to Statement No. 128.

**Statement No. 130:** Plaintiff did not show up for the 11:00 a.m. meeting with OGWDW. *See* 2d Email from Doyle to various of 05/18/2006, Attached Ex. 50.

Statement No. 130: **Immaterial.** Plaintiff did not show up for the 11:00 meeting because she was unaware that it was going on and she was out on sick leave that morning. DX 1 at 147.

**Statement No. 131:** In response to Plaintiff's non-attendance, Dr. Doyle wrote an email to Dr. Ohanian and Ms. Barr, cc'ing Plaintiff and Mr. Burneson and informing them that Plaintiff did

not show-up for the 11:00 a.m. meeting with OGWDW and, thus, the meeting with Ms. Barr later that day should be cancelled. *Id.*

Statement No. 131: **Objection.** The email speaks for itself.

**Statement No. 132:** Plaintiff claims that she was sick and was out on sick leave until later in the day on Thursday, May 18, 2006. See Nwachuku Dep. Tr. at 147-48, Attached Ex. 1.

Statement No. 132: **There are material issues of fact regarding this contention.** There is no

evidence to dispute that the plaintiff was sick and out on sick leave the morning of May 18,

2006. Nwachuku testified that she had called Sherry Howard, the same person she had always

contacted when she was going to be out of the office, at 5:30 in the morning to explain that she

would be in later in the day. DX 1 at 147.

**Statement No. 133:** Dr. Doyle wrote Plaintiff an email at 1:42 a.m. on Thursday, May 18, 2006, specifically informing Plaintiff that because the Charge was not completed as per OGWDW's concerns, " I [Dr. Doyle] regret that I can not (sic) authorize your travel for next week." Email 3d Doyle to Nwachuku of 05/18/2006, Attached Ex. 51.

Statement No. 133: **There are material issues of fact regarding this contention.** While Doyle

wrote this email, a reasonable jury could credit Nwachuku's testimony that she did not read this

email because of her overwhelming work load the weeks leading up to the expert panel. *See e.g.*

DX 1 at 126, 158.

**Statement No. 134:** Dr. Doyle went on to expressly state that "I want to remind you that you do not have authorization to travel on government [funds]." *Id.*

Statement No. 134: **There are material issues of fact regarding this contention.** *See*

Response to Statement No. 133.

**Statement No. 135:** Dr. Doyle told Plaintiff in person, after Plaintiff arrived in the office on

Thursday, May 18, 2006, at approximately 4:30 p.m., that Plaintiff was not authorized to go to ASM conference, or expend any government funds on travel to such conference. *See* Doyle MSPB Decl. at ¶¶ 3-5, Attached Ex. 52.

Statement No. 135: **There are material issues of fact regarding this contention**. A reasonable

jury could reject the EPA's assertion that Doyle approached the plaintiff in-person and told her

that she could not attend the ASM conference and instead credit Nwachuku's testimony that she

did not have the time to read her emails while she was preparing the materials for the expert

panel, and therefore did not learn that Dr. Doyle had revoked authorization for her to go to the

ASM conference. *See* DX 1 at 151 ("I have, oh, about 500-and-something [emails] that I

wouldn't be opened, and during this time... I was in several places), 169 (testifying that she

believed she was approved to go on the trip and believed that it was important to go because she

was representing the EPA on work she had done at the Agency)

**Statement No. 136:** After having this face-to-face conversation with Plaintiff, Dr. Doyle left for the weekend as she was on an alternative work schedule and was off on Friday, May 19, 2006. *See* Doyle Dep. Tr. at 44, Attached Ex. 12.

Statement No. 136: **There are material issues of fact regarding this contention**. A reasonable

jury could reject the EPA's assertion that the plaintiff had a face-to-face conversation with Doyle

about the ASM conference. *See* Response to Statement No. 135.

**Statement No. 137:** Plaintiff spoke with Dr. Doyle after she arrived in the office in the afternoon of May 18, 2006. *See* Nwachuku Dep. Tr. at 211, Attached Ex. 1.

Statement No. 137: **There are material issues of fact regarding this contention**. The

defendant is being misleading by stating that the plaintiff "spoke with Dr. Doyle after she arrived

in the office in the afternoon of May 18, 2006." When she returned to the office after being on

sick leave, Nwachuku was sitting in the hallway next to the copy machine xeroxing packets to be

sent to the experts and sorting papers on the floor, when Doyle came out of her office and saw

that Dr. Nwachuku was there. *Id* at 212-214. Doyle came up behind Dr. Nwachuku and began

yelling at her about not showing up to the meeting earlier that day. *See* DX 70 (Email from

Nwachuku to Pam Parker 5/30/2006); *see also* DX 1 at 217. Then, Doyle grabbed Dr.

Nwachuku's arm and swung her around in her office chair so that she was facing Doyle. *Id.* at

225-226. Doyle was angry that Dr. Nwachuku had not called her directly about being on sick

leave that morning and said that Dr. Nwachuku should only report to Doyle when she was going

to be out of the office. *Id.* Dr. Nwachuku tried to explain that she called Sherry Howard, as she

always had done, to explain that she would be out of the office for a doctor's appointment. *Id.* at

219. However, Doyle screamed at Dr. Nwachuku until Dr. Nwachuku was in tears. *Id.* at 218.

Dr. Nwachuku was afraid for her safety because she had never been grabbed by a supervisor

before. *Id.* at 228 ("I was so afraid. I was trying to explain to her that I went to the doctor and

that I called in sick"); *see also* DX 70 (email from Nwachuku to Parker 5/30/3006). A

reasonable jury could credit Nwachuku's testimony regarding this incident and reject Doyle's

assertion that she informed Nwachuku on May 18 that she would not be able to attend the ASM

conference.

**Statement No. 138:** Based upon Plaintiff's general practice, if she saw an email regarding her
potential travel to the ASM conference, she would have opened it. *See id.* at 176.

Statement No. 138: **Immaterial**. While the plaintiff testified it would have been her regular

practice to check an email regarding travel to the ASM conference, a reasonable jury could credit

her testimony that she did not read the email sent to her by Doyle revoking authorization for her

to go to the ASM conference, and therefore find that Nwachuku was unaware that she was not

authorized to go on the trip. *See* DX 1 at 151 ("I have, oh, about 500-and-something [emails]

that I wouldn't be opened, and during this time... I was in several places), 169 (testifying that she

believed she was approved to go on the trip and believed that it was important to go because she

was representing the EPA on work she had done at the Agency)

**Statement No. 139:** On Friday, May 19, 2006, Plaintiff distributed to the experts and logistics contractor the draft Charge without OGWDW's comments ("Draft Charge"). *See* Email from Ohanian to various of 05/20/2006, attaching Email from Nwachuku to various of 05/19/2006, Attached Ex. 53.

Statement No. 139: **There are material issues of fact regarding this contention.**  Plaintiff did

distribute the charge on May 19, 2006 without Tom Carpenter's changes, however, there is no

evidence that Nwachuku left out all the comments of the Office of Ground Water and Drinking

Water (OGWDW).  Nwachuku testified that she prepared the charge with help from individuals

from the Office of Ground Water and Drinking Water and the other members of the CCL3

workgroup.  *Id.* at 118.  This group had been working on the charge for several months (Doyle

Depo. at 125) and it had gone through at least four revisions during that time period. DX 1 at

129 ("we were the ones who had already worked on the charge.  We had worked on it four times

already, and it was ready").

**Statement No. 140:** After Mr. Burneson received Plaintiff's email on Monday, May 22, 2006, and noticed that the distributed Draft Charge did not contain OGWDW's comments, he discussed the matter with Dr. Doyle, and Dr. Doyle subsequently sent an email to the workgroup, experts and contractor indicating that the Draft Charge was not final and that a revised Charge would be forthcoming. *See* Burneson MSPB Tr. at 141-42, Attached Ex. 54.

Statement No. 140: **There are material issues of fact regarding this contention.**  While Doyle

did send an email to the workgroup stating that the charge sent out on May 19, 2006 was not the

final charge, the plaintiff has no knowledge of the conversations that Doyle and Burneson had

regarding the charge.  It is up for a jury to decide whether this conversation took place in the

manner proscribed by the defendant.

**Statement No.141:** Also on Friday, May 19, 2006, Plaintiff arranged travel through Rogers
Travel, EPA's contracted travel agent, to attend the 2006 ASM conference in Orlando, Florida.
*See* Nwachuku Dep. Tr. at 125, Attached Ex. 1.

Statement No.141: **There are material issues of fact regarding this contention**.  Plaintiff

made her travel arrangements for the trip to Orlando prior to May 19, 2006.  However, on May

19, 2006, Nwachuku had received a call explaining that Rodgers travel was unable to reach

Sherry Howard, the person at the Agency that approved funding for employees that did not have

government credit cards.  DX 1 at 117- 118.  Nwachuku was told that Rodgers travel had been

unable to reach Ms. Howard, and therefore did not have the number they needed to process the

travel request.  *Id.*  Nwachuku was unaware of what number was needed to book the trip, but

understood that because Ms. Howard could not be reached, the ticket to Orlando had not yet

been purchased.  *Id.* at 118.  When she investigated Ms. Howard's whereabouts, Nwachuku

learned that Ms. Howard was out of the office that day. *Id.* at 120.  Because Ms. Howard would

not be able to give the travel agent the number that was needed, Dr. Nwachuku gave the agent

her personal credit card information so that the trip could be charged to her own account.  *Id.* at

115, 120-21; DX 57 (Declaration of Scott Sylvester)("Prior to ticketing, the reservation was

documented by Anthony, on May 19, 2006, that Nena indicated that she had already purchased a

ticket on her own personal credit card with Southwest.").  However, she received a call two

hours later explaining that everything had been resolved. *Id.* at 116, 122. Two days after her

credit card was charged, the charges were reversed. *Id*. at 122.

**Statement No. 142:** Specifically, on May 19, 2006, Plaintiff concedes that in a series of phone
calls with Rodgers Travel she learned that Rodgers Travel was attempting to reach Sherry
Howard, the individual in OST responsible for travel billing, and coordinating with EPA's
administrative offices in Cincinnati to obtain billing approval for Plaintiff's scheduled travel to
the ASM Conference. *See* Nwachuku Dep. Tr. at 119, 122, Attached Ex. 1.

Statement No. 142: **There are material issues of fact regarding this contention**. Plaintiff did

receive a call from the agent at Rodgers Travel explaining that Sherry Howard could not be

reached. However, a reasonable jury could credit the plaintiff's testimony that she did not

understand that Rodgers Travel did not have billing approval for the trip. Nwachuku testified

that the agent from Rodgers travel called her and told her that she needed a number from Sherry

Howard in order to process the travel request. DX 1 at 118. She also testified that she was

unaware of what number was needed to book the trip, but understood that because Ms. Howard

could not be reached, the ticket to Orlando had not yet been purchased. *Id.*

**Statement No. 143**: Plaintiff never informed Rodgers Travel that her first-line supervisor had
directly told her that she was not authorized to book travel using government funds. *See* Doyle
MSPB Decl. at ¶¶ 12-13, Attached Ex. 52; Williams MSPB Decl. at ¶¶ 2-5, Attached Ex. 55.

Statement No. 143: **There are material issues of fact regarding this contention**. The

defendant is being misleading by stating that Nwachuku did not tell the Rodgers Travel agent

that she was "not authorized to book travel using government funds." A reasonable jury could

find that the plaintiff did not know that her authorization for the trip to the ASM conference had

been revoked and therefore find that Nwachuku could not have told the agent that information.

*See* DX 1 at 151, 169 (testifying that she believed she was approved to go on the trip and

76

believed that it was important to go because she was representing the EPA on work she had done at the Agency). Furthermore, there is evidence that Sarah Williams, the Federal representative in Cincinnati who was responsible for arranging travel for EPA employees, was the one who ultimately authorized Nwachuku's travel. Sarah Williams herself testified that on the Friday before Dr. Nwachuku was to depart for Florida, she had received a call from a representative from Rodgers Travel, Anthony Crisomia, who explained that he did not have the proper paperwork to process Dr. Nwachuku's travel request. DX 55 (Declaration of Sarah Williams) at 1. After speaking with Mr. Crisomia, Williams tried to reach four different people at the EPA to confirm that the travel was authorized. *Id.* However, she was not able to reach anyone at the Agency. *Id.* As such, Williams "made a command decision to advise Rodgers Travel to acquire the airline tickets and charge their cost to EPA's account."

**Statement No. 149**: Ms. Williams was unable to contact any of Plaintiff's supervisors, and relying upon the assumption that Plaintiff submitted her travel request in good faith, approved Rodgers Travel to book Plaintiff's travel. *Id.* at ¶ 5.

**Statement No. 149**: **There are material issues of fact regarding this contention**. A reasonable jury could find that the plaintiff did submit her travel request in good faith. The plaintiff did not know that she was no longer authorized to go on the trip to the ASM conference and therefore could not have told the agent that information. *See* DX 1 at 151, 169 (testifying that she believed she was approved to go on the trip and believed that it was important to go because she was representing the EPA on work she had done at the Agency). Furthermore, there is evidence that Sarah Williams, the Federal representative in Cincinnati who was responsible for arranging travel for EPA employees, was the one who ultimately authorized Nwachuku's

travel. Sarah Williams herself testified that on the Friday before Dr. Nwachuku was to depart

for Florida, she had received a call from a representative from Rodgers Travel, Anthony

Crisomia, who explained that he did not have the proper paperwork to process Dr. Nwachuku's

travel request. DX 55 (Declaration of Sarah Williams) at 1. After speaking with Mr. Crisomia,

Williams tried to reach four different people at the EPA to confirm that the travel was

authorized. *Id.* However, she was not able to reach anyone at the Agency. *Id.* As such,

Williams "made a command decision to advise Rodgers Travel to acquire the airline tickets and

charge their cost to EPA's account."

**Statement No. 150**: Plaintiff implicitly or explicitly informed Rodgers Travel that she had
authority to travel. *Id.* at ¶¶ 14-15; *see also* Sylvester MSPB Decl. at ¶ 6, Attached Ex. 57
(Plaintiff never informed Rodgers Travel that she lacked authority to travel, "Rodgers Travel
took Dr. Nwachuku at her word that she was authorized to travel to Orlando"); Doyle MSPB
Decl. at ¶¶ 13-14, Attached Ex. 52.

Statement No. 150: **There are material issues of fact regarding this contention.** There is no

evidence that the plaintiff discussed whether she was authorized to travel to Orlando during her

phone conversations with the agent from Rodgers Travel. There is evidence that the only thing

plaintiff discussed with the agent from Rodgers Travel was the fact that Sherry Howard was out

of the office and therefore could not give the travel agent the number needed to book the ticket.

DX 1 at 118 (testifying that she was unaware of what number was needed to book the trip, but

understood that because Ms. Howard could not be reached, the ticket to Orlando had not yet

been purchased). Additionally, a reasonable jury could credit Nwachuku's testimony that she

did not know that her authorization for the trip to the ASM conference had been revoked, and

therefore find that Nwachuku had no reason to discuss with the travel agent whether she was

authorized to go.  *See* DX 1 at 151, 169 (testifying that she believed she was approved to go on
the trip and believed that it was important to go because she was representing the EPA on work
she had done at the Agency).

Furthermore, there is evidence that Sarah Williams, the Federal representative in
Cincinnati who was responsible for arranging travel for EPA employees, was the one who
ultimately authorized Nwachuku's travel.  Sarah Williams herself testified that on the Friday
before Dr. Nwachuku was to depart for Florida, she had received a call from a representative
from Rodgers Travel, Anthony Crisomia, who explained that he did not have the proper
paperwork to process Dr. Nwachuku's travel request.  DX 55 (Declaration of Sarah Williams) at
1.  After speaking with Mr. Crisomia, Williams tried to reach four different people at the EPA to
confirm that the travel was authorized.  *Id.*  However, she was not able to reach anyone at the
Agency.  *Id.*  As such, Williams "made a command decision to advise Rodgers Travel to acquire
the airline tickets and charge their cost to EPA's account."  *Id.*

**Statement No. 152:** As noted on such forms, Plaintiff's 2004 request was signed and approved
by Drs. Ohanian and Doyle in advance of the 2004 ASM conference. *See id.* at 2-3. Indeed,
Plaintiff acknowledged that the travel forms are prepared "to make sure . . . that it [travel] is
approved." Nwachuku Dep. Tr. at 109, Attached. Ex. 1.

Statement No. 152: **There are material issues of fact regarding this contention.**  The
defendant is seeking a favorable inference that Nwachuku was aware that she needed to have
certain forms filled out before she could travel on behalf of the EPA.  However, all inferences
must be made in favor of the defendant at the summary judgment stage.  *See Adickes v. S.H.
Kress & Co. ,* 398 U.S. 144, 157 (1970); *Washington Post Co. v. United States Dep't of Health
and Human Srvs. ,* 865 F.2d 320, 325 (D.C. Cir. 1989).

Second, the defendant purposefully left out a portion of Nwachuku's testimony in order to be misleading. Nwachuku's actual testimony was that the travel forms were prepared, "to make sure that this is not a new travel, that it is approved." A reasonable jury could find from this testimony that Nwachuku believed that the forms were only necessary if the travel was not approved previously. However, plaintiff's travel was approved previously, and a reasonable jury could find that because of that fact, Nwachuku did not know that she had to have the forms filled out before she departed for her trip. Nwachuku's travel was first approved in September or October of 2005, when she first informed the EPA that two of her papers were selected for presentation at the 2006 ASM conference in Orlando. PX 1 at 169.

Furthermore, a reasonable jury could credit Nwachuku's testimony that she believed the trip had been approved (DX 1 at 169 (testifying that she believed she was approved to go on the trip and believed that it was important to go because she was representing the EPA on work she had done at the Agency)) and find that Sarah Williams actually approved Nwachuku's travel on May 19, 2006. (DX 55 at 1 (testifying that she made a "command" decision to advise Rodgers Travel to acquire the airline tickets and charge their cost to EPA's account). This is sufficient to create an issue of material fact about whether Nwachuku knew she had to have her travel forms signed by her supervisor before she departed.

**Statement No. 155:** Although a Traveler Authorization Form and Advance of Funds Application were prepared for Plaintiff's travel to the 2006 ASM conference, they were never signed or authorized by any of Plaintiff's supervisors, let alone before she departed for the 2006 ASM conference. *See* Draft 2006 ASM Travel Request Forms, Attached Ex. 60.

Statement No. 156: See Response to Statement No. 152.

80

**Statement No. 156**: Plaintiff knew that she had not obtained authorization for travel funds to attend the 2006 ASM conference. *See also* Williams MSPB Decl. at ¶¶ 20-21, Attached Ex. 55 (explaining that no documentation authorizing Plaintiff's travel was ever submitted to OCFO); Doyle 2d MSPB Decl. at ¶¶ 9-11, Attached Ex. 56 (Plaintiff had previously followed process to request funds in prior travel requests).

Statement No. 156: A reasonable jury could conclude that the plaintiff did have authorization for travel funds to attend the 2006 ASM conference.  Sarah Williams testified that she approved the travel funds on May 19, 2006 after being unable to get in touch with any of the plaintiff's supervisors about the travel.  DX 55 at 1.  Furthermore, the plaintiff testified that she did not know that Doyle had revoked authorization for her to go on the trip to Orlando. *See* DX 1 at 169.

**Statement No. 158:** Plaintiff used tickets obtained without authorization from Rodgers Travel and paid for by the EPA to attend the 2006 ASM conference in Orlando, Florida. *See* Nwachuku Dep. Tr. at 122, Attached Ex. 1 (Plaintiff concedes that EPA eventually paid for the tickets); Williams MSPB Decl. at ¶¶ 15-16, Attached Ex. 55 (Plaintiff used tickets paid for by EPA); Sylvester MSPB Decl. at ¶ 7, Attached Ex. 57 (Tickets booked by Rodgers Travel were used).

Statement No. 158: **There are material issues of fact regarding this contention.**  A reasonable jury could find that the plaintiff did have authorization from Rodgers Travel for the tickets she used to go to the 2006 ASM Conference.  Sarah Williams testified that she approved the travel funds on May 19, 2006 after being unable to get in touch with any of the plaintiff's supervisors about the travel.  DX 55 at 1.  *See also* Response to Statement No. 152.

**Statement No. 159:** On Monday, May 22, 2006, the first business day following Plaintiff's flight to Orlando, Dr. Doyle discovered that Plaintiff had indeed traveled to the ASM conference without authorization. *See* Doyle MSPB Decl. at ¶ 6, Attached Ex. 52.

Statement No. 159: **There are material issues of fact regarding this contention.**  It is up for the jury to decide whether to credit Doyle's testimony that she first learned Nwachuku was on

81

the trip to Orlando on Monday, May 22, 2006. There is evidence that Nwachuku had notified

her supervisors that she was going on the trip and because a message had been left on Doyle's

voicemail by Sarah Williams informing her of Nwachuku's departure. *See* DX 52. Furthermore,

a reasonable jury could find that the trip was authorized because Williams testified that she

approved Nwachuku's travel when she was unable to reach plaintiff's supervisors regarding the

travel arrangements. DX 55 at 1. Nwachuku also testified that she did not know that Doyle had

revoked authorization for her to go on the trip to Orlando. *See* DX 1 at 169.

**Statement No. 160**: Dr. Doyle proceeded to talk with Dr. Ohanian to be sure that he had not
subsequently authorized Plaintiff's travel to Orlando after Dr. Doyle's email and face-to-face
instructions. *See id.* at ¶ 8.

Statement No 160: **There are material issues of fact regarding this contention**. The plaintiff

has no knowledge of the conversations that took place between Ohanian and Doyle in her

absence. It is up to a jury to decide whether this conversation took place in the manner

proscribed by the defendant.

Additionally, a reasonable jury could reject Doyle's claim that she told Nwachuku that

she was not authorized to go to the ASM conference in a face-to-face conversation. The plaintiff

testified that she was not approached by Doyle in person and told that she could not attend the

ASM conference. She also testified that because she did not have the time to read her emails

while she was preparing the materials for the expert panel, she did not find out that Dr. Doyle

had revoked authorization for her to go to the ASM conference. *See* DX 1 at 151 ("I have, oh,

about 500-and-something [emails] that I wouldn't be opened, and during this time... I was in

several places), 169 (testifying that she believed she was approved to go on the trip and believed

that it was important to go because she was representing the EPA on work she had done at the

Agency).

Finally, there is an issue of fact regarding whether the trip to Orlando was unauthorized.

because Williams testified that she approved Nwachuku's travel when she was unable to reach

plaintiff's supervisors regarding the travel arrangements. DX 55 at 1.

**Statement No. 161:** Thereafter, Dr. Doyle called Ms. Williams, who had left a message for Dr.
Doyle the previous Friday, to inquire into the situation and inform Ms. Williams that Plaintiff's
travel was unauthorized. *See id.* at ¶¶ 7, 9-15; Williams MSPB Decl. at ¶¶ 6-7, Attached Ex. 55.

Statement No. 161: **There are material issues of fact regarding this contention.** A reasonable

jury could find that the real reason Doyle called Williams was to gather evidence to use against

Nwachuku and not to figure out whether Nwachuku had gone on unauthorized travel.    Doyle

testified that the reason called Williams was that she wanted to document the fact that Dr.

Nwachuku had gone on the trip to Florida so that she could take some sort of adverse action

against her. PX 4 at 171 ("I wanted to make sure that she actually was in the wrong as I

suspected and not make any kind of misstep, you know, that was improper);174 ("the reason I

wanted to do it that way was because I anticipated I would take some form of disciplinary

action).

**Statement No. 163:** On or about May 22, 2006, Dr. Doyle called the ASM conference contact
number and asked them to post a message on the conference message board for Plaintiff to
immediately call Dr. Doyle. *See* Proposed Removal (without supporting documentation) at 4,
Attached Ex. 62.

Statement No. 163: **Immaterial.** Whether Doyle called the ASM conference contact number to

ask them to post a message for the plaintiff is not material to the plaintiff's discrimination case

because Nwachuku there is no evidence that Nwachuku ever saw the message posted on the

message board or that Nwachuku knew she was on AWOL during the week of May 22 through

May 26, 2006.

**Statement No. 164:** On or about May 22, 2006, Dr. Doyle sent Plaintiff an email telling Plaintiff she was on travel without authorization. *See* Email from Doyle to Nwachuku of 05/23/2006, Attached Ex. 63.

Statement No. 164: **Immaterial.**  Whether Doyle sent plaintiff an email telling her that she was

on travel without authorization is not material to the plaintiff's discrimination case because

Doyle knew that plaintiff was out of town for the ASM conference and that she would be unable

to check her email.  There is no evidence that the plaintiff received this email while she was in

Florida for the ASM conference or that she knew she had been placed on AWOL in her absence.

**Statement No. 165**: Plaintiff failed to ever respond to the message left on the ASM message board or to Dr. Doyle's email. *See* Proposed Removal at 4, Attached Ex 62.

Statement No. 165: *See* Response to Statement No. 164.

**Statement No. 167:** When Ms. Moss reached Plaintiff on her cell phone and conveyed Dr. Doyle's instruction for Plaintiff to call Dr. Doyle immediately, Plaintiff refused to speak about the matter and instead only offered to speak about the pending seat selection process in HECD. *See* Moss MSPB Decl. at ¶¶ 5, 7, Attached Ex. 64.

Statement No. 167: **There is an issue of material fact regarding this contention.** It is up for a

jury to decide whether this conversation took place in the manner proscribed by the defendant.

**Statement No. 168**: Plaintiff was absent without leave and on unauthorized travel from Monday, May 22, 2006, until Friday, May 26, 2006. *See* Proposed Removal at 4, Attached Ex. 62.

Statement No. 168: **There is an issue of material fact regarding this contention**.  While

Nwachuku was placed on AWOL for the week of May 22 through May 26, 2006, a reasonable

jury could credit the plaintiff's testimony that she believed that her travel to the ASM conference

in Orlando was authorized.  *See* DX 1 at 151, 169.  Additionally, a reasonable jury could find

that the travel was authorized given the testimony of Sarah Williams that she "made the

command decision" to authorize the EPA to pay for the plaintiff's travel funds.  DX 55 at 1.

**Statement No. 169:** When Plaintiff returned to work on Tuesday, May 30, 2006 (the Monday
was Memorial Day), she refused to speak to any of her supervisors about her previous week's
absence. *See id.* at 2.

Statement No. 169: **There is an issue of material fact regarding this contention**.  Other than

the bald statement of Doyle that Nwachuku refused to speak about her trip to the ASM

conference, there is no evidence that this occurred.  There is no evidence that Nwachuku knew

she had been placed on AWOL during her absence.

**Statement No. 170:** During Plaintiff's unauthorized leave, after discussing the Draft Charge, Dr.
Doyle and Messrs. Burneson and Carpenter incorporated OGWDW's comments into the Draft
Charge that Plaintiff improperly distributed on May 19, 2006. *See* Burneson MSPB Tr. at 141-
42, Attached Ex. 54; Doyle MSPB Tr. at 24-25, Attached Ex. 36.

Statement No. 170: **There are issues of material fact regarding this contention**.  While

Doyle, Burneson, and Carpenter did make changes to the charge document in Nwachuku's

absence, there are issues of fact regarding whether plaintiff was on unauthorized leave and

whether she improperly distributed the charge on May 19, 2006.  A reasonable jury could

determine that Nwachuku was unaware that Doyle had revoked her authorization to travel to the

ASM conference.  There is evidence that Nwachuku was not able to check her emails during the

week before she left for the ASM conference, and did not receive Doyle's email revoking

authorization to go to the ASM conference. *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141. Nwachuku has consistently testified that she believed she was authorized to go to the trip. DX 1 at 169. Indeed, when Nwachuku sent out what she believed to be the final charge on May 19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at the ASM conference the following week. *See* DX 53.

Furthermore, there is evidence that Sarah Williams, the Federal representative in Cincinnati who was responsible for arranging travel for EPA employees, was the one who ultimately authorized Nwachuku's travel. Sarah Williams herself testified that on the Friday before Dr. Nwachuku was to depart for Florida, she had received a call from a representative from Rodgers Travel, Anthony Crisomia, who explained that he did not have the proper paperwork to process Dr. Nwachuku's travel request. DX 55 (Declaration of Sarah Williams) at 1. After speaking with Mr. Crisomia, Williams tried to reach four different people at the EPA to confirm that the travel was authorized. *Id.* However, she was not able to reach anyone at the Agency. *Id.* As such, Williams "made a command decision to advise Rodgers Travel to acquire the airline tickets and charge their cost to EPA's account."

Finally, a reasonable jury could find that when Nwachuku sent the charge to the logistics contractor on May 19, 2006, she believed that it was the final draft and that it was ready to be distributed to the experts who would be attending the June 6, 2006 panel. *See* DX 53. Nwachuku testified that she believed it was the final charge because the workgroup had approved that charge. DX 1 at 129 ("It wasn't Nena that was working on the charge. It was the entire workgroup, working on the charge, and we had minutes of the meeting as to what we want

86

to change and what we want to remain. So it wasn't just me. They had already worked on the charge. My responsibility is to ship these things and to the contractor, the logistics contractor, on Thursday"); *see also* DX 47 (email from Nwachuku to Doyle, Ohanian, & Burneson) ("please find attached the CCL micro workgroup revised (by the W/G) agenda and charge. All the revisions were discussed extensively by the workgroup and agreed upon by the members on 5/10/06 and 5/17/06"); DX 68 (Contemporaneous notes of Eric Burneson) ("At this point Nena exclaimed that was ridiculous, that the already distributed charge had been agreed to by the EPA workgroup).

**Statement No. 171:** After Dr. Doyle and Mr. Burneson became comfortable with the revised Charge, they met with Ms. Barr, while Plaintiff was on unauthorized leave, and obtained her approval of the revised Charge. *See* Burneson MSPB Tr. at 143, Attached Ex. 54.

Statement No. 171: There are issues of material fact regarding this contention. While this meeting did take place, a reasonable jury could determine that the plaintiff was not on unauthorized leave the week of May 22 through May26, 2006. *See* Response to Statement No. 170.

**Statement No. 172**: Upon Plaintiff's return to the office on May 30, 2006, she was provided the revised charge with OGWDW's comments ("Revised Charged") and instructed to email the Revised Charge to the workgroup, experts and contractors. *See* Email from Doyle to various of 05/30/2006, Attached Ex. 66; Doyle MSPB Tr. at 25-26, Attached Ex. 36.

Statement No. 172: **There are issues of material fact with regard to this contention.** The defendant is misleading by stating that the plaintiff was "provided with the revised charge" when she returned to the office on May 30, 2006. Even after Dr. Nwachuku's supervisors spent the week of May 22 preparing to take actions against her for going out of town without their

permission, none of them discussed with her face-to-face when she returned from the ASM trip in Florida. Doyle Depo. at 183. Even one day before the panel was to convene, Ohanian emailed Dr. Nwachuku with the "revised" charge and asked her to distribute it to the expert panel. DX 67 (email from Ohanian to Nwachuku 6/5/2006); *see also* Ohanian Depo. at 146-47; DX 36 at 26 ("I sent an email to Ed and also talked to him direct- Ed Ohanian- and asked him to contact her and order her to send forward the revised charge. He sent her emails."); DX 61 (Affidavit of Ohanian September 14, 2006)(describing the emails that he sent Dr. Nwachuku emails regarding the revised charge); DX 66 (Email from Doyle to Nwachuku 5/30/2006) ("By way of this email, I am directing you to send the attached, revised charge to the panel with notification to the panel that this version supercedes the one that you sent them previously.").

Furthermore, a reasonable jury could find that it was not until the morning of June 6, 2006, the day of the expert panel, that Dr. Nwachuku first learned that the charge had been revised by management in her absence. Doyle Depo. at 187 ("when we appeared there, she did not know we were going to [distribute the revised charge.]"). Dr. Nwachuku was excited that the experts had made it to the workshop and was in the conference room greeting them before the panel was to convene. DX 1 at 235. She was called outside the meeting room to have a conversation with Doyle, Ohanian, Tom Carpenter, and Eric Berneson. Ohanian Depo. at 150, 156; Doyle Depo. at 185. Pam Barr, the division director of the Office of Ground Water and Drinking Water, joined this conversation as it was taking place. Doyle Depo. at 185. It was then that Dr. Nwachuku was told that the charge had been revised while she was away at the ASM conference. DX 1 at 234. As such, there is an issue of material fact about whether Nwachuku was "provided" with the revised charge prior to this meeting.

88

**Statement No. 174:** On Monday, June 5, 2006, realizing that Plaintiff had not distributed the Revised Charge, Dr. Doyle emailed Dr. Ohanian, cc'ing Plaintiff, and asked for his assistance in directing Plaintiff to distribute the Revised Charge. *See* Email from Ohanian to various of 06/05/2006, attaching Email from Doyle to Ohanian, Nwachuku of 06/05/2006, Attached Ex. 67; Doyle MSPB Tr. at 26-27, Attached Ex. 36.

Statement No. 174: **Objection.** The email speaks for itself.

**Statement No. 175**: Ohanian then emailed Plaintiff and reiterated the instruction to distribute the Revised Charge. *See id.* Plaintiff refused to respond to her supervisors' direct instructions and did not distribute the Revised Charge. *See* Doyle Dep. Tr. at 187, Attached. Ex. 12; Ohanian MSPB Decl. at ¶¶ 1-2, Attached Ex. 61.

Statement No. 175: **Objection.** The email speaks for itself.

**Statement No. 176:** Because Plaintiff refused to distribute the Revised Charge, Dr. Doyle came to the June Workshop, which was scheduled to begin on Tuesday, June 6, 2006, with copies of the Revised Charge to hand out at the commencement of the workshop. *See* Doyle Dep. Tr. 186-87, Attached Ex. 12; Doyle MSPB Tr. at 27-29, Attached Ex. 36; Burneson Notes of 06/06/2006 at 2, Attached Ex. 68.

Statement No. 176: **There are issues of material fact with regard to this contention**. While Doyle did bring copies of the revised charge to the workshop, a reasonable jury could reject the EPA's assertion that the plaintiff "refused" to distribute the revised charge. She did not know that the charge had been revised until she arrived at the June 6, 2006 workshop. *See* Response to Statement No. 172.

**Statement No. 177:** When Plaintiff learned of Dr. Doyle's intent to distribute the Revised Charge to the group at the June Workshop, she became angry. Doyle Dep. Tr. at 186-87, Attached Ex. 12.

Statement No. 177. **There are issues of material fact with regard to this contention**. Dr. Nwachuku had a conversation with her managers about whether the charge needed to be revised

and which version would be distributed to the experts. However, a reasonable jury could creidt

Nwachuku's testimony that because they were outside the room where all the experts were

sitting, she did not raise her voice or make a scene. DX 1 at 235-37. Nwachuku testified that

she was not upset about the charge being revised because she was too excited for the panel to

begin and she was happy that the experts had arrived. *Id.* at 234. Additionally, Nwachuku

testified that the changes that management had made to the charge in Nwachuku's absence were

minor and non-substantive. *Id.*

**Statement No. 179:** When Plaintiff was informed by Drs. Doyle and Ohanian and Mr. Burneson that the Revised Charge would be circulated, Plaintiff became very agitated at Dr. Doyle. *See id.* Plaintiff began to shout at Dr. Doyle, stepped close to Dr. Doyle, and waved her finger in Dr. Doyle's face. *Id.*

Statement No. 179.  **There are issues of material fact with regard to this contention**.

Nwachuku had a conversation with her managers about whether the charge needed to be revised

and which version would be distributed to the experts. However, a reasonable jury could credit

Nwachuku's testimony that because they were outside the room where all the experts were

sitting, she did not raise her voice or make a scene. DX 1 at 235-37. Nwachuku testified that

she was not upset about the charge being revised because she was too excited for the panel to

begin and she was happy that the experts had arrived. *Id.* at 234. Nwachuku specifically denied

getting in Doyle's face or being asked to "step back" during this conversation. *Id.* at 236.

Additionally, Nwachuku testified that the changes that management had made to the charge in

Nwachuku's absence were minor and non-substantive. *Id.*

**Statement No. 180:** At one point, Dr. Ohanian told Plaintiff to step back from Dr. Doyle. Despite Plaintiff's hostile tone and behavior, Dr. Doyle kept her composure and responded calmly to Plaintiff's aggression. *See id.*

Statement No. 180: There are issues of material fact regarding this contention. See Response to Statement 179.

**Statement No. 181**: After Plaintiff returned to work on May 30, 2006, and was directed to circulate the Revised Charge, Plaintiff sent an email to Pam Parker, a Workplace Violence Policy contact at EPA, alleging that Dr. Doyle assaulted Plaintiff during a conversation with Dr. Doyle on May 18, 2006. *See* Email from Nwachuku to Parker of 05/30/2006, Attached Ex. 70.

Statement No. 181: **There are issues of material fact regarding this contention**. While the plaintiff did make a complaint to Pam Parker on May 30, 3006 regarding workplace violence, there is an issue of fact about whether the plaintiff was directed to circulate the revised charge. *See* Response to Statement No. 172.

**Statement No. 182:** Plaintiff claimed that Dr. Doyle touched and threatened Plaintiff and waved her finger at Plaintiff wildly. *See id.*

Statement No. 182: **There are issues of material fact with regard to this contention**. A reasonable jury could credit the plaintiff testimony that on May 18, 2006, Nwachuku was sitting in the hallway next to the copy machine xeroxing packets to be sent to the experts and sorting papers on the floor, when Doyle came up behind Dr. Nwachuku and began yelling at her about missing a meeting earlier that day. *See* DX 1 at 212, 212-214, 217; DX 70. Then, Doyle grabbed Nwachuku's arm and swung her around in her office chair so that she was facing Doyle. *Id.* at 225-226. Doyle yelled at her for being on sick leave. *Id.* Nwachuku tried to explain that she had called in, as she always had done in the past, and had only come in because she had a 4:00 p.m. meeting, but Doyle kept screaming at her *Id.* at 218-219. As a result, Nwachuku was afraid for her safety and in tears. *Id.* at 218, 228; DX 70. A jury could credit Nwachuku's testimony regarding this incident and find that Doyle assaulted the plaintiff. *See Haynes v.*

*Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's personal testimony cannot be

inadequate to raise a genuine issue regarding his 'own experience.'").

**Statement No. 183:** Plaintiff claimed that this incident occurred in the only face-to-face meeting she and Dr. Doyle had on May 18, 2006. *See* Nwachuku Dep. Tr. at 211, Attached Ex. 1.

Statement No. 183: **There are issues of material fact with regard to this contention.**  A

reasonable jury could credit the plaintiff's testimony regarding this incident and find that Doyle

assaulted the plaintiff.  *See Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's

personal testimony cannot be inadequate to raise a genuine issue regarding his 'own

experience.'").

**Statement No. 185:** Dr. Doyle denied that any such incident took place, but agrees that she and Plaintiff had just a single conversation on that day, within which Dr. Doyle informed Plaintiff that she was not authorized to go to the 2006 ASM conference. *See* Doyle Dep. Tr. at 146-50, Attached Ex. 12.

Statement No. 185: **There are issues of material fact regarding this contention.**  While Doyle

does deny that the incident took place, there is an issue of fact about what occurred during the

conversation between Nwachuku and Doyle.  Nwachuku testified that on May 18, 2006, she was

sitting in the hallway next to the copy machine xeroxing packets to be sent to the experts and

sorting papers on the floor, when Doyle came up behind Dr. Nwachuku and began yelling at her

about missing a meeting earlier that day.  *See* DX 1 at 212, 212-214, 217; DX 70.  Then, Doyle

grabbed Nwachuku's arm and swung her around in her office chair so that she was facing Doyle.

*Id.* at 225-226.   Doyle yelled at her for being on sick leave.  *Id.*  Nwachuku tried to explain that

she had called in, as she always had done in the past, and had only come in because she had a

4:00 p.m. meeting, but Doyle kept screaming at her  *Id.* at 218-219.  As a result, Nwachuku was

afraid for her safety and in tears.  *Id.* at 218, 228; DX 70.  A jury could credit Nwachuku's

testimony regarding this incident and find that Doyle assaulted the plaintiff.  *See Haynes v.*

*Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's personal testimony cannot be

inadequate to raise a genuine issue regarding his 'own experience.'").

Furthermore, a reasonable jury could reject the EPA's claim that Doyle told Nwachuku

that she was not authorized to go to the ASM conference.  There is evidence that because Dr.

Nwachuku did not have the time to read her emails while she was preparing the materials for the

expert panel, she did not find out that Dr. Doyle had revoked authorization for her to go to the

ASM conference.  *See* DX 1 at 151 ("I have, oh, about 500-and-something [emails] that I

wouldn't be opened, and during this time... I was in several places), 169 (testifying that she

believed she was approved to go on the trip and believed that it was important to go because she

was representing the EPA on work she had done at the Agency).

**Statement No.186:** Dr. Dana Thomas, a colleague of Plaintiff's in HECD, witnessed the alleged
incident. *See* Thomas MSPB Decl. at ¶ 4, Attached Ex. 72.

Statement No. 186: **There is an issue of material fact regarding this contention.**  A

reasonable jury could credit Nwachuku's testimony that there were no witnesses to the May 18,

2006 incident between Doyle and Nwachuku.  *See Haynes v. Williams*, 392 F.3d 478, 482 (D.C.

Cir. 2004) ("a plaintiff's personal testimony cannot be inadequate to raise a genuine issue

regarding his 'own experience.'").  First, Doyle did not tell the investigator who was looking into

the incident, Maria Gomez-Taylor, that Thomas may have witnessed the interaction between

herself and Dr. Nwachuku until June 8th, three days after she initially met with her about the

incident.  DX 71 (Report on Investigation on Allegations Stated in Nena's Note to Ephraim

King) at 3 ("Beth was not sure if there was a witness when I first interviewed her.  Beth told me

on June 8 that she remembers that there was someone at the copier and she believes it was Dana

Thomas.") Given that Doyle claimed to have remembered more about the incident three days

after she gave her original statement, a reasonable jury could reject Doyle's claim that she

remembered Thomas being present during the confrontation.

Second, when Thomas was interviewed, she was unable to remember the day that she

recalled seeing Dr. Nwachuku and Doyle talking in the corridor.  *See* DX 72 (Declaration of

Dana Thomas) at 1 ("I distinctly remember overhearing a conversation between Nena and

Elizabeth while I made copies at the xerox machine *around* the date and time in

question)(emphasis added); *see also* Thomas Depo. at 34 ("The date, I wasn't sure when I was

talking to Maria").  Even when she was deposed in 2008, Thomas was not sure that the

interaction she witnessed took place on May 18, 2006, the date that Dr. Nwachuku alleges Doyle

assaulted her in the office ("I'm pretty sure that it was on that date, but I think I wrote 'on or

around' to leave myself some uncertainty that it may not have been May 18th").

**Statement No. 187:** Specifically, Dr. Thomas recalls observing a conversation between Plaintiff
and Dr. Doyle on or about Thursday, May 18, 2006, in the proximity of the Xerox machine in
OST's office space. *See id.*

Statement No. 187: There is an issue of material fact regarding this contention.  A reasonable

jury could determine that Thomas does not recall when she witnessed Doyle and Nwachuku

having a conversation.  When Thomas was interviewed, she was unable to remember the day

that she recalled seeing Dr. Nwachuku and Doyle talking in the corridor.  *See* DX 72

(Declaration of Dana Thomas) at 1 ("I distinctly remember overhearing a conversation between

Nena and Elizabeth while I made copies at the xerox machine *around* the date and time in

question)(emphasis added); *see also* Thomas Depo. at 34 ("The date, I wasn't sure when I was

talking to Maria").  Even when she was deposed in 2008, Thomas was not sure that the

interaction she witnessed took place on May 18, 2006, the date that Dr. Nwachuku alleges Doyle

assaulted her in the office ("I'm pretty sure that it was on that date, but I think I wrote 'on or

around' to leave myself some uncertainty that it may not have been May 18th").

**Statement No. 188:** Although Dr. Thomas does not recall the topic of the conversation, she
recalls that Plaintiff had an abrasive demeanor, and that Dr. Doyle was extremely composed. *Id.*

Statement No. 188: **There is a material issue of fact regarding this contention.**  While

Thomas claims to remember the incident that took place between Doyle and Nwachuku on May

18, 2008, a reasonable jury could find that she did not witness this event, and therefore reject her

claims that during the confrontation, the plaintiff was abrasive while Doyle was composed.  See

Response to Statement No. 187.

**Statement No. 189:** Dr. Thomas distinctly recalls thinking that "this must be the reason why
[Dr. Doyle] recently won a manager of the year award." *Id.*

Statement No. 189: **There is an issue of material fact regarding this contention**.  While

Thomas claims to remember what she was thinking while witnessing the May 18, 2006 incident,

a reasonable jury could find that she did not witness this event.  See Response to Statement No.

187.

**Statement No. 190:** Dr. Doyle recalls Dr. Thomas being in the vicinity when Dr. Doyle told
Plaintiff on May 18, 2006, that she would not be permitted to attend the 2006 ASM conference.
*See* Doyle Dep. Tr. at 133-34, Attached Ex. 12.

Statement No. 190: **There are issues of material fact regarding this contention**.  A reasonable

jury could reject Doyle's claim that she recalls Thomas being present during the May 18, 2006

incident and instead credit Nwachuku's testimony that there were no witnesses to this

confrontation. *See Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("a plaintiff's

personal testimony cannot be inadequate to raise a genuine issue regarding his 'own

experience.'").  Doyle did not tell the investigator who was looking into the incident, Maria

Gomez-Taylor, that Thomas may have witnessed the interaction between herself and Dr.

Nwachuku until June 8th, three days after she initially met with her about the incident.  DX 71

(Report on Investigation on Allegations Stated in Nena's Note to Ephraim King) at 3 ("Beth was

not sure if there was a witness when I first interviewed her.  Beth told me on June 8 that she

remembers that there was someone at the copier and she believes it was Dana Thomas.") Given

that Doyle claimed to have remembered more about the incident three days after she gave her

original statement, a reasonable jury could reject Doyle's claim that she remembered Thomas

being present during the confrontation.

Furthermore, there is an issue of fact about whether Doyle ever told Nwachuku that she

was not authorized to go to the ASM conference.  There is evidence that because Dr. Nwachuku

did not have the time to read her emails while she was preparing the materials for the expert

panel, she did not find out that Dr. Doyle had revoked authorization for her to go to the ASM

conference.  *See* DX 1 at 151 ("I have, oh, about 500-and-something [emails] that I wouldn't be

opened, and during this time... I was in several places), 169 (testifying that she believed she was

approved to go on the trip and believed that it was important to go because she was representing

the EPA on work she had done at the Agency).

**Statement No. 191:** After being forwarded Plaintiff's violence in the workplace allegations,
Maria Gomez-Taylor, the then Deputy Director of HECD, conducted an inquiry into Plaintiff's
allegations and concluded that there was no violence in the workplace by Dr. Doyle. *See* Memo
from Gomez-Taylor to Ohanian rev. 06/12/2006, Attached. Ex. 71.

Statement No. 191: **There is an issue of material fact with regard to this contention and it is immaterial**. While Gomez did issue a report finding that there was no violence in the workplace, a reasonable jury could find that Gomez-Taylor did not conduct a fair and unbiased inquiry into the situation before making that conclusion and that she credited the white manager's account of events . There is evidence that Gomez-Taylor contacted Thomas three weeks after the incident took place and gave her information about it before she made her statement. See PX 42 at 27-30. Additionally, Gomez-Taylor did not inform Nwachuku that Doyle had identified Thomas as a witness three days after Doyle gave her original statement or give Nwachuku a chance to respond to this claim. *See* DX 71.

Finally, whether whether Gomez-Taylor determined that there was no violence in the workplace is not material to Nwachuku's discrimination case. It was improper for Doyle to use Nwachuku's complaint against her as a reason for terminating her from the EPA. The fact that she did so is further evidence that Doyle was retaliating against Nwachuku when she proposed her termination from the Agency.

**Statement No. 192**: On July 11, 2006, after careful consideration, Dr. Doyle proposed Plaintiff's removal from the EPA. *See* Proposed Removal at 1, Attached Ex. 62.

Statement No. 192: **There is an issue of material fact regarding this contention.** While Doyle did propose Nwachuku's termination on July 11, 2006, a reasonable jury could reject EPA's assertion that it was done after careful consideration because there is evidence that the Doyle's true motivation for proposing Nwachuku's termination was discrimination and retaliation. Doyle's claims regarding Dr. Nwachuku's wrongful conduct indicate the proposed removal was at least partly based on Doyle's reaction to Nwachuku filing complaints against her with the

Agency. Indeed, Doyle specifically refers to Dr. Nwachuku's "harassment complaint" in the Proposed Removal. *See* PX 41 (Proposed Removal) at 5-6. A jury could reject Doyle's self-serving assertion that she "behaved at all times in a professional and courteous manner" and credit Dr. Nwachuku's testimony that Doyle was abusive, that she physically assaulted her, made her fearful, and caused her to cry. *Id.* Moreover, Doyle was also displeased because the settlement agreement resulting from a grievance filed by Dr. Nwachuku and other foreign born women required her to respond to communications by Dr. Nwachuku within 24 hours and she considered that unduly burdensome. *See* PX 4 (Doyle Depo.) At 91-102. Additionally, a jury could find that Doyle lied when she claimed that management took efforts to limit the gossip surrounding Nwachuku's allegedly unauthorized trip to the ASM conference (See PX 41 (Proposed termination) at 8) because Doyle herself told numerous staff members at the EPA that Nwachuku was on unauthorized travel to Florida. *See e.g.* PX 4 (Doyle Depo.) at 155-157, 169. As such, a jury could conclude that Doyle spread the gossip around the agency and then used the notoriety of the offense as a pretext to terminate Nwachuku

A reasonable jury could also reject the EPA's reasons for terminating Nwachuku as false and therefore determine that they were pretextual. First, there is evidence that Dr. Nwachuku did not refuse to obey management's order to revise the "charge" because she was unaware of the order. She has testified that she was not able to check her email due to the overwhelming amount of work that she was doing in preparation for the expert panel. *See e.g.* DX 1 at 158 ("I was so overwhelmed with work. That's constant hours so overwhelmed with emails from everybody, 12 experts, from so many– the contractor, the contractor's assistant, the workgroup, everybody is calling on Nena. I didn't have help. I was working 19 hours, 16 hours a day, and I

didn't have any help, and I was sick"); DX 1 at 126 ("I wasn't checking all my email. I was checking specifically my emails for the experts... I was working in five different locations and was xeroxing). Notwithstanding this fact, even though they worked in the same office, Doyle sent e-mails to her directing her to make changes to the "charge" document without talking to her or confirming that she had received those emails. Moreover, Nwachuku had informed King of this breakdown in communications prior to her termination. Based upon this evidence, a juror could conclude that the insubordination charge against Nwachuku was pretextual. *See also* DX 47.

Second, there is also an issue of fact about whether Nwachuku was aware that Doyle had revoked her authorization to travel to the ASM conference. A jury could credit Nwachuku's testimony that she was not able to check her emails during the week before she left for the ASM conference, and did not receive Doyle's email revoking authorization to go to the ASM conference. *See e.g.* DX 1 at 151; DX 51 (email from Doyle to Nwachuku 5/18/2006); *see also* PX Doyle Depo. at 141. Nwachuku has consistently testified that she believed she was authorized to go to the trip. DX 1 at 169. Indeed, when Nwachuku sent out what she believed to be the final charge on May 19, 2006, the accompanying email, which was also sent to Doyle, explained that she would be at the ASM conference the following week. See DX 53. A jury could infer from this evidence that Nwachuku was unaware that her managers had revoked her authorization to attend the ASM conference.

Third, there is also an issue of fact regarding whether Nwachuku submitted false claims for travel against the federal government. Nwachuku has testified that she believed she was authorized to go to the ASM conference when she left on May 20, 2006. *See* DX 1 at 169.

While she initially paid for the travel on her personal credit card, after she later received a call from the EPA's travel agent explaining that everything had been resolved. *Id.* at 116, 122. Furthermore, Sarah Williams has testified that she gave the go ahead to book Dr. Nwachuku's travel.  Williams testified that on the Friday before Dr. Nwachuku was to depart for Florida, she had received a call from the travel agent stating that he did not have the proper paperwork to process Nwachuku's travel request.  DX 55 (Declaration of Sarah Williams) at 1.  After speaking with the travel agent, Williams tried to reach four different people at the EPA to determine if the travel was authorized.  *Id.*  Because Doyle and others failed to respond to her inquiries, Williams "made a command decision" to approve Nwachuku's travel.  *Id.*  With this evidence, a reasonable jury could reject the EPA's claim that Dr. Nwachuku knowingly made a false claim for travel funds.

Finally, there is an issue of fact regarding whether Doyle touched Nwachuku in an offensive manner or whether Nwachuku's allegation was false.  According to the EPA, there was proof that Nwachuku filed a false complaint against Doyle because Dana Thomas testified that she saw the incident and that Doyle had done nothing wrong.  See PX 41 (Proposed Removal) at 5-6.  However, a reasonable jury could find that Thomas's testimony did not show that Nwachuku filed a false complaint against Doyle because Thomas did not view the actual incident.  In fact, when the incident was investigated, Doyle made no claim that Thomas may have witnessed the altercation.  It was not until days later that Doyle claimed Thomas was present.  DX 71 (Report on Investigation on Allegations Stated in Nena's Note to Ephraim King) at 3 ("Beth was not sure if there was a witness when I first interviewed her.  Beth told me on June 8 that she remembers that there was someone at the copier and she believes it was Dana

100

Thomas."). Then, when Thomas was interviewed, she was unable to identify the day that she

claimed to have seen Nwachuku and Doyle talking in the corridor. See DX 72 (Declaration of

Dana Thomas) at 1; *see also* Thomas Depo. at 34. Because Thomas herself was not sure of

whether she saw Doyle and Dr. Nwachuku speaking on May 18, 2006, a reasonable jury could

determine that what Thomas observed happened on a different day and that Doyle did assault

Nwachuku, rejecting the EPA's claim that Nwachuku made a false allegation of workplace

violence. This is especially so given that Nwachuku testified that no one was present when the

incident took place and that she was using both xerox machines. See DX 70, DX 71.

**Statement No. 193:** In the Proposed Removal, Dr. Doyle set forth several grounds upon which
she believed Plaintiff should be removed: (i) failing to follow supervisors' instructions (on
numerous occasions); (ii) being absent without leave (for five working days); (iii) making a false
statement by telling Rodgers Travel that her authorization to travel to Orlando was a work in
progress; (iv) making a false claim against the EPA by expending travel funds without
authorization; (v) making a knowingly false violence in the workplace allegation; and (vi)
engaging in disrespectful conduct toward Plaintiff's supervisors. *See id.* at 3-6.

Statement No. 193: **There are issues of material fact regarding this contention**. While Doyle

did allege that plaintiff should be removed for the reasons provided by the defendant, a

reasonable jury could reject EPA's assertion that Doyle believed these were legitimate reasons

for terminating Nwachuku and instead find that Doyle's true reason for proposing Nwachuku's

termination was discrimination and retaliation. *See* Response to Statement No. 192.

**Statement No. 196:** Thereafter, based upon issues raised in Plaintiff's oral and written
responses, Mr. King requested additional information from persons of knowledge within the
Agency. *See* Letter from King to Shapiro of 11/13/2006, Attached Ex. 74.

Statement No. 196: **There are issues of material fact with regard to this contention**. While

King did do an supplemental investigation before terminating Nwachuku (*See* DX 74

(November 13, 2006 Notice by King), a reasonable jury could find that King did this in order to

gather additional information to terminate Nwachuku.  A month after Dr. Nwachuku submitted

her response to the proposed termination, King, who was added to the Access Control List of Dr.

Nwachuku's computer without her knowledge, spent an hour going through her emails.  *See* list

generated from Dr. Nwachuku's computer of her already-read emails.  Then, on November 13,

2006, he sent Dr. Nwachuku a notice explaining that he would be conducting his own

supplemental investigation, which included talking to witnesses. *See* DX 74 at 1 (November 13,

2006 Notice by King)("I have found it purposeful to collect further evidentiary materials in order

to best reach a judicial decision.  Primarily, I have examined additional e-mail traffic that was

sent to Dr. Nwachuku during the critical time frame and Agency travel records that reflect Dr.

Nwachuku's regular practice); King Depo. at 61.

King also decided to elicit additional affidavits before making his decision.  *See* DX 74

at 1 (explaining that he solicited statements from the Office of Water managers who "witnessed

the June 6, 2006 episode that occurred prior to the commencement of the CCL Workshop,"

Agency and contractor personnel that had direct knowledge of Dr. Nwachuku's May 19, 2006

reservation request, Dr. Doyle, Dr. Dana Thomas, "the individual who witnessed the May 18[th]

interaction between Dr. Doyle and Dr. Nwachuku,"and, Bessie McCain an employee in the

EPA's Office of Civil Rights").  For instance, King elicited an affidavit from Dana Thomas, an

individual that Doyle identified as a possible witness to the alleged workplace violence incident

of May 19, 2006.   Doyle did not tell the investigator who was looking into the incident, Maria

Gomez-Taylor, that Thomas may have witnessed the interaction between herself and Dr.

Nwachuku until June 8th, three days after she initially met with her about the incident.  DX 71

(Report on Investigation on Allegations Stated in Nena's Note to Ephraim King) at 3 ("Beth was

not sure if there was a witness when I first interviewed her.  Beth told me on June 8 that she

remembers that there was someone at the copier and she believes it was Dana Thomas.")  In fact,

when Thomas was interviewed, she was unable to remember the day that she recalled seeing Dr.

Nwachuku and Doyle talking in the corridor.  *See* DX 72 (Declaration of Dana Thomas) at 1 ("I

distinctly remember overhearing a conversation between Nena and Elizabeth while I made

copies at the xerox machine *around* the date and time in question)(emphasis added); *see also*

Thomas Depo. at 34 ("The date, I wasn't sure when I was talking to Maria").  Even when she

was deposed in 2008, Thomas was not sure that the interaction she witnessed took place on May

18, 2006, the date that Dr. Nwachuku alleges Doyle assaulted her in the office ("I'm pretty sure

that it was on that date, but I think I wrote 'on or around' to leave myself some uncertainty that it

may not have been May 18th").  Still, King elicited Thomas's affidavit, and relied on it in making

a determination that Dr. Nwachuku had made a false allegation against Doyle.  King Depo. at

57.  Not only did King speak with so-called witnesses to the May 18th workplace violence

incident and the June 6th confrontation outside the workshop meeting room, but he also

"examined her past performance appraisals, as well as affidavits from a number of personnel

who have served in her supervisory chain and who had been asked to opine on Dr. Nwachuku's

work history."

  Once his investigation concluded, Dr. Nwachuku provided a Supplemental Written

Response to the Proposed Termination, on November 30, 2006 providing additional information

and objecting to the use of the supplemental information collected by Mr. King.  See DX 75 at 2

(Supplemental Written Response to Proposed Termination) ("with the exception of Dr.

Ohanian's February 25, 2005 declaration, the declarations from three of Dr.Nwachuku's prior

supervisors cover a time period that pre-dates your arrival at the Director of OST, as well as

predating the incidents that are the subject of her proposed termination... we find your

introduction and review of these declarations to be objectionable, at the last, but certainly

retaliatory, in the instant matter of Dr. Nwachuku's proposed termination."), 3 ("It appears that

the documentation that was collected after September 7, 2006, shares a common theme- without

exception, the documents reflect wholly negative characterizations of Dr. Nwachuku during her

career at EPA").  However, King did not find Dr. Nwachuku's response persuasive.  Instead, on

December 4, 2006, King decided that Dr. Nwachuku should be terminated from employment

with the EPA.  *See* DX 76 (Final Decision on Proposed Removal).

**Statement No. 198**: After Mr. King's review of all the submissions, on December 4, 2006, Mr. King concluded that the evidence supported Plaintiff's removal for all but one portion of reason (i) described above. *See* Removal Decision at 2, Attached Ex. 76.

Statement No. 198: **There is an issue of material fact regarding this contention.**  While King

did decide to terminate Nwachuku, a reasonable jury could find that he did not conclude that the

evidence supported her termination and instead, find that King conducted his own investigation

in order to try and substantiate the claims against Nwachuku to support her termination.  A

reasonable jury could also conclude that King favored the testimony of his white coworkers over

Nwachuku's.  *See* Response to statement No. 196.


**Statement No. 199:** In making his decision to remove Plaintiff, Mr. King provided Plaintiff a twenty-six page discussion of the evidence he reviewed and why it supported, or did not support, the charges presented in the Proposed Removal. *See id.*

Statement No. 199: **There is an issue of material fact regarding this contention**.  While King

did provide the plantiff with a twenty-six page document, a reasonable jury could find that this

document was not based on an unbiased interpretation of the evidence but instead an after-the-fact justification of Nwachuku's termination written to substantiate the claims against Nwachuku. A reasonable jury could also conclude that King favored the testimony of his white coworkers over Nwachuku's. *See* Response to Statement No. 196.

**Statement No. 200:** Prior to issuing the Removal Decision, Plaintiff had not alleged that Mr. King discriminated or retaliated against her in any way. *See infra* at 33-34.

Statement No. 200: **Immaterial.** Whether the Plaintiff alleged that King discriminated or retaliated against her prior to the Decision to Remove is not material to Nwachuku's discrimination case. First, King was well aware of Nwachuku's discrimination and retaliation complaints against Doyle and other members of management. For instance, Nwachuku sought out King's assistance when she was denied the accretion of duties promotion and again when management sent Brendlyn Faison to confront her and indicate that they were planning to take adverse actions against her.

Furthermore, the defendant's statement is geared at convincing the court that King could not have discriminated against Nwachuku because he had never been named as a discriminating official in one of Nwachuku's EEO complaints. *See* Def.'s Motion for Summary Judgment at 40. However, while King was the ultimate decision maker in Nwachuku's termination, the evidence reveals that in making his decision on Nwachuku's termination, King relied upon statements by Doyle and other management officials that were named in Nwachuku's prior EEO complaints. *See* DX 74 at 1 (explaining that before making his decision, he solicited affidavits from the Office of Water managers, Agency and contractor personnel, Elizabeth Doyle, Dana Thomas, and Bessie McCain). As such, there is sufficient evidence for a reasonable jury to find

that Nwachuku's termination was tainted by these managers' bias against Dr. Nwachuku. *See George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir.2005) (To the extent a non-decisionmaker "participated in and influenced . . .[a challenged]decision, her good-faith belief in the proffered reasons also becomes relevant); *see also Griffin v. Wash. Convention Ctr* ., 142 F.3d 1308, 1312 (D.C. Cir. 1998)(finding that "evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.")

**Statement No. 201:** Plaintiff's last prior EEO administrative complaint was filed on May 11, 2004, and this action was instituted on May 19, 2006. *See* 2004 EEO Compl., Attached Ex. 8; Docket Entry No. 1.

Statement No. 202: **There are material issues of fact regarding this contention.** First, the plaintiff filed an EEO complaint several months before Doyle proposed her termination alleging discrimination and retaliation after management sent Brendlyn Faison to gather evidence against Nwachuku in order so that it could take an adverse action against her. See PX 30 (EEO complaint dated March 24, 2006). Furthermore, there is evidence of additional protected activity after Nwachuku's final EEO complaint was filed. On May 19, 2006, Nwachuku filed this lawsuit. *See* PX 37 (Docket Entry of 5/19/2006). Just weeks later, on July 11, 2006, Doyle proposed Dr. Nwachuku's termination. Throughout August of 2006, members of management were interviewed by the EEO investigator regarding Dr. Nwachuku's EEO Complaint regarding management's role in the Brendlyn Faison meeting. *See e.g.* DX 56 (Declaration of Elizabeth Doyle 8/10/2006), Ohanian Affidavit of August 22, 2006. King spent September, October, and November of 2006 gathering additional information to support the termination of Dr. Nwachuku. *See* DX 74 (letter from King dated November 13, 2006) (explaining that he had

elicited additional statements from management to assist him in making his decision).  Then, on

November 20, 2006, this Court ordered that the parties to the District Court action submit a joint

status report within 30 days.  Less than one month later, on December 4, 2006, King terminated

Dr. Nwachuku from her job with the EPA.

Respectfully submitted,

_____

David H. Shapiro
D.C. Bar # 961326
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W., Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: dhshapiro@swickandshapiro.com

*Attorneys for Plaintiff*