# EXHIBIT A

Page 328

1        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                BALTIMORE DISTRICT OFFICE
2                      VOLUME II

NENA NWACHUKU
3           Complainant          EEOC Case No.
       vs.                       100-2004-011025X
4

MICHAEL LEVITT, ADMINISTRATOR
5  ENVIRONMENTAL PROTECTION       Agency Case Nos.
   AGENCY                         2003-0065-HQ
6           Agency                2004-0050-HQ
7  _____/

8        The above-entitled matter came on for
9  Hearing before Laurence Gallagher, Administrative
10 Judge, on Wednesday, October 26, 2005, commencing at
11 8:10 A.M. at the Equal Employment Opportunity
12 Commission, City Crescent Building, 10 South Howard
13 Street, 3rd floor, Baltimore, Maryland, before Chuck
14 Peppler, a Notary Public.
15 APPEARANCES:
16       LAURENCE GALLAGHER, ADMINISTRATIVE JUDGE
17       ROY J. BUCHOLTZ, ESQUIRE
            On behalf of the Complainant
18
         PAUL M. WINICK, ESQUIRE
19          On behalf of the Agency
20
21 REPORTED BY:   Chuck Peppler

Page 588

1    JUDGE GALLAGHER: Okay. Mr. Zarba, my
2 name is Administrative Judge Gallagher. You know
3 everybody else. Would you please raise your right
4 hand.
5 Whereupon,
6                CHRISTOPHER ZARBA
7 called as a witness, having been first duly sworn
8 to tell the truth, the whole truth, and nothing but
9 the truth, was examined and testified as follows:
10    JUDGE GALLAGHER: Your name again for the
11 record.
12    THE WITNESS: Christopher Zarba,
13 Z-A-R-B-A.
14    JUDGE GALLAGHER: Mr. Zarba, we're dealing
15 with a case that is involving race, color, national
16 origin and reprisal. What is your race for the
17 record?
18    THE WITNESS: Caucasian.
19    JUDGE GALLAGHER: What is your national
20 origin?
21    MR. WINICK: Italian, Irish and English.

1  hadn't approached him. He asked me if I would come

2  over and do a six-month tenure in HECD.

3      Q    Could you briefly just enumerate the

4  factors that you think made you an appropriate

5  candidate for that position, that division director

6  job?

7      A    The Health and Ecological Criteria

8  Division has a strong foundation in science. It deals

9  a lot with the research office. He knew I had some

10 experience there. That office deals closely with the

11 Office of Research and Development, which is the

12 office I was in, so I knew that office very well and

13 could work both linkages very well. I had a long

14 track record in supervisory positions that he was

15 aware of, and I dealt with him on a number of other

16 issues over the years, and I think we had mutual

17 respect for each other.

18     Q    With respect to the promotion process that

19 Dr. Nwachuku has challenged at this hearing is about,

20 could you discuss with me how that process worked?

21     A    You mean, just Grubbs' promotion process?

Page 593

```
 1       Q     Yes, that promotion process.
 2       A     Promotion within the Agency and within
 3   Water from the GS-13 to the 14 level and GS-14 to the
 4   15 level are a big deal.  These are very important
 5   positions.  There are many people that are interested
 6   in them.  So, Geoff had a very organized and open
 7   process to make sure that when those decisions were
 8   made, they were made in best of conditions as
 9   possible.  He let us, me and the other supervisors
10   within the Office of Science and Technology know that
11   we were approaching a time where some of those
12   positions, we might look for opportunities to see
13   which people would be most qualified for accretion of
14   duties.  My division had already received several
15   GS-15 positions, in that we had filled some
16   supervisory slots within the division, so I had
17   already received several.  Now, we were talking about
18   at this meeting, nonsupervisory 14 and 15 positions.
19   He asked all of us to get our thoughts together,
20   paperwork together.  I had asked the folks within the
21   Health and Ecological Criteria Division, that they
```

1  knew this was coming.  I said I was going to go to
2  that meeting.  If they chose to, they could provide
3  any documentation they wanted to me, because I had
4  only been there for four or five months at the time.
5  If they felt like I didn't understand their background
6  or their full job range of responsibilities, they
7  could put that in writing.  It wasn't a requirement.
8  It was just something if they wanted to, they could.
9  If they didn't do that, they would not be precluded
10 from being considered for a promotion, but it was just
11 something they had the option to do or not to do.
12              I got those documents from a number of
13 people and a number of other ones didn't provide that
14 information.  I looked through it.  I went to the
15 meeting where each of the division directors talked
16 about the people in their division that they thought
17 were potential candidates for an accretion of duties.
18 It wasn't just the discussion on who had worked best
19 for their boss, which is typically or more commonly
20 what happens in the Agency.  What I thought was unique
21 and special about Geoff's process, he was concerned

Page 595

1  about how well the people we were considering were

2  working across the organization.  Were they just

3  supporting their boss and doing what their boss

4  needed, or were they reaching out to others within the

5  organization?  So, that's what the discussions were

6  about, about who were the people who were most

7  qualified, what the rationale was and how well had

8  they done, supported other parts of the organization,

9  not just their immediate supervisor.

10      Q    When you said all of us, the division

11  directors, could you identify by name who participated

12  in this process?

13      A    It was myself.  It was Peter.  What's his

14  name?

15      Q    Grevatt?

16      A    Grevatt.  There was a Mary, I can't

17  remember her last name.

18      Q    Mary Smith?

19      A    Mary Smith.  It's been two and a half

20  years since I have been over there.

21           JUDGE GALLAGHER:  Anybody else?

Page 641

1  We know there is a distinction between materials you
2  write within your own office, your own job or you
3  might do a bar review article which is different.
4  Some of them may be peer reviewed. You see what I'm
5  saying? Like the stuff I write over here, occasional
6  people might have a problem with it. I think it's the
7  greatest stuff there ever was.
8        Q    Mr. Zarba, do you have any memory of a
9  specific document that Dr. Nwachuku wrote that you
10 thought did not reflect writing of a GS-13 which you
11 then corrected for?
12       A    There were a number of documents. There
13 were briefing materials and there were memos that came
14 across my desk that Nena had prepared, that when I
15 read them, they were totally unacceptable. Then I
16 gave them to her manager, Tony Maciorowski, saying
17 this doesn't work. You need to work with her to get
18 it right.
19       Q    What was wrong with one of them? Be
20 specific.
21       A    Well, official correspondence, you need to

1   make a point.  You need to make it clearly and you
2   need to use English.
3        Q    What language did she use?
4        A    She wasn't using grammar correctly in the
5   memo.
6        Q    Are you aware that she's from Africa?
7        A    Yes, I am.  But, you can't send a memo out
8   and say excuse the writing because the person is from
9   Africa.  I expect a GS-13, GS-14 level scientist to
10  write a one-page memo that makes a point and lays out
11  options and has a conclusion.
12       Q    Are you aware that Dr. Nwachuku wrote a
13  number of e-mails?  There's been a lot of testimony
14  today about e-mails, a number of e-mails to various
15  officials about different things and to team members
16  about what was going on.
17       A    I'm sure she did.
18       Q    Are you aware that Dr. Nwachuku's e-mails
19  were understood?
20       A    The level of clarity --
21       Q    Yes or no.

Page 643

1   A   The level of clarity --

2       JUDGE GALLAGHER: Answer yes or no and
3   then clarify.

4       THE WITNESS: I'm sure that much of what
5   she put in her e-mails was understood. But, I also
6   believe much of what she put in her e-mails wasn't
7   understood, in that the exchange, in particular the
8   exchange on the awards board stuff, there were e-mails
9   going back and forth and it was clear people were not
10  understanding each other.

11  Q   They were not understanding each other.
12  Who were the other people that did not understand each
13  other?

14  A   Well, Heidi Bell, Bill Swietlik.

15  Q   Were there any of Heidi Bell's writings
16  not being understood?

17  A   No. What Nena was saying and putting in
18  writing could easily be interpreted as being
19  inflammatory, accusatory.

20  Q   What about what Heidi Bell was putting in
21  writing?